Jonathan S. Henes, P.C.
George Klidonas
Rebecca Blake Chaikin
Gene Goldmintz
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Emily E. Geier (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Proposed Counsel for the Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FULLBEAUTY BRANDS HOLDINGS CORP., *et al.*,[1] | ) | Case No. 19-22185 (RDD) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DEBTORS' MOTION SEEKING ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING CERTAIN PROTECTIONS TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 507, AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state the following in support of this motion:[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Blackdog Holdings, Inc. (8991); FULLBEAUTY Brands Holdings Corp. (8053); FULLBEAUTY Brands, Inc. (4198); FULLBEAUTY Brands, LLC (9445); FULLBEAUTY Brands Management Services, LLC (8637); FULLBEAUTY Brands Merchant, Inc. (7812); FULLBEAUTY Brands Operations, LLC (5382); FULLBEAUTY Brands Texas, LLC (9606); Jessica London, Inc. (1070); and Swimsuits for All, LLC (3246).  The location of the Debtors' service address is:  50 Main Street, Suite 1000, White Plains, New York 10606.

[2] A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Robert J. Riesbeck, Chief Financial Officer of FULLBEAUTY Brands Holdings Corp., in Support of Chapter 11 Petitions and First Day Motions*

### Relief Requested

1.      The Debtors seek entry of an order (the "Order"), substantially in the form attached hereto as **Exhibit A**, (a) authorizing the Debtors' use of Cash Collateral on an interim basis pending a final hearing on this motion (the "Final Hearing"), (b) granting adequate protection to the Prepetition Secured Parties (as defined in the Order), (c) modifying the automatic stay, and (d) scheduling the Final Hearing within approximately twenty-five (25) days of the commencement of these chapter 11 cases to consider approval of the Order, if necessary.

### Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated February 1, 2012. The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Bankruptcy Court in connection with this motion to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

(the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on February 3, 2019 (the "Petition Date") Capitalized terms used but not otherwise defined in this motion shall have the meanings ascribed to them in the First Day Declaration, the Order (as defined herein), or the *First Amended Joint Prepackaged Chapter 11 Plan of Reorganization of FULLBEAUTY Brands Holdings Corp. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, modified, or supplemented, the "Plan"), filed contemporaneously herewith, as applicable.

4.       The statutory bases for the relief requested herein are sections 105, 361, 362, 363, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and rules 4001-2 and 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

## Background

5.       The Debtors are a leading direct-to-consumer retailer in the growing U.S. plus-size apparel market with over $825.3 million in direct plus-size sales in 2018.  The Debtors started their businesses in 1901 as an early pioneer in the direct-to-consumer fashion market and expanded their presence over the past 117 years to include web, mobile, and tablet platforms.  The Debtors serve both women and men, offering an assortment of plus-size apparel, swimwear, footwear, and home décor.  Each of the Debtors' seven brands provide a solution targeted to specific customer needs.  In addition to these brands, the Debtors also operate a dedicated plus-size clothing website and eCommerce platform, *fullbeauty.com*, which offers their proprietary products.

6.       On December 18, 2018, the Debtors entered into the restructuring support agreement (the "Restructuring Support Agreement") with all of their major stakeholders, pursuant to which the Debtors agreed to a comprehensive financial reorganization of their capital structure. Pursuant to the Restructuring Support Agreement, on January 6, 2019, the Debtors commenced a prepetition solicitation process and distributed the *Joint Prepackaged Chapter 11 Plan of Reorganization of FULLBEAUTY Brands Holdings Corp. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, modified, or supplemented, the "Plan") and a related disclosure statement (as may be amended, modified, or supplemented, the "Disclosure Statement") to creditors entitled to vote on the Plan.  As of January 24, 2019, the proposed Plan voting deadline, the holders of 100 percent of first-in, last-out claims, 100 percent of first lien claims, and 100 percent of the second lien claims have voted to accept the Plan.

7.      On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  In connection therewith, the Debtors requested that the Bankruptcy Court schedule a combined hearing to approve the adequacy of the Disclosure Statement and confirm the Plan.

8.      The Debtors continue to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these chapter 11 cases.

9.      Additional information regarding the Debtors' business, their capital structure, and the circumstances leading to these chapter 11 filings is contained in the First Day Declaration, filed in connection herewith.

### The Debtors' Prepetition Capital Structure[3]

10.     As of the Petition Date, the Debtors' capital structure consisted of outstanding funded-debt obligations in the aggregate principal amount of approximately $1.3 billion, consisting of the ABL Credit Facility, including the ABL Facility and the FILO Facility, the First Lien Credit Facility, and the Second Lien Credit Facility (each as defined in the Plan). The following table summarizes the Debtors' outstanding funded-debt obligations.

| Debt Instrument | Facility Size | Maturity Date | Outstanding Principal Amount |
|---|---|---|---|
| ABL Facility | $100 million | October 14, 2020 | $68.9 million |
| FILO Facility | $75 million | October 14, 2020 | $75 million |
| First Lien Credit Facility | $820 million | October 14, 2022 | $782 million |
| Second Lien Credit Facility | $345 million | September 15, 2023 | $345 million |
| | | | $1.271 billion |

---

[3]   The descriptions of the Debtors' prepetition debt facilities and the collateral securing those facilities provided herein does not constitute, and should not be construed as, an admission by the Debtors regarding the validity, priority, and/or enforceability of any liens and security interests granted in connection therewith, and the Debtors reserve all rights to challenge or dispute any of the foregoing on any basis whatsoever.

## I.    The ABL Credit Facility.

11.    The ABL Credit Facility consists of the ABL Facility and FILO Facility.  The ABL Agent, the ABL Lenders, the FILO Lenders, the letter of credit issuers and other parties thereto and the Debtors are parties to the ABL Credit Agreement.  Debtors FULLBEAUTY Brands Holdings Corp., FULLBEAUTY Brands Management Services, LLC, FULLBEAUTY Brands Merchant, Inc., FULLBEAUTY Brands Operations, LLC, and Jessica London, Inc. are each borrowers under the ABL Facility.  The Debtors guaranteed the obligations of the borrowers pursuant to that certain ABL Guaranty Agreement, dated as of October 14, 2015 (the "ABL Guaranty Agreement").

12.    Pursuant to, among other things, that certain security agreement in connection with the ABL Credit Facility, dated as of October 14, 2015 (together with all other pledge agreements or similar security documents entered into by any Debtor and the ABL Agent in respect of the Debtors' assets and all other documentation executed in connection with any of the foregoing, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "ABL Lien Security Documents"), the Debtors have granted a first-priority lien and security interest (the "ABL Liens") in, to, and against substantially all of the Debtors' assets described in the ABL Lien Security Documents  (subject to that certain ABL Intercreditor Agreement, dated as of October 14, 2015 (the "ABL Intercreditor Agreement")), including, without limitation, the cash and noncash proceeds thereof (collectively, the "ABL Collateral"), to the ABL Agent for the benefit of the ABL Lenders and the FILO Lenders (the ABL Credit Agreement, the ABL Guaranty Agreement, the ABL Lien Security Documents, including, without limitation, the ABL Intercreditor Agreement, the letter of credit documentation, and any other collateral and ancillary documents executed in connection therewith, collectively, the "ABL Loan Documents").

13.    The availability of loans and letters of credit under the ABL Credit Facility is governed by a borrowing base, consisting primarily of accounts receivable and inventory.  As of the Petition Date, the total borrowing base was $96.3 million.

14.    As of January 4, 2019, the Debtors were jointly and severally liable to the ABL Agent and the ABL Lenders for all loans under the ABL Credit Facility, including the FILO Facility, letter of credit obligations, and other obligations described therein and payable thereunder in the aggregate principal amount of approximately $143.9 million, consisting of approximately $68.9 million under the ABL Facility[4] and approximately $75.0 million under the FILO tranche commitment.  The ABL Credit Facility matures on October 14, 2020 and requires quarterly interest payments.

15.    In addition to loans and letters of credit, the ABL Obligations include certain Cash Management Obligations (as defined in the ABL Documents), Bank Product Obligations (as defined in the ABL Documents), and/or hedging agreements, subject to payment priority as set forth in the credit agreement governing the ABL Facility.

**II.    The First Lien Credit Facility.**

16.    The First Lien Agent, the First Lien Lenders, and Debtor FULLBEAUTY Brands Holdings Corp., as borrower, are parties to the First Lien Credit Agreement.  Each of the remaining Debtors guaranteed the obligations of the Debtor FULLBEAUTY Brands Holdings Corp., as borrower, under the First Lien Credit Agreement pursuant to that certain First Lien Guaranty, dated as of October 14, 2015 (the "First Lien Guaranty Agreement").

17.    Pursuant to, among other things, that certain security agreement in connection with the First Lien Credit Facility, dated as of October 14, 2015 (together with all other pledge

---

[4]    This amount includes approximately $16.6 million in undrawn letter of credit obligations under the ABL Facility.

agreements or similar security documents entered into by any Debtor and the First Lien Agent in respect of the Debtors' assets and all other documentation executed in connection with any of the foregoing, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "First Lien Security Documents"), the Debtors have granted a first-priority lien and security interest in, to, and against substantially all of the Debtors' assets described in the First Lien Security Documents (subject to the ABL Intercreditor Agreement), including, without limitation, the cash and noncash proceeds thereof, to the First Lien Agent for the benefit of the First Lien Lenders (the First Lien Credit Agreement, the First Lien Guaranty Agreement, the First Lien Security Documents (subject to the ABL Intercreditor Agreement), including, without limitation, the ABL Intercreditor Agreement, the Prepetition Term Intercreditor Agreement, and any other collateral and ancillary documents executed in connection therewith, collectively, the "First Lien Loan Documents").

18.    As of the date hereof, the Debtors were jointly and severally liable to the First Lien Agent and the First Lien Lenders for the First Lien Credit Facility, and other obligations described therein and payable thereunder in the aggregate principal amount of approximately $782 million. The First Lien Credit Facility matures on October 14, 2022 and requires quarterly interest payments.

**III.    The Second Lien Credit Facility.**

19.    The Second Lien Agent (collectively with the ABL Agent and First Lien Agent, the "Prepetition Agents"), the Second Lien Lenders, and Debtor FULLBEAUTY Brands Holdings Corp., as borrower, are parties to the Second Lien Credit Agreement.  Each of the remaining Debtors guaranteed the obligations of Debtor FULLBEAUTY Brands Holdings Corp., as borrower, under the Second Lien Credit Agreement pursuant to that certain Second Lien Guaranty, dated as of October 14, 2015 (the "Second Lien Guaranty Agreement").

20.     Pursuant to, among other things, that certain security agreement in connection with the Second Lien Credit Facility, dated as of October 14, 2015 (together with all other pledge agreements or similar security documents entered into by any Debtor and the Second Lien Agent in respect of the Debtors' assets and all other documentation executed in connection with any of the foregoing, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Second Lien Security Documents"), the Debtors have granted a second-priority lien and security interest in, to, and against the Prepetition Collateral (subject to the ABL Intercreditor Agreement), to the Second Lien Agent for the benefit of itself and the Second Lien Lenders (the Second Lien Credit Agreement, the Second Lien Guaranty Agreements, the Second Lien Security Documents, including, without limitation, the ABL Intercreditor Agreement, the Prepetition Term Intercreditor Agreement, and any other collateral and ancillary documents executed in connection therewith, collectively with the ABL Loan Documents and the First Lien Loan Documents, the "Prepetition Loan Documents").

21.     As of the date hereof, the Debtors were jointly and severally liable to the Second Lien Agent and the Second Lien Secured Parties for all loans under the Second Lien Credit Facility, and other obligations described therein and payable thereunder in the aggregate principal amount of approximately $345 million.

**IV.     The ABL Intercreditor Agreement.**

22.     The Debtors and the Prepetition Agents, as representatives of the ABL, FILO, First, and Second Lien Lenders, as applicable, are parties to the ABL Intercreditor Agreement. The ABL Intercreditor Agreement governs certain of the respective rights and interests of the ABL Lenders, FILO Lenders, First Lien Lenders, and Second Lien Lenders relating to, among other things, their rights and their ability to exercise remedies in connection with an Event of Default (as defined in the ABL Intercreditor Agreement) and in the event of a bankruptcy filing, including related

8

enforcement and turnover provisions. As more particularly stated in the ABL Intercreditor Agreement, the ABL Lenders and FILO Lenders have priority over, and are senior in all respects, to the First Lien Lenders and the Second Lien Lenders in the ABL Priority Collateral (as defined therein).

23. Importantly, section 2.06 of the ABL Intercreditor Agreement generally provides that, in the event of a chapter 11 filing, if the Required Lenders (as defined in the ABL Credit Agreement) under the ABL Credit Agreement consent to the use of cash collateral or the Debtors' obtaining of debtor in possession financing secured by the ABL Priority Collateral, the First Lien Lenders and Second Lien Lenders agree not to raise any objection or request adequate protection. In addition, the same section of the ABL Intercreditor Agreement requires the First Lien Lenders and Second Lien Lenders to subordinate the First Liens and the Second Liens to the ABL Liens of the ABL Lenders and the FILO Liens of the FILO Lenders under any debtor in possession financing facility as well as any "carve-out" for professional or U.S. Trustee fees, in each case, with respect to the ABL Priority Collateral. Section 2.06 of the ABL Intercreditor Agreement also provides that if the ABL Lenders and FILO Lenders receive adequate protection with respect to the ABL Priority Collateral, then the First Lien Lenders and Second Lien Lenders shall have the right to seek their own adequate protection; *provided*, that such adequate protection is subordinate to any adequate protection provided to the ABL Lenders with respect to the ABL Priority Collateral.

## V.    The Term Intercreditor Agreement.

24. The Debtors, the First Lien Agent, and the Second Lien Agent, as representatives of the First Lien Lenders and Second Lien Lenders, respectively, are parties to that certain Term Intercreditor Agreement, dated as of October 14, 2015 (the "Term Intercreditor Agreement"). The Term Intercreditor Agreement governs certain of the respective rights and interests of the

First Lien Lenders and Second Lien Lenders relating to, among other things, their rights and their ability to exercise remedies in connection with an Event of Default (as defined in the Term Intercreditor Agreement) and in the event of a bankruptcy filing, including related enforcement and turnover provisions.   As more particularly stated in the Term Intercreditor Agreement, the First Lien Lenders have priority over, and are senior in all respects, to the Second Lien Lenders.

25.     Importantly, section 6.01 of the Term Intercreditor Agreement generally provides that, in the event of a chapter 11 filing, if the First Lien Lenders consent to the use of cash collateral or the Debtors' obtaining of debtor in possession financing, the Second Lien Lenders agree not to raise any objection or request adequate protection.   In addition, the same section of the Term Intercreditor Agreement requires the Second Lien Lenders to subordinate the Second Liens to the First Liens of the First Lien Agent and First Lien Lenders and the lenders under any debtor in possession financing facility as well as any "carve-out" for professional or U.S. Trustee fees.   Section 6.03 of the Term Intercreditor Agreement provides that if the First Lien Lenders receive adequate protection, then the Second Lien Lenders shall have the right to seek their own adequate protection; *provided*, that such adequate protection is subordinate to any adequate protection provided to the First Lien Lenders.

## VI.   Other Secured Claims.

26.     In the ordinary course of business, the Debtors routinely transact business with a number of third-party contractors and vendors that may be able to assert liens under applicable non-bankruptcy law against the Debtors and/or their assets if the Debtors fail to pay for the goods delivered or services rendered.   If such parties have valid liens under applicable non-bankruptcy law, such claims are likely secured claims against the Debtors.   The Plan provides for payment in full in cash for all such claims.

10

**VII.    General Unsecured Claims**.

27.    In the ordinary course, the Debtors routinely transact business with a number of third-party contractors and vendors, the majority of which are based outside of the United States. These transactions give rise to general unsecured claims against the Debtors.  The Plan provides for payment in full in cash for all such claims.

<div align="center">

**Concise Statement of the**
**Material Terms of the Order**

</div>

28.    Pursuant to and in accordance with Bankruptcy Rule 4001(b)(1)(B) and Local Bankruptcy Rule 4001-2(a), the material provisions of the Order, and the location of such provisions therein are summarized below.

| Material Terms | Summary of Material Terms | Paragraphs of Order |
|---|---|---|
| **Entities with an Interest in Cash Collateral.**<br>(Fed. R. Bankr. P. 4001(b)(1)(B)(i)) | The Prepetition Secured Parties and/or the Prepetition Agents. | ¶ 2 |
| **Purpose for Use of Cash Collateral.**<br>(Fed. R. Bankr. P. 4001(b)(1)(B)(ii)) | The Debtors require the use of Cash Collateral to operate their businesses.  Without the use of Cash Collateral, the Debtors will be unable to meet their case requirements for working capital needs and would result in an immediate shutdown of the Debtors' businesses. | ¶¶ F, 2 |
| **Duration of Use of Cash Collateral / Termination Events.**<br>(Fed. Bankr. R. P. 4001(b)(1)(B)(iii); S.D.N.Y. Bankr. L.R. 4001-2(a)(10)) | <u>Termination Date</u>: The Order includes standard and customary termination events, which events, unless waived by the ABL Agent and the First Lien Agent, shall terminate the Debtors' authority to continue to use Cash Collateral. | ¶ 8 |

| Material Terms | Summary of Material Terms | Paragraphs of Order |
|---|---|---|
| **Proposed Adequate Protection**<br><br>(Fed. Bankr. R. P. 4001(b)(1)(B)(iv))<br><br>**Economic Terms Including Fees and Expenses of the Lenders, Agents, and Their Respective Professionals.**<br><br>(S.D.N.Y. Bankr. L.R. 4001-2(a)(3)). | <u>Prepetition Secured Parties Adequate Protection Package</u>. The adequate protection package provided to the Prepetition Secured Parties includes:<br><br>• the adequate protection liens, including a first priority lien on and security interest in unencumbered property and a junior lien on all property encumbered by the Permitted Liens;<br><br>• a superpriority administrative expense claim pursuant to section 507(b) of the Bankruptcy Code; and<br><br>• payment of the reasonable and documented fees and disbursements incurred by the professionals retained by the Prepetition Secured Parties. | ¶ 6 |
| **Amount of Cash Collateral to Be Used.**<br><br>(S.D.N.Y. Bankr. L.R. 4001-2(a)(1)) | Subject to the terms of the Order, the Debtors may use Cash Collateral in which the Prepetition Secured Parties and/or the Prepetition Agents may have an interest. Any dispute in connection with the use of Cash Collateral shall be heard by the Bankruptcy Court. Except as otherwise provided in the Order, the Debtors shall be prohibited from at any time using the Cash Collateral absent consent of the Prepetition Secured Parties or further order of the Court. | ¶ 2 |
| **Material Conditions to Closing and Borrowing, Including Budget Provisions.**<br><br>(S.D.N.Y. Bankr. L.R. 4001-2(a)(2)) | <u>The Budget</u>. Beginning February 18, 2019, all use of Cash Collateral by the Debtors shall be pursuant to the Approved Budget. | ¶ 3 |
| **Effect On the Existing Liens of the Adequate Protection.**<br><br>(S.D.N.Y. Bankr. L.R. 4001-2(a)(4)) | <u>Priority of Adequate Protection Liens</u>. Except as otherwise provided in the Order, the Adequate Protection Liens granted to the Prepetition Secured Parties pursuant to paragraphs 6(a)–(c) of the Order shall not be subject to or subordinated to, or made *pari passu* with any lien, security interest, or claim existing as of the Petition Date, or created under sections 363 or 364(d) of the Bankruptcy Code or otherwise, or subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code. | ¶ 6 |
| **Carve-Out.**<br><br>(S.D.N.Y. Bankr. L.R. 4001-2(a)(5)) | The Order provides a "Carve-Out" of certain statutory fees, allowed professional fees of the Debtors, the U.S. Trustee, and any official committee of unsecured creditors appointed in the chapter 11 cases pursuant to section 1103 of the Bankruptcy Code (the "<u>Creditors' Committee</u>"), including a Post-Carve-Out Trigger Notice Cap, all as detailed in the Order. | ¶ 10 |

| Material Terms | Summary of Material Terms | Paragraphs of Order |
|---|---|---|
| **Provisions that Could Restrict the Rights and Powers of the Debtor In Possession.**<br><br>(S.D.N.Y. Bankr. L.R. 4001-2(a)(8))<br><br>**Limitations on the Lender's Obligation to Fund Certain Activities of the Debtors or Any Committee Appointed Under Sections 1102 or 1114 of the Bankruptcy Code.**<br><br>(S.D.N.Y. Bankr. L.R. 4001-2(a)(9)) | The Order contains certain stipulations by the Debtors, among other things, to the amount, validity, priority, and enforceability of the ABL Facility, the FILO Facility, the First Lien Credit Facility, and the Second Lien Credit Facility. The Order also includes a release, effective as of the earlier of entry of the Final Order, if necessary, and the occurrence of the Effective Date (as defined in the Plan), of the Prepetition Agent and the Prepetition Secured Parties.<br><br>Claims Stipulation Investigation Period Reservation of Rights. Except as expressly set forth in the Order, the stipulations set forth in paragraphs D and E in the Order (together, the "Claims Stipulation") and all of the terms and conditions of the Order shall be immediately and irrevocably binding on all persons and entities, subject to a customary investigation period by the earlier of (i) the date on which the Plan is confirmed in the Chapter 11 Cases and (ii) (A) if no Creditors' Committee has been appointed, seventy-five (75) days after the entry of the Final Order, if any, or such later date as has been agreed to by the Prepetition Agent, as applicable; or (B) if a Creditors' Committee has been appointed, sixty (60) days after the entry of the Final Order, if any, or such later date as has been agreed to by the Prepetition Agent, as applicable.<br><br>Restriction on Use of Funds. The Order provides that no Cash Collateral, Prepetition Collateral, proceeds thereof, or any portion of the Carve-Out may be used by any of the Debtors, their estates, any affiliate of the Debtors, any Creditors' Committee, any trustee or examiner appointed in these chapter 11 cases or any chapter 7 trustee, or any other person, party, or entity for certain proscribed actions; *provided, however*, that the Creditors' Committee, if any, may incur fees and expenses in investigating the claims and liens of the Prepetition Secured Parties not to exceed $50,000 in the aggregate (the "Investigation Fund"). Any claim incurred in connection with any proscribed activities described in paragraph 13 of the Order shall not constitute an allowed administrative expense claim for purposes of section 1129(a)(9)(A) of the Bankruptcy Code. | ¶¶ D, E, 12, 13 |

## The Debtors' Need to Use Cash Collateral

29.    As of the Petition Date, the Debtors' cash on hand totaled approximately $3.8 million, substantially all of which is Cash Collateral of the Prepetition Secured Parties. Furthermore, because the Debtors do not believe that they can provide adequate protection to the

Prepetition Secured Parties, the Debtors engaged with the Prepetition Secured Parties regarding the terms on which they would consent to permit the Debtors to continue to use Cash Collateral as part of their negotiations regarding the Restructuring Support Agreement. These discussions resulted in the proposed Order, entry of which will allow the Debtors to transition smoothly into chapter 11, effectuate the Restructuring Support Agreement, and confirm and consummate the Plan, all while continuing to operate their businesses without disruption.

## Summary of Proposed Use of Cash Collateral

30.     Pursuant to the Order, the Debtors' right to use Cash Collateral will commence on the date of entry of the Order and shall remain in effect until the earlier of (a) the effective date of the Plan and (b) the occurrence of any Cash Collateral Termination Date.

31.     Immediate access to Cash Collateral will provide the Debtors with the necessary liquidity to (a) minimize (and perhaps eliminate, if all other "first day" relief is granted) disruption to the Debtors' businesses and ongoing operations, (b) preserve and maximize the value of the Debtors' estates for the benefit of all the Debtors' creditors, and (c) avoid immediate and irreparable harm to the Debtors and their creditors, businesses, employees, and assets. If the Debtors are unable to access Cash Collateral to meet their obligations on a timely basis, the Debtors could suffer permanent harm.

## Basis for Relief

**I.      The Use of Cash Collateral Is Warranted and Should Be Approved**.

32.     Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

33.    Here, the Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral pursuant to the Restructuring Support Agreement, which has the support of Holders of 100 percent in amount of the FILO Claims, approximately 99 percent in amount of First Lien Claims, and approximately 95 percent in amount Second Lien Claims.  Accordingly, the Debtors submit that the use of Cash Collateral satisfies the requirements of section 363(c)(2) of the Bankruptcy Code.

## II.    The Debtors' Proposed Adequate Protection is Appropriate.

34.    Section 363(c)(2) of the Bankruptcy Code provides that, absent consent, a debtor may use cash collateral where "the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."    11 U.S.C. § 363(c)(2)(A), (B). Section 363(e) of the Bankruptcy Code requires that the debtor adequately protect the secured creditors' interest in property to be used by a debtor against any diminution in value of such interest resulting from the debtor's use of the property during the chapter 11 proceedings. 11 U.S.C. § 363(e).

35.    The essential purpose of adequate protection is to protect against the diminution of a secured creditor's collateral during the period when such collateral is being used by the debtor in possession.  *See Contrarian Funds LLC v. Aretex LLC (In re WestPoint Stevens, Inc.)*, 600 F.3d 231, 257 (2d Cir. 2010) ("Adequate protection is generally defined as a method by which a secured creditor may apply to the Bankruptcy Court to protect its interest in the diminution in value of its security during a bankruptcy proceeding." (internal quotation marks omitted)); *see also In re WorldCom, Inc.*, 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004) ("The legislative history for section 361 of the Bankruptcy Code, which sets forth how adequate protection may be provided under section 363, makes clear that the purpose is to insure that the secured creditor receives the value for which the creditor bargained for prior to the debtor's bankruptcy."); *In re Carbone Cos.,*

15

*Inc.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral." (citation omitted)).  "However, neither the legislative history nor the Bankruptcy Code requires the Court to protect a creditor beyond what was bargained for by the parties."  *WorldCom, Inc.*, 304 B.R. at 619; *see In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) ("Adequate protection, not absolute protection, is the statutory standard.").

36.      Generally, what constitutes sufficient adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.  *In re Mosello,* 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case."); *In re Realty Sw. Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992) ("'Adequate protection' is a question of fact because it has as its linchpin the concept of value, and therefore is determined on a case-by-case basis.") (citation omitted); *Beker Indus*, 58 B.R. at 736 (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

37.      As described above, the Debtors have obtained the consent of the Prepetition Secured Parties to continue to use Cash Collateral during the pendency of these chapter 11 cases. A critical condition of that agreement with the Prepetition Secured Parties is the Debtors' agreement to provide the Prepetition Secured Parties with the proposed adequate protection package, which is consistent with the forms of adequate protection contemplated by the Bankruptcy Code.

38.     Accordingly, the Debtors submit that the adequate protection proposed for the benefit of the Prepetition Secured Parties is necessary and appropriate and satisfies the standards under section 363(c)(2) of the Bankruptcy Code.  Courts in this district and others have granted similar relief in other chapter 11 cases.  *See, e.g.*, *In re Aegean Marine Petroleum Network, Inc.,* Case No. 18-13374 (MEW) (Bankr. S.D.N.Y. Jan. 15, 2019); *In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC) (Bankr. S.D.N.Y. June 28, 2018); *In re Cenveo, Inc.*, Case No. 18-22178 (RDD) (Bankr. S.D.N.Y. Mar. 8, 2018); *In re Global A&T Electronics Ltd.*, Case No. 17-23931 (RDD) (Bankr. S.D.N.Y. Jan. 10, 2018); *In re BCBG Max Azria Global Holdings, LLC*, Case No. 17-10466 (SCC) (Bankr. S.D.N.Y. Mar. 2, 2017).[5]

**III.     The Automatic Stay Should Be Modified on a Limited Basis**.

39.     The Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified as necessary to effectuate the terms and provisions of the Order. The Order further provides that the automatic stay is modified and vacated to the extent necessary, upon the occurrence of the Cash Collateral Termination Date, to permit the Adequate Protection Obligations, if any, to become immediately due and payable and to allow the Prepetition Agents to exercise the rights and remedies available under the Prepetition Loan Documents, the Order, or applicable law, including foreclosing upon and selling all or a portion of the Prepetition Collateral in order to collect the Adequate Protection Obligations.

40.     The Debtors have determined, in an exercise of their business judgment that such stay modifications are appropriate under the circumstances, in the context of a negotiated consensual cash collateral order.  Further, stay modifications of this kind are ordinary, and are

---

[5]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these cited orders are available upon request of the Debtors' proposed counsel.

reasonable and fair under the circumstances of these chapter 11 cases.  Courts in this district have granted similar relief in other chapter 11 cases.  *See, e.g.*, *In re Aegean Marine Petroleum Network, Inc.,* Case No. 18-13374 (MEW) (Bankr. S.D.N.Y. Jan. 15, 2019); *In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC) (Bankr. S.D.N.Y. June 28, 2018); *In re Cenveo, Inc.*, Case No. 18-22178 (RDD) (Bankr. S.D.N.Y. Mar. 8, 2018); *In re Global A&T Electronics Ltd.*, Case No. 17-23931 (RDD) (Bankr. S.D.N.Y. Jan. 10, 2018); *In re BCBG Max Azria Global Holdings, LLC*, Case No. 17-10466 (SCC) (Bankr. S.D.N.Y. Mar. 2, 2017).[6]

### The Requirements of Bankruptcy Rule 6003 Are Satisfied

41.     The Debtors respectfully request emergency consideration of this motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."   As set forth in this motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Bankruptcy Court approve the relief requested in this motion on an emergency basis.

---

[6]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these cited orders are available upon request of the Debtors' proposed counsel.

## Request for Final Hearing

42.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Bankruptcy Court, if necessary, set a date for the Final Hearing that is as soon as practicable, but in no event later than 25 days following the entry of the Order, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

## Motion Practice

43.     This motion includes citation to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this motion. Moreover, in addition to all entities otherwise entitled to receive notice, the Debtors have given notice of this motion to all entities believed to have or be claiming an interest in the subject matter of the proposed order.  Accordingly, the Debtors submit that this motion satisfies Local Rule 9013-1(a).

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

44.     To implement the foregoing successfully, the Debtors request that the Bankruptcy Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

45.     The Debtors will provide notice of this motion to: (a) the U.S. Trustee; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the ABL Agent; (d) counsel to the First Lien Agent; (e) counsel to the Second Lien Agent; (f) the FILO Lenders; (g) counsel to the Ad Hoc Group of First Lien Lenders; (h) counsel to the Ad Hoc Group of Second Lien Lenders; (i) counsel to Apax Partners, LLP; (j) counsel to Charlesbank Capital Partners, LLC; (k) the United States Attorney's Office for the Southern

District of New York; (l) the Internal Revenue Service; (m) the United States Securities and

Exchange Commission; (n) the state attorneys general for all states in which the Debtors conduct

business; (o) the Prepetition Secured Parties; and (p) any party that requests service pursuant to

Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no

other or further notice need be given.

**<u>No Prior Request</u>**

46.    No prior request for the relief sought in this motion has been made to this or any

other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request entry of the Order, substantially in the

form attached hereto as **Exhibit A**, (a) granting the relief requested herein and such other relief as

is just and proper.

| | |
|---|---|
| Dated:  February 3, 2019<br>New York, New York | */s/ Jonathan S. Henes, P.C.* |

Jonathan S. Henes, P.C.
George Klidonas
Rebecca Blake Chaikin
Gene Goldmintz
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

-and-

Emily E. Geier (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Proposed Counsel for the Debtors and Debtors in Possession*

## Exhibit A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| FULLBEAUTY BRANDS HOLDINGS CORP., *et al.*,[1] | ) | Case No. 19-22185 (RDD) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO USE**
**CASH COLLATERAL, (B) GRANTING ADEQUATE PROTECTION TO THE**
**PREPETITION SECURED PARTIES, (C) MODIFYING THE AUTOMATIC STAY,**
**(D) SCHEDULING A FINAL HEARING, AND (E) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (collectively,

the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases") for

entry of an interim order (this "Interim Order") and a final order, if necessary, (the "Final Order")

under sections 105, 361, 362, 363, 503, 507, and 552 of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and the Local Bankruptcy Rules for the Southern District of

New York (the "Local Rules"), among other things:

> (a)     authorizing the Debtors' use of Cash Collateral (as defined below), subject
> to and pursuant to the terms and conditions set forth in this Interim Order;

> (b)     authorizing the Debtors to provide adequate protection to the Prepetition
> Secured Parties (as defined below) for any diminution in value of the Prepetition Collateral
> (as defined below) from and after the Petition Date as a condition to the Debtors' use of
> Prepetition Collateral securing the obligations under:

---

[1]  The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax
identification number, are as follows: Blackdog Holdings, Inc. (8991); FULLBEAUTY Brands Holdings
Corp. (8053); FULLBEAUTY Brands, Inc. (4198); FULLBEAUTY Brands, LLC (9445); FULLBEAUTY
Brands Management Services, LLC (8637); FULLBEAUTY Brands Merchant, Inc. (7812);
FULLBEAUTY Brands Operations, LLC (5382); FULLBEAUTY Brands Texas, LLC (9606); Jessica
London, Inc. (1070); and Swimsuits for All, LLC (3246).  The location of the Debtors' service address is:
50 Main Street, Suite 1000, White Plains, New York 10606.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion or
the Plan (as defined in the Motion), as applicable.

(i)      the ABL Credit Agreement (together with all related agreements and documents executed by any of the Debtors in connection with the ABL Credit Agreement, collectively, the "ABL Documents") by and among Holdings, FULLBEAUTY Brands Holdings Corp. (the "Lead Borrower"), the other borrowers party thereto (collectively with the Lead Borrower, the "Borrowers"), the guarantors party thereto (together with the Borrowers and Holdings, the "ABL Obligors"), the ABL Agent and the ABL Lenders (together with the ABL Agent and all other Secured Parties (as defined in the ABL Credit Agreement), collectively, the "ABL Secured Parties"),

(ii)     the First Lien Credit Agreement (together with all related agreements and documents executed by any of the Debtors in connection with the First Lien Credit Agreement, collectively, the "First Lien Documents") by and among Holdings, the Lead Borrower, the First Lien Agent, the guarantors party thereto (collectively with the Lead Borrower and Holdings, the "First Lien Obligors") and the First Lien Lenders (together with the First Lien Agent, collectively, the "First Lien Secured Parties"), and

(iii)    the Second Lien Credit Agreement (together with all related agreements and documents executed by any of the Debtors in connection with the Second Lien Credit Agreement, the "Second Lien Documents"; and the Second Lien Documents together with the ABL Documents and the First Lien Documents, collectively, the "Credit Documents") by and among Holdings, the Lead Borrower, the Second Lien Agent (together with the ABL Agent and the First Lien Agent, the "Prepetition Agents"), the guarantors party thereto (collectively with the Lead Borrower and Holdings, the "Second Lien Obligors") and the Second Lien Lenders (together with the Second Lien Agent, the "Second Lien Secured Parties" and, together with the ABL Secured Parties and the First Lien Secured Parties, collectively, the "Prepetition Secured Parties");

(c)      subject to certain limited challenge rights, approving certain stipulations by the Debtors with respect to the Credit Documents and the liens and security interests arising therefrom;

(d)      subject only to the Final Order, if necessary, and the Carve-Out, and effective upon the entry of the Final Order, if any, and to the extent set forth herein, waiving the Debtors' right to surcharge the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code and any "equities of the case" exception pursuant to section 552(b) of the Bankruptcy Code;

(e)      waiving the equitable doctrine of "marshaling" and other, similar doctrines with respect to any of the Prepetition Collateral (including the Cash Collateral) for the benefit of any non-Secured Party;

(f)      vacating and modifying the Automatic Stay (as defined herein) to the extent set forth herein;

(g)      waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order and as later applicable, if necessary, the Final Order; and

(h)     Pursuant to Bankruptcy Rule 4001, the Court's holding that an interim hearing on this Motion be held before this Court to consider entry of this Interim Order, authorizing that during the period commencing on the date of this Court's entry of this Interim Order and ending on the earlier of (a) the date this Court enters the Final Order, if necessary, (b) the date on which the right to use Cash Collateral terminates under the terms of this Interim Order, and (c) the Effective Date (as defined in the Plan), the Debtors be authorized to use the Cash Collateral; and

(i)     scheduling a final hearing (the "Final Hearing") on the Motion, if necessary, to consider entry of a Final Order granting the relief requested in the Motion on a final basis on the earlier of (x) the date of any hearing to confirm the Plan and (y) 30 days after the Petition Date.

The Court having considered the Motion, the exhibits attached thereto, the *Declaration of Robert J. Riesbeck, Chief Financial Officer of FULLBEAUTY Brands Holdings Corp., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), and the evidence submitted and arguments made by the Debtors at the interim hearing held on February 4, 2019 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, and otherwise is fair and reasonable and in the best interests of the Debtors and their estates, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW**:

A.     Petition Date.  On February 3, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court").  On February 4, 2019, this Court entered an order approving the joint administration of the Chapter 11 Cases.

B.    Debtors in Possession.  The Debtors have continued in the management and

operation of their business and properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11

Cases.    As  of  the  date  hereof,  an  official  committee  of  unsecured  creditors

(a "Creditors' Committee") has not been appointed in these Chapter 11 Cases.

C.    Jurisdiction and Venue. This Court has jurisdiction over the Chapter 11 Cases, the

Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and

the *Amended Standing Order of Reference from the United States District Court for the Southern*

*District of New York*, dated January 31, 2012.  Venue for the Chapter 11 Cases and proceedings on

the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core

proceeding pursuant to 28 U.S.C. § 157(b).

D.    Debtors' Stipulations.  Subject to the limitations set forth in paragraphs 11 and 12

below, the Debtors acknowledge, admit, agree, represent and stipulate to the following (paragraphs

D(a) through D(o) below are collectively referred to herein as the "Debtors' Stipulations"):

(a)    First Lien Obligations.  As of the Petition Date, the First Lien Obligors
were truly and justly indebted and liable to the First Lien Secured Parties, without defense,
counterclaim, recoupment, or offset of any kind, in the aggregate principal amount of not
less than (i) $782,000,000 outstanding pursuant to and in accordance with the terms of the
First Lien Documents, plus (ii) (A) accrued and unpaid interest thereon, (B) any additional
fees, costs and expenses (including, but not limited to, any attorneys', financial advisors',
and other professionals fees and expenses) that are chargeable or reimbursable under the
First Lien Documents, and (C) all other charges, indemnities, and other costs and
obligations incurred therewith, whether arising before or after the Petition Date, including
any Obligations (as defined in the First Lien Documents) of any kind or nature, whether or
not evidenced by any note, agreement, or other instrument, whether or not contingent,
whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the
Debtors'    obligations    under    the    First    Lien    Documents    (collectively,
the "First Lien Obligations").

(b)    Second Lien Obligations.  As of the Petition Date, the Second Lien
Obligors were truly and justly indebted and liable to the Second Lien Secured Parties,
without defense, counterclaim, recoupment, or offset of any kind, in the aggregate principal
amount of not less than (i) $345,000,000 outstanding pursuant to and in accordance with
the terms of the Second Lien Documents, plus (ii) (A) accrued and unpaid interest thereon,
(B) any additional fees, costs, and expenses (including, but not limited to, any attorneys',
financial advisors', and other professionals fees and expenses that are chargeable or
reimbursable under the Second Lien Documents), and (C) all other charges, indemnities

4

and other costs and obligations incurred therewith, whether arising before or after the Petition Date, including any Obligations (as defined in the Second Lien Documents) of any kind or nature, whether or not evidenced by any note, agreement, or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations under the Second Lien Documents (collectively, the "Second Lien Obligations" and, together with the First Lien Obligations, collectively, the "Term Loan Obligations").

(c)     ABL Obligations.  As of the Petition Date, the ABL Obligors were truly and justly indebted and liable to the ABL Secured Parties, without defense, counterclaim, recoupment or offset of any kind, in the aggregate principal amount of not less than (i) $75,000,000 in aggregate principal amount of First Amendment FILO Tranche Loans (as defined in the ABL Credit Agreement) outstanding under the ABL Credit Agreement, plus (ii) $52,300,000 in aggregate principal amount of Revolving Credit Loans (as defined in the ABL Credit Agreement) outstanding under the ABL Credit Agreement, plus (iii) $16,625,169 in an aggregate undrawn amount of outstanding letters of credit issued pursuant to and in accordance with the terms of the ABL Documents ("Letters of Credit"), plus (iv) $0 in aggregate amount of L/C Borrowings outstanding under the ABL Credit Agreement, plus (v) with respect to each of clauses (i) through (iv), (a) accrued and unpaid interest and fees with respect thereto, (b) any additional fees, costs, and expenses (including, but not limited to, any attorneys', financial advisors', and other professionals fees and expenses that are chargeable or reimbursable under the ABL Documents), and (c) all other charges, indemnities and other costs and obligations incurred therewith, whether arising before or after the Petition Date, including any Obligations (as defined in the ABL Documents, including, without limitation, all Cash Management Obligations and all Bank Product Obligations as such terms are defined in the ABL Documents and which Bank Product Obligations include, $6.5 million owing to Wells Fargo Bank, N.A. ("Wells Fargo") pursuant to the Amended and Restated Wellstone Commercial Card Agreement, dated on or about May 23, 2016, by and among Wells Fargo, FullBeauty Brands Holdings Corp. and FullBeauty Brands Operations, LLC (f/k/a FullBeauty Brands L.P.), as amended, restated, amended and restated, supplemented or otherwise modified from time to time after such date) of any kind or nature, whether or not evidenced by any note, agreement or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations under the ABL Documents (collectively, the "ABL Obligations" and together with the Term Loan Obligations, the "Secured Obligations").

(d)     Prepetition First Liens and Collateral.  The First Lien Obligations are secured by, subject to the terms of the Intercreditor Agreements (as defined below), (i) first priority security interests in and liens on (collectively, the "Prepetition First Lien First Priority Liens") the Term Priority Collateral (as defined in the ABL Intercreditor Agreement), including any identifiable cash proceeds from the sale, lease, conveyance, or other disposition of any Term Priority Collateral that has been deposited in the Collateral Proceeds Account (as defined in the ABL Intercreditor Agreement) in accordance with the terms of the First Lien Documents and the Second Lien Documents, as more particularly described in and on the terms set forth in the First Lien Documents, and (ii) second priority security interests in and liens on (the "Prepetition First Lien Second Priority Liens" and, together with the Prepetition First Lien First Priority Liens, the "Prepetition First Lien Liens") the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement) (the ABL Priority Collateral and the Term Priority Collateral as of the Petition Date being, collectively, the "Prepetition Collateral").

(e)    <u>Prepetition Second Lien Liens and Collateral</u>.    The Second Lien Obligations are secured by, subject to the terms of the Intercreditor Agreements, (i) second priority security interests in and liens on (collectively, the "<u>Prepetition Second Lien First Priority Liens</u>") the Term Priority Collateral  including any identifiable cash proceeds from the sale, lease, conveyance, or other disposition of any Term Priority Collateral that has been deposited in the Collateral Proceeds Account in accordance with the terms of the First Lien Documents and the Second Lien Documents, as more particularly described in and on the terms set forth in the Second Lien Documents, and (ii) third priority security interests in and liens on (the "<u>Prepetition Second Lien Second Priority Liens</u>" and, together with the Prepetition Second Lien First Priority Liens, the "<u>Prepetition Second Lien Liens</u>"; and the Prepetition Second Lien Liens together with the Prepetition First Lien Liens, collectively, the "<u>Prepetition Term Loan Liens</u>") the ABL Priority Collateral.

(f)    <u>Prepetition ABL Liens and Collateral</u>.  The ABL Obligations are secured by, subject to the terms of the ABL Intercreditor Agreement, (i) first priority security interests in and liens on (collectively, the "<u>Prepetition ABL First Priority Liens</u>") the ABL Priority Collateral including, but not limited to, the Debtors' cash, other than the cash in the Excluded Accounts (as defined below), including cash in banking, checking, or other deposit accounts or securities accounts with financial institutions (in each case, other than the "Excluded Accounts" as defined in the ABL Credit Agreement)  (whether subject to control agreements or otherwise) collections from the Debtors' accounts, and credit card receivables, as more particularly described in and on the terms set forth in the ABL Documents, and (ii) third priority security interests in and liens on (the "<u>Prepetition ABL Second Priority Liens</u>" and, together with the Prepetition ABL First Priority Liens, the "<u>Prepetition ABL Liens</u>" and, together with the Prepetition Term Loan Liens, collectively, the "<u>Prepetition Liens</u>") the Prepetition Term Priority Collateral.

(g)    <u>Intercreditor Agreements</u>.    Pursuant to that certain ABL Intercreditor Agreement, dated as of October 14, 2015, by and among the ABL Agent, the First Lien Agent, and the Second Lien Agent (as amended, restated, supplemented or otherwise modified from time to time prior to the commencement of these Chapter 11 Cases and with all supplements and exhibits thereto, the "<u>ABL Intercreditor Agreement</u>") and that certain Term Intercreditor Agreement, dated as of October 14, 2015, by and among the First Lien Agent, and the Second Lien Agent (as amended, restated, supplemented or otherwise modified from time to time prior to the commencement of these Chapter 11 Cases and with all supplements and exhibits thereto, the "<u>Term Intercreditor Agreement</u>" and, together with the ABL Intercreditor Agreement, the "<u>Intercreditor Agreements</u>") and as more particularly stated therein, the (i) Prepetition First Lien First Priority Liens have priority over and are senior in all respects to the Prepetition Second Lien First Priority Liens and the Prepetition ABL Second Priority Liens with respect to the Prepetition Term Priority Collateral, (ii) Prepetition Second Lien First Priority Liens have priority over and are senior in all respects to the Prepetition ABL Second Priority Liens with respect to the Prepetition Term Priority Collateral, (iii) Prepetition ABL First Priority Liens have priority over and are senior in all respects to the Prepetition First Lien Second Priority Liens and the Prepetition Second Lien Second Priority with respect to the ABL Priority Collateral, and (iv) Prepetition First Lien Second Priority Liens have priority over and are senior in all respects to the Prepetition Second Lien First Priority with respect to the ABL Priority Collateral.

(h)    <u>Validity of First Lien Obligations</u>.  The First Lien Obligations constitute legal, valid, and binding obligations of the First Lien Obligors.  No offsets, defenses, or

counterclaims to the First Lien Obligations exist. No portion of the First Lien Obligations or any payments made to the First Lien Secured Parties or applied to or paid on account of the obligations owing under the First Lien Documents prior to the Petition Date is subject to any contest, avoidance, disallowance, reduction, recharacterization, recovery, subordination (whether equitable, contractual or otherwise), attachment, offset, counterclaim, cross-claim, defense, "claim" (as defined in the Bankruptcy Code) of any kind, cause of action, impairment, or any other challenge of any kind. The First Lien Documents are valid and enforceable by each of the First Lien Secured Parties and the First Lien Agent, as applicable, for the benefit of the First Lien Secured Parties against each of the applicable Debtors. The First Lien Obligations constitute allowed claims against the applicable Debtors' estates. No claim of or cause of action held by the Debtors or their estates exists against any of the First Lien Secured Parties or their agents (in such capacity), whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the First Lien Documents (or the transactions contemplated thereunder), First Lien Obligations, or Prepetition First Lien Liens, including without limitation, any right to assert any disgorgement or recovery.

(i)     Validity of Second Lien Obligations.  The Second Lien Obligations constitute legal, valid, and binding obligations of the Second Lien Obligors. No offsets, defenses, or counterclaims to the Second Lien Obligations exist. No portion of the Second Lien Obligations or any payments made to the Second Lien Secured Parties or applied to or paid on account of the Second Lien Obligations prior to the Petition Date is subject to any contest, avoidance, disallowance, reduction, recharacterization, recovery, subordination (whether equitable, contractual or otherwise), attachment, offset, counterclaim, cross-claim, defense, "claim" (as defined in the Bankruptcy Code) of any kind, cause of action, impairment, or any other challenge of any kind. The Second Lien Documents are valid and enforceable by each of the Second Lien Secured Parties and the Second Lien Agent, as applicable, for the benefit of the Second Lien Secured Parties against each of the applicable Debtors. The Second Lien Obligations constitute allowed claims against the applicable Debtors' estates. No claim of or cause of action held by the Debtors or their estates exists against any of the Second Lien Secured Parties or their agents (in such capacity), whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the Second Lien Documents (or the transactions contemplated thereunder), Second Lien Obligations, or Prepetition Second Lien Liens, including without limitation, any right to assert any disgorgement or recovery.

(j)     Validity of ABL Obligations.  The ABL Obligations constitute legal, valid, and binding obligations of the ABL Obligors. No offsets, defenses, or counterclaims to the ABL Obligations exist. No portion of the ABL Obligations or any payments made to the ABL Secured Parties or applied to or paid on account of the obligations owing under the ABL Documents prior to the Petition Date is subject to any contest, avoidance, disallowance, reduction, recharacterization, recovery, subordination (whether equitable, contractual or otherwise), attachment, offset, counterclaim, cross-claim, defense, "claim" (as defined in the Bankruptcy Code) of any kind, cause of action, impairment, or any other challenge of any kind. The ABL Documents are valid and enforceable by each of the ABL Secured Parties and the ABL Agent, as applicable, for the benefit of the ABL Secured Parties against each of the applicable Debtors. The ABL Obligations constitute allowed

claims against the applicable Debtors' estates. No claim of or cause of action held by the Debtors or their estates exists against any of the ABL Secured Parties or their agents (in such capacity), whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the ABL Documents (or the transactions contemplated thereunder), ABL Obligations, or Prepetition ABL Liens, including without limitation, any right to assert any disgorgement or recovery.

(k)     _Validity and Perfection of Prepetition First Lien Liens_. The Prepetition First Lien Liens (a) secure the First Lien Obligations; (b) are valid, binding, perfected, and enforceable liens on and security interests in the Prepetition Collateral (including the Cash Collateral); (c) are not subject, pursuant to the Bankruptcy Code or other applicable law, to any contest, avoidance, disallowance, reduction, recharacterization, recovery, subordination (whether equitable, contractual or otherwise), attachment, offset, counterclaim, cross-claim, defense, "claim" (as defined in the Bankruptcy Code) of any kind, cause of action, impairment, or any other challenge of any kind; and (d) are subject and subordinate only to (1) the Carve-Out (as defined below), (2) the Permitted Liens (as defined below), and (3) solely with respect to the ABL Priority Collateral, the Prepetition ABL First Priority Liens, and each of the Debtors irrevocably waives, for itself and its subsidiaries and affiliates, any right to challenge or contest in any way the perfection, validation, and enforceability of the Prepetition First Lien Liens or the validity or enforceability of the First Lien Obligations and the First Lien Documents.

(l)     _Validity and Perfection of Prepetition Second Lien Liens_. The Prepetition Second Lien Liens (a) secure the Second Lien Obligations; (b) are valid, binding, perfected and enforceable liens on and security interests in the Prepetition Collateral (including the Cash Collateral); (c) are not subject, pursuant to the Bankruptcy Code or other applicable law, to any contest, avoidance, disallowance, reduction, recharacterization, recovery, subordination (whether equitable, contractual or otherwise), attachment, offset, counterclaim, cross-claim, defense, "claim" (as defined in the Bankruptcy Code) of any kind, cause of action, impairment, or any other challenge of any kind; and (d) are subject and subordinate only to (1) the Carve-Out (as defined below), (2) the Permitted Liens (as defined below), (3) solely with respect to the ABL Priority Collateral, the Prepetition ABL First Priority Liens and Prepetition First Lien Liens, and (4) solely with respect to the Prepetition Term Priority Collateral, the Prepetition First Lien First Priority Liens, and the Debtors each irrevocably waive, for themselves and their subsidiaries and affiliates, any right to challenge or contest in any way the perfection, validation, and enforceability of the Prepetition Second Lien Liens or the validity or enforceability of the Second Lien Obligations and the Second Lien Documents.

(m)     _Validity and Perfection of Prepetition ABL Liens_. The Prepetition ABL Liens (a) secure the ABL Obligations; (b) are valid, binding, perfected, and enforceable liens on and security interests in the Prepetition Collateral (including the Cash Collateral); (c) are not subject, pursuant to the Bankruptcy Code or other applicable law, to any contest, avoidance, disallowance, reduction, recharacterization, recovery, subordination (whether equitable, contractual or otherwise), attachment, offset, counterclaim, cross-claim, defense, "claim" (as defined in the Bankruptcy Code) of any kind, cause of action, impairment, or any other challenge of any kind; and (d) are subject and subordinate only to (1) the Carve-Out, (2) the Permitted Liens, and (3) solely with respect to the Prepetition Term Priority Collateral, the Prepetition First Lien First Priority Liens, and Prepetition Second Lien First

Priority Liens, and the Debtors each irrevocably waive, for themselves and their subsidiaries and affiliates, any right to challenge or contest in any way the perfection, validation, and enforceability of the Prepetition ABL Liens or the validity or enforceability of the ABL Obligations and the ABL Documents.

(n)    <u>Value of Prepetition ABL Liens and Claims</u>.  The value of the ABL Priority Collateral exceeds the aggregate amount of the ABL Obligations payable under clauses (1) through (7) of section 8.04 of the ABL Credit Agreement and the claims of the ABL Secured Parties arising under, or secured by, the ABL Documents constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(o)    <u>Cash Collateral</u>.  All cash proceeds of the Prepetition Collateral, including all such cash proceeds of such Prepetition Collateral held in any of the Debtors' banking, checking or other deposit accounts or securities accounts with financial institutions (in each case, other than trust, escrow and custodial funds held as of the Petition Date in properly established trust, escrow or custodial accounts or other Excluded Accounts pursuant to clauses (i), (ii), (iii), and (v) of the definition of "Excluded Accounts" in the ABL Credit Agreement), are "Cash Collateral" of the Secured Parties within the meaning of section 363(a) of the Bankruptcy Code, whether received before, on or after the Petition Date.

E.    <u>Releases by the Debtors</u>.  As of the earlier of the entry of the Final Order, if necessary, and the Effective Date and subject to the challenge provisions described in paragraph 11 herein, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present, and future predecessors, successors, heirs, subsidiaries, and assigns (collectively, the "<u>Releasors</u>"), to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever releases, remises, acquits, relinquishes, irrevocably waives, and discharges each of the Prepetition Secured Parties and each of their respective former and current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, each in their capacities as such (collectively, the "<u>Releasees</u>"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description

that exist on the date hereof relating to any of the Credit Documents, Secured Hedge Agreements (as defined in the ABL Credit Agreement), documents evidencing or governing Bank Product Obligations or Cash Management Obligations, or the transactions contemplated under such documents, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, (iii) any and all claims and causes of action regarding the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Secured Parties, and (iv) any field examination, reappraisal of assets under the Credit Documents prior to the date hereto, any actions taken in connection with alleged defaults under the Credit Documents prior to the date hereof and/or the negotiation or consummation of forbearance agreements related thereto, *provided*, *however*, that nothing herein shall operate as a release or waiver of any claims or causes of action against the Releasees solely on account of any act taken after the Petition Date.   The Debtors' acknowledgments, stipulations, and releases set forth in this paragraph E shall be binding on the Debtors and their respective representatives, successors, and assigns, and on each of the Debtors' estates, and, subject to entry of the Final Order, if necessary, and the challenge provisions contained in paragraph 11 herein, all creditors thereof and each of their respective representatives, successors and assigns, including, without limitation, any trustee or other representative appointed in these Chapter 11 Cases, whether such trustee or representative is appointed in chapter 11 or chapter 7.

F.   <u>Use of Cash Collateral</u>.  An immediate and critical need exists for the Debtors to use the Cash Collateral, in accordance with this Interim Order, for working capital purposes, other general corporate purposes of the Debtors, and the satisfaction of the costs and expenses of administering the Chapter 11 Cases.

G.   <u>Consent by Prepetition Secured Parties</u>.  The Prepetition Secured Parties have consented, conditioned on the entry of this Interim Order, to the Debtors' proposed use of Cash Collateral, solely on the terms and conditions set forth in this Interim Order.

H.      Adequate Protection.  The adequate protection provided to the Prepetition Secured Parties, as set forth more fully in paragraph 5 of this Interim Order, for any diminution in the value of the Prepetition Secured Parties' respective interests in the Prepetition Collateral from and after the Petition Date resulting from the imposition of the automatic stay under section 362 of the Bankruptcy Code (the "Automatic Stay"), or the use, sale, or lease of the Prepetition Collateral (including the Cash Collateral) under section 363 of the Bankruptcy Code is consistent with and authorized by the Bankruptcy Code and is offered by the Debtors to protect such parties' interests in the Prepetition Collateral (including the Cash Collateral) in accordance with sections 361, 362, and 363 of the Bankruptcy Code.  The adequate protection provided herein and other benefits and privileges contained herein are necessary in order to (i) protect the Prepetition Secured Parties from diminution in the value of their respective interests of their Prepetition Collateral (including the Cash Collateral) and (ii) obtain the consents and agreements contemplated herein.

I.      Good Cause Shown; Best Interest.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and the Local Rules. Absent entry of this Interim Order, the Debtors' businesses, properties, and estates will be immediately and irreparably harmed.  This Court concludes that good cause has been shown and entry of this Interim Order is in the best interest of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for a successful reorganization.

J.      No Liability to Third Parties.  The Debtors stipulate and the Court finds that, subject to entry of the Final Order, if necessary, in permitting the Debtors to use the Cash Collateral, none of the Prepetition Secured Parties shall (i) be deemed to be in control of the operation of any of the Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of any of the Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any other Federal or

11

state statute) or (ii) owe any fiduciary duty to any of the Debtors, their creditors, shareholders, or estates, or shall constitute or be deemed to constitute a joint venture or partnership with any of the Debtors.

K.      Section 552(b). Subject to entry of the Final Order, if necessary, and the Carve-Out, (i) each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and (ii) the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits with respect to any of the Prepetition Collateral.

L.      Notice. Under the circumstances of these Chapter 11 Cases, proper, timely, adequate and sufficient notice of the Motion and Interim Hearing has been provided in accordance with the Bankruptcy Code, Bankruptcy Rules, and the Local Rules, and no further notice of the Motion, Interim Hearing, or the Final Hearing shall be required.

M.      Compliance with Local Rule 4001-2. The Motion and this Interim Order comply with the requirements of Local Rule 4001-2.

Based upon the foregoing, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      Motion Granted. The relief requested in the Motion is granted on an interim basis in accordance with the terms and conditions of this Interim Order. Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, resolved, or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.

2.      Authorization to Use Cash Collateral.

(a)      Subject to the terms and conditions of this Interim Order, the Debtors are hereby authorized to use Cash Collateral in which the Prepetition Secured Parties may have an interest on an interim basis during the period beginning with the Petition Date and ending on the Termination Date (as defined below) for working capital purposes, other

12

general corporate purposes of the Debtors, and the satisfaction of the costs and expenses of administering the Chapter 11 Cases.

(b)     The Debtors' use of Cash Collateral shall be in accordance with the Approved Budget (as defined below), subject to the variance provisions set forth in paragraph 3 herein, or as otherwise set forth in this Interim Order.  The Prepetition Secured Parties are granted the adequate protection as set forth herein.  For the avoidance of doubt, except on the terms and conditions of this Interim Order, the Debtors shall be prohibited from at any time using the Cash Collateral absent consent of the Prepetition Secured Parties or further order of the Court.

3.     Approved Budget; Budget Variance.

(a)     Beginning February 18, 2019, unless a chapter 11 plan shall have become effective for each of the Debtors, the Debtors shall comply with the Approved Budget, subject to the variance provisions set forth in this paragraph 3.

(b)     No later than 12:00 p.m. (prevailing Eastern Time) on every fourth Thursday, the Debtors shall deliver a proposed updated budget (each, a "Proposed Budget") for the following 13-week period (beginning with the week ending on the first Sunday following the required date of delivery).  Beginning on February 18, 2019, no later than 5:00 p.m. (prevailing Eastern time) on each Thursday, the Debtors shall deliver to the ABL Agent (for delivery to the ABL Lenders) and its professional advisors and the Prepetition Agents and their professional advisors a weekly variance report, in form and detail reasonably satisfactory to the ABL Agent, that sets forth and compares the Debtors' actual cash flow for the preceding week compared to the Proposed Budget (the "Budget Variance Report").

(c)     Each week beginning February 25, 2019, the Debtors shall ensure that at no time shall any of the following occur: (i) the cumulative total actual cash receipts of the Debtors for the immediately preceding week ending on Sunday are less than 80% of the cumulative budgeted total cash receipts of the Debtors for such period as set forth in the most recent Approved Budget, (ii) the cumulative total actual cash disbursements of the Debtors for the immediately preceding week ending on Sunday exceed 120% of the cumulative budgeted total cash disbursements of the Debtors for such period as set forth in the most recent Approved Budget; (iii) the cumulative total actual cash receipts of the Debtors for the immediately preceding four weeks (or any applicable shorter period prior to the fifth week after the Petition Date) through and including the immediately preceding week ending on Sunday are less than 85% of the cumulative budgeted total cash receipts of the Debtors for such period as set forth in the most recent Approved Budget, and (iv) the cumulative total actual cash disbursements of the Debtors for the immediately preceding four weeks (or any applicable shorter period prior to the fifth week after the Petition Date) through and including the immediately preceding week ending on Sunday exceed 115% of the cumulative budgeted total cash disbursements of the Debtors for such period as set forth in the most recent Approved Budget; *provided* that cash disbursements of the Debtors shall include any disbursements made by the Debtors (including, but not limited to, any payments, expenditures, or advances) other than (i) professional fees and expenses related to adequate protection and (ii) professional fees and expenses relating to administration of these Chapter 11 Cases.

13

See the above

4.      The budget attached hereto as **Exhibit 1** will be the first Approved Budget for reporting and permitted variance purposes unless and until another Proposed Budget shall become an Approved Budget.  Each Approved Budget provided to the ABL Agent shall be of no force and effect unless and until it is approved by the ABL Agent (including by email) delivered to the address specified in paragraph 25 of this Interim Order and until such determination is made, the prior Approved Budget shall remain in effect.  The ABL Agent shall approve or reject each Proposed Budget by the third business day of the week immediately following the week in which the Debtors delivered such Proposed Budget to the ABL Agent, and the ABL Agent shall be deemed to have approved the Proposed Budget on the day immediately following such third business day if no objection is delivered in writing (including by email) by either such party on or prior to such third business day to the address specified in paragraph 25 of this Interim Order.  Any such Proposed Budget, upon the approval (or deemed approval) of the ABL Agent, shall become an "Approved Budget" effective as of the day immediately following the third business day of the week immediately following the week in which the Debtors delivered the Proposed Budget to such parties and for the period of time covered thereby, and shall prospectively replace any prior Approved Budget.

5.      <u>Mandatory Prepayments; Reserves</u>.[3]

(a)      The Debtors shall make all mandatory prepayments required under Section 2.05(b) of the ABL Credit Agreement in accordance with the provisions thereof, *provided*, *however*, that for purposes of this paragraph 5 the Line Cap shall be defined as the Borrowing Base at such time and shall be reduced by $10,000,000 such that Excess Availability shall at all times equal or exceed $10,000,000.

(b)      The ABL Agent shall be entitled to maintain Reserves (as defined in the ABL Credit Agreement) as the ABL Agent from time to time determines in its Permitted Discretion as being appropriate to (i) to reflect the impediments to the ABL Agents' ability to realize upon the Prepetition Collateral, (ii) to reflect claims and liabilities that the ABL Agent determines will need to be satisfied in connection with the realization upon the Prepetition Collateral, or (iii) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, the Prepetition Collateral

---

[3]  Capitalized terms used but not otherwise defined in this paragraph shall have the meanings set forth in the ABL Credit Agreement.

or the validity or enforceability of the ABL Credit Documents or any material remedies of the Secured Parties hereunder or thereunder; *provided* that the ABL Agent shall not impose Reserves based on facts currently known by or disclosed to the ABL Agent or solely as a result of the commencement of the Chapter 11 Cases.

6.      Prepetition Secured Parties' Adequate Protection.  Pursuant to sections 361 and 363(c) of the Bankruptcy Code, each Prepetition Secured Party is hereby granted adequate protection of its interest in the Prepetition Collateral for any diminution in the value of such Prepetition Secured Party's interest in the Prepetition Collateral from and after the Petition Date in any way resulting from the imposition of the Automatic Stay, or the use, sale, or lease of Prepetition Collateral (including the Cash Collateral) under section 363 of the Bankruptcy Code (each, an "Adequate Protection Claim" and, collectively, the "Adequate Protection Claims"). The Prepetition Agents, on behalf of themselves and for the benefit of each of the other Prepetition Secured Parties, are hereby granted the following (collectively, the "Adequate Protection Obligations"):

(a)      First Lien Adequate Protection Liens.  Subject to the Carve-Out and the Permitted Liens, as adequate protection for actual diminution in value of their interests in the Prepetition Collateral, effective as of the Petition Date and perfected without the need for execution by the Debtors or recordation or filing of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, or the possession or control by the First Lien Agent of any of the Adequate Protection Collateral (as defined below), the First Lien Agent is hereby granted, for the ratable benefit of the First Lien Secured Parties, valid, binding, continuing, enforceable, fully perfected, senior security interests in and liens (collectively, the "First Lien Adequate Protection Liens") on any and all tangible and intangible prepetition and postpetition property of the Debtors, whether existing before, on, or after the Petition Date, together with any proceeds thereof, including, without limitation, any and all cash and any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds (*provided*, *however*, that to the extent that any lease prohibits the granting of a lien thereon, or otherwise prohibits hypothecation of the leasehold interest, then in such event there shall only be a lien on the economic value of, proceeds of sale, or other disposition of, and any other proceeds and products of such leasehold interests unless the applicable provision is rendered ineffective by applicable non-bankruptcy law or the Bankruptcy Code), real property, deposit accounts, securities accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries, wherever located, and the proceeds, products, rents, accession and profits of the foregoing (collectively, the "Adequate Protection Collateral").

15

(b)      Second Lien Adequate Protection Liens.  Subject to the Carve-Out and the Permitted Liens in all respects, as adequate protection for actual diminution in value of their interests in the Prepetition Collateral, effective as of the Petition Date and perfected without the need for execution by the Debtors or recordation or filing of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, or the possession or control by the Second Lien Agent of any of the Adequate Protection Collateral, the Second Lien Agent is hereby granted, for the ratable benefit of the Second Lien Secured Parties, valid, binding, continuing, enforceable, fully perfected, senior security interests in and liens (the "Second Lien Adequate Protection Liens") on the Adequate Protection Collateral.

(c)      ABL Adequate Protection Liens.  Subject to the Carve-Out and the Permitted Liens in all respects, as adequate protection for actual diminution in value of their interests in the Prepetition Collateral, effective as of the Petition Date and perfected without the need for execution by the Debtors or recordation or filings of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, or the possession or control by the ABL Agent of any of the Adequate Protection Collateral, the ABL Agent is hereby granted, for the ratable benefit of the ABL Secured Parties, valid, binding, continuing, enforceable, fully perfected, senior security interests in and liens (the "ABL Adequate Protection Liens" and together with the Term Loan Adequate Protection Liens, the "Adequate Protection Liens") on the Adequate Protection Collateral.

(d)      Avoidance Actions and Avoidance Action Proceeds.  The Adequate Protection Collateral shall not include any claims or causes of action of the Debtors arising under sections 502(d), 544, 545, 547, 548, or 550 of the Bankruptcy Code (collectively, the "Avoidance Actions") of the Debtors; provided, however, the Adequate Protection Collateral shall include, subject to and effective upon entry of the Final Order, all proceeds of and recoveries on Avoidance Actions (the "Avoidance Actions Proceeds").

(e)      Adequate Protection Superpriority Claims.  The Adequate Protection Claims of the First Lien Secured Parties shall constitute allowed superpriority administrative expense claims pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code of the First Lien Secured Parties (such claims, collectively, the "First Lien Adequate Protection Superpriority Claims").  The Adequate Protection Claims of the Second Lien Secured Parties shall constitute allowed superpriority administrative expense claims pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code of the Second Lien Secured Parties (such claims, collectively, the "Second Lien Adequate Protection Superpriority Claims").  The Adequate Protection Claims of the ABL Secured Parties shall constitute allowed superpriority administrative expense claims pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code by each of the ABL Secured Parties (such claims, collectively, the "ABL Adequate Protection Superpriority Claims" and, together with the Term Loan Adequate Protection Superpriority Claim, the "Adequate Protection Superpriority Claims").  The Adequate Protection Superpriority Claims shall be subject only to the Carve-Out, and shall be allowed claims against each of the Debtors (jointly and severally) with priority over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327,

16

328, 330, 331, 503(b), 507(a), 507(b), 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment.  The Adequate Protection Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors including, subject to entry of the Final Order, if necessary, to the extent provided therein, the proceeds of any Avoidance Actions.

(f)     Priority of Adequate Protection Liens and Adequate Protection Superpriority Claims.

(i)     The First Lien Adequate Protection Liens and First Lien Superpriority Claims shall be (x) senior to the ABL Adequate Protection Liens and ABL Adequate Protection Superpriority Claims, respectively, and to the Second Lien Adequate Protection Liens and Second Lien Adequate Protection Claims, respectively, with respect to all prepetition and postpetition property of the First Lien Obligors of the same nature, scope, and type as the Term Priority Collateral without regard to whether such property constitutes Term Loan Debt Collateral (as defined in the ABL Intercreditor Agreement) and (y) junior to the ABL Adequate Protection Liens and ABL Adequate Protection Superpriority Claims, respectively, and senior to the Second Lien Adequate Protection Liens and Second Lien Adequate Protection Superpriority Claims, respectively, with respect to all prepetition and postpetition property of the First Lien Obligors of the same nature, scope and type as the ABL Priority Collateral without regard to whether such property constitutes ABL Facility Collateral (as defined in the ABL Intercreditor Agreement).

(ii)    The Second Lien Adequate Protection Liens and Second Lien Adequate Protection Superpriority Claims shall be (x) senior to the ABL Adequate Protection Liens and ABL Adequate Protection Superpriority Claims, respectively, and junior to the First Lien Adequate Protection Liens and First Lien Adequate Protection Superpriority Claims, respectively, with respect to all prepetition and postpetition property of the Second Lien Obligors of the same nature, scope, and type as the Term Priority Collateral without regard to whether such property constitutes Term Loan Debt Collateral and (y) junior to the ABL Adequate Protection Liens and ABL Adequate Protection Superpriority Claims, respectively, and to the First Lien Adequate Protection Liens and First Lien Adequate Protection Superpriority Claims, respectively, with respect to all prepetition and postpetition property of the Second Lien Obligors of the same nature, scope, and type as the ABL Priority Collateral without regard to whether such property constitutes ABL Facility Collateral.

(iii)   The ABL Adequate Protection Liens and ABL Adequate Protection Superpriority Claims shall be (x) junior to the First Lien Adequate Protection Liens and First Lien Adequate Protection Superpriority Claims, respectively, and to the Second Lien Adequate Protection Liens and Second Lien Adequate Protection Superpriority Claims, respectively, with respect to all prepetition and postpetition property of the ABL Obligors of the same nature, scope and type as the Term Priority Collateral without regard to whether such property constitutes Term Loan Debt Collateral and (y) senior to the First Lien Adequate Protection Liens and First Lien Adequate Protection Superpriority Claims, respectively, and to the Second Lien Adequate Protection Liens and

17

Second Lien Adequate Protection Superpriority Claims, respectively, with respect to all prepetition and postpetition property of the First Lien Obligors of the same nature, scope, and type as the ABL Priority Collateral without regard to whether such property constitutes ABL Facility Collateral.

(iv)     Adequate Protection Liens shall be junior only to (A) the Carve-Out and (B) any valid, enforceable, unavoidable, and properly perfected liens existing on the Petition Date on property unencumbered by the Prepetition Liens or on the Prepetition Collateral (including the Cash Collateral and the Adequate Protection Collateral) existing on the Petition Date with priority over the Prepetition Secured Parties' liens on the Prepetition Collateral (collectively, the "Permitted Liens").  Other than the Carve-Out and the Permitted Liens, and subject to the entry of the Final Order, if necessary, no cost or expense of administration under sections 105, 503, or 507 of the Bankruptcy Code or otherwise, including any such cost or expense resulting from or arising after the conversion of any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code, shall be senior to, or *pari passu* with, the Adequate Protection Liens or the Adequate Protection Superpriority Claims.

(g)     ABL Adequate Protection Payments.  The ABL Agent shall receive for its own benefit and on behalf of the ABL Secured Parties from the Debtors (i) on the Effective Date (as defined in the Plan), but in any event no later than five (5) business days after the Petition Date, cash payment in an amount equal to all accrued but unpaid prepetition fees, interest at the non-default contract rate (including Eurocurrency Rate pricing options, which shall remain available until such time as the Eurocurrency Rate Loans (as defined in the ABL Credit Agreement) expire, at which such time such loans will accrue interest at the Base Rate provided for under the ABL Credit Agreement) under the ABL Credit Agreement in accordance with the terms thereof on the dates provided for such interest payments under the ABL Credit Agreement, and any fees and expenses payable under the ABL Documents or any other documents evidencing or governing Bank Product Obligations, as applicable, and (ii) current cash payment in an amount equal to current payment of letter of credit fees, fronting fees, interest at the non-default contract rate, and all other amounts payable under the ABL Documents (through the Plan Effective Date) (such payments, the "ABL Adequate Protection Payments").  Notwithstanding anything to the contrary herein, no commitments shall be continuing under the ABL Credit Agreement from and after the Petition Date and the ABL Lenders' only obligations under the ABL Documents from and after the Petition Date shall be solely with respect to draws under Letters of Credit in existence prior to the Petition Date, including Letters of Credit that are renewed pursuant to paragraph 13.  The ABL Secured Parties' rights are reserved to assert claims for default rate interest without further order of the Court if either (x) the Confirmation Order has not been entered within thirty (30) days of the Petition Date or (y) the ABL Obligations have not, within forty-four (44) days of the Petition Date, been indefeasibly paid in full, in cash, all Commitments (as defined in the ABL Credit Agreement) have been terminated and Letters of Credit have been terminated, Cash Collateralized (as defined in the ABL Credit Agreement) or backstopped in a manner satisfactory to the applicable L/C Issuer in its sole discretion.  Notwithstanding anything to the contrary herein or in this Order, no cash payments shall be made in connection with the First Amendment FILO Tranche Loans (as defined in the ABL Credit Agreement).

(h)     First Lien and Second Lien Adequate Protection Payments. The First Lien Agent's and the Second Lien Agent's rights are reserved with respect to additional

Adequate Protection Obligations in the event the Confirmation Order has not been entered within thirty (30) days of the Petition Date, including with respect to the payment of interest, fees, and expenses.

(i)     Letter of Credit Reimbursement Obligations. If the L/C Issuer (as defined in the ABL Documents) makes payment on any Letter of Credit (as defined in the ABL Documents), the Debtors shall reimburse the L/C Issuer on a current basis for such payment, together with any interest at the applicable rate, in accordance with the terms of the ABL Documents on the Honor Date (as defined in the ABL Documents) (such obligations, collectively, the "Letter of Credit Reimbursement Obligations"). Any unreimbursed Letter of Credit Reimbursement Obligations shall constitute an ABL Adequate Protection Superpriority Claim. If the Debtors fail to satisfy their Letter of Credit Reimbursement Obligations for any reason, the Debtors shall be in default of the Cash Collateral Order (such default, a "Reimbursement Default"), the Debtors' right to use any Cash Collateral shall be automatically terminated without further notice, application, hearing, or order of the Court, and all L/C Borrowing shall accrue interest at the Default Rate.

(j)     Professional Fees and Expenses. As additional adequate protection, the Prepetition Secured Parties shall receive from the Debtors, as applicable, current payment of all outstanding prepetition and all postpetition reasonable and documented fees and expenses incurred by (a) the ABL Agent, including the reasonable and documented fees and expenses incurred by Davis Polk & Wardwell LLP, as counsel to the ABL Agent, and FTI Consulting, Inc., as financial advisor to the ABL Agent, (b) the Ad Hoc Group of First Lien Lenders (as defined in the Restructuring Support Agreement dated as of December 18, 2018 (the "Restructuring Support Agreement")), including the reasonable and documented fees and expenses incurred by Milbank, Tweed, Hadley, & McCloy LLP as counsel to the Ad Hoc Group of First Lien Lenders and Ducera Partners LLC, as financial advisor to the Ad Hoc Group of First Lien Lenders, (c) the First Lien Agent, including the reasonable and documented fees and expenses incurred by Milbank, Tweed, Hadley & McCloy LLP, as counsel to the First Lien Agent, (d) the Ad Hoc Group of Second Lien Lenders (as defined in the Restructuring Support Agreement), including the reasonable and documented fees and expenses incurred by Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the Ad Hoc Group of Second Lien Lenders and Houlihan Lokey Capital Inc., as financial advisor to the Ad Hoc Group of Second Lien Lenders, and (e) the Second Lien Agent, including the reasonable and documented fees and expenses incurred by Shipman & Goodwin LLP, solely in its capacity as counsel to the Second Lien Agent. If an objection is not filed with the Court pursuant to this paragraph, the Debtors shall pay the fees, expenses and disbursements set forth in this clause (i) within ten (10) days (which time period may be extended by the applicable professional in its discretion) after delivery of an invoice therefor to the Debtors, any counsel to the Creditors' Committee (if any), and the United States Trustee for the Southern District of New York (the "U.S. Trustee"). None of such invoices shall be required to comply with the U.S. Trustee fee guidelines or to be filed with any fee applications with the Court, but shall provide reasonably detailed statements (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine). The Debtors, any Creditors' Committee, and the U.S. Trustee shall have ten (10) days following their receipt of such invoices to file objections with the Court with

respect to the reasonableness of the postpetition fees and expenses included therein.  If any such objection is not resolved within ten (10) days after such objection is interposed, a hearing with respect thereto shall be conducted at a regularly scheduled omnibus hearing in the Chapter 11 Cases, *provided*, *however* that if any party files any such objection, the Debtors shall pay (i) the prepetition portion and any undisputed portion of such fees, costs, and expenses within fifteen (15) days of their receipt of such invoice and (ii) the disputed portion of such fees, costs, and expenses promptly following the resolution of such dispute as described in this paragraph; *provided further* that any payments made pursuant to the foregoing clauses (i) and (ii) may be subject to recharacterization as principal payments to the extent permitted by the Bankruptcy Code.

7.      <u>Reporting; Access to Records</u>.  The Debtors shall comply with all reporting requirements (including all reporting requirements applicable during a Notice Period (as defined in the ABL Credit Agreement)) and honor all inspection rights set forth in the Credit Documents (as amended, in the case of the ABL Credit Agreement, by this paragraph) and shall provide to the ABL Agent for delivery to the ABL Lenders such other business or financial information that is reasonably requested by the ABL Agent or its advisors; *provided*, that the Debtors may deliver the weekly Borrowing Base Certificate (as defined in the ABL Credit Agreement) required by Section 6.17(a) of the ABL Credit Agreement by the Friday (rather than Wednesday) of each week (as of the immediately preceding Friday).  In addition, no later than fifteen (15) days following the end of each month, the Debtors shall provide to the ABL Agent for delivery to the ABL Lenders reporting on the Company's top ten (10) vendors (including current trade terms and open orders) in form and substance satisfactory to the Prepetition Agents.

8.      <u>Termination of Cash Collateral Authorization</u>.  Unless otherwise ordered by the Court (upon notice and a hearing) or agreed to in writing by the (i) ABL Agent acting at the direction of the Required Lenders (as defined in the ABL Credit Agreement) and (ii) the First Lien Agent, the Debtors' right to use Cash Collateral under the terms of this Interim Order shall terminate without further order of the Court upon the occurrence of the "<u>Termination Date</u>" (notice of which shall promptly be provided to the Debtors and the U.S. Trustee), which shall occur upon five (5) business days' prior written notice from the ABL Agent to the Debtors of the occurrence of any of the following events unless such event has been cured (excluding subsections 8(a), 8(i),

8(k), 8(m), 8(n), 8(o) and 8(p) below, upon which the Termination Date shall occur immediately);
*provided* that during such five (5) day period the Debtors may only use Cash Collateral to (a) make necessary ordinary course operating expenditures in accordance with the Approved Budget, if any, or (b) contest or cure any alleged Termination Date (as defined below):

(a)    the occurrence of the effective date of any plan of reorganization confirmed in these Chapter 11 Cases;

(b)    the date that is thirty (30) days after the Petition Date, unless the Court shall have entered the *Order (I) Approving the Disclosure Statement and Confirming the First Amended Joint Prepackaged Chapter 11 Plan of Reorganization of FULLBEAUTY Brands Holdings Corp. and Its Debtor Affiliates and (II) Granting Related Relief*;

(c)    the date that is forty-four (44) days after the Petition Date unless the Effective Date shall have occurred;

(d)    the Restructuring Support Agreement shall have terminated in accordance with its terms;

(e)    any of the Debtors shall support or take any steps in furtherance of any plan of reorganization other than that contemplated by the Restructuring Support Agreement or any Alternative Transaction (as defined in the Restructuring Support Agreement as of the date hereof), in either case other than as expressly permitted under the Restructuring Support Agreement;

(f)    any Debtor's failure to comply with any of the material terms or conditions of this Interim Order, including, but not limited to, failure to comply with the Approved Budget (subject to the variance provisions described in paragraph 3), failure to deliver any Budget Variance Report as and when provided in paragraph 3 or any Borrowing Base Certificate as and when provided in paragraph 6, any Reimbursement Default shall have occurred that has not been cured pursuant and in accordance with paragraph 5(h), or failure to make a mandatory prepayment as and when provided in paragraph 4 (all of which failures and defaults shall be deemed to be failures to comply with the material terms or conditions of this Interim Order);

(g)    any Debtor shall grant, create, incur, or suffer to exist any postpetition liens or security interests other than (i) those granted pursuant to this Interim Order, (ii) carriers', mechanics', operator's, warehousemen's, repairmen's, or other similar liens arising in the ordinary course of business, (iii) pledges or deposits in connection with workers' compensation, unemployment insurance, and other social security legislation arising in the ordinary course of business, and (iv) deposits to secure the performance of any postpetition statutory obligations and other obligations of a like nature incurred in the ordinary course of business;

(h)    any Debtor shall create, incur, or suffer to exist any claim that is *pari passu* with or senior to the Adequate Protection Superpriority Claims;

(i)       the failure of the Debtors to make any payment provided for under this Interim Order to the Prepetition Secured Parties within five (5) business days of the date such payment is due;

(j)       this Interim Order or the Final Order (if entered) ceases, for any reason (other than by reason of the express written agreement by the Required Lenders (as defined in the ABL Credit Agreement) and the Required Consenting Term Lenders in their sole discretion), to be in full force and effect in any material respect, or any Debtor so asserts in writing, or the Adequate Protection Liens or Adequate Protection Superpriority Claims cease in any material respect to be enforceable and of the same effect and priority purported to be created hereby or any Debtor so asserts in writing;

(k)       the Court shall have entered an order amending, supplementing, or otherwise modifying this Interim Order (other than non-substantive amendments, supplementations, or modifications) without the consent of each affected Prepetition Secured Party;

(l)       any Debtor supports or takes any steps in furtherance of an action commenced by any other person against any Prepetition Secured Party, with respect to any of the Credit Documents, including, without limitation, any action to avoid or subordinate any obligations under any of the Credit Documents;

(m)       the Court shall have entered an order appointing a chapter 11 trustee, responsible officer, or any examiner with enlarged powers relating to the operation of the businesses in these Chapter 11 Cases;

(n)       the Court shall have entered an order granting relief from the Automatic Stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any of the Debtors' assets which have an aggregate value in excess of $1,000,000;

(o)       the Court shall have entered an order avoiding, disallowing, subordinating or recharacterizing any claim, lien, or interest held by the ABL Secured Parties;

(p)       an order shall have been entered dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(q)       the occurrence of an event of default under any material contract that results in the right of the non-Debtor contract party to terminate such contract (other than any such right triggered solely by the commencement of these Chapter 11 Cases) without taking into account whether such right may or may not be exercised due to the imposition of the automatic stay;

(r)       termination or expiration of any exclusivity period for any Debtor to file or solicit acceptances for a plan of reorganization; and

(s)       the Court shall have entered an order (A) that is inconsistent with this Interim Order in any material respect, including, without limitation, surcharging any Prepetition Secured Party, any of the Secured Obligations, any of their respective claims,

22

the Prepetition Collateral or the Adequate Protection Collateral or (B) authorizing the sale of all or substantially all of the assets of the Lead Borrower and its subsidiaries.

9.      <u>Remedies upon the Occurrence of the Termination Date</u>.  Upon the occurrence of the Termination Date, (a) the Adequate Protection Obligations, if any, shall become due and payable; (b) upon the occurrence of the Termination Date under Paragraph 8(a) (subject to the Debtors' right to cure or contest such Termination Date), all ABL Obligations shall be paid in full in cash or, in the case of outstanding Letters of Credit, each such letter of credit shall be (x) cancelled and replaced, (y) cash collateralized in accordance with section 2.03(f) of the ABL Credit Agreement, or (z) backstopped or otherwise treated in a manner satisfactory to the applicable L/C Issuer in its sole and absolute discretion; (c) upon seven (7) days' notice provided in accordance with Local Rule 4001-2(g)(10) (such notice period to run concurrently with the five (5) day period specified in paragraph 7), the ABL Agent may set off amounts in any account of the Debtors maintained with the ABL Agent or with respect to which the ABL Agent exercise control pursuant to a deposit account control agreement to the extent necessary for payment of the Secured Party Adequate Protection Obligation (provided that the ABL Agent may place an administrative hold to preserve any setoff right without such notice); and (d) upon seven (7) days' notice provided in accordance with Local Rule 4001-2(g)(10) (such notice period to run concurrently with the five (5) day period specified in paragraph 7), subject to the terms of the Intercreditor Agreements, each Prepetition Secured Party may exercise the rights and remedies available under the Credit Documents, this Interim Order, or applicable law (subject only to the Carve-Out), including, without limitation, foreclosing upon and selling all or a portion of the applicable Prepetition Collateral or Adequate Protection Collateral in order to collect the Secured Party Adequate Protection Obligations.  Remedies shall be cumulative and non-exclusive.  The Automatic Stay is hereby deemed modified and vacated to the extent necessary to permit such actions upon the occurrence of the Termination Date and pursuant to the terms set forth herein.  Notwithstanding anything to the contrary herein or the occurrence of the Termination Date, all of the rights,

23

remedies, benefits, and protections provided to the Prepetition Agents under this Interim Order

shall survive the occurrence of the Termination Date. The Debtors and all parties in interest shall

be entitled to seek an emergency hearing before this Court to contest whether the Termination Date

has occurred under paragraph 8 of this Interim Order and at which hearing the Debtors shall reserve

the right to seek Court approval of a new order approving the use of Cash Collateral, *provided* that

pending such hearing, the Debtors may only use Cash Collateral as permitted pursuant to

Paragraph 8 above, and, at such a hearing, the Debtors may only (x) seek, in good faith, a

determination regarding whether the Termination Date has occurred and/or (y) seek, in good faith,

approval of a new order authorizing the Debtors' use of Cash Collateral on a nonconsensual basis

by showing that the Prepetition Secured Parties are adequately protected.

10.    Carve-Out.

(a)    Carve-Out. As used in this Interim Order, the "Carve-Out" means the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus any applicable interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee appointed in the Debtors' Chapter 11 Cases under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the official committee of unsecured creditors (if any) (the "Creditors' Committee") pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the ABL Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $4,000,000 incurred after the first business day following delivery by the ABL Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap"). For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the ABL Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, the Prepetition Agents, and counsel to the Creditors' Committee (if any), which notice may be delivered following the occurrence and during the continuation of a Termination Event and upon termination of the Debtors' right to use Cash Collateral by the ABL Lenders, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

(b)      Fee Estimates.  Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "Estimated Fees and Expenses") incurred during the preceding week by such Professional Person (through Saturday of such week, the "Calculation Date"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly Statement"); *provided*, that within one business day of the occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver one additional statement (the "Final Statement") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date.  If any Professional Person fails to deliver a Weekly Statement within three calendar days after such Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in the Carve Out Accounts (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Approved Budget for such period for such Professional Person; *provided*, that such Professional Person shall be entitled to be paid any unpaid amount of Allowed Professional Fees in excess of Allowed Professional Fees included in the Approved Budget for such period for such Professional Person from a reserve to be funded by the Debtors from all cash on hand as of such date and any available cash thereafter held by any Debtor pursuant to paragraph 10(c) below.  Solely as it relates to the ABL Secured Parties, the Carve-Out under paragraph 10(a)(iii) above shall be limited to the greater of (x) the sum of (I) the aggregate unpaid amount of Estimated Fees and Expenses included in such Weekly Statements timely received by the Debtors prior to the Termination Declaration Date *plus*, without duplication, (II) the lesser of (1) the aggregate unpaid amount of Estimated Fees and Expenses included in the Final Statements timely received by the Debtors pertaining to the period through and including the Termination Declaration Date and (2) the Budgeted Cushion Amount (as defined below), and (y) the aggregate unpaid amount of Allowed Professional Fees included in the Budget for the period prior to the Termination Declaration Date (such amount, the "Professional Fee Carve Out Cap").  For the avoidance of doubt, the ABL Agent shall be entitled to maintain at all times a reserve (the "Carve-Out Reserve") in an amount (the "Carve-Out Reserve Amount") equal to the sum of (i) the greater of (x) the aggregate unpaid amount of Estimated Fees and Expenses included in *all* Weekly Statements timely received by the Debtors, and (y) the aggregate amount of Allowed Professional Fees contemplated to be unpaid in the Budget at the applicable time, *plus* (ii) the Post-Carve Out Trigger Notice Cap, *plus* (iii) the amounts contemplated under paragraph 10(a)(i) and 10(a)(ii) above, *plus* (iv) an amount equal to the amount of Allowed Professional Fees set forth in the Budget for the week occurring after the most recent Calculation Date and the two weeks succeeding such week (such amount set forth in (iv), regardless of whether such reserve is maintained, the "Budgeted Cushion Amount").  Not later than 7:00 p.m. New York time on the fourth business day of each week starting with the first full calendar week following the Petition Date, the Debtors shall deliver to the ABL Agent a report setting forth the Carve-Out Reserve Amount as of such time, and, in setting the Carve-Out Reserve, the ABL Agent shall be entitled to rely upon such reports in accordance with section 9.04 of the ABL Credit Agreement.  Prior to the delivery of the first report setting forth the Carve-Out

Reserve Amount, the ABL Agent shall calculate the Carve-Out Reserve Amount by reference to the Budget for subsection (i) of the Carve-Out Reserve Amount.

(c)     Carve-Out Reserves.  On the day on which a Carve-Out Trigger Notice is given by the ABL Agent to the Debtors' lead restructuring counsel, the U.S. Trustee, the Prepetition Agents, and counsel to the Creditors' Committee (if any) (the "Termination Declaration Date"), the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve-Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date, after funding the Pre-Carve-Out Trigger Notice Reserve, the Debtors shall utilize all remaining cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-Carve-Out Trigger Notice Cap (the "Post-Carve-Out Trigger Notice Reserve" and, together with the Pre-Carve-Out Trigger Notice Reserve, the "Carve-Out Reserves") prior to any and all other claims.  All funds in the Pre-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve-Out set forth above (the "Pre-Carve-Out-Amounts"), but not, for the avoidance of doubt, the Post-Carve-Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve-Out Trigger Notice Reserve has not been reduced to zero, paid to the ABL Agent for the benefit of the ABL Lenders until the ABL Obligations have been indefeasibly paid in full, in cash, all Commitments (as defined in the ABL Credit Agreement) have been terminated and Letters of Credit have been terminated, Cash Collateralized (as defined in the ABL Credit Agreement) or backstopped in a manner satisfactory to the applicable L/C Issuer in its sole discretion, in which case any such excess shall be paid to the First Lien Agent and the Second Lien Agent for the benefit of the First Lien Term Loan Lenders and Second Lien Term Loan Lenders, respectively, in accordance with their respective rights and priorities under the First Lien Term Loan Documents, the Second Lien Term Loan Documents, and this Interim Order.  All funds in the Post-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve-Out set forth above (the "Post-Carve-Out Amounts"), and then, to the extent the Post-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the ABL Agent for the benefit of the ABL Lenders until the ABL Obligations have been indefeasibly paid in full, in cash, all Commitments have been terminated, and Letters of Credit have been terminated, Cash Collateralized or backstopped in a manner satisfactory to the applicable L/C Issuer in its sole discretion and any excess shall be paid to the First Lien Agent and the Second Lien Agent for the benefit of the First Lien Term Loan Lenders and Second Lien Term Loan Lenders, respectively, in accordance with their respective rights and priorities under the First Lien Term Loan Documents, the Second Lien Term Loan Documents, and this Interim Order.  Notwithstanding anything to the contrary herein, if either of the Carve-Out Reserves is not funded in full in the amounts set forth herein, then any excess funds in one of the Carve-Out Reserves following the payment of the Pre-Carve-Out Amounts and Post-Carve-Out Amounts, respectively, shall be used to fund the other Carve-Out Reserve, up to the applicable amount set forth herein, prior to making any payments to the ABL Agent, the Prepetition Agents, or any other prepetition secured creditors, as applicable.  Notwithstanding anything to the contrary in the ABL Credit Agreement or this Interim Order, following delivery of a Carve-Out Trigger Notice, the ABL Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserves have been fully

funded, but shall have a security interest in any residual interest in the Carve-Out Reserves, with any excess paid to the ABL Agent for application in accordance with the ABL Credit Agreement. Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursement by the Debtors from the Carve Out reserves shall not constitute Loans (as defined in the ABL Credit Agreement) or increase or reduce the ABL Facility, (ii) the failure of the Carve-Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out, and (iii) in no way shall the Proposed Budget Carve-Out, Post-Carve-Out Trigger Notice Cap, Carve-Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order or in any ABL Credit Agreement, the Carve-Out shall be senior to all liens and claims under the Credit Documents, the Adequate Protection Liens and the Adequate Protection Superpriority Claims, and any and all other forms of adequate protection, liens, or claims securing the Secured Obligations, or the obligations secured pursuant to any prepetition secured facilities, and provided further that any residual interest in the Carve-Out shall be subject to the Adequate Protection Liens and the Adequate Protection Superpriority Claims set forth above.

(d) <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve-Out.

(e) <u>No Direct Obligation To Pay Allowed Professional Fees</u>. None of the ABL Lenders shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the ABL Lenders, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f) <u>Payment of Carve-Out On or After the Termination Declaration Date</u>. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.

11.    <u>Right to Seek Additional Adequate Protection</u>. This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Secured Parties to request additional forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request.

12.    <u>Effect of Stipulations on Third Parties</u>. The releases, stipulations, agreements, and admissions contained in this Interim Order, including, without limitation, in paragraphs D and E of this Interim Order, shall be binding upon the Debtors and their affiliates and any of their respective successors (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected

for the Debtor) in all circumstances and for all purposes.  The releases, stipulations, agreements, and admissions contained in this Interim Order, including, without limitation, in paragraphs  D and E of this Interim Order, shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases (including a Creditors' Committee, if any) and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes, unless and except to the extent that, with respect to any particular party in interest, (a) such party in interest has filed an adversary proceeding or contested matter (subject to the limitations contained in this Interim Order) by the earlier of (i) the date on which the Plan is confirmed in these Chapter 11 Cases and (ii) (A) if no Creditors' Committee has been appointed, seventy-five (75) days after the entry of the Final Order, if any, or such later date as has been agreed to, in writing, by the applicable Prepetition Agent, or as has been ordered by the Court or (B) if a Creditors' Committee has been appointed, sixty (60) days after the entry of the Final Order, if any, or such later date as has been agreed to, in writing, by the applicable Prepetition Agent, or as has been ordered by the Court (each, as applicable, the "<u>Investigation Termination Date</u>"), objecting to or challenging the amount, validity, perfection, enforceability, priority, or extent of the Secured Obligations or asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims, or any other claims, counterclaims, or causes of action, objections, contests, or defenses, including, to the extent released by the Debtors under paragraphs D and E against any of the Prepetition Secured Parties or their subsidiaries, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such in connection with the matters related to the Credit Documents or the Prepetition Collateral (including the Cash Collateral) (collectively, "<u>Claims and Defenses</u>") (each such adversary proceeding or contested matter filed on or before the applicable

Investigation Termination Date, a "Challenge Proceeding"), and (b) there is a final, non-appealable order in favor of the plaintiff sustaining any such Claims and Defenses in the applicable Challenge Proceeding; *provided* that any Challenge Proceeding shall set forth with specificity the basis for the applicable Claims and Defenses, and any and all Claims and Defenses not so specified in a Challenge Proceeding prior to the expiration of the applicable Investigation Termination Date shall be deemed forever waived, released, and barred.  If no Challenge Proceeding is filed, (1) the Debtors' stipulations, admissions, agreements, and releases contained in this Interim Order, including, without limitation, in paragraphs  D and E of this Interim Order, shall be binding on all parties in interest, including, without limitation, the Creditors' Committee, (2) the Secured Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance, for all purposes in the Chapter 11 Cases and any subsequent chapter 7 case(s), (3) the liens and security interests securing the Secured Obligations shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected, not subject to recharacterization, subordination, or avoidance, and (4) the Secured Obligations, the liens and security interests securing the Secured Obligations, and the Prepetition Secured Parties shall not be subject to any other or further claim or challenge by the Creditors' Committee, any non-statutory committees appointed or formed in the Chapter 11 Cases, or any party in interest seeking to exercise the rights of any Debtor's estate, including, without limitation, any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any Debtor).  If a Challenge Proceeding is timely filed, the releases, stipulations, and admissions contained in paragraphs D and E of this Interim Order shall nonetheless remain binding and preclusive on any person or entity, except to the extent that such findings and admissions were expressly challenged and set forth with specificity in a Challenge Proceeding by such person or entity.  Nothing in this Interim Order vests or confers on any Entity (as defined in the Bankruptcy Code), including any Creditors' Committee or any non-statutory committees appointed or formed in the Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the

Debtors or their estates, including, without limitation, any Claims and Defenses with respect to the Credit Documents or the Secured Obligations, and an order of the Court conferring such standing on a party-in-interest shall be a prerequisite for the prosecution of a Challenge Proceeding by any party-in-interest.

13.    <u>Limitation on Use of Collateral</u>.  Notwithstanding anything herein or in any other order by this Court to the contrary, no Cash Collateral, Prepetition Collateral, proceeds of any of the foregoing, or the Carve-Out may be used for any of the following: (a) to pay professional fees, disbursements, costs, or expenses incurred by any party in connection with any litigation or threatened litigation (whether by contested matter, adversary proceeding or otherwise, including any investigation in connection with litigation or threatened litigation) against any of the Prepetition Secured Parties or for the purpose of objecting to or challenging the validity, perfection, enforceability, extent, or priority of any claim, lien, or security interest held or asserted by any of the Prepetition Secured Parties or the validity or enforceability of this Interim Order or asserting any defense, claim, cause of action, counterclaim, or offset with respect to the Secured Obligations (including, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise) or the Prepetition Liens or against any of the Prepetition Secured Parties or their respective representatives; (b) to object to, contest, interfere with, prevent, hinder, or otherwise delay any of the Prepetition Secured Parties' assertion, enforcement or realization on the Prepetition Collateral (including the Cash Collateral), including the exercise of rights or remedies with respect thereto after the Termination Date, in accordance with the Credit Documents or this Interim Order other than to seek a determination that the Termination Date has not occurred; (c) to seek to modify any of the rights granted to the Prepetition Secured Parties under this Interim Order or the Credit Documents; (d) to pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved by an order of this Court that is in form and substance reasonably satisfactory to the First Lien Agent, the Second Lien Agent, and the ABL Agent; (e) to object to,

contest, delay, prevent, or interfere with in any way the exercise of rights or remedies by any Prepetition Secured Parties with respect to any Prepetition Collateral (including the Cash Collateral) after the occurrence of the Termination Date (other than to the extent expressly permitted by the final provisos contained in paragraph 8 and this paragraph 12 of this Interim Order); or (f) to pursue an Alternative Transaction other than as expressly permitted under the Restructuring Support Agreement; *provided* that, notwithstanding the foregoing or anything else to the contrary herein, advisors to the Creditors' Committee, if any, may incur fees and expenses in investigating the claims and liens of the Prepetition Secured Parties prior to the Investigation Termination Date not to exceed $50,000 in the aggregate; *provided further* that nothing herein shall preclude the Debtors from seeking reimbursement for their reasonable fees and expenses incurred in responding to formal discovery requests brought by third parties in connection with any of the foregoing; *provided further* that nothing herein shall preclude the Debtors from (x) seeking, in good faith, a determination regarding whether the Termination Date has occurred (or curing or attempting to cure any alleged termination events hereunder), (y) seeking, in good faith, an order authorizing the Debtors' non-consensual use of Cash Collateral by showing that the Prepetition Secured Parties are adequately protected, or (z) contesting, in good faith, whether the Restructuring Support Agreement is breached or otherwise terminated.

14.     <u>Letters of Credit under the ABL Documents</u>.  Subject to the provisions of this Interim Order, including, without limitation, the adequate protection granted to or for the benefit of the ABL Secured Parties and the remedies provisions in paragraph 8, following entry of this Interim Order, the Debtors shall be authorized, but not directed, to request that the Issuing Banks extend, renew, or otherwise amend letters of credit issued under the ABL Credit Agreement, in accordance with the practices and procedures in the ABL Documents and subject to the terms and conditions of the ABL Credit Agreement, and to take all actions reasonably appropriate with respect thereto (including seeking that the applicable beneficiaries of such letters of credit approve the same), and the Issuing Banks in their discretion are each authorized to extend, renew, or otherwise

amend such letters of credit in accordance with the terms of the ABL Credit Agreement, *provided* that no Issuing Bank or any other ABL Secured Party shall have any obligation to extend, renew, or otherwise amend any letters of credit and the obligations of the parties with respect to existing letters of credit shall not be modified by this Interim Order except as otherwise described in paragraph 6(h) of this Interim Order.  Notwithstanding anything herein to the contrary, the Debtors' right to request any such extension, renewal, or amendment shall terminate on the Termination Date.

15.    <u>No Waiver of Secured Parties' Rights; Reservation of Rights</u>.  Notwithstanding any provision in this Interim Order to the contrary, this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, any of the Prepetition Secured Parties' rights with respect to any person or entity other than the Debtors or with respect to any other collateral owned or held by any person or entity other than the Debtors.  The rights of the Prepetition Secured Parties are expressly reserved and entry of this Interim Order shall be without prejudice to, and does not constitute a waiver, expressly or implicitly, of the following, provided, for the avoidance of doubt, that the terms of the Restructuring Support Agreement shall continue to bind the parties thereto:

(a)    the Prepetition Secured Parties' rights under the Credit Documents;

(b)    the Prepetition Secured Parties' rights to seek any other or supplemental relief in respect of the Debtors;

(c)    the Prepetition Secured Parties' rights to seek modification of the grant of adequate protection provided under this Interim Order so as to provide different or additional adequate protection at any time;

(d)    any of the Prepetition Secured Parties' rights under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the right to: (i) request modification of the Automatic Stay; (ii) request dismissal of the Chapter 11 Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with extended powers; or (iii) propose, subject to section 1121 of the Bankruptcy Code, a chapter 11 plan or plans;

(e)    any of the Prepetition Secured Parties' unqualified right to credit bid up to the full amount of any remaining Secured Obligation in the sale of any Prepetition Collateral, or, pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of

32

reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code; or

       (f)     any other rights, claims, or privileges (whether legal, equitable, or otherwise) of the Prepetition Secured Parties.

16.    <u>Modification of Automatic Stay</u>.  The Debtors are authorized and directed to perform all acts and to make, execute, and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Interim Order and the transactions contemplated hereby.  The Automatic Stay is hereby modified to permit the Debtors and each of the Prepetition Secured Parties to accomplish each of the transactions contemplated by this Interim Order.

17.    <u>Further Assurances</u>.  The Debtors shall execute and deliver to the Prepetition Agents and the Prepetition Lenders all such agreements, financing statements, instruments, and other documents as they may reasonably request to evidence, confirm, validate, or evidence the perfection of the Adequate Protection Liens.  The First Lien Agent, the Second Lien Agent, and the ABL Agent are hereby authorized to file or record such documents in their discretion without seeking modification of the Automatic Stay, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.

18.    <u>506(c) Waiver</u>.  Subject to the entry of the Final Order, if any, and the Carve-Out, all rights to surcharge any Prepetition Secured Party, any of the Secured Obligations, any of their respective claims, the Prepetition Collateral, or the Adequate Protection Collateral pursuant to sections 506(c) or 105(a) of the Bankruptcy Code, or any other applicable principal in equity or law shall be and are hereby finally and irrevocably waived, and such waiver shall be binding upon the Debtors and all parties in interest in these Chapter 11 Cases, and no costs or expenses of administration which have been or may be incurred in any of the Chapter 11 Cases at any time shall be charged against any of the foregoing without the prior written consent of the Prepetition Agents, the Required Consenting Term Lenders, and the Required ABL Lenders and no such consent shall

be implied from any other action, inaction, or acquiescence by any of the Prepetition Secured Parties or their respective representatives or from the Prepetition Secured Parties' consent to the budget or any provision of this Interim Order or the Final Order.

19.  <u>Payments Free and Clear</u>.  Any and all payments or proceeds remitted to the Prepetition Secured Parties pursuant to the provisions of the Orders or any subsequent order of the Court shall be irrevocable (subject to paragraphs 11 and 14 of this Interim Order), received free and clear of any claim, charge, assessment, or other liability, including, without limitation, subject to entry of the Final Order, if any, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtors) or 552(b) of the Bankruptcy Code, and solely in the case of payments made or proceeds remitted after the delivery of a Carve-Out Trigger Notice, subject to the Carve-Out in all respects.

20.  <u>Bankruptcy Code Section 552(b)</u>.  The Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and, subject to the entry of a Final Order, if any, and the Carve-Out, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, products, offspring, or profits of any of the Prepetition Collateral, subject to paragraph 11 of this Interim Order.

21.  <u>No Marshaling/Application of Proceeds</u>.  The Prepetition Agents shall be entitled to apply the payments or proceeds of the Prepetition Collateral (including the Cash Collateral) in accordance with the provisions of the Credit Documents, including the Intercreditor Agreements and any related intercreditor agreements, and, subject to the Carve-Out and the earlier of the entry of the Final Order, if any, or the Effective Date, in no event shall any of the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral (including the Cash Collateral) for the benefit of any non-Secured Party.

22.     <u>Restrictions on Granting Postpetition Claims and Liens</u>. Except as expressly provided in this Interim Order, no claim or lien that is *pari passu* with or senior to the claims and liens of any of the Prepetition Secured Parties, including Adequate Protection Superpriority Claims and Adequate Protection Liens shall be offered by any Debtor, or granted, to any other person.

23.     <u>Automatic Effectiveness of Liens</u>.  The Adequate Protection Liens shall not be subject to challenge and shall attach and become valid, perfected, enforceable, non-avoidable, and effective by operation of law as of the Petition Date, having the priority set forth in paragraph 5 of this Interim Order, without any further action by the Debtors or the Prepetition Secured Parties and without the necessity of execution by the Debtors, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, filings with the U.S. Patent and Trademark Office, the U.S. Copyright Office, or the Library of Congress, or the taking of any other actions.  If any of the Prepetition Agents hereafter requests that the Debtors execute and deliver to them financing statements, security agreements, collateral assignments, mortgages, or other instruments and documents considered by such agent to be reasonably necessary or desirable to further evidence the perfection of the Adequate Protection Liens, the Debtors are hereby directed to execute and deliver such financing statements, security agreements, mortgages, collateral assignments, instruments, and documents, and the First Lien Agent, the Second Lien Agent, and the ABL Agent are hereby authorized to file or record such documents in their discretion without seeking modification of the Automatic Stay, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.

24.     <u>Binding Effect</u>.  Subject to paragraph 11 of this Interim Order, the provisions of this Interim Order shall be binding upon and inure to the benefit of the Prepetition Secured Parties to the extent and as set forth herein, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereafter appointed or elected for the estate of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property

35

of the estate of any of the Debtors). To the extent permitted by applicable law, this Interim Order

shall bind any trustee hereafter appointed or elected for the estate of any of the Debtors, whether in

these Chapter 11 Cases or in the event of the conversion of any of the Chapter 11 Cases to a

liquidation under chapter 7 of the Bankruptcy Code. Such binding effect is an integral part of this

Interim Order.

   25. <u>Notices and Documents and Communications pursuant to this Interim Order;</u>

<u>Invoices</u>. All notices, documents, and other communications provided for herein (including the

delivery of the Proposed Budgets, any objections or approvals thereof, or Budget Variance Reports

under paragraph 3 of this Interim Order) shall be in writing (including by email) and shall be

delivered by hand or overnight courier service, mailed by certified or registered mail, or emailed

as follows,

    a) if to the Debtors,

     FULLBEAUTY Brands Holdings Corp.
     One New York Plaza
     New York, New York 10004
     Attention: Chief Executive Officer
        Chief Legal Officer

     FULLBEAUTY Brands Holdings Corp.
     50 Main Street, Suite 1000
     White Plains, New York 10606
     Attention: Chief Executive Officer
        Chief Legal Officer

     *with a courtesy copy (that does not constitute notice) to:*

     Kirkland & Ellis LLP
     601 Lexington Avenue
     New York, New York 10022
     Attention: Jonathan S. Henes, P.C.
        Emily Geier
        George Klidonas
        Gene Goldmintz
     e-mail: jhenes@kirkland.com
        emily.geier@kirkland.com
        george.klidonas@kirkland.com
        gene.goldmintz@kirkland.com

b)    if to the First Lien Agent,

Wilmington Savings Fund Society, FSB
Global Capital Markets
500 Delaware Ave
Wilmington, Delaware 19081
Attention:   Raye Goldsborough
                    Benedict Harris
                    Haley Harris
e-mail:       rgoldsborough@wsfsbank.com
                    bharris3@wsfsbank.com
                    hharis@wsfsbank.com

*with a copy to:*

Cahill Gordon & Reindel LLP
80 Pine Street
New York, New York 10005
Attention:   Corey Wright
e-mail:       cwright@cahill.com

c)    if to the Second Lien Agent

Wilmington Trust, National Association
50 South Sixth Street, Suite 1290
Minneapolis, Minnesota 55402
Attention:   Jeffery Rose
e-mail:       jrose@wilmingtontrust.com

*with a copy to:*

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, Connecticut 06103
Attention:   Marie C. Pollio
                    Nathan Z. Plotkin
e-mail:       mpollio@goodwin.com
                    nplotkin@goodwin.com

d)    if to the ABL Agent,

J.P. Morgan Chase Bank, N.A.
270 Park Avenue
New York, New York 10017
Attention:   Daniel J. Stampfel
e-mail:       daniel.j.stampfel@chase.com

*with a copy to:*

Davis Polk & Wardwell LLP
450 Lexington Avenue

37

New York, NY 10017
Attention:  Darren Klein
            Aryeh Falk
e-mail:     darren.klein@davispolk.com
            aryeh.falk@davispolk.com

26.    <u>Survival</u>.  The provisions of this Interim Order, except as otherwise superseded by

the provisions of the Final Order, if necessary, and any actions taken pursuant hereto shall survive

the entry of any order: (i) confirming any plan of reorganization in any of the Chapter 11 Cases;

(ii) converting any of the Chapter 11 Cases to a chapter 7 case; or (iii) dismissing any of the Chapter

11 Cases, and, with respect to the entry of any order as set forth in clause (ii) or (iii) of this

paragraph 25, the terms and provisions of this Interim Order, except as otherwise superseded by

the provisions of the Final Order, if any, including, without limitation, the Adequate Protection

Liens and the Adequate Protection Superpriority Claims, shall continue in full force and effect

notwithstanding the entry of any such order.

27.    <u>Effect of Dismissal of Chapter 11 Cases</u>.  If any of the Chapter 11 Cases is

dismissed, converted, or substantively consolidated, such dismissal, conversion, or substantive

consolidation of these Chapter 11 Cases shall not affect the rights of the Prepetition Secured Parties

under this Interim Order, and all of their rights and remedies hereunder, including, without

limitation, the Adequate Protection Liens and the Adequate Protection Superpriority Liens, shall

remain in full force and effect as if the Chapter 11 Cases had not been dismissed, converted, or

substantively consolidated.  If an order dismissing any of the Chapter 11 Cases is at any time

entered, such order shall provide or be deemed to provide (in accordance with Sections 105 and

349 of the Bankruptcy Code) that: (i) subject to paragraph 11 of this Interim Order, the Prepetition

Liens, Adequate Protection Liens, and Adequate Protection Superpriority Claims shall continue in

full force and effect and shall maintain their priorities as provided in this Interim Order (and that

the Adequate Protection Superpriority Claims shall, notwithstanding such dismissal, remain

binding on all interested parties) and (ii) to the greatest extent permitted by applicable law, this

Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the Prepetition Liens, Adequate Protection Liens, and Adequate Protection Superpriority Claims.

28.    <u>Intercreditor Agreements</u>.  Nothing in this Interim Order shall amend or otherwise modify the terms and enforceability of the Intercreditor Agreements.  The rights of the Prepetition Secured Parties in relation to one another shall at all times remain subject to the Intercreditor Agreements.

29.    <u>Cash Management</u>.    The Debtors shall maintain their cash management arrangements in accordance with the ABL Credit Agreement and in a manner substantially consistent with that described in the ABL Credit Agreement and the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* (the "<u>Cash Management Motion</u>").

30.    <u>Headings</u>.  The headings in this Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of the Interim Order.

31.    <u>Order Effective</u>.  This Interim Order shall be effective as of the date of the signature by the Court.

32.    <u>No Requirement to Accept Title to Collateral</u>.  The Prepetition Secured Parties shall not be obligated to accept title to any portion of the Prepetition Collateral in payment of the indebtedness owed to them by the Debtors, in lieu of payment in cash or cash equivalents, nor shall the Prepetition Secured Parties be obligated to accept payment in cash or cash equivalents that is encumbered by any interest of any person or entity.

33.    <u>Controlling Effect of Interim Order</u>.  To the extent any provision of this Interim Order conflicts or is inconsistent with any provision of the Motion or any prepetition agreement, the provisions of this Interim Order shall control to the extent of such conflict.

34.    <u>Final Hearing</u>.  Unless the Effective Date (as defined in the Plan) has occurred, the Final Hearing to consider the entry of the Final Order approving the relief sought in the Motion shall be held on February___, 2019 at [___] [a.m./p.m.] before the Honorable Robert D. Drain at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601.

Dated: February _____, 2019
White Plains, New York

                    THE HONORABLE ROBERT D. DRAIN
                    UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT 1</u>**

**Approved Budget**

*Dollars USD*

| | *Dollars in thousands* | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Week Beginning** | 2/3 | 2/10 | 2/17 | 2/24 | 3/3 | 3/10 | 3/17 | 3/24 | 3/31 | 4/7 | 4/14 | 4/21 | 4/28 |
| | **Week Ending** | 2/9 | 2/16 | 2/23 | 3/2 | 3/9 | 3/16 | 3/23 | 3/30 | 4/6 | 4/13 | 4/20 | 4/27 | 5/4 |
| | | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* |
| | **ADJUSTED NET SALES** | **13,890** | **12,797** | **16,159** | **15,700** | **15,224** | **19,025** | **22,595** | **15,090** | **15,406** | **17,805** | **16,833** | **17,049** | **19,085** |
| **Cash Receipt** | Sales-related Receipts | 14,126 | 14,333 | 15,371 | 17,087 | 15,972 | 18,225 | 21,256 | 17,765 | 15,272 | 16,734 | 17,157 | 16,871 | 17,911 |
| | Non Sales-related Receipts | 1,291 | 79 | 73 | 102 | 805 | 71 | 64 | 61 | 89 | 2,238 | 1,203 | 64 | 72 |
| | **TOTAL INFLOWS** | **15,417** | **14,412** | **15,444** | **17,189** | **16,777** | **18,297** | **21,320** | **17,825** | **15,361** | **18,972** | **18,359** | **16,935** | **17,983** |
| **Merchandise Disbursements** | KGS/Connor - Merch and Comms | 7,028 | 5,516 | 4,738 | 7,522 | 3,349 | 3,569 | 4,380 | 3,066 | 4,823 | 1,432 | 1,299 | 1,474 | 2,332 |
| | KGS Deposit | - | - | - | (10,842) | - | - | - | - | (6,158) | - | - | - | - |
| | Domestic and Other Imports | 3,847 | 2,360 | 2,622 | 2,333 | 2,687 | 2,208 | 2,748 | 1,770 | 2,932 | 2,879 | 2,063 | 969 | 2,821 |
| | Freight, Duty, and Other | 230 | 1,021 | 2,726 | 298 | 190 | 37 | 1,920 | 156 | 105 | 129 | 95 | 2,481 | 149 |
| | **Total Merchandise Disbursements** | **11,105** | **8,897** | **10,086** | **(689)** | **6,226** | **5,814** | **9,047** | **4,991** | **1,703** | **4,440** | **3,457** | **4,924** | **5,302** |
| **Operating Disbursements** | Commercial Investments (Non-P-Card) | 1,851 | 1,979 | 2,244 | 3,588 | 3,038 | 2,928 | 1,063 | 3,300 | 4,078 | 3,204 | 1,955 | 2,342 | 6,659 |
| | P-Card (CI, Distribution, & Other) | - | - | 834 | - | - | - | 3,098 | - | - | - | 4,346 | - | - |
| | Payroll | 197 | 4,665 | 708 | 4,455 | 770 | 5,720 | 770 | 4,410 | 770 | 4,605 | 1,011 | 4,288 | 1,069 |
| | Income, Property and Unclaimed Property | - | - | 38 | - | - | - | 74 | - | - | - | - | - | - |
| | Other Operating Disbursements | 6,971 | 1,599 | 1,685 | 2,990 | 1,956 | 2,266 | 1,682 | 1,938 | 4,486 | 1,996 | 5,693 | 2,180 | 3,514 |
| | **Total Operating Disbursements** | **9,019** | **8,243** | **5,509** | **11,033** | **5,764** | **10,914** | **6,687** | **9,648** | **9,334** | **9,805** | **13,005** | **8,810** | **11,241** |
| | **OPERATING CASH FLOW** | **(4,707)** | **(2,729)** | **(151)** | **6,846** | **4,787** | **1,569** | **5,585** | **3,186** | **4,324** | **4,726** | **1,897** | **3,201** | **1,440** |
| **Other** | Professional Fees | 13,794 | - | - | - | - | - | - | 250 | - | - | - | - | - |
| | Interest and Fees | 10,013 | - | - | - | - | - | - | - | - | - | - | - | - |
| | Principal Payments | (35,000) | - | - | - | - | - | - | - | - | - | - | - | - |
| | Other Non-Operating | 6,500 | - | - | - | - | - | - | - | - | - | - | - | - |
| | **Non-Operating and Financing Disbursem** | **(4,693)** | **-** | **-** | **-** | **-** | **-** | **-** | **250** | **-** | **-** | **-** | **-** | **-** |
| | **TOTAL OUTFLOWS** | **15,430** | **17,140** | **15,595** | **10,343** | **11,990** | **16,728** | **15,734** | **14,889** | **11,037** | **14,245** | **16,462** | **13,734** | **16,543** |
| | **NET CASH FLOW** | **(14)** | **(2,729)** | **(151)** | **6,846** | **4,787** | **1,569** | **5,585** | **2,936** | **4,324** | **4,726** | **1,897** | **3,201** | **1,440** |
| **Liquidity** | Borrowing Base | 96,332 | 96,332 | 96,332 | 96,332 | 96,332 | 96,332 | 92,225 | 92,225 | 92,225 | 92,225 | 89,444 | 89,444 | 92,908 |
| | Letters of Credit + Other Reserves | (16,625) | (16,625) | (16,625) | (16,625) | (16,625) | (16,625) | (16,625) | (16,625) | (16,625) | (16,625) | (16,125) | (16,125) | (16,125) |
| | **Borrowing Base Availability** | **79,707** | **79,707** | **79,707** | **79,707** | **79,707** | **79,707** | **75,600** | **75,600** | **75,600** | **75,600** | **73,319** | **73,319** | **76,783** |
| | Starting ABL Outstanding | 52,300 | 52,300 | 52,300 | 52,300 | 52,300 | 52,300 | 52,300 | 52,300 | 52,300 | 52,300 | 52,300 | 52,300 | 52,300 |
| | ABL Draw / (Repayment) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | **Ending ABL Outstanding** | **52,300** | **52,300** | **52,300** | **52,300** | **52,300** | **52,300** | **52,300** | **52,300** | **52,300** | **52,300** | **52,300** | **52,300** | **52,300** |
| | **Ending ABL Availability** | **27,407** | **27,407** | **27,407** | **27,407** | **27,407** | **27,407** | **23,300** | **23,300** | **23,300** | **23,300** | **21,019** | **21,019** | **24,483** |
| | Plus: Cash | 2,136 | 1,407 | 3,257 | 8,103 | 10,889 | 12,458 | 18,044 | 20,980 | 25,304 | 30,030 | 31,928 | 35,128 | 36,569 |
| | **ENDING LIQUIDITY** | **29,543** | **28,814** | **30,663** | **35,509** | **38,296** | **39,865** | **41,344** | **44,280** | **48,604** | **53,331** | **52,946** | **56,147** | **61,052** |
| | Beginning Liquidity | 29,556 | 29,543 | 28,814 | 30,663 | 35,509 | 38,296 | 39,865 | 41,344 | 44,280 | 48,604 | 53,331 | 52,946 | 56,147 |
| | Change in Cash | (14) | (729) | 1,849 | 4,846 | 2,787 | 1,569 | 5,585 | 2,936 | 4,324 | 4,726 | 1,897 | 3,201 | 1,440 |
| | Change in ABL Availability | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | **Net Cash Flow** | **(14)** | **(729)** | **1,849** | **4,846** | **2,787** | **1,569** | **5,585** | **2,936** | **4,324** | **4,726** | **1,897** | **3,201** | **1,440** |
| | Change in Borrowing Base Availability | - | - | - | - | - | - | (4,106) | - | - | - | (2,282) | - | 3,465 |
| | **Change in Liquidity** | **(14)** | **(729)** | **1,849** | **4,846** | **2,787** | **1,569** | **1,479** | **2,936** | **4,324** | **4,726** | **(384)** | **3,201** | **4,905** |
| | **ENDING LIQUIDITY** | **29,543** | **28,814** | **30,663** | **35,509** | **38,296** | **39,865** | **41,344** | **44,280** | **48,604** | **53,331** | **52,946** | **56,147** | **61,052** |