Jonathan S. Henes, P.C.
George Klidonas
Rebecca Blake Chaikin
Gene Goldmintz
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Emily E. Geier (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FULLBEAUTY BRANDS HOLDINGS CORP., *et al.*,[1] | ) | Case No. 19-22185 (RDD) |
| | ) | |
| Debtors. | ) | |
| | ) | |

**DISCLOSURE STATEMENT FOR THE**
**JOINT PREPACKAGED CHAPTER 11 PLAN OF**
**REORGANIZATION OF FULLBEAUTY BRANDS HOLDINGS CORP. AND ITS**
**DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Blackdog Holdings, Inc. (8991); FULLBEAUTY Brands Holdings Corp. (8053); FULLBEAUTY Brands, Inc. (4198); FULLBEAUTY Brands, LLC (9445); FULLBEAUTY Brands Management Services, LLC (8637); FULLBEAUTY Brands Merchant, Inc. (7812); FULLBEAUTY Brands Operations, LLC (5382); FULLBEAUTY Brands Texas, LLC (9606); Jessica London, Inc. (1070); and Swimsuits for All, LLC (3246).  The location of the Debtors' service address is:  50 Main Street, Suite 1000, White Plains, New York 10606.

**THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126, 11 U.S.C. §§ 1125, 1126. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS INTEND TO SUBMIT THIS DISCLOSURE STATEMENT TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE AND SUBJECT TO THE RESTRUCTURING SUPPORT AGREEMENT AND THE RELATED TERM SHEETS. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT FOR SOLICITATION OF VOTES ON THE JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF FULLBEAUTY BRANDS HOLDINGS CORP. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE FROM THE HOLDERS OF OUTSTANDING:**

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|:---:|:---:|
| **CLASS 4** | **FILO CLAIMS** |
| **CLASS 5** | **FIRST LIEN CLAIMS** |
| **CLASS 6** | **SECOND LIEN CLAIMS** |

**IF YOU ARE IN CLASS 4, CLASS 5, OR CLASS 6, YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN**

**DELIVERY OF BALLOTS**

**BALLOTS MUST BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT BY THE VOTING DEADLINE, WHICH IS 5:00 P.M. (PREVAILING EASTERN TIME) ON JANUARY 24, 2019 VIA THE ENCLOSED PRE-PAID, PRE-ADDRESSED RETURN ENVELOPE**

**OR**

**AT THE FOLLOWING ADDRESS:**

**<u>VIA FIRST-CLASS MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO:</u>**

**FULLBEAUTY BRANDS BALLOTS PROCESSING
C/O PRIME CLERK LLC
830 THIRD AVENUE, 3RD FLOOR
NEW YORK, NY 10022**

**OR**

**<u>VIA THE E-BALLOT PORTAL USING THE E-BALLOT ID ON YOUR BALLOT AT:</u>**

**<u>HTTPS://CASES.PRIMECLERK.COM/FULLBEAUTY</u>**

**PLEASE CHOOSE ONLY ONE METHOD TO RETURN YOUR BALLOT**

---

**BALLOTS RECEIVED VIA ELECTRONIC MEANS (OTHER THAN E-BALLOT)
WILL NOT BE COUNTED**

**IF YOU HAVE ANY QUESTIONS ON THE PROCEDURES FOR VOTING ON THE
PLAN, PLEASE CONTACT PRIME CLERK LLC (THE DEBTORS' SOLICITATION AGENT) AT:**

**(844) 205-7534 (TOLL FREE)**

**(347) 576-1559 (INTERNATIONAL)**

**OR VIA EMAIL: FULLBEAUTYBALLOTS@PRIMECLERK.COM**

---

This disclosure statement (as may be amended, supplemented, or otherwise modified from time to time, this "<u>Disclosure Statement</u>") provides information regarding the *Joint Prepackaged Chapter 11 Plan of Reorganization of FULLBEAUTY Brands Holdings Corp. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>"),[2] which the Debtors are seeking to have confirmed by the Bankruptcy Court. A copy of the Plan is attached hereto as <u>Exhibit A</u>. The Debtors are providing the information in this Disclosure Statement to certain Holders of Claims for purposes of soliciting votes to accept or reject the Plan.

Pursuant to the Restructuring Support Agreement, the Plan is currently supported by the Debtors, Holders of 100% of the amount of FILO Claims, Holders of approximately 99% of the amount of First Lien Claims, and the Holders of approximately 95% of the amount of Second Lien Claims. The Sponsors have also executed the Restructuring Support Agreement and, therefore, support the Debtors' Plan.

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in <u>Article VIII</u> of the Plan. There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or, in the alternative, waived.

You are encouraged to read this Disclosure Statement (including "Certain Factors to Be Considered" described in <u>Article VII</u> hereof) and the Plan in their entirety before submitting your Ballot to vote on the Plan.

The Debtors urge each Holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each transaction contemplated by the Plan.

The Debtors strongly encourage Holders of Claims in Class 4, Class 5, and Class 6 to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan. Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

---

**<u>RECOMMENDATION BY THE DEBTORS</u>**

**EACH DEBTOR'S BOARD OF DIRECTORS, GENERAL PARTNER, MEMBER, OR MANAGER, AS APPLICABLE, HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF EACH OF THE DEBTOR'S ESTATES, AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS. AT THIS TIME, EACH DEBTOR BELIEVES THAT THE PLAN AND RELATED TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES. EACH OF THE DEBTORS, THEREFORE, STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY</u> <u>RECEIVED</u> BY THE**

---

[2]   Capitalized terms used but not defined herein have the meanings given to such terms in the Plan.

**SOLICITATION AGENT NO LATER THAN <u>JANUARY 24, 2019 AT 5:00 P.M. (PREVAILING EASTERN TIME)</u> PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND IN THE BALLOTS.**

### SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

**The Bankruptcy Court has not reviewed this Disclosure Statement or the Plan, and the securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the United States Securities and Exchange Commission (the "<u>SEC</u>") under the United States Securities Act of 1933 (as amended, the "<u>Securities Act</u>") or any securities regulatory authority of any state under any state securities law ("<u>Blue Sky Laws</u>").  The Plan has not been approved or disapproved by the SEC or any state regulatory authority and neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan.  Any representation to the contrary is a criminal offense.  The Debtors are relying on section 4(a)(2) of the Securities Act, and similar Blue Sky Laws provisions, to exempt from registration under the Securities Act and Blue Sky Laws the offer to certain Holders of First Lien Claims, certain Holders of Second Lien Claims, and the Sponsors of new securities prior to the Petition Date, including in connection with the solicitation of votes to accept or reject the Plan (the "<u>Solicitation</u>").**

**After the Petition Date, the Debtors will rely on section 1145(a) of the Bankruptcy Code, Section 4(a)(2) of the Securities Act, and/or other exemptions under the Securities Act to exempt from registration under the Securities Act and Blue Sky Laws the offer, issuance, and distribution of New Common Stock and Warrants under the Plan and the shares of New Common Stock issuable upon exercise of the Warrants and the Option Rights.  Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.**

**Except to the extent publicly available, this Disclosure Statement, the Plan, and the information set forth herein and therein are confidential.  This Disclosure Statement and the Plan may contain material non-public information concerning the Debtors, their subsidiaries, and their respective debt and Securities.  Each recipient hereby acknowledges that it (a) is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is obtained from the company or its representatives, from purchasing or selling Securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such Securities and (b) is familiar with the United States Securities Exchange Act of 1934 (as amended, the "<u>Securities Exchange Act</u>") and the rules and regulations promulgated thereunder.**

## DISCLAIMER

This Disclosure Statement contains summaries of certain provisions of the Plan and certain other documents and financial information. The information included in this Disclosure Statement is provided solely for the purpose of soliciting acceptances of the Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Plan. All Holders of Claims entitled to vote are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting. The Debtors believe that these summaries are fair and accurate. The summaries of the financial information and the documents that are attached to, or incorporated by reference in, this Disclosure Statement are qualified in their entirety by reference to such information and documents. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement, on the one hand, and the terms and provisions of the Plan or the financial information and documents incorporated in this Disclosure Statement by reference, on the other hand, the Plan or the financial information and documents, as applicable, shall govern for all purposes.

Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement. The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Plan. The statements and financial information contained in this Disclosure Statement have been made as of the date hereof unless otherwise specified. Holders of Claims reviewing the Disclosure Statement should not assume at the time of such review that there have been no changes in the facts set forth in this Disclosure Statement since the date of this Disclosure Statement. No Holder of a Claim or Interest should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in this Disclosure Statement, the documents attached to this Disclosure Statement, and the Plan. This Disclosure Statement does not constitute legal, business, financial, or tax advice. Any Person or Entity desiring any such advice should consult with their own advisors. Additionally, this Disclosure Statement has not been approved or disapproved by the Bankruptcy Court, the SEC, or any securities regulatory authority of any state under Blue Sky Laws. The Debtors are soliciting acceptances to the Plan prior to commencing any cases under chapter 11 of the Bankruptcy Code.

The financial information contained in or incorporated by reference into this Disclosure Statement has not been audited, except as specifically indicated otherwise. The Debtors' management, in consultation with their advisors, has prepared the financial projections attached hereto as **Exhibit E** and described in this Disclosure Statement. The financial projections, while presented with numerical specificity, necessarily were based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of the Debtors' management. Important factors that may affect actual results and cause the management forecasts not to be achieved include, but are not limited to, risks and uncertainties relating to the Debtors' businesses (including their ability to achieve strategic goals, objectives, and targets over applicable periods), industry performance, the regulatory environment, general business and economic conditions, and other factors. The Debtors caution that no representations can be made as to the accuracy of these projections or to their ultimate performance compared to the information contained in the forecasts or that the forecasted results will be achieved. Therefore, the financial projections may not be relied upon as a guarantee or other assurance that the actual results will occur.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence and any analogous state or foreign laws or rules. As such, this Disclosure Statement shall not be construed to be conclusive advice on the tax, securities, financial or other effects of the Plan to Holders of Claims against or Interests in, the Debtors or any other party in interest. Please refer to <u>Article VII</u> of this Disclosure Statement, entitled "Certain Factors to Be Considered" for a discussion of certain risk factors that Holders of Claims voting on the Plan should consider.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors. No person is authorized by the Debtors in connection with this Disclosure Statement, the Plan, or the Solicitation to give any information or to make any representation or statement regarding this Disclosure Statement, the Plan, or the Solicitation, in each case, other than as contained in this Disclosure Statement and the exhibits attached hereto or as otherwise incorporated herein by reference or referred to herein.

If any such information, representation, or statement is given or made, it may not be relied upon as having been authorized by the Debtors.

This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions.  Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, but not limited to, those summarized herein.  When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements.  Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved.  These statements are only predictions and are not guarantees of future performance or results.  Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement.  All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in this Disclosure Statement.  Forward-looking statements speak only as of the date on which they are made.  Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ...................................................................................................................1

INTRODUCTION .............................................................................................................................3

ARTICLE II THE PLAN .................................................................................................................6

    2.1    Treatment of Claims and Interests ...................................................................6
    2.2    Compromise and Settlement of Claims, Interests, and Controversies ............7
    2.3    New Capital Structure ......................................................................................8
    2.4    Stockholders Agreement ...................................................................................8
    2.5    Advisory Services Agreement ..........................................................................8
    2.6    Unclassified Claims .........................................................................................9
    2.7    Liquidation Analysis ......................................................................................19
    2.8    Valuation Analysis .........................................................................................20
    2.9    Financial Information and Projections ...........................................................20

ARTICLE III VOTING PROCEDURES AND REQUIREMENTS ..........................................21

    3.1    Class Entitled to Vote on the Plan .................................................................21
    3.2    Votes Required for Acceptance by a Class .....................................................21
    3.3    Certain Factors to Be Considered Prior to Voting .........................................21
    3.4    Classes Not Entitled To Vote on the Plan ......................................................22
    3.5    Solicitation Procedures ...................................................................................22
    3.6    Voting Procedures ..........................................................................................23

ARTICLE IV BUSINESS DESCRIPTIONS .................................................................................24

    4.1    Overview of the Debtors' Business ................................................................24
    4.2    Organization and Capital Structure ...............................................................27
    4.3    The Debtors' Board Members and Executives ...............................................30

ARTICLE V EVENTS LEADING TO THE CHAPTER 11 CASES ..........................................33

    5.1    Operational Hurdles and Competition ............................................................33
    5.2    Changes in the Board of Directors and Other Recent Developments ............33
    5.3    Supply Chain and Liquidity Challenges ........................................................34
    5.4    The October 31 Interest Payments, Forbearance Negotiations, and the Restructuring
            Support Agreement ........................................................................................34
    5.5    Importance of Deleveraging ...........................................................................34

ARTICLE VI OTHER KEY ASPECTS OF THE PLAN ...........................................................35

    6.1    Distributions ...................................................................................................35
    6.2    Timing and Calculation of Amounts to Be Distributed .................................35
    6.3    Substantive Consolidation ..............................................................................38
    6.4    General Settlement of Claims and Interests ...................................................38
    6.5    Restructuring Transactions .............................................................................38
    6.6    Corporate Existence .......................................................................................40
    6.7    Vesting of Assets in the Reorganized Debtors ..............................................41
    6.8    Cancellation of Agreements, Securities Interests, and Other Interests ..........41
    6.9    Sources for Plan Distributions and Transfers of Funds Among Debtors .......41
    6.10   Exemption from Registration Requirements ..................................................41
    6.11   Organizational Documents .............................................................................42
    6.12   Exemption from Certain Transfer Taxes and Recording Fees .......................42
    6.13   Directors and Officers of the Reorganized Debtors .......................................42
    6.14   Directors and Officers Insurance Policies .....................................................43
    6.15   Other Insurance Policies .................................................................................43
    6.16   Preservation of Rights of Action ...................................................................43
    6.17   Corporate Action ............................................................................................44

6.18    Effectuating Documents; Further Transactions.................................................44
6.19    Management Incentive Plan.................................................................................44
6.20    Workers' Compensation Programs .....................................................................44
6.21    Treatment of Executory Contracts and Unexpired Leases ...............................45
6.22    Employee Compensation and Benefits...............................................................46
6.23    Release, Injunction, and Related Provisions .....................................................47
6.24    Setoffs and Recoupment......................................................................................50
6.25    Release of Liens ...................................................................................................50
6.26    Modification of Plan ............................................................................................51
6.27    Effect of Confirmation on Modifications...........................................................51
6.28    Revocation of Plan ...............................................................................................51
6.29    Reservation of Rights...........................................................................................51
6.30    Conditions Precedent to the Effective Date ......................................................51
6.31    Waiver of Conditions Precedent .........................................................................52
6.32    Effect of Non-Occurrence of Conditions to the Effective Date ......................53

**ARTICLE VII CERTAIN FACTORS TO BE CONSIDERED ................................53**
7.1    General ...................................................................................................................53
7.2    Risks Relating to the Plan and Other Bankruptcy Law Considerations...........53
7.3    Risks Relating to the Restructuring Transactions .............................................59
7.4    Risks Relating to the New Common Stock and Warrants..................................60
7.5    Risks Relating to the Debtors' Business .............................................................61
7.6    Certain Tax Implications of the Chapter 11 Cases and the Plan ......................63
7.7    Disclosure Statement Disclaimer .......................................................................63

**ARTICLE VIII CONFIRMATION PROCEDURES..............................................65**
8.1    The Confirmation Hearing...................................................................................65
8.2    Confirmation Standards .......................................................................................66
8.3    Best Interests Test / Liquidation Analysis .........................................................67
8.4    Feasibility..............................................................................................................67
8.5    Confirmation Without Acceptance by All Impaired Classes ............................67
8.6    Alternatives to Confirmation and Consummation of the Plan .........................68

**ARTICLE IX IMPORTANT SECURITIES LAW DISCLOSURE .......................69**
9.1    New Common Stock and Warrants......................................................................69
9.2    Issuance and Resale of New Common Stock and Warrants...............................69
9.3    Resales of New Common Stock and Warrants; Definition of Underwriter ......69
9.4    New Common Stock & Management Incentive Plan..........................................70

**ARTICLE X CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.........................................................................................................71**
10.1    Introduction..........................................................................................................71
10.2    Certain U.S. Federal Income Tax Consequences to the Debtors and Reorganized Debtors ...........72
10.3    Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Claims Entitled to Vote.....................................................................................................................75
10.4    Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Claims Entitled to Vote .........................................................................................................79
10.5    Information Reporting and Backup Withholding...............................................83

**ARTICLE XI CONCLUSION AND RECOMMENDATION................................85**

## **EXHIBITS**

| | |
|---|---|
| Exhibit A | Joint Prepackaged Chapter 11 Plan of Reorganization |
| Exhibit B | Restructuring Support Agreement (and exhibits thereto, including the Restructuring Term Sheet, term sheets regarding the Exit New Money Facility, New First Lien Term Loan, New Junior Debt, Warrants, Purchase Option, and Governance) |
| Exhibit C | Liquidation Analysis |
| Exhibit D | Valuation Analysis |
| Exhibit E | Financial Projections |
| Exhibit F | Corporate Organizational Chart |

**EXECUTIVE SUMMARY**

The Plan implements a pre-packaged restructuring agreed to among the Debtors and the Debtors' major stakeholders, including an ad hoc committee comprised of holders of approximately 99% of the First Lien Claims, an ad hoc committee comprised of holders of approximately 95% of holders of the Second Lien Claims, and the Debtors' prepetition equity sponsors and certain of their affiliated entities and investment funds, which restructuring will result in a significant deleveraging of the Debtors' capital structure, as reflected in the chart below:

| Capital Structure as of January 1, 2019 | Principal Outstanding | Post-Emergence Capital Structure | Principal Outstanding |
|---|---|---|---|
| ABL Loans (including letters of credit obligations) | $69 million | Exit ABL Facility (including letters of credit obligations) | $71 million |
| FILO Facility | $75 million | Exit New Money Facility | $30 million |
| First Lien Credit Facility | $782 million | New First Lien Term Loan | $252 million[3] |
| Second Lien Credit Facility | $345 million | New Junior Loan | $15 million - $50 million |
| **Total** | **$1,271 million** | **Total** | **$368 million - $403 million** |

The anticipated benefits of the Plan include, without limitation the following:

(a)  Conversion of approximately $782 million of the First Lien Credit Facility to a combination of equity, $175 million of a new first lien facility, and up to $35 million of a new junior loan;

(b)  Conversion of approximately $345 million of the Second Lien Credit Facility to a combination of equity, warrants, and $15 million of a new junior loan;

(c)  Prompt emergence from chapter 11; and

(d)  A new money capital infusion in the form of a $30 million exit first lien facility, backstopped by certain of the First Lien Lenders.

The Plan provides for a comprehensive restructuring of the Debtors' prepetition obligations, preserves the going-concern value of the Debtors' businesses, maximizes all creditor recoveries, and protects the jobs of the Debtors' invaluable employees. To evidence their support of the Debtors' restructuring, the Debtors and their key stakeholders executed the Restructuring Support Agreement (as defined herein), a copy of which is attached hereto as **Exhibit B**. As described in further detail below, under the terms of the Plan, among other things:

(a)  Each Holder of First Lien Claims will receive its Pro Rata Share of the following:

(i)  $175 million in aggregate principal amount of the New First Lien Term Loan;

(ii)  at least 87.5% of the New Common Stock (subject to dilution as set forth in the Plan);

(iii)  the opportunity to elect to receive, in lieu of its share of the New Common Stock (which forfeited shares shall be distributed to non-electing Holders Pro Rata), a principal amount of the New Junior Loan that is equal to 85% of the Exchange Benchmark Value (which is $79 million or the mid-point range of the Plan Equity

---

[3]  The approximately $2 million increase is in the event the Debtors elects to roll accrued but unpaid interest with respect to the FILO Facility into the New First Lien Facility.

Value as defined herein)  of its original New Common Stock distribution (*i.e.*, a 15% discount to its Pro Rata share of the Exchange Benchmark Value of its original New Common Stock distribution) as further described in Section 6.5(a)(4) herein.  This election can be made by checking the applicable Item 3 in the Class 5 Ballot.

(b)     Each Holder of an Allowed Second Lien Claim shall receive the following:

(i)     **If Class 6 votes in favor of the Plan,** its Pro Rata Share of (A) $15 million of the New Junior Loan, (B) 10% of the New Common Stock, subject to dilution by the Option Rights, Warrants, and Management Incentive Plan), and (C) the Second Lien Warrant Package, as set forth in the Warrant Documents; or

(ii)    **If Class 6 votes to reject the Plan,** no Holder of an Allowed Second Lien Claim shall receive any distribution under the Plan, and the 10% of the New Common Stock shall be reallocated to the Holders of Allowed First Lien Claims in Class 5 and distributed in accordance with Article III.B.5.c of the Plan.

(c)     Pursuant to an Advisory Services Agreement, in exchange for the provision of transition services, continuation of advisory and operational services, and provision of releases, the Service Providers or their affiliates that provide advisory services shall receive 2.5% of the New Common Stock as well as the Option Rights and the Sponsor Warrant Package, as described herein.

(d)     All General Unsecured Claims will be Reinstated.

The purpose of this Disclosure Statement is to provide Holders of Claims entitled to vote to accept or reject the Plan with adequate information about (i) the Debtors' businesses and certain historical events, (ii) the Chapter 11 Cases, (iii) the rights of Holders of Claims and Interests under the Plan, and (iv) other information necessary to enable each Holder of a Claim to make an informed judgment as to whether to vote to accept or reject the Plan.

**INTRODUCTION**

FULLBEAUTY Brands Holdings Corp., together with its above captioned debtor affiliates (the "Debtors" or "FullBeauty"), and together with its non-debtor affiliates (the "Company"), are a leading direct-to-consumer retailer in the growing U.S. plus-size apparel market with over $730 million in direct plus-size sales in YTD 2018. FullBeauty serves both women and men, offering an assortment of plus-size apparel, swimwear, footwear, and home décor. Each of FullBeauty's seven brands provide a solution targeted to specific customer needs. In addition to these brands, FullBeauty operates website, *fullbeauty.com*, that offers a selection of its plus-size clothing, footwear, and accessories products across brands.


www.womanwithin.com

- *Woman Within* is a basic, casual comfortable and colorful collection offered at attractive prices.


www.roamans.com

- *Roaman's* offers a complete collection of stylish looks at value prices.

JESSICA LONDON®
www.jessicalondon.com

- *Jessica London* provides classic, polished, sophisticated collections with a fashion twist.


www.swimsuitsforall.com

- *Swimsuits for All* is the plus-size swimwear specialist, offering fashionable, flattering and well-fitting styles from aquatic fitness to fun beach wear.


www.kingsizedirect.com

- *KingSize* offers comfortable, masculine, easy and basic apparel at great values.


www.brylanehome.com

- *Brylane Home* offers customers a large selection of current and colorful soft home goods, including bedding, window, bath and seasonal décor.


www.ellos.us

- *Ellos* encompasses a modern Scandinavian lifestyle and design for women looking for apparel that is fitting for every occasion.


www.fullbeauty.com

- *FullBeauty.com* is the most comprehensive online resource for plus-size fashion inspiration, style advice and the latest trends, offering a selection of FullBeauty's proprietary brands.

FullBeauty started its businesses in 1901 as an early pioneer in the direct-to-consumer fashion market and expanded its presence over the past 117 years to include web, mobile, and tablet platforms. Over the past two decades, FullBeauty has established itself as a leading plus-size eCommerce retailer by sales and breadth of product selection. In August 2015, funds advised by Apax Partners LLP (collectively, "Apax"), a global private equity firm, acquired the Debtors from a group of investors led by Charlesbank Capital Partners, LLC ("Charlesbank") and Webster Capital Management, LLC ("Webster"). A more comprehensive discussion of each of the Debtors' businesses is set forth in Article IV hereof.

As described in more detail below, the Debtors employ approximately 1,665 employees in the United States, consisting of approximately 1,545 full-time employees and approximately 120 part-time employees. In addition to their employees, the Debtors periodically retain specialized individuals as independent contractors as well as temporary workers to fulfill certain duties on a short-term basis. The Debtors' workforce includes approximately 461 active employees subject to a collective bargaining agreement. The Debtors serve their customer base from their corporate headquarters in New York, New York, Debtor Swimsuits for All, LLC's merchandising and marketing office in Keyport, New Jersey, fulfillment centers in Indianapolis, Indiana and a customer care center in El Paso, Texas. As detailed more fully herein, the Debtors are seeking relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") to restructure and deleverage their balance sheet on a fully consensual basis.

The Debtors have outstanding funded debt obligations in the aggregate principal amount of approximately $1.3 billion, consisting of the following:

(a)     $68.9 million outstanding under the ABL Facility, which consists of approximately $52.3 million of borrowings and $16.6 million of letter of credit obligations;

(b)     approximately $75 million outstanding under the first-in, last-out ("<u>FILO</u>") tranche commitment;

(c)     approximately $782 million in principal amount outstanding under the First Lien Credit Facility;

(d)     approximately $345 million in principal amount outstanding under the Second Lien Credit Facility (together with the ABL Facility, FILO, First Lien Credit Facility, collectively, the "<u>Prepetition Secured Debt</u>").

As of September 30, 2018, the Debtors reported approximately $1.37 billion in book value in total assets and approximately $1.41 billion in book value in total liabilities.

Over the past few years, the Debtors faced a number of operational hurdles and a generally depressed retail apparel market, which reduced profit margins, revenues, and customer engagement. Unfortunately, top-line sales and EBITDA declined year-over-year; in addition, the Debtors have approximately $100 million of interest expenses on annual basis. These operational hurdles decreased available liquidity necessary to both pay the Debtors' approximately $26.2 million in interest payments due on October 31, 2018 in full and invest in the Debtors' business operations.

In response to these events, the Debtors hired the current industry-experienced executive team, including Chief Executive Officer Emilie Arel in November 2017, Chief Financial Officer Robert Riesbeck in June 2018, Chief Operating Officer Laura Warren in January 2017, Chief People Officer Robert Lepere in February 2018, Chief Customer Officer Liz White in January 2018, and Chief Legal Officer Arlene Hong in July 2018 to improve FullBeauty's operations. Following significant discussion and planning, the Sponsors and the Company's new executive management team recognized that even flawless execution of FullBeauty's new business plan would not enable it to alleviate the liquidity constraints under the Company's existing leveraged capital structure. In July 2018, the Debtors retained Kirkland & Ellis LLP ("<u>K&E</u>") as their legal advisors and PJT Partners LP ("<u>PJT</u>") as their restructuring advisors to advise management and the Company's board of directors (the "<u>Board of Directors</u>") regarding potential strategic alternatives to enhance the Debtors' liquidity and address the capital structure, including a comprehensive restructuring and/or a financing transaction. In August 2018, the Company appointed an independent director—Mohsin Meghji—to oversee their financing and restructuring efforts and evaluate potential transactions. After evaluating potential restructuring options, FullBeauty, in consultation with K&E and PJT, determined that its most important priorities were increasing liquidity and deleveraging the balance sheet.

Thereafter, FullBeauty began negotiating with each of the Ad Hoc Group of First Lien Lenders and the Ad Hoc Group of Second Lien Lenders regarding potential restructuring transactions. In September 2018, FullBeauty hired AlixPartners, LLP as its financial advisors ("Alix," and, together with K&E and PJT, collectively, the "Advisors") to address a pending liquidity crunch as a result of the imminent $26.2 million in interest payments due on October 31, 2018. In addition, FullBeauty took measures to enhance liquidity. On October 30, 2018 FullBeauty drew $24.5 million under the ABL Facility (the "Revolver Draw"), which provided FullBeauty with sufficient liquidity to make the aggregate $14.6 million FILO and First Lien Credit Facility interest payments. The Company took advantage of a 150-day standstill provision with respect to payment of a $10.0 million interest payment under the Second Lien Credit Agreement. Over the past few months, the Debtors and their Advisors worked constructively with both the ABL Lenders and the Ad Hoc Group of First Lien Lenders to negotiate a series of forbearance agreements, under which the ABL Lenders and the First Lien Lenders each agreed to forbear from enforcing remedies against the Debtors in connection with certain specified defaults. These forbearance agreements provided the Debtors with much needed time and breathing space to assess their strategic options, negotiate a consensual restructuring with their key stakeholders, and, eventually, agree on the Restructuring Support Agreement with certain FILO Lenders, certain First Lien Lenders, certain Second Lien Lenders, and the Sponsors (collectively, the "RSA Parties").

The Debtors and the RSA Parties subsequently worked diligently to finalize the terms of the restructuring support agreement attached hereto as **Exhibit B** (as amended, supplemented, or otherwise modified from time to time in accordance with its terms, and including any exhibits, schedules, or annexes attached thereto, the "Restructuring Support Agreement") before liquidity became an insurmountable issue and before the market got word of a potential restructuring. Ultimately, on December 18, 2018, the Debtors and the RSA Parties executed the Restructuring Support Agreement. The Restructuring Support Agreement is supported by the FILO Lenders holding 100% in amount of FILO Claims, First Lien Lenders holding approximately 99% in amount of First Lien Claims, and Second Lien Lenders holding approximately 95% in amount of Second Lien Claims as well as by the Sponsors. The transactions contemplated by the Restructuring Support Agreement will be implemented through the Plan, including an expeditious balance sheet restructuring that will eliminate approximately $900 million of the Debtors' funded-debt obligations and minimize the time and expense associated with the Chapter 11 Cases. Furthermore, under the Restructuring Support Agreement, the Debtors have secured the Exit New Money Credit Facility, a $30 million new money credit facility, to fund the Reorganized Debtors' working capital and operational needs upon emergence from chapter 11.

Given the overwhelming support for the Debtors' restructuring by the RSA Parties, the Debtors elected to pursue a prepackaged restructuring in the weeks leading up to the solicitation period to maximize value by minimizing both the costs of restructuring and the impact on the Debtors' businesses. Among other things, the Debtors intend to file motions to avoid the need for schedules of assets and liabilities and statements of financial affairs, which will provide them with significant cost savings. In addition, implementing the restructuring contemplated by the Plan in a "prepackaged" manner, will obviate the need for an unsecured creditors' committee and the expenses associated therewith that would otherwise be borne by the Debtors' estates. The Debtors believe that the Plan represents the most efficient route to consummate their restructuring and best position the Debtors, their trade partners, and other stakeholders going forward.

If confirmed and consummated, the Plan will: (i) significantly deleverage the Debtors' balance sheet; (ii) provide the Debtors with working capital to fund ongoing operations post-emergence; (iii) distribute the New First Lien Term Loan, New Junior Debt, New Common Stock, and Warrants to the Holders of First Lien Claims and Second Lien Claims, as applicable, in satisfaction of their claims; (iv) allow Holders of General Unsecured Claims to remain Unimpaired; (v) maintain the critical business relationship that FullBeauty and the Sponsors have had over the last several years; and (vi) maximize recoveries for all key stakeholders.

The formulation of the Restructuring Support Agreement and Plan contemplated thereunder is a significant achievement for the Debtors in the face of their liquidity issues and operating environment. Each of the Debtors strongly believes that the Plan is in the best interests of each of their estates and represents the best available alternative for all of their stakeholders. Given the Debtors' core strengths, including their experienced management team and strategic business plan going-forward, the Debtors are confident that they can implement the Plan's balance sheet restructuring to ensure the Debtors' long-term viability. To effectuate the Plan, the Debtors will pursue a prepackaged chapter 11 plan of reorganization, and intend to emerge from chapter 11 pursuant to the Plan on an expedited timeline and on a schedule to be established by the Bankruptcy Court.

# ARTICLE II

# THE PLAN

**2.1    Treatment of Claims and Interests**

The Plan provides for the treatment of Claims against and Interests in the Debtors through, among other things, the following:  (a) the issuance of New Common Stock and the Warrants; (b) the Unimpaired treatment of certain Claims and Interests; and (c) conversion of certain Claims into the New First Lien Term Loan or the New Junior Loan, as applicable.  As more fully described herein and in the Plan:

- Holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, Allowed Other Priority Claims, and Allowed Professional Claims will (i) be paid in full in Cash in the ordinary course of business, (ii) be Reinstated, (iii) receive the collateral securing the Claim, or (iv) be otherwise rendered Unimpaired, each as applicable;

- Holders of Allowed ABL Claims shall be paid in full in Cash using the proceeds from the Exit ABL Facility and, in the case of outstanding letters of credit, each such letter of credit shall be (i) cancelled and replaced, (ii) cash collateralized in accordance with section 2.03(f) of the ABL Credit Agreement, or (iii) backstopped or otherwise treated in a manner satisfactory to the applicable L/C Issuer (as defined in the ABL Credit Agreement) in its sole and absolute discretion;

- Holders of Allowed FILO Claims will receive their Pro Rata Share of $75 million of the New First Lien Term Loan and accrued interest;

- Holders of Allowed First Lien Claims shall receive, in full and final satisfaction of their First Lien Claims, their Pro Rata Share of the following:  (i) $175 million in aggregate principal amount of the New First Lien Term Loan; and (ii) subject to Article III.B.6.c of the Plan, at least 87.5% of the New Common Stock, subject to dilution by the Option Rights, Warrants, and Management Incentive Plan; *provided* that a Holder of an Allowed First Lien Claim may, by selecting the appropriate box on the Class 5 Ballot, elect to receive in lieu of New Common Stock (which forfeited shares shall be distributed to non-electing Holders of Allowed First Lien Claims based on their Pro Rata Share) a principal amount of the New Junior Loan that is equal to 85% of the Exchange Benchmark Value (which is $79 million or the mid-point range of the Plan Equity Value as defined herein) of such Holder's original New Common Stock distribution (*i.e.*, a 15% discount to the Exchange Benchmark Value of its original New Common Stock distribution); *provided*, *further*, that electing Holders of Allowed First Lien Claims shall not receive more than $35 million in aggregate principal amount of the New Junior Loan;[4]

- Holders of Allowed Second Lien Claims shall receive, in exchange for full and final satisfaction, settlement, release, and discharge of their Second Lien Claim, the following:  (i) if Class 6 votes to accept the Plan, its Pro Rata Share of (a) $15 million of the New Junior Loan, (b) 10% of the New Common Stock, subject to dilution by the Option Rights, Warrants, and Management Incentive Plan, and (c) the Second Lien Warrant Package as set forth in the Plan and the Warrant Documents or (ii) if Class 6 votes to reject the Plan, no Holder of an Allowed Second Lien Claim shall receive any distribution under the Plan, and the 10% of the New Common Stock shall be reallocated to the Holders of Allowed First Lien Claims in Class 5 and distributed in accordance with Article III.B.5.c of the Plan;

---

[4]    In the event that electing Holders of First Lien Claims (in selecting the appropriate box on the Class 5 Ballot) oversubscribe for the $35 million in aggregate principal amount of the New Junior Loan available pursuant to the Class 5 treatment, each such electing Holder of First Lien Claims will receive its Pro Rata Share of the $35 million in aggregate principal amount of the New Junior Loan with the remaining portion of the electing Holder's First Lien Claim to be satisfied with New Common Stock.

- Holders of Allowed General Unsecured Claims shall have such Claims Reinstated;

- Intercompany Claims shall receive be Reinstated, compromised, or cancelled at the election of the Debtors or the Reorganized Debtors, as applicable, and in accordance with the Restructuring Support Agreement;

- Holders of Interests in Holdings shall have such Interests cancelled and extinguished and be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to Holders of Interests in Topco or Holdings on account of any such Interests; and

- Holders of Intercompany Interests shall have such Intercompany Interest Reinstated, compromised, or cancelled at the election of the Debtors or the Reorganized Debtors, as applicable, and in accordance with the Restructuring Support Agreement.

As described below, you are receiving this Disclosure Statement because you are a Holder of a Claim entitled to vote to accept or reject the Plan. Prior to voting on the Plan, you are encouraged to read this Disclosure Statement and all documents attached to this Disclosure Statement in their entirety. As reflected in this Disclosure Statement, there are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement. Certain of these risks, uncertainties, and factors are described in Article VII of this Disclosure Statement, entitled "Risk Factors."

## 2.2     Compromise and Settlement of Claims, Interests, and Controversies

The Plan provides that, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against and Interests in the Debtors and their Estates and Causes of Action against other Entities.

The global settlement incorporated into the Plan and the Restructuring Support Agreement constitutes a settlement among the Debtors, the FILO Lenders, First Lien Lenders, Second Lien Lenders, and the Sponsors. As part of the global settlement: (a) the Service Providers will continue to provide their expertise and strategic input on the Company's go-forward operations pursuant to the Advisory Services Agreement in exchange for the Service Providers' Pro Rata Share of the Options Rights, the Sponsor Warrant Package, and 2.5% of the New Common Stock, all subject to dilution by the Warrants, the Option Rights, and the Management Incentive Plan; (b) the Sponsors agreed to defer exercising their worthless stock deduction on account of their Equity Interest in Holdings, thereby reducing potentially significant tax liabilities to the Company that would otherwise have resulted from such deduction; (c) the Holders of the FILO Claims will receive their Pro Rata Share of $75 million of the New First Lien Term Loan; (d) the Holders of the First Lien Claims will reduce their debt by between approximately $572 million and $607 million in exchange for their Pro Rata Share of $175 million of the New First Lien Term Loan, at least 87.5% of the New Common Stock, and up to $35 million of the New Junior Loan based on voluntary elections of Holders of First Lien Claims as further described in herein; (e) the Holders of the Second Lien Claims will reduce their debt by $330 million and forego and surrender a $10 million interest payment and any interest thereon under the Second Lien Credit Agreement in exchange for their Pro Rata Share of $15 million of the New Junior Loan, 10% of the New Common Stock, and the Second Lien Warrant Package, all of which is subject to Holders of Allowed Second Lien Claims voting to accept the Plan; and (f) the Debtors, the Reorganized Debtors, the FILO Lenders, the First Lien Agent, the First Lien Lenders, the Second Lien Agent, the Second Lien Lenders, the Sponsors, and, if the DIP Facility is incurred, the

DIP Agent (if any) and DIP Lenders (if any), in each case solely in such capacity, agree to release any all Claims or Causes of Action against one another.

**2.3    New Capital Structure**

On the Effective Date, the Debtors or Reorganized Debtors, as applicable, will effectuate the Restructuring Transactions by, among other things:  (a) entering into the Exit ABL Facility, proceeds of which shall be distributed to Holders of Allowed ABL Claims in Class 3 in accordance with the Plan; (b) entering into the Exit New Money Facility in accordance with the New First Lien Term Loan Documents; (c) terminating the First Lien Credit Facility and incurring the New First Lien Term Loan in accordance with the New First Lien Term Loan Documents; (d) terminating the Second Lien Credit Facility and incurring the New Junior Loan as provided in the New Junior Loan Documents; (e) cancelling the Interests in Holdings and issuing the New Common Stock to Holders of Allowed Claims as set forth in the Plan; (f) issuing the Warrants to (i) Holders of Allowed Second Lien Claims as set forth in the Plan and the Warrant Documents and (ii) the Service Providers as set forth in the Plan, the Warrant Documents, and the Advisory Services Agreement; and (g) issuing the Option Rights to the Service Providers as set forth in the Plan, the Advisory Services Agreement, and the Option Rights Documents.  All above-listed documents shall become effective in accordance with their terms and the Plan.

**2.4    Stockholders Agreement**

On the Effective Date, the parent company of the Reorganized Debtors and the Holders of the New Equity shall enter into the Stockholders Agreement in substantially the form included in the Plan Supplement.  The Stockholders Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of the New Equity shall be bound thereby, in each case without the need for execution by any party thereto other than the parent company of the Reorganized Debtors.

**2.5    Advisory Services Agreement**

Confirmation of the Plan shall be deemed to constitute approval of the Advisory Services Agreement (including all transactions contemplated thereby, such as any supplementation, and all actions to be taken and undertakings to be made as contemplated therein).  On the Effective Date, the Reorganized Debtors are authorized to and shall enter into the Advisory Services Agreement with the Service Providers on the terms set forth in the Restructuring Support Agreement, pursuant to which the Service Providers shall provide transition services, advisory services, and operational services and assistance to the Reorganized Debtors as reasonably requested from time to time and shall release any and all Sponsor Claims.  The Advisory Services Agreement shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with it terms.

In exchange for such services and release, the Service Providers shall be entitled to receive from the Reorganized Debtors their Pro Rata Share of (a) the Option Rights, subject to dilution by the Warrants and Management Incentive Plan, (b) the Sponsor Warrant Package, and (c) 2.5% (in the aggregate) of the New Common Stock issued and outstanding as of the Effective Date, subject to dilution by the Warrants, the Option Rights, and Management Incentive Plan; *provided*, *however*, that Pro Rata Share with respect to the Advisory Services Agreement means 72.44% as to Apax and 27.56% as to Charlesbank.

**2.6**     **Unclassified Claims**

(a)     **Unclassified Claims Summary**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims (if any), Professional Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan. The recoveries for such unclassified Claims are set forth below:

| Claim | Plan Treatment | Projected Plan Recovery |
|---|---|---|
| Administrative Claims | Paid in Full in Cash | 100% |
| DIP Facility Claims (if any) | Paid in Full in Cash or Such Other Agreed Upon Treatment | 100% |
| Accrued Professional Compensation Claims | Paid in Full in Cash | 100% |
| Priority Tax Claims | Paid in Full in Cash | 100% |

(b)     **Unclassified Claims**

(1)     **General Administrative Claims**

Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code and except to the extent that a Holder of an Allowed General Administrative Claim and the applicable Debtor before the Effective Date or the applicable Reorganized Debtor after the Effective Date agree to less favorable treatment, each Holder of an Allowed General Administrative Claim will be paid the full unpaid amount of such Allowed General Administrative Claim in Cash: (A) if such Allowed General Administrative Claim is based on liabilities that the Debtors incurred in the ordinary course of business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Administrative Claim and without any further action by any Holder of such Allowed General Administrative Claim; (B) if such Allowed General Administrative Claim is due, on the Effective Date, or, if such Allowed General Administrative Claim is not due as of the Effective Date, on the date that such Allowed General Administrative Claim becomes due or as soon as reasonably practicable thereafter; (C) if a General Administrative Claim is not Allowed as of the Effective Date, on the date that is no later than sixty (60) days after the date on which an order Allowing such General Administrative Claim becomes a Final Order of the Bankruptcy Court or as soon as reasonably practicable thereafter; or (D) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

(2)     **Professional Compensation Claims**

A.     **Final Fee Applications**

All final requests for Accrued Professional Compensation Claims shall be filed no later than sixty (60) days after the Effective Date. The amount of Accrued Professional Compensation Claims owed to the Retained Professionals shall be paid in Cash to such Retained Professionals from funds held in the Professional Fee Escrow Account after such Claims are Allowed by a Final Order. To the extent that funds held in the Professional Fee Escrow Account are unable to satisfy the amount of Accrued Professional Compensation Claims owed to the Retained Professionals, such Retained Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan. After all Allowed Accrued Professional Compensation Claims have been paid in full, any excess amounts remaining in the Professional Fee Escrow Account shall be returned to the Reorganized Debtors.

**B.**        **Professional Fee Escrow Account**

On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Retained Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.

**C.**        **Professional Fee Reserve Account**

To receive payment for unbilled fees and expenses incurred through the Confirmation Date, the Retained Professionals shall estimate in good faith their Accrued Professional Compensation Claims (taking into account any retainers) prior to and as of the Confirmation Date and shall deliver such estimate to the Debtors and counsel to the Required Consenting First Lien Lenders at least three (3) calendar days prior to the Confirmation Date. If a Retained Professional does not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional. The total amount so estimated as of the Confirmation Date shall comprise the Professional Fee Reserve Amount.

**D.**        **Post-Confirmation Date Fees and Expenses**

Upon the Confirmation Date, any requirement that Retained Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Debtor or Reorganized Debtor, as applicable, may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, each Debtor and Reorganized Debtor, as applicable, shall pay in Cash the reasonable legal fees and expenses incurred by such Debtor or Reorganized Debtor, as applicable, after the Confirmation Date in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors and Reorganized Debtors, as applicable, shall pay, within ten (10) Business Days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, all outstanding reasonable and documented fees and out-of-pocket expenses of (i) the First Lien Agent and the Second Lien Agent, (ii) the advisors to the Ad Hoc Group of First Lien Lenders, (iii) the advisors to the Ad Hoc Group of Second Lien Lenders, (iv) counsel to the Sponsors in an amount not to exceed $250,000 in the aggregate (after taking into account any and all amounts previously satisfied by FullBeauty and/or any of its affiliates or subsidiaries in connection with this restructuring), (v) Davis Polk & Wardwell LLP, in its capacity as counsel to certain First Lien Lenders and in an amount not to exceed $188,000 in the aggregate (after taking into account any and all previously paid amounts and all amounts previously satisfied by FullBeauty and/or any of its affiliates or subsidiaries), (vi) the members of the Ad Hoc Group of First Lien Lenders, and (vii) the advisors to the ABL Agent and the ABL Lenders in accordance with the ABL Credit Agreement and any forbearance agreements or amendments in connection with the ABL Credit Agreement in effect as of the date that the Restructuring Support Agreement was executed, in each case in accordance with section 27(b) of the Restructuring Support Agreement, if applicable. If the Debtors or the Reorganized Debtors dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors, as applicable, or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved. The undisputed portion of such reasonable fees and expenses shall be paid as provided herein.

**E.**        **Substantial Contribution Compensation and Expenses**

Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must file an application and serve such application on counsel for the Debtors or Reorganized Debtors, as applicable, and as required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules on or before three (3) Business Days after the Confirmation Date.

(3)    **First Lien Early Acceptance Premium**

On or before the Effective Date, the Reorganized Debtors shall pay in full in Cash each Eligible First Lien Lender its Pro Rata Share of the First Lien Early Acceptance Premium pursuant to the terms set forth in the Restructuring Support Agreement.

(4)    **DIP Facility Claims**

If the DIP Facility is incurred, notwithstanding anything to the contrary in the Plan, Holders of Allowed DIP Facility Claims, in exchange for full and final satisfaction, settlement, release, and discharge of all DIP Facility Claims (other than Claims under the DIP Facility that expressly survive the termination thereof), on the Effective Date, all amounts outstanding under the DIP Facility on the Effective Date, shall receive (A) payment in full in Cash (and all outstanding letters of credit shall be cash collateralized) or (B) such other treatment agreed upon between the Debtors, the Required Consenting First Lien Lenders, and Holders of Allowed DIP Facility Claims.

(5)    **Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall be treated pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on or before the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and such Holder or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

(6)    **United States Trustee Statutory Fees**

The Debtors and the Reorganized Debtors, as applicable, will pay fees payable pursuant to 28 U.S.C § 1930(a), including fees and expenses payable to the United States Trustee, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

(c)    **Classified Claims and Interests Summary**

The Plan establishes a comprehensive classification of Claims and Interests. The table below summarizes the classification, treatment, voting rights, and estimated recoveries, estimated as of December 31, 2018, of the Claims and Interests, by Class, under the Plan. Amounts in the far right column under the heading "Liquidation Recovery" are estimates only and are based on certain assumptions described herein and set forth in greater detail in the Liquidation Analysis (as defined below) attached hereto as **Exhibit C**. Accordingly, recoveries actually received by Holders of Claims and Interests in a liquidation scenario may differ materially from the projected liquidation recoveries listed in the table below.

The "Projected Plan Recovery" figures included in the table below are shown prior to any impact of the Management Incentive Plan and prior to the exercise of the Warrants or Option Rights. The figures reflect the full range of the Debtors' valuation analysis; however, for the avoidance of doubt, the Exchange Benchmark Value is fixed at the midpoint of the Debtors' equity valuation, or $79 million. The analysis also assumes approximately $2 million of accrued interest on the FILO Facility is capitalized as part of the New First Lien Term Loan.

| Class | Claim | Voting Rights | Treatment | Projected Plan Recovery | Liquidation Recovery |
|-------|-------|---------------|-----------|-------------------------|----------------------|
| 1 | Other Secured Claims | Presumed to Accept | (i) Payment in full in Cash in the ordinary course of business, (ii) the collateral securing such Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (iii) Reinstatement, or (iv) such other treatment rendering such Claim Unimpaired | 100% | 100% |
| 2 | Other Priority Claims | Presumed to Accept | (i) Payment in full in Cash in the ordinary course of business, (ii) Reinstatement, or (iii) such other treatment rendering such Claim Unimpaired | 100% | 100% |
| 3 | ABL Claims | Presumed to Accept | Payment in full in Cash or, in the case of each outstanding letter of credit, (i) cancelled and replaced, (ii) cash collateralized in accordance with section 2.03(f) of the ABL Credit Agreement, or (ii) backstopped or otherwise treated in a manner satisfactory to the applicable L/C Issuer (as defined in the ABL Credit Agreement) in its sole and absolute discretion | 100% | 100% |
| 4 | FILO Claims | Entitled to Vote | At the Debtors' election, either the Pro Rata Share of (i) $75 million of the New First Lien Term Loan and payment of any accrued but unpaid interest, fees, and expenses in Cash or (ii) $75 million plus any accrued but unpaid interest, fees, and expenses of the New First Lien Term Loan | 100% | 38% - 43% |

| 5 | First Lien Claims | Entitled to Vote | Pro Rata Share of (i) $175 million of the New First Lien Term Loan and (ii) subject to <u>Article III.B.6.c</u> of the Plan, 87.5% of the New Common Stock, subject to dilution by the Option Rights, Warrants, and Management Incentive Plan; *provided* that a Holder of an Allowed First Lien Claim may check the applicable box on the Class 5 Ballot to receive in lieu of New Common Stock (which forfeited shares shall be distributed Pro Rata to non-electing Holders ) a principal amount of the New Junior Loan that is equal to 85% of the Exchange Benchmark Value of such Holder's original New Common Stock distribution (*i.e.*, a 15% discount to the Exchange Benchmark Value of its original New Common Stock distribution); *provided*, *further*, that electing Holders of Allowed First Lien Claims shall not receive more than $35 million in aggregate principal amount of the New Junior Loan. | <u>Holders Electing Junior Loan</u><br>28.9% - 34.4%<br><br>or<br><br><u>Holders Not Electing Junior Loan</u><br>27.6% -41.3%[5] | 7% - 12% |
| 6 | Second Lien Claims | Entitled to Vote | (i) **If Class 6 votes to accept the Plan**, the Pro Rata Share of (A) $15 million of the New Junior Loan; (B) 10% of the New Common Stock, subject to dilution by the Option Rights, Warrants, and the Management Incentive Plan; and (C) the Second Lien Warrant Package described in the Warrant Documents or (ii) **If Class 6 votes to reject the Plan**, no distribution shall be received under the Plan, and the 10% of the New Common Stock shall be reallocated to Allowed First Lien Claims in Class 5 and distributed in accordance with <u>Article III.B.5.c</u> of the Plan | 4.8% - 7.3%[6] | 0% |

---

[5]   These projected recovery ranges for both electing and non-electing Holders assume the valuation range from the Valuation Analysis and a range of participation in the New Junior Loan in lieu of the New Common Stock by that Holders of Allowed First Lien Claims. The recovery ranges are shown prior to any impact of the Management Incentive Plan and prior to the exercise of the Warrants or Option Rights. The value of the New Common Stock for recovery purposes is reduced by the value of the Warrants and Option Rights.

[6]   This projected recovery range assumes the valuation range from the Valuation Analysis and a range of participation in the New Junior Loan in lieu of the New Common Stock by that Holders of Allowed First Lien Claims. The recovery range is shown prior to any impact of the Management Incentive Plan and prior to the

| 7 | General Unsecured Claims | Not Entitled to Vote (Presumed to Accept) | Reinstatement (and satisfaction in the ordinary course) | 100% | 0% |
| 8 | Intercompany Claims | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) | Reinstatement or Cancelation | 0% / 100% | N/A |
| 9 | Equity Interests | Not Entitled to Vote (Deemed to Reject) | Cancelation | 0% | 0% |
| 10 | Intercompany Interests | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) | Reinstatement or Cancelation | 0% / 100% | N/A |

    (d)    **Classified Claims and Interests Details**[7]

Except to the extent that the Debtors and a Holder of an Allowed Claim or Allowed Interest, as applicable, agree to less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date.

    (1)    *Class 1 — Other Secured Claims*

    A.    *Classification*: Class 1 consists of all Other Secured Claims.

    B.    *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive the following, at the option of the applicable Debtor:

        (i)    payment in full in Cash in the ordinary course of business;

---

exercise of the Warrants or Option Rights. The recovery to the Second Lien Claims includes the value of the Second Lien Warrant Package. The value of the New Common Stock for recovery purposes is reduced by the value of the Warrants and Option Rights.

[7] Allowed Claim amounts referenced in this section are subject to adjustment to reflect any changes to the outstanding principal amounts prior to the Effective Date.

        (ii)      the collateral securing its Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

        (iii)     Reinstatement of such Allowed Other Secured Claim; or

        (iv)     such other treatment rendering such Allowed Other Secured Claim Unimpaired.

C.     *Voting*:  Class 1 is Unimpaired, and Holders of Class 1 Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1 Other Secured Claims are not entitled to vote to accept or reject the Plan.

(2)     <u>*Class 2 — Other Priority Claims*</u>

A.     *Classification*:  Class 2 consists of all Other Priority Claims.

B.     *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Other Priority Claim, each Holder of such Allowed Other Priority Claim shall receive the following at the option of the applicable Debtor:

        (i)      payment in full in Cash in the ordinary course of business;

        (ii)     Reinstatement of such Allowed Other Priority Claim; or

        (iii)     such other treatment rendering such Allowed Other Priority Claim Unimpaired.

C.     *Voting*:  Class 2 is Unimpaired, and Holders of Class 2 Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

(3)     <u>*Class 3 — ABL Claims*</u>

A.     *Classification*:  Class 3 consists of ABL Claims.

B.     *Allowance*:  On the Effective Date, the ABL Claims shall be deemed Allowed in the aggregate amount of all outstanding principal (including any letter of credit and cash management obligations) as of the Petition Date, plus all outstanding interest, fees, expenses, costs, and other charges with respect to the ABL Facility under the ABL Credit Agreement whether accruing before or after the Petition Date.

C.     *Treatment*:  Except to the extent that a Holder of an Allowed ABL Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each ABL Claim, Holders of Allowed ABL Claims shall receive payment in full in Cash using the proceeds from the Exit ABL Facility or, in the case of outstanding letters of credit, each such letter of credit shall (i) cancelled and replaced, (ii) cash collateralized in accordance with section 2.03(f) of the ABL Credit Agreement, or (iii) backstopped or otherwise treated in

a manner satisfactory to the applicable L/C Issuer (as defined in the ABL Credit Agreement) in its sole and absolute discretion.

D.    *Voting*:  Class 3 is Unimpaired, and Holders of Class 3 ABL Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 3 ABL Claims are not entitled to vote to accept or reject the Plan.

(4)    *Class 4 — FILO Claims*

A.    *Classification*:  Class 4 consists of FILO Claims.

B.    *Allowance*:  On the Effective Date, FILO Claims shall be deemed Allowed in the aggregate principal amount of $75 million, plus all interest, fees, expenses, costs, and other charges payable with respect to the FILO Facility under the ABL Credit Agreement as of the Petition Date.

C.    *Treatment*:  Except to the extent that a Holder of an Allowed FILO Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each FILO Claim, on the Effective Date, each Holder of an Allowed FILO Claims shall receive, at the election of the Debtors, either of the following:

(i)    its Pro Rata Share of $75 million of the New First Lien Term Loan and payment in Cash of any accrued but unpaid interest, fees, and expenses; or

(ii)    its Pro Rata Share of $75 million plus any accrued but unpaid interest, fees, and expenses of the New First Lien Term Loan..

D.    *Voting*:  Class 4 is Impaired, and Holders of Class 4 FILO Claims are entitled to vote to accept or reject the Plan.

(5)    *Class 5 — First Lien Claims*

A.    *Classification*:  Class 5 consists of First Lien Claims.

B.    *Allowance*:  On the Effective Date, First Lien Claims shall be deemed Allowed in the aggregate principal amount of $781,568,965.52, plus all interest, fees, expenses, costs, and other charges due under the First Lien Credit Agreement.

C.    *Treatment*:  Except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each First Lien Claim, on the Effective Date, each Holder of Allowed First Lien Claims shall receive, in full and final satisfaction of its First Lien Claims, its Pro Rata Share of the following:

(i)    $175 million in aggregate principal amount of the New First Lien Term Loan; and

(ii)    subject to Article III.B.6.c of the Plan, at least 87.5% of the New Common Stock, subject to dilution by the Option Rights, Warrants, and Management Incentive Plan; *provided* that a Holder of an Allowed First Lien Claim may check the applicable box on the Class 5 Ballot to receive, in lieu of New

16

Common Stock (which forfeited shares shall be distributed Pro Rata to non-electing Holders of Allowed First Lien Claims), a principal amount of the New Junior Loan that is equal to 85% of the Exchange Benchmark Value of such Holder's original New Common Stock distribution (*i.e.*, a 15% discount to the Exchange Benchmark Value of its original New Common Stock distribution); *provided*, *further*, that electing Holders of Allowed First Lien Claims shall not receive more than $35 million in aggregate principal amount of the New Junior Loan.

D.    *Voting*:  Class 5 is Impaired, and Holders of Class 5 First Lien Claims are entitled to vote to accept or reject the Plan.

(6)    *Class 6 — Second Lien Claims*

A.    *Classification*:  Class 6 consists of Second Lien Claims.

B.    *Allowance*:  On the Effective Date, Second Lien Claims shall be deemed Allowed in the aggregate principal amount of $345 million, plus all accrued and unpaid interest, fees, expenses, costs, and other charges, under the Second Lien Credit Agreement as of the Petition Date.

C.    *Treatment*:  On the Effective Date, each Holder of an Allowed Second Lien Claim shall receive, in exchange for full and final satisfaction, settlement, release, and discharge of its Allowed Second Lien Claim, the following treatment:

(i)    **If Class 6 votes to accept the Plan,** its Pro Rata Share of (a) $15 million of the New Junior Loan, (b) 10% of the New Common Stock, subject to dilution by the Option Rights, Warrants, and Management Incentive Plan, and (c) the Second Lien Warrant Package as set forth in the Warrant Documents;

(ii)    **If Class 6 votes to reject the Plan,** no Holder of an Allowed Second Lien Claim shall receive any distribution under the Plan, and the 10% of the New Common Stock shall be reallocated to the Holders of Allowed First Lien Claims in Class 5 and distributed in accordance with Article III.B.5.c of the Plan.

D.    *Voting*:  Class 6 is Impaired, and Holders of Class 6 Second Lien Claims are entitled to vote to accept or reject the Plan.

(7)    *Class 7 — General Unsecured Claims*

A.    *Classification*: Class 7 consists of all General Unsecured Claims.

B.    *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of its Allowed Claim, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim (other than any Sponsor Claims or other Claims arising from the ownership of any instrument evidencing an ownership interest in a Debtor) shall have its Claim Reinstated as of the Effective Date as an obligation of the applicable Reorganized Debtor and shall be satisfied in full in the ordinary course of business in

17

accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim.

C.  *Voting*: Class 7 is Unimpaired, and Holders of Class 7 General Unsecured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 7 General Unsecured Claims are not entitled to vote to accept or reject the Plan.

(8)  *Class 8 — Intercompany Claims*

A.  *Classification*: Class 8 consists of all Intercompany Claims.

B.  *Treatment*:  On the Effective Date, Intercompany Claims shall be Reinstated, compromised, or cancelled at the election of the Debtors or the Reorganized Debtors, as applicable, and in accordance with the Restructuring Support Agreement.

C.  *Voting*:  Holders of Claims in Class 8 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

(9)  *Class 9 — Equity Interests in Holdings*

A.  *Classification*: Class 9 consists of all Interests in Holdings.

B.  *Treatment*:  On the Effective Date, all Interests in Holdings, including Sponsor Claims, shall be deemed cancelled and extinguished and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distributions to Holders of Interests in Topco or Holdings on account of any such Interests.

C.  *Voting*:  Class 9 is Impaired, and Holders of Class 9 Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

(10)  *Class 10 — Intercompany Interests*

A.  *Classification*: Class 10 consists of all Intercompany Interests.

B.  *Treatment*:  On the Effective Date, Intercompany Interests shall be Reinstated, compromised, or cancelled at the election of the Debtors or the Reorganized Debtors, as applicable, and in accordance with the Restructuring Support Agreement.

C.  *Voting*:  Holders of Class 10 Intercompany Interests are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

(e)  **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights with respect to any Unimpaired Claim, including all legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

18

(f)    **Voting Classes; Presumed Acceptance by Non-Voting Classes**

If a Class contains Claims or Interests eligible to vote, and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the Holders of such Claims or Interests in such Class.

(g)    **Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests or any Class thereof is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

(h)    **Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

(i)    **Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

(a)    **Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptances or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

(b)    **Intercompany Interests**

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure for the ultimate benefit of the Holders that receive New Equity in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions on account of such Holders' Allowed Claims.

**2.7    Liquidation Analysis**

The Debtors believe that the Plan provides a greater recovery for Holders of Allowed Claims as would be achieved in the Debtors' liquidation under chapter 7 of the Bankruptcy Code.  This belief is based on a number of considerations, including:  (a) the Debtors' primary assets are intangible and include goodwill and customer relationships, which would have little to no value in a chapter 7 liquidation; (b) the additional Administrative Claims generated by conversion to a chapter 7 case and any related costs in connection with a chapter 7 liquidation; and (c) the absence of a robust market for the liquidation of the Debtors' assets and services.

The Debtors, with the assistance of Alix, have prepared an unaudited liquidation analysis, which is attached hereto as **Exhibit C** (the "Liquidation Analysis"), to assist Holders of Claims and Interests in evaluating the Plan. The Liquidation Analysis compares the projected recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests under the Plan.  The Liquidation Analysis is based on the value of the Debtors' assets and

liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date.  Further, the Liquidation Analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings.  Therefore, the actual liquidation value of the Debtors could vary materially from the estimate provided in the Liquidation Analysis.

## 2.8    Valuation Analysis

The Plan provides for the distribution of the New Common Stock to Holders of Allowed First Lien Claims and New Common Stock and Warrants to Holders of Allowed Second Lien Claims if such Holders in Class 6 vote to accept the Plan upon consummation of certain of the Restructuring Transactions set forth in the Plan.  Additionally, the Advisory Services Agreement will provide for the New Common Stock and Warrants to be distributed to the Service Providers in accordance with the terms thereof.  Accordingly, PJT, at the request of the Debtors, has performed an analysis, which is attached hereto as **Exhibit D**, of the estimated implied value of the Debtors on a going-concern basis as of December 31, 2018 (the "Valuation Analysis").  The Valuation Analysis, including the procedures followed, assumptions made, qualifications, and limitations on review undertaken described therein, should be read in conjunction with Article VII of this Disclosure Statement, entitled "Certain Factors To Be Considered." The Valuation Analysis is based on data and information as of July 2018 through and including December 2018. PJT makes no representations as to changes to such data and information that may have occurred since the date of the Valuation Analysis.

THE VALUATION ANALYSIS REPRESENTS A HYPOTHETICAL VALUATION OF THE REORGANIZED DEBTORS AND THEIR ASSETS AND BUSINESSES, WHICH ASSUMES THAT SUCH REORGANIZED DEBTORS CONTINUE AS AN OPERATING BUSINESS IN SUBSTANTIALLY THE SAME CORPORATE STRUCTURE. THE ESTIMATED VALUE SET FORTH IN THE VALUATION ANALYSIS DOES NOT PURPORT TO CONSTITUTE AN APPRAISAL OR NECESSARILY REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE REORGANIZED DEBTORS, THEIR SECURITIES OR THEIR ASSETS, WHICH MAY BE MATERIALLY DIFFERENT THAN THE ESTIMATES SET FORTH IN THE VALUATION ANALYSIS.  ACCORDINGLY, SUCH ESTIMATED VALUE IS NOT NECESSARILY INDICATIVE OF THE PRICES AT WHICH ANY SECURITIES OF THE REORGANIZED DEBTORS MAY TRADE AFTER GIVING EFFECT TO THE RESTRUCTURING TRANSACTIONS SET FORTH IN THE PLAN.  ANY SUCH PRICES MAY BE MATERIALLY DIFFERENT THAN INDICATED BY THE VALUATION ANALYSIS.

## 2.9    Financial Information and Projections

In connection with planning and developing the Plan, the Debtors, with the assistance of their advisors, prepared projections for the fiscal years 2018 through 2022, which are attached hereto as **Exhibit E** (the "Financial Projections"), including management's assumptions related thereto.  For purposes of the Financial Projections, the Debtors have assumed an Effective Date of December 31, 2018.  The Financial Projections assume that the Plan will be implemented in accordance with its stated terms.  The Debtors are unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the Financial Projections due to a material change in the Debtors' prospects.

The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, commodity prices, regulatory changes, and/or a variety of other factors, including the factors listed in this Disclosure Statement.  Accordingly, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to significant business, economic, and competitive uncertainties.  Therefore, such projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein. The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement.

## ARTICLE III

## VOTING PROCEDURES AND REQUIREMENTS

**3.1**      **Class Entitled to Vote on the Plan**

The following Classes are entitled to vote to accept or reject the Plan (collectively, the "Voting Classes"):

| Class | Claim or Interest | Status |
|:---:|:---|:---:|
| 4 | FILO Claims | Impaired |
| 5 | First Lien Claims | Impaired |
| 6 | Second Lien Claims | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined below), including a ballot setting forth detailed voting instructions. If you are a Holder of a Claim in one or more of the Voting Classes, you should read your ballot(s) and carefully follow the instructions included in the ballot(s). Please use only the ballot(s) that accompany the applicable Solicitation Package, if any, or the ballot(s) that the Debtors, or Prime Clerk LLC (the "Solicitation Agent") on behalf of the Debtors, otherwise provided to you. If you are a Holder of a Claim in more than one of the Voting Classes, you will receive a ballot for each such Claim.

**3.2**      **Votes Required for Acceptance by a Class**

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

**3.3**      **Certain Factors to Be Considered Prior to Voting**

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of the Plan by all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Claims.

While these factors could affect distributions available to Holders of Allowed Claims and Interests under the Plan, the occurrence or impact of such factors may not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims in the Voting Classes pursuant to section 1127 of the Bankruptcy Code.

For a further discussion of risk factors, please refer to "Certain Factors to Be Considered" described in Article VII of this Disclosure Statement.

**3.4**    **Classes Not Entitled To Vote on the Plan**

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan. Accordingly, the following Classes of Claims against and Interests in the Debtors are ***not entitled to*** vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|:---:|:---|:---:|:---:|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | ABL Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 7 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 9 | Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |

**3.5**    **Solicitation Procedures**

(a)        **Solicitation Agent**

The Debtors have retained Prime Clerk LLC to act as, among other things, the Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

(b)        **Solicitation Package**

The following materials constitute the solicitation package (collectively, the "Solicitation Package") distributed to Holders of Claims in the Voting Classes:

- the form of the notice of the combined hearing to consider approval of the adequacy of the Disclosure Statement and confirmation the Plan;

- the Debtors' cover letter in support of the Plan;

- a Ballot and applicable voting instructions, together with a pre-paid, pre-addressed return envelope; and

- this Disclosure Statement and all exhibits hereto, including the Plan and all exhibits thereto.

(c)       **Distribution of the Solicitation Package and Plan Supplement**

The Debtors will cause the Solicitation Agent to distribute the Solicitation Package to Holders of Claims in the Voting Classes on January 7, 2019, which is seventeen (17) days before the Voting Deadline (*i.e.*, 5:00 p.m. (prevailing Eastern Time) on January 24, 2019.

The Solicitation Package (except the Ballots) may also be obtained from the Solicitation Agent by: (i) calling the Solicitation Agent at (844) 205-7534 (toll free) or (347) 576-1559 (international), (ii) emailing fullbeautyteam@PrimeClerk.com and referencing "FULLBEAUTY" in the subject line, and/or (iii) writing to the Solicitation Agent at FULLBEAUTY Brands c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, New York 10022.  After the Debtors file the Chapter 11 Cases, you may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://cases.primeclerk.com/fullbeauty, or for a fee via PACER at https://www.pacer.gov/.

The Debtors shall file the Plan Supplement with the Bankruptcy Court no later than one (1) calendar day after the Petition Date.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.   The Debtors will not serve copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Solicitation Agent by:  (i) calling the Solicitation Agent at the telephone numbers set forth above; (ii) visiting the Debtors' restructuring website, https://cases.primeclerk.com/fullbeauty; or (iii) writing to the Solicitation Agent at FULLBEAUTY Brands c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, New York 10022.

**3.6**    **Voting Procedures**

January 3, 2019 (the "Voting Record Date") is the date that was used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of a Claim in the Voting Classes to have its Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by (a) using the enclosed pre-paid, pre-addressed return envelope, (b) via first class mail, overnight courier, or hand delivery to FULLBEAUTY Brands Ballot Processing c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, New York 10022, or (c) via the e-ballot portal using the e-ballot ID on the Holder's ballot at https://cases.primeclerk.com/fullbeauty, so that such Holder's ballot is actually received by the Solicitation Agent on or before the Voting Deadline, which is January 24, 2019 at 5:00 p.m. (prevailing Eastern Time).

If a Holder of a Claim in a Voting Class transfers all of such Claim to one or more parties on or after the Voting Record Date and before the Holder has cast its vote on the Plan, such Claim Holder is automatically deemed to have provided a voting proxy to the purchasers of the Holder's Claim, and such purchasers shall be deemed to be the Holders thereof as of the Voting Record Date for purposes of voting on the Plan.

If you hold Claims in more than one Voting Class under the Plan, you should receive a separate Ballot for each Class of Claims, coded by Class number, and a set of solicitation materials.  You may also receive more than one Ballot if you hold Claims through one or more affiliated funds, in which case the vote cast by each such affiliated fund will be counted separately.  Separate Claims held by affiliated funds in a particular Class shall not be aggregated, and the vote of each such affiliated fund related to its Claims shall be treated as a separate vote to accept or reject the Plan, as applicable.  If you hold any portion of a single Claim, you and all other Holders of any portion of such Claim will be (a) treated as a single creditor for voting purposes and (b) required to vote every portion of such Claim collectively to either accept or reject the Plan.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE OR AS ORDERED BY THE BANKRUPTCY COURT.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT

INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS OR INTERESTS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM OR INTEREST WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS OR INTERESTS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.  IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLAIM AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.  SUBJECT TO THE TERMS OF THE RESTRUCTURING SUPPORT AGREEMENT, NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT FULLBEAUTY'S PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.  UPON (A) ANY TERMINATION DATE (AS DEFINED IN THE RESTRUCTURING SUPPORT AGREEMENT), ANY VOTES OR CONSENTS GIVEN BY A CONSENTING FIRST LIEN LENDER, (B) ANY FILO TERMINATION DATE (AS DEFINED IN THE RESTRUCTURING SUPPORT AGREEMENT), ANY VOTES OR CONSENTS GIVEN BY A CONSENTING FILO LENDER, (C) ANY SECOND LIEN TERMINATION DATE (AS DEFINED IN THE RESTRUCTURING SUPPORT AGREEMENT), ANY VOTES OR CONSENTS GIVEN BY A CONSENTING SECOND LIEN LENDER, OR (D) ANY SPONSOR TERMINATION DATE (AS DEFINED IN THE RESTRUCTURING SUPPORT AGREEMENT), ANY VOTES OR CONSENTS GIVEN BY A SPONSOR, IN EACH CASE, PRIOR TO SUCH TERMINATION SHALL AUTOMATICALLY BE DEEMED, FOR ALL PURPOSES, TO BE NULL AND VOID AB INITIO AND SHALL NOT BE CONSIDERED OR OTHERWISE USED IN ANY MANNER BY THE PARTIES IN CONNECTION WITH THE RESTRUCTURING AND THE RESTRUCTURING SUPPORT AGREEMENT AND SUCH CONSENTS OR BALLOTS MAY BE CHANGED OR RESUBMITTED REGARDLESS OF WHETHER THE APPLICABLE VOTING DEADLINE HAS PASSED (WITHOUT THE NEED TO SEEK AN ORDER OF A COURT OF COMPETENT JURISDICTION OR CONSENT FROM THE COMPANY OR ANY OTHER APPLICABLE PARTY ALLOWING SUCH CHANGE OR RESUBMISSION).

## ARTICLE IV

## BUSINESS DESCRIPTIONS

### 4.1    Overview of the Debtors' Business

FullBeauty is a direct-to-consumer market leader in the growing U.S. plus-size apparel market with over $730 million in direct plus-size sales in YTD 2018.  FullBeauty serves both women and men, offering an assortment of plus-size apparel, swimwear, footwear, and home décor.  Each of FullBeauty's brands provide a solution targeted to specific customer needs:  *Woman Within* and *Roaman's* offer a large variety of women's clothing for various occasions; *Jessica London* provides sophisticated styles for professional, casual, and special events; *King Size* offers a basic apparel line for big and tall men, *Ellos* offers a portfolio of modern, Swedish design apparel; *Swimsuits for All* specializes in plus-size swimwear; and *Brylane Home* specializes in home goods and décor.  In addition, FullBeauty operates a dedicated plus-size clothing website and eCommerce platform, *fullbeauty.com*, that offers FullBeauty's proprietary products.

FullBeauty was an early pioneer in the direct-to-consumer fashion market with operations dating back to 1901.  The Debtors launched their first fashion catalog, *Woman Within*, in 1924.  *Woman Within* offered mail order women's wear at affordable prices.  In 1941, FullBeauty moved its mail order business to Indianapolis, Indiana.  Since then, FullBeauty has maintained its Indianapolis presence, incorporating its distribution and logistics operations into Debtor FullBeauty Brands Merchant, Inc., an Indiana corporation.  FullBeauty maintains one 750,000 square foot distribution facility in Indianapolis, and a secondary 740,000 square foot facility in Plainfield, Indiana.  In addition to

its Indiana distribution facilities, FullBeauty maintains an in-house customer care center located in El Paso, Texas with over 600–800 (depending on anticipated volume) associates that operates eighteen (18) hours per day, seven (7) days per week and is closed only on Christmas Day.  The customer care center handles approximately 8 million points of contact each year, including phone calls, emails and live chat, and supports telemarketing, customer service, internet customer support for email/live chat and social media support, as well as customer protection and sales recovery support for all of FullBeauty's brands.  Debtor Swimsuits for All, LLC is based in Keyport, New Jersey, where its merchandising and marketing efforts are located.  FullBeauty's corporate headquarters is located in New York.  The services housed in the corporate headquarters include management, marketing, merchandising, planning, sourcing, design, creative services, inventory control, human resources functions, and online technology.

In the mid-twentieth century, FullBeauty began an expansion of their plus-size market share and industry presence through a series of acquisitions.  In 1982, FullBeauty acquired *Roaman's*, offering a complete collection of apparel at value prices.  In 1997, FullBeauty acquired *Jessica London*, a sophisticated collection with styles for professional, casual, and special events.  FullBeauty continued its expansion with its entrance into the home goods and male fashion markets.  In 1995, FullBeauty entered the male fashion market with the acquisition of *King Size*, a basic apparel line for big and tall men.  In 1998, FullBeauty launched *Brylane Home*, a home goods and lifestyle brand including bedding, window, bath, and seasonal décor.  Since 2014, FullBeauty has acquired the swimsuit company *Swimsuits for All* and entered into a license agreement for the design of clothes with *Ellos*, a Swedish clothing brand.

In 2001, FullBeauty launched its first eCommerce websites and has since expanded its focus to include emerging consumer technologies on mobile and tablet interfaces.  Over the past two decades, FullBeauty has established itself as a leading plus-size eCommerce retailer by sales and breadth of product selection.  In 2007, FullBeauty launched *fullbeauty.com*, a website which offers a selection of plus-size apparel, footwear and accessories products across its brands.  FullBeauty does not operate or own any brick-and-mortar locations.

FullBeauty has been the subject of a series of third-party acquisitions.  In 1999, FullBeauty was acquired by Kering S.A. (formerly known as Pinault-Printemps-Redoute) and organized as Redcats USA.  On February 5, 2013, a group of investors led by Charlesbank and Webster acquired all of the issued and outstanding equity interests and capital stock in Redcats USA LLC, (now known as FULLBEAUTY Brands, LLC), and its wholly owned subsidiaries through OSP Holdings Corp., (now known as FULLBEAUTY Brands Holdings Corp.).  The gross purchase price for FullBeauty was approximately $525 million.  On August 18, 2015, Apax entered into an agreement to acquire a controlling interest in FullBeauty from investment funds advised by each of Charlesbank and Webster for approximately $1.7 billion.  Following the acquisition, investment funds advised by Charlesbank retained approximately 26.4% of the outstanding equity in the Debtors' ultimate parent and such funds are one of the Sponsors.

(a)     **Online and Sales Infrastructure**

As mentioned above, FullBeauty launched its first online eCommerce platform in 2001.  Currently, FullBeauty operates its full online sales operation through its online eCommerce platforms, website *fullbeauty.com*, as well as third-party marketplaces, including Amazon and Walmart.com.  Through November 2018, eCommerce penetration grew to approximately 74% of gross demand, or $559 million, with over $136 million coming from mobile devices.

FullBeauty markets its brands through email marketing, search engine marketing and optimization, as well as targeted print media.  In 2018, FullBeauty achieved approximately 70% online penetration and an industry-leading web conversion rate of 5.4% year to date return.  FullBeauty's online marketing is bolstered by delivery of over 350 million print catalogs annually, which both drive traffic to FullBeauty's eCommerce platform and promote FullBeauty's brands.

(b)     **Supply Chain**

FullBeauty's direct-to-consumer model ensures the uninterrupted flow of merchandise from vendor source to customer.  Merchandise is sourced from foreign manufacturers, using agents and vendors based in the United States and overseas.  The sourcing strategy is carried out by FullBeauty's global sourcing team, comprised of 30 associates who manage two primary independent sourcing agents and a portfolio of more than 150 vendors.  These two sourcing agents manage approximately 53% of the Debtors' inventory purchases.

FullBeauty designs merchandise in-house and contracts with various foreign manufacturers located throughout Asia (collectively, the "Manufacturers"). The Manufacturers generally manufacture and ship inventory and other goods to FullBeauty pursuant to a "free on board" ("FOB") arrangement. Under an FOB arrangement, FullBeauty pays freight forwarders to transport merchandise and other goods from Asia to FullBeauty's U.S.-based warehouses and title passes to FullBeauty when merchandise and goods are loaded for shipment to the United States. FullBeauty does not actually take title of its goods until its goods are on board the ship or carrier. As a result, FullBeauty is at risk that its vendors will refuse to ship or deliver goods to the consolidator if their comfort level has diminished with respect to FullBeauty's financial condition. FullBeauty incurs a range of customs and import duties in the regular operation of its supply chain.

FullBeauty primarily stores and ship goods to United States customers from their warehouses in Indianapolis and Plainfield, Indiana (each, a "Warehouse," and together, the "Warehouses"). The Warehouses have foreign trade zone status, which allows FullBeauty to defer payment of duties until merchandise is shipped to customers, ensuring a seamless flow of goods. FullBeauty's primary Warehouse is a 750,000 square foot owned facility located in Indianapolis. The majority of merchandise is received, processed and distributed through the Indianapolis Warehouse. Merchandise typically arrives at the distribution facility pre-packed by the applicable Manufacturer and the site team leverages five separate sorting systems, to fulfill hundreds of thousands of orders each week through third-party carriers who ship directly to customers.

In addition to fulfillment center operations, FullBeauty's finance and IT departments are located in its Indianapolis Warehouse. FullBeauty also leases 740,000 square feet of Warehouse space in Plainfield, Indiana. The Plainfield Warehouse is used primarily for overflow, fragile, and oversized inventory in addition to processing orders for the Debtors' home business. In addition, the Debtors sublease 200,000 square feet of the Plainfield facility to a third party, with an option to increase such sublease by an additional 25,000 square feet. The term of the Plainfield Warehouse lease expires on September 14, 2019, with the option to extend for up to two additional five-year terms.

### (c)    The Debtors' Products and Inventory

FullBeauty's merchandising strategy is focused on providing a full range of well-fitting, comfortable and trend-right merchandise designed to address a variety of lifestyle needs ranging from casual, work, social and vacation wear, technical categories including swimwear and footwear; and home décor, all at affordable prices. FullBeauty offers products in a larger range of sizes compared to competing plus-size retailers, including women's sizes 12 to 44 and up to men's size 10XL. Product is designed in-house using a centralized design team that interprets seasonal trends for the merchandising team. In determining assortment, FullBeauty's merchants analyze historical purchasing data and review customer feedback and product reviews to develop new collections. Fresh colors, patterns, and fabrics are frequently introduced to create a sense of newness across the assortment, which mitigates some inventory and fashion risk. FullBeauty's design team works closely with its technical design and fit experts, who use live fit models to ensure products are comfortable and flattering. These processes enable FullBeauty to deliver a broad and deep inventory assortment comprised of over 400,000 SKUs.

### (d)    The Debtors' Employees

As of December 2018, FullBeauty employed approximately 1,665 employees in the United States, consisting of approximately 1,545 full-time employees and approximately 120 part-time employees. In addition to their employees, FullBeauty periodically retains specialized individuals as independent contractors as well as temporary workers to fulfill certain duties on a short-term basis. FullBeauty's workforce includes approximately 461 active employees subject to that certain collective bargaining agreement between FullBeauty and the Chicago and Midwest Regional Joint Board on behalf of its affiliated Local No. 2002 of Workers United (the "CBA"). The CBA also requires, among other things, that FullBeauty contribute approximately $0.66 per hour per eligible employee in 2018 and $0.70 per eligible employee in 2019 to the National Retirement Fund, totaling approximately $590,000 in 2018 and $600,000 in 2019. The CBA enables the Debtors to maintain a strong labor force in Indianapolis and Plainfield, Indiana, the location of the Debtors' Warehouses.

(e)        **Key Employee Incentive Plans**

Prior to the Petition Date, and in the ordinary course of business, the Debtors used a long-term incentive plans to drive business outperformance from senior executives and certain key employees.  Specifically, the Debtors historically employed cash-based annual bonus incentive programs and equity incentive grants for both insider and non-insider employees (collectively, the "Legacy Incentive Plans").  The participants in the annual bonus incentive programs were eligible for cash awards if they achieved certain adjusted EBITDA, sales, and cost-savings goals approved by the Board.  The participants in the equity incentive grant program were granted equity units based on a combination of components, including EBITDA, an investment performance indicator, and time. The Legacy Incentive Plans were essential components of the Debtors' historical compensation packages: they were designed to incentivize future performance, align management incentives with the Debtors' business objectives, and provide key employees with competitive, market-based compensation.

In late 2018, as a comprehensive restructuring process became imminent, it was clear that the Legacy Incentive Plans were insufficient to motivate key employees.  In particular, due to the Debtors' significant funded debt load and its impending restructuring, equity was no longer a viable incentive for senior executives and key employees. Consequently, the Debtors, in consultation with Willis Towers Watson ("WTW"), as their independent third-party compensation consultant, and their Advisors, discussed strategies on how best to incentivize senior executives and other key employees to align their interests with the strategic goals of the Debtors during a potential restructuring.

More specifically, the Debtors determined, in consultation with their advisors, that it was prudent to adopt insider and non-insider cash-based incentive compensation plans for FY 2019 (collectively, the "KEIPs"), rather than continuing the Legacy Incentive Plans, to better align incentives for senior management and certain other key personnel with the Debtors' strategic go forward goals.  The KEIPs include a similar scope of the Debtors' employees as was historically included under the Legacy Incentive Plans, encompassing approximately 311 participants, consisting of six insider employees and approximately 305 non-insider employees (collectively, the "KEIP Participants").  To earn KEIP payments, KEIP Participants must meet performance tiers based on certain metrics (collectively, the "Performance Goals").  The Performance Goals will be determined by the New Board.  If the achievement is between any of the performance tiers, payment of awards are calculated on the basis of straight-line interpolation.

On October 15, 2018, the compensation committee of the Board of Directors (the "Compensation Committee") unanimously approved the KEIPs, which were also subsequently approved by the Board of Directors on October 21, 2018.  The KEIPs will commence January 1, 2019, with each participant eligible to earn semi-annual cash payments, subject to New Board approval of the performance measures and conditions.  On the Effective Date, both the KEIP and the Retention Plans (discussed below) shall be assumed by the Reorganized Debtors as of the Effective Date, in each case as modified by the Restructuring Support Agreement and Exhibit A thereto and provided that the amounts to be paid under such plans shall not exceed $22.88 million in the aggregate.

(f)        **Prepetition and Post-Emergence Retention Payments**

On October 15, 2018, the Compensation Committee also approved a certain pre-filing key employee retention plan (the "KERP") and a certain non-insider retention plan (the "Non-Insider Retention Plan" and together with the KERP, the "Retention Plans"), which were subsequently approved by the Board of Directors on October 21, 2018.  On November 15, 2018, KERPs awards were paid to 6 insider employees.  The aggregate KERP payments to the six (6) insider employees totaled $4.8 million.  Non-Insider Retention Plan payments are scheduled to be paid to approximately thirty-two (32) non-insider participants at the end of the retention period, which is December 31, 2019.  The aggregate Non-Insider Retention Plan payments are estimated to not exceed approximately $2.6 million.

**4.2    Organization and Capital Structure**

(a)        **Organizational Structure**

An organizational chart illustrating the corporate structure of the Debtors is annexed hereto as **Exhibit F**.

(b)    **The Debtors' Capital Structure**

As of September 30, 2018, the Debtors reported approximately $1.37 billion in book value in total assets and approximately $1.41 billion in book value in total liabilities. As of the date hereof, the Debtors have outstanding funded debt obligations in the aggregate principal amount of approximately $1.3 billion, including the following:

- approximately $68.9 million outstanding under the ABL Facility, which consists of approximately $52.3 million of borrowings and $16.6 million of letter of credit obligations;

- approximately $75 million outstanding under the FILO tranche commitment;

- approximately $782 million in principal amount outstanding under the First Lien Credit Facility; and

- approximately $345 million in principal amount outstanding under the Second Lien Credit Facility.

(1)    **ABL Credit Facility**

The ABL Credit Facility consists of the ABL Facility and FILO Facility. The ABL Agent, the ABL Lenders, the FILO Lenders, the letter of credit issuers and other parties thereto and the Debtors are parties to the ABL Credit Agreement. Debtors FULLBEAUTY Brands Holdings Corp., FULLBEAUTY Brands Management Services, LLC, FULLBEAUTY Brands Merchant, Inc., FULLBEAUTY Brands Operations, LLC, and Jessica London, Inc. are each borrowers under the ABL Facility. The Debtors guaranteed the obligations of the borrowers pursuant to that certain ABL Guaranty Agreement, dated as of October 14, 2015 (the "ABL Guaranty Agreement").

Pursuant to, among other things, that certain ABL Lien Security Agreement, dated as of October 14, 2015, (together with all other pledge agreements or similar security documents entered into by any Debtor and the ABL Agent in respect of the Debtors' assets and all other documentation executed in connection with any of the foregoing, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "ABL Lien Security Documents"), the Debtors have granted a first-priority lien and security interest (the "ABL Liens") in, to, and against substantially all of the Debtors' assets described in the ABL Lien Security Documents  (subject to the ABL Intercreditor Agreement), including, without limitation, the cash and noncash proceeds thereof (collectively, the "ABL Collateral"), to the ABL Agent for the benefit of the ABL Lenders and the FILO Lenders (the ABL Credit Agreement, the ABL Guaranty Agreement, the ABL Security Documents, including, without limitation, the ABL Intercreditor Agreement (as defined below), the letter of credit documentation, and any other collateral and ancillary documents executed in connection therewith, collectively, the "ABL Loan Documents").

As of the date hereof, the Debtors were jointly and severally liable to the ABL Agent and the ABL Lenders for all loans under the ABL Credit Facility, including the FILO Facility, letter of credit obligations, and other obligations described therein and payable thereunder (collectively, the "ABL and FILO Indebtedness") in the aggregate principal amount of approximately $151.9 million, consisting of approximately $68.9 million under the ABL Facility[8] and approximately $75 million under the FILO tranche commitment.

(2)    **First Lien Credit Facility**

The First Lien Agent, the First Lien Lenders, and Debtor FULLBEAUTY Brands Holdings Corp., as borrower, are parties to the First Lien Credit Agreement. Each of the remaining Debtors guaranteed the obligations of the Debtor FULLBEAUTY Brands Holdings Corp., as borrower, under the First Lien Credit Agreement pursuant to that certain First Lien Guaranty, dated as of October 14, 2015 (the "First Lien Guaranty Agreement").

Pursuant to, among other things, that certain First Lien Security Agreement, dated as of October 14, 2015, (together with all other pledge agreements or similar security documents entered into by any Debtor and the First Lien Agent in respect of the Debtors' assets and all other documentation executed in connection with any of the foregoing,

---

[8]    This amount includes approximately $16.6 million in undrawn letter of credit obligations under the ABL Facility.

each as may be amended, restated, supplemented, or otherwise modified from time to time, the "First Lien Security Documents"), the Debtors have granted a first-priority lien and security interest (the "Prepetition First Liens") in, to, and against substantially all of the Debtors' assets described in the First Lien Security Documents, including, without limitation, the cash and noncash proceeds thereof (collectively, the "Prepetition Term Loan Collateral"), to the First Lien Agent for the benefit of the First Lien Lenders (the First Lien Credit Agreement, the First Lien Guaranty Agreements, the First Lien Security Documents (subject to the ABL Intercreditor Agreement), including, without limitation, the ABL Intercreditor Agreement, the Prepetition Term Intercreditor Agreement (as defined below), and any other collateral and ancillary documents executed in connection therewith, collectively, the "First Lien Loan Documents").

As of the date hereof, the Debtors were jointly and severally liable to the First Lien Agent and the First Lien Secured Parties for the First Lien Credit Facility, and other obligations described therein and payable thereunder (the "First Lien Indebtedness") in the aggregate principal amount of approximately $782 million.

### (3) Second Lien Credit Facility

The Second Lien Agent (collectively with the ABL Agent and First Lien Agent, the "Prepetition Agents"), the Second Lien Lenders, and Debtor FULLBEAUTY Brands Holdings Corp., as borrower, are parties to the Second Lien Credit Agreement. Each of the remaining Debtors guaranteed the obligations of Debtor FULLBEAUTY Brands Holdings Corp., as borrower, under the Second Lien Credit Agreement pursuant to that certain Second Lien Guaranty, dated as of October 14, 2015 (the "Second Lien Guaranty Agreement").

Pursuant to, among other things, that certain Second Lien Security Agreement, dated as of October 14, 2015 (together with all other pledge agreements or similar security documents entered into by any Debtor and the Second Lien Agent in respect of the Debtors' assets and all other documentation executed in connection with any of the foregoing, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Second Lien Security Documents"), the Debtors have granted a second-priority lien and security interest (the "Prepetition Second Liens," and together with the ABL Liens and the First Liens, collectively, the "Prepetition Liens") in, to, and against the Prepetition Collateral (subject to the ABL Intercreditor Agreement), to the Second Lien Agent for the benefit of the Second Lien Lenders (the Second Lien Credit Agreement, the Second Lien Guaranty Agreements, the Second Lien Security Documents, including, without limitation, the ABL Intercreditor Agreement, the Prepetition Term Intercreditor Agreement, and any other collateral and ancillary documents executed in connection therewith, collectively, the "Second Lien Loan Documents," and collectively with the ABL Loan Documents and the First Lien Loan Documents, the "Prepetition Loan Documents").

As of the date hereof, the Debtors were jointly and severally liable to the Second Lien Agent and the Second Lien Secured Parties for all loans under the Second Lien Credit Agreement, and other obligations described therein and payable thereunder (the "Second Lien Indebtedness") in the aggregate principal amount of approximately $345 million.

### (4) ABL Intercreditor Agreement

The Debtors and the Prepetition Agents, as representatives of the ABL, FILO, First, and Second Lien Lenders (collectively, the "Prepetition Lenders"), as applicable, are parties to that certain ABL Intercreditor Agreement, dated as of October 14, 2015 (the "ABL Intercreditor Agreement"). The ABL Intercreditor Agreement governs certain of the respective rights and interests of the ABL Lenders, FILO Lenders, First Lien Lenders, and Second Lien Lenders relating to, among other things, their rights and their ability to exercise remedies in connection with an Event of Default (as defined in the ABL Intercreditor Agreement) and in the event of a bankruptcy filing, including related enforcement and turnover provisions. As more particularly stated in the ABL Intercreditor Agreement, the ABL Lenders and FILO Lenders have priority over, and are senior in all respects, to the First Lien Lenders and the Second Lien Lenders with respect to the ABL Priority Collateral (as defined therein).

Importantly, section 2.06 of the ABL Intercreditor Agreement generally provides that, in the event of a chapter 11 filing, if the ABL Lenders and FILO Lenders consent to the use of cash collateral or the Debtors' obtaining of debtor in possession financing secured by the ABL Priority Collateral, the First Lien Lenders and Second Lien Lenders agree not to raise any objection or request adequate protection. In addition, the same section of the ABL Intercreditor Agreement requires the First Lien Lenders and Second Lien Lenders to subordinate the First Liens and

the Second Liens to the ABL Liens of the ABL Lenders and the FILO Liens of the FILO Lenders under any debtor in possession financing facility as well as any "carve-out" for professional or United States Trustee fees, in each case, with respect to the ABL Priority Collateral. Section 2.06 of the ABL Intercreditor Agreement also provides that if the ABL Lenders and FILO Lenders receive adequate protection with respect to the ABL Priority Collateral, then the First Lien Lenders and Second Lien Lenders shall have the right to seek their own adequate protection; *provided* that such adequate protection is subordinate to any adequate protection provided to the ABL Lenders with respect to the ABL Priority Collateral.

(5)    <b>Term Intercreditor Agreement</b>

The Debtors, the First Lien Agent, and the Second Lien Agent, as representatives of the First Lien Lenders and Second Lien Lenders, respectively, are parties to that certain Term Intercreditor Agreement, dated as of October 14, 2015 (the "Term Intercreditor Agreement"). The Term Intercreditor Agreement governs certain of the respective rights and interests of the First Lien Lenders and Second Lien Lenders relating to, among other things, their rights and their ability to exercise remedies in connection with an Event of Default (as defined in the Term Intercreditor Agreement) and in the event of a bankruptcy filing, including related enforcement and turnover provisions. As more particularly stated in the Term Intercreditor Agreement, the First Lien Lenders have priority over, and are senior in all respects, to the Second Lien Lenders with respect to the Prepetition Collateral.

Importantly, section 6.01 of the Term Intercreditor Agreement generally provides that, in the event of a chapter 11 filing, if the First Lien Lenders consent to the use of cash collateral or the Debtors' obtaining of debtor in possession financing, the Second Lien Lenders agree not to raise any objection or request adequate protection. In addition, the same section of the Term Intercreditor Agreement requires the Second Lien Lenders to subordinate the Second Liens to the First Liens of the First Lien Agent and First Lien Lenders and the lenders under any debtor in possession financing facility as well as any "carve-out" for professional or United States Trustee fees. Section 6.03 of the Prepetition Term Intercreditor Agreement provides that if the First Lien Lenders receive adequate protection, then the Second Lien Lenders shall have the right to seek their own adequate protection; *provided* that such adequate protection is subordinate to any adequate protection provided to the First Lien Lenders.

(c)    <b><u>The Debtors' Legacy Liabilities</u></b>

(1)    <b>Collective Bargaining Agreement</b>

As discussed above, the Debtors are party to the CBA. The Debtors do not currently intend to seek relief pursuant to section 1113 of the Bankruptcy Code with respect to the CBA. The unexpired CBA and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed the unexpired CBA.

(2)    <b>Multi-Employer Pension Plan</b>

The Debtors have no single-employer defined benefit pension plans. The Debtors, however, currently contribute to a single active multi-employer pension plan. The Debtors contributed approximately $590,000 to the National Retirement Fund pursuant to the CBA in 2018 and expect to contribute $600,000 in 2019.

## 4.3    <u>The Debtors' Board Members and Executives</u>

As of the date hereof, set forth below are the names, positions, and biographical information of the current Board of Directors of Debtor FullBeauty Brands Holdings Corp. as well as current key executive officers for the Debtors. These individuals oversee the businesses and affairs of the Debtors.

(a)    <b><u>Executives</u></b>

*Emilie Arel*, Director and Chief Executive Officer. Ms. Arel has been the Chief Executive Officer of FullBeauty since November 2017. She previously served as Chief Executive Officer of Quidsi, Inc. from 2015 to 2017, an Amazon, Inc. subsidiary and diversified retail technology company with a portfolio of six eCommerce sites. Prior to becoming Chief Executive Officer at Quidsi, Inc. Ms. Arel was the Senior Vice President of Retail Buying,

30

Marketing, and Inventory from 2014 to 2015.  Ms. Arel has also served at Gap, Inc., including serving as a division vice president and general manager at Old Navy, and Target Corporation as a buyer and in various positions in inventory planning and strategy.  Ms. Arel holds a dual M.B.A. from Columbia School of Business and the Haas School of Business and a B.A. from the University of Saint Thomas.

*Robert Riesbeck*, Chief Financial Officer.  Robert Riesbeck joined FullBeauty as Chief Financial Officer in June 2018.  Mr. Riesbeck has more than twenty-five (25) years of retail financial and operations management experience.  Mr. Riesbeck most recently served as Chief Executive Officer and President of HHGregg, Inc., and Chief Financial Officer prior to those roles.  Prior to HHGregg, Mr. Riesbeck served as an Operations Executive at Sun Capital Partners, Inc., held finance and operations roles at Nike, Inc., and began his career with Grant Thornton LLP. He is a Certified Public Accountant and holds a B.S. in accounting from the University of Akron.

*Laura Warren*, Chief Operating Officer.  Laura Warren has served as the Chief Operating Officer of FullBeauty since January 2017.  Prior to joining FullBeauty, Ms. Warren served as Executive Vice President of Operations for Victoria's Secret Stores, LLC from November 2015 to January 2017, and from October 2007 to January 2009.  Prior to Victoria's Secret Stores, LLC, Ms. Warren served in various senior operations positions L Brands, Inc., including Senior Vice President of Operations, Vice President of Enterprise Integration, and Assistant Treasurer.  Prior to L Brands, Ms. Warren spent six (6) years at Cardinal Health, Inc. as Director of Corporate Finance and six (6) years at Arthur Andersen as a Tax Manager.  Ms. Warren received a J.D., M.B.A., and B.A. from The Ohio State University.

*Robert Lepere*, Chief People Officer.  Robert Lepere joined FullBeauty in February 2018 with twenty (20) years of operational and human resources experience in the retail industry.  He previously worked as the VP of Talent Strategy for Ascena Retail Group, and prior to that held a variety of human resources positions within Ann Inc. Mr. Lepere also served as the Head of HR, Stores for Charlotte Russe and was the HR Director for Old Navy.  He holds a B.A. in Journalism and Speech Communication, and an M.A. in Speech and Interpersonal Communication from New York University.

*Liz White*, Chief Customer Officer.  Liz White joined FullBeauty in January 2018 with fourteen (14) years of experience driving digital strategy and operations for media, entertainment, fashion, and eCommerce brands.  Prior to joining FullBeauty, Ms. White served as CEO of Soko Inc.  Prior to that, she worked as the Head of Strategy and Development at Poshly, a VC-backed big data enterprise.  Ms. White spent over ten (10) years at Time Inc. where she held various senior leadership roles, including running the digital businesses for PEOPLE Magazine and Entertainment Weekly.  White holds a B.A. in sociology from Trinity College, and M.B.A.s from Columbia Business School and the University of California, Berkeley.

*Arlene Hong*, Chief Legal Officer.  Arlene Hong joined FullBeauty in July 2018 with over seventeen (17) years of experience as senior in-house counsel managing legal and business risks in the retail industry.  She most recently served as Lead Counsel for Amazon Fashion.  Prior to that, Ms. Hong was General Counsel for Amazon's retail subsidiary, Quidsi, Inc. where she worked closely with FullBeauty's Chief Executive Officer, Emilie Arel, who served as Chief Executive Officer of Quidsi at that time.  Ms. Hong was also General Counsel, Senior Vice President, and Corporate Secretary for Ideeli, and J. Crew Group, Inc.  She holds a B.A. from Columbia University and a J.D. from Cornell University Law School.

(b)     **Board of Directors**

*Seth A. Brody*, Director since 2015. Mr. Seth A. Brody is Partner and Global Head of the Operational Excellence Group at Apax Partners LLP.  He has been with Apax since 2008.  Prior to joining Apax, he held several executive operating positions in digitally focused enterprises including roles as Executive Vice President and General Manager at Razorgator Interactive Group, Inc., Group Vice President and General Manager at Orbitz Worldwide, Inc., Director of Marketing at *priceline.com*, and Product Manager at Netmarket Group, Inc.  During his time at Apax, Mr. Brody has served in interim management positions across the Apax portfolio including roles as the Chief Executive Officer of FULLBEAUTY Brands, Chief Marketing Officer at Trader Canada Corporation, and Chief Information Officer at Netrada Management GmbH.  Mr. Brody currently serves on the Boards of Directors for

31

FULLBEAUTY Brands and Aptos, Inc., and was previously a director at Bankrate, Inc. He also has served as an investor, director and advisor to numerous growth companies in the digital space. Mr. Brody received his B.A. from Yale University and his M.B.A. from Harvard Business School.

*Andrew S. Janower*, Director since 2013. Mr. Janower has been Managing Director at Charlesbank Capital Partners, LLC since 2002. Mr. Janower is a co-founder at A Kids' Brain Tumor Cure Foundation (also known as Fight PLGA). He was previously a Vice President at the Harvard Private Capital Group where he started in 1996 as an associate in the Boston office, a consultant at Bain & Company Inc. where he focused on industrial and consumer products, business services and distribution and a Research Associate in Entrepreneurial Finance at Harvard Business School. He has served as a director of World Strides LLC, Education Holdings 1, Inc., Varsity Brands, Inc., American Residential Services, LLC, Facing History and Ourselves, Inc., The GSI Group, Inc., Sealy Corporation, Del Taco LLC, HGGC Citadel Plastics Holdings, Inc., Mattress Discounters Group LLC, The Princeton Review, Blacksmith Brands Inc., Master Craft Boat Company, Inc., and One Stop Plus Group. He has also served on the board of trustees of the Dana Farber Cancer Institute. Mr. Janower is a co-founder of the Pediatric Low Grade Astrocytoma Foundation. Mr. Janower is a certified public accountant and holds an M.B.A. from Harvard University with Baker Scholar Honors and a B.S. in economics, *magna cum laude*, from the Wharton School at the University of Pennsylvania.

*Joshua A. Klevens*, Director since 2013. Mr. Klevens has served as managing director and vice president at Charlesbank since 2005. Prior to Charlesbank, Mr. Klevens worked at Bain Capital Partners on private equity transactions in the retail, consumer products, distribution, healthcare, technology, and manufacturing sectors. Prior to Bain Capital Partners, he worked as a business analyst at McKinsey & Company, Inc. He has served as a director of HDT Global, Inc., Education Holdings 1, Inc., TLC Vision Corporation, World Strides, LLC, TLC Vision (USA) Corporation, Blacksmith Brands, Tecomet Inc., and The Princeton Review. Mr. Klevens also chairs the advisory board of Youth Connect. He holds an M.B.A. from the Stanford University Graduate School of Business and is a *cum laude* graduate of Princeton University, with a B.A. from the Woodrow Wilson School of Public Policy and International Affairs.

*Alex S. Pellegrini*, Director since 2015. Mr. Pellegrini is a Partner at Apax, which he joined in 2000, and focuses on investments in the retail and consumer sector. Prior to Apax, Mr. Pellegrini was a financial analyst at Merrill Lynch Global Private Equity and was an associate at Saunders Karp & Megrue (SKM) (now Apax). He has been a Director of rue21, Inc., Cole Haan, LLC, Golden Jaguar, Advantage Sales and Marketing, TMT Co., Ltd., Tivit Terceirização de Processos, Serviços e Tecnologia, S.A, and Encompass Home Health & Hospice. Mr. Pellegrini graduated, with honors, from Pennsylvania State University, where he received a B.S. in Finance.

*Mohsin Y. Meghji*, Independent Director since 2018. For more than twenty-five (25) years, Mohsin Meghji has focused primarily on reviving companies experiencing financial, operational, or strategic transitions to maximize value for stakeholders. He has accomplished this through management and/or advisory roles in partnership with some of the world's leading financial institutions, private equity, and distressed hedge fund investors. Mohsin's most recent corporate role was as Executive Vice President & Head of Strategy at Springleaf Holdings, LLC as well as Chief Executive Officer of its captive insurance companies. Prior to Springleaf Holdings, LLC, Mohsin co-founded Loughlin Meghji + Company (now Loughlin Management Partners + Co.), a financial and restructuring advisory firm which became one of the leading restructuring boutiques in the U.S. Earlier in his career, Mohsin spent twelve (12) years with Arthur Andersen & Co. in the firm's London, Toronto, and New York offices as a Partner in the Global Corporate Finance group. He has served as a director on a number of corporate boards including Mariner Health Care Inc., Cascade Timberlands, LLC, Dan River, Inc. and MS Resorts. He is a director of The Children's Museum of Manhattan as well as the Equity Group International Foundation, which provides funding for underprivileged high potential students in Kenya. Previously, he served on the Board of HealthRight International from 2004 to 2012. Mohsin is a graduate of the Schulich School of Business, York University, Canada and has taken executive courses at the INSEAD School of Business in France. He has qualified as a U.K. and Canadian Chartered Accountant as well as a U.S. Certified Turnaround Professional.

*Emilie Arel*, Director since 2017. Ms. Arel has been a Director and the Chief Executive Officer since November 2017. As discussed above, Ms. Arel previously served as Chief Executive Officer of Quidsi, Inc. from

2015 to 2017, an Amazon, Inc. subsidiary and diversified retail technology company with a portfolio of six eCommerce sites. Prior to becoming Chief Executive Officer at Quidsi, Inc. Ms. Arel was the Senior Vice President of Retail Buying, Marketing, and Inventory from 2014 to 2015. Ms. Arel has also served at Gap, Inc., including serving as a division vice president and general manager at Old Navy, and Target Corporation as a buyer and in various positions in inventory planning and strategy. Ms. Arel holds a dual M.B.A. from Columbia School of Business and the Haas School of Business and a B.A. from the University of Saint Thomas.

(c)    **The Reorganized FullBeauty Board of Directors**

The New Board will initially consist of directors who will be designated in accordance with the terms of the Restructuring Support Agreement and the New Equity Documents. To the extent known, the identity of the members of the New Board will be disclosed in the Plan Supplement or prior to the Confirmation Hearing. The existing directors of each of the subsidiary Debtors shall remain in their current capacities as directors of the applicable Reorganized Debtor subject to the Restructuring Support Agreement and until replaced or removed in accordance with the organizational documents of the applicable Reorganized Debtors.

## ARTICLE V

## EVENTS LEADING TO THE CHAPTER 11 CASES

As stated above, the Debtors intend to file the Chapter 11 Cases to implement a prepackaged chapter 11 plan of reorganization that provides for a comprehensive balance sheet restructuring of their funded debt obligations with the consent of the Consenting Lenders and the Sponsors. Given the events described in greater detail below and other considerations, the Debtors have concluded in the exercise of their business judgment and as fiduciaries for all of the Debtors' stakeholders that the best path to maximize the value of their businesses is a strategic prepackaged chapter 11 filing to implement the Plan in accordance with the terms of the Restructuring Support Agreement.

**5.1    Operational Hurdles and Competition**

In addition to the substantial debt service obligations required under the Prepetition Loan Documents, FullBeauty faced a number of operational hurdles and a generally depressed retail apparel market in the months and years leading up to their decision to commence the Chapter 11 Cases. In particular, FullBeauty has suffered from recent merchandising issues that have contributed to the decline in EBITDA, which include (a) rapid untested changes to product strategy, (b) challenged inventory and sales processes implementation, and (c) inventory and pricing controls. First, FullBeauty's product strategy suffered from untested assortment and creative initiatives that proved to have been implemented too rapidly. Specifically, FullBeauty's attempt to rationalize its product offering by eliminating underselling products resulted in lower profit margins. Additionally, FullBeauty revised its creative materials and catalogs to reflect an alternative target customer demographic. Unfortunately, this approach inadvertently disengaged FullBeauty's core customers who no longer identified with models and suggested customer base, resulting in a dramatic decline in sales. Second, FullBeauty's inventory procurement and sales processes have suffered from an outdated merchandise planning system and fragmented competing eCommerce platforms, respectively. Third, profit margins were eroded by (x) changes in product assortment architecture, (y) increased sales, promotions, and discounts to clear underperforming inventory, and (z) promotion missteps related to implementation of FullBeauty's new eCommerce platform. In addition to these operational hurdles, FullBeauty has also faced competition from online retail giant Amazon, Inc. and retail chains, including Walmart Inc. and Kohl's Corporation, that have recently entered the plus-size clothing space.

**5.2    Changes in the Board of Directors and Other Recent Developments**

Anticipating the need for a potential restructuring in the near future given FullBeauty's liquidity troubles and October Interest Payment, FullBeauty's Board of Directors decided to appoint an independent director to oversee any restructuring efforts. Accordingly, on August 7, 2018, Mohsin Meghji was appointed to the Board of Directors.

To assist with a potential restructuring, FullBeauty retained K&E and PJT in July 2018, and Alix in August 2018. Since their respective engagements, Alix, K&E, and PJT have assisted FullBeauty's management with organizing FullBeauty's lender groups and assessing FullBeauty's strategic restructuring options. At the same time,

33

Alix and the FullBeauty undertook a number of steps to address FullBeauty's liquidity troubles, including: (a) developing a 13-week cash flow forecast; (b) advising and assisting management in evaluating the Company's business plan, and (c) identifying potential strategies and tactics to improve FullBeauty's financing operations, including monetization of an approximately $13 million interest rate swap contract and conversion of Base rate loans to LIBOR rate loans for the calculation of interest under the ABL Facility. Ultimately, however, the implementation of these measures was not, by itself, sufficient to solve FullBeauty's liquidity problems without more extensive balance sheet restructuring of its funded debt obligations.

### 5.3    Supply Chain and Liquidity Challenges

Operational challenges, including servicing prepetition debt, led to tightening liquidity beginning in 2017. These challenges caused the Debtors to choose to hold back the $10.5 million interest payment under the Second Lien Credit Facility at the end of October 2018 for the purposes of maintaining liquidity to fund ongoing operations. The consequent ratings downgrade of the Debtors' Prepetition Secured Debt caused further tightening in the Debtors' trade terms, which has exacerbated the Debtors' ongoing liquidity issues.

### 5.4    The October 31 Interest Payments, Forbearance Negotiations, and the Restructuring Support Agreement

On October 31, 2018, FullBeauty was scheduled to pay approximately $26.2 million in interest payments, consisting of: (a) an approximately $2.0 million interest payment under the FILO; (b) an approximately $14.2 million interest payment under the First Lien Credit Facility; and (c) an approximately $10.0 million interest payment under the Second Lien Credit Facility (collectively, the "October 31 Interest Payments"). On October 30, FullBeauty made the Revolver Draw, which provided FullBeauty with sufficient liquidity to make the October 31 Interest Payments. However, payment of the October 31 Interest Payments in full would have reduced FullBeauty's liquidity from approximately $52.5 million as of October 30, 2018 to approximately $26.3 million. The October 31 Interest Payments left FullBeauty with the dilemma of either (a) making the October 31 Interest Payments to avoid defaulting under the Prepetition Secured Debt, but sacrificing 100% of the proceeds of the Revolver Draw, liquidity that was critical to maintaining operations, implementing FullBeauty's new business plan, and preserving optionality in furtherance of ongoing discussions with FullBeauty's lenders, or (b) not making such payments and defaulting under the Prepetition Secured Debt.

After negotiating the terms of forbearance agreements with both the ABL Lenders and the Ad Hoc Group of First Lien Lenders, the Debtors and the applicable parties agreed to the terms of forbearance agreements with respect to the ABL Facility (as extended to date) and the First Lien Credit Facility, as applicable through January 7, 2019, and January 6, 2019, respectively. As set forth in the Restructuring Support Agreement, the applicable forbearance period with respect to the First Lien Credit Facility was ultimately extended by agreement of all parties through February 1, 2019, which enabled the Debtors and the Ad Hoc Group of First Lien Term Lenders, the Ad Hoc Group of Second Lien Term Lenders, and the Sponsors to negotiate a fully consensual prepackaged restructuring as contemplated under the Restructuring Support Agreement. Each forbearance was subsequently amended to include the failure to make an amortization payment due under the First Lien Credit Facility at the end of December that may be considered a "designated default" thereunder.

The Restructuring Support Agreement, which has the support of the overwhelming majority of the Holders of the Debtors' funded indebtedness, contemplates FullBeauty's restructuring through (a) the issuance of New Common Stock and the Warrants, (b) the Unimpaired treatment of certain Claims and Interests, and (c) conversion of certain Claims into the New First Lien Credit Facility or the New Junior Loan, as applicable. Such restructuring pursuant to the Restructuring Support Agreement will enable the Debtors to deleverage their balance sheet by approximately $900 million—*approximately 70%* of their funded debt obligations—and position their businesses for stability and success after emergence from bankruptcy.

### 5.5    Importance of Deleveraging

As the Debtors' financial performance has suffered, their capital structure has become increasingly unsustainable, and debt-service obligations have consumed an increasing percentage of the Debtors' free cash flow. Given recent performance, business plan projections, and the lack of free cash flow needed to make critical

investments in their businesses, the Debtors have determined that deleveraging the capital structure is an absolute necessity. Accordingly, the Debtors intend to commence the Chapter 11 Cases primarily to implement the balance sheet restructuring contemplated under the Restructuring Support Agreement and to best position themselves to execute on their new business plan and capitalize on their growth opportunities.

Significantly, the restructuring carries the support of each class of the Debtors' secured creditors, as approximately 100% of its FILO Lenders, 99% of its First Lien Lenders, and 95% of its Second Lien Lenders, and the Sponsors are signatories to the Restructuring Support Agreement, pursuant to which such parties have agreed to support a reorganization contemplated under the Plan in accordance with and subject to the terms of the Restructuring Support Agreement. This level of consensus for a comprehensive reorganization reflects the enormous efforts undertaken by the Debtors and the RSA Parties over recent months.

## ARTICLE VI

## OTHER KEY ASPECTS OF THE PLAN

### 6.1    Distributions

One of the key concepts under the Bankruptcy Code is that only claims and interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an Allowed Claim or Interest means that the Debtors agree, or if there is a dispute, the Bankruptcy Court determines, that the Claim or Interest, and the amount thereof, is in fact a valid Claims against or Interest in the Debtors.

### 6.2    Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall distribute the full amount of the distributions that the Plan provides for the ABL Claims, the FILO Claims, First Lien Claims, and Second Lien Claims, and all other Holders of Allowed Claims or Interests shall receive on the Effective Date (or, if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the date that such Claim becomes an Allowed Claim or Interest) or as soon as reasonably practicable thereafter (or, in the case of Allowed General Unsecured Claims, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claims), the full amount of the distributions that the Plan provides for such Allowed Claims or Interests, in each applicable Class, and in the manner provided in the Plan. If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date. If and to the extent that there are any Disputed Claims or Interests, distributions on account of any such Disputed Claims or Interests shall be made pursuant to the provisions set forth in Article VII of the Plan.

(a)    Delivery of Distributions

(1)    Delivery of Distributions on Account of DIP Facility Claims

The DIP Agent (if any) shall be deemed to be the Holder of any and all DIP Facility Claims (if incurred) for purposes of distributions to be made hereunder, and any distributions on account of such DIP Facility Claims shall be made to the DIP Agent (if any). As soon as practicable following compliance with the requirements set forth in Article VI of the Plan, the DIP Agent (if any) shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of DIP Facility Claims in accordance with the terms of the DIP Facility, subject to any modifications to such distributions in accordance with the terms of the Plan. Notwithstanding anything in the Plan to the contrary and without limiting the exculpation and release provisions of the Plan, the DIP Agent (if any) shall not have any liability to any Entity with respect to distributions made or directed to be made by the DIP Agent.

(2)    Delivery of Distributions on Account of ABL Claims and FILO Claims

The ABL Agent shall be deemed to be the Holder of all Allowed ABL and FILO Claims for purposes of distributions to be made hereunder, and all distributions on account of such Allowed Claims shall be made to the ABL

Agent.  As soon as practicable following compliance with the requirements set forth in Article VI of the Plan, if applicable, the ABL Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed ABL and FILO Claims in accordance with the terms of the ABL Credit Agreement and the Plan. Notwithstanding anything in the Plan to the contrary and without limiting the exculpation and release provisions of the Plan, the ABL Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the ABL Agent.

(3)    <strong>Delivery of Distributions on Account of First Lien Claims and Second Lien Claims</strong>

The First Lien Agent shall be deemed to be the Holder of all Allowed First Lien Claims, and the Second Lien Agent shall be deemed to be the Holder of all Allowed Second Lien Claims for purposes of distributions to be made hereunder, and all distributions on account of such Allowed Claims shall be made to or at the direction of the applicable Agent.  As soon as practicable following compliance with the requirements set forth in Article VI of the Plan, the First Lien Agent and Second Lien Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed First Lien and Second Lien Claims, as applicable, in accordance with the terms of the First Lien Credit Agreement, Second Lien Credit Agreement, and the Plan.  Notwithstanding anything in the Plan to the contrary and without limiting the exculpation and release provisions of the Plan, the First Lien Agent and Second Lien Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the First Lien Agent or the Second Lien Agent.

(4)    <strong>Distribution by Distribution Agents</strong>

The Debtors and the Reorganized Debtors, as applicable, shall have the authority to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder.  To the extent the Debtors and the Reorganized Debtors, as applicable, determine to utilize a Distribution Agent to facilitate the distributions under the Plan to Holders of Allowed Claims, any such Distribution Agent would first be required to:  (A) affirm its obligation to facilitate the prompt distribution of any documents; (B) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan; (C) waive any right or ability to setoff, deduct from, or assert any lien or encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent; and (D) post a bond, obtain a surety, or provide some other form of security for the performance of its duties, and the costs and expenses of procuring such forms of security shall be borne by the Debtors or the Reorganized Debtors, as applicable.

The Debtors or the Reorganized Debtors, as applicable, shall pay to the Distribution Agents all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions, or consents.  The Distribution Agents shall submit detailed invoices to the Debtors or the Reorganized Debtors, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement, and the Debtors or the Reorganized Debtors, as applicable, shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Reorganized Debtors, as applicable, deem to be unreasonable.  In the event that the Debtors or the Reorganized Debtors, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtors or the Reorganized Debtors, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the Debtors or the Reorganized Debtors, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

(5)    <strong>Minimum Distributions</strong>

Notwithstanding anything herein to the contrary, the Reorganized Debtors and the Distribution Agents shall not be required to make distributions or payments of less than $100 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars.  Whenever any payment or distribution of a fraction of a dollar or fractional share of New Equity under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar or share of New Equity (up or down), with half dollars and half shares of New Equity or less being rounded down.  The total number of authorized shares

36

of New Common Stock or of the Warrants, as applicable, shall be adjusted as necessary to account for the foregoing rounding.

(b)        **Undeliverable Distributions**

If any distribution to a Holder of an Allowed Claim made in accordance with the Plan is returned to the Reorganized Debtors (or their Distribution Agent) as undeliverable, no further distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time such undelivered distribution shall be made to such Holder within ninety (90) days of receipt of such Holder's then-current address or other necessary information; *provided* that any such undelivered distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the later of (1) the Effective Date and (2) the date of the initial attempted distribution. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable non-bankruptcy escheat, abandoned, or unclaimed property laws to the contrary), and the right, title, and interest of any Holder to such property or interest in property shall be discharged and forever barred.

(c)        **Manner of Payment**

At the option of the Distribution Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

(d)        **No Postpetition or Default Interest on Claims**

Unless otherwise specifically provided for in the Plan or the Confirmation Order and notwithstanding any documents that govern the Debtors' prepetition indebtedness to the contrary, (1) postpetition and/or default interest shall not accrue or be paid on any Claims, and (2) no Holder of a Claim shall be entitled to (a) interest accruing on or after the Petition Date on any such Claim or (b) interest at the contract default rate, each as applicable.

(e)        **Compliance with Tax Requirements/Allocations**

In connection with the Plan, to the extent applicable, the Debtors, Reorganized Debtors, and other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, Reorganized Debtors, and other applicable withholding and reporting agents and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors, Reorganized Debtors, and other applicable withholding agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances. For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

(f)        **Surrender of Cancelled Instruments or Securities**

On the Effective Date, each Holder of a certificate or instrument evidencing a Claim or an Equity Interest shall be deemed to have surrendered such certificate or instrument to the Distribution Agent. Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Equity Interest, which shall continue in effect for purposes of allowing Holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan.

37

(g)    **Claims Paid or Payable by Third Parties**

(1)    **Claims Payable by Insurance**

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.

(2)    **Applicability of Insurance Policies**

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## 6.3    Substantive Consolidation

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan; *provided* that the Reorganized Debtors may consolidate Allowed Claims on a per Class basis for voting purposes.

## 6.4    General Settlement of Claims and Interests

As discussed further herein and as otherwise provided in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that Holders of Claims or Interests might have with respect to any Claim or Interest under the Plan. Distributions made to Holders of Allowed Claims in any Class are intended to be final.

## 6.5    Restructuring Transactions

On the Effective Date, the Debtors, the Reorganized Debtors, or any other entities may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan (subject to the Restructuring Support Agreement), including: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities pursuant to applicable law; and (d) all other actions that the Debtors or the Reorganized Debtors, as applicable, and the Required Consenting First Lien Lenders determine are necessary or appropriate.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

(a)    **Exit Facilities**

On the Effective Date, the Exit Facilities Documents shall constitute legal, valid, binding, and authorized obligations of either the Reorganized Debtors or the Debtors, as applicable, and following the consummation of the Restructuring Transactions, the Exit Facilities Documents shall constitute legal, valid, binding, and authorized obligations of the applicable Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Facilities Documents are being extended and shall be deemed to

have been extended in good faith and for legitimate business purposes and are reasonable and shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents (1) shall be deemed to be granted, (2) shall be legal, binding, and enforceable Liens on and security interests in the collateral granted thereunder in accordance with the terms of the Exit Facilities Documents, (3) shall be deemed automatically perfected on the Effective Date (without any further action being required by the Debtors, the Reorganized Debtors, as applicable, the applicable agent, or any of the applicable lenders), having the priority set forth in the Exit Facilities Documents and subject only to such Liens and security interests as may be permitted under the Exit Facilities Documents, and (4) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Debtors, the Reorganized Debtors, as applicable, and the Entities granted such Liens and security interests are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

(1)    **Exit ABL Facility**

The capital structure of the Reorganized Debtors upon the Effective Date shall consist of the Exit ABL Facility, which shall be entered into on terms and conditions to be agreed with the Exit ABL Lenders, subject to any applicable the consent rights under Section 2 of the Restructuring Support Agreement.

(2)    **Exit New Money Facility**

The capital structure of the Reorganized Debtors upon the Effective Date shall also consist of a new $30 million exit term facility, *i.e.*, the Exit New Money Facility, which shall be entered into on terms and conditions consistent with the terms set forth on Exhibit D to the Restructuring Support Agreement and otherwise subject to the consent rights under Section 2 of the Restructuring Support Agreement.

(3)    **New First Lien Term Loan**

The capital structure of the Reorganized Debtors upon the Effective Date shall also consist of up to a $252 million New First Lien Term Loan, consistent with the material terms set forth in Annex 2 of the Restructuring Support Agreement and otherwise subject to the consent rights under Section 2 of the Restructuring Support Agreement.

(4)    **New Junior Loan**

The capital structure of the Reorganized Debtors upon the Effective Date shall also consist of a new junior facility of up to $50 million ($35 million of which shall be available to electing Holders of Allowed First Lien Claims and $15 million of which shall be distributed to Holders of Second Lien Claims if the restructuring is consummated pursuant to a Plan that is accepted by the class of Second Lien Claims), consistent with the material terms set forth in Annex 3 of the Restructuring Support Agreement and otherwise subject to the consent rights under Section 2 of the Restructuring Support Agreement.

Holders of First Lien Claims that may elect to receive, in lieu of New Common Stock (which forfeited shares shall be distributed Pro Rata to non-electing Holders), a principal amount of the New Junior Loan that is equal to 85% of the Exchange Benchmark Value (which is $79 million or the mid-point range of the Plan Equity Value as defined herein) of their original New Common Stock distribution, (*i.e.*, a 15% discount to the Exchange Benchmark Value of its original New Common Stock distribution); *provided* that such electing First Lien Lenders shall not receive more than $35 million in aggregate principal amount of the New Junior Loan.  Holders of First Lien Claims must make the

foregoing election by checking the applicable Item 3 in the Class 5 Ballot.  The calculation for determining the value of New Junior Loans for an electing Holder of First Lien Claims is as follows:

- **In the event Class 6 votes to reject the Plan**:

  o New Junior Loan allocation = (First Lien Claim amount Holder elects to exchange / aggregate amount of Allowed First Lien Claims) * 97.5% * Exchange Benchmark Value ($79 million) * 85.0%

- **In the event Class 6 votes to accept the Plan**:

  o New Junior Loan allocation = (First Lien Claim amount Holder elects to exchange / aggregate amount of Allowed First Lien Claims) * 87.5% * Exchange Benchmark Value ($79 million) * 85.0%

In the event that electing Holders of First Lien Claims (in selecting the appropriate box on the Class 5 Ballot) oversubscribe for the $35 million in aggregate principal amount of the New Junior Loan available pursuant to the Class 5 treatment, each such electing Holder of First Lien Claims will receive its Pro Rata Share of the $35 million in aggregate principal amount of the New Junior Loan with the remaining portion of the electing First Lien Claims satisfied by receiving their Pro Rata Share of the New Common Stock.

(b)    **New Equity**

On the Effective Date, a Reorganized Debtor entity (as determined in accordance with the terms and conditions of the Restructuring Support Agreement) shall issue or reserve for issuance all of the New Equity issued or issuable in accordance with the terms herein, subject to dilution on the terms described herein and in the Restructuring Support Agreement.  The (1) issuance of the New Equity for distribution pursuant to the Plan and (2) the New Common Stock issuable upon exercise of the Warrants and the Option Rights, in each case issued under the Plan, are authorized without the need for further corporate action, and all of the shares of New Common Stock issued or issuable pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

(c)    **Advisory Services Agreement**

Confirmation of the Plan shall be deemed to constitute approval of the Advisory Services Agreement (including all transactions contemplated thereby, such as any supplementation, and all actions to be taken and undertakings to be made as contemplated therein).  On the Effective Date, the Reorganized Debtors are authorized to and shall enter into the Advisory Services Agreement with the Service Providers on the terms set forth in the Restructuring Support Agreement, pursuant to which the Service Providers shall provide transition services, advisory services, and operational services and assistance to the Reorganized Debtors as reasonably requested from time to time and shall release any and all Sponsor Claims.  The Advisory Services Agreement shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with it terms.

In exchange for such services and release, the Service Providers shall be entitled to receive from the Reorganized Debtors their Pro Rata Share of (1) the Option Rights, subject to dilution by the Warrants and Management Incentive Plan, (2) the Sponsor Warrant Package, and (3) 2.5% (in the aggregate) of the New Common Stock issued and outstanding as of the Effective Date, subject to dilution by the Warrants, the Option Rights, and Management Incentive Plan.

**6.6    Corporate Existence**

Except as otherwise provided in the Plan or the Restructuring Transactions Memorandum, each Debtor shall continue to exist as of the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation

documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval.

**6.7      Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**6.8      Cancellation of Agreements, Securities Interests, and Other Interests**

On the Effective Date, except to the extent otherwise provided on the Plan (including with respect to Unimpaired Claims and all Executory Contracts and Unexpired Leases to be assumed pursuant to the Plan), all notes, instruments, certificates, and other documents evidencing Claims or Interests, including the Secured Lender Claims, Sponsor Claims, and the Interests in Holdings, shall be cancelled and the obligations of the Debtors or the Reorganized Debtors and any non-Debtor Affiliates thereunder or in any way related thereto shall be discharged, the Agents thereunder shall be discharged from all obligations thereunder, and all security interests and/or Liens granted under the ABL Facility, FILO Facility, First Lien Credit Facility, and Second Lien Credit Facility and/or any other Secured Claims shall be automatically released, discharged, terminated, and of no further force and effect; *provided* that, notwithstanding Confirmation or the occurrence of the Effective Date, any credit document or agreement that governs the rights of any Holder of a Claim or Interest shall continue in effect solely for purposes of (a) allowing Holders of Allowed Claims or Interests to receive distributions under the Plan and (b) allowing and preserving the rights of the Agents or representative of Holders of Claims or Interests, as applicable, to make distributions on account of Allowed Claims or Interests, as provided herein.

**6.9      Sources for Plan Distributions and Transfers of Funds Among Debtors**

The Debtors shall fund distributions under the Plan with the proceeds of the Exit ABL Facility, the Exit New Money Facility, the New First Lien Term Loan, and the New Junior Loan, and by the issuance of New Equity. The Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement (including the Exit Facilities Documents, the New Equity Documents, the Warrants Documents, and any other documents, agreements, or instruments relating to the New Equity), shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

**6.10      Exemption from Registration Requirements**

The offering, issuance, and distribution of any Securities, including the New Equity, pursuant to the Plan (other than Securities issuable to the Service Providers or their affiliates), shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code. Except as otherwise provided in the Plan or the governing certificates or instruments, any and all New Common Stock issued under the Plan (other than Securities issuable to the Service Providers or their affiliates) will be freely tradable under the Securities Act by the recipients thereof, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments, including any such restrictions in the Stockholders

Agreement; (b) the restrictions, if any, on the transferability of such Securities and instruments; and (c) any other applicable regulatory approval.

The offering, issuance and distribution of New Common Stock, the Option Rights and the Sponsor Warrant Package to the Service Providers pursuant to the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act pursuant to section 4(a)(2) of the Securities Act and/or another exemption from registration under the Securities Act. Any and all such Securities shall be deemed "restricted securities" that may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act or an exemption from registration under the Securities Act is available and in compliance with any applicable state or foreign securities laws.

**6.11**   **Organizational Documents**

Subject to Article V.D of the Plan, the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and provisions of the Plan. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the organizational documents of each of the Reorganized Debtors will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective organizational documents, and the Reorganized Debtors may file their respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the organization documents of each of the Reorganized Debtors.

**6.12**   **Exemption from Certain Transfer Taxes and Recording Fees**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**6.13**   **Directors and Officers of the Reorganized Debtors**

(a)      **The New Board**

The New Board will initially consist of the current chief executive officer and eight (8) other members who will be designated in accordance with the terms of the Restructuring Support Agreement and the Stockholders Agreement. The identity of the New Board members will be disclosed in the Plan Supplement or at or prior to the Confirmation Hearing to the extent not known. The existing directors of each of the Debtors' subsidiaries shall remain in their current capacities as directors of the applicable Reorganized Debtor, subject to the Restructuring Support Agreement, until replaced or removed in accordance with the organizational documents of the applicable Reorganized Debtors.

(b)        **Senior Management**

On the Effective Date, the officers of the Reorganized Debtors shall be substantially the same and their employment shall be subject to the ordinary rights and powers of the New Board to remove or replace them in accordance with the Reorganized Debtors' organizational documents and any applicable employment agreements that are assumed pursuant to the Plan; *provided*, *however*, that the Chief Financial Officer, Robert J. Riesbeck, is planning to depart after the Effective Date.

## 6.14    Directors and Officers Insurance Policies

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity on or at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

## 6.15    Other Insurance Policies

On the Effective Date, each of the Debtors' insurance policies in existence as of the Effective Date shall be Reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code and Article V of the Plan.  Nothing in the Plan shall affect, impair, or prejudice the rights of the insurance carriers, the insureds, or the Reorganized Debtors under the insurance policies in any manner, and such insurance carriers, the insureds, and Reorganized Debtors shall retain all rights and defenses under such insurance policies.  The insurance policies shall apply to and be enforceable by and against the insureds and the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.

## 6.16    Preservation of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code but subject to the releases set forth in Section 5.24 in this Disclosure Statement and Article IX of the Plan, all Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor on the Effective Date.  Thereafter, the Reorganized Debtors shall have the exclusive right, authority, and discretion to determine, initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, whether arising before or after the Petition Date, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  **Subject to the releases set forth in Section 6.23 in this Disclosure Statement and Article IX of the Plan, no Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any specific Cause of Action as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action.  The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan,** and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to any Cause of Action upon, after, or as a consequence of the Confirmation or the occurrence of the Effective Date.

**6.17    Corporate Action**

Subject to the Restructuring Support Agreement, upon the Effective Date, all actions contemplated by the Plan and the Restructuring Transactions Memorandum shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, or officers of the Debtors, the Reorganized Debtors, or any other Entity, including: (a) assumption of Executory Contracts and Unexpired Leases; (b) selection of the directors, managers, and officers for the Reorganized Debtors; (c) the execution of and entry into the Exit Facilities Documents, the New Equity Documents, the Warrants Documents, the Option Rights Documents, and the Advisory Services Agreement; (d) the issuance and distribution of the New Equity as provided herein; and (e) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the company structure of the Debtors and any company action required by the Debtors in connection therewith shall be deemed to have occurred on and shall be in effect as of the Effective Date without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtors.

On or prior to the Effective Date, the appropriate officers, directors, managers, or authorized persons of the Debtors (including any president, vice-president, chief executive officer, treasurer, general counsel, or chief financial officer thereof) shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Debtors or the Reorganized Debtors, as applicable, including (a) the Exit Facilities Documents the New Equity Documents, the Warrants Documents, the Option Rights Documents, and the Advisory Services Agreement and (b) any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

**6.18    Effectuating Documents; Further Transactions**

Prior to, on, and after the Effective Date, the Debtors and Reorganized Debtors and the directors, managers, officers, authorized persons, and members of the boards of directors or managers and directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of the Plan, the Exit Facilities Documents, the New Equity Documents, the Warrant Documents, the Option Rights Documents, the Advisory Services Agreement, and any securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to the Plan or the Restructuring Support Agreement.

**6.19    Management Incentive Plan**

Effective as of the Effective Date, shares will be reserved for issuance under the Management Incentive Plan to directors, officers, and key employees of the Reorganized Debtors in accordance with the material terms set forth in the Restructuring Support Agreement and the term sheet agreed to between the Debtors and the Required Consenting First Lien Lenders. The Management Incentive Plan shall provide for no less than 10% of the New Common Stock to be reserved for issuance to management of the Reorganized Debtors on or following the Effective Date. The initial grants under the Management Incentive Plan will be in the form of restricted stock units, two-thirds of which will vest based on achievement of certain performance conditions to be determined by the New Board in good faith and set forth in the applicable award agreement, but in no event shall any performance condition require achievement of greater than EBITDA of $130 million, and one-third of which will vest ratably over four (4) years based on the passage of time.

**6.20    Workers' Compensation Programs**

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under (a) all applicable workers' compensation laws in states in which the Reorganized Debtors operate and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans, in each case, for workers' compensation and workers' compensation insurance. Any and all Proofs of Claims on account of workers' compensation shall be

deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs, and plans; *provided*, *further*, that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

**6.21    Treatment of Executory Contracts and Unexpired Leases**

(a)    **Assumption of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases shall be deemed assumed without the need for any further notice to or action, order, or approval of the Bankruptcy Court as of the Effective Date under section 365 of the Bankruptcy Code; *provided* that the Restructuring Support Agreement shall be deemed assumed as of the Confirmation Date; *provided*, *further*, that, upon the occurrence of the Effective Date, the Restructuring Support Agreement will terminate in accordance with its terms.

Entry of the Confirmation Order shall constitute a Bankruptcy Court Final Order approving the assumption or assumption and assignment, as applicable, of such Executory Contracts or Unexpired Leases as set forth in the Plan, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, the assumption or assumption and assignment of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or a Bankruptcy Court Final Order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified in the Plan or any Final Order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, purports to restrict or prevent, or is breached or deemed breached by the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

(b)    **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Bankruptcy Court shall hear such dispute prior to the assumption becoming effective.  The cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption and shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and payment of the applicable cure amount shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any proof of claim filed with respect to an Executory Contract or Unexpired Lease that is assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.**

(c)     **Contracts and Leases Entered into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

(d)     **Indemnification and Reimbursement Obligations**

On and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan, and the Reorganized Debtors' governance documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' current and former directors, officers, employees, and agents to the fullest extent permitted by law and at least to the same extent as the certificate of incorporation, bylaws, or similar organizational documents of each of the respective Debtors as of the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed, or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted. None of the Reorganized Debtors shall amend and/or restate its certificate of incorporation, bylaws, or similar organizational document before or after the Effective Date to terminate or materially adversely affect (1) any of the Reorganized Debtors' obligations referred to in the immediately preceding sentence or (2) the rights of such managers, directors, officers, employees, or agents referred to in the immediately preceding sentence. Notwithstanding anything to the contrary herein, the Reorganized Debtors shall not be required to indemnify the Debtors' managers, directors, officers, or employees for any claims or Causes of Action for which indemnification is barred under applicable law, the Debtors' organizational documents, or applicable agreements governing the Debtors' indemnification obligations.

On and as of the Effective Date, any of the Debtors' indemnification obligations with respect to any contract or agreement that is the subject of or related to any litigation against the Debtors or Reorganized Debtors, as applicable, shall be assumed by the Reorganized Debtors and otherwise remain unaffected by the Chapter 11 Cases; *provided that* the Reorganized Debtors shall not indemnify the Debtors' directors for any claims or causes of action for which indemnification is barred under applicable law, the Debtors' organizational documents, or applicable agreements governing the Debtors' indemnification obligations.

**6.22     Employee Compensation and Benefits**

(a)     **Compensation and Benefits Programs**

Subject to the provisions of the Plan and the Restructuring Support Agreement, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code; *provided that* (1) with respect to management, any provision relating to equity-based awards, including any termination-related provisions with respect to equity based awards, will be replaced and superseded in its entirety by the Management Incentive Plan, and (2) the insider and non-insider cash-based incentive compensation plans for fiscal year 2019 and the pre-filing key employee retention plan and non-insider retention plan will be assumed as modified under the Restructuring Support Agreement. The Reorganized Debtors shall honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order.

Any assumption of Compensation and Benefits Programs pursuant to the terms herein shall not be deemed to trigger any applicable change of control, immediate vesting, termination, or similar provisions therein. No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

(b)     **The Collective Bargaining Agreement**

The Debtors' Collective Bargaining Agreement shall be treated as and deemed to be an Executory Contract under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed the Collective Bargaining Agreement and all obligations arising therein.

6.23    **Release, Injunction, and Related Provisions**

(a)    **Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Equity Interests, and Controversies**

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the Plan, the distributions, rights, and treatments that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Interests and Claims of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Debtors, the Reorganized Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest is Allowed; or (3) the Holder of such Claim or Interest has accepted the Plan.  Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to, or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.  For the avoidance of doubt, nothing in <u>Article IX.A</u> of the Plan shall affect the rights of Holders of Claims and Interests to seek to enforce the Plan, including the distributions to which Holders of Allowed Claims and Interests are entitled under the Plan.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities.

(b)    **Releases by the Debtors**

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY IS DEEMED RELEASED AND DISCHARGED BY THE DEBTORS, THE REORGANIZED DEBTORS, AND THEIR ESTATES FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED ON BEHALF OF THE DEBTORS, THAT THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS COUNTERCLAIMS OR DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTORS), INTERCOMPANY TRANSACTIONS, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE**

PLAN SUPPLEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY (IF ANY), THE PLAN, THE PLAN SUPPLEMENT, THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN OR (B) ANY INDIVIDUAL FROM ANY CLAIM OR CAUSES OF ACTION RELATED TO AN ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (A) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING AND IMPLEMENTING THE PLAN; (B) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (C) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (D) FAIR, EQUITABLE, AND REASONABLE; (E) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (F) A BAR TO ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE DEBTORS' ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

(c)      **Releases by the Releasing Parties**

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR, AND RELEASED PARTY FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED ON BEHALF OF THE DEBTORS, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS COUNTERCLAIMS OR DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTORS), INTERCOMPANY TRANSACTIONS, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING

THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN OR (B) ANY INDIVIDUAL FROM ANY CLAIM OR CAUSES OF ACTION RELATED TO AN ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS:  (A) CONSENSUAL; (B) ESSENTIAL TO THE CONFIRMATION OF THE PLAN; (C) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (D) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE; (E) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (F) FAIR, EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

(d)     **Exculpation**

SUBJECT TO SECTION 1125(E) OF THE BANKRUPTCY CODE, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, NO EXCULPATED PARTY SHALL HAVE OR INCUR LIABILITY FOR AND EACH EXCULPATED PARTY IS RELEASED AND EXCULPATED FROM ANY CAUSE OF ACTION FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT AND RELATED PREPETITION TRANSACTIONS, THE DIP FACILITY (IF ANY), THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DIP FACILITY (IF ANY), THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN.

THE EXCULPATED PARTIES HAVE, AND UPON CONFIRMATION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF VOTES AND DISTRIBUTION OF CONSIDERATION PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF

SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE EXCULPATION SET FORTH ABOVE DOES NOT RELEASE OR EXCULPATE ANY CLAIM RELATING TO ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.

       (e)    **Injunction**

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT: (A) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (B) HAVE BEEN RELEASED PURSUANT TO ARTICLE IX.B OF THE PLAN; (C) HAVE BEEN RELEASED PURSUANT TO ARTICLE IX.C OF THE PLAN, (D) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE IX.D OF THE PLAN (BUT ONLY TO THE EXTENT OF THE EXCULPATION PROVIDED IN ARTICLE IX.D OF THE PLAN), OR (E) ARE OTHERWISE DISCHARGED, SATISFIED, STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY ACTION OR OTHER PROCEEDING, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF, OR IN CONNECTION WITH OR WITH RESPECT TO, ANY DISCHARGED, RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES.

**6.24**    **Setoffs and Recoupment**

Except as otherwise provided herein, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of an Allowed Claim may setoff or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan, a Final Order or otherwise); *provided* that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action.

**6.25**    **Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns.

To the extent that any Holder of a Secured Claim that has has had its Claim satisfied or discharged in full pursuant to the Plan or any agent for such Holder has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or any administrative agent under the Exit Facilities Documents that are necessary or desirable to record or effectuate the cancellation and/or

extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

**6.26     Modification of Plan**

Subject to the limitations contained in the Plan, the Debtors reserve the right, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement (a) to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code and the Restructuring Support Agreement, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

**6.27     Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**6.28     Revocation of Plan**

Subject to the conditions to the Effective Date, the Debtors reserve the right, subject to the terms of the Restructuring Support Agreement, to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan with the prior reasonable consent of the Required Parties, if entry of the Confirmation Order or the Effective Date does not occur, or if the Restructuring Support Agreement terminates in accordance with its terms, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan, assumption of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any claims by or against or any Equity Interests in such Debtor or any other Entity, (ii) prejudice in any manner the rights of the Debtors or any other Entity, or (iii) constitute an admission of any sort by the Debtors or any other Entity.

**6.29     Reservation of Rights**

The Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

**6.30     Conditions Precedent to the Effective Date**

The following are conditions precedent to the Effective Date that must be satisfied or waived:

1.      The Bankruptcy Court shall have approved the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

2.      The Confirmation Order shall have been entered and shall be in full force and effect and such Confirmation Order shall be a Final Order.

3.      The Debtors shall have obtained any authorization, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring Transactions.

4.      All actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws.

5.      All conditions precedent to the effectiveness of the Exit Facilities Documentation shall have been satisfied contemporaneously therewith or duly waived.

6.      All conditions precedent to the issuance of the New Common Stock, including the Warrants, and in accordance with the Option Rights, and the Management Incentive Plan, shall have been satisfied or duly waived.

7.      The Shareholders Agreement shall have been executed by all parties thereto as provided under the Plan.

8.      All documents and agreements necessary to implement the Plan shall have been executed and tendered for delivery.   All conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms thereof (or will be satisfied and waived substantially concurrently with the occurrence of the Effective Date).

9.      The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein and all other schedules, documents, supplements, and exhibits to the Plan shall be consistent with the Restructuring Support Agreement and Article I.E of the Plan.

10.     All of the other Definitive Documents not expressly set forth in Article VIII of the Plan shall have been executed in accordance with section 2 of the Restructuring Support Agreement and Article I.E of the Plan.

11.     The Restructuring Support Agreement shall not have been terminated in accordance with its terms and shall be in full force and effect.

12.     The Professional Fee Escrow Account shall have been established and funded.

13.     All Accrued Professional Compensation Claims and expenses of Retained Professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court.

14.     The First Lien Early Acceptance Premium shall have been paid in Cash in full on or before the Effective Date in accordance with the terms of the Restructuring Support Agreement and Article II.B of the Plan.

15.     All invoiced reasonable and documented fees and out-of-pocket expenses payable pursuant to Section 27(b) of the Restructuring Support Agreement, Article II.A.2.d of the Plan, or an order of the Bankruptcy Court shall have been paid in full.

16.     The Debtors shall have provided to the Consenting First Lien Lenders or their advisors all reasonably requested financial information as of the Effective Date.

17.     The Debtors and Reorganized Debtors, as applicable, shall have implemented the restructuring in a manner consistent in all respects with the Plan and the Restructuring Support Agreement.

**6.31    Waiver of Conditions Precedent**

The Debtors or the Reorganized Debtors, as applicable, subject to the Restructuring Support Agreement, may waive any of the conditions to the Effective Date set forth above at any time, without any notice to parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court and without any formal action other than a proceeding to confirm the Plan.

**6.32**        **Effect of Non-Occurrence of Conditions to the Effective Date**

If the Effective Date does not occur on or before the termination of the Restructuring Support Agreement, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected under the Plan, and document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, the Confirmation Order, or the Disclosure Statement shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action, (2) prejudice in any manner the rights of the Debtors or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

**ARTICLE VII**

**CERTAIN FACTORS TO BE CONSIDERED**

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

**ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE PLAN AND ITS IMPLEMENTATION.**

**7.1**        **General**

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive.  In considering whether to vote to accept or reject the Plan, Holders of Claims should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise incorporated by reference in this Disclosure Statement.

**7.2**        **Risks Relating to the Plan and Other Bankruptcy Law Considerations**

(a)        **A Holder of a Claim or Interest May Object to, and the Bankruptcy Court May Disagree with, the Debtors' Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created ten (10) Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  However, a Holder of a Claim or Interest could challenge the Debtors' classification.  In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan may increase, and there can be no assurance that the Bankruptcy Court will agree with the Debtors' classification.  If the Bankruptcy Court concludes that the classifications of Claims and Interests under the Plan do not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Plan. Such modification could require re-solicitation of votes on the Plan. The Plan may not be confirmed if the Bankruptcy Court determines that the Debtors' classification of Claims and Interests is not appropriate.

(b)        **The Debtors May Not Be Able to Satisfy the Voting Requirements for Confirmation of the Plan**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors may seek, as promptly as practicable thereafter, Confirmation.  If the Plan does not receive the required support from Class 4, Class 5, and Class 6, the Debtors may elect to amend the Plan, seek to sell their assets pursuant to section 363 of the Bankruptcy Code, or proceed with liquidation.  There can be no assurance that the terms of any

such alternative chapter 11 plan or sale pursuant to section 363 of the Bankruptcy Code would be similar or as favorable to the Holders of Allowed Claims as the Restructuring Transactions contemplated by the Plan.

(c)      **The Debtors Might Not Meet the Liquidity Condition in the Restructuring Support Agreement**

On the Petition Date and pursuant to the Restructuring Support Agreement, the Debtors are required to have at least 90% of the "Ending Liquidity," as set forth in the applicable line item in the budget, dated as of December 17, 2018, (the "Liquidity Budget") that was provided to the financial advisors to the Ad Hoc Group of First Lien Lenders. Otherwise, the Consenting First Lien Lenders may terminate the Restructuring Support Agreement as it relates to such lenders.  Although the Debtors intend to meet the Ending Liquidity Requirement in the Restructuring Support Agreement, there can be no assurance that this requirement will be satisfied and that the Consenting First Lien Lenders may terminate the Restructuring Support Agreement if the Debtors do not meet such requirement.

(d)      **The Bankruptcy Court May Not Confirm the Plan or May Require the Debtors to Re-Solicit Votes with Respect to the Plan**

The Debtors cannot assure you that the Plan will be confirmed by the Bankruptcy Court.  Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, a finding by the Bankruptcy Court that the plan of reorganization is "feasible," that all claims and interests have been classified in compliance with the provisions of section 1122 of the Bankruptcy Code, and that, under the plan of reorganization, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value, as of the date the plan of reorganization becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  With respect to impaired classes of claims or interests that do not accept the plan, section 1129(b) requires that the plan be fair and equitable (including, without limitation the "absolute priority rule") and not discriminate unfairly with respect to such classes.  There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of section 1129 of the Bankruptcy Code (including, without limitation, finding that the Plan satisfies the "new value" exception to the absolute priority rule, if applicable) have been met with respect to the Plan.  If and when the Plan is filed, there can be no assurance that modifications to the Plan would not be required for Confirmation, or that such modifications would not require a re-solicitation of votes on the Plan.

The Bankruptcy Court could fail to approve this Disclosure Statement and determine that the votes in favor of the Plan should be disregarded.  The Debtors then would be required to recommence the solicitation process, which would include re-filing a plan of reorganization and disclosure statement.  Typically, this process involves a 60- to 90-day period and includes a Bankruptcy Court hearing with respect to the required approval of a disclosure statement, followed (after Bankruptcy Court approval) by solicitation of claim and interest holder votes for the plan of reorganization, followed by a confirmation hearing at which the Bankruptcy Court will determine whether the requirements for confirmation have been satisfied, including the requisite claim and interest holder acceptances.

If the Plan is not confirmed, the Chapter 11 Cases may be converted into cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests and the Debtors' analysis thereof are set forth in the unaudited Liquidation Analysis, attached hereto as **Exhibit C**.  The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code would result in, among other things, smaller distributions being made to creditors and interest holders than those provided for in the Plan because of:

- the likelihood that the Debtors' assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner, affecting the business as a going concern;

- additional administrative expenses involved in the appointment of a chapter 7 trustee; and

- additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, and including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

(e)     **The Debtors May Object to the Amount or Classification of a Claim or Interest**

Except as otherwise provided in the Plan, the Debtors and other parties in interest reserve the right to object to the amount or classification of any Claim or Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection.  Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

(f)     **Even if the Debtors Receive All Necessary Acceptances for the Plan to Become Effective, the Debtors May Fail to Meet All Conditions Precedent to Effectiveness of the Plan**

Although the Debtors believe that the Effective Date would occur very shortly after the Confirmation Date, there can be no assurance as to such timing.

The Confirmation and effectiveness of the Plan are subject to certain conditions that may or may not be satisfied.  The Debtors cannot assure you that all requirements for Confirmation and effectiveness required under the Plan will be satisfied.  If each condition precedent to Confirmation is not met or waived, the Plan will not be confirmed, and if each condition precedent to consummation is not met or waived, the Effective Date will not occur.  In the event that the Plan is not Confirmed or is not consummated, the Debtors may seek Confirmation of an alternative plan of reorganization.

(g)     **Contingencies May Affect Distributions to Holders of Allowed Claims and Interests**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

(h)     **The Bankruptcy Court May Find the Solicitation of Acceptances Inadequate**

Usually, votes to accept or reject a plan of reorganization are solicited after the filing of a petition commencing a chapter 11 case.  Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b).  Sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

- solicitation comply with applicable nonbankruptcy law;

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote; and

- the time prescribed for voting is not unreasonably short.

In addition, Bankruptcy Rule 3018(b) provides that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures.  Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is deemed to have accepted or rejected the plan if (i) the solicitation of such acceptance or rejection was in compliance with applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) there is no such law, rule, or regulation, and such acceptance or rejection was solicited after

disclosure to such holder of adequate information (as defined by section 1125(a) of the Bankruptcy Code).  While the Debtors believe that the requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(i)    **There is a Risk of Termination of the Restructuring Support Agreement**

To the extent that events giving rise to termination of the Restructuring Support Agreement occur, the Restructuring Support Agreement may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituencies and could result in the loss of use of cash collateral by the Debtors under certain circumstances.  Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

(j)    **The Bankruptcy Court May Dismiss Some or All of the Chapter 11 Cases**

Certain parties in interest may contest the Debtors' authority to commence and/or prosecute the Chapter 11 Cases.  If, pursuant to any such proceeding, the Bankruptcy Court finds that some or all of the Debtors could not commence the Chapter 11 Cases for any reason, the Debtors may be unable to consummate the transactions contemplated by the Restructuring Support Agreement and the Plan.  If some or all of the Chapter 11 Cases are dismissed, the Debtors may be forced to cease operations due to insufficient funding and/or liquidate their businesses in another forum to the detriment of all parties in interest.

(k)    **The United States Trustee or Other Parties May Object to the Plan on Account of the Debtors Releases, Third-Party Releases, Exculpations, or Injunction Provisions**

Any party in interest, including the United States Trustee (the "U.S. Trustee"), could object to the Plan on the grounds that the (a) debtor release contained Article IX of the Plan is to be given without adequate consideration, (b) third-party release contained in Article IX of the Plan is not given consensually or in a permissible non-consensual manner, (c) exculpation contained in Article IX of the Plan cannot extend to non-estate fiduciaries, or (d) the injunction contained in Article IX of the Plan is overly broad.  In response to such an objection, the Bankruptcy Court could determine that any of these provisions are not valid under the Bankruptcy Code.  If the Bankruptcy Court makes such a determination, the Plan could not be confirmed without modifying the Plan to alter or remove the applicable provision.  This could result in substantial delay in Confirmation of the Plan or the Plan not being confirmed at all.

(l)    **The Debtors May Seek To Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Confirmation**

The Debtors, reserve the right, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement, and consistent with the terms of the Plan, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are consistent with the terms of the Restructuring Support Agreement and necessary or desirable to consummate the Plan.  The potential impact of any such amendment or waiver on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.  All Holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court.  If, after receiving sufficient acceptances, but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if (1) all classes of adversely affected creditors and interest holders accept the modification in writing, or (2) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of Holders of accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

(m)    **The Plan May Have Material Adverse Effects on the Debtors' Operations**

The solicitation of acceptances of the Plan and commencement of the Chapter 11 Cases could adversely affect the relationships between the Debtors and their respective customers, employees, partners, and other parties. Such adverse effects could materially impair the Debtors' operations.

(n)      **The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan, and a Lengthy Bankruptcy Proceeding Could Disrupt the Debtors' Businesses, as Well as Impair the Prospect for Reorganization on the Terms Contained in the Plan**

The Debtors estimate that the process of obtaining Confirmation of the Plan by the Bankruptcy Court will last between one (1) and five (5) Business days  from the Petition Date, but it could last considerably longer if, for example, Confirmation is contested or the conditions to Confirmation or Consummation are not satisfied or waived.

Although the Plan is designed to minimize the length of the bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed.  Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' businesses.  There is a risk, due to uncertainty about the Debtors' futures that, among other things:

- customers could move to the Debtors' competitors;

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- suppliers, vendors, or other business partners could terminate their relationships with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' future prospects.

A lengthy bankruptcy proceeding also would involve additional expenses and divert the attention of management from the operation of the Debtors' businesses.

The disruption that the bankruptcy process would have on the Debtors' businesses could increase with the length of time it takes to complete the Chapter 11 Cases.  If the Debtors are unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time while they try to develop a different plan of reorganization that can be confirmed.  A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

(o)      **Other Parties in Interest Might Be Permitted to Propose Alternative Plans of Reorganization That May Be Less Favorable to Certain of the Debtors' Constituencies Than the Plan**

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization to the Plan.  Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for a period of 120 days from the Petition Date.  However, such exclusivity period can be reduced or terminated upon order of the Bankruptcy Court.  If such an order were to be entered, parties in interest other than the Debtors would then have the opportunity to propose alternative plans of reorganization.

If another party in interest were to propose an alternative plan of reorganization following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to existing Holders of Claims and Interests and may seek to exclude such Holders from retaining any equity under their proposed plan.

The Debtors consider maintaining relationships with their stakeholders, customers, and other partners as critical to maintaining the value of their enterprise following the Effective Date and have sought to treat those constituencies accordingly.  However, proponents of alternative plans of reorganization may not share the Debtors' assessments and may seek to impair the Claims or Interests of such constituencies to a greater degree.  If there were competing plans of reorganization, the Chapter 11 Cases likely would become longer, more complicated, more litigious, and much more expensive.  If this were to occur, or if the Debtors' stakeholders or other constituencies important to the Debtors' business were to react adversely to an alternative plan of reorganization, the adverse consequences discussed in the foregoing sections also could occur.

(p) **The Debtors' Business May Be Negatively Affected if the Debtors Are Unable to Assume Their Executory Contracts**

An executory contract is a contract on which performance remains due to some extent by both parties to the contract. The Plan provides for the assumption of all Executory Contracts and Unexpired Leases. The Debtors intend to preserve as much of the benefit of their existing Executory Contracts and Unexpired Leases as possible. However, with respect to some limited classes of Executory Contracts, including licenses with respect to patents or trademarks, the Debtors may need to obtain the consent of the counterparty to maintain the benefit of the contract. There is no guarantee that such consent either would be forthcoming or that conditions would not be attached to any such consent that makes assuming the contracts unattractive. The Debtors then would be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them.

(q) **Material Transactions Could Be Set Aside as Fraudulent Conveyances or Preferential Transfers**

Certain payments received by stakeholders prior to the bankruptcy filing could be challenged under applicable debtor/creditor or bankruptcy laws as either a "fraudulent conveyance" or a "preferential transfer." A fraudulent conveyance occurs when a transfer of a debtor's assets is made with the intent to defraud creditors or in exchange for consideration that does not represent reasonably equivalent value to the property transferred. A preferential transfer occurs upon a transfer of property of the debtor while the debtor is insolvent for the benefit of a creditor on account of an antecedent debt owed by the debtor that was made on or within ninety (90) days before the petition date or one year before the petition date, if the creditor, at the time of such transfer, was an insider. If any transfer were challenged in the Bankruptcy Court and found to have occurred with regard to any of the Debtors' material transactions, the Bankruptcy Court could order the recovery of all amounts received by the recipient of the transfer.

(r) **The Debtors May Be Unsuccessful in Obtaining First Day Orders To Permit Them to Pay Their Vendors or Continue Operating Their Businesses in the Ordinary Course of Business**

The Debtors have attempted to address potential concerns of their customers, vendors, and other key parties in interest that might arise from the filing of the Plan through a variety of provisions incorporated into or contemplated by the Plan, including the Debtors' intention to seek appropriate Bankruptcy Court orders to permit the Debtors to pay their prepetition and postpetition accounts payable to parties in interest in the ordinary course. However, there can be no guarantee that the Debtors will be successful in obtaining the necessary approvals of the Bankruptcy Court for such arrangements or for every party in interest the Debtors may seek to treat in this manner, and, as a result, the Debtors' businesses might suffer.

(s) **The Bankruptcy Court May Not Approve the Debtors' Use of Cash Collateral or the DIP Facility**

Upon commencing the Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to authorize the Debtors to enter into postpetition financing arrangements and/or use cash collateral to fund the Chapter 11 Cases and to provide customary adequate protection to the Secured Lenders under the applicable prepetition debt documents, which requests will be in accordance with the terms of the Restructuring Support Agreement. Such access to postpetition financing and/or cash collateral will provide liquidity during the pendency of the Chapter 11 Cases. There can be no assurance that the Bankruptcy Court will approve the DIP Facility and/or such use of cash collateral on the terms requested. Moreover, if the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust their available cash collateral. There is no assurance that the Debtors will be able to obtain an extension of the right to obtain further postpetition financing and/or use cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' businesses may be impaired materially.

(t) **Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors'

filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations on a post-reorganization basis.

**7.3    Risks Relating to the Restructuring Transactions**

(a)    **The Debtors Will Be Subject to Business Uncertainties and Contractual Restrictions Prior to the Effective Date**

Uncertainty about the effects of the Plan on employees may have an adverse effect on the Debtors. These uncertainties may impair the Debtors' ability to retain and motivate key personnel and could cause customers and others that deal with the Debtors to defer entering into contracts with the Debtors or making other decisions concerning the Debtors or seek to change existing business relationships with the Debtors. In addition, the Debtors are highly dependent on the efforts and performance of their senior management team. If key employees depart because of uncertainty about their future roles and potential complexities of the Restructuring Transactions, the Debtors' business, financial condition, liquidity, and results of operations could be adversely affected.

(b)    **The Support of the RSA Parties Is Subject to the Terms of the Restructuring Support Agreement Which Is Subject to Termination in Certain Circumstances**

Pursuant to the Restructuring Support Agreement, the RSA Parties have agreed to support the restructuring transactions set forth in the Plan. Nevertheless, the Restructuring Support Agreement is subject to termination upon the occurrence of certain termination events. Accordingly, the Restructuring Support Agreement may be terminated after the date of this Disclosure Statement, and such a termination would present a material risk to Confirmation and/or consummation of the Plan because the Plan may no longer have the support of the RSA Parties.

(c)    **There Is Inherent Uncertainty in the Debtors' Financial Projections Such that the Reorganized Debtors May Not Be Able to Meet the Projections**

The Financial Projections attached hereto as **Exhibit E** includes projections covering the Debtors' operations through 2022. These projections are based on assumptions that are an integral part of the projections, including Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the value of the New Common Stock and Warrants and the ability of the Debtors to make payments with respect to their indebtedness. Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date. In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Lastly, the business plan was developed by the Debtors with the assistance of their Advisors. There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the

Board of Directors may make after reevaluating the strategic direction of the Debtors and their business plan. Any deviations from the Debtors' existing business plan would necessarily cause a deviation from the Financial Projections, and could result in materially different outcomes from those projected.

      (d)      **Failure to Implement the Restructuring Transactions and Confirm and Consummate the Plan Could Negatively Impact the Debtors**

If the Restructuring Transactions are not implemented, the Debtors may consider other restructuring alternatives available at that time, subject to the Restructuring Support Agreement, which may include the filing of an alternative chapter 11 plan, conversion to chapter 7, commencement of section 363 sales of the Debtors' assets, or any other transaction that would maximize value of the Debtors' estates. Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described herein.

Any material delay in Confirmation of the Plan, or the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

If the Plan is not confirmed and consummated, the ongoing businesses of the Debtors may be adversely affected and there may be various consequences, including:

- the adverse impact to the Debtors' businesses caused by the failure to pursue other beneficial opportunities due to the focus on the Restructuring Transactions, without realizing any of the anticipated benefits of the Restructuring Transactions;

- the incurrence of substantial costs by the Debtors in connection with the Restructuring Transactions, without realizing any of the anticipated benefits of the Restructuring Transactions;

- the possibility, for the Debtors, of being unable to repay indebtedness when due and payable; and

- the Debtors pursuing traditional chapter 11 or chapter 7 proceedings, resulting in recoveries for creditors and interest holders that are less than contemplated under the Plan, or resulting in no recovery for certain creditors and interest holders.

      (e)      **Even if the Restructuring Transactions are Successful, the Debtors Will Continue to Face Risks**

The Restructuring Transactions are generally designed to reduce the amount of the Debtors' cash interest expense and improve the Debtors' liquidity and financial and operational flexibility to generate long-term growth. Even if the Restructuring Transactions are implemented, the Debtors will continue to face a number of risks, including certain risks that are beyond the Debtors' control, such as changes in economic conditions, changes in the Debtors' industry, and changes in commodity prices. As a result of these risks and others, there is no guarantee that the Restructuring Transactions will achieve the Debtors' stated goals.

**7.4**      **Risks Relating to the New Common Stock and Warrants**

      (a)      **The Value of the New Common Stock and Warrants Cannot Be Stated With Certain**

Despite the Debtors' best efforts to value the New Common Stock and Warrants, various uncertainties and contingencies, including market conditions, the Debtors' potential inability to implement their business plan or lack of a market for the New Common Stock and Warrants may cause fluctuations or variations in value of the New Common Stock and Warrants not fully accounted for herein. All of these factors are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets and other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by other factors not possible to predict.

(b)    **The Plan Exchanges Senior Indebtedness for Junior Securities**

If the Plan is confirmed and consummated, certain Holders of First Lien Claims and Second Lien Claims will receive the New Common Stock and the Warrants, as applicable. Thus, in agreeing to the Plan, certain of such Holders will be consenting to the exchange of their interests in senior debt, which has, among other things, a stated interest rate, a maturity date, and a liquidation preference over equity securities, for the New Common Stock and the Warrants, which will be subordinate to all future creditor claims.

(c)    **A Liquid Trading Market for the New Common Stock and the Warrants May Not Develop**

The Debtors make no assurance that liquid trading markets for the New Common Stock and the Warrants will develop. The liquidity of any market for the New Common Stock and the Warrants will depend, among other things, upon the number of Holders of New Common Stock and Warrants, the Reorganized Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted. Therefore, the Debtors cannot assure that an active trading market will develop or, if a market develops, what the liquidity or pricing characteristics of that market will be.

(d)    **The Debtors May Be Controlled by Significant Holders**

Under the Plan, certain Holders of Allowed Claims may receive New Common Stock and Warrants. If Holders of a significant portion of the New Common Stock were to act as a group, such Holders might be in a position to control the outcome of actions requiring shareholder approval, including the election of directors. In addition, the New Board shall consist of the current chief executive officer, six directors appointed by the Consenting First Lien Lenders, one director appointed by the Consenting Second Lien Lenders, and one director appointed by the Sponsors whose appointment is subject to the Sponsors' exercise of the Purchase Option in accordance with the Restructuring Support Agreement.

**7.5    Risks Relating to the Debtors' Business**

(a)    **The Debtors May Not Be Able To Implement the Business Plan**

The Debtors may not achieve their business plan and financial restructuring strategy. In such event, the Reorganized Debtors may be unable to restructure their funded debt or be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated in this Disclosure Statement, or become subject to further insolvency proceedings.

(b)    **The Debtors' Financial Projections Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based**

The Debtors' Financial Projections are based on numerous assumptions including: timely Confirmation and Consummation pursuant to the terms of the Plan; the anticipated future performance of the Debtors; industry performance; general business and economic conditions; and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date that the Disclosure Statement is approved by the Bankruptcy Court may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the ability of the Debtors to make payments with respect to indebtedness following consummation. Because the actual results achieved throughout the periods covered by the projections may vary from the projected results, the projections should not be relied upon as an assurance of the actual results that will occur. Except with respect to the projections and except as otherwise specifically and expressly stated, the Disclosure Statement does not reflect any events that may occur subsequent to the date of the Disclosure Statement. Such events may have a material impact on the information contained in the Disclosure Statement. The Debtors do not intend to update the Financial Projections and therefore the Financial Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Financial Projections.

(c)     **The Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness**

The Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Debtors' control. The Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, borrowings in connection with emergence.

(d)     **The Debtors' Substantial Liquidity Needs May Impact Revenue**

The Debtors' principal sources of liquidity historically have been cash flow from operations, borrowings under their Prepetition Secured Debt, and issuances of equity securities. If the Debtors' cash flow from operations remains depressed or continues to decrease, the Debtors' ability to expend the capital necessary to invest in their businesses and remain competitive will be severely constrained.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources and have extremely limited, if any, access to additional financing. In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases. The Debtors cannot guarantee that cash on hand, cash flow from operations, and cash provided by the DIP Facility will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to comply with the terms and condition of any debtor-in-possession financing and/or cash collateral order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; (b) their ability to maintain adequate cash on hand; (c) their ability to generate cash flow from operations; (d) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; (e) the availability of incremental draws under the DIP Facility (if any); and (f) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that cash on hand, cash flow from operations, and cash provided under the DIP Facility (if any) are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. In addition, the Debtors' ability to consummate the Plan is dependent on their ability to satisfy the conditions precedent to the Exit ABL Facility. The Debtors can provide no assurance that such conditions will be satisfied. The Debtors' long-term liquidity requirements and the adequacy of the capital resources are difficult to predict at this time.

(e)     **Existing and Increased Competition in the Apparel Industry or Decreasing Demand for Plus-Size Products May Adversely Affect the Debtors' Business and Results of Operations**

The Debtors compete with numerous direct-to-consumer companies and retailers, including national department store chains, men's and women's specialty apparel chains, outdoor specialty stores, apparel catalog businesses, sportswear marketers and online apparel businesses that sell similar lines of merchandise, for customers, vendors and personnel. Increased demand in the Debtors' markets due to the growing number of consumers requiring plus-size clothing could lead to increased competition. The Debtors' competitors may be able to adopt more aggressive pricing and promotional policies, adapt to changes in customer tastes or requirements more quickly, devote greater resources to the design, sourcing, distribution, marketing and sale of their products or generate greater national brand recognition than the Debtors. In addition, the Debtors' competitors may seek to emulate facets of the Debtors' business strategy, which could result in a reduction of any competitive advantage or special appeal that the Debtors might possess. An inability to overcome potential competitive disadvantages or effectively market the Debtors' products relative to the Debtors' competitors could have an adverse effect on the Debtors' business and results of

operations.  Further, a decrease in demand for plus-size clothing could have an adverse effect on the Debtors' business and results of operations.

(f)      **The Debtors' Reliance on Suppliers May Impact the Debtors' Operation and Performance.**

The Debtors rely significantly on their suppliers.  Adverse changes in any of the relationships with their suppliers, or the inability to enter into new relationships with suppliers, could negatively impact the Debtors' operations and performance.  The Debtors' current arrangements with suppliers may not remain in effect on current or similar terms, and the impact of changes to those arrangements may adversely impact the Debtors' revenue.

(g)      **The Debtors Must Continue to Retain, Motivate, and Recruit Executives and Other Key Employees, Which May Be Difficult in Light of Uncertainty Regarding the Plan, and Failure To Do So Could Negatively Affect the Debtors' Businesses**

The Reorganized Debtors' success will depend, in part, on the efforts of their executive officers and other key employees, none of whom are covered by key person insurance policies.  These individuals possess sales, marketing, financial, administrative, and technological skills that are critical to the operation of the Debtors' business. If the Reorganized Debtors lose or suffer an extended interruption in the services of one or more of their executive officers or other key employees, the Reorganized Debtors' business, operational results, and financial condition may be negatively impacted.

(h)      **The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases**

In the future, the Debtors may become a party to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

**7.6      Certain Tax Implications of the Chapter 11 Cases and the Plan**

Holders of Allowed First Lien Claims and Allowed Second Lien Claims should carefully review Article IX of the Disclosure Statement, "Certain U.S. Federal Income Tax Consequences," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors, Reorganized Debtors, and Holders of such Claims.

**7.7      Disclosure Statement Disclaimer**

(a)      **Information Contained Herein Is Solely for Soliciting Votes**

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose.  Specifically, this Disclosure Statement is not legal advice to any Person or Entity.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each reader should consult its own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan and whether to object to Confirmation.

(b)      **Disclosure Statement May Contain Forward-Looking Statements**

This Disclosure Statement may contain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," the negative thereof, or other variations thereon or comparable terminology.

The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the filing or pendency of the Chapter 11 Cases;

- financing plans;

- competitive position;

- business strategy;

- budgets;

- projected cost reductions;

- projected dividends;

- projected price increases;

- effect of changes in accounting due to recently issued accounting standards;

- projected and estimated liability costs, including tort, and environmental costs and costs of environmental remediation;

- growth opportunities for existing products and services;

- results of litigation;

- disruption of operations;

- contractual obligations;

- projected general market conditions;

- plans and objectives of management for future operations;

- off-balance sheet arrangements;

the Debtors' expected future financial position, liquidity, results of operations, profitability, and cash flows; and

growth opportunities for existing products and services.

Statements concerning these and other matters are not guarantees of the Debtors' future performance. The reader is cautioned that all forward-looking statements are necessarily speculative. The Valuation Analysis, the Liquidation Analysis, the recovery projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims and Interests may be affected by many factors that cannot be predicted. Forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement.

(c)    **No Legal, Business, or Tax Advice Is Provided to You by This Disclosure Statement**

**THIS DISCLOSURE STATEMENT IS NOT LEGAL, BUSINESS, OR TAX ADVICE TO YOU.** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation.

(d)    **No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (1) constitute an admission of any fact or liability by any entity (including the Debtors) nor (2) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Interests, or any other parties-in-interest.

(e)        **Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. All Parties, including the Debtors, reserve the right to continue to investigate Claims and Interests and file and prosecute objections to Claims and Interests.

(f)        **No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a Holder of an Allowed Claim or Interest for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors to object to that Holder's Allowed Claim or Interest, or to bring Causes of Action or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

(g)        **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

(h)        **The Potential Exists for Inaccuracies and the Debtors Have No Duty to Update**

The Debtors make the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since such date. Although the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered by the Bankruptcy Court.

(i)        **No Representations Outside of the Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. In deciding whether to vote to accept or reject the Plan, you should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, unless otherwise indicated herein. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

## ARTICLE VIII

## CONFIRMATION PROCEDURES

The following is a brief summary of the Confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

## 8.1        The Confirmation Hearing

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization. The Debtors will request, on the Petition Date, that the Bankruptcy Court approve the Plan and Disclosure Statement. The Confirmation Hearing may, however, be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code and the Restructuring Support

Agreement, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation. The Debtors, in the same motion requesting a date for the Confirmation Hearing, will request that the Bankruptcy Court set a date and time for parties in interest to file objections to Confirmation of the Plan. An objection to Confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.

## 8.2    Confirmation Standards

Among the requirements for Confirmation are that the Plan (a) is accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (b) is feasible; and (c) is in the "best interests" of Holders of Claims and Interests that are Impaired under the Plan.

The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before a bankruptcy court may confirm a plan of reorganization. The Debtors believe that the Plan fully complies with all the applicable requirements of section 1129 of the Bankruptcy Code set forth below, other than those pertaining to voting, which has not yet taken place.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors (or any other proponent of the Plan) have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the Debtors (or any other proponent of the Plan) or by a Person issuing Securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtors (or any other proponent of the Plan) have disclosed the identity and affiliations of any individual proposed to serve, after Confirmation, as a director, or officer, the Reorganized Debtors, any Affiliate of the Debtors reorganized under the Plan, or any successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy.

- The Debtors (or any other proponent of the Plan) have disclosed the identity of any Insider that will be employed or retained the Reorganized Debtors and the nature of any compensation for such Insider.

- With respect to each Holder within an Impaired Class of Claims or Interests, as applicable, each such Holder (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such Holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

- With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan or (b) is Unimpaired under the Plan (subject to the "cram-down" provisions discussed below); *see* Section 8.5 hereof ("Confirmation Without Acceptance by All Impaired Classes").

- The Plan provides for treatment of Claims, as applicable, in accordance with the provisions of section 507(a) of the Bankruptcy Code.

- If a Class of Claims is Impaired under the Plan, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider.

- Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors, or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

- All fees payable under 28 U.S.C. § 1930 have been paid or the Plan provides for the payment of all such fees on the Effective Date.

- The Plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to Confirmation, for the duration of the period the applicable Debtor has obligated itself to provide such benefits.

## 8.3    Best Interests Test / Liquidation Analysis

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Based on the unaudited Liquidation Analysis attached hereto as **Exhibit C**, the Debtors believe that the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be no greater than the value of distributions under the Plan.  As a result, the Debtors believe Holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of Confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation.

THE LIQUIDATION ANALYSIS HAS BEEN PREPARED SOLELY FOR USE IN THIS DISCLOSURE STATEMENT AND DOES NOT REPRESENT VALUES THAT ARE APPROPRIATE FOR ANY OTHER PURPOSE.  NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION BY OR ADMISSION OF ANY DEBTOR FOR ANY PURPOSE.

## 8.4    Feasibility

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan of reorganization is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared the Financial Projections, which, together with the assumptions on which they are based, are attached hereto as **Exhibit E**.  Based on such Financial Projections, the Debtors believe that they will be able to make all payments required under the Plan while conducting ongoing business operations.  Therefore, Confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

## 8.5    Confirmation Without Acceptance by All Impaired Classes

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan without taking into consideration the votes of any insiders in such class and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan.  These so-called "cram down" provisions are set forth in section 1129(b) of the Bankruptcy Code.

(a)    **No Unfair Discrimination**

The no "unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Debtors believe the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation.

(b)    **Fair and Equitable Test**

This test applies to Classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no Class of Claims or Interests receive more than 100% of the amount of the allowed Claims or Interests in such Class.  As to the dissenting Class, the test sets different standards depending on the type of Claims or Interests in such Class.  In order to demonstrate that a plan is fair and equitable, the plan proponent must demonstrate:

- Secured Creditors:  Each holder of a secured claim:  (1) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the chapter 11 plan, of at least the allowed amount of such claim; (2) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof); or (3) receives the "indubitable equivalent" of its allowed secured claim.

- Unsecured Creditors:  Either (1) each holder of an impaired unsecured claim receives or retains under the chapter 11 plan property of a value equal to the amount of its allowed claim or (2) the holders of claims and interests that are junior to the claims of the non-accepting class will not receive any property under the chapter 11 plan.

- Holders of Interests:  Either (1) each holder of an impaired interest will receive or retain under the chapter 11 plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest or (2) the holders of interests that are junior to the non-accepting class will not receive or retain any property under the chapter 11 plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement notwithstanding that Class 9 (Equity Interests in Holdings) are deemed to reject the Plan, because, as to such Class, there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such Classes will receive or retain any property on account of the Claims or Interests in such Class.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for "cram down" (or non-consensual Confirmation of the Plan) pursuant to section 1129(b) of the Bankruptcy Code.

**8.6    Alternatives to Confirmation and Consummation of the Plan**

If the Plan cannot be confirmed, subject to the requirements of the Restructuring Support Agreement, the Debtors may seek to (a) prepare and present to the Bankruptcy Court an alternative chapter 11 plan for confirmation, (b) effect a merger or sale transaction, including, potentially, a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (c) liquidate their assets and businesses under chapter 7 of the Bankruptcy Code.  If the Debtors were to pursue a liquidation of their assets and businesses in chapter 7, the Debtors would convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, and a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on creditors' recoveries and the Debtors is described in the unaudited Liquidation Analysis attached hereto as **Exhibit C**.

**ARTICLE IX**

## IMPORTANT SECURITIES LAW DISCLOSURE

**9.1**    **New Common Stock and Warrants**

As discussed herein, the Plan provides for the New Common Stock and the Warrants to be distributed to Holders of First Lien Claims and Second Lien Claims in accordance with <u>Article III</u> of the Plan.  The New Common Stock will also be distributed under the Management Incentive Plan after the Effective Date.

The Debtors believe that the class of New Common Stock and the Warrants will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable Blue Sky Law. The Debtors further believe that the offer and sale of the New Common Stock and/or the Warrants pursuant to the Plan (other than Securities issuable to the Service Providers or their affiliates) is, and subsequent transfers of the New Common Stock and/or Warrants by the Holders thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) will be, exempt from federal and state securities registration requirements under the Bankruptcy Code and any applicable state Blue Sky Law as described in more detail below. New Equity distributed pursuant to the Management Incentive Plan will be issued pursuant to another exemption from registration under the Securities Act and other applicable law.

**9.2**    **Issuance and Resale of New Common Stock and Warrants**

All shares of the New Common Stock and the Warrants issued pursuant to the Plan on account of Claims and all shares of New Common Stock issued upon the exercise of the Warrants (other than Securities issuable to the Service Providers or their affiliates) will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on Section 1145(a) of the Bankruptcy Code.  Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any state law requirements for the offer and sale of a security do not apply to the offer or sale of stock, options, warrants or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor, and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange or partly for cash and property.  The Debtors believe that the offer and sale of the New Common Stock and Warrants in exchange for the Claims described above satisfy the requirements of section 1145(a) of the Bankruptcy Code.  The offering, issuance and distribution of New Common Stock, the Option Rights and the Sponsor Warrant Package to the Service Providers pursuant to the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act pursuant to section 4(a)(2) of the Securities Act and/or another exemption from registration under the Securities Act.  Accordingly, no registration statement will be filed under the Securities Act or any state securities laws.  Recipients of the New Common Stock and the Warrants are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law. As discussed below, the exemptions provided for in section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

**9.3**    **Resales of New Common Stock and Warrants; Definition of Underwriter**

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all

"affiliates," which are all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in rule 405 of the Securities Act, means to possess, directly or indirectly, the power to direct or cause to direct management and policies of a Person, whether through owning voting securities, contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor may be deemed to be a "controlling person" of the debtor or successor under a plan of reorganization, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.

Resales of the New Common Stock and/or the Warrants offered, issued and distributed pursuant to the Plan in reliance on Section 1145 of the Bankruptcy Code by entities deemed to be "underwriters" are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.

Under certain circumstances, Holders of New Common Stock and/or Warrants offered, issued and distributed pursuant to the Plan in reliance on Section 1145 of the Bankruptcy Code who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. In addition, Securities issued pursuant to the Plan to the Service Providers in reliance on Section 4(a)(2) of the Securities Act and/or another exemption from registration under the Securities Act may also be entitled to resell their Securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Any and all such Securities issued in reliance on Section 4(a)(2) of the Securities Act and/or another exemption from registration under the Securities Act shall be deemed "restricted securities" that may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act or an exemption from registration under the Securities Act is available and in compliance with any applicable state or foreign securities laws.

Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" with respect to the New Common Stock and Warrants would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Stock and/or Warrants and, in turn, whether any Person may freely resell New Common Stock and/or Warrants. However, the Debtors do not intend to make publicly available the requisite information regarding FullBeauty, and, as a result, after the holding period, Rule 144 will not be available for resales of the New Common Stock or Warrants by Persons deemed to be underwriters or otherwise.

**Accordingly, the Debtors recommend that potential recipients of the New Common Stock and the Warrants consult their own counsel concerning their ability to freely trade such securities without compliance with the federal law and any applicable state Blue Sky Law. In addition, these securities will not be registered under the Exchange Act or listed on any national securities exchange. The Debtors make no representation concerning the ability of a person to dispose of the New Common Stock or the Warrants**.

**9.4    New Common Stock & Management Incentive Plan**

The Management Incentive Plan shall reserve no less than 10% of the fully diluted New Common Stock to be awarded to participants on terms to be determined in accordance with the terms and conditions contained in the Plan. The Management Incentive Plan shall be included in the Plan Supplement. The Confirmation Order shall authorize the New Board to adopt and enter into the Management Incentive Plan. The New Common Stock issued pursuant to the Management Incentive Plan shall dilute the New Common Stock outstanding at the time of such issuance. New Equity distributed pursuant to the Management Incentive Plan will be issued pursuant to an exemption from registration under the Securities Act and other applicable law.

# ARTICLE X

# CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**10.1**    **Introduction**

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain Holders of Claims entitled to vote on the Plan, and it does not address the U.S. federal income tax consequences to Holders of Claims not entitled to vote on the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, revenue rulings and revenue procedures of the Internal Revenue Service (the "IRS"), and any other published administrative rules and pronouncements of the IRS, all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in the Applicable Tax Law or new interpretations of Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein. The discussion below is not binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, local or non-income tax consequences of the Plan (including such consequences with respect to the Debtors or the Reorganized Debtors), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code, persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, U.S. expatriates, certain former citizens or long-term residents of the United States, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, Holders of Claims or who will hold the New Common Stock and/or Warrants as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds such a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the Claims to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and Holders of Claims described below also may vary depending on the nature of any Restructuring Transactions that the Debtors or Reorganized Debtors engage in, as applicable. This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to accept or deemed to reject the Plan. Additionally, this discussion does not address any consideration being received other than in a person's capacity as a Holder of a Claim. For the avoidance of doubt, this summary does not discuss the treatment of the receipt of the New Common Stock pursuant to the Advisory Services Agreement, which is being received by Service Providers on account of services to be provided to the Reorganized Debtors after the Effective Date.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim  (including a beneficial owner of Claims) that, for U.S. federal income tax purposes, is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity.  Partners (or other beneficial owners) of partnerships (or other entities treated as partnerships or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**10.2**    **Certain U.S. Federal Income Tax Consequences to the Debtors and Reorganized Debtors**

(a)    **Effects of Restructuring on the Debtors**

The tax consequences of the implementation of the Plan to the Debtors will differ depending on whether the Restructuring Transactions are structured as a taxable sale of the assets and/or stock of any Debtor (a "Taxable Transaction") or as a recapitalization of the Debtors (a "Recapitalization Transaction").  It has not yet been determined how the Restructuring Transactions will be structured under Applicable Tax Law.  Such decision will depend on, among other things, whether assets being sold (or deemed to be sold) pursuant to any Taxable Transaction have an aggregate fair market value in excess of their aggregate tax basis (i.e., a "built-in gain") or an aggregate fair market value less than their aggregate tax basis (i.e., a "built-in loss"), the amount of the expected reduction in the aggregate tax basis of such assets by excluded cancellation of indebtedness income ("COD Income"), whether sufficient tax attributes are available to offset any such built-in gain, future tax benefits associated with a step-up (if any) in the tax basis of the Debtors' assets as a result of a Taxable Transaction, and the amount and character of any losses with respect to the stock of any applicable Debtor, in each case for U.S. federal, state, and local income tax purposes.

If the transactions undertaken pursuant to the Plan are structured as a Taxable Transaction, the Debtors would realize gain or loss upon the transfer (or deemed transfer) in an amount equal to the difference between the fair market value of the assets transferred (or deemed to be transferred) by the Debtors and the Debtors' tax basis in such assets.  Realized gains, if any, may be offset by current-year losses and deductions, which may include interest deductions that may be (or become) available under section 163(j) of the Tax Code, and losses that may be available with respect to the stock of the Debtors; provided that any such gain that is ordinary in nature may not be offset by capital losses.  Any taxable gain remaining after such offsets would result in a cash tax obligation.  The Debtors do not anticipate utilizing a Taxable Transaction if it would give rise to any material cash tax obligation; however, because the amount of gain recognized and availability of losses are subject to some uncertainty, the Debtors cannot be certain that no cash tax liability will arise in a Taxable Transaction.  If a Reorganized Debtor purchases (or is deemed to purchase) assets or stock of any Debtor pursuant to a Taxable Transaction, the Reorganized Debtor will take a fair market value basis in the transferred assets or stock.  However, if a Taxable Transaction involves a purchase of stock, the Debtor whose stock is transferred will retain its basis in its assets, unless the Debtors and/or Reorganized Debtors timely make certain elections provided for under the Tax Code to treat such stock purchase as the purchase of the Debtors' assets.

The Debtors do not currently believe they have any material federal net operating losses, net capital loss carry forwards ("NOLs") or other tax attributes, other than approximately $75 million of interest deduction that have been deferred under section 163(j) of the Tax Code (the "163(j) Deductions").  A portion of the 163(j) Deductions may be available to offset taxable gain in a Taxable Transaction.  In a Taxable Transaction, the Reorganized Debtors will not be able to utilize any remaining 163(j) Deductions.

If the transactions contemplated by the Plan are structured as a Recapitalization Transaction, the Debtors would not be expected to recognize any taxable gain or loss as a result of the implementation of the Plan.  Subject to the discussion below regarding attribute reduction as a result of COD Income, the Debtors' tax basis in its assets would remain unchanged.  Further, the 163(j) Deductions may remain available for use following the implementation of the Plan, subject to the discussion below regarding section 382 of the Tax Code.

(b)    **Cancellation of Indebtedness Income and Reduction of Tax Attributes**

In general, absent an exception, the Debtors will realize and recognize COD Income upon satisfaction of their outstanding indebtedness for total consideration with a value less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the amount of Cash and the fair market value (or adjusted issue price, in the case of debt instruments) of other consideration received in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, the Debtors will not be required to include any amount of COD Income in gross income if the Debtors are under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, the Debtors must reduce certain of their tax attributes by the amount of COD Income that they excluded from gross income pursuant to section 108 of the Tax Code. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards, (b) general business credit carryovers, (c) capital loss carryovers, (d) tax basis in assets (but not below the amount of liabilities to which the applicable Reorganized Debtor will remain subject immediately after the discharge) as further described in the following two paragraphs, (e) passive activity loss and credit carryovers, and (f) foreign tax credit carryovers. Alternatively, the Debtors may elect first to reduce the basis of their depreciable assets pursuant to section 108(b)(5) of the Tax Code. Although not free from doubt, in the absence of contrary guidance, it appears to be the case that the 163(j) Deductions are not subject to reduction under these rules. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

Treasury Regulations applicable to an affiliated group of Corporations, like the Debtors, provide that the tax attributes of each member that is excluding COD Income are first subject to reduction before reducing tax attributes of other members of such group. To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member. If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group. Any excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and generally has no other U.S. federal income tax impact.

The amount of COD Income, if any, and, accordingly, the amount of tax attributes required to be reduced, will depend on the fair market value (or, in the case of debt instruments, the adjusted issue price) of various forms of consideration to be received by Holders of Claims under the Plan. These amounts cannot be known with certainty until after the Effective Date and, as a result, the total amount of attribute reduction as a result of the Plan cannot be determined until after the Effective Date.

The attribute reduction rules described above would not be expected to apply to the tax basis of the assets of the Reorganized Debtors if a Taxable Transaction is consummated.

(1)    **Limitation on 163(j) Deductions and Other Tax Attributes**

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Reorganized Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the Tax Code.

Under sections 382 and 383 of the Tax Code, if the Debtors undergo an "ownership change," the amount of any remaining NOL carryforwards, tax credit carryforwards, 163(j) Deductions, net unrealized built-in losses, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the Debtors allocable to periods prior to the Effective Date (collectively, the "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or

consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10 million , or (b) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of sections 382 and 383 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Stock pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes, and that the Reorganized Debtors' use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

Section 382 is not expected to be relevant to the tax attributes of a Reorganized Debtor immediately after emergence in the event that the transactions undertaken pursuant to the plan are structured as a Taxable Transaction.

A.    General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), and (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, currently 2.51% for December 2018). The annual limitation may be increased to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

B.    Special Bankruptcy Exceptions

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding. An exception to the foregoing annual limitation rules generally applies when shareholders and so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50% of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis, but, instead, NOL carryforwards would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock pursuant to the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (a) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (b) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

The Debtors have not determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Reorganized Debtors will elect out of its application. As noted above, section 382 of the Tax Code is not expected to be relevant to the tax attributes of a Reorganized Debtor immediately after emergence in the event that the transactions undertaken pursuant to the Plan are structured as a Taxable Transaction.

**10.3    Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Claims Entitled to Vote**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan.  Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

(a)    **U.S. Federal Income Tax Consequences to the Holders of First Lien Claims and Second Lien Claims**

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of First Lien Claims, each Holder thereof will receive its Pro Rata Share of the (1) New Common Stock and (2) New First Lien Term Loan.  Such Holders may also elect to receive New Junior Loan.

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of Second Lien Claims, each Holder thereof will receive its Pro Rata Share of the (1) New Common Stock, (2) New Junior Loan, and (3) Second Lien Warrant Package.

The treatment of U.S. Holders of First Lien Claims and Second Lien Claims should be the same regardless of whether the Plan is consummated pursuant to a Taxable Transaction or a Recapitalization.  This is because Holdings is the issuer of such Claims, but Holdings is not expected to be the issuer of any of the non-Cash consideration being received in exchange for such Claims pursuant to the Plan.[9]  Accordingly, the Holders of such Claims should generally be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code.  Other than with respect to any amounts received that are attributable to accrued but untaxed interest, the Holder should recognize gain or loss in an amount equal to the difference, if any, between (a) the fair market value (or "issue price," as defined below, in the case of debt instruments) of the consideration received, and (b) the Holder's adjusted tax basis in its Claim.  The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the Holder, the rules regarding "market discount," as discussed below and accrued but untaxed interest, and whether and to what extent the Holder had previously claimed a bad-debt deduction with respect to its Claim.  If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange.  The holding period for non-Cash consideration received should begin on the day following the Effective Date.  Subject to the rules regarding accrued but untaxed interest and "market discount," the Holder should obtain a tax basis in the non-Cash consideration received equal to the fair market value (or issue price, in the case of debt instruments) of such property.

(b)    **Accrued but Untaxed Interest (or OID)**

A portion of the consideration received by U.S. Holders of Claims may be attributable to accrued but untaxed interest on such Claims.  Such amount should be taxable to that U.S. Holder as ordinary interest income if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes.  Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent that any accrued interest on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear.  Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be

---

[9]    Specifically, in a Recapitalization, the New Common Stock and Warrants are expected to be issued by Blackdog Holdings, and the New First Lien Loans and New Junior Loan are expected to be issued by Jessica London, Inc. In a Taxable Transaction, the New Common Stock, and Warrants will be issued by a company newly-formed on behalf of Holders of Claims by a representative thereof, as provided in the Restructuring Transactions Memorandum, and the New First Lien Term Loan and Junior Loan are expected to be issued by an entity other than Holdings. In each case, even if a Claim constitutes a "security," such Claim is not being exchanged for stock or a security of the same entity that issued such claim and, therefore, the recapitalization provisions of the Tax Code should be inapplicable.

allocated first to the principal amount of Allowed Claims, with any excess allocated to untaxed interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their respective tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but untaxed interest in such event.

(c)   **Market Discount**

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of an Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount ("OID"), its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Claim (as described below) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

U.S. federal income tax laws enacted in December 2017 added section 451 of the Tax Code. This new provision generally would require accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the Tax Code) to include certain items of income (such as market discount) no later than the time such amounts are reflected on such a financial statement. The application of this rule to income of a debt instrument with market discount is effective for taxable years beginning after December 31, 2018. However, the IRS recently announced in Notice 2018-80 that it intends to issue proposed Treasury Regulations confirming that taxpayers may continue to defer income (including market discount income) for tax purposes until there is a payment or sale at a gain. Accordingly, although market discount may have to be included in income currently as it accrues for financial accounting purposes, taxpayers may continue to defer the income for tax purposes. U.S. Holders are urged to consult their own tax advisors concerning the application of the market discount rules to their Claims.

(d)   **Issue Price**

The determination of "issue price" of the New First Lien Term Loan and the New Junior Loan (together, the "New Loans") for purposes of the analysis herein will depend, in part, on whether such debt instruments and other property issued to a holder or the property surrendered under the Plan are treated as traded on an "established securities market" at any time during the 60-day period ending thirty (30) days after the Effective Date. In general, a debt instrument (or the stock or property exchanged therefor) will be treated as traded on an established market if (a) it is listed on (i) a qualifying national securities exchange, (ii) certain qualifying interdealer quotation systems, or (iii) certain qualifying non-U.S. securities exchanges; (b) it appears on a system of general circulation that provides a reasonable basis to determine fair market value; or (c) in certain situations the price quotations are readily available from dealers, brokers or traders. The issue price of a debt instrument that is traded on an established market (or that is issued for stock or securities so traded) would be the fair market value of such debt instrument (or such stock or securities so traded) on the issue date as determined by such trading; provided if both the property exchanged and the property received therefor are treated as traded, the trading price of the property so received controls. The issue price of a debt instrument that is neither so traded nor issued for stock or securities so traded would be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS). Debt issues under $100 million, including the New Junior Loan, are not treated as traded for these purposes.

Where, as here, creditors receiving debt instruments are also receiving other property in exchange for their Claims, the "investment unit" rules under Applicable Tax Law may also apply to the determination of the issue price

for any debt instrument received in exchange for their Claims. In general, if all of the components (other than cash) of the "investment unit" are publicly traded (as described above), then the issue price of the investment unit, as a whole, is determined as the aggregate of the market value of each of the components of the "investment unit" allocating the issue price of the investment unit to each of the investment unit's components on the basis of each Component's fair market value. In the event that some, but not all, of the property composing the "investment unit" is publicly traded, then the application of the investment unit rules is unclear. If the Claims being exchanged for the investment unit are publicly traded prior to the exchange, the trading value of such Claims may set the issue price for the investment unit, with such issue price being allocated among the components of the investment unit in proportion to their fair market value. Alternatively, if the new debt instrument is publicly traded, the trading price of the new debt instrument may control the issue price of the new debt instrument, without regard to the potential application of the investment unit rules. The Debtors expect to take the position that if the New First Lien Term Loan is traded, then such trading values will be used to determine the issue price of the New First Lien Term Loan, even if other portions of the investment unit are not traded, but no assurance can be given that the IRS will agree with this view.

In general, a Holders of Claims must follow the Debtors' determination of issue price with respect to each debt instrument issued under the Plan, unless such Holders specifically discloses its disagreement with such determination on the Holder's own tax return. The Debtors will publish their determination of the issue price in accordance with applicable Treasury Regulations.

(e)    **Medicare Tax**

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

(f)    **Limitation on Use of Capital Losses**

A U.S. Holder of an Allowed Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on its use of capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. A corporate U.S. Holder who has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

(g)    **U.S. Federal Income Tax Consequences to Holders Regarding Owning and Disposing of Shares of New Common Stock, Warrants, Second Lien Warrant Package, and New Loans.**

(1)    **Ownership and Disposition of Shares of New Common Stock**

A.    Dividends on New Common Stock

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the entity issuing the New Common Stock as determined under U.S. federal income tax principles. "Qualified dividend income" received by a non-corporate U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Common Stock. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

B.      Sale, Redemption, or Repurchase of New Common Stock and Warrants

Unless a non-recognition provision applies, and subject to the market discount rules discussed above, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Stock or Warrants. Such capital gain will be long-term capital gain if at the time of the sale, redemption, or other taxable disposition, the U.S. Holder held the New Common Stock or Warrants for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described above.

(2)      **Ownership, Exercise, and Disposition of Warrants**

A U.S. Holder that elects to exercise the Warrants will be treated as purchasing, in exchange for its Warrants and the amount of Cash funded by the U.S. Holder to exercise the Warrants, the New Common Stock it is entitled to purchase pursuant to the Warrants. Such a purchase will generally be treated as the exercise of an option under general tax principles, and as such a U.S. Holder should not recognize income, gain or loss for U.S. federal income tax purposes when it exercises the Warrants. A U.S. Holder's aggregate tax basis in the New Common Stock received upon exercise will equal the sum of (i) the amount of Cash paid by the U.S. Holder to exercise its Warrants plus (ii) such U.S. Holder's tax basis in its Warrants immediately before the Warrants are exercised.

Under section 305 of the Tax Code, certain transactions that affect an increase in the proportionate interest of a shareholder or warrant holder (treating warrants as stock for this purpose) in the corporation's assets are treated as creating deemed distributions to such shareholder or warrant holder in respect of such "stock" interest. Any deemed distribution will be taxed and reported to the IRS in the same manner as an actual distribution on stock and thus could potentially be taxable as a dividend (in whole or in part), despite the absence of any actual payment of cash (or property) to the Holder in connection with such distribution.

A U.S. Holder that elects not to exercise the Warrants may be entitled to claim a capital loss equal to the amount of tax basis allocated to the Warrants, subject to any limitations on such U.S. Holder's ability to utilize capital losses. Such U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of either electing to exercise or electing not to exercise the Warrants.

In the event that a U.S. Holder sells its Warrants in a taxable transaction, the U.S. Holder will recognize gain or loss upon such sale in an amount equal to the difference between the amount realized upon such sale and the U.S. Holder's tax basis in the Warrants. Such gain or loss will be treated as gain or loss from the sale or exchange of property which has the same character as the New Common Stock to which the Warrants relate would have had in the hands of the U.S. holder if such stock had been acquired by the U.S. Holder upon exercise. If such sale gives rise to capital gain or loss to the U.S. Holder, such gain or loss will be long-term or short-term in character based upon the length of time such U.S. Holder has held his or her Warrants.

(3)      **Ownership and Disposition of New Loans**

A.      Ownership, Interest and Original Issue Discount on New Loans

Stated interest paid to a U.S. Holder will be includible in the U.S. Holder's gross income as ordinary interest income at the time interest is received or accrued in accordance with the U.S. Holder's regular method of tax accounting for U.S. federal income tax purposes.

If the "stated redemption price at maturity" of the New Loans received by U.S. Holders exceeds the "issue price" of the New Loans (as determined pursuant to the above discussion) by an amount equal to or greater than a

statutorily defined de minimis amount, the New Loans will be considered to be issued with OID for U.S. federal income tax purposes. The stated redemption price at maturity of the New Loans is the total of all payments due on the New Loans other than payments of "qualified stated interest." In general, qualified stated interest is stated interest that is payable unconditionally in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate (or at certain qualifying floating rates).

For purposes of determining whether there is OID, the de minimis amount is generally equal to ¼ of 1% of the principal amount of the New Loans multiplied by the number of complete years to maturity from their original issue date, or if the New Loans provide for payments other than payments of qualified stated interest before maturity, multiplied by the weighted average maturity (as determined under applicable Treasury Regulations). If the New Loans are issued with OID, a U.S. Holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the New Loans, in advance of the receipt of the cash attributable to such OID and regardless of the holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any Cash payment on the New Loans that is attributable to previously accrued OID that has been included in its income. If the amount of OID on the New Loans is de minimis, rather than being characterized as interest, any payment attributable to the de minimis OID will be treated as gain from the sale of the New Loans, and a Pro Rata amount of such de minimis OID must be included in income as principal payments are received on the New Loans.

Under section 451 of the Tax Code (as described above), accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the Tax Code) generally would be required to include certain items of income such as OID (but not market discount, as described above) no later than the time such amounts are reflected on such a financial statement. The application of this rule to income of a debt instrument with OID is effective for taxable years beginning after December 31, 2018. U.S. Holders are urged to consult their tax advisors with regard to interest, OID, market discount and premium matters concerning the Claims and any non-Cash consideration received therefor.

B.       Sale, Redemption, or Repurchase of Interests in the New Loans

Upon the sale, exchange or other taxable disposition of New Loans, a U.S. Holder generally will recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or other taxable disposition (other than accrued but untaxed interest, which will be taxable as interest) and the U.S. Holder's adjusted tax basis in their interest in the New Loans. A U.S. Holder's initial tax basis in the New Loans will be increased by any previously accrued OID and decreased by any payments on the New Loans other than qualified stated interest. Any such gain or loss generally will be capital gain or loss and generally will be long-term capital gain or loss if the interest in the New Loans has been held for more than one year at the time of its sale, exchange or other taxable disposition. Certain non-corporate U.S. Holders (including individuals) may be eligible for preferential rates of U.S. federal income tax in respect of long-term capital gains. The deductibility of capital losses is subject to limitations as discussed above.

**10.4**      **Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Claims Entitled to Vote**

    (a)      **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Claims**

The following discussion assumes that the Debtors or Reorganized Debtors, as applicable, will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Common Stock, Warrants, and New Loans, as applicable.

(1)      **Gain Recognition**

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

(2)      **Accrued but Untaxed Interest (or OID)**

Payments made to a Non-U.S. Holder under the Plan that are attributable to accrued but untaxed interest (or OID) generally will not be subject to U.S. federal income or withholding tax, provided that (i) such Non-U.S. Holder is not a bank, (ii) such Non-U.S. Holder does not actually or constructively own 10% or more of the total combined voting power of all classes of the stock of Holdings, and (iii) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E, as applicable, or other applicable IRS Form W-8) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest (or OID) at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest (or OID) that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty, provided certification requirements as discussed below under "U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock, Warrants, and New Loans—Dividends on New Common Stock" are satisfied) on payments that are attributable to accrued but untaxed interest (or OID). For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, as applicable, or other applicable IRS Form W-8, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

(b)      <u>**U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock, Warrants, and New Loans**</u>

(1)      **Dividends on New Common Stock**

Any distributions made with respect to New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the entity issuing the New Common Stock, as determined under U.S. federal income tax principles. Except as described below, dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are not effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are not attributable to a permanent

establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or a successor form), or other applicable IRS Form W-8, upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will not be subject to withholding tax, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or a successor form). However, such dividends generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

(2)     **Sale, Redemption, or Repurchase of New Common Stock**

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Stock unless: (i) such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition and certain other conditions are met; (ii) such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or (iii) the Reorganized Debtors, as applicable, are or have been during a specified testing period "U.S. real property holding corporation[s]" for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Stock. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty). Based on the Reorganized Debtors current business plans and operations, the Debtors do not anticipate that Holdings is or was or that the Reorganized Debtors will be "U.S. real property holding corporation[s]" for U.S. federal income tax purposes.

(3)     **Ownership, Exercise, and Disposition of the Warrants**

A Non-U.S. Holder that elects to exercise the Warrants will be treated as purchasing, in exchange for its Warrants and the amount of Cash funded by the Non-U.S. Holder to exercise the Warrants, the New Common Stock it is entitled to purchase pursuant to the Warrants. Such a purchase will generally be treated as the exercise of an option under general tax principles, and as such a Non-U.S. Holder (to the extent such Non-U.S. Holder is subject to U.S. federal income tax, as described above) should not recognize income, gain or loss for U.S. federal income tax purposes when it exercises the Warrants. A Non-U.S. Holder's aggregate tax basis in the New Common Stock will equal the sum of (i) the amount of Cash paid by the Non-U.S. Holder to exercise its Warrants plus (ii) such Non-U.S. Holder's tax basis in its Warrants immediately before the Warrants are exercised.

Any deemed distribution under section 305 of the Tax Code (as discussed above), will be taxed and reported to the IRS in the same manner as an actual distribution on stock and will be subject to the rules described above under "Dividends on New Common Stock" with respect to such Non-U.S. Holder.

In the event that a Non-U.S. Holder sells its Warrants in a taxable transaction, the Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition except as described above in "Sale, Redemption, or Repurchase of New Common Stock." If a Non-U.S. Holder is subject to U.S. federal income tax, any such gain or loss will be treated as gain or loss from the sale or exchange of property which has the same character as the New Common Stock to which the Warrants relate would have had in the

hands of the Non-U.S. Holder if such stock had been acquired by the Non-U.S. Holder upon exercise. If such sale gives rise to capital gain or loss to the Non-U.S. Holder, such gain or loss will be long-term or short-term in character based upon the length of time such Non-U.S. Holder has held his or her Warrants.

Under Treasury Regulations issued pursuant to section 871(m) of the Tax Code, withholding at a rate of 30% (subject to certain treaty considerations) would apply to certain "dividend equivalent" payments made or deemed made to Non-U.S. Holders in respect of financial instruments that reference U.S. stocks. The section 871(m) Treasury Regulations do not apply to a payment to the extent that the payment is already treated as a deemed dividend under the rules described above, and therefore generally would not apply in respect of adjustments to the conversion rate of the Warrants. However, because the section 871(m) rules are complex, it is possible that they will apply in certain circumstances in which the deemed dividend rules described above do not apply, in which case the section 871(m) rules might require withholding at a different time or amount than the deemed dividend. Importantly, in Notice 2018-72, the IRS extended certain transition relief that makes section 871(m) of the Tax Code inapplicable to instruments that are not so-called "delta one" instruments. The Debtors will make a determination regarding the applicable of section 871(m) of the Tax Code to the Warrants prior to the Effective Date.

 (4)  **Payments on New Loans**

Subject to the discussion below regarding "FATCA," payments to a Non-U.S. Holder with respect to the New Loans that are treated as interest, including payment attributable to any OID (see discussion above) generally will not be subject to U.S. federal income or withholding tax, provided that (i) such Non-U.S. Holder is not a bank, (ii) such Non-U.S. Holder does not actually or constructively own 10% or more of the total combined voting power of all classes of the stock of the Reorganized Debtors, and (iii) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E, as applicable, or other applicable IRS Form W-8) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest (or OID) at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

Subject to the discussion below regarding "FATCA," a Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to interest, including any OID.

For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, as applicable, or other applicable IRS Form W-8, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

 (5)  **Sale, Exchange or Other Disposition of New Loans**

Subject to the discussion below regarding "FATCA," any gain recognized by a Non-U.S. Holder on the sale, exchange or other disposition of New Loans (other than an amount representing accrued but untaxed interest (or OID) on the New Loans, which is subject to the rules discussed above under "Payments on New Loans") generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the disposition occurs and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which

such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder. Subject to the discussion below regarding "FATCA," in order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

(c)    **FATCA**

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income (including dividends, if any, on shares of New Common Stock and U.S.-source interest (including OID) paid in respect of instruments such as the New Loans), and also include gross proceeds from the sale of any property of a type which can produce U.S.-source interest or dividends (which would include New Common Stock and loans provided under the New Loans).  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

FATCA withholding rules currently apply to withholdable payments other than payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S.-source interest or dividends and under recently proposed regulations will not apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S.-source income or dividends.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF ITS CLAIMS PURSUANT TO THE PLAN AND ON ITS OWNERSHIP OF LOANS PROVIDED UNDER THE NEW LOANS.**

**10.5    Information Reporting and Backup Withholding**

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends.  The Debtors will comply with all applicable reporting requirements of the Tax Code.  In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan.  Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 or, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).  The current backup withholding rate is 24%.  Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE,**

**LOCAL, NON-U.S., NON-INCOME, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## ARTICLE XI

## CONCLUSION AND RECOMMENDATION

The Debtors believe that Confirmation and Consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their ballots so they will be received by the Solicitation Agent no later than 5:00 p.m. (prevailing Eastern Time) on January 24, 2019.

Dated:  January 4, 2019

Respectfully submitted,

FULLBEAUTY Brands Holdings Corp.
on behalf of itself and each of its Debtor affiliates

By:      */s/ Robert J. Riesbeck*
Name:    Robert J. Riesbeck
Title:   Chief Financial Officer

Prepared by:

Jonathan S. Henes, P.C.
George Klidonas
Rebecca Blake Chaikin
Gene Goldmintz
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

-and-

Emily E. Geier (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Proposed Counsel for the Debtors and Debtors in Possession*

## EXHIBIT A

**Joint Prepackaged Chapter 11 Plan of Reorganization**

SOLICITATION VERSION

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| FULLBEAUTY BRANDS HOLDINGS CORP., *et al.*,[1] | Case No. 19-[__] (RDD) |
| Debtors. | (Joint Administration Requested) |

## JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF FULLBEAUTY BRANDS HOLDINGS CORP. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

THIS CHAPTER 11 PLAN IS BEING SUBMITTED TO THE
BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION

Jonathan S. Henes, P.C.
Nicole L. Greenblatt, P.C.
George Klidonas
Rebecca Blake Chaikin
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Emily E. Geier (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

Dated:  January 4, 2019

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Blackdog Holdings, Inc. (8991); FULLBEAUTY Brands Holdings Corp. (8053); FULLBEAUTY Brands, Inc. (4198); FULLBEAUTY Brands, LLC (9445); FULLBEAUTY Brands Management Services, LLC (8637); FULLBEAUTY Brands Merchant, Inc. (7812); FULLBEAUTY Brands Operations, LLC (5382); FULLBEAUTY Brands Texas, LLC (9606); Jessica London, Inc. (1070); and Swimsuits for All, LLC (3246).  The location of the Debtors' service address is:  50 Main Street, Suite 1000, White Plains, New York 10606.

# TABLE OF CONTENTS

**Page**

Article I. DEFINED TERMS AND RULES OF INTERPRETATION ...................................................... 1
    A.    Defined Terms ................................................................................................................. 1
    B.    Rules of Interpretation ................................................................................................... 12
    C.    Computation of Time ..................................................................................................... 13
    D.    Controlling Document ................................................................................................... 13
    E.    Restructuring Support Agreement .................................................................................. 13

Article II. ADMINISTRATIVE CLAIMS, DIP FACILITY CLAIMS,  PRIORITY TAX CLAIMS, AND
UNITED STATES TRUSTEE STATUTORY FEES ............................................................... 13
    A.    Administrative Claims .................................................................................................... 13
    B.    First Lien Early Acceptance Premium ............................................................................ 15
    C.    DIP Facility Claims ....................................................................................................... 15
    D.    Priority Tax Claims ........................................................................................................ 15
    E.    United States Trustee Statutory Fees ............................................................................. 15

Article III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ........................ 15
    A.    Classification of Claims .................................................................................................. 15
    B.    Treatment of Claims and Interests ................................................................................. 16
    C.    Special Provision Governing Unimpaired Claims ........................................................... 20
    D.    Voting Classes; Presumed Acceptance by Non-Voting Classes ...................................... 20
    E.    Controversy Concerning Impairment .............................................................................. 20
    F.    Confirmation Pursuant to Section 1129(a)(10) and Section 1129(b) of the Bankruptcy
        Code .............................................................................................................................. 20
    G.    Subordinated Claims ..................................................................................................... 20
    H.    Elimination of Vacant Classes ....................................................................................... 20
    I.    Intercompany Interests .................................................................................................. 20

Article IV. MEANS FOR IMPLEMENTATION OF THE PLAN ...................................................... 21
    A.    Substantive Consolidation .............................................................................................. 21
    B.    General Settlement of Claims and Interests ................................................................... 21
    C.    Restructuring Transactions ............................................................................................ 21
    D.    Corporate Existence ...................................................................................................... 22
    E.    Vesting of Assets in the Reorganized Debtors ............................................................... 22
    F.    Cancellation of Agreements, Security Interests, and Other Interests .............................. 23
    G.    Sources for Plan Distributions and Transfers of Funds Among Debtors ......................... 23
    H.    Stockholders Agreement ................................................................................................ 23
    I.    Exemption from Registration Requirements ................................................................... 23
    J.    Organizational Documents .............................................................................................. 24
    K.    Exemption from Certain Transfer Taxes and Recording Fees ........................................ 24
    L.    Directors and Officers of the Reorganized Debtors ....................................................... 24
    M.    Directors and Officers Insurance Policies ...................................................................... 25
    N.    Other Insurance Policies ................................................................................................ 25
    O.    Preservation of Rights of Action .................................................................................... 25
    P.    Corporate Action ........................................................................................................... 25
    Q.    Effectuating Documents; Further Transactions .............................................................. 26
    R.    Management Incentive Plan ............................................................................................ 26
    S.    Workers' Compensation Programs ................................................................................. 26

Article V. TREATMENT OF EXECUTORY CONTRACTS  AND UNEXPIRED LEASES; EMPLOYEE
BENEFITS; AND INSURANCE POLICIES ........................................................................... 27
    A.    Assumption of Executory Contracts and Unexpired Leases .......................................... 27
    B.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases .................... 27

i

C.      Contracts and Leases Entered into After the Petition Date ........................................28
D.      Indemnification and Reimbursement Obligations.....................................................28
E.      Employee Compensation and Benefits .....................................................................28
F.      Modifications, Amendments, Supplements, Restatements, or Other Agreements.........29
G.      Reservation of Rights ...............................................................................................29
H.      Nonoccurrence of Effective Date .............................................................................29

Article VI. PROVISIONS GOVERNING DISTRIBUTIONS ..................................................29
A.      Timing and Calculation of Amounts to Be Distributed..............................................29
B.      Delivery of Distributions .........................................................................................30
C.      Manner of Payment..................................................................................................31
D.      No Postpetition or Default Interest on Claims ..........................................................31
E.      Compliance with Tax Requirements/Allocations.......................................................31
F.      Surrender of Cancelled Instruments or Securities .....................................................32
G.      Claims Paid or Payable by Third Parties..................................................................32

Article VII. PROCEDURES FOR RESOLVING UNLIQUIDATED ........................................32

AND DISPUTED CLAIMS OR EQUITY INTERESTS ...........................................................32
A.      Allowance of Claims and Interests ...........................................................................32
B.      Proofs of Claim .......................................................................................................32
C.      Claims Administration Responsibilities....................................................................33
D.      Estimation of Claims and Interests ...........................................................................33
E.      Adjustment to Claims Without Objection..................................................................33
F.      Disallowance of Certain Claims ...............................................................................33
G.      No Distributions Pending Allowance ........................................................................34
H.      Distributions After Allowance ..................................................................................34
I.      No Interest...............................................................................................................34

Article VIII. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ...............................34
A.      Conditions Precedent to the Effective Date ..............................................................34
B.      Effect of Non-Occurrence of Conditions to the Effective Date ..................................35
C.      Waiver of Conditions ...............................................................................................35

Article IX. RELEASE, INJUNCTION, AND RELATED PROVISIONS ..................................35
A.      Discharge of Claims and Termination of Interests; Compromise and Settlement of
        Claims, Interests, and Controversies ........................................................................35
**B.      Releases by the Debtors** .......................................................................................36
**C.      Releases by the Releasing Parties** ........................................................................37
**D.      Exculpation** .........................................................................................................38
**E.      Injunction**............................................................................................................39
F.      Setoffs and Recoupment ..........................................................................................39
G.      Release of Liens ......................................................................................................39

Article X. RETENTION OF JURISDICTION ........................................................................39

Article XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN ......................41
A.      Modification of Plan ................................................................................................41
B.      Effect of Confirmation on Modifications...................................................................41
C.      Revocation of Plan ..................................................................................................41

Article XII. MISCELLANEOUS PROVISIONS .....................................................................42
A.      Immediate Binding Effect ........................................................................................42
B.      Additional Documents .............................................................................................42
C.      Reservation of Rights...............................................................................................42
D.      Successors and Assigns............................................................................................42

E.      Service of Documents ..................................................................................................42
F.      Term of Injunctions or Stays.......................................................................................44
G.      Entire Agreement .........................................................................................................44
H.      Plan Supplement Exhibits ...........................................................................................44
I.      Governing Law .............................................................................................................44
J.      Nonseverability of Plan Provisions upon Confirmation..............................................44
K.      Closing of Chapter 11 Cases........................................................................................45
L.      Section 1125(e) Good Faith Compliance .....................................................................45

### JOINT PREPACKAGED CHAPTER 11 PLAN OF
### REORGANIZATION OF FULLBEAUTY BRANDS HOLDINGS CORP.
### AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Blackdog Holdings, Inc., FULLBEAUTY Brands Holdings Corp., FULLBEAUTY Brands, Inc., FULLBEAUTY Brands, LLC, FULLBEAUTY Brands Management Services, LLC, FULLBEAUTY Brands Merchant, Inc., FULLBEAUTY Brands Operations, LLC, FULLBEAUTY Brands Texas, LLC, Jessica London, Inc., and Swimsuits for All, LLC (each a "Debtor" and, collectively, the "Debtors") propose this joint prepackaged plan of reorganization (the "Plan") for the resolution of outstanding claims against and equity interests in the Debtors. Capitalized terms used in the Plan and not otherwise defined have the meanings ascribed to such terms in Article I.A of this Plan.

Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. The Debtors seek to consummate the Restructuring Transactions on the Effective Date of the Plan. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of this Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors.

Reference is made to the Disclosure Statement, filed contemporaneously with the Plan, for a discussion of the Debtors' history, businesses, historical financial information, valuation, liquidation analysis, projections, and operations as well as a summary and analysis of the Plan and certain related matters, including distributions to be made under this Plan.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY.

### Article I.

### DEFINED TERMS AND RULES OF INTERPRETATION

A.    *Defined Terms*

The following terms shall have the following meanings when used in capitalized form herein:

1.    "*ABL Agent*" means JPMorgan Chase Bank, N.A. in its capacity as administrative agent and collateral agent under the ABL Credit Agreement.

2.    "*ABL Claim*" means any and all outstanding Claims arising under, derived from, based on, or secured pursuant to the ABL Credit Agreement or any other agreement, instrument, or document executed at any time in connection therewith, including all obligations under and as defined in the ABL Credit Agreement.

3.    "*ABL Credit Agreement*" means that certain credit agreement, dated as of October 14, 2015, (as amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms) by and among FullBeauty, as lead borrower, Holdings, as borrower, each of the other borrower parties thereto, the ABL Agent, the ABL Lenders, and the FILO Lenders.

4.    "*ABL Facility*" means that certain asset-based revolving loan facility provided for under the ABL Credit Agreement.

5.    "*ABL Lenders*" means the lenders that are party to the ABL Credit Agreement and with respect to the ABL Loans.

6.    "*ABL Loans*" means approximately $100 million in commitments for asset-based loans and letters of credit as defined under the ABL Credit Agreement.

7.    "*Accrued Professional Compensation Claim*" means, at any date, a Claim for all accrued fees and reimbursable expenses for services rendered by a Retained Professional in the Chapter 11 Cases through and

including such date, to the extent that such fees and expenses have not been previously paid whether pursuant to a retention order with respect to such Retained Professional or otherwise.  To the extent that there is a Final Order denying some or all of a Retained Professional's fees or expenses, such denied amounts shall no longer be considered an Accrued Professional Compensation Claim.

8.      "*Ad Hoc Group of First Lien Lenders*" means the ad hoc committee of Consenting First Lien Lenders represented by Milbank, Tweed, Hadley & McCloy LLP and Ducera Partners LLC.

9.      "*Ad Hoc Group of Second Lien Lenders*" means the ad hoc committee of Consenting Second Lien Lenders represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP and Houlihan Lokey Capital Inc.

10.      "*Administrative Claim*" means a Claim (other than DIP Facility Claims) for costs and expenses of administration under sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; and (b) Accrued Professional Compensation Claims (to the extent Allowed by the Bankruptcy Court).

11.      "*Advisory Services Agreement*" means that certain consulting agreement by and among the Service Providers and the Reorganized Debtors that is consistent with Article I.E of this Plan and pursuant to which the Service Providers shall (a) provide transition services, advisory services, and operational services and assistance to the Reorganized Debtors as reasonably requested from time to time and (b) release any and all Sponsor Claims.

12.      "*Affiliate*" means, with respect to any Entity, any other Entity that would fall within the meaning of the term "affiliate" set forth in section 101(2) of the Bankruptcy Code, if such Entity was a debtor in a case under the Bankruptcy Code.

13.      "*Agents*" means, collectively, (a) the DIP Agent (if any), (b) the ABL Agent, (c) the First Lien Agent, (d) the Second Lien Agent, and (e) the Distribution Agent.

14.      "*Allowed*" means (a) any Claim (or portion thereof) that (i) is not Disputed within the applicable period of time, if any, fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, (ii) is allowed, compromised, settled, or otherwise resolved pursuant to the terms of the Plan, in any stipulation that is approved by a Final Order of the Bankruptcy Court, or pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith, or (iii) has been allowed by a Final Order of the Bankruptcy Court or (b) an Interest (or portion thereof) that is reflected as outstanding in the stock transfer ledger or similar register of the applicable Debtor as of the Effective Date.  For the avoidance of doubt, any Claim or Interest (or portion thereof) that has been disallowed pursuant to a Final Order shall not be an "Allowed" Claim or Interest.

15.      "*Apax*" means, collectively, Apax VIII-B L.P., Apax VIII-A L.P., Apax VIII-AIV A, L.P., Apax VIII-AIV B, L.P., Apax VIII-2 L.P., and Apax VIII-1 L.P.

16.      "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer or conveyance laws.

17.      "*Ballot*" means a ballot accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

18.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

19.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York or such other court having jurisdiction over the Chapter 11 Cases.

20.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court.

21.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)).

22.     "*Cash*" means the legal tender of the United States of America.

23.     "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

24.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the chapter 11 case filed for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases for all of the Debtors.

25.     "*Charlesbank*" means, collectively, Charlesbank Equity Fund VII, Limited Partnership, CB Offshore Equity Fund VII, L.P., CB Parallel Fund VII, Limited Partnership, Charlesbank Equity Coinvestment Fund VII, Limited Partnership, and Charlesbank Coinvestment Partners, Limited Partnership.

26.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

27.     "*Class*" means a category of Claims or Equity Interests as set forth in Article III of this Plan pursuant to section 1122(a) of the Bankruptcy Code.

28.     "*Collective Bargaining Agreement*" means that certain agreement between certain of the Debtors and Chicago and Midwest Regional Joint Board on behalf of its affiliated Local No. 2002 of Workers United dated March 1, 2018 (as may be amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms).

29.     "*Compensation and Benefits Programs*" means all employment agreements and severance policies, and all employment, compensation and benefit plans, policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans, and programs of the Debtors applicable to any of its employees and retirees.

30.     "*Confirmation*" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

31.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

32.     "*Confirmation Hearing*" means the hearing(s) conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

33.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code.

34.    "*Consenting FILO Lenders*" means the FILO Lenders that are or become parties to the Restructuring Support Agreement, solely in their capacity as such.

35.    "*Consenting First Lien Lenders*" means the First Lien Lenders that are or become parties to the Restructuring Support Agreement, solely in their capacity as such.

36.    "*Consenting Lenders*" means the Consenting FILO Lenders, the Consenting First Lien Lenders, and the Consenting Second Lien Lenders.

37.    "*Consenting Second Lien Lenders*" means the Second Lien Lenders that are or become parties to the Restructuring Support Agreement, solely in their capacity as such.

38.    "*Cure*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

39.    "*Cure Bar Date*" means the deadline for filing requests for payment of a Cure, which shall be thirty (30) days after the Effective Date unless otherwise ordered by the Bankruptcy Court or agreed to by the Debtors or Reorganized Debtors, as applicable, the Required Consenting First Lien Lenders (if such agreement is made prior to the Effective Date**)**, and the counterparty to the relevant Executory Contract or Unexpired Lease.

40.    "*Cure Claim*" means a Claim based on the Debtors' defaults on an Executory Contract or Unexpired Lease at the time such Executory Contract or Unexpired Lease is assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

41.    "*D&O Liability Insurance Policies*" means all insurance policies of any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date.

42.    "*Debtor Release*" means the releases set forth in Article IX.B of this Plan.

43.    "*Definitive Documents*" means (a) the Exit ABL Documents, (b) the New First Lien Term Loan Documents, (c) the New Junior Loan Documents, (d) the New Equity Documents, (e) the Warrants Documents, (f) the Option Rights Documents, (g) all agreements, interim and final orders, and/or amendments in connection with the use of cash collateral, (h) all agreements, documents, interim and final orders, and/or amendments in connection with the DIP Facility (if incurred), (i) the Advisory Services Agreement, (j) the Plan, (k) the Plan Supplement, (l) the Disclosure Statement and related solicitation materials, (m) the motions and related pleadings seeking approval of the Disclosure Statement and related solicitation materials and scheduling a combined hearing for the Plan and the Disclosure Statement, and (o) the Confirmation Order.

44.    "*DIP Agent*" means an Entity in its capacity as administrative agent and collateral agent under the DIP Facility (if incurred).

45.    "*DIP Credit Agreement*" means, to the extent applicable, the debtor-in-possession credit agreement (as amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms) to be entered into by the Debtors, the DIP Agent (if any), and the DIP Lender (if any) if the DIP Facility is incurred.

46.    "*DIP Facility*" means that certain debtor-in-possession credit facility to be provided by the DIP Lenders on the terms of and subject to the conditions set forth in the DIP Credit Agreement if debtor-in-possession financing is necessary to the Chapter 11 Cases.

47.    "*DIP Facility Claim*" means any Claim derived from or based upon the DIP Facility or DIP Orders, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising under or related to the DIP Facility (if incurred).

48.    "*DIP Lenders*" means the banks, financial institutions, and other lenders party to the DIP Facility from time to time (if incurred).

49.    "*DIP Orders*" means, collectively, the Interim DIP Order and the Final DIP Order (if any).

50.    "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, as amended, supplemented, or modified from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable law.

51.    "*Disputed*" means, with respect to a Claim or Interest (or portion thereof), (a) that an objection to such Claim or Interest (or portion thereof) has been filed on or before the Effective Date or (b) for which a proof of such Claim or Interest is filed; *provided* that in no event shall a Claim or Interest (or portion thereof) that is deemed Allowed pursuant to the Plan be a Disputed Claim or Interest.

52.    "*Distribution Agent*" means the Debtors or any Entity or Entities chosen by the Debtors, which Entities may include the Notice and Claims Agent, to make or to facilitate distributions required by the Plan.

53.    "*Distribution Record Date*" means the date for determining which Holders of Claims are eligible to receive distributions under the Plan, which date shall be the Confirmation Date.

54.    "*Early Acceptance Date*" means the date that is five (5) Business Days after the Restructuring Support Agreement became effective in accordance with its terms.

55.    "*Effective Date*" means the date selected by the Debtors and the Required Consenting First Lien Lenders that is a Business Day no later than fourteen (14) calendar days after the Confirmation Order is entered and which (a) no stay of the Confirmation Order is in effect and (b) all conditions specified in Article VIII.A of this Plan have been (i) satisfied or (ii) waived pursuant to Article VIII.A of this Plan.

56.    "*Eligible First Lien Lender*" means any Consenting First Lien Lender entitled to receive its Pro Rata Share of the First Lien Early Acceptance Premium pursuant to section 27(a) of the Restructuring Support Agreement.

57.    "*Entity*" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

58.    "*Equity Interest*" means any issued, unissued, authorized, or outstanding shares of common stock, preferred stock or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, together with any warrants, equity-based awards or contractual rights to purchase or acquire such equity interests at any time and all rights arising with respect thereto that existed immediately before the Effective Date including any claims arising from the ownership of any instrument evidencing an ownership interest in a Debtor; *provided* that Equity Interest does not include any Intercompany Interest.

59.    "*Estate*" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code.

60.    "*Exchange Benchmark Value*" means $79 million or the mid-point range of the Plan Equity Value as set forth in the Disclosure Statement prior to any issuance of the New Junior Loan to electing First Lien Term Lenders; *provided* that the Exchange Benchmark Value shall be used only to calculate the principal amount of the New Junior Loan to be distributed to those First Lien Lenders that elect to receive a principal amount of the New Junior Loan *in lieu* of New Common Stock as set forth in Article III.B.5 of this Plan.

61.    "*Exculpated Party*" means each of the following, solely in its capacity as such:  (a) the Debtors; (b) the DIP Agent (if any); (c) the DIP Lenders (if any); (d) the ABL Agent; (e) the ABL Lenders; (f) the Consenting FILO Lenders; (g) the First Lien Agent; (h) the Consenting First Lien Lenders; (i) the Second Lien Agent; (j) the Consenting Second Lien Lenders; (k) the Sponsors; (l) with respect to the foregoing clauses (a) through (k), each such Entity's current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, investment managers, and other professionals, each in their capacity as such.

62.    "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

63.    "*Exit ABL Documents*" means any documentation necessary to effectuate the incurrence of the Exit ABL Facility.

64.    "*Exit ABL Facility*" means the new $100 million asset-based revolving credit facility, plus a $5 million first-in, last-out facility, which will have the terms set forth in the Exit ABL Documents.

65.    "*Exit ABL Lender*" means any lender of the Exit ABL Facility in accordance with the Exit ABL Documentation.

66.    "*Exit Facilities Documents*" means the Exit ABL Documents, the New First Lien Term Loan Documents, and the New Junior Loan Documents.

67.    "*Exit New Money Facility*" means the new $30 million senior secured term loan facility, which will have the terms set forth in Exhibit D to the Restructuring Support Agreement and the New First Lien Term Loan Documentation.

68.    "*FILO Claim*" means any and all outstanding Claims arising under, derived from, based on, or secured pursuant to the ABL Credit Agreement with respect to the FILO Facility or any other agreement, instrument, or document executed at any time in connection therewith, including all obligations under and as defined in the ABL Credit Agreement with respect to the FILO Facility.

69.    "*FILO Facility*" means that certain $75 million first-in, last-out loan facility provided for under the ABL Credit Agreement, plus any accrued and unpaid interest, fees, expenses, costs, and other charges payable in accordance therewith.

70.    "*FILO Lenders*" means the lenders party to the ABL Credit Agreement with respect to the FILO Facility.

71.    "*Final DIP Order*" means an order (if any) of the Bankruptcy Court authorizing, among other things, on a final basis, the Debtors to (a) enter into the DIP Facility and incur postpetition obligations thereunder and (b) use cash collateral pursuant to the terms set forth therein.

72.    "*Final Order*" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek reconsideration under Rule 59(b) or 59(e) of the Federal Rules of Civil Procedure, seek a new trial, reargument, or rehearing and, where applicable, petition for certiorari has expired and no appeal, motion for reconsideration under Rule 59(b) or 59(e) of the Federal Rules of Civil Procedure, motion for a new trial, reargument or rehearing or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought, or as to which any motion for reconsideration that has been filed pursuant to Rule 59(b) or 59(e) of the Federal Rules of Civil Procedure or any motion for a new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024, or any analogous rule, may be filed relating to such order or judgment shall not cause such order or judgment not to be a Final Order.

73.    "*First Lien Agent*" means Wilmington Savings Fund Society, FSB in its capacity as successor administrative agent and collateral agent under the First Lien Credit Agreement.

74.     "*First Lien Claim*" means any and all outstanding Claims arising under, derived from, based on, or secured pursuant to the First Lien Credit Agreement or any other agreement, instrument, or document executed at any time in connection therewith, including all obligations under and as defined in the First Lien Credit Agreement.

75.     "*First Lien Credit Agreement*" means that certain credit agreement, dated October 14, 2015 (as amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms), by and among FullBeauty, as borrower, Holdings, the First Lien Agent, and the First Lien Lenders.

76.     "*First Lien Credit Facility*" means that certain term loan facility provided for under the First Lien Credit Agreement.

77.     "*First Lien Early Acceptance Premium*" means the 1% yield enhancement ($7.8 million) payable in Cash and deemed an Allowed General Unsecured Claim to be paid in accordance with Article II.B of this Plan.

78.     "*First Lien Lenders*" means those lenders party to the First Lien Credit Agreement.

79.     "*FullBeauty*" means FULLBEAUTY Brands Holdings Corp., a Delaware corporation.

80.     "*General Administrative Claim*" means any Administrative Claim, other than an Accrued Professional Compensation Claim and Claims for fees and expenses pursuant to 28 U.S.C § 1930(a).

81.     "*General Unsecured Claim*" means any unsecured claim other than (a) a DIP Facility Claim, (b) an Administrative Claim, (c) an Accrued Professional Compensation Claim, (d) a Priority Tax Claim, (e) an Other Priority Claim, (f) an ABL Claim, (g) a FILO Claim, (h) a First Lien Claim, (i) a Second Lien Claim, (j) an Intercompany Claim against one or more of the Debtors that is not entitled to priority under the Bankruptcy Code or Final Order of the Bankruptcy Court, or (k) the Sponsor Claims.

82.     "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

83.     "*Holder*" means an Entity holding a Claim or Interest.

84.     "*Holdings*" means Blackdog Holdings, Inc., a Delaware corporation and ultimate parent for each Debtor.

85.     "*Impaired*" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

86.     "*Impaired Class*" means a Class that is Impaired.

87.     "*Indemnification Provisions*" means each of the Debtors' indemnification provisions currently in place, whether in the Debtors' bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment contracts, for the Debtors' current and former directors, officers, managers, employees, attorneys, other professionals, and agents and such current and former directors, officers, and managers' respective Affiliates.

88.     "*Intercompany Claims*" means, collectively, any Claim held by a Debtor against another Debtor or an Affiliate of a Debtor or any Claim held by an Affiliate of a Debtor against a Debtor.

89.     "*Intercompany Interest*" means an Equity Interest in a Debtor or OSP Group Canada Holdings, Inc. held by another Debtor.

90.     "*Interests*" means, collectively, Equity Interests and Intercompany Interests.

91.     "*Interim DIP Order*" means an order (if any) of the Bankruptcy Court authorizing, among other things, on an interim basis, the Debtors to (a) enter into the DIP Facility and incur postpetition obligations thereunder and (b) use cash collateral pursuant to the terms set forth therein.

92.     "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code.

93.     "*Local Bankruptcy Rules*" means the Local Bankruptcy Rules for the Southern District of New York.

94.     "*Management Incentive Plan*" means the management incentive plan of the Reorganized Debtors that shall be consistent with the material terms set forth in the Restructuring Support Agreement and the term sheet agreed to between the Debtors and the Required Consenting First Lien Lenders and in form and substance acceptable to the Debtors and the Required Consenting First Lien Lenders and which management incentive plan shall reserve no less than 10% of New Common Stock to be awarded to participants on or following the Effective Date.

95.     "*New Board*" means the board of directors of the parent company of the Reorganized Debtors, as determined in accordance with the Restructuring Support Agreement and the New Equity Documents.

96.     "*New Common Stock*" means a single class of equity interests in a Reorganized Debtor entity to be authorized, issued, or reserved on the Effective Date pursuant to the Plan, in accordance with the terms and conditions set forth in the Restructuring Support Agreement, and as provided in the Restructuring Transactions Memorandum.

97.     "*New Equity*" means the New Common Stock and the Warrants.

98.     "*New Equity Documents*" means any shareholder agreement, organizational documents, evidence of equity interests (including share certificates or other mutually agreed evidence of equity interests to be issued in accordance with the Restructuring Support Agreement), or other governance documents for the Reorganized Debtors, which, to the extent applicable to such documents, shall include terms consistent with minority equity holder protections and governance rights provisions set forth in the Restructuring Support Agreement.

99.     "*New First Lien Term Loan*" means the new first lien term loan credit facility in the amount of up to $252 million, which will have the terms set forth in the Restructuring Support Agreement and the New First Lien Term Loan Documents.

100.     "*New First Lien Term Loan Documents*" means any documentation necessary to effectuate the incurrence of the Exit New Money Facility and the New First Lien Term Loan, subject to Article I.E of this Plan.

101.     "*New Junior Loan*" means the new facility in the amount of up to $50 million, which will have the terms set forth in the Restructuring Support Agreement and the New Junior Loan Documents.

102.     "*New Junior Loan Documents*" means any documentation necessary to effectuate the incurrence of the New Junior Loan, subject to Article I.E of this Plan.

103.     "*Notice and Claims Agent*" means Prime Clerk LLC in its capacity as noticing, claims, and solicitation agent for the Debtors, pursuant to an order of the Bankruptcy Court.

104.     "*Option Rights*" means the rights to purchase New Common Stock from the Reorganized Debtors that shall be issued in accordance with the terms set forth in the Restructuring Support Agreement, the Option Rights Documents, and the Advisory Services Agreement.

105.     "*Option Rights Documents*" means the applicable Definitive Document with respect to the Option Rights, subject to Article I.E of this Plan.

106.     "*Other Priority Claim*" means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or Claims entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code.

107.     "*Other Secured Claim*" means any Secured Claim against the Debtors other than the DIP Facility Claims and the Secured Lender Claims.

108.    "*Petition Date*" means the date on which each of the Debtors commenced the Chapter 11 Cases.

109.    "*Plan*" means this joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Restructuring Support Agreement, or the terms hereof, as the case may be, and the Plan Supplement, which is incorporated herein by reference, including all exhibits and schedules hereto and thereto.

110.    "*Plan Supplement*" means a supplemental appendix to the Plan that shall be filed with the Bankruptcy Court not later than one (1) calendar day after the Petition Date and shall contain, among other things, draft forms of documents (or term sheets thereof), schedules, and exhibits to the Plan, in each case subject to the terms and provisions of the Restructuring Support Agreement (including any consent rights as to the form and substance of such documents set forth therein) and as may be amended, modified, or supplemented from time to time on or prior to the Effective Date in accordance with the terms hereof, the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement, including the following documents:  (a) the New Equity Documents; (b) to the extent known, the identity of the members of the New Board; (c) the Exit Facilities Documents; (d) the Warrant Documents; (e) the Option Rights Documents; (f) the Restructuring Transactions Memorandum, and (g) any and all other documentation necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan.

111.    "*Priority Tax Claim*" means a Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

112.    "*Pro Rata Share*" or "*Pro Rata*" means a distribution equal in amount to the ratio of the amount of such Allowed Claim in relation to the aggregate amount of all Allowed Claims in its Class.

113.    "*Professional Fee Escrow Account*" means an interest-bearing escrow account in an amount equal to the Professional Fee Reserve Amount funded and maintained by the Reorganized Debtors on and after the Effective Date solely for the purpose of paying all Allowed and unpaid fees and expenses of Retained Professionals in the Chapter 11 Cases.

114.    "*Professional Fee Reserve Amount*" means the aggregate Accrued Professional Compensation through the Effective Date as estimated by the Retained Professionals in accordance with Article II.A.2.c of this Plan.

115.    "*Proof of Claim*" means a proof of Claim filed against any Debtor in the Chapter 11 Cases.

116.    "*Reinstatement*" or "*Reinstated*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

117.    "*Released Party*" means each of the following, solely in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Estates; (d) the DIP Agent (if any); (e) the DIP Lenders (if any); (f) the ABL Agent; (g) the ABL Lenders; (h) the FILO Lenders; (i) the First Lien Agent, (j) the First Lien Lenders; (k) the Second Lien Agent; (l) the Second Lien Lenders; (m) the Sponsors; (n)  with respect to the foregoing clauses (a) through (m), each such Entity's current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, investment managers, and other professionals, each in their capacity as such; *provided*, *further*, that any holder of a Claim or Interest that opts out of the releases contained in the Plan shall not be a "Released Party."

118.    "*Releasing Party*" means each of the following, solely in its capacity as such:  (a) the DIP Agent (if any); (b) the DIP Lenders (if any); (c) the ABL Agent; (d) the ABL Lenders (e) the FILO Lenders; (f) the First Lien Agent; (g) the First Lien Lenders; (h) the Second Lien Agent; (i) the Second Lien Lenders; (j) the Sponsors; (k)  all holders of Claims or Interests who vote to accept the Plan; (l) all holders of Claims or Interests who are eligible to vote, but abstain from voting on the Plan <u>and</u> who do not opt out of the releases provided by the Plan; (m) all holders of Claims or Interests who vote to reject the Plan <u>and</u> who do not opt out of the releases provided by the

9

Plan; (n) with respect to the foregoing clauses (a) through (m), each such Entity's current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, investment managers, and other professionals, each in their capacity as such; *provided* that any holder of a Claim or Interest that validly opts out of, or validly objects to, the releases contained in the Plan shall not be a "Releasing Party."

119.    "*Reorganized Debtors*" means the Debtors, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, or otherwise on or after the Effective Date, including any transferee, assign, or successor of any Reorganized Debtor created to issue the New Common Stock as determined by the Debtors and the Required Consenting First Lien Lenders prior to the Effective Date following the Debtors' consultation with the Ad Hoc Group of Second Lien Lenders and the Required Sponsors.

120.    "*Representatives*" means, with regard to an Entity, current and former officers, directors, members (including *ex officio* members), managers, employees, partners, advisors, attorneys, professionals, accountants, investment bankers, investment advisors, actuaries, Affiliates, financial advisors, consultants, agents, and other representatives of each of the foregoing Entities (whether current or former, in each case in his, her or its capacity as such).

121.    "*Required Consenting FILO Lenders*" means the Consenting FILO Lenders that hold, in the aggregate, greater than 50% in principal amount outstanding of all FILO Claims.

122.    "*Required Consenting First Lien Lenders*" means Consenting First Lien Lenders that hold, in the aggregate, greater than 50% in principal amount outstanding of all First Lien Claims held by Consenting First Lien Lenders that are (or whose managers or investment managers are) members of the Ad Hoc Group of First Lien Lenders.

123.    "*Required Consenting Lenders*" means, collectively, the Required Consenting FILO Lenders, the Required Consenting First Lien Lenders, and the Required Consenting Second Lien Lenders.

124.    "*Required Consenting Second Lien Lenders*" means Consenting Second Lien Lenders that hold, in the aggregate, greater than 50% in principal amount outstanding of all Second Lien Claims held by Consenting Second Lien Lenders that are (or whose managers or investment managers are) members of the Ad Hoc Group of Second Lien Lenders; *provided* that any Second Lien Claims held by a Sponsor or its controlled affiliates shall not be counted or considered in either the numerator or denominator for the purposes of determining Required Consenting Second Lien Lenders.

125.    "*Required Consenting Sponsor*" means Apax.

126.    "*Required Parties*" means, collectively, the Debtors, the Required Consenting Sponsor, and the Required Consenting Lenders.

127.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement (including the exhibits and annexes attached thereto) entered into on December 18, 2018, by and among the Debtors, the Sponsors, the Consenting Lenders, and any subsequent Entity that becomes a party thereto pursuant to the terms thereof, as attached to the Disclosure Statement as Exhibit B.

128.    "*Restructuring Transactions*" means the transactions described in Article IV.C of this Plan.

129.    "*Restructuring Transactions Memorandum*" means that certain memorandum regarding the Restructuring Transactions under the Plan that may be included in the Plan Supplement, which memorandum must be consistent with the terms and conditions set forth in the Restructuring Support Agreement and otherwise in form and substance reasonably acceptable to the Debtors and the Required Consenting First Lien Lenders.

130.    "*Retained Professional*" means an Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services

rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

131.    "*SEC*" means the Securities and Exchange Commission.

132.    "*Second Lien Agent*" means Wilmington Trust, National Association in its capacity as successor administrative agent and collateral agent under the Second Lien Credit Agreement.

133.    "*Second Lien Claim*" means any and all outstanding Claims arising under, derived from, based on, or secured pursuant to the Second Lien Credit Agreement or any other agreement, instrument, or document executed at any time in connection therewith, including all obligations under and as defined in the Second Lien  Credit Agreement.

134.    "*Second Lien Credit Agreement*" means that certain credit agreement, dated October 14, 2015 (as amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms), by and among FullBeauty, as borrower, Holdings, the Second Lien Agent, and the Second Lien Lenders.

135.    "*Second Lien Credit Facility*" means that certain term loan facility provided for under the Second Lien Credit Agreement.

136.    "*Second Lien Lenders*" means the lenders party to the Second Lien Credit Agreement.

137.    "*Second Lien Loans*" means approximately $345 million in loans provided for under the Second Lien Credit Agreement.

138.    "*Second Lien Warrant Package*" means 100% of the Series A Warrants, 60% of the Series B Warrants, and 60% of the Series C Warrants, each as defined in the Warrants Documents and on the terms set forth in the Restructuring Support Agreement.

139.    "*Secured Claim*" means, when referring to a Claim, a Claim:  (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by Final Order of the Bankruptcy Court, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) otherwise Allowed pursuant to the Plan or Final Order of the Bankruptcy Court as a secured claim.

140.    "*Secured Lender Claims*" means the ABL Claims, the FILO Claims, the First Lien Claims, and/or the Second Lien Claims.

141.    "*Secured Lenders*" means those Entities that are Holders of ABL Claims, FILO Claims, First Lien Claims, and/or Second Lien Claims.

142.    "*Securities*" means any instruments that qualify under section 2(a)(1) of the Securities Act, including the New Equity.

143.    "*Securities Act*" means the Securities Act of 1933, as now in effect or hereafter amended, or any regulations promulgated thereunder.

144.    "*Securities Exchange Act*" means the Securities Exchange Act of 1934, as amended.

145.    "*Service Providers*" means, collectively, Apax Partners LP and Charlesbank (or its affiliates that provide advisory services).

146.    "*Sponsors*" means Apax and Charlesbank.

147.    "*Sponsor Claims*" means any and all outstanding Claims that Topco, the Sponsors, and/or any controlled affiliates of the Sponsors, solely in their capacities as such, may have against the Debtors (but excluding,

for the avoidance of doubt, any Second Lien Claims that any of the Sponsors or any of their respective Affiliates may hold as of the Petition Date, which such Second Lien Claims shall be treated as Class 6 Claims hereunder).

148.   "*Sponsor Warrant Package*" means 40% of the Series B Warrants and 40% of the Series C Warrants, each as defined in the Warrants Documents.

149.   "*Stockholders Agreement*" means the stockholders agreement with respect to the New Common Stock to be entered into on the Effective Date, which shall be included in the Plan Supplement as part of the New Equity Documents, subject to Article I.E of this Plan.

150.   "*Third-Party Release*" means the releases set forth in Article IX.C of this Plan.

151.   "*Topco*" means Blackdog Topco Holdings, LP, a Delaware corporation.

152.   "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

153.   "*Unimpaired*" means, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

154.   "*United States Trustee*" means the United States Trustee for the Southern District of New York.

155.   "*Warrants*" means the warrants issued pursuant to the Warrant Documents.

156.   "*Warrant Documents*" means the applicable Definitive Document with respect to the Warrants to be issued in accordance with the terms and conditions set forth in the Restructuring Support Agreement, subject to Article I.E of this Plan.

B.   *Rules of Interpretation*

1.   For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) unless otherwise specified, any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles of this Plan; (e) the words ''herein,'' "hereof," and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) the words "include" and "including" and variations thereof shall not be deemed to be terms of limitation and shall be deemed to be followed by the words "without limitation"; (g) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (h) references to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable; (i) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (j) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (k) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (l) any effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, subject to the terms of the Restructuring Support Agreement, and such interpretation shall control.

2.   All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

3.      Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

## C.      Computation of Time

Unless otherwise specifically stated in the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed in the Plan.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter unless otherwise specified herein.

## D.      Controlling Document

In the event of an inconsistency between the Plan, the Restructuring Support Agreement, and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the Plan shall control.  In the event of an inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

## E.      Restructuring Support Agreement

Notwithstanding anything to the contrary in the Plan, the Plan Supplement, the Confirmation Order, or the Disclosure Statement, any and all consent rights in the Restructuring Support Agreement with respect to the form and substance of the Plan, the Plan Supplement, and any other documents relating to the Restructuring Transactions, including any amendments, restatements, supplements, or other modifications to such documents and any consents, waivers, or other deviations under or from any such documents, shall be incorporated by reference herein and fully enforceable as if stated in full herein.  Solely with respect to any consent or consultation rights in this Plan, in the event of an inconsistency between the Plan, the Plan Supplement, the Disclosure Statement, and the Restructuring Support Agreement, the terms of the Restructuring Support Agreement shall control.

## Article II.

## ADMINISTRATIVE CLAIMS, DIP FACILITY CLAIMS, PRIORITY TAX CLAIMS, AND UNITED STATES TRUSTEE STATUTORY FEES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of this Plan.

## A.      Administrative Claims

### 1.      General Administrative Claims

Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code and except to the extent that a Holder of an Allowed General Administrative Claim and the applicable Debtor before the Effective Date or the applicable Reorganized Debtor after the Effective Date agree to less favorable treatment, each Holder of an Allowed General Administrative Claim will be paid the full unpaid amount of such Allowed General Administrative Claim in Cash:  (a) if such Allowed General Administrative Claim is based on liabilities that the Debtors incurred in the ordinary course of business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Administrative Claim and without any further action by any Holder of such Allowed General Administrative Claim; (b) if such Allowed General Administrative Claim is due, on the Effective Date, or, if such Allowed General Administrative Claim is not due as of the Effective Date, on the date that such Allowed General Administrative Claim becomes due or as soon as reasonably practicable thereafter; (c) if a General Administrative Claim is not Allowed as of the Effective Date, on the date that is no later than sixty (60) days after the date on which an order Allowing such General Administrative Claim becomes a Final Order of the Bankruptcy Court or as soon as reasonably practicable thereafter; or (d) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

13

    2.    <u>Professional Compensation Claims</u>

        a.    Final Fee Applications

All final requests for Accrued Professional Compensation Claims shall be filed no later than sixty (60) days after the Effective Date. The amount of Accrued Professional Compensation Claims owed to the Retained Professionals shall be paid in Cash to such Retained Professionals from funds held in the Professional Fee Escrow Account after such Claims are Allowed by a Final Order. To the extent that funds held in the Professional Fee Escrow Account are unable to satisfy the amount of Accrued Professional Compensation Claims owed to the Retained Professionals, such Retained Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of this Plan. After all Allowed Accrued Professional Compensation Claims have been paid in full, any excess amounts remaining in the Professional Fee Escrow Account shall be returned to the Reorganized Debtors.

        b.    Professional Fee Escrow Account

On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Retained Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.

        c.    Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through the Confirmation Date, the Retained Professionals shall estimate in good faith their Accrued Professional Compensation Claims (taking into account any retainers) prior to and as of the Confirmation Date and shall deliver such estimate to the Debtors and counsel to the Required Consenting First Lien Lenders at least three (3) calendar days prior to the Confirmation Date. If a Retained Professional does not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional. The total amount so estimated as of the Confirmation Date shall comprise the Professional Fee Reserve Amount.

        d.    Post-Confirmation Date Fees and Expenses

Upon the Confirmation Date, any requirement that Retained Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate. Each Debtor or Reorganized Debtor, as applicable, may employ and pay any fees and expenses of any professional, including any Retained Professional, in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court, including with respect to any transaction, reorganization, or success fees payable by virtue of the consummation of this Plan or the occurrence of the Effective Date.

The Debtors and Reorganized Debtors, as applicable, shall pay, within ten (10) Business Days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, all outstanding reasonable and documented fees and out-of-pocket expenses of (i) the First Lien Agent and the Second Lien Agent, (ii) the advisors to the Ad Hoc Group of First Lien Lenders, (iii) the advisors to the Ad Hoc Group of Second Lien Lenders, (iv) counsel to the Sponsors in an amount not to exceed $250,000 in the aggregate (after taking into account any and all amounts previously satisfied by FullBeauty and/or any of its affiliates or subsidiaries in connection with this restructuring), (v) Davis Polk & Wardwell LLP, in its capacity as counsel to certain First Lien Lenders and in an amount not to exceed $188,000 in the aggregate (after taking into account any and all amounts previously satisfied by FullBeauty and/or any of its affiliates or subsidiaries), (vi) the members of the Ad Hoc Group of First Lien Lenders, and (vii) the advisors to the ABL Agent and the ABL Lenders in accordance with the ABL Credit Agreement and any forbearance agreements or amendments in connection with the ABL Credit Agreement in effect as of the date that the Restructuring Support Agreement was executed, in each case in accordance with section 27(b) of the Restructuring Support Agreement, if applicable. If the Debtors or the Reorganized Debtors dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors, as applicable, or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and

the disputed portion of such invoice shall not be paid until the dispute is resolved.  The undisputed portion of such reasonable fees and expenses shall be paid as provided herein.

e.    Substantial Contribution Compensation and Expenses

Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must file an application and serve such application on counsel for the Debtors or Reorganized Debtors, as applicable, and as required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules on or before three (3) Business Days after the Confirmation Date.

B.    *First Lien Early Acceptance Premium*

On or before the Effective Date, the Reorganized Debtors shall pay in full in Cash each Eligible First Lien Lender its Pro Rata Share of the First Lien Early Acceptance Premium pursuant to the terms set forth in the Restructuring Support Agreement.

C.    *DIP Facility Claims*

If the DIP Facility is incurred, notwithstanding anything to the contrary herein, Holders of Allowed DIP Facility Claims, in exchange for full and final satisfaction, settlement, release, and discharge of all DIP Facility Claims (other than Claims under the DIP Facility that expressly survive the termination thereof), on the Effective Date, all amounts outstanding under the DIP Facility on the Effective Date, shall receive (1) payment in full in Cash (and all outstanding letters of credit shall be cash collateralized) or (2) such other treatment agreed upon between the Debtors, the Required Consenting First Lien Lenders, and Holders of Allowed DIP Facility Claims.

D.    *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall be treated pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on or before the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and such Holder or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

E.    *United States Trustee Statutory Fees*

The Debtors and the Reorganized Debtors, as applicable, will pay fees payable pursuant to 28 U.S.C § 1930(a), including fees and expenses payable to the United States Trustee, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

### Article III.

### CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Classification of Claims*

This Plan constitutes a separate chapter 11 plan of reorganization for each Debtor.  Except for the Claims addressed in Article II above (or as otherwise set forth herein), all Claims and Interests are placed in Classes for each of the Debtors.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, DIP Facility Claims, and Priority Tax Claims, as described in Article II.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation, and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to

the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or an Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

**Summary of Classification and Treatment of Claims and Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | ABL Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | FILO Claims | Impaired | Entitled to Vote |
| 5 | First Lien Claims | Impaired | Entitled to Vote |
| 6 | Second Lien Claims | Impaired | Entitled to Vote |
| 7 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 9 | Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |

B.    *Treatment of Claims and Interests*[1]

    1.    <u>*Class 1 — Other Secured Claims*</u>

        a.    *Classification*: Class 1 consists of all Other Secured Claims.

        b.    *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive the following, at the option of the applicable Debtor:

            (i)    payment in full in Cash in the ordinary course of business;

            (ii)    the collateral securing its Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

            (iii)    Reinstatement of such Allowed Other Secured Claim; or

            (iv)    such other treatment rendering such Allowed Other Secured Claim Unimpaired.

        c.    *Voting*: Class 1 is Unimpaired, and Holders of Class 1 Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the

---

[1]    Allowed Claim amounts referenced in this section are subject to adjustment to reflect any changes to the outstanding principal amounts prior to the Effective Date.

Bankruptcy Code.  Therefore, Holders of Class 1 Other Secured Claims are not entitled to vote to accept or reject the Plan.

2. _Class 2 — Other Priority Claims_

a. *Classification*:  Class 2 consists of all Other Priority Claims.

b. *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Other Priority Claim, each Holder of such Allowed Other Priority Claim shall receive the following at the option of the applicable Debtor:

(i)      payment in full in Cash in the ordinary course of business;

(ii)     Reinstatement of such Allowed Other Priority Claim; or

(iii)    such other treatment rendering such Allowed Other Priority Claim Unimpaired.

c. *Voting*:  Class 2 is Unimpaired, and Holders of Class 2 Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

3. _Class 3 — ABL Claims_

a. *Classification*:  Class 3 consists of ABL Claims.

b. *Allowance*:  On the Effective Date, the ABL Claims shall be deemed Allowed in the aggregate amount of all outstanding principal (including any letter of credit and cash management obligations) as of the Petition Date, plus all outstanding interest, fees, expenses, costs, and other charges with respect to the ABL Facility under the ABL Credit Agreement whether accruing before or after the Petition Date.

c. *Treatment*:  Except to the extent that a Holder of an Allowed ABL Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each ABL Claim, Holders of Allowed ABL Claims shall receive payment in full in Cash using the proceeds from the Exit ABL Facility or, in the case of outstanding letters of credit, each such letter of credit shall be (x) cancelled and replaced, (y) cash collateralized in accordance with section 2.03(f) of the ABL Credit Agreement, or (z) backstopped or otherwise treated in a manner satisfactory to the applicable L/C Issuer (as defined in the ABL Credit Agreement) in its sole and absolute discretion.

d. *Voting*:  Class 3 is Unimpaired, and Holders of Class 3 ABL Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 3 ABL Claims are not entitled to vote to accept or reject the Plan.

4. _Class 4 — FILO Claims_

a. *Classification*:  Class 4 consists of FILO Claims.

b. *Allowance*:   On the Effective Date, FILO Claims shall be deemed Allowed in the aggregate principal amount of $75 million, plus all interest, fees, expenses, costs, and other charges payable with respect to the FILO Facility under the ABL Credit Agreement as of the Petition Date.

c. *Treatment*:  Except to the extent that a Holder of an Allowed FILO Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and

17

discharge of each FILO Claim, on the Effective Date, each Holder of an Allowed FILO Claim shall receive, at the election of the Debtors, either of the following:

(i)    its Pro Rata Share of $75 million of the New First Lien Term Loan and payment in Cash of any accrued but unpaid interest, fees, and expenses; or

(ii)    its Pro Rata Share of $75 million plus any accrued but unpaid interest, fees, and expenses of the New First Lien Term Loan..

d.    *Voting*:  Class 4 is Impaired, and Holders of Class 4 FILO Claims are entitled to vote to accept or reject the Plan.

5.    *Class 5 — First Lien Claims*

a.    *Classification*:  Class 5 consists of First Lien Claims.

b.    *Allowance*:  On the Effective Date, First Lien Claims shall be deemed Allowed in the aggregate principal amount of $781,568,965.52, plus all interest, fees, expenses, costs, and other charges due under the First Lien Credit Agreement.

c.    *Treatment*:  Except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each First Lien Claim, on the Effective Date, each Holder of Allowed First Lien Claims shall receive, in full and final satisfaction of its First Lien Claims, its Pro Rata Share of the following:

(i)    $175 million in aggregate principal amount of the New First Lien Term Loan; and

(ii)    subject to Article III.B.6.c of this Plan, at least 87.5% of the New Common Stock, subject to dilution by the Option Rights, Warrants, and Management Incentive Plan; *provided* that a Holder of an Allowed First Lien Claim may check the applicable box on the Class 5 Ballot to receive, *in lieu* of New Common Stock (which forfeited shares shall be distributed Pro Rata to non-electing Holders of Allowed First Lien Claims), a principal amount of the New Junior Loan that is equal to 85% of the Exchange Benchmark Value of such Holder's original New Common Stock distribution (*i.e.*, a 15% discount to the Exchange Benchmark Value of its original New Common Stock distribution); *provided*, *further*, that electing Holders of Allowed First Lien Claims shall not receive more than $35 million in aggregate principal amount of the New Junior Loan.

d.    *Voting*:  Class 5 is Impaired, and Holders of Class 5 First Lien Claims are entitled to vote to accept or reject the Plan.

6.    *Class 6 — Second Lien Claims*

a.    *Classification*:  Class 6 consists of Second Lien Claims.

b.    *Allowance*:  On the Effective Date, Second Lien Claims shall be deemed Allowed in the aggregate principal amount of $345 million, plus all accrued and unpaid interest, fees, expenses, costs, and other charges, under the Second Lien Credit Agreement as of the Petition Date.

c.    *Treatment*:  On the Effective Date, each Holder of an Allowed Second Lien Claim shall receive, in exchange for full and final satisfaction, settlement, release, and discharge of its Allowed Second Lien Claim, the following treatment:

(i)     **If Class 6 votes to accept the Plan,** its Pro Rata Share of (A) $15 million of the New Junior Loan, (B) 10% of the New Common Stock, subject to dilution by the Option Rights, Warrants, and Management Incentive Plan, and (C) the Second Lien Warrant Package as set forth in the Warrant Documents; or

(ii)    **If Class 6 votes to reject the Plan,** no Holder of an Allowed Second Lien Claim shall receive any distribution under the Plan, and the 10% of the New Common Stock shall be reallocated to the Holders of Allowed First Lien Claims in Class 5 and distributed in accordance with Article III.B.5.c of the Plan.

d.    *Voting*: Class 6 is Impaired, and Holders of Class 6 Second Lien Claims are entitled to vote to accept or reject the Plan.

7.    *Class 7 — General Unsecured Claims*

a.    *Classification*: Class 7 consists of all General Unsecured Claims.

b.    *Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of its Allowed Claim, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim (other than any Sponsor Claims or other Claims arising from the ownership of any instrument evidencing an ownership interest in a Debtor) shall have its Claim Reinstated as of the Effective Date as an obligation of the applicable Reorganized Debtor and shall be satisfied in full in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim.

c.    *Voting*: Class 7 is Unimpaired, and Holders of Class 7 General Unsecured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 7 General Unsecured Claims are not entitled to vote to accept or reject the Plan.

8.    *Class 8 — Intercompany Claims*

a.    *Classification*: Class 8 consists of all Intercompany Claims.

b.    *Treatment*:  On the Effective Date, Intercompany Claims shall be Reinstated, compromised, or cancelled at the election of the Debtors or the Reorganized Debtors, as applicable, and in accordance with the Restructuring Support Agreement.

c.    *Voting*:  Holders of Claims in Class 8 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

9.    *Class 9 — Equity Interests in Holdings*

a.    *Classification*: Class 9 consists of all Interests in Holdings.

b.    *Treatment*: On the Effective Date, all Interests in Holdings, including Sponsor Claims, shall be deemed cancelled and extinguished and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distributions to Holders of Interests in Topco or Holdings on account of any such Interests.

c.    *Voting*: Class 9 is Impaired, and Holders of Class 9 Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

10.    *Class 10 — Intercompany Interests*

    a.    *Classification*: Class 10 consists of all Intercompany Interests.

    b.    *Treatment*:    On the Effective Date, Intercompany Interests shall be Reinstated, compromised, or cancelled at the election of the Debtors or the Reorganized Debtors, as applicable, and in accordance with the Restructuring Support Agreement.

    c.    *Voting*:    Holders of Class 10 Intercompany Interests are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively.    Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights with respect to any Unimpaired Claim, including all legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.    *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote, and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the Holders of such Claims or Interests in such Class.

E.    *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests or any Class thereof is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

F.    *Confirmation Pursuant to Section 1129(a)(10) and Section 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.    The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

G.    *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.    Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

H.    *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptances or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

I.    *Intercompany Interests*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure for the ultimate

benefit of the Holders that receive New Equity in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions on account of such Holders' Allowed Claims.

## Article IV.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Substantive Consolidation*

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan; *provided* that the Reorganized Debtors may consolidate Allowed Claims on a per Class basis for voting purposes.

B.    *General Settlement of Claims and Interests*

As discussed further in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that Holders of Claims or Interests might have with respect to any Claim or Interest under the Plan. Distributions made to Holders of Allowed Claims in any Class are intended to be final.

C.    *Restructuring Transactions*

1.    Restructuring Transactions

On the Effective Date, the Debtors, the Reorganized Debtors, or any other entities may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan (subject to the Restructuring Support Agreement), including: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities pursuant to applicable law; and (d) all other actions that the Debtors or the Reorganized Debtors, as applicable, and the Required Consenting First Lien Lenders determine are necessary or appropriate.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

2.    Exit Facilities

On the Effective Date, the Exit Facilities Documents shall constitute legal, valid, binding, and authorized obligations of either the Reorganized Debtors or the Debtors, as applicable, and following the consummation of the Restructuring Transactions, the Exit Facilities Documents shall constitute legal, valid, binding, and authorized obligations of the applicable Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Facilities Documents are being extended and shall be deemed to have been extended in good faith and for legitimate business purposes and are reasonable and shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on and security interests in the collateral granted thereunder in accordance with the terms of the Exit Facilities Documents, (c) shall be deemed automatically perfected on the Effective Date (without any further action being required by the Debtors, the Reorganized Debtors, as applicable, the applicable

agent, or any of the applicable lenders), having the priority set forth in the Exit Facilities Documents and subject only to such Liens and security interests as may be permitted under the Exit Facilities Documents, and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Debtors, the Reorganized Debtors, as applicable, and the Entities granted such Liens and security interests are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

3.    New Equity

On the Effective Date, a Reorganized Debtor entity (as determined in accordance with the terms and conditions of the Restructuring Support Agreement) shall issue or reserve for issuance all of the New Equity issued or issuable in accordance with the terms herein, subject to dilution on the terms described herein and in the Restructuring Support Agreement.  The (a) issuance of the New Equity for distribution pursuant to the Plan and (b) the New Common Stock issuable upon exercise of the Warrants and the Option Rights, in each case issued under the Plan, are authorized without the need for further corporate action, and all of the shares of New Common Stock issued or issuable pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

4.    Advisory Services Agreement

Confirmation of the Plan shall be deemed to constitute approval of the Advisory Services Agreement (including all transactions contemplated thereby, such as any supplementation, and all actions to be taken and undertakings to be made as contemplated therein).  On the Effective Date, the Reorganized Debtors are authorized to and shall enter into the Advisory Services Agreement with the Service Providers on the terms set forth in the Restructuring Support Agreement, pursuant to which the Service Providers shall provide transition services, advisory services, and operational services and assistance to the Reorganized Debtors as reasonably requested from time to time and shall release any and all Sponsor Claims.  The Advisory Services Agreement shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with it terms.

In exchange for such services and release, the Service Providers shall be entitled to receive from the Reorganized Debtors their Pro Rata Share of (a) the Option Rights, subject to dilution by the Warrants and Management Incentive Plan, (b) the Sponsor Warrant Package, and (c) 2.5% (in the aggregate) of the New Common Stock issued and outstanding as of the Effective Date, subject to dilution by the Warrants, the Option Rights, and Management Incentive Plan; *provided*, *however*, that Pro Rata Share with respect to the Advisory Services Agreement means 72.44% as to Apax and 27.56% as to Charlesbank.

D.    *Corporate Existence*

Except as otherwise provided in the Plan or the Restructuring Transactions Memorandum, each Debtor shall continue to exist as of the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval.

E.    *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of

22

the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

F.      *Cancellation of Agreements, Security Interests, and Other Interests*

On the Effective Date, except to the extent otherwise provided herein (including with respect to Unimpaired Claims and all Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan), all notes, instruments, certificates, and other documents evidencing Claims or Interests, including the Secured Lender Claims, Sponsor Claims, and the Interests in Holdings, shall be cancelled and the obligations of the Debtors or the Reorganized Debtors and any non-Debtor Affiliates thereunder or in any way related thereto shall be discharged, the Agents thereunder shall be discharged from all obligations thereunder, and all security interests and/or Liens granted under the ABL Facility, FILO Facility, First Lien Credit Facility, and Second Lien Credit Facility and/or any other Secured Claims shall be automatically released, discharged, terminated, and of no further force and effect; *provided* that, notwithstanding Confirmation or the occurrence of the Effective Date, any credit document or agreement that governs the rights of any Holder of a Claim or Interest shall continue in effect solely for purposes of (1) allowing Holders of Allowed Claims or Interests to receive distributions under the Plan and (2) allowing and preserving the rights of the Agents or representative of Holders of Claims or Interests, as applicable, to make distributions on account of Allowed Claims or Interests, as provided herein.

G.      *Sources for Plan Distributions and Transfers of Funds Among Debtors*

The Debtors shall fund distributions under the Plan with the proceeds of the Exit ABL Facility, the Exit New Money Facility, the New First Lien Term Loan, and the New Junior Loan, and by the issuance of the New Equity.  The Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement (including the Exit Facilities Documents, the New Equity Documents, the Warrants Documents, and any other documents, agreements, or instruments relating to the New Equity), shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

H.      *Stockholders Agreement*

On the Effective Date, the parent company of the Reorganized Debtors and the Holders of the New Equity shall enter into the Stockholders Agreement in substantially the form included in the Plan Supplement.  The Stockholders Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of the New Equity shall be bound thereby, in each case without the need for execution by any party thereto other than the parent company of the Reorganized Debtors.

I.      *Exemption from Registration Requirements*

The offering, issuance, and distribution of any Securities, including the New Equity, pursuant to the Plan (other than Securities issuable to the Service Providers or their affiliates), shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code.  Except as otherwise provided in the Plan or the governing certificates or instruments, any and all New Common Stock and Warrants issued under the Plan (other than Securities issuable to the Service Providers or their affiliates) will be freely tradable under the Securities Act by the recipients thereof, subject to:  (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments, including any such

restrictions in the Stockholders Agreement; (2) the restrictions, if any, on the transferability of such Securities and instruments; and (3) any other applicable regulatory approval.

The offering, issuance and distribution of New Common Stock, the Option Rights and the Sponsor Warrant Package to the Service Providers pursuant to the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act pursuant to section 4(a)(2) of the Securities Act and/or another exemption from registration under the Securities Act. Any and all such Securities shall be deemed "restricted securities" that may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act or an exemption from registration under the Securities Act is available and in compliance with any applicable state or foreign securities laws.

*J.    Organizational Documents*

Subject to Article V.D of this Plan, the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and provisions of the Plan. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the organizational documents of each of the Reorganized Debtors will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective organizational documents, and the Reorganized Debtors may file their respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the organization documents of each of the Reorganized Debtors.

*K.    Exemption from Certain Transfer Taxes and Recording Fees*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

*L.    Directors and Officers of the Reorganized Debtors*

1.    <u>The New Board</u>

The New Board will initially consist of the current chief executive officer and eight (8) other members who will be designated in accordance with the terms of the Restructuring Support Agreement and the Stockholders Agreement. The identity of the New Board members will be disclosed in the Plan Supplement or at or prior to the Confirmation Hearing to the extent not known. The existing directors of each of the Debtors' subsidiaries shall remain in their current capacities as directors of the applicable Reorganized Debtor, subject to the Restructuring Support Agreement, until replaced or removed in accordance with the organizational documents of the applicable Reorganized Debtors.

2.    <u>Senior Management</u>

On the Effective Date, the officers of the Reorganized Debtors shall be substantially the same and their employment shall be subject to the ordinary rights and powers of the New Board to remove or replace them in accordance with the Reorganized Debtors' organizational documents and any applicable employment agreements

that are assumed pursuant to the Plan; *provided*, *however*, that the Chief Financial Officer, Robert J. Riesbeck, is planning to depart after the Effective Date.

M.      *Directors and Officers Insurance Policies*

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity on or at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

N.      *Other Insurance Policies*

On the Effective Date, each of the Debtors' insurance policies in existence as of the Effective Date shall be Reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code and Article V of this Plan. Nothing in the Plan shall affect, impair, or prejudice the rights of the insurance carriers, the insureds, or the Reorganized Debtors under the insurance policies in any manner, and such insurance carriers, the insureds, and Reorganized Debtors shall retain all rights and defenses under such insurance policies.  The insurance policies shall apply to and be enforceable by and against the insureds and the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.

O.      *Preservation of Rights of Action*

In accordance with section 1123(b) of the Bankruptcy Code but subject to the releases set forth in Article IX of this Plan, all Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor on the Effective Date.  Thereafter, the Reorganized Debtors shall have the exclusive right, authority, and discretion to determine, initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, whether arising before or after the Petition Date, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  **Subject to the releases set forth in Article IX of this Plan, no Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any specific Cause of Action as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action.  The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan,** and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to any Cause of Action upon, after, or as a consequence of the Confirmation or the occurrence of the Effective Date.

P.      *Corporate Action*

Subject to the Restructuring Support Agreement, upon the Effective Date, all actions contemplated by the Plan and the Restructuring Transactions Memorandum shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, or officers of the Debtors, the Reorganized Debtors, or any other Entity, including: (1) assumption of Executory Contracts and Unexpired Leases; (2) selection of the directors, managers, and officers

for the Reorganized Debtors; (3) the execution of and entry into the Exit Facilities Documents, the New Equity Documents, the Warrants Documents, the Option Rights Documents, and the Advisory Services Agreement; (4) the issuance and distribution of the New Equity as provided herein; and (5) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the company structure of the Debtors and any company action required by the Debtors in connection therewith shall be deemed to have occurred on and shall be in effect as of the Effective Date without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtors.

On or prior to the Effective Date, the appropriate officers, directors, managers, or authorized persons of the Debtors (including any president, vice-president, chief executive officer, treasurer, general counsel, or chief financial officer thereof) shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Debtors or the Reorganized Debtors, as applicable, including (1) the Exit Facilities Documents the New Equity Documents, the Warrants Documents, the Option Rights Documents, and the Advisory Services Agreement and (2) any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

Q.      *Effectuating Documents; Further Transactions*

Prior to, on, and after the Effective Date, the Debtors and Reorganized Debtors and the directors, managers, officers, authorized persons, and members of the boards of directors or managers and directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of the Plan, the Exit Facilities Documents, the New Equity Documents, the Warrant Documents, the Option Rights Documents, the Advisory Services Agreement, and any securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to the Plan or the Restructuring Support Agreement.

R.      *Management Incentive Plan*

Effective as of the Effective Date, shares will be reserved for issuance under the Management Incentive Plan to directors, officers, and key employees of the Reorganized Debtors in accordance with the material terms set forth in the Restructuring Support Agreement and the term sheet agreed to between the Debtors and the Required Consenting First Lien Lenders. The Management Incentive Plan shall provide for no less than 10% of the New Common Stock to be reserved for issuance to management of the Reorganized Debtors on or following the Effective Date. The initial grants under the Management Incentive Plan will be in the form of restricted stock units, two-thirds of which will vest based on achievement of certain performance conditions to be determined by the New Board in good faith and set forth in the applicable award agreement, but in no event shall any performance condition require achievement of greater than EBITDA of $130 million, and one-third of which will vest ratably over four (4) years based on the passage of time.

S.      *Workers' Compensation Programs*

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under (1) all applicable workers' compensation laws in states in which the Reorganized Debtors operate and (2) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans, in each case, for workers' compensation and workers' compensation insurance. Any and all Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs, and plans; *provided*, *further*, that nothing herein

shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

## Article V.

## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES; EMPLOYEE BENEFITS; AND INSURANCE POLICIES

A.    *Assumption of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases shall be deemed assumed without the need for any further notice to or action, order, or approval of the Bankruptcy Court as of the Effective Date under section 365 of the Bankruptcy Code; *provided* that the Restructuring Support Agreement shall be deemed assumed as of the Confirmation Date; *provided, further*, that, upon the occurrence of the Effective Date, the Restructuring Support Agreement will terminate in accordance with its terms.

Entry of the Confirmation Order shall constitute a Bankruptcy Court Final Order approving the assumption or assumption and assignment, as applicable, of such Executory Contracts or Unexpired Leases as set forth in the Plan, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, the assumption or assumption and assignment of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or a Bankruptcy Court Final Order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified in the Plan or any Final Order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, purports to restrict or prevent, or is breached or deemed breached by the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

B.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Bankruptcy Court shall hear such dispute prior to the assumption becoming effective.  The cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption and shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and payment of the applicable cure amount shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any proof of claim filed with respect to an Executory Contract or Unexpired Lease that is assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.**

C.    *Contracts and Leases Entered into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

D.    *Indemnification and Reimbursement Obligations*

On and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan, and the Reorganized Debtors' governance documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' current and former directors, officers, employees, and agents to the fullest extent permitted by law and at least to the same extent as the certificate of incorporation, bylaws, or similar organizational documents of each of the respective Debtors as of the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed, or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted. None of the Reorganized Debtors shall amend and/or restate its certificate of incorporation, bylaws, or similar organizational document before or after the Effective Date to terminate or materially adversely affect (1) any of the Reorganized Debtors' obligations referred to in the immediately preceding sentence or (2) the rights of such managers, directors, officers, employees, or agents referred to in the immediately preceding sentence. Notwithstanding anything to the contrary herein, the Reorganized Debtors shall not be required to indemnify the Debtors' managers, directors, officers, or employees for any claims or Causes of Action for which indemnification is barred under applicable law, the Debtors' organizational documents, or applicable agreements governing the Debtors' indemnification obligations.

On and as of the Effective Date, any of the Debtors' indemnification obligations with respect to any contract or agreement that is the subject of or related to any litigation against the Debtors or Reorganized Debtors, as applicable, shall be assumed by the Reorganized Debtors and otherwise remain unaffected by the Chapter 11 Cases; *provided* that the Reorganized Debtors shall not indemnify the Debtors' directors for any claims or causes of action for which indemnification is barred under applicable law, the Debtors' organizational documents, or applicable agreements governing the Debtors' indemnification obligations.

E.    *Employee Compensation and Benefits*

1.    Compensation and Benefits Programs

Subject to the provisions of the Plan and the Restructuring Support Agreement, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code; *provided that* (a) with respect to management, any provision relating to equity-based awards, including any termination-related provisions with respect to equity based awards, will be replaced and superseded in its entirety by the Management Incentive Plan, and (b) the insider and non-insider cash-based incentive compensation plans for fiscal year 2019 and the pre-filing key employee retention plan and non-insider retention plan will be assumed as modified under the Restructuring Support Agreement. The Reorganized Debtors shall honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order.

Any assumption of Compensation and Benefits Programs pursuant to the terms herein shall not be deemed to trigger any applicable change of control, immediate vesting, termination, or similar provisions therein. No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

2.        The Collective Bargaining Agreement

The Debtors' Collective Bargaining Agreement shall be treated as and deemed to be an Executory Contract under the Plan.  On the Effective Date, the Debtors shall be deemed to have assumed the Collective Bargaining Agreement and all obligations therein.

F.        *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease.

G.        *Reservation of Rights*

Except with respect to the Restructuring Support Agreement, nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have thirty (30) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date.

H.        *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

**Article VI.**

**PROVISIONS GOVERNING DISTRIBUTIONS**

A.        *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall distribute the full amount of the distributions that the Plan provides for the ABL Claims, FILO Claims, First Lien Claims, and Second Lien Claims, and all other Holders of Allowed Claims or Interests shall receive on the Effective Date (or, if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the date that such Claim becomes an Allowed Claim or Interest) or as soon as reasonably practicable thereafter (or, in the case of Allowed General Unsecured Claims, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claims), the full amount of the distributions that the Plan provides for such Allowed Claims or Interests, in each applicable Class, and in the manner provided in the Plan.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.  If and to the extent that there are any Disputed Claims or Interests, distributions on account of any such Disputed Claims or Interests shall be made pursuant to the provisions set forth in Article VII of this Plan.

B.   *Delivery of Distributions*

1.   Delivery of Distributions on Account of DIP Facility Claims

The DIP Agent (if any) shall be deemed to be the Holder of any and all DIP Facility Claims (if incurred) for purposes of distributions to be made hereunder, and any distributions on account of such DIP Facility Claims shall be made to the DIP Agent (if any).  As soon as practicable following compliance with the requirements set forth in Article VI of this Plan, the DIP Agent (if any) shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of DIP Facility Claims in accordance with the terms of the DIP Facility, subject to any modifications to such distributions in accordance with the terms of the Plan.  Notwithstanding anything in the Plan to the contrary and without limiting the exculpation and release provisions of the Plan, the DIP Agent (if any) shall not have any liability to any Entity with respect to distributions made or directed to be made by the DIP Agent.

2.   Delivery of Distributions on Account of ABL Claims and FILO Claims

The ABL Agent shall be deemed to be the Holder of all Allowed ABL and FILO Claims for purposes of distributions to be made hereunder, and all distributions on account of such Allowed Claims shall be made to the ABL Agent.  As soon as practicable following compliance with the requirements set forth in Article VI of this Plan, if applicable, the ABL Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed ABL and FILO Claims in accordance with the terms of the ABL Credit Agreement and the Plan.  Notwithstanding anything in the Plan to the contrary and without limiting the exculpation and release provisions of the Plan, the ABL Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the ABL Agent.

3.   Delivery of Distributions on Account of First Lien Claims and Second Lien Claims

The First Lien Agent shall be deemed to be the Holder of all Allowed First Lien Claims, and the Second Lien Agent shall be deemed to be the Holder of all Allowed Second Lien Claims for purposes of distributions to be made hereunder, and all distributions on account of such Allowed Claims shall be made to or at the direction of the applicable Agent.  As soon as practicable following compliance with the requirements set forth in Article VI of this Plan, the First Lien Agent and Second Lien Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed First Lien and Second Lien Claims, as applicable, in accordance with the terms of the First Lien Credit Agreement, Second Lien Credit Agreement, and the Plan.  Notwithstanding anything in the Plan to the contrary and without limiting the exculpation and release provisions of the Plan, the First Lien Agent and Second Lien Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the First Lien Agent or the Second Lien Agent.

4.   Distributions by Distribution Agents

The Debtors and the Reorganized Debtors, as applicable, shall have the authority to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder.  To the extent the Debtors and the Reorganized Debtors, as applicable, determine to utilize a Distribution Agent to facilitate the distributions under the Plan to Holders of Allowed Claims, any such Distribution Agent would first be required to:  (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan; (c) waive any right or ability to setoff, deduct from, or assert any lien or encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent; and (d) post a bond, obtain a surety, or provide some other form of security for the performance of its duties, and the costs and expenses of procuring such forms of security shall be borne by the Debtors or the Reorganized Debtors, as applicable.

The Debtors or the Reorganized Debtors, as applicable, shall pay to the Distribution Agents all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions, or consents.  The Distribution Agents shall submit detailed invoices to the Debtors or the Reorganized Debtors, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement, and the Debtors or the Reorganized Debtors, as applicable, shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Reorganized

Debtors, as applicable, deem to be unreasonable. In the event that the Debtors or the Reorganized Debtors, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtors or the Reorganized Debtors, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses. In the event that the Debtors or the Reorganized Debtors, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

     5.     <u>Minimum Distributions</u>

Notwithstanding anything herein to the contrary, the Reorganized Debtors and the Distribution Agents shall not be required to make distributions or payments of less than $100 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars. Whenever any payment or distribution of a fraction of a dollar or fractional share of New Equity under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar or share of New Equity (up or down), with half dollars and half shares of New Equity or less being rounded down. The total number of authorized shares of New Common Stock or of the Warrants, as applicable, shall be adjusted as necessary to account for the foregoing rounding.

     6.     <u>Undeliverable Distributions</u>

If any distribution to a Holder of an Allowed Claim made in accordance herewith is returned to the Reorganized Debtors (or their Distribution Agent) as undeliverable, no further distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time such undelivered distribution shall be made to such Holder within ninety (90) days of receipt of such Holder's then-current address or other necessary information; *provided* that any such undelivered distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the later of (a) the Effective Date and (b) the date of the initial attempted distribution. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable non-bankruptcy escheat, abandoned, or unclaimed property laws to the contrary), and the right, title, and interest of any Holder to such property or interest in property shall be discharged and forever barred.

*C.*     *Manner of Payment*

At the option of the Distribution Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

*D.*     *No Postpetition or Default Interest on Claims*

Unless otherwise specifically provided for in the Plan or the Confirmation Order and notwithstanding any documents that govern the Debtors' prepetition indebtedness to the contrary, (1) postpetition and/or default interest shall not accrue or be paid on any Claims, and (2) no Holder of a Claim shall be entitled to (a) interest accruing on or after the Petition Date on any such Claim or (b) interest at the contract default rate, each as applicable.

*E.*     *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the Debtors, Reorganized Debtors, and other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, Reorganized Debtors, and other applicable withholding and reporting agents and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors,

Reorganized Debtors, and other applicable withholding agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances. For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

F.      *Surrender of Cancelled Instruments or Securities*

On the Effective Date, each Holder of a certificate or instrument evidencing a Claim or an Equity Interest shall be deemed to have surrendered such certificate or instrument to the Distribution Agent. Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Equity Interest, which shall continue in effect for purposes of allowing Holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan.

G.      *Claims Paid or Payable by Third Parties*

1.      Claims Payable by Insurance

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.

2.      Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**Article VII.**

**PROCEDURES FOR RESOLVING UNLIQUIDATED
AND DISPUTED CLAIMS OR EQUITY INTERESTS**

A.      *Allowance of Claims and Interests*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Equity Interest immediately prior to the Effective Date. This Article VII shall not apply to the DIP Facility Claims and the Secured Claims, which Claims shall be Allowed in full and will not be subject to any avoidance, reductions, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or Entity. All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

B.      *Proofs of Claim*

Holders of Claims and Interests need not file a Proof of Claim with the Bankruptcy Court and shall be subject to the Bankruptcy Court process only to the extent provided in the Plan. On and after the Effective Date, except as otherwise provided in the Plan, all Allowed Claims shall be satisfied in the ordinary course of business of the Reorganized Debtors. The Debtors and the Reorganized Debtors, as applicable, shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan. If the Debtors or Reorganized Debtors dispute any Claim or Interest, such dispute shall be determined,

resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; *provided* that the Debtors or Reorganized Debtors may elect, at their sole option, to object to any Claim (other than Claims expressly Allowed by the Plan) and to have the validity or amount of any Claim adjudicated by the Bankruptcy Court; *provided, further*, that Holders of Claims and Administrative Claims may elect to resolve the validity or amount of any Claim in the Bankruptcy Court.  If a Holder makes such an election, the Bankruptcy Court shall apply the law that would have governed the dispute if the Chapter 11 Cases had not been filed.  All Proofs of Claim filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  On the Effective Date, all Proofs of Claim filed against the Debtors, regardless of when such Proofs of Claim were filed, including Proofs of Claims filed after the Effective Date, shall be deemed withdrawn.

C.      Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority to (1) file, withdraw, or litigate to judgment, any objections to Claims or Interests and (2) settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to the Plan.

D.      Estimation of Claims and Interests

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged but that either is subject to appeal or has not been the subject of a Final Order shall be deemed to be estimated at zero ($0.00) dollars unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

E.      Adjustment to Claims Without Objection

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged by the Reorganized Debtors without the Reorganized Debtors having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest, and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.      Disallowance of Certain Claims

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code unless expressly Allowed pursuant to the Plan, and Holders of such Claims may not receive any distributions on account of such Claims and Interests until such time as such Causes of Action against that Entity have been settled or a Final Order of the Bankruptcy Court with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors.

G.      *No Distributions Pending Allowance*

Notwithstanding any other provision hereof, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

H.      *Distributions After Allowance*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

I.      *No Interest*

Interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim if and when such Disputed Claim becomes an Allowed Claim.

## Article VIII.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A.      *Conditions Precedent to the Effective Date*

The following are conditions precedent to the Effective Date that must be satisfied or waived in accordance with the terms of the Restructuring Support Agreement and the Plan:

1.      The Bankruptcy Court shall have approved the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

2.      The Confirmation Order shall have been entered and shall be in full force and effect and such Confirmation Order shall be a Final Order.

3.      The Debtors shall have obtained any authorization, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring Transactions.

4.      All actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws.

5.      All conditions precedent to the effectiveness of the Exit Facilities Documents shall have been satisfied contemporaneously or duly waived.

6.      All conditions precedent to the issuance of the New Common Stock, including the Warrants and in accordance with the Option Rights and the Management Incentive Plan, shall have been satisfied or duly waived.

7.      The Shareholders Agreement shall have been executed by all parties thereto as provided under the Plan.

8.      All documents and agreements necessary to implement the Plan shall have been executed and tendered for delivery.  All conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms thereof (or will be satisfied and waived substantially concurrently with the occurrence of the Effective Date).

9.      The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein and all other schedules, documents, supplements, and exhibits to the Plan shall be consistent with the Restructuring Support Agreement and Article I.E of this Plan.

10.      All of the other Definitive Documents not expressly set forth in Article VIII of this Plan shall have been executed in accordance with section 2 of the Restructuring Support Agreement and Article I.E of this Plan.

11.      The Restructuring Support Agreement shall not have been terminated in accordance with its terms and shall be in full force and effect.

12.      The Professional Fee Escrow Account shall have been established and funded.

13.      All Accrued Professional Compensation Claims and expenses of Retained Professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court.

14.      The First Lien Early Acceptance Premium shall have been paid in Cash in full on or before the Effective Date in accordance with the terms of the Restructuring Support Agreement and Article II.B of this Plan.

15.      All invoiced reasonable and documented fees and out-of-pocket expenses payable pursuant to section 27(b) of the Restructuring Support Agreement, Article II.A.2.d of this Plan, or an order of the Bankruptcy Court shall have been paid in full.

16.      The Debtors shall have provided to the Consenting First Lien Lenders or their advisors all reasonably requested financial information as of the Effective Date.

17.      The Debtors and Reorganized Debtors, as applicable, shall have implemented the restructuring in a manner consistent in all respects with the Plan and the Restructuring Support Agreement.

B.      *Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur on or before the termination of the Restructuring Support Agreement, then (1) the Plan shall be null and void in all respects, (2) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected under the Plan, and document or agreement executed pursuant to the Plan shall be deemed null and void, and (3) nothing contained in the Plan, the Confirmation Order, or the Disclosure Statement shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of the Debtors or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

C.      *Waiver of Conditions*

The Debtors or the Reorganized Debtors, as applicable, subject to the Restructuring Support Agreement, may waive any of the conditions to the Effective Date set forth above at any time, without any notice to parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court and without any formal action other than a proceeding to confirm the Plan.

## Article IX.

## RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the Plan, the distributions, rights, and treatments that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Interests and Claims of any nature whatsoever, including any interest accrued on Claims from and after the Petition

Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Debtors, the Reorganized Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest is Allowed; or (3) the Holder of such Claim or Interest has accepted the Plan.  Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.  For the avoidance of doubt, nothing in this Article IX.A shall affect the rights of Holders of Claims and Interests to seek to enforce the Plan, including the distributions to which Holders of Allowed Claims and Interests are entitled under the Plan.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities.

**B.      *Releases by the Debtors***

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY IS DEEMED RELEASED AND DISCHARGED BY THE DEBTORS, THE REORGANIZED DEBTORS, AND THEIR ESTATES FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED ON BEHALF OF THE DEBTORS, THAT THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS COUNTERCLAIMS OR DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTORS), INTERCOMPANY TRANSACTIONS, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY (IF ANY), THE PLAN, THE PLAN SUPPLEMENT, THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR**

OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN OR (B) ANY INDIVIDUAL FROM ANY CLAIM OR CAUSES OF ACTION RELATED TO AN ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (A) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING AND IMPLEMENTING THE PLAN; (B) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (C) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (D) FAIR, EQUITABLE, AND REASONABLE; (E) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (F) A BAR TO ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE DEBTORS' ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

C.      *Releases by the Releasing Parties*

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR, AND RELEASED PARTY FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED ON BEHALF OF THE DEBTORS, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS (BUT EXCLUDING AVOIDANCE ACTIONS BROUGHT AS COUNTERCLAIMS OR DEFENSES TO CLAIMS ASSERTED AGAINST THE DEBTORS), INTERCOMPANY TRANSACTIONS, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN

37

SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN OR (B) ANY INDIVIDUAL FROM ANY CLAIM OR CAUSES OF ACTION RELATED TO AN ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS: (A) CONSENSUAL; (B) ESSENTIAL TO THE CONFIRMATION OF THE PLAN; (C) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (D) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE; (E) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (F) FAIR, EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

D.      *Exculpation*

SUBJECT TO SECTION 1125(E) OF THE BANKRUPTCY CODE, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, NO EXCULPATED PARTY SHALL HAVE OR INCUR LIABILITY FOR AND EACH EXCULPATED PARTY IS RELEASED AND EXCULPATED FROM ANY CAUSE OF ACTION FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT AND RELATED PREPETITION TRANSACTIONS, THE DIP FACILITY (IF ANY), THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DIP FACILITY (IF ANY), THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE CHAPTER 11 CASES, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN.

THE EXCULPATED PARTIES HAVE, AND UPON CONFIRMATION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF VOTES AND DISTRIBUTION OF CONSIDERATION PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE EXCULPATION SET FORTH ABOVE DOES NOT RELEASE OR EXCULPATE ANY CLAIM RELATING TO ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.

E.      *Injunction*

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT:  (A) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (B) HAVE BEEN RELEASED PURSUANT TO ARTICLE IX.B OF THIS PLAN; (C) HAVE BEEN RELEASED PURSUANT TO ARTICLE IX.C OF THIS PLAN, (D) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE IX.D OF THIS PLAN (BUT ONLY TO THE EXTENT OF THE EXCULPATION PROVIDED IN ARTICLE IX.D OF THIS PLAN), OR (E) ARE OTHERWISE DISCHARGED, SATISFIED, STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY ACTION OR OTHER PROCEEDING, INCLUDING ON ACCOUNT OF ANY CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR ANY ENTITY SO RELEASED OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO RELEASED OR EXCULPATED) ON ACCOUNT OF, OR IN CONNECTION WITH OR WITH RESPECT TO, ANY DISCHARGED, RELEASED, SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES.**

F.      *Setoffs and Recoupment*

Except as otherwise provided herein, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of an Allowed Claim may setoff or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan, a Final Order or otherwise); *provided* that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action.

G.      *Release of Liens*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns.

To the extent that any Holder of a Secured Claim has had such Claim satisfied or discharged in full pursuant to the Plan or any agent for such Holder has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or any administrative agent under the Exit Facilities Documents that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

## Article X.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters related to: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Cure Claims arising therefrom, including Cure or Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.      Resolve any cases, controversies, suits, or disputes that may arise in connection with General Unsecured Claims, including establishment of a bar date, related notice, claim objections, allowance, disallowance, estimation and distribution;

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.      Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.      Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;

12.      Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.      Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by any Holder of a Claim or Interest for amounts not timely repaid;

14.      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.      Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, or the Confirmation Order;

16.      Enter an order or final decree concluding or closing the Chapter 11 Cases;

17.      Adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.      Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.      Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.      Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order;

21.      Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.      Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

23.      Enforce all orders previously entered by the Bankruptcy Court; and

24.      Hear any other matter not inconsistent with the Bankruptcy Code.

## Article XI.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN

A.      *Modification of Plan*

Subject to the limitations contained in the Plan, the Debtors reserve the right, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement (1) to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code and the Restructuring Support Agreement, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

B.      *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation of Plan*

Subject to the conditions to the Effective Date, the Debtors reserve the right, subject to the terms of the Restructuring Support Agreement, to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan with the prior reasonable consent of the Required Parties, if entry of the Confirmation Order or the Effective Date does not occur, or if the Restructuring Support Agreement terminates in accordance with its terms, then (1) the Plan shall be null and void in all respects, (2) any settlement or compromise embodied in the Plan, assumption of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void, and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any claims by or against or any Equity

Interests in such Debtor or any other Entity, (b) prejudice in any manner the rights of the Debtors or any other Entity, or (c) constitute an admission of any sort by the Debtors or any other Entity.

## Article XII.

## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the documents and instruments contained in the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims and Interests (irrespective of whether such Holders of Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases.  The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rule 3020(e), 6004(g), and 7062.

B.      *Additional Documents*

On or before the Effective Date and in accordance with the Restructuring Support Agreement and Article I.E of this Plan, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

C.      *Reservation of Rights*

The Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

D.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

E.      *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or Reorganized Debtors, as applicable, shall also be served on or delivered to:

| Debtors | Proposed Counsel to the Debtors |
|---------|--------------------------------|
| FullBeauty Brands Holdings Corp.<br>One New York Plaza<br>New York, New York 10004<br>Attn.: Chief Executive Officer and Chief Legal Officer | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn.: Jonathan S. Henes, P.C., George Klidonas, and Rebecca Blake Chaikin |
| FullBeauty Brands Holdings Corp.<br>50 Main Street, Suite 1000<br>White Plains, New York 10606<br>Attn.: Chief Executive Officer and Chief Legal Officer | Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Attn.: Emily E. Geier |

| United States Trustee | Counsel to the Ad Hoc Group of First Lien Lenders |
|----------------------|--------------------------------------------------|
| Office of the United States Trustee<br>for the Southern District of New York<br>201 Varick Street, Suite 1006<br>New York, New York 10014 | Milbank, Tweed, Hadley & McCloy LLP<br>28 Liberty Street<br>New York, New York 10005<br>Attn.: Dennis F. Dunne, Gerard Uzzi, Nelly Almeida, and Jason T. Anderson |

| Counsel to the<br>Ad Hoc Group of Second Lien Lenders | Counsel to the Sponsors |
|------------------------------------------------------|------------------------|
| Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, New York 10019<br>Attn.: Paul M. Basta, Elizabeth R. McColm, Christopher Hopkins, and Alice Nofzinger | If to Apax:<br><br>Simpson Thacher & Bartlett LLP<br>425 Lexington Avenue<br>New York, New York 10017<br>Attn.: Elisha D. Graff and Nicholas E. Baker<br><br>If to Charlesbank:<br><br>Goodwin Procter LLP<br>The New York Times Building<br>620 Eighth Avenue<br>New York, New York 10018<br>Attn.: William P. Weintraub<br><br>and<br><br>Goodwin Procter LLP<br>100 Northern Avenue<br>Boston, Massachusetts 02210<br>Attn: Joseph F. Bernardi, Jr. |

After the Effective Date, the Debtors or Reorganized Debtors, as applicable, have authority to send a notice to Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

In accordance with Bankruptcy Rules 2002 and 3020(e), within fourteen (14) calendar days of the date of entry of the Confirmation Order, the Debtors shall serve the Notice of Confirmation by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties served with the Confirmation Hearing notice; *provided* that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Confirmation Hearing notice but received such notice returned marked "undeliverable as

addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason unless the Debtors or Reorganized Debtors, as applicable, have been informed in writing by such Entity or are otherwise aware of that Entity's new address. To supplement the notice described in the preceding sentence, within (21) twenty-one calendar days of the date of the Confirmation Order, the Debtors or Reorganized Debtors, as applicable, shall publish the Notice of Confirmation once in *The Wall Street Journal* and *Financial Times (International Edition)*. Mailing and publication of the Notice of Confirmation in the time and manner set forth in the this paragraph shall be good and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(e), and no further notice is necessary.

F.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

G.    *Entire Agreement*

On the Effective Date, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

H.    *Plan Supplement Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. Copies of such exhibits and documents shall be made available upon written request to the Debtors' proposed counsel at the address above or by downloading such exhibits and documents from https://cases.primeclerk.com/fullbeauty or the Bankruptcy Court's website at www.nysb.uscourts.gov. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control. The documents considered in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

I.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to Debtors or Reorganized Debtors, as applicable, not incorporated in Delaware shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

J.    *Nonseverability of Plan Provisions upon Confirmation*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided* that any such alteration or interpretation shall be reasonably acceptable to the Required Parties and otherwise consistent with Article I.E of this Plan. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is the following: (a) valid and enforceable pursuant to

its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or Reorganized Debtors, as applicable; and (c) nonseverable and mutually dependent.

K.       *Closing of Chapter 11 Cases*

The Reorganized Debtors shall promptly file, after the full administration of the Chapter 11 Cases, with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

L.       *Section 1125(e) Good Faith Compliance*

The Debtors, the Reorganized Debtors, the Agents, the Secured Lenders, the DIP Lenders (if any), and the Sponsors, and each of their respective Representatives shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

Respectfully submitted, as of the date first set forth above,

**FULLBEAUTY Brands Holdings Corp. (on behalf of itself
and all other Debtors)**

By:      */s/ Robert J. Riesbeck*

Name:   Robert J. Riesbeck

Title:    Chief Financial Officer

## EXHIBIT B

**Restructuring Support Agreement**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE RSA EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, and including any exhibits, schedules, or annexes attached hereto, this "*Agreement*"), dated as of  December 18, 2018, is entered into by and among the following parties:

(a)     Blackdog Holdings, Inc. ("*Holdings*"), FULLBEAUTY Brands Holdings Corp., ("*FULLBEAUTY*"), and each of their subsidiaries that executes this Agreement, which are listed on Annex 1 to the Term Sheet (as defined below) (together with Holdings and FULLBEAUTY, collectively, the "*Company*");

(b)     Blackdog Topco Holdings, L.P. ("*Topco*");

(c)     Apax VIII-B L.P., Apax VIII-A L.P., Apax VIII-AIV A L.P., Apax VIII-AIV B, L.P., Apax VIII-2 L.P. and Apax VIII-1 L.P.(collectively, "*Apax*") and Charlesbank Equity Fund VII, Limited Partnership, CB Offshore Equity Fund VII, L.P., CB Parallel Fund VII, Limited Partnership, Charlesbank Equity Coinvestment Fund VII, Limited Partnership and Charlesbank Coinvestment Partners, Limited Partnership ("*Charlesbank*" and, together with Apax, collectively, the "*Sponsors*");

(d)     the undersigned entities that are FILO Lenders under the ABL Credit Agreement (each as defined below) (the "*Consenting FILO Lenders*");

(e)     the undersigned entities that are lenders under the First Lien Credit Agreement (as defined below) (the "*Consenting First Lien Lenders*"); and

(f)     the undersigned entities that are lenders under the Second Lien Credit Agreement (as defined below) (the "*Consenting Second Lien Lenders*" and, together with the Consenting FILO Lenders and the Consenting First Lien Lenders, collectively, the "*Consenting Lenders*").

Each of the Company, Topco, the Sponsors, the Consenting FILO Lenders, the Consenting First Lien Lenders, the Consenting Second Lien Lenders, and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof, are referred to as the "*Parties*" and individually as a "*Party*."

## Recitals

WHEREAS, to preserve the going concern value of the Company and maximize distributions to the Company's stakeholders, the Parties have, in good faith and at arm's length, negotiated and agreed to certain restructuring transactions with respect to the Company's capital structure that will be implemented consistent with the terms and conditions set forth herein and in the term sheet attached hereto as **Exhibit A** (together with any schedules, annexes, and exhibits attached thereto, and as may be modified in accordance with Section 12 hereof, the "***Term Sheet***" and the transactions described in this Agreement and the Term Sheet, collectively, the "***Restructuring***");[1]

WHEREAS, the Company shall commence voluntary cases (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***") to pursue and implement the Restructuring pursuant to a "prepackaged" chapter 11 plan that is subject to the terms and conditions set forth in this Agreement and otherwise in form and substance acceptable to the Parties as set forth herein (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof and including any exhibits and schedules thereto, the "***Plan***") and the supplement thereto (the "***Plan Supplement***");

WHEREAS, as of the date hereof, the Sponsors hold, in the aggregate, 95.5 percent of the issued, outstanding, and vested shares of Topco;

WHEREAS, as of the date hereof, the Consenting FILO Lenders hold, in the aggregate, 100 percent of the aggregate principal amount of outstanding FILO Loans under the ABL Credit Agreement;

WHEREAS, as of the date hereof, the Consenting First Lien Lenders hold, in the aggregate, approximately 41 percent of the aggregate principal amount of outstanding loans under the First Lien Credit Agreement;

WHEREAS, as of the date hereof, the Consenting Second Lien Lenders hold, in the aggregate, approximately 67.3 percent of the aggregate principal amount of outstanding loans under the Second Lien Credit Agreement;

WHEREAS, the Eligible First Lien Lenders will be entitled to receive their pro rata share of the First Lien Early Acceptance Premium pursuant to the terms set forth in Section 27(a); and

WHEREAS, the Parties agree that this Agreement, the Term Sheet, and the Restructuring are the product of arm's-length and good-faith negotiations among all of the Parties.

---

[1]   Capitalized terms used but not defined in this Agreement have the meanings set forth in the Term Sheet.

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

**Agreement**

**Section 1.**        **Definitions and Interpretation.**

As used in this Agreement, the following terms have the following meanings:

(a)        "*100% Condition*" means  the execution of this Agreement by (i) FILO Lenders who hold, in the aggregate, one hundred (100) percent in principal amount outstanding of all FILO Claims, (ii) First Lien Lenders who hold, in the aggregate, one hundred (100) percent in principal amount outstanding of all First Lien Claims, and (iii) Second Lien Lenders who hold, in the aggregate, one hundred (100) percent in principal amount outstanding of all Second Lien Claims.

(b)        "*ABL Agent*" means JPMorgan Chase Bank, N.A. in its capacity as administrative agent and collateral agent under the ABL Credit Agreement.

(c)        "*ABL Claims*" means all claims derived from, based upon, or secured by the ABL Credit Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto, in each case, with respect to the ABL Loans.

(d)        "*ABL Credit Agreement*" means that certain ABL Credit Agreement, dated October 14, 2015 (as amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms), by and among FULLBEAUTY, as lead borrower, Holdings, each of the other borrowers party thereto, the ABL Agent, the ABL Lenders, and the FILO Lenders.

(e)        "*ABL Lenders*" means the lenders party to the ABL Credit Agreement with respect to the ABL Loans.

(f)        "*ABL Loans*" means the "Loans" and "Letters of Credit" as defined in the ABL Credit Agreement (other than the FILO Loans).

(g)        "*Ad Hoc Group of First Lien Lenders*" means the ad hoc group of Consenting First Lien Lenders represented by Milbank.

(h)        "*Ad Hoc Group of Second Lien Lenders*" means the ad hoc group of Consenting Second Lien Lenders represented by Paul Weiss, holding as of the date hereof, in the aggregate, approximately 67.3 percent of the aggregate principal amount of outstanding loans under Second Lien Credit Agreement.

(i)     "***Board of Directors***" means with respect to any entity, its board of directors, board of managers, managing member, general partner, or other governing body constituted pursuant to its governing documents.

(j)     "***Data Site***" means the virtual data rooms maintained by the Company for (i) the First Lien Lenders pursuant to the terms of the First Lien Credit Agreement and (ii) the Second Lien Lenders pursuant to the terms of the Second Lien Credit Agreement.

(k)     "***Ducera***" means Ducera Partners LLC, as financial advisor to the Ad Hoc Group of First Lien Lenders.

(l)     "***Exit Term Facility***" means that certain exit term loan facility in accordance to the terms and conditions set forth in **Exhibit D** to this Agreement.

(m)     "***FILO Claims***" means all claims derived from, based upon, or secured by the ABL Credit Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto, in each case, with respect to the FILO Loans.

(n)     "***FILO Lenders***" means the lenders party to the ABL Credit Agreement with respect to the FILO Loans.

(o)     "***FILO Loans***" means the "First Amendment FILO Tranche Loans" as defined in the ABL Credit Agreement.

(p)     "***First Lien Agent***" means Wilmington Savings Fund Society, FSB, in its capacity as successor administrative agent and collateral agent under the First Lien Credit Agreement.

(q)     "***First Lien Claims***" means all claims derived from, based upon, or secured by the First Lien Credit Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto.

(r)     "***First Lien Credit Agreement***" means that certain First Lien Term Loan Credit Agreement, dated October 14, 2015 (as amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms), by and among FULLBEAUTY, as borrower, Holdings, the First Lien Agent, and the First Lien Lenders.

(s)     "***First Lien Lenders***" means the lenders party to the First Lien Credit Agreement.

(t)     "***Goodwin***" means Goodwin Procter LLP, as counsel to Charlesbank.

(u)     "***Houlihan Lokey***" means Houlihan Lokey Capital Inc., as financial advisor to the Ad Hoc Group of Second Lien Lenders.

4

(v)     "*Kirkland*" means, collectively, Kirkland & Ellis LLP and Kirkland & Ellis International LLP, as counsel to the Company.

(w)     "*Lender Claims*" means, collectively, FILO Claims, First Lien Claims, and Second Lien Claims.

(x)     "*Milbank*" means Milbank, Tweed, Hadley, & McCloy LLP, as counsel to the Ad Hoc Group of First Lien Lenders.

(y)     "*Paul Weiss*" means Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the Ad Hoc Group of Second Lien Lenders.

(z)     "*Required Consenting FILO Lenders*" means the Consenting FILO Lenders who hold, in the aggregate, greater than fifty (50) percent in principal amount outstanding of all FILO Claims held by the Consenting FILO Lenders.

(aa)    "*Required Consenting First Lien Lenders*" means Consenting First Lien Lenders who hold, in the aggregate, greater than fifty (50) percent in principal amount outstanding of all First Lien Claims held by Consenting First Lien Lenders that are (or whose managers or investment managers are) members of the Ad Hoc Group of First Lien Lenders.

(bb)    "*Required Consenting Lenders*" means, collectively, the Required Consenting FILO Lenders, the Required Consenting First Lien Lenders, and the Required Consenting Second Lien Lenders.

(cc)    "*Required Consenting Second Lien Lenders*" means Consenting Second Lien Lenders that hold, in the aggregate, greater than fifty (50) percent in principal amount outstanding of all Second Lien Claims held by Consenting Second Lien Lenders that are (or whose managers or investment managers are) members of the Ad Hoc Group of Second Lien Lenders; *provided* that any Second Lien Claims held by a Sponsor or its controlled affiliates shall not be counted or considered, in either the numerator or denominator, for the purposes of determining Required Consenting Second Lien Lenders under this Agreement.

(dd)    "*Required Consenting Sponsor*" means Apax.

(ee)    "*Required Parties*" means, collectively, the Company, the Required Consenting Sponsor, and the Required Consenting Lenders.

(ff)    "*Restructuring Effective Date*" means the date upon which the Restructuring is consummated.

(gg)    "*RSA Effective Date*" means the date upon which this Agreement shall become effective, and the obligations contained herein shall become binding upon the Parties, which date shall be the first date that this Agreement has been executed and delivered by all of (i) the Company, (ii) Topco, (iii) the Sponsors, (iv) the

5

members of the Steering Committee, and (v) the members of the Ad Hoc Group of Second Lien Lenders.

(hh)   "***Second Lien Agent***" means the administrative agent and collateral agent under the Second Lien Credit Agreement.

(ii)   "***Second Lien Claims***" means all claims derived from, based upon, or secured by the Second Lien Credit Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto.

(jj)   "***Second Lien Credit Agreement***" means that certain Second Lien Term Loan Credit Agreement, dated October 14, 2015 (as amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms), by and among FULLBEAUTY, as borrower, Holdings, the Second Lien Agent, and the Second Lien Lenders.

(kk)   "***Second Lien Lenders***" means the lenders party to the Second Lien Credit Agreement.

(ll)   "***Simpson Thacher***" means Simpson Thacher & Bartlett LLP, as counsel to Apax.

(mm)   "***Steering Committee***" means the Steering Committee of the Ad Hoc Group of First Lien Lenders, holding as of the date hereof, in the aggregate, approximately 41 percent of the aggregate principal amount of outstanding loans under the First Lien Credit Agreement.

(nn)   "***Support Period***" means, with respect to any Party, the period commencing on the RSA Effective Date applicable to such Party and ending on the date on which this Agreement is terminated in accordance with <u>Section 7</u>.

This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof shall not be effective in regard to the interpretation hereof.  For purposes of this Agreement:

(a)   in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural;

(b)   capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)   unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

6

(d)     unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)     unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)     the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)     captions and headings to Sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement;

(h)     references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company laws; and

(i)     the use of "include" or "including" is without limitation, whether stated or not.

**Section 2.     Definitive Documents.**

(a)     The definitive documents with respect to the Restructuring (collectively, the "***Definitive Documents***") shall include all documents (including any related orders, agreements, instruments, schedules, or exhibits) that are contemplated by this Agreement and that are otherwise necessary to implement, or otherwise relate to the Restructuring, including, without limitation, to the extent applicable:

(i)     the agreement with respect to the Exit ABL Facility and any agreements, intercreditor agreements, commitment letters, documents, or instruments related thereto;

(ii)     the agreement with respect to the Exit Term Facility and any agreements, commitment letters, documents, or instruments related thereto;

(iii)     the agreements, documents, or instruments related to the New First Lien Term Loan and any agreements, intercreditor agreements, commitment letters, documents, or instruments related thereto (collectively, the "***New First Lien Term Loan Documents***");

(iv)     the agreements, documents, or instruments related to the New Junior Loan and any agreements, intercreditor agreements (if any), commitment letters,

7

documents, or instruments related thereto (collectively, the "***New Junior Loan Documents***");

(v)     any shareholder agreement, organizational documents, evidence of equity interests (including share certificates or other mutually agreed evidence of equity interests to be issued in accordance with the Term Sheet), or other governance documents for the reorganized Company, which, to the extent applicable to such documents, shall include terms consistent with the minority equity holder protections, governance rights provisions, and other terms and conditions set forth on <u>Annex 6</u> to the Term Sheet (collectively, the "***New Equity Documents***");

(vi)    the definitive documentation with respect to the Warrants to be issued in accordance with the Term Sheet (the "***Warrants Documents***");

(vii)   the definitive documentation with respect to the Option Rights to be issued in accordance with the Term Sheet (the "***Option Rights Documents***");

(viii)  any motion seeking approval of (A) the use of cash collateral and all agreements, interim and final orders, and/or amendments in connection therewith (collectively, the "***Cash Collateral Documents***") and/or (B) if DIP Financing is necessary to the Chapter 11 Cases, the Company's incurrence of postpetition financing and, with respect to (A) and (B) above, all agreements, documents, interim and final orders, and/or amendments in connection therewith (collectively, the "***DIP Documents***");

(ix)    the Advisory Services Agreement;

(x)     the Plan (which shall include the Release);

(xi)    the Plan Supplement;

(xii)   the Disclosure Statement and other solicitation materials in respect of the Plan (such materials, collectively, the "***Solicitation Materials***");

(xiii)  the motion(s) and related pleadings seeking approval of the Disclosure Statement and Solicitation Materials and scheduling a combined hearing on the Plan and Disclosure Statement (the "***Disclosure Statement Motion***") and the order approving the Disclosure Statement and Solicitation Materials (the "***Disclosure Statement Order***"); and

(xiv)   the motion(s) and related pleadings seeking confirmation of the Plan and the order confirming the Plan, which order may be contained in the same order as the Disclosure Statement Order (the "***Confirmation Order***").

(b)     The Definitive Documents remain subject to negotiation and completion. Each of the Definitive Documents shall, upon completion, contain terms, conditions,

representations, warranties, and covenants consistent with the terms of this Agreement, including, without limitation, the Term Sheet, as it may be modified, amended, or supplemented pursuant to Section 12, and otherwise be in form and substance reasonably acceptable to the Company and the Required Consenting First Lien Lenders; *provided* that the Company shall consult with the Ad Hoc Group of Second Lien Lenders with respect to the Definitive Documents; *provided*, *further*, that in addition to the consent rights of the Company and the Required Consenting First Lien Lenders, (i) the New First Lien Term Loan Documents shall also be in form and substance reasonably acceptable to the Required Consenting FILO Lenders; (ii) the New Equity Documents, the Warrants Documents, the New Junior Loan Documents, the Plan, and the Confirmation Order shall also be in form and substance reasonably acceptable to the Required Consenting Second Lien Lenders; (iii) the New Equity Documents, the Warrants Documents, the Advisory Services Agreement and the Option Rights Documents shall also be in form and substance reasonably acceptable to the Required Consenting Sponsor; (iv) with respect to the Required Consenting Second Lien Lenders, the Cash Collateral Documents, and, if DIP Financing is necessary to the Chapter 11 Cases, the DIP Documents shall also be subject to the consent rights set forth in the Term Intercreditor Agreement, dated as of October 14, 2015; and (v) to the extent any Definitive Document materially and adversely affects the claims of, or rights and benefits proposed to be granted to, or received by, the FILO Lenders, the Second Lien Lenders, or the Sponsors, such Definitive Document (solely with respect to such provision materially and adversely affected) shall also be in form and substance reasonably acceptable to the Required Consenting FILO Lenders, the Required Consenting Second Lien Lenders, or the Required Consenting Sponsor, as applicable.  For the avoidance of doubt, the consent rights set forth above, shall apply to any proposed amendments, waivers, modifications, or supplements to the applicable Definitive Documents.

**Section 3.**    **Milestones.**

On and after the RSA Effective Date, the Company shall use commercially reasonable efforts to implement the Restructuring in accordance with the following milestones (the "***Milestones***"), as applicable, unless extended or waived in writing (which may be by electronic mail between applicable counsel) by the Company, the Required Consenting Sponsor, and the Required Consenting Lenders:[2]

(a)    as soon as reasonably practicable, but in no event later than five (5) business days after the RSA Effective Date (the "***Early Acceptance Date***"), First Lien Lenders holding at least 66.67 percent (in the aggregate) of the principal amount outstanding of First Lien Claims shall have executed this Agreement;

---

[2]    The date of each Milestone provided for in this Section 3 shall be calculated in accordance with Rule 9006 of the Federal Rules of Bankruptcy Procedure.

(b)     as soon as reasonably practicable, but in no event later than January 5, 2019, the Plan, the Disclosure Statement, and the Solicitation Materials shall have been agreed in form and substance in accordance with Section 2 hereof;

(c)     no later than 11:59 p.m. (prevailing Eastern time) on January 7, 2019 (the "*Solicitation Commencement Date*"), the Company shall have commenced the Solicitation and distribution of the Solicitation Materials to entities entitled to vote on the Plan and shall have posted an executed copy of this Agreement to the Data Site;

(d)     as soon as reasonably practicable, but in no event later than January 14, 2019 (the "*Definitive Documents Agreement Date*"), the remaining Definitive Documents shall have been agreed in form and substance in accordance with Section 2 hereof and the Company shall post such forms to the Data Site;

(e)     no later than 11:59 p.m. (prevailing Eastern time) on January 31, 2019, the Company shall have commenced the Chapter 11 Cases in the Bankruptcy Court (the "*Petition Date*") and shall have filed the Plan, the Disclosure Statement, and the Disclosure Statement Motion, in each case consistent in all respects with this Agreement; *provided* that the Company shall have received ballots accepting the Plan from (i) holders of at least 66.67 percent in aggregate principal amount outstanding of FILO Claims, First Lien Claims, and Second Lien Claims and (ii) more than 50 percent of the holders of FILO Claims, First Lien Claims, and Second Lien Claims, in each case, who timely submit valid ballots in such class;

(f)     as soon as reasonably practicable, but in no event later than the date that is thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered (i) the Disclosure Statement Order and (ii) the Confirmation Order; and

(g)     as soon as reasonably practicable, but in no event later than the date that is fourteen (14) calendar days after entry of a Confirmation Order that has not been stayed, reversed, revoked, modified or vacated, the Restructuring Effective Date shall occur.

Notwithstanding anything to the contrary herein, in the event that the 100% Condition is achieved, the Company will pursue an out-of-court restructuring if requested by the Required Consenting First Lien Lenders in their sole discretion, and the milestones listed in (b)–(g) of this Section shall be voided and replaced in favor of revised milestones to be agreed as between the Company and the Required Consenting First Lien Lenders and reasonably acceptable to the Required Consenting Second Lien Lenders.

**Section 4.     <u>Agreements of the Consenting Lenders</u>.**

(a)     <u>Restructuring Support</u>.    During the Support Period, subject to the terms and conditions hereof, each Consenting Lender agrees, severally and not jointly, with respect to all claims held, that it shall:

10

(i)     use its commercially reasonable efforts to support the Restructuring and to act in good faith and take all reasonable actions necessary to implement and consummate the Restructuring in accordance with the terms, conditions, and applicable deadlines set forth in this Agreement, the Term Sheet, and the Plan, as applicable;

(ii)    negotiate in good faith the applicable Definitive Documents and use its commercially reasonable efforts to agree to the form and substance of such Definitive Documents consistent with the terms of this Agreement no later than the Definitive Documents Agreement Date;

(iii)   upon receipt of Solicitation Materials that comply with applicable law and are consistent with the terms and conditions of this Agreement, (A) vote each of its ABL Claims, FILO Claims, First Lien Claims, and/or Second Lien Claims, as applicable, to accept the Plan by delivering its duly executed and completed ballot(s) accepting the Plan to the Company's solicitation agent on or before the date that is five (5) business days after the date on which Solicitation Materials are received by such Consenting Lender, (B) not select on its ballot(s) the "opt-out" with respect to the Release, and (C) not withdraw, amend, or revoke (or cause to be withdrawn, amended, or revoked) its vote with respect to such Plan; *provided* that the votes of the Consenting Lenders shall be immediately and automatically without further action of any Consenting Lender revoked and deemed null and void *ab initio* upon termination of this Agreement pursuant to <u>Section 7</u> prior to the Restructuring Effective Date in accordance with the terms hereof;

(iv)    neither direct the ABL Agent, First Lien Agent, or Second Lien Agent, as applicable, to take any action nor solicit, encourage, or support any other person to (A) take any action inconsistent with such Consenting Lender's obligations under this Agreement or (B) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Company or any direct or indirect subsidiaries of the Company except in a manner consistent with this Agreement, including, without limitation and for the avoidance of any doubt, seeking to initiate involuntary bankruptcy proceedings, the appointment of a provisional liquidator, or seeking to initiate any other sort of insolvency proceeding in a court of competent jurisdiction, or otherwise exercising any right or remedy under the ABL Credit Agreement, First Lien Credit Agreement, Second Lien Credit Agreement, or any related security agreement (including the right to direct the ABL Agent, First Lien Agent, or Second Lien Agent, as applicable, to accelerate any obligations under the ABL Credit Agreement, First Lien Credit Agreement, or Second Lien Credit Agreement, as applicable), with respect to the interest payment under the Second Lien Credit Agreement that was payable as of October 31, 2018 (the "***October 31 Coupon***"), or otherwise; *provided*, *however*, that nothing herein shall prejudice the rights of any Party to (1) assert that the October 31 Coupon constitutes a

11

valid and enforceable Second Lien Claim during the Support Period and to exercise any rights with respect thereto after the occurrence of the Termination Date or the Second Lien Termination Date or (2) contest any assertion described in clause (1);

(v)     (A) support and take all commercially reasonable actions necessary or reasonably requested by the Company to facilitate the solicitation, confirmation, approval, and consummation of the Restructuring, as applicable, to the extent consistent with the terms and conditions in this Agreement; (B) not, nor encourage any other person to, take any action, directly or indirectly, that would, or would reasonably be expected to, breach this Agreement or object to, prevent, interfere with, delay, impede or appeal the solicitation, acceptance, confirmation, approval, consummation, and/or implementation of the Restructuring, including the solicitation of votes on the Plan, in each case, to the extent applicable and to the extent consistent with the terms and conditions of this Agreement; and (C) not directly or indirectly propose, file, support, vote for, consent to, encourage, or take any other action in furtherance of the negotiation or formulation of any reorganization (including, for the avoidance of doubt, a transaction premised on an asset sale or a chapter 11 plan other than one that implements the Restructuring, or otherwise), proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets, or restructuring in any jurisdiction anywhere in the world for any entity of the Company other than the Restructuring (any such transaction, an "***Alternative Transaction***"); and

(vi)    use commercially reasonable efforts to support the Release in the Plan.

(b)     <u>Transfers</u>.  During the Support Period, subject to the terms and conditions hereof, each Consenting Lender agrees, solely with respect to itself, that it shall not directly or indirectly sell, use, pledge, assign, transfer, permit the participation in, or otherwise dispose of (each, a "***Transfer***") any ownership (including any beneficial ownership)[3] in its Lender Claims, or any option thereon or any right or interest therein (including by granting any proxies or depositing any interests in such Lender Claims into a voting trust or by entering into a voting agreement with respect to such Lender Claims), unless the intended transferee (A) is a Consenting Lender or a Sponsor and provides notice of such Transfer (including the amount and type of Lender Claim to be Transferred) to Kirkland, Milbank, Paul Weiss, Simpson Thacher, and Goodwin by delivery of an executed transfer agreement in the form attached hereto as **<u>Exhibit B</u>** (a "***Transfer Agreement***") at or before the time of such Transfer or (B) executes and delivers to Kirkland, Milbank, Paul

---

[3]     As used herein, the term "***beneficial ownership***" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, the Lender Claims or the right to acquire such Lender Claims.

Weiss, Simpson Thacher, and Goodwin an executed joinder agreement in the form attached hereto as **Exhibit C** (a "*Joinder Agreement*") at or before the time of such Transfer (it being understood that any Transfer shall be void *ab initio* and shall not be effective as against the Company or with respect to this Agreement or the transactions contemplated herein until notification of such Transfer and a copy of the executed Joinder Agreement has been received by Kirkland, Milbank, Paul Weiss, Simpson Thacher, and Goodwin, in each case, on the terms set forth herein) (such transfer, a "*Permitted Transfer*" and such party to such Permitted Transfer, a "*Permitted Transferee*").

(i)     Notwithstanding anything to the contrary herein, (A) a Qualified Marketmaker[4] that acquires any Lender Claims with the purpose and intent of acting as a Qualified Marketmaker for such Lender Claims, shall not be bound by the terms and conditions set forth in this Agreement if such Qualified Marketmaker transfers such Lender Claims (by purchase, sale, assignment, participation, or otherwise) within ten (10) business days of its acquisition to a Consenting Lender or Permitted Transferee and the transfer otherwise is a Permitted Transfer and (B) to the extent any Party is acting solely in its capacity as a Qualified Marketmaker, it may Transfer any ownership interests in the Lender Claims that it acquires from a holder that is not a Consenting Lender to a transferee that is not a Consenting Lender at the time of such Transfer without the requirement that the transferee be or become a signatory to this Agreement or execute a Joinder Agreement.

(ii)    This Agreement shall in no way be construed to preclude the Consenting Lenders from acquiring additional Lender Claims; *provided* that (A) any Consenting Lender that acquires additional Lender Claims during the Support Period shall promptly notify Kirkland, Milbank, Paul Weiss, Simpson Thacher, and Goodwin of such acquisition, including the amount acquired, and (B) such acquired Lender Claims shall automatically and immediately upon acquisition by a Consenting Lender be deemed to be subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to Kirkland, Milbank, Paul Weiss, Simpson Thacher, and Goodwin).

(iii)   This Section 4(b) shall not impose any obligation on the Company to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Lender to Transfer any Lender Claims.  Notwithstanding anything to the contrary herein, to the extent the

---

[4]   As used herein, the term "*Qualified Marketmaker*" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against the Company (or enter with customers into long and short positions in claims against the Company), in its capacity as a dealer or market maker in claims against the Company and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

Company and another Party have entered into a separate agreement with respect to the issuance of a "cleansing letter" or other public disclosure of information, the terms of such confidentiality agreement shall continue to apply and remain in full force and effect according to its terms.

(iv)     Any Transfer made in violation of this <u>Section 4(b)</u> shall be void *ab initio*. Upon the completion of any Transfer of Lender Claims in accordance with this <u>Section 4(b)</u>, the Permitted Transferee shall be deemed a Consenting Lender hereunder with respect to such transferred Lender Claims and the transferor shall be deemed to relinquish its rights and claims (and be released from its obligations under this Agreement) with respect to such transferred Lender Claims; *provided* that if such transferor retains any rights related to such Lender Claims, such transferor shall remain subject to the provisions of this Agreement with respect to such rights.

(v)     Each Consenting Lender agrees to provide, on three (3) business days' notice, its current holdings of Lender Claims to Kirkland on a professionals' eyes only basis.

(c)     <u>Participation in Exit Term Facility</u>.  The commitment letter relating to the Exit Term Facility is set forth on **Exhibit D** attached hereto.  Each Consenting First Lien Lender shall have the right to participate in the Exit Term Facility, if applicable, on a pro rata basis (based on the First Lien Claims held by such Consenting First Lien Lender as a percentage of all First Lien Claims) by providing written notice (which notice shall include the maximum amount of the Exit Term Facility that such Consenting First Lien Lender elects to fund) of its election to participate to Milbank by the Early Acceptance Date in accordance with Section 22 hereof.

**Section 5.     Agreements of the Sponsors.**

(a)     <u>Restructuring Support</u>.  During the Support Period, subject to the terms and conditions of this Agreement, each Sponsor agrees, severally and not jointly, that it shall:

(i)     use its commercially reasonable efforts to support the Restructuring and to act in good faith and take all reasonable actions necessary to implement and consummate the Restructuring in accordance with the terms, conditions, and applicable deadlines set forth in this Agreement, the Term Sheet, and the Plan, as applicable;

(ii)     negotiate in good faith the applicable Definitive Documents and use its commercially reasonable efforts to agree to the form and substance of such Definitive Documents consistent with the terms of this Agreement no later than the Definitive Documents Agreement Date;

(iii)     continue to provide advisory and operational services to the Company during the Support Period consistent with historical practice;

14

(iv)    (A) support and take all commercially reasonable actions necessary or reasonably requested by the Company to facilitate the solicitation, confirmation, approval, and consummation of the Restructuring, as applicable, to the extent consistent with the terms and conditions in this Agreement; (B) not, nor encourage any other person to, take any action, directly or indirectly, that would, or would reasonably be expected to, breach this Agreement or object to, prevent, interfere with, delay, impede or appeal the solicitation, acceptance, confirmation, approval, consummation, and/or implementation of the Restructuring, including the solicitation of votes on the Plan, in each case, to the extent applicable and to the extent consistent with the terms and conditions of this Agreement; and (C) not directly or indirectly propose, file, support, vote for, consent to, encourage, or take any other action in furtherance of the negotiation or formulation of any Alternative Transaction;

(v)    not pledge, encumber, assign, sell, or otherwise transfer, including by the declaration of a worthless stock deduction for any tax year ending on or prior to the Restructuring Effective Date, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any of its shares, stock, or other interests in the Company entities, whether held directly or indirectly (including interests in Topco), to the extent such pledge, encumbrance, assignment, sale, or other transfer will impair any of the Company entities' tax attributes;

(vi)    use commercially reasonable efforts to support the Release in the Plan; and

(vii)    waive any and all Sponsor Claims they or any of their controlled affiliates may have.

(b)    <u>Transfers</u>.  During the Support Period, subject to the terms and conditions hereof, each Sponsor agrees, solely with respect to itself, that it shall not Transfer, offer, or contract to Transfer in whole or in part, any portion of its right, title, or interests in any of its shares, stock, or other interests in, or claims against the Company unless (i) such Sponsor has received the prior written consent of the Required Consenting First Lien Lenders to such Transfer and (ii) the intended transferee (A) is a Consenting Lender or Sponsor and provides notice of such Transfer to Kirkland, Milbank, Paul Weiss, Simpson Thacher, and Goodwin by delivery of an executed Transfer Agreement before or at the time of such Transfer or (B) executes and delivers a Joinder Agreement to Kirkland, Milbank, Paul Weiss, Simpson Thacher, and Goodwin before or at the time of such Transfer, each in accordance with <u>Section 4(b)</u> (it being understood that any Transfer in violation of this paragraph shall be void *ab initio* and shall not be effective as against the Company or with respect to this Agreement or the transactions contemplated herein).

15

**Section 6.**    **Agreements of the Company and Topco.**

(a)    <u>Restructuring Support</u>.    During the Support Period, subject to the terms and conditions of this Agreement, including without limitation <u>Section 10</u>, each of the Company and Topco agrees that it shall:

(i)    use commercially reasonable efforts to implement the Restructuring in accordance with the terms and conditions set forth in this Agreement;

(ii)    implement and consummate the Restructuring in a timely manner and take any and all commercially reasonable and appropriate actions in furtherance of the Restructuring, as contemplated under this Agreement;

(iii)    negotiate in good faith the applicable Definitive Documents and use its commercially reasonable efforts to agree to the form and substance of such Definitive Documents consistent with the terms of this Agreement no later than the Definitive Documents Agreement Date;

(iv)    subject to <u>Section 10</u> of this Agreement, (A) support and take all commercially reasonable actions necessary or reasonably requested by the other Required Parties to facilitate the solicitation, confirmation, approval, and consummation of the Restructuring, as applicable, to the extent consistent with the terms and conditions in this Agreement; (B) not, nor encourage any other person to, take any action, directly or indirectly, that would, or would reasonably be expected to, breach this Agreement or object to, prevent, interfere with, delay, impede or appeal the solicitation, acceptance, confirmation, approval, consummation, and/or implementation of the Restructuring, including the solicitation of votes on the Plan, in each case, to the extent applicable and to the extent consistent with the terms and conditions of this Agreement; and (C) except as expressly provided in this Agreement, not directly or indirectly propose, file, support, vote for, consent to, encourage, or take any other action in furtherance of the negotiation or formulation of any Alternative Transaction;

(v)    with respect to Topco, not pledge, encumber, assign, sell, or otherwise transfer, including by the declaration of a worthless stock deduction for any tax year ending on or prior to the Restructuring Effective Date, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, any portion of Topco's right, title, or interests in any of its shares, stock, or other interests in the Company entities to the extent such pledge, encumbrance, assignment, sale, or other transfer will impair any of the Company entities' tax attributes;

(vi)    support and seek approval of the Release in the Plan;

(vii)    provide draft copies of all Definitive Documents and all "first day" motions, applications, or other material documents the Company intends

16

to file with the Bankruptcy Court on the Petition Date to Milbank, Paul Weiss, Simpson Thacher, and Goodwin at least two (2) business days before the date the Company intends to file or execute such document and shall, without limiting any approval rights set forth in this Agreement, consult in good faith with such counsel regarding the form and substance of such proposed filing with the Bankruptcy Court.  The Company will use good faith efforts to provide draft copies of all other material pleadings the Company intends to file with the Bankruptcy Court to Milbank, Paul Weiss, Simpson Thacher, and/or Goodwin, as applicable, at least two (2) business days (or such shorter period as necessary in light of exigent circumstances) before the date the Company intends to file or execute such document and, without limiting any approval rights in this Agreement, shall consult in good faith with such counsel regarding the form and substance of any such proposed pleading;

(viii)   provide to the Consenting Lenders and the Sponsors and/or their respective professionals:  (A) upon reasonable advance notice to Kirkland, reasonable access (without any material disruption to the conduct of the Company's business) during normal business hours to the Company's books, records, and facilities; (B) upon reasonable advance notice to Kirkland, reasonable access to the management of and advisors to the Company for the purposes of evaluating the Company's finances and operations and participating in the planning process with respect to the Restructuring; (C) reasonable access to any non-confidential information provided to any existing or prospective financing sources (including lenders under any exit financing); (D) timely updates regarding the Restructuring, including any material developments or any material conversations with parties in interest; (E) timely notification of the occurrence of the RSA Effective Date; and (F) any other reasonable information related to the Restructuring reasonably requested by the Consenting Lenders in writing (electronic mail shall suffice) from the Company's professionals;

(ix)   no later than the date that is five (5) business days after the RSA Effective Date, the Chief Executive Officer of the Company shall deliver a presentation to the Consenting Lenders consistent with the presentation delivered to the Steering Committee on October 10, 2018 (and shall post such presentation on the Data Site on the Solicitation Commencement Date); *provided* that the Company shall provide such additional information as may be reasonably requested by the advisors to the Consenting Lenders reasonably promptly after such request is made;

(x)   support and take all actions as are reasonably necessary and appropriate to obtain any and all required regulatory and/or third-party approvals to consummate the Restructuring;

(xi)    to the extent applicable, timely object, in a reasonable manner, to any motion filed with the Bankruptcy Court by any person (A) seeking the entry of an order terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization or (B) seeking the entry of an order terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset that, to the extent such relief was granted, would have a material adverse effect on the consummation of the Restructuring transactions;

(xii)   to the extent applicable, not file any pleading seeking entry of an order, and timely object, in a reasonable manner, to any motion filed with the Bankruptcy Court by any person seeking the entry of an order, (A) directing the appointment of an examiner or a trustee, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases, or (D) for relief that (1) is inconsistent with this Agreement in any material respect or (2) would reasonably be expected to frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring;

(xiii)  use its commercially reasonable efforts to (A) carry on the business of the Company in the ordinary course and in a manner consistent with past practices and preserve intact such businesses and their assets, (B) keep available the services of its current officers and material employees (in each case, other than voluntary resignations, terminations for cause, or terminations consistent with applicable fiduciary duties), (C) preserve its material relationships with customers, suppliers, licensors, licensees, distributors, and others having material business dealings with the Company, and (D) commence discussions with trade vendors to return to normalized terms;

(xiv)   not, without the prior written consent (which shall not be unreasonably withheld, delayed, or conditioned) of the Required Consenting First Lien Lenders (with email from counsel to the Ad Hoc Group of First Lien Lenders being sufficient), enter into or amend, adopt, restate, supplement, or otherwise modify (A) any deferred compensation, incentive, retention, bonus or other compensatory arrangements, policies, programs, practices, plans or agreements, including, without limitation, offer letters, employment agreements, consulting agreements, severance arrangements, or change in control arrangements with or for the benefit of any employee or (B) any contracts, arrangements, commitments or understandings that entitle any current or former director, officer or employee to indemnification from the Company;

(xv)    promptly and before the Petition Date, take all commercially reasonable actions, including those necessary to effectuate assignments under the First Lien Credit Agreement and Second Lien Credit Agreement, required to clear the trading of any rights and/or obligations of lenders under the

18

First Lien Credit Agreement or Second Lien Credit Agreement, including such trades that occurred prior to the date of this Agreement;

(xvi) not solicit, negotiate, or enter into any transaction that is material to the business or the assets of the Company other than (A) transactions in the ordinary course of business or that are consistent with past practices and (B) matters identified in email correspondence from Kirkland to the advisors to the Consenting Lenders and the Sponsors, in each case, except as expressly set forth in this Agreement or with the prior written consent of the Required Consenting Lenders; and

(xvii) to the extent reasonably practicable, if the Company receives an unsolicited proposal or expression of interest with respect to an Alternative Transaction, within forty-eight (48) hours of the receipt of such proposal or expression of interest, except to the extent it is precluded from doing so pursuant to any applicable confidentiality agreement(s) approved by the Required Consenting First Lien Lenders, notify Milbank and Paul Weiss of the receipt thereof, with such notice to include the material terms thereof, including the identity of the Person or group of Persons involved.   Notwithstanding the receipt of such unsolicited proposal or expression of interest, the Company acknowledges and agrees that it is, and will continue to be, bound by its obligations set forth in this Agreement, subject to its duties under applicable law and/or its governing documents to act in the best interests of the Company.

(b)   Automatic Stay.  The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, if applicable, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the fullest extent permitted by law, the applicability of the automatic stay to the giving of such notice).

**Section 7.**   **Termination of Agreement.**

(a)   Automatic Termination.  This Agreement shall terminate automatically, without any further action required by any Party, upon the occurrence of any of the following events:

(i)   the occurrence of the Restructuring Effective Date;

(ii)   this Agreement has not been executed by First Lien Lenders holding in the aggregate at least 66.67 percent of the aggregate principal amount outstanding of the First Lien Claims by the Early Acceptance Date in accordance with Section 3(a) and the date for completion of such Milestone has not been extended or waived by the Company and the Steering Committee;

19

(iii)    entry of an order denying confirmation of the Plan, unless the Required Consenting Sponsor and the Required Consenting Lenders shall deliver written notice within two (2) business days of the entry of such order to the Company of their desire to amend the Plan to address the grounds on which confirmation was denied;

(iv)    an order confirming the Plan is reversed or vacated, unless the Required Consenting Sponsor and the Required Consenting Lenders shall deliver written notice within two (2) business days of the entry of such order reversing or vacating confirmation to the Company of their desire to amend the Plan to address the grounds on which confirmation was reversed or vacated; or

(v)    any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable.

(b)    <u>Consenting Lender Termination Events</u>. The obligations of the Consenting FILO Lenders under this Agreement may be terminated by the Required Consenting FILO Lenders, the obligations of the Consenting First Lien Lenders under this Agreement may be terminated by the Required Consenting First Lien Lenders, and the obligations of the Consenting Second Lien Lenders under this Agreement may be terminated by the Required Consenting Second Lien Lenders (such Consenting FILO Lenders, Consenting First Lien Lenders, or Consenting Second Lien Lenders seeking to terminate, the "***Terminating Consenting Lenders***"), in each case, by the delivery to each of the other Parties of a written notice in accordance with <u>Section 22</u>, stating in reasonable detail the reasons for such termination, upon the occurrence and continuation of any of the following events:

(i)    the breach by any Party, other than the Terminating Consenting Lenders, of (A) any affirmative or negative covenant contained in this Agreement or (B) any other obligations of such breaching Party set forth in this Agreement, in each case, in any material respect and which breach is continuing for a period of three (3) business days following such breaching Party's receipt of a written notice of breach pursuant to <u>Section 22</u> (which written notice shall set forth in detail the alleged breach); *provided* that such termination right shall be ineffective if the breaching Party is a Consenting Lender other than the Terminating Consenting Lenders and at such time Consenting Lenders holding in the aggregate at least 66.67 percent in aggregate principal amount outstanding of each of the First Lien Claims and Second Lien Claims have not breached this Agreement in any material respect; it being understood that a breach of <u>Section 6(a)(xiv)</u> constitutes a material breach for purposes of this provision;

(ii)    the breach in any material respect by the Company or the Required Consenting Sponsor of any of their respective representations or warranties in this Agreement, which breach remains uncured for a period

20

of three (3) business days following the Company's or the Required Consenting Sponsor's, as applicable, receipt of a written notice pursuant to Section 22 (which written notice shall set forth in detail the alleged failure of the representation or warranty); it being understood that a breach of Section 9(d)(i) constitutes a material breach for purposes of this provision;

(iii)   the Company or any Sponsor files, amends, modifies or supports any motion, pleading, or related document with a court of competent jurisdiction in a manner that is materially inconsistent with this Agreement, and such motion, pleading, or related document has not been withdrawn after three (3) business days following such Party's receipt of a written notice in accordance with Section 22 that such motion, pleading, or related document is materially inconsistent with this Agreement;

(iv)   the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Restructuring or any material portion thereof, and such ruling, judgment, or order has not been reversed or vacated within twenty-one (21) calendar days after such issuance;

(v)   the Bankruptcy Court (or other court of competent jurisdiction) enters an order (A) directing the appointment of a liquidator, judicial manager, trustee, receiver, or examiner with expanded powers or a trustee in any of the Chapter 11 Cases, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, (D) invaliding, disallowing, subordinating, or limiting the enforceability, priority, or validity of any of the Lender Claims, or (E) the effect of which would render the Plan incapable of consummation on the terms set forth in this Agreement or the Term Sheet;

(vi)   the Company or a Sponsor files or supports (or fails to timely object to) another person in filing (A) any plan of reorganization, liquidation, or sale of all or substantially all of the Company's assets other than the Restructuring set forth herein or (B) a motion or pleading asserting (or seeking standing to assert) any purported claims or causes of action against the Terminating Consenting Lenders;

(vii)   any of the Milestones have not been achieved, extended, or waived within three (3) business days after such Milestone, unless the failure to achieve the Milestone is the result of any act, omission, or delay on the part of the Terminating Consenting Lenders in violation of their obligations under this Agreement;

(viii)   the Company or a Sponsor files, or supports (or fails to timely object to) another person in filing, any motion or pleading seeking to avoid, disallow, subordinate, or recharacterize any Lender Claims held by the

21

Consenting Lenders or that contests the amount, validity, or priority of any of the Lender Claims held by the Consenting Lenders; *provided* that any motions or pleadings filed or actions taken in furtherance of the Restructuring and consistent with this Agreement shall not be deemed or construed to contest the priority of the Lender Claims;

(ix)    the failure of the Company to use commercially reasonable efforts to oppose any enforcement action against any material portion of its assets in any jurisdiction or the entry of a judgment in any enforcement action against any material portion of the Company's assets;

(x)    (A) any Definitive Document is finalized or has become effective, or the Company or any Sponsor files or files a pleading seeking approval of a Definitive Document, in each case, containing terms and conditions inconsistent with this Agreement or otherwise not in form and substance reasonably acceptable to such Terminating Consenting Lenders (to the extent such acceptance is required by Section 2), or (B) any of the terms or conditions of any of the Definitive Documents is waived, amended, supplemented, or otherwise modified in a manner that has any material impact on the Restructuring or the legal or economic rights or obligations of the Terminating Consenting Lenders without (x) the consents required by Section 2 with respect to such Definitive Document and such consents are not obtained within two (2) business days after the receipt by the Company of written notice delivered in accordance with Section 22, which written notice will set forth in detail the alleged failure to obtain consent, and (y) complying with the amendment or waiver provision of a Definitive Document that had the consents required by Section 2; *provided* that solely with respect to the Plan Supplement, the Company may file drafts of such Definitive Documents, so long as they are clearly identified as being subject to the future acceptances and approvals as set forth in this Agreement;

(xi)    the commencement of an involuntary bankruptcy case against any Company entity under the Bankruptcy Code if such involuntary case is not dismissed within sixty (60) calendar days after the filing thereof, or if a court order grants the relief sought in such involuntary case; or

(xii)    the Company publicly announces its intention not to support the Restructuring or to support an Alternative Transaction.

(c)    Consenting First Lien Lender Termination Event.    The obligations of the Consenting First Lien Lenders under this Agreement may be terminated by the Required Consenting First Lien Lenders if, on the Petition Date, the Company shall fail to have "Ending Liquidity" (calculated as set forth in the budget provided to the financial advisors to the Ad Hoc Group of First Lien Lenders, dated as of December 17, 2018 (the "Liquidity Budget")) of at least 90% of the amount shown in the line item entitled "Ending Liquidity" in the Liquidity Budget

22

for the period in which the Petition Date occurs; it being understood that amounts for Ending Liquidity set forth in the Liquidity Budget shall be deemed to be reduced by the tax refund budgeted to be received by year ended 2018 in the amount of $10.9 million, to the extent such refund has not yet been received by the Company.

(d)  Individual Consenting Lender Termination Event.  The obligations of each Consenting Lender under this Agreement may be terminated as to itself by such Consenting Lender, if, without the consent of such Consenting Lender, any of the terms of any of the Definitive Documents are amended, supplemented, or otherwise modified in a material and adverse manner to such Consenting Lender, effectuated by the delivery to each of the other Parties of a written notice in accordance with Section 22, stating in reasonable detail the reasons for such termination.

(e)  Automatic Consenting Second Lien Lender Termination Event.  The obligations of the Consenting Second Lien Lenders under this Agreement shall terminate automatically, without any further action required by the Consenting Second Lien Lenders, if, following commencement of the Chapter 11 Cases, the Consenting Second Lien Lenders vote to accept the Plan, but the Second Lien Lenders, voting as a class, do not accept the Plan.

(f)  Sponsor Termination Events.  The obligations of a Sponsor under this Agreement may be terminated by such Sponsor (such Sponsor seeking to terminate, the "***Terminating Sponsor***") by the delivery to each of the other Parties of a written notice in accordance with Section 22, stating in reasonable detail the reasons for such termination, upon the occurrence and continuation of any of the following events:

(i)  the breach by any Company entity (unless such breach is caused by or resulted from any action or direction by the Terminating Sponsor or any of its employees, agents, or representatives in their respective capacities as such, and not in their capacities as employees, agents, or representatives of the Company or its subsidiaries) or a Consenting Lender of (A) any affirmative or negative covenant contained in this Agreement or (B) any other obligations of such breaching Party set forth in this Agreement, in each case, in any material respect and which breach is continuing for a period of three (3) business days following such breaching Party's receipt of a written notice of breach pursuant to Section 22 (which written notice shall set forth in detail the alleged breach); *provided* that such termination right shall be ineffective if the Terminating Sponsors are seeking termination as a result of a breach by any Consenting Lender and at such time Consenting Lenders holding in the aggregate at least 66.67 percent in aggregate principal amount outstanding of each of the First Lien Claims and Second Lien Claims have not breached this Agreement in any material respect;

23

(ii)     the breach in any material respect by the Company or a Consenting Lender of any of their respective representations or warranties in this Agreement, which breach remains uncured for a period of three (3) business days following the Company's or Consenting Lender's, as applicable, receipt of a written notice pursuant to <u>Section 22</u> (which written notice shall set forth in detail the alleged failure of the representation or warranty); *provided* that such termination right shall be ineffective if at such time Consenting Lenders holding in the aggregate at least 66.67 percent in aggregate principal amount outstanding of each of the First Lien Claims and Second Lien Claims have not breached their representations and warranties in this Agreement in any material respect;

(iii)    the Company (unless the Company is acting at the direction or instruction of a Sponsor or any of their respective employees, agents, or representatives in their respective capacities as such, and not in their capacities as employees, agents, or representatives of the Company or its subsidiaries), or any Consenting Lender files, amends, modifies, or supports any motion, pleading, or related document with a court of competent jurisdiction in a manner that is materially inconsistent with this Agreement, and such motion, pleading, or related document has not been withdrawn after three (3) business days following such Party's receipt of a written notice in accordance with <u>Section 22</u> that such motion, pleading, or related document is materially inconsistent with this Agreement;

(iv)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Restructuring or any material portion thereof, and such ruling, judgment, or order has not been reversed or vacated within twenty-one (21) calendar days after such issuance;

(v)     the Company (unless the Company is acting at the direction or instruction of a Sponsor or any of their respective employees, agents, or representatives in their respective capacities as such, and not in their capacities as employees, agents, or representatives of the Company or its subsidiaries) or a Consenting Lender files or supports (or fails to timely object to) another person in filing (A) any plan of reorganization, liquidation, or sale of all or substantially all of the Company's assets other than the Restructuring set forth herein, or (B) a motion or pleading asserting (or seeking standing to assert) any purported claims or causes of action against the Terminating Sponsor;

(vi)    the Company (unless the Company is acting at the direction or instruction of a Sponsor or any of their respective employees, agents, or representatives in their respective capacities as such, and not in their capacities as employees, agents, or representatives of the Company or its subsidiaries) or a Consenting Lender files or supports (or fails to timely

24

object to) another person in filing a motion or pleading seeking to avoid, disallow, subordinate, or recharacterize any equity interests in the Company or claims held by the Sponsors or that contests the amount, validity, or priority of any equity interests in the Company or claims held by the Sponsors; *provided* that any motions or pleadings filed or actions taken in furtherance of the Restructuring shall not be deemed or construed to contest the priority of any equity interests in the Company or claims held by the Sponsors;

(vii)    the failure of the Company (unless the Company is acting at the direction or instruction of a Sponsor or any of its respective employees, agents, or representatives in their respective capacities as such and not in their capacities as employees, agents, or representatives of the Company or its subsidiaries) to achieve any of the Milestones set forth in clauses (d), (e), (f), or (g) of Section 3, unless such Milestones have been extended or waived within three (3) business days after the applicable Milestone;

(viii)   the failure of the Company (unless the Company is acting at the direction or instruction of a Sponsor or any of their respective employees, agents, or representatives in their respective capacities as such, and not in their capacities as employees, agents, or representatives of the Company or its subsidiaries) to use commercially reasonable efforts to oppose any enforcement action against any material portion of its assets in any jurisdiction or the entry of a judgment in any enforcement action against any material portion of the Company's assets; or

(ix)    (A) the Company (unless the Company is acting at the direction or instruction of a Sponsor or any of their respective employees, agents, or representatives in their respective capacities as such, and not in their capacities as employees, agents, or representatives of the Company or its subsidiaries) or any Consenting Lender files or files a pleading seeking approval of a Definitive Document, in each case, containing terms and conditions inconsistent with this Agreement or otherwise not in form and substance reasonably acceptable to such Terminating Sponsor (to the extent such acceptance is required by Section 2) or (B) any of the terms or conditions of any of the Definitive Documents is waived, amended, supplemented, or otherwise modified in a manner that has any material impact on the Restructuring or the legal or economic rights or obligations of the Terminating Sponsor without (x) the consents required by Section 2 with respect to such Definitive Document and such consents are not obtained within two (2) business days after the receipt by the Company of written notice delivered in accordance with Section 22, which written notice will set forth in detail the alleged failure to obtain consent, and (y) complying with the amendment or waiver provision of a Definitive Document that had the consents required by Section 2; *provided* that solely with respect to the Plan Supplement, the Company may file drafts of such Definitive Documents, so long as they are clearly identified as

being subject to the future acceptances and approvals as set forth in this Agreement.

(g) <u>Company Termination Events</u>.  The obligations of the Company under this Agreement may be terminated by the Company by the delivery to each of the other Parties of a written notice in accordance with <u>Section 22</u>, stating in reasonable detail the reasons for such termination, upon the occurrence and continuation of any of the following events:

   (i)    the breach by any Party other than the Company of (A) any affirmative or negative covenant contained in this Agreement or (B) any other obligations of such breaching Party set forth in this Agreement, in each case, in any material respect and which breach is continuing for a period of three (3) business days following such breaching Party's receipt of a written notice of breach pursuant to <u>Section 22</u> (which written notice shall set forth in detail the alleged breach); *provided* that such termination right shall be ineffective if the Company is seeking termination as a result of a breach by any Consenting Lender and at such time Consenting Lenders holding in the aggregate at least 66.67 percent in aggregate principal amount outstanding of each of the First Lien Claims and Second Lien Claims have not breached this Agreement in any material respect;

   (ii)   the Milestone set forth in <u>Section 3(g)</u> has not been achieved, extended, or waived within three (3) business days after the date identified in <u>Section 3(g)</u> for completion of such Milestone (as such date may be extended or waived), unless the failure to achieve the Milestone is the result of any act, omission, or delay on the part of the Company in violation of its obligations under this Agreement;

   (iii)  the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Restructuring or any material portion thereof, and such ruling, judgment, or order has not been reversed or vacated within twenty-one (21) calendar days after such issuance; or

   (iv)   the Board of Directors of Blackdog Topco Holdings L.P. determines in good faith and after consulting with counsel that continued performance under this Agreement (including taking any action or refraining from taking any action) would be inconsistent with the exercise of its fiduciary duties under applicable law (as reasonably determined in good faith after consultation with external legal counsel).

(h) <u>Mutual Termination</u>.  This Agreement may be terminated by mutual agreement of the Required Parties upon the receipt of written notice delivered in accordance with <u>Section 22</u>.

26

(i) <u>Effect of Termination</u>.

    (i)    The earliest date on which termination of this Agreement is effective (A) as to the Company or the Consenting First Lien Lenders shall be referred to, with respect to such Party, as a "***Termination Date***," (B) as to the Consenting FILO Lenders shall be referred to, with respect to the Consenting FILO Lenders, as a "***FILO Termination Date***," (C) as to the Consenting Second Lien Lenders shall be referred to, with respect to the Consenting Second Lien Lenders, as a "***Second Lien Termination Date***," and (D) as to a Sponsor shall be referred to, with respect to such Party, as a "***Sponsor Termination Date***."

    (ii)    Except as provided in <u>Section 17</u>, upon the occurrence of (x) a FILO Termination Date, Second Lien Termination Date, or a Sponsor Termination Date, the terminating Party's obligations under this Agreement shall be terminated effective immediately and (y) a Termination Date or a termination pursuant to <u>Section 7(a)</u> or <u>Section 7(h)</u>, all Parties' obligations under this Agreement shall be terminated effective immediately and, in each case, such Party or Parties shall be immediately released from its liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement; *provided* that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination. Upon (A) any Termination Date, any votes or consents given by a Consenting First Lien Lender, (B) any FILO Termination Date, any votes or consents given by a Consenting FILO Lender, (C) any Second Lien Termination Date, any votes or consents given by a Consenting Second Lien Lender, or (D) any Sponsor Termination Date, any votes or consents given by a Sponsor, in each case, prior to such termination shall automatically be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek an order of a court of competent jurisdiction or consent from the Company or any other applicable Party allowing such change or resubmission).

    (iii)    Notwithstanding the foregoing, in the event the Required FILO Lenders or Required Consenting Second Lien Lenders terminate this Agreement pursuant to <u>Section 7(b)</u>, a Consenting Lender terminates this Agreement pursuant to <u>Section 7(d)</u>, this Agreement is terminated with respect to the Consenting Second Lien Lenders pursuant to <u>Section 7(e)</u>, or any Sponsor terminates this Agreement pursuant to <u>Section 7(f)</u> (each of the foregoing,

27

a "***Terminating Party***"), this Agreement shall not terminate (except to the extent provided in <u>Section 7(b)</u>) or be terminable by any other Party solely on the basis of such termination, and this Agreement shall remain in full force and effect, except that (A) the applicable Terminating Party shall no longer be a Party to the Agreement and shall be relieved of all obligations hereunder, except as provided in <u>Section 17</u>; (B) the other Parties shall have no further obligations to the applicable Terminating Party, and shall be permitted to take further actions otherwise permitted hereunder with respect to any Definitive Documentation or other document or matter or any Restructuring Transaction without any liability hereunder, except the rights and obligations of such other Parties under this Agreement shall remain in full force and effect; (C) such other Parties shall not be obligated to grant or support the grant of any releases to the applicable Terminating Party under the Plan (*provided* that the foregoing shall not permit such other Parties to not grant or support the grant of any releases to any Party that is not a Terminating Party); and (D) all of the applicable rights and remedies of the remaining Parties under this Agreement, the Term Sheet, and applicable law shall be reserved in all respects.

**Section 8.** **<u>Definitive Documents; Good Faith Cooperation; Further Assurances</u>.**

Subject to the terms and conditions described herein, during the Support Period, each Party, severally and not jointly, hereby covenants and agrees to reasonably cooperate with each other in good faith in connection with the negotiation, drafting, execution (to the extent such Party is a party thereto), and delivery of the Definitive Documents.  Furthermore, subject to the terms and conditions hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings.

**Section 9.** **<u>Representations and Warranties</u>.**

(a)      <u>Mutual Representations and Warranties</u>.  Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct, and complete as of the date hereof (or as of the date such Party becomes a party hereto):

     (i)      such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has, as applicable, all requisite corporate, partnership, limited liability company, or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by, as applicable, all necessary corporate, limited liability company, partnership, or other similar action on its part;

(ii)    the execution, delivery, and performance by such Party of this Agreement does not and will not (A) violate any provision of law, rule, or regulation applicable to it, its charter, or bylaws (or other similar governing documents), or (B) conflict with, result in a breach of, or constitute a default under any material contractual obligation to which it is a party; *provided* that with respect to the Company, it is understood that commencing the Chapter 11 Cases may result in a breach of or constitute a default under such obligations;

(iii)    the execution, delivery, and performance by such Party of this Agreement, except as expressly provided in this Agreement (including the Term Sheet), does and will not require the consent or approval by any other person or entity, except for any consent or approval obtained prior to, or contemporaneously with, the RSA Effective Date; and

(iv)    this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of a court of competent jurisdiction.

(b)    <u>Consenting Lenders Representations and Warranties</u>.  Each Consenting Lender, severally and not jointly, represents and warrants to the Company that, as of the date hereof (or as of the date such Consenting Lender becomes a party hereto), such Consenting Lender:

(i)    is the beneficial owner of the aggregate principal amount of Lender Claims set forth below its name on the signature page hereof (or below its name on the signature page of a Joinder Agreement for any Consenting Lender that becomes a party hereto after the date hereof), which shall specify the aggregate principal amount of ABL Claims, FILO Claims, First Lien Claims, and/or Second Lien Claims held by such Consenting Lender, as applicable;

(ii)    does not directly or indirectly own any Lender Claims other than as identified below its name on its signature page hereof; and/or

(iii)    has, with respect to the beneficial owners of such Lender Claims (as may be set forth on a schedule to such Consenting Lender's signature page hereto), (A) sole investment or voting discretion with respect to such Lender Claims, (B) full power and authority to vote on and consent to matters concerning such Lender Claims, or to exchange, assign, and transfer such Lender Claims, and (C) full power and authority to bind or act on the behalf of, such beneficial owners for purposes of this Agreement.

29

(c)    Company and Sponsor Representations and Warranties.

    (i)    Each of the Company and the Sponsors, severally and not jointly, represents and warrants to the Consenting Lenders that neither it nor any of its affiliates has entered into any agreements with any party regarding a sale or restructuring of the Company that would result in a greater recovery on the Lender Claims than is contemplated under this Agreement; and

    (ii)    The Sponsors represent and warrant that the Sponsors hold, in the aggregate, 95.5 percent of the issued, outstanding, and vested shares of Topco.

(d)    Company Representations and Warranties. The Company represents and warrants to the Consenting Lenders that:

    (i)    there are no deferred compensation, incentive, retention, bonus, or other compensatory arrangements, policies, programs, practices, plans, or agreements, including, without limitation, offer letters, employment agreements, severance arrangements, or change in control arrangements, nor are there any amendments, restatements, modifications, or supplements with respect to any of the foregoing, that have been entered into by or are sponsored, maintained, or contributed to by the Company, in each case other than those set forth on the schedule sent by Milbank to the Company on December 15, 2018;

    (ii)    there are no (A) contracts, arrangements, commitments or understandings that entitle any current or former director, officer or employee to indemnification from the Company, that have been entered into by the Company or (B) executive liability insurance policies entered into by the Company on behalf of any current or former director, officer or employee, in each case other than those set forth in the schedule sent by Milbank to the Company on December 15, 2018 or the Company's bylaws;

    (iii)    all labor, collective bargaining or similar agreements with any labor organization covering employees of the Company entered into by the Company have been furnished to Milbank prior to the execution of this Agreement; and

    (iv)    all forbearance agreements and similar agreements entered into by the Company containing forbearance fees or other similar fees to be paid by the Company have been furnished to Milbank prior to the execution of this Agreement.

(e)    Topco Representations. Topco represents and warrants to the Consenting Lenders that Topco owns 100 percent of the equity interests of Holdings.

30

**Section 10.**     **Fiduciary Duty.**

Notwithstanding any provision in this Agreement to the contrary, nothing in this Agreement shall require the Company, nor the Company's directors, managers, and officers, including any director, manager, or officer of the Company that is an employee, representative, or agent of any Sponsor, to take or refrain from taking any action in its capacity as a director, manager, or officer of the Company (including, without limitation, terminating this Agreement under Section 7), to the extent such person (or persons) determines in good faith, based on the advice of external counsel (including counsel to the Company), that taking or refraining from taking such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.  The Company shall provide written notice in accordance with Section 22 to the Consenting Lenders and the Sponsors promptly following any determination by the Company or the Company's directors, managers, or officers to take or refrain from taking any action that would otherwise be prohibited or required, as applicable, by this Agreement, which notice shall set forth in reasonable detail the basis for such determination.

**Section 11.**     **Disclosure; Publicity.**

The Company shall submit drafts to counsel to the Consenting Lenders and the Sponsors of any press releases, public documents, and any and all filings with the Bankruptcy Court, or otherwise that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least forty-eight hours prior to making any such disclosure, and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall consider any such comments in good faith. This Agreement, as well as its terms, its existence, and the existence of the negotiation of its terms are expressly subject to any existing confidentiality agreements executed by and among any of the Parties as of the date hereof; *provided*, *however*, that, after the Petition Date, the Parties may disclose the existence of, or the terms of, this Agreement or any other material term of the Restructuring without the express written consent of the other Parties; *provided*, *further*, *however*, that no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Party) other than advisors to the Company the principal amount or percentage of any Lender Claims held by any Party or the specific legal entity name of any Consenting Lender, in each case, without such Party's prior written consent, except as required by law or otherwise permitted under the terms of any other agreement between the Company, on the one hand, and any Consenting Lender, on the other hand; *provided* that (a) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Party a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant disclosing Party) and (b) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Lender Claims held by all the Consenting Lenders collectively.  Any public filing of this Agreement, with the Bankruptcy Court or otherwise, that includes executed signature pages to this Agreement shall include such signature pages only in redacted form with respect to the amount of Lender Claims held by each Consenting Lender and, in the case of managed accounts, the specific name of the account managed (*provided* that the holdings disclosed in such signature pages may be filed in unredacted form with the Bankruptcy Court under seal).

31

**Section 12.**    **Amendments and Waivers.**

During the Support Period, this Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended, or supplemented except in a writing signed by the Company and the Required Consenting First Lien Lenders and, to the extent any such waiver, modification, amendment, or supplement materially and adversely affects the rights or benefits proposed to be granted to or received by, or imposes additional obligations on, the FILO Lenders, Second Lien Lenders or the Sponsors, by the Required Consenting FILO Lenders, Required Consenting Second Lien Lenders or the Required Consenting Sponsor, as applicable, with respect to such waiver, modification, amendment, or supplement, unless otherwise specifically provided herein; *provided* that any waiver, modification, amendment, or supplement to the Definitive Documentation shall be governed by Section 2(b); *provided*, *further*, that:  (a) any waiver, modification, amendment, or supplement to this Section 12 or to Section 2, Section 7(a), or Section 7(i) shall require the prior written consent of each Party; (b) any waiver, modification, amendment, or supplement to Section 4(b) shall require the prior written consent of the Required Parties; (c) any waiver, modification, amendment, or supplement to the definition of Required Consenting Lenders shall require the prior written consent of the Company, the Required Consenting First Lien Lenders, and the Required Consenting Second Lien Lenders; (d) any waiver, modification, amendment, or supplement to the definition of Required Consenting First Lien Lenders shall require the prior written consent of the Company and each Consenting First Lien Lender; (e) any waiver, modification, amendment, or supplement to the definition of Required Consenting FILO Lenders shall require the prior written consent of the Company and each Consenting FILO Lender;   (f) any waiver, modification, amendment, or supplement to the definition of Required Consenting Second Lien Lenders shall require the prior written consent of the Company and each Consenting Second Lien Lender; (g) any waiver, modification, amendment, or supplement to the definition of Required Consenting Sponsor, or to Section 5 or Section 7(f), shall require the prior written consent of the Company, the Required Consenting First Lien Lenders, and each Sponsor; (h) any waiver, modification, amendment, or supplement to the definition of Required Parties shall require the prior written consent of the Company, the Required Consenting First Lien Lenders, the Required Consenting FILO Lenders, the Required Consenting Second Lien Lenders, and the Required Consenting Sponsor, and (i) any waiver, modification, amendment, or supplement that disproportionately and adversely affects the economic recoveries, treatment, or rights of any Consenting Lender or Sponsor may not be made without the prior written consent of such Consenting Lender or Sponsor. Notwithstanding anything to the contrary contained herein, any waiver of any condition to the consummation of the Restructuring shall only require the consent of the Company and the Required Consenting First Lien Lenders, unless such waiver would create a material and adverse effect on the rights or benefits proposed to be granted to or received by, or imposes additional obligations on, the FILO Lenders, the Second Lien Lenders or the Sponsors, in which case such waiver shall require the reasonable consent of the Required Consenting FILO Lenders, the Required Consenting Second Lien Lenders and the Required Consenting Sponsor, as applicable; *provided* that any waiver of the conditions to the effectiveness contained in any Definitive Document shall be governed by such Definitive Document.  Notwithstanding anything herein to the contrary, no waiver, modification, amendment, or supplement to Section 7(c) shall require the consent of any Party other than the Company and the Required Consenting First Lien Lenders.

**Section 13.**     <u>**Forbearance**</u>.

Provided that (i) First Lien Lenders holding in the aggregate at least 66.67 percent in aggregate principal amount outstanding of the First Lien Claims execute the RSA and (ii) Second Lien Lenders holding in the aggregate at least 66.67 percent in aggregate principal amount outstanding of the Second Lien Claims execute the RSA, in each case by the Early Acceptance Date, that certain Forbearance Agreement dated as of November 7, 2018, among Holdings, FULLBEAUTY, the guarantors party thereto and the lenders party thereto to the First Lien Credit Agreement attached hereto as <u>**Exhibit E**</u> (the "***Forbearance Agreement***") shall be amended as follows:

(a)     (i) section 4(a) of the Forbearance Agreement shall be amended and restated to (i) replace "60 days from the Forbearance Effective Date" with "February 1, 2019" and (ii) add to the end thereof, after replacing the final period with a semicolon, "provided further that any extension of the Milestone (as defined in the RSA (as defined below)) set forth in Section 3(e) of the RSA with respect to the Petition Date (as defined in the RSA) shall automatically be deemed to be a consent of Borrower and Consenting Lenders constituting Required Lenders under the Credit Agreement to an extension of the Forbearance Period in the same amount of time and the Forbearance Period shall be automatically so extended.";

(b)     (ii) the first WHEREAS clause of the Forbearance Agreement shall be amended and restated to include an additional "Designated Default" in a new subsection (v) which shall read "Section 8.01(a)(i) of the Credit Agreement as the result of Borrower's actual or prospective failure to make the principal payments due under Section 2.07 of the Credit Agreement for the fiscal quarter ending December 31, 2018." Further, the word "and" immediately before subsection (iv) shall be deleted and reinserted immediately before the new subsection (v) and a comma shall be inserted after "December 2017" at the end of subsection (iv); and

(c)     (iii) section 4(c) of the Forbearance Agreement shall be amended and restated to include an additional "Forbearance Termination Event" in a new subsection (vi) which shall read "that certain Restructuring Support Agreement, dated as of December 18, 2018, by and among Holdings, Borrower, certain of their affiliates, and certain of the foregoing's lenders (as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "RSA") ceases to remain in full force and effect with respect to the Consenting First Lien Lenders (as such term is defined in the RSA)." Further, the word "or" after "Forbearance Period;" in subsection (iv) shall be deleted and reinserted immediately after the word "respect" in subsection (v). In addition, the period after the word "respect" in subsection (v) shall be deleted and replaced with a semicolon.

All other terms and conditions of the Forbearance Agreement shall remain unchanged.

**Section 14.**    **Effectiveness.**

This Agreement shall become effective and binding on the Parties on the RSA Effective Date and not before such date; *provided* that signature pages executed by Consenting Lenders shall be delivered to (a) the Company, other Consenting Lenders, and counsel to other Consenting Lenders in a redacted form that removes such Consenting Lenders' holdings of the Lender Claims and any schedules to such Consenting Lenders' holdings (if applicable) and (b) Kirkland in an unredacted form (to be held by such counsel on a professionals' eyes only basis).

**Section 15.**    **Governing Law; Jurisdiction; Waiver of Jury Trial.**

(a)    This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York, without giving effect to any conflicts of law principles which would permit or require the application of the law of any other jurisdiction.

(b)    Each of the Parties irrevocably agrees for itself that any legal action, suit, or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in any federal or state court in the Borough of Manhattan, the City of New York, and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring.  Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the courts described above in New York, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree, or award rendered by any such court in New York as described herein.  Subject to the foregoing, each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim, or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring, (i) that any claim is not personally subject to the jurisdiction of the courts in New York as described herein for any reason and (ii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper, or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.  Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.   By executing and delivering this Agreement, and upon commencement of the Chapter 11 Cases, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of the Bankruptcy Court solely for purposes of any action, suit, proceeding, or other contested matter arising out of or relating to this Agreement, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding, or other contested matter.

(c)   EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>Section 15</u>. ANY DISPUTES RESOLVED IN COURT SHALL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

**Section 16.    <u>Specific Performance/Remedies</u>.**

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party, that such breach would represent an irreparable harm, and that each non-breaching Party shall be entitled to, in addition to any other legal or equitable rights or remedies under applicable law, specific performance of the terms hereof and injunctive or other equitable relief, including attorneys' fees and costs (without the posting of bond) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of a court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder; *provided*, *however*, that no Party shall be entitled to pursue specific performance as a remedy against any other Party in connection with any action or omission taken pursuant to <u>Section 10</u> of this Agreement.

**Section 17.    <u>Survival</u>.**

Notwithstanding the termination of this Agreement pursuant to <u>Section 7</u> (other than a termination pursuant to <u>Section 7(a)(i)</u>), the agreements and obligations of the Parties set forth in the following Sections: <u>Section 1</u>, <u>Section 7(i)</u>, <u>Section 10</u>, <u>Section 12</u>, <u>Section 14</u>, <u>Section 15</u>, <u>Section 16</u>, <u>Section 17</u>, <u>Section 18</u>, <u>Section 19</u>, <u>Section 20</u>, <u>Section 21</u>, <u>Section 22</u>, <u>Section 23</u>, and <u>Section 24</u> (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect for the benefit of the Consenting Lenders and the Sponsors in accordance with the terms hereof; *provided* that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination (other than a termination pursuant to <u>Section 7(a)(i)</u>).

**Section 18.    <u>Successors and Assigns; Severability; Several Obligations</u>.**

This Agreement is intended to bind and inure to the benefit of each of the Parties and their respective predecessors, successors, permitted assigns, heirs, executors, administrators, and representatives; *provided* that nothing contained in this <u>Section 18</u> shall be deemed to permit Transfers of interests in the Lender Claims other than in accordance with the express terms of

this Agreement.    Notwithstanding anything to the contrary herein, the agreements, representations, and obligations of the Parties are, in all respects, several and neither joint nor joint and several.  For the avoidance of doubt, the obligations arising out of this Agreement are several and neither joint nor joint and several with respect to each Consenting Lender, in accordance with its proportionate interest hereunder, and the Parties agree not to proceed against any Consenting Lender for the obligations of another.  For the avoidance of doubt, the obligations arising out of this Agreement are several and neither joint, nor joint and several, with respect to each Sponsor.

**Section 19.    No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

**Section 20.    Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto (including the Term Sheet) constitutes the entire, integrated agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Consenting Lender shall continue in full force and effect in accordance with its terms.

**Section 21.    Counterparts.**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by facsimile, electronic mail, or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

**Section 22.    Notices.**

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier, or by registered or certified mail (return receipt requested) to the following addresses:

(a)    If to the Company, to:

FullBeauty Brands Holdings Corp.
One New York Plaza
New York, New York 10004
Attention:   Emilie Arel
                     Arlene Hong
                     (earel@fbbrands.com)
                     (ahong@fbbrands.com)

With a copy to:

36

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:   Jonathan S. Henes, P.C.
                   Emily Geier
                   George Klidonas
                   Rebecca Blake Chaikin
                   (jhenes@kirkland.com)
                   (emily.geier@kirkland.com)
                   (george.klidonas@kirkland.com)
                   (rebecca.chaikin@kirkland.com)

(b)      If to a Consenting Lender or a transferee thereof, to the addresses set forth below such Consenting Lender's signature (or as directed by any transferee thereof), as the case may be, with a copy to:

**If to the Consenting First Lien Lenders or the Consenting FILO Lenders:**

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, New York 10005
Attention:   Dennis F. Dunne
                   Gerard Uzzi
                   Nelly Almeida
                   Jason T. Anderson
                   (ddunne@milbank.com)
                   (guzzi@milbank.com)
                   (nalmeida@milbank.com)
                   (jtanderson@milbank.com)

**If to the Consenting Second Lien Lenders:**

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention:   Paul M. Basta
                   Elizabeth McColm
                   Christopher Hopkins
                   (pbasta@paulweiss.com)
                   (emccolm@paulweiss.com)
                   (chopkins@paulweiss.com)

(c)      If to a Sponsor or a transferee thereof, to the addresses set forth below such Sponsor's signature (or as directed by any transferee thereof), as the case may be, with a copy to:

37

**If to Apax:**

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attention:   Elisha D. Graff
                      Nicholas E. Baker
                      (egraff@stblaw.com)
                      (nbaker@stblaw.com)

**If to Charlesbank:**

Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Attention:   William P. Weintraub
                      Joseph F. Bernardi, Jr.
                      (wweintraub@goodwinlaw.com)
                      (jbernardi@goodwinlaw.com)

Any notice given by electronic mail, facsimile, delivery, mail, or courier shall be effective when received.

**Section 23.    Reservation of Rights; No Admission.**

(a)    Nothing contained herein shall (i) limit (A) the ability of any Party to consult with other Parties or (B) the rights of any Party under any applicable bankruptcy, insolvency, foreclosure, or similar proceeding, including the right to appear as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in or related to the Restructuring before a court of competent jurisdiction, in each case, so long as such consultation or appearance is not inconsistent with such Party's obligations hereunder, or, to the extent such Restructuring is consistent with this Agreement, under the terms of the Restructuring; (ii) limit the ability of any Consenting Lender to sell or enter into any transactions in connection with the Lender Claims, or any other claims against or interests in the Company, subject to the terms of Section 4(b); (iii) limit the rights of any Consenting Lender under the ABL Credit Agreement, First Lien Credit Agreement, or Second Lien Credit Agreement, as applicable, or any agreements executed in connection therewith, except to the extent exercise of any such rights are inconsistent with the terms of this Agreement as applicable to each such Consenting Lender; or (iv) constitute a waiver or amendment of any provision of the ABL Credit Agreement, First Lien Credit Agreement, or Second Lien Credit Agreement, as applicable, or any agreements executed in connection therewith.

(b)     Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in any bankruptcy case filed by the Company or any of its affiliates and subsidiaries. This Agreement and the transactions contemplated thereby are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms. This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses that it has asserted or could assert.

**Section 24.**     **<u>Relationship Among Consenting Lenders.</u>**

(a)     For the avoidance of doubt, (i) the Consenting FILO Lenders, (ii) the Consenting First Lien Lenders that are members of the Ad Hoc Group of First Lien Lenders, and (iii) the Consenting Second Lien Lenders that are members of the Ad Hoc Group of Second Lien Lenders, in each case, act in their individual capacities and not as agent, trustee, or in any other fiduciary capacity with respect to any other Consenting Lender or any other Party

(b)     It is understood and agreed that no Consenting Lender has any duty of trust or confidence in any kind or form with any other Consenting Lender as a result of this Agreement. In this regard, it is understood and agreed that any Consenting Lender may trade in the Lender Claims or other debt of the Company without the consent of the Company or any other Consenting Lender, subject to the ABL Credit Agreement, First Lien Credit Agreement, or Second Lien Credit Agreement, as applicable, the terms of this Agreement, and any confidentiality agreement entered into with the Company; *provided* that no Consenting Lender shall have any responsibility for any such trading to any other person or entity by virtue of this Agreement. No prior history, pattern, or practice of sharing confidences among or between the Consenting Lender shall in any way affect or negate this Agreement. The Parties acknowledge that this agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Company and the Parties do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended. No action taken by any Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Parties are in any way acting in concert or as such a "group."

(c) Notwithstanding anything to the contrary herein, nothing in this Agreement shall require any Consenting Lender or representative of a Consenting Lender that becomes a member of a statutory committee that may be established in any proceeding before a court of competent jurisdiction to take any action, or to refrain from taking any action, in such person's capacity as a statutory committee member; *provided* that nothing in this Agreement shall be construed as requiring any Consenting Lender to serve on any statutory committee that may be established in any proceeding before a court of competent jurisdiction.

**Section 25.**   **<u>No Solicitation; Representation by Counsel; Adequate Information</u>.**

(a) This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan. The acceptances and consents of any party with respect to the Plan will not have been solicited until after such party has been provided with such disclosures and/or materials in compliance with the applicable requirements of applicable law with respect to such solicitation.

(b) Each Party acknowledges that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c) Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation or acceptance of a chapter 11 plan of reorganization or an offering of securities, each Consenting Lender acknowledges, agrees, and represents to the other Parties that it (i) is an "accredited investor" as such term is defined in Rule 501(a) of the Securities Act of 1933, (ii) understands that any securities to be acquired by it pursuant to the Restructuring have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Lender's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, and (iii) has such knowledge and experience in financial and business matters that such Consenting Lender is capable of evaluating the merits and risks of the securities to be acquired by it pursuant to the Restructuring and understands and is able to bear any economic risks with such investment.

**Section 26.**   **<u>Additional Parties</u>.**

Without in any way limiting the requirements of <u>Section 4(b)</u> of this Agreement, additional Lenders may elect to become Parties upon execution and delivery to the other Parties of a counterpart hereof in accordance with <u>Section 14</u>. Such additional Parties shall become a Consenting Lender under this Agreement in accordance with the terms of this Agreement.

**Section 27.**    **Early Acceptance Premium and Professional Fees & Expenses.**

(a)    First Lien Early Acceptance Premium.

(i)    Each First Lien Lender that executes this Agreement by the Early Acceptance Date, or such other date as agreed to in writing between the Company and the Required Consenting First Lien Lenders (each, an "***Eligible First Lien Lender***") shall have earned its *pro rata* share of the First Lien Early Acceptance Premium set forth in the Term Sheet on the terms and conditions therein.  The Early Acceptance Premium shall be deemed to be a claim against the Company that rides through the Chapter 11 Cases unimpaired and shall be paid, in full, in cash on or before the Restructuring Effective Date.

(ii)    For the avoidance of doubt, the First Lien Early Acceptance Fee shall not be subject to Section 2.13 of the First Lien Credit Agreement, and the Company and the Consenting First Lien Lenders agree the Credit Agreement is hereby amended to provide for the foregoing.  Such amendment shall become effective on the date of this Agreement.  No other provisions of the First Lien Credit Agreement shall be deemed to be modified, and all other provisions of the First Lien Credit Agreement shall remain in full force and effect.

(b)    Reimbursement of Fees and Expenses.

(i)    The Company shall seek approval from the Bankruptcy Court for payment of the reasonable and documented out-of-pocket (i) fees and expenses incurred by advisors to the Ad Hoc Group of First Lien Lenders, Milbank and Ducera, pursuant to the existing fee payment arrangements between the Company and such advisors, (ii) fees and expense incurred by advisors to the Ad Hoc Group of Second Lien Lenders, Paul Weiss and Houlihan Lokey, pursuant to the existing fee payment arrangements between the Company and such advisors, (iii)  fees and expenses incurred by Davis Polk in its role as counsel to certain of the First Lien Lenders, in an amount not to exceed $188,000 in the aggregate, (iv) fees and expenses incurred by advisors to the Sponsors in an amount not to exceed $250,000 in the aggregate, and (v) the reasonable and documented out-of-pocket expenses of the members of Ad Hoc Group of First Lien Lenders, in each case pursuant to the Plan or other appropriate filing; *provided* that all invoices of such advisors and members of the Ad Hoc Group of First Lien Lenders received and outstanding as of the day before the Petition Date shall be paid in full on such date.

**Section 28.**    **Additional Provisions Regarding the Parties' Commitments.**

Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:

(a)     be construed to prohibit any Party from contesting whether any matter, fact, or thing is a breach of or is inconsistent with this Agreement;

(b)     be construed to prohibit any Party from appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of delaying, interfering with, impeding, or taking any other action to delay, interfere with, or impede, directly or indirectly, the Restructuring or this Agreement;

(c)     subject to the terms of section 4(a)(i)-(iii), affect the ability of any Party to consult with any other Party, the Company, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States trustee);

(d)     impair or waive the rights of any Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring;

(e)     prevent any Party from enforcing this Agreement;

(f)     require any Party to incur any material financial or other material liability other than as expressly described in this Agreement or the Definitive Documents;

(g)     obligate a Party to deliver a vote to support the Plan or prohibit a Party from withdrawing such vote, in each case, upon the Termination Date, Second Lien Termination Date, or Sponsor Termination Date, as applicable (other than as a result of the occurrence of the Effective Date); *provided* that upon the withdrawal of any such vote on or after the Termination Date (other than as a result of the occurrence of the Restructuring Effective Date), such vote shall be deemed void *ab initio* and such Party shall have the opportunity to change its vote, subject to the rules and provisions in the Bankruptcy Code or any order entered by the Bankruptcy Court;

(h)     require any Party to take any action which is prohibited by applicable law or to waive or forego the benefit of any applicable legal professional privilege;

(i)     prevent any Party from taking any action which is required by applicable law;

(j)     prevent any Party from exercising any right under the ABL Credit Agreement, the First Lien Credit Agreement, and the Second Lien Credit Agreement, nor shall anything contained in this Agreement be deemed to constitute a waiver or amendment of any provision of the ABL Credit Agreement, the First Lien Credit Agreement, and the Second Lien Credit Agreement other than as expressly set forth herein;

(k)     subject to the Bankruptcy Code, including section 362, prevent any Party from taking any customary perfection step or other action as is necessary to preserve or defend the validity, existence, or priority of its Company claims/interests in accordance with the terms of the ABL Credit Agreement, the First Lien Credit

Agreement, and the Second Lien Credit Agreement (including, without limitation, the filing of a proof of claim against any filing entity); *provided* that, for the avoidance of doubt, nothing in this Section 28(k) shall permit any Party to enforce any security interest, or exercise any foreclosure or other contractual or legal remedy, in respect of any asset of any Debtor that would otherwise not be permitted pursuant to Section 4; or

(l)     prohibit any Party from taking any action that does not violate such Party's obligations under this Agreement.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

[*Signature Pages Follow*]

43

**BLACKDOG HOLDINGS, INC.**

By:
Name:
Title: Emilie Arel
CEO, FullBeauty Brands

**FULLBEAUTY BRANDS HOLDINGS CORP.**

By:
Name:
Title: Emilie Arel
CEO, FullBeauty Brands

**FULLBEAUTY BRANDS LLC**

By:
Name:
Title: Emilie Arel
CEO, FullBeauty Brands

**FULLBEAUTY BRANDS INC.**

By:
Name:
Title: Emilie Arel
CEO, FullBeauty Brands

**FULLBEAUTY BRANDS MERCHANT, INC.**

By:
Name:
Title: Emilie Arel
CEO, FullBeauty Brands

**JESSICA LONDON, INC.**

By:
Name:
Title: Emilie Arel
CEO, FullBeauty Brands

**FULLBEAUTY BRANDS MANAGEMENT SERVICES, LLC**

By:
Name:
Title: Emilie Arel
CEO, FullBeauty Brands

**SWIMSUITS FOR ALL, LLC**

By:
Name:
Title: Emilie Arel
CEO, FullBeauty Brands

**FULLBEAUTY BRANDS OPERATIONS, LLC**

By:
Name:
Title: Emilie Arel
CEO, FullBeauty Brands

**FULLBEAUTY BRANDS TEXAS, LLC**

By:
Name:
Title: Emilie Arel
CEO, FullBeauty Brands

[Company Signature Page to Restructuring Support Agreement]

**BLACKDOG TOPCO HOLDINGS, LP**

By:

Name:

Title: Emilie Arel

Ceo, FullBeauty Brands

**CHARLESBANK EQUITY FUND VII, LIMITED PARTNERSHIP**

By:  Charlesbank Equity Fund VII GP, Limited Partnership, its General Partner

By:  Charlesbank Capital Partners, LLC, its General Partner

By: _____

Name:   Joshua Klevens

Title:   Managing Director

Sponsor's Claims Against the Company / Ownership Interest In Topco:

128,497,878.05 Topco Class A-2 Units

_____

_____

_____

Notice Information

Address:   c/o Charlesbank Capital Partners, LLC

   200 Clarendon Street, 54th Floor

   Boston, MA 02116

Attn:   Joshua Klevens and Stephanie Paré Sullivan, Esq.

Fax:   (617) 619-5402

Email:   jklevens@charlesbank.com and ssullivan@charlesbank.com

[*Sponsor Signature Page to Restructuring Support Agreement*]

**CB OFFSHORE EQUITY FUND VII, L.P**

By: CB Offshore Equity Fund VII GP, LLC, its General Partner

By: Charlesbank Equity Fund VII GP, Limited Partnership, its Sole Member

By: Charlesbank Capital Partners, LLC, its General Partner

By: _____

Name:   Joshua Klevens

Title:   Managing Director

> Sponsor's Claims Against the Company /   29,824,773.21 Topco Class A-2 Units
> Ownership Interest In Topco:

_____

_____

_____

Notice Information

Address:   c/o Charlesbank Capital Partners, LLC

200 Clarendon Street, 54th Floor

Boston, MA 02116

_____

_____

Attn:   Joshua Klevens and Stephanie Paré Sullivan, Esq.

Fax:   (617) 619-5402

Email:   jklevens@charlesbank.com and ssullivan@charlesbank.com

*[Sponsor Signature Page to Restructuring Support Agreement]*

**CHARLESBANK EQUITY COINVESTMENT FUND VII, LIMITED PARTNERSHIP**

By: Charlesbank Equity Fund VII GP, Limited Partnership, its General Partner
By: Charlesbank Capital Partners, LLC, its General Partner

By:  _____

Name:   Joshua Klevens

Title:   Managing Director

|  |  |
|---|---|
| Sponsor's Claims Against the Company / Ownership Interest In Topco: | 3,144,747.96 Topco Class A-2 Units |
|  | _____ |
|  | _____ |
|  | _____ |

Notice Information

Address:  c/o Charlesbank Capital Partners, LLC

200 Clarendon Street, 54th Floor

Boston, MA 02116

_____

_____

Attn:   Joshua Klevens and Stephanie Paré Sullivan, Esq.

Fax:   (617) 619-5402

Email:   jklevens@charlesbank.com and ssullivan@charlesbank.com

**CB PARALLEL FUND VII, LIMITED PARTNERSHIP**

By: Charlesbank Equity Fund VII GP, Limited Partnership, its General Partner
By: Charlesbank Capital Partners, LLC, its General Partner

By: _____

Name:    Joshua Klevens

Title:    Managing Director

Sponsor's Claims Against the Company /    12,800,331.67 Topco Class A-2 Units
Ownership Interest In Topco:

_____

_____

_____


Notice Information

Address:    c/o Charlesbank Capital Partners, LLC

200 Clarendon Street, 54th Floor

Boston, MA 02116

_____

_____

Attn:    Joshua Klevens and Stephanie Paré Sullivan,
Esq.

Fax:    (617) 619-5402

Email:    jklevens@charlesbank.com and
ssullivan@charlesbank.com

[*Sponsor Signature Page to Restructuring Support Agreement*]

**CHARLESBANK COINVESTMENT PARTNERS, LIMITED PARTNERSHIP**

By:  Charlesbank Capital Partners, LLC, its General Partner

By:  _____

Name:    Joshua Klevens

Title:    Managing Director

Sponsor's Claims Against the Company /         232,269.11 Topco Class A-2 Units
Ownership Interest In Topco:

_____

_____

_____

Notice Information

Address:    c/o Charlesbank Capital Partners, LLC

200 Clarendon Street, 54th Floor

Boston, MA 02116

_____

_____

Attn:    Joshua Klevens and Stephanie Paré Sullivan,
Esq.

Fax:    (617) 619-5402

Email:    jklevens@charlesbank.com and
ssullivan@charlesbank.com

*[Sponsor Signature Page to Restructuring Support Agreement]*

**APAX VIII-A L.P.**

By: _llha y_

Name: _Seth Brody_

Title: _Partner_

Sponsor's Claims Against the Company /
Ownership Interest In Topco:

_103,611,898 Class A-1 units_

By: _____

Name:

Title:

Notice Information

Address: _601 Lexington Avenue_
_53rd floor_
_New York, NY 10022_

Attn: _Seth Brody_
Fax: _212 319 6155_
Email: _seth.brody@apax.com_

*[Sponsor Signature Page to Restructuring Support Agreement]*

**APAX VIII-A L.P.**

By:  _____

Name:

Title:

Sponsor's Claims Against the Company /
Ownership Interest In Topco:

_____

_____

_____

By:  _____

Name:  Alex  Pellegrini

Title:  PartneR

Notice Information

Address:  601  Lexington  Avenue
53rd floor
New York, NY  10022

_____

Attn:  Alex pellegrini
Fax:  212 319 6155
Email:  Alex. Pellegrini@apax.com

*[Sponsor Signature Page to Restructuring Support Agreement]*

**APAX VIII-B L.P.**

By: _(signature)_

Name: Seth Brody

Title: Partner

Sponsor's Claims Against the Company /
Ownership Interest In Topco:

210,631,733 Class A-1 units

By: _____

Name:

Title:

Notice Information

Address: 601 Lexington Avenue
53rd floor
New York, NY 10022

Attn: Seth Brody

Fax: 212 319 6155

Email: seth.brody@apax.com

[*Sponsor Signature Page to Restructuring Support Agreement*]

**APAX VIII-B L.P.**

By: _____

Name:

Title:

        Sponsor's Claims Against the Company /
        Ownership Interest In Topco:

_____

_____

_____

By: _____

Name: Alex  Pellegrini

Title: Partner

Notice Information

Address: 601 Lexington Avenue.
        53rd floor
        New York, NY 10022

Attn: Alex Pellegrini
Fax: 212 319 6155
Email: Alex. pellegrini@apax.com

*[Sponsor Signature Page to Restructuring Support Agreement]*

**APAX VIII-1 L.P.**

By: _Seth Brody_

Name: _Seth Brody_

Title: _Partner_

Sponsor's Claims Against the Company /
Ownership Interest In Topco:

2,576,637 class A-1 units

By: _____

Name:

Title:

Notice Information

Address: 601 Lexington Avenue
53rd floor
New York, NY 10022

Attn: Seth Brody
Fax: 212 319 6155
Email: Seth.Brody@apax.com

*[Sponsor Signature Page to Restructuring Support Agreement]*

**APAX VIII-1 L.P.**

By: _____

Name:

Title:

       Sponsor's Claims Against the Company /
       Ownership Interest In Topco:

       _____

       _____

       _____

By: _____

Name: Alex Pellegrini

Title: PartneR

Notice Information

Address: 601 Lexington Avenue
         53rd floor
         New York, NY 10022

Attn: Alex Pellegrini
Fax: 212 319 6155
Email: alex.pellegrini@apax.com

*[Sponsor Signature Page to Restructuring Support Agreement]*

APAX VIII-2 L.P.

By: _Seth Brody_ (signature)

Name: Seth Brody

Title: Partner

Sponsor's Claims Against the Company /
Ownership Interest In Topco:

3,174,593 Class A-1 Units

By: _____

Name:

Title:

Notice Information

Address: 601 Lexington Avenue
53rd floor
New York, NY 10022

Attn: Seth Brody
Fax: 212 319 6155
Email: seth.brody@apax.com

*[Sponsor Signature Page to Restructuring Support Agreement]*

**APAX VIII-2 L.P.**

By: _____

Name:

Title:

Sponsor's Claims Against the Company /
Ownership Interest In Topco:

_____

_____

_____

By: _____

Name:  Alex Pellegrini

Title:  Partner

Notice Information

Address:  601 Lexington Avenue,
          53rd floor
          New York, New York 10022

_____

Attn:  Alex Pellegrini
Fax:   212 319  6155
Email: alex.pellegrini@apax.com

[*Sponsor Signature Page to Restructuring Support Agreement*]

**APAX VIII-AIV A L.P.**

By: _Seth Brody_

Name: _Seth Brody_

Title: _Partner_

Sponsor's Claims Against the Company /
Ownership Interest In Topco:        _101,883,884 Class A-1 units_

By: _____

Name:

Title:

Notice Information

Address: _601 Lexington Avenue_
_53rd floor_
_New York, NY 10022_

Attn: _Seth Brody_
Fax: _212 319 6155_
Email: _seth.Brody @apax. com_

[*Sponsor Signature Page to Restructuring Support Agreement*]

**APAX VIII-AIV A L.P.**

By: _____

Name:

Title:

Sponsor's Claims Against the Company /
Ownership Interest In Topco:

_____

_____

_____

By: _____

Name: Alex Pellegrini

Title: Partner

Notice Information

Address: 601 Lexington Avenue
53rd floor
New York, NY 10022

_____

Attn: Alex Pellegrini
Fax: 212 319 6155
Email: alex.pellegrini@apax.com

[*Sponsor Signature Page to Restructuring Support Agreement*]

**APAX VIII-AIV B, L.P.**

By: _(signature)_

Name: Seth Brody

Title: Partner

Sponsor's Claims Against the Company /
Ownership Interest In Topco:

36,808,999 Class A-1 units

By: _____

Name:

Title:

Notice Information

Address: 601 Lexington Avenue
53rd floor
New York, NY 10022

Attn: Seth Brody
Fax: 212 319 6155
Email: seth.Brody@apax.com

[Sponsor Signature Page to Restructuring Support Agreement]

**APAX VIII-AIV B, L.P.**

By: _____

Name:

Title:

Sponsor's Claims Against the Company /
Ownership Interest In Topco:

_____

_____

_____

By: _____

Name: Alex Pellegrini

Title: Partner

Notice Information

Address: 601 Lexington Avenue
53rd floor
New York, NY 10022

_____

Attn: Alex Pellegrini

Fax: 212 319 6155

Email: alex.pellegrini@apax.com

*[Sponsor Signature Page to Restructuring Support Agreement]*

[*Consenting Lender Signature Pages Omitted*]

## Exhibit A

**Term Sheet**

# FULLBEAUTY

## RESTRUCTURING TERM SHEET

### DECEMBER 18, 2018

This term sheet (together with the exhibits and schedules attached hereto, each as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and of Section 12 of the RSA (as defined herein), the "***Restructuring Term Sheet***") sets forth the principal terms of a financial restructuring (the "***Restructuring***") of the existing debt and other obligations of Blackdog Holdings, Inc. ("***Holdings***"), FULLBEAUTY Brands Holdings Corp. ("***FULLBEAUTY***"), and each of their subsidiaries that execute the RSA, which are listed on __Annex 1__ attached hereto (together with Holdings, collectively, the "***Company***").  This Restructuring Term Sheet has the support of the Consenting Lenders and the Sponsors, as set forth in the RSA.[1]

**THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.**

**THIS SUMMARY IS PRESENTED FOR DISCUSSION AND SETTLEMENT PURPOSES, AND IS ENTITLED TO PROTECTION FROM ANY USE OR DISCLOSURE TO ANY PERSON PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER RULE OF SIMILAR IMPORT.  THE TRANSACTIONS DESCRIBED HEREIN WILL BE SUBJECT TO THE NEGOTIATION, EXECUTION, AND DELIVERY OF DEFINITIVE DOCUMENTS THAT ARE IN ACCORDANCE WITH THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.[2]  NO BINDING OBLIGATIONS WILL BE CREATED BY THIS TERM SHEET UNLESS AND UNTIL SIGNATURE PAGES TO THE RSA ARE EXECUTED AND DELIVERED BY ALL APPLICABLE PARTIES.**

**TO THE EXTENT THAT ANY PROVISION OF THIS RESTRUCTURING TERM SHEET IS INCONSISTENT WITH THE RSA, THE TERMS OF THE RESTRUCTURING TERM SHEET WITH RESPECT TO SUCH PROVISION SHALL CONTROL.**

---

[1]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the RSA.

[2]  For the avoidance of doubt, approval of the Definitive Documents shall be subject to the terms of Section 2 of the RSA.

| Term | Description |
|------|-------------|
| | **OVERVIEW** |
| **Restructuring Summary** | Subject in all respects to the terms of the Restructuring Support Agreement (the "***RSA***") to which this Restructuring Term Sheet is attached as <u>Exhibit A</u>, the Restructuring will be consummated through voluntary cases (the "***Chapter 11 Cases***") commenced under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***"). |
| | The Chapter 11 Cases will be financed by (i) use of cash collateral and (ii) if the Company determines debtor-in-possession financing is necessary to the Chapter 11 Cases, one or more debtor-in-possession facilities (the "***DIP Financing***") on market terms, subject to a customary marketing process and approval by the Bankruptcy Court, which DIP Financing and use of cash collateral shall be consistent with this Restructuring Term Sheet and the RSA. |
| | As reorganized pursuant to the Restructuring, the Company shall be referred to herein, collectively, as the "***Reorganized Company***." |
| **Debt to Be Restructured** | Outstanding indebtedness of the Company that will be restructured or satisfied pursuant to the Restructuring includes: |
| | i.   All claims held by the lenders party to the ABL Credit Agreement derived from, based upon, or secured by the ABL Credit Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising under or related to (a) the approximately $100 million in commitments for asset-based loans and letters of credit (the "***ABL Claims***") and (b) approximately $75 million in first-in, last-out loans (the "***FILO Claims***"); |
| | ii.  All claims held by lenders party to the First Lien Credit Agreement derived from, based upon, or secured by the First Lien Credit Agreement, including approximately $782 million in principal amount outstanding, plus all interest, fees, expenses, costs, and other charges arising under or related to the First Lien Credit Agreement (the "***First Lien Claims***"); |
| | iii. All claims held by lenders party to the Second Lien Credit Agreement derived from, based upon, or secured by the Second Lien Credit Agreement, including approximately $345 million in principal amount outstanding, plus all interest, fees, expenses, costs, and other charges arising under or related to the Second Lien Credit Agreement (the "***Second Lien Claims***"); and |
| | iv.  Any and all claims that Topco, the Sponsors, and any controlled affiliates of the Sponsors, in their capacities as such, may have against the Company and/or the Reorganized Company, known or unknown as of the Restructuring Effective Date, including, without limitation, in connection with any advisory services or otherwise (the "***Sponsor Claims***"). |

| Term | Description |
|------|-------------|
| | **MATERIAL TERMS OF THE RESTRUCTURING** |
| **Reorganized Company Capital Structure** | The capital structure of the Reorganized Company upon the Restructuring Effective Date shall consist of the following: |
| | i.   A new exit facility (the "***Exit ABL Facility***"), which shall be entered into on terms and conditions substantially consistent with the existing ABL Credit Agreement (as modified consistent with Section 2 of the RSA), to be secured by the liens and security interests in substantially the same assets of the Reorganized Company and of substantially the same priority as the liens and security interests that currently secure the ABL Claims and subject to the consent rights under Section 2 of the RSA. |
| | ii.  A new $30 million exit term facility (the "***Exit Term Facility***"), which shall be entered into on terms and conditions consistent with the terms set forth on **Exhibit D** to the Restructuring Support Agreement and otherwise subject to the consent rights under Section 2 of the RSA. |
| | iii. A new first lien term loan credit facility (the "***New First Lien Term Loan***") of $250 million, consistent with the material terms set forth in the term sheet attached hereto as **Annex 2** (the "***New First Lien Term Loan Term Sheet***") and otherwise subject to the consent rights under Section 2 of the RSA. |
| | iv.  A new junior facility (the "***New Junior Loan***") of up to $50 million ($35 million of which shall be available to Electing First Lien Lenders and $15 million of which shall be distributed to holders of Second Lien Claims if the Restructuring is consummated pursuant to a Plan that is accepted by the class of Second Lien Claims), consistent with the material terms set forth in the term sheet attached hereto as **Annex 3** (the "***New Junior Loan Term Sheet***") and otherwise subject to the consent rights under Section 2 of the RSA. |
| | v.   A single class of equity interests in a Reorganized Company entity as determined by the Company and the Required Consenting First Lien Lenders, following the Company's consultation with the Ad Hoc Group of Second Lien Lenders and the Required Sponsors (the "***New Common Stock***"). |
| **Warrants** | On the Restructuring Effective Date, holders of Second Lien Claims and the Service Providers (as defined below) shall have the right to receive a package of warrants (the "***Warrants***") consistent with the material terms set forth below and in the term sheet attached hereto as **Annex 4** (the "***Warrants Term Sheet***"). |
| **Advisory Services Agreement** | On the Restructuring Effective Date, Apax Partners LP and Charlesbank (or its affiliates that provide advisory services) (collectively, the "***Service Providers***") and the Reorganized Company shall enter into a consulting agreement that is reasonably acceptable to the Service Providers, the Reorganized Company, and the Consenting First Lien Lenders pursuant to which the Service Providers shall provide transition services, advisory services, and operational services and |

| Term | Description |
|------|-------------|
| | assistance to the Reorganized Company as reasonably requested from time to time (the "***Advisory Services Agreement***") and shall release any and all Sponsor Claims. |
| | In exchange for such services and release, the Service Providers shall be entitled to receive from the Reorganized Company their *pro rata* share of (i) the Option Rights, subject to dilution by the Warrants and the MIP; (ii) the Sponsor Warrant Package, which consists of 40 percent of the Series B Warrants and 40 percent of the Series C Warrants, each as defined in the Warrants Term Sheet; and (iii) 2.5 percent (in the aggregate) of the New Common Stock issued and outstanding as of the Restructuring Effective Date, subject to dilution by the Warrants, the Option Rights, and the MIP. |
| | The term of the Advisory Services Agreement shall be 12 months; *provided* that if the Service Providers exercise the Option Rights in full, the term of the Advisory Services Agreement shall be extended by an additional 12 months (which extension shall not entitle the Sponsors or Service Providers to any additional fees under the Advisory Services Agreement or otherwise). |
| | All consideration paid to the Service Providers pursuant to, or otherwise as a result of entering into, the Advisory Services Agreement and providing the release shall be pro rata as between Apax and Charlesbank based on their relative ownership of equity of Topco as of the date hereof. |
| **Purchase Option** | On account of the services and releases to be provided by the Service Providers and Sponsors, as applicable, under the Advisory Services Agreement, on the Restructuring Effective Date, the Service Providers shall receive rights (the "***Option Rights***") to purchase New Common Stock from the Reorganized Company on the terms and conditions set forth in the term sheet attached hereto as **Annex 5** (the "***Purchase Option Term Sheet***"). |
| **Cash-Out Option** | Between the RSA Effective Date and the Restructuring Effective Date, the Company shall be entitled to purchase all, but not less than all, of the First Lien Claims held by the Consenting First Lien Lenders; *provided* that the purchase price is no less than 90 percent of the outstanding amount of such claims. |
| **Early Acceptance Premium** | Subject to Section 26 of the RSA, each Eligible First Lien Lender shall be entitled to receive its *pro rata* share of a 1 percent yield enhancement ($7.8 million) payable in cash (the "***First Lien Early Acceptance Premium***"). |
| | The Early Acceptance Premium shall be (i) fully earned by a Consenting First Lien Lender upon execution of the RSA by such Consenting First Lien Lender on or before the Early Acceptance Date or such other date as agreed to in writing between the Company and the Required Consenting First Lien Lenders (with email from counsel being sufficient); (ii) deemed to be a claim against the Company that rides through the Chapter 11 Cases unimpaired; and (iii) payable on or before the Restructuring Effective Date. |
| | The Early Acceptance Premium shall be payable to any affiliate of an Eligible First Lien Lender, at the election of such Eligible First Lien Lender. |

| Term | Description |
|---|---|
| **TREATMENT OF CLAIMS AND INTERESTS UNDER THE RESTRUCTURING** | |
| **DIP Claims** | If the Company determines DIP Financing is necessary to the Chapter 11 Cases and such DIP Financing is approved by the Bankruptcy Court, on the Restructuring Effective Date, all amounts outstanding under the DIP Financing shall (i) be paid in full, in cash (and all outstanding letters of credit shall be cash collateralized) or (ii) receive such other treatment agreed upon between the Company, the Required First Lien Lenders, and holders of claims under the DIP Financing. |
| **ABL Claims** | On the Restructuring Effective Date, the ABL Claims shall be paid in full in cash using the proceeds of the Exit ABL Facility. |
| **FILO Claims** | On the Restructuring Effective Date the FILO Claims shall be rolled into $75 million of New First Lien Term Loans. |
| **First Lien Claims** | Subject to the row entitled "Second Lien Claims" below, on the Restructuring Effective Date, each holder of First Lien Claims shall receive, in full and final satisfaction of its First Lien Claims, its *pro rata* share of (collectively, the "***First Lien Consideration***"): <br><br> i.  $175 million in aggregate principal amount of the New First Lien Term Loan; and <br><br> ii.  87.5 percent of the New Common Stock, subject to dilution by the Option Rights, Warrants, and MIP; *provided* that a holder may elect to receive in lieu of New Common Stock (which forfeited shares shall be distributed to non-electing holders, *pro rata*) a principal amount of the New Junior Loan that is equal to fifteen percent (15%) of the plan value of its original New Common Stock distribution; *provided, further*, that electing First Lien Lenders (the "***Electing First Lien Lenders***"), collectively, may receive no more than $35 million in aggregate principal amount of the New Junior Loan. |
| **Second Lien Claims** | On the Restructuring Effective Date, each holder of Second Lien Claims shall receive, in full and final satisfaction of its Second Lien Claims, its *pro rata* share of (collectively, the "***Second Lien Consideration***"): <br><br> i.  $15 million of the New Junior Loan; <br><br> ii.  10.0 percent of the New Common Stock, subject to dilution by the Option Rights, Warrants, and MIP; and <br><br> iii.  the Second Lien Warrant Package described in the Warrant Term Sheet. <br><br> The Plan will provide that holders of Second Lien Claims will receive the Second Lien Consideration only if the Plan is accepted by the class of Second Lien Lenders.  If the class of Second Lien Lenders votes to reject the plan, 10.0 percent of the New Common Stock shall be added to the First Lien Consideration and the $15 million of the New Junior Loan and the Second Lien |

5

| Term | Description |
|---|---|
| | Warrant Package shall not be issued. |
| **Other Claims** | On the Restructuring Effective Date, all other secured, priority, and general unsecured claims against the Company or its subsidiaries (not otherwise released pursuant to the RSA and this Restructuring Term Sheet) will (i) be paid in full in cash in the ordinary course of business, (ii) be reinstated, or (iii) receive such other treatment agreed to by the Company and the Required Consenting First Lien Lenders, following the Company's consultation with the Ad Hoc Group of Second Lien Lenders.<br><br>Notwithstanding anything to the contrary herein, any Sponsor Claims shall be waived or deemed canceled, released, and discharged and shall be of no further force and effect. |
| **Existing Equity** | On the Restructuring Effective Date, existing equity in Holdings shall be deemed canceled and extinguished and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distributions under the Plan to holders of existing equity in Topco or Holdings on account of such equity interests. |
| **Intercompany Claims & Interests** | Intercompany claims and interests shall be reinstated, compromised, or cancelled at the election of the Company, with the reasonable consent of the Required Consenting First Lien Lenders, such that intercompany claims and interests are treated in a tax-efficient manner to the extent reasonably practicable. |
| **GENERAL PROVISIONS** | |
| **Structuring** | The Restructuring shall be structured in a manner determined by the Company and the Required Consenting First Lien Lenders, following the Company's consultation with the Ad Hoc Group of Second Lien Lenders and the Sponsors, to achieve a tax efficient structure for the First Lien Lenders and the Reorganized Company. |
| **Release Provisions** | Occurrence of the Restructuring Effective Date will be subject in all respects to approval (in all material respects) in the Confirmation Order of the release provisions set forth in **Annex 6**, attached hereto (the "*Release*"). Pursuant to the RSA, and subject to the terms and conditions set forth therein, the Consenting Lenders and Sponsors agree not to "opt out" of the consensual "Third-Party" releases, including those granted to the Company's current and former officers, directors, and employees. |
| **Constituent Documents** | The documentation evidencing the corporate governance for each reorganized Company, including charters, bylaws, limited liability company agreements, shareholder agreements, and/or other organizational documents of each Company entity shall be consistent with this Term Sheet and otherwise prepared in accordance with the consent rights set forth in Section 2 of the |

| Term | Description |
|------|-------------|
| | RSA. |
| **Governance** | The composition of the Board of Directors of the Reorganized Company shall be consistent with the material terms set forth in the term sheet attached hereto as **Annex 7** (the "**Governance Term Sheet**") and otherwise subject to the consent rights set forth in Section 2 of the RSA. |
| **Management Incentive Plan** | The management incentive plan of the Company (the "**MIP**") shall be agreed to in form and substance no later than the Definitive Documents Agreement Date and the terms and conditions of the MIP shall be (i) consistent with the material terms set forth below and in the term sheet agreed to between the Company and the Required Consenting First Lien Lenders on or before the RSA Effective Date and (ii) in form and substance acceptable to the Company and the Required Consenting First Lien Lenders. |
| | The MIP shall provide for no less than 10.0 percent of the New Common Stock to be reserved for issuance to management of the Reorganized Company on or following the Restructuring Effective Date. |
| | The initial grants under the MIP will be in the form of restricted stock units, two-thirds of which will vest based on achievement of certain performance conditions to be determined by the board of the Reorganized Company in good faith and set forth in the applicable award agreement, but in no event shall any performance condition require achievement of greater than EBITDA of $130 million, and one-third of which will vest ratably over four years based on the passage of time. |
| **Employee Compensation and Benefit Programs** | Subject to the terms and conditions set forth in the RSA (including, without limitation, the representations and warranties set forth therein), the employment agreements and severance policies, and all employment, compensation and benefit plans, policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, SERP plans, healthcare plans, disability plans, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans, and programs of the Company applicable to any of its employees and retirees, in each case existing as of the Restructuring Effective Date (collectively, the "**Employee Plans**"), shall be assumed by the Company (and assigned to the Reorganized Company, if necessary) pursuant to section 365(a) of the Bankruptcy Code, either by a separate motion filed with the Bankruptcy Court or pursuant to the terms of the Plan; *provided, that* the terms of any long-term incentive plan shall be as determined in the discretion of the Reorganized Company's board of directors. |
| | Notwithstanding the foregoing, with respect to management, any provision relating to equity based awards, including without limitation, any termination related provisions with respect to equity based awards will be replaced and superseded in its entirety by the MIP. |
| **Key Employee Incentive and** | Subject to the terms and conditions set forth in the RSA (including, without limitation, the representations and warranties set forth therein), the key |

| Term | Description |
|------|-------------|
| **Retention Plans** | employee incentive or retention plans, as approved by the Compensation Committee on October 15, 2018 and the Board of Directors of Blackdog Topco Holdings L.P. on October 21, 2018, shall be assumed by the Reorganized Company (and assigned to the Reorganized Company, if necessary) pursuant to section 365(a) of the Bankruptcy Code and the terms of the Plan; *provided, that* the aggregate amount to be paid under the retention and incentive plans shall not exceed $22.88 million (as set forth in the schedule sent by Milbank to the Company on December 15, 2018 and not including payroll taxes and other administrative costs) and the key employee incentive plan for both Insiders and non-Insiders shall be 50% guaranteed and 50% set on performance (to be determined by the board of directors of the Reorganized Company).<br><br>Notwithstanding the foregoing, with respect to management, any provision relating to equity based awards will be replaced and superseded in its entirety by the MIP. |
| **Indemnification Obligations** | Subject to the terms and conditions set forth in the RSA (including, without limitation, the representations and warranties set forth therein), the Company's indemnification provisions in place as of the RSA Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment contracts, for the current and former directors and officers that are currently employed by, or serving on the Board of Directors of any of the Company's entities, as of the Petition Date, will be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and will continue as obligations of the Reorganized Debtors; *provided* the Reorganized Debtors shall not indemnify the directors of the Debtors for any claims or causes of action for which indemnification is barred under applicable law, the Company's organizational documents, or applicable agreements governing the Company's indemnification obligations.<br><br>Subject to the terms and conditions set forth in the RSA (including, without limitation, the representations and warranties set forth therein), all director and officer insurance policies in place as of the Restructuring Effective Date will be deemed and treated as executory contracts that will be assumed by the Reorganized Company under the Plan and the Company shall retain tail coverage for the current and former directors and officers of any of the Company's entities, subject to the consent of the Required Consenting First Lien Lenders (which shall not be unreasonably withheld). |

| Term | Description |
|------|-------------|
| **BANKRUPTCY-SPECIFIC CONSIDERATIONS** ||
| **Fees and Expenses** | The Company shall, and shall seek approval from the Bankruptcy Court to, pay or reimburse all reasonable and documented fees and out-of-pocket expenses in accordance with Section 26 of the RSA.<br><br>In addition, the Company shall, and shall seek Bankruptcy Court approval to, pay or reimburse all reasonable and documented fees and out-of-pocket expenses of the advisors to the ABL Agent and the ABL Lenders in accordance with the ABL Credit Agreement and any forbearance agreements or amendments in connection with the ABL Credit Agreement in effect as of the RSA Effective Date. |
| **General Comment Regarding Treatment** | Each holder of an allowed claim or allowed interest, as applicable, shall receive under the Plan the treatment described herein in final satisfaction, settlement, release, and discharge of and in exchange for such holder's allowed claim or allowed interest, except to the extent different treatment is agreed to by (i) the Company or the Reorganized Company, as applicable, (ii) the holder of such allowed claim or allowed interest, as applicable, and (iii) the Required Consenting First Lien Lenders; provided, that the Company shall consult with the Ad Hoc Group of Second Lien Lenders.<br><br>Unless otherwise indicated, the holder of an allowed claim or allowed interest, as applicable, shall receive such treatment on the Restructuring Effective Date or as soon as reasonably practicable thereafter. |
| **Conditions Precedent to the Restructuring Effective Date** | The Plan shall contain customary conditions precedent to occurrence of the Restructuring Effective Date, including the following:<br><br>i. The RSA shall remain in full force and effect and shall not have been terminated;<br><br>ii. The Early Acceptance Premium shall have been paid in cash, in full in accordance with the terms hereof and in the RSA;<br><br>iii. All conditions precedent to the effectiveness of the Exit ABL Facility, the Exit Term Facility, the New First Lien Term Loan, and the New Junior Loan shall have been satisfied or duly waived;<br><br>iv. The Plan shall contain the Release;<br><br>v. The Confirmation Order shall have been duly entered and in full force and effect;<br><br>vi. The Company shall have obtained any authorization, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring;<br><br>vii. The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements, and exhibits to the Plan shall be consistent with |

| Term | Description |
|------|-------------|
| | the RSA and otherwise approved by the parties thereto consistent with their respective consent and approval rights as set forth in Section 2 of the RSA, and shall have been filed in a manner consistent with the RSA; |
| | viii. All fees, expenses, and other amounts payable pursuant to Section 26(b) of the RSA or an order of the Bankruptcy Court consistent with the RSA shall have been paid in full; |
| | ix. The Company shall have provided to the Consenting First Lien Lenders or their advisors all reasonably requested financial information; |
| | x. The execution of all other Definitive Documents in accordance with Section 2 of the RSA; and |
| | xi. The Company and Reorganized Company, as applicable, shall have implemented the Restructuring in a manner consistent in all respects with the Plan and the RSA. |
| **Executory Contracts and Unexpired Leases** | Except as otherwise set forth herein, the treatment (*e.g.*, assumption, assumption and assignment, and/or rejection) of all executory contracts and unexpired leases to which the Company is party shall be subject to the reasonable consent of the Required Consenting First Lien Lenders and the Company's consultation with the Ad Hoc Group of Second Lien Lenders. |
| **Amendments** | This Term Sheet may be amended only as permitted pursuant to Section 12 of the RSA. |

\*      \*      \*      \*      \*

## <u>Annex 1</u>

- Blackdog Holdings, Inc.
- FULLBEAUTY Brands Holdings Corp.
- FULLBEAUTY Brands, LLC
- FULLBEAUTY Brands, Inc.
- FULLBEAUTY Brands Merchant, Inc.
- FULLBEAUTY Brands Management Services, LLC
- Jessica London, Inc.
- Swimsuits for All, LLC
- FULLBEAUTY Brands Operations, LLC
- FULLBEAUTY Brands Texas, LLC

**<u>Annex 2</u>**

**New First Lien Term Loan Term Sheet**

FULLBEAUTY Brands Holdings Corp.
$250,000,000 Term Facility
Summary of Principal Terms and Conditions


THIS TERM SHEET (TOGETHER WITH THE EXHIBITS AND SCHEDULES ATTACHED HERETO, EACH AS MAY BE AMENDED, RESTATED, SUPPLEMENTED, OR OTHERWISE MODIFIED FROM TIME TO TIME IN ACCORDANCE WITH THE TERMS HEREOF, THE "*TERM FACILITY TERM SHEET*") SETS FORTH THE PRINCIPAL TERMS OF THE TERM FACILITY TO BE ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING AND IS ATTACHED AS ANNEX 2 TO, AND SUBJECT IN ALL RESPECTS TO, THE TERMS OF THE RESTRUCTURING TERM SHEET, ATTACHED AS EXHIBIT A TO THE RESTRUCTURING SUPPORT AGREEMENT.

THIS TERM FACILITY TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS. THIS SUMMARY IS PRESENTED FOR DISCUSSION AND SETTLEMENT PURPOSES, AND IS ENTITLED TO PROTECTION FROM ANY USE OR DISCLOSURE TO ANY PERSON PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER RULE OF SIMILAR IMPORT.

THE REGULATORY, TAX, ACCOUNTING, AND OTHER LEGAL AND FINANCIAL MATTERS RELATED TO THE RESTRUCTURING HAVE NOT BEEN FULLY EVALUATED, AND ANY SUCH EVALUATION MAY AFFECT THE TERMS AND STRUCTURE OF THE TERM FACILITY. FURTHER, THE TRANSACTIONS DESCRIBED HEREIN WILL BE SUBJECT TO THE NEGOTIATION, EXECUTION, AND DELIVERY OF DEFINITIVE DOCUMENTS IN ACCORDANCE WITH THE TERMS SET FORTH HEREIN (THE "FACILITIES DOCUMENTATION"). THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH FACILITIES DOCUMENTATION. NO BINDING OBLIGATIONS WILL BE CREATED BY THIS TERM SHEET UNLESS AND UNTIL SIGNATURE PAGES TO THE FACILITIES DOCUMENTATION ARE EXECUTED AND DELIVERED BY ALL APPLICABLE PARTIES.


| | |
|---|---|
| Borrower: | FULLBEAUTY Brands Holdings Corp. ("*FULLBEAUTY Holdings*") a Delaware corporation or a subsidiary and/or affiliate of FULLBEAUTY Holdings as determined by the Required Consenting First Lien Lenders (as defined in the Restructuring Support Agreement ("*RSA*")) and the Company (the |

"***Borrower***").[1]

Holdings:

Blackdog Holdings Inc., a Delaware corporation ("***Holdings***").

Credit Facilities Transactions:

In connection with the Restructuring it is intended that Borrower will obtain (i) a Term Facility (as defined below) in an aggregate principal amount of $250.0 million, (ii) a senior facility (the "***New Term Facility***") in an aggregate principal amount of $30.0 million; provided that the New Term Facility shall be incurred pursuant to the same documentation as the Term Facility (iii) a second lien subordinated junior loan facility (the "***Subordinated Facility***" in an aggregate principal amount of up to $50.0 million and (iii) an asset based revolving credit facility in an aggregate principal amount up to $100.0 million (the "***ABL Facility***", and collectively with the Term Facilities, the "***Credit Facilities***").

Administrative Agents and Collateral Agents:

An entity determined by Required First Lien Lenders (as defined in the RSA) will act as sole administrative agent and sole collateral agent (in such capacities, the "***Administrative Agent***") for a syndicate of banks, financial institutions and other entities (excluding certain disqualified institutions) with respect to the Term Facility (the "***Lenders***"), and will perform the duties customarily associated with such roles.

Credit Facilities:

A senior secured first lien term loan facility (the "***Term Facility***") in an aggregate principal amount of $250.0 million (the loans thereunder, the "***Term Loans***") which will include $175.0 million funded by exchanging the Existing First Lien Term Loans (as defined below) and $75.0 million funded by exchanging the Existing FILO Tranche (as defined below) of the Existing ABL Facility (as defined below) and the $30.0 million New Term Facility subject to the terms and conditions set forth on Exhibit

---

[1] To the extent the Borrower is an entity other than FULLBEAUTY Holdings, this Term Facility Term Sheet shall be amended as appropriate to reflect all necessary corresponding changes.

D to the RSA.

| | |
|---|---|
| Existing Credit Facilities: | (a) <u>Existing First Lien Facility</u>: First Lien Term Loan Credit Agreement dated as of October 14, 2015 among FullBeauty Brands Holdings Corp., as borrower, JP Morgan Chase Bank, N.A., as administrative agent and the lenders party thereto (as amended, amended and restated or otherwise modified, the "***Existing First Lien Credit Agreement***" and the loans outstanding pursuant thereto, the "***Existing First Lien Term Loans***"); (b) <u>Existing ABL Credit Agreement</u>: ABL Credit Agreement dated as of October 14, 2015 among FullBeauty Brands Holdings Corp., as borrower, JP Morgan Chase Bank, N.A. as administrative agent and the lenders party thereto (the "***Existing ABL Credit Agreement***" and the loans outstanding pursuant thereto, the "***Existing ABL Loans***") as amended by Amendment No. 1 dated August 8, 2017 pursuant to which Incremental Lenders (as defined in the Existing ABL Credit Agreement) provided a FILO Tranche (as defined in the existing ABL Credit Agreement) of $75.0 million (such FILO Tranche, the "***Existing FILO Tranche***") and (c) Existing Second Lien Credit Agreement: Second Lien Term Loan Credit Agreement dated as of October 14, 2015 among FullBeauty Brands Holdings Corp., as borrower, Goldman Sachs Bank USA, as administrative agent and the lenders party thereto (as amended, amended and restated or otherwise modified, the "***Existing Second Lien Credit Agreement***" and the loans outstanding pursuant thereto, the "***Existing Second Lien Term Loans***").<br><br>Terms not otherwise defined herein, shall have the meanings set forth in the Existing First Lien Credit Agreement. |
| Incremental Term Facilities: | The Facilities Documentation will permit the Borrower to add one or more incremental term loan facilities under the Facilities Documentation (each, an "***Incremental Term Facility***") in an aggregate amount of up to: (a) $50.0 million (this clause (a), the "***Unrestricted Incremental Amount***") <u>plus</u> (b) all voluntary prepayments of the Term Facility prior to such time (excluding prepayments with the proceeds of indebtedness (other than the ABL Facility)) <u>plus</u> (c) |

3

unlimited additional amounts so long as on a pro forma basis after giving effect to the incurrence of any such Incremental Term Facility (assuming the full amount thereof is drawn) and after giving effect to any acquisition consummated in connection therewith and all other appropriate pro forma adjustments (but excluding the cash proceeds of any Incremental Facilities) the First Lien Senior Secured Leverage Ratio (as defined below) does not exceed 4.10 to 1.00 (other than amounts incurred concurrently with the incurrence of Incremental Term Facilities in reliance on the Unrestricted Incremental Amount) in which case the First Lien Senior Secured Leverage Ratio shall be permitted to exceed 4.10 to 1.00 to the extent of such amounts incurred in reliance on the Unrestricted Incremental Amount) (this clause (c), the "*Incremental Incurrence Test*"), subject to the terms and conditions consistent with the Existing First Lien Credit Agreement (including for the avoidance of doubt, the MFN adjustment set forth in Section 2.14(b) of the Existing First Lien Credit Agreement).

"*First Lien Senior Secured Leverage Ratio*" means the ratio of (a) Consolidated Total Debt (to be defined consistent with the Existing First Lien Credit Agreement but in any event to calculate amounts outstanding under the ABL Facility on an average basis on terms customary for retail ABL facilities), other than junior lien and unsecured debt less the Borrower's and its restricted subsidiaries' unrestricted cash and cash equivalents, as of the last day of such test period to (b) Consolidated EBITDA (to be defined in a manner consistent with the Existing First Lien Credit Agreement) for such test period.

Refinancing Facilities:

The Facilities Documentation will permit the Borrower to refinance loans under the Term Facility (or any Incremental Term Facility) from time to time, in whole or part, with one or more new term facilities (each, a "*Refinancing Term Facility*") under the Facilities Documentation with the consent of the Borrower, the Administrative Agent (acting upon the consent of the Requisite Lenders) and the institutions providing such Refinancing Term Facility or with one or more

4

additional series of senior unsecured notes or loans or senior secured notes or loans that will be secured by the Collateral on a *pari passu* basis or by senior secured notes or loans that will be secured on a junior basis with the Term Facility, senior subordinated notes or loans, or subordinated notes or loans (any such notes or loans, "**Refinancing Notes**"), subject to the terms and conditions consistent with the Existing First Lien Credit Agreement .

| | |
|---|---|
| Closing Date: | The Restructuring Effective Date (as defined in the RSA). |
| Interest Rates and Fees: | As set forth on Annex I hereto. |
| Default Rate: | Consistent with the Existing First Lien Credit Agreement. |
| Final Maturity and Amortization: | Commencing on the first full fiscal quarter ended after the Closing Date, the Term Facility will amortize in equal quarterly installments in aggregate annual amounts equal to 1.0% of the original principal amount of the Term Facility, with the balance payable on the maturity date thereof.  The Term Facility will mature on the date that is five years after the Closing Date; *provided that* the Facilities Documentation shall provide the right for individual Lenders to agree to extend the maturity date of the outstanding Term Loans upon the request of the Borrower and without the consent of any other Lender (and as further described below). |

Notwithstanding anything to the contrary set forth herein, the Facilities Documentation shall provide that the Borrower may at any time and from time to time request that all or a portion of any loans of the Borrower be converted to extend the scheduled maturity date(s) of any payment of principal with respect to all or a portion of any principal amount of such loans (any such loans which have been so converted, "**Extended Loans**") and upon such request of the Borrower any individual Lender shall have the right to agree to extend the maturity date of its outstanding Term Loans without the consent of any other Lender; *provided* that all such requests shall be made in a manner and subject to terms consistent with

5

the Existing First Lien Credit Agreement.

In connection with incurring any Extended Loans, Borrower and the applicable Lender shall agree to any modifications to such Extended Loans as are necessary to ensure that the incurrence of such Extended Loans shall not prevent the repayment of the indebtedness under the Subordinated Facility at maturity.

<u>Guarantees</u>:                    Same as the Existing First Lien Credit Agreement.

<u>Security</u>:                      Same as the Existing First Lien Credit Agreement (the "***Collateral***").

<u>Mandatory Prepayments</u>:         Loans under the Term Facility shall be prepaid with:

a)  commencing with the first full fiscal year ending after the Closing Date, 50% of Excess Cash Flow (to be defined in a manner consistent with the Existing First Lien Credit Agreement) in excess of $5.0 million per annum if the First Lien Senior Secured Leverage Ratio is greater than or equal to 4.00 to 1.00; 25% of Excess Cash Flow if the First Lien Senior Secured Leverage Ratio is greater than or equal to 3.50 to 1.00 but less than 4.00 to 1.00; and 0% of Excess Cash Flow if the First Lien Senior Secured Leverage Ratio is less than 3.50 to 1.00; *provided that* such prepayment shall be subject to the same terms, conditions and other provisions (including any applicable credits and reductions) as set forth in the Existing First Lien Credit Agreement;

b)  100% of the net cash proceeds of all non-ordinary course asset sales or other dispositions of property by the Borrower and its restricted subsidiaries (including insurance and condemnation proceeds and sale leaseback proceeds) subject to exceptions to be agreed (including in excess of thresholds per transaction and per fiscal year consistent with the Existing First Lien Credit Agreement) and subject to the right to reinvest 100% of such proceeds, if such proceeds are reinvested in the business (other

6

than working capital, except for short term capital assets), including in permitted acquisitions or capital expenditures (or committed to be reinvested) within 12 months and, if so committed to be reinvested, so long as such reinvestment is actually completed within 180 days after the end of such 12 month period, and other exceptions to be set forth in the Facilities Documentation and consistent with the Existing First Lien Credit Agreement; and

c) 100% of the net cash proceeds of issuances of debt obligations of the Borrower and its restricted subsidiaries after the Closing Date (excluding debt permitted under the Facilities Documentation, but including Refinancing Term Facilities and Refinancing Notes).

Mandatory prepayments (other than from the proceeds of indebtedness) shall be applied, without premium or penalty, subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of Adjusted LIBOR borrowings other than on the last day of the relevant interest period, on a pro rata basis (subject to the third succeeding paragraph) to the Term Facility and any Incremental Facility under the Facilities Documentation and to scheduled amortization payments thereof in direct order of maturity to the next eight scheduled amortization payments and then pro rata to the remaining scheduled amortization payments.

Any Lender under the Term Facility may elect not to accept its pro rata portion of any mandatory prepayment under clause (a) or (b) above (each a "***Declining Lender***").    Any prepayment amount declined by a Declining Lender may be retained by the Borrower.

Prepayments from foreign subsidiaries' Excess Cash Flow and asset sale proceeds will be subject to customary limitations under the Facilities Documentation to the extent such prepayments (including the repatriation of cash in connection therewith) would (a) be prohibited or delayed by applicable law (*provided that* the Borrower and its restricted subsidiaries shall take all commercially

7

reasonable actions available under local law to permit such repatriation) or (b) result in material adverse tax consequences.

Mandatory prepayments shall be applied first to loans under the New Term Facility until paid in full and then to Lenders under any Term Facility on a pro rata basis as provided for above.

Voluntary Prepayments and Reductions in Commitments:

Voluntary prepayments of borrowings under the Term Facility will be permitted at any time in minimum principal amounts consistent with the Existing First Lien Credit Agreement, without premium or penalty (except as provided below), subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of Adjusted LIBOR borrowings other than on the last day of the relevant interest period.

All voluntary prepayments of the Term Facility and any Incremental Facility will be applied to the remaining amortization payments under the Term Facility or such Incremental Facility, as applicable, as directed by the Borrower (and absent such direction, in direct order of maturity thereof) and may be applied to the Term Facility or any Incremental Facility, in any case, as directed by the Borrower.

Prepayment Premium:

In the event all or any portion of the Term Facility is voluntarily repaid (or mandatorily prepaid from the proceeds of any indebtedness), prior to the second anniversary of the Closing Date, such repayments shall be (i) non-callable if such repayment occurs prior to the first anniversary of the Closing Date (unless such repayment is made subject to a customary make-whole), (ii) made at 101% of the amount repaid if such repayment occurs after the first anniversary of the Closing Date but on or prior to the second anniversary of the Closing Date and (iii) at par after the second anniversary of the Closing Date.

Representations and Warranties:

Including without limitation the following and consistent with the Existing First Lien Credit Agreement (to be applicable to the Borrower, its restricted subsidiaries and, in certain cases as determined by the Required First Lien Lenders, Holdings only): organizational status and good standing; power and authority, due authorization,

8

qualification, execution, delivery, binding effect and enforceability of the Facilities Documentation; with respect to the Facilities Documentation, no violation of, or conflict with, law, organizational documents or material debt agreements; compliance with law; anti-terrorism laws, including PATRIOT Act and OFAC; FCPA; litigation; margin regulations; material governmental and third party approvals; Investment Company Act; accurate and complete disclosure; accuracy of historical and pro forma financial statements; no material adverse change (after the Closing Date); taxes; ERISA; subsidiaries; intellectual property; environmental laws; use of proceeds; ownership of properties; creation and perfection of liens (subject to permitted liens) and other security interests; and consolidated solvency of the Borrower and its subsidiaries as of the Closing Date, subject, in the case of each of the foregoing representations and warranties, to customary qualifications and limitations for materiality to be provided in the Facilities Documentation in a manner consistent with the Existing First Lien Credit Agreement.

Conditions to Borrowing:

The availability of the extension of credit under the Term Facility on the Closing Date will be subject to conditions usual and customary for transactions of this type, including without limitation:

(a) the accuracy of representations and warranties in all material respect, (b) the absence of defaults or events of default at the time of, or after giving effect to the making of, such extension of credit and (c) the consummation of the other transactions contemplated to occur pursuant to the RSA on the Closing Date.

Affirmative Covenants:

Including without limitation the following and consistent with the Existing First Lien Credit Agreement (to be applicable to the Borrower and its restricted subsidiaries only):   delivery of annual audited and quarterly unaudited financial statements, annual budgets in form customarily prepared by the Borrower, accountants' letters, officers certificates and other information reasonably requested by the Administrative Agent; compliance certificates; notices of defaults and litigation; notice of material ERISA events; inspections (subject to frequency (so long as

9

there is no ongoing event of default) and cost reimbursement limitations); maintenance of property (subject to casualty, condemnation and normal wear and tear) and customary insurance (but not, for the avoidance of doubt, flood insurance except to the extent required by applicable law); maintenance of existence and corporate franchises, rights, licenses and privileges; maintenance and inspection of books and records; payment of material taxes and similar claims; compliance with laws and regulations (including ERISA, environmental, the PATRIOT Act, OFAC and FCPA); additional Guarantors and Collateral (subject to limitations set forth above); use of proceeds; quarterly lender calls; provided that any calls hosted for the equity holders that Lenders can participate in shall be sufficient for purposes of this covenant; changes in lines of business; and further assurances on collateral and guarantee matters, subject, in the case of each of the foregoing covenants, to exceptions and qualifications to be provided in the Facilities Documentation in a manner consistent with the Existing First Lien Credit Agreement.

<u>Negative Covenants:</u>

Including without limitation the following and consistent with the Existing First Lien Credit Agreement (to be applicable to the Borrower and its restricted subsidiaries and, with respect to the passive holding company covenant, Holdings) limitations on:

a) the incurrence of debt, with exceptions that are consistent with the Existing First Lien Credit Agreement other than (i) an exception to incur indebtedness in respect of the ABL Facility, any Incremental ABL Facility and permitted refinancings thereof, (ii) an exception to incur the Subordinated Facility (subject to a customary intercreditor and subordination agreement) and any permitted refinancings thereof, (iii) an exception to incur the New Term Facility (subject to provisions setting forth the senior priority and first right of payment of the New Term Loans); provided that, no refinancings of the New Term Facility shall be permitted, (iv) Permitted Alternative Incremental Facilities Debt; provided that any such Indebtedness that is secured by a lien on

10

the Collateral that is pari passu with the liens securing the Obligations shall be subject to the MFN adjustment set forth in Section 2.14(b) of the Existing First Lien Credit Agreement (v) the general indebtedness basket which shall not exceed the greater of $26.25 million and 30% of Consolidated EBITDA as of the most recent test period;

b) liens, with exceptions including the ability to secure the New Term Facility in accordance with the Interlender Agreement and to incur additional liens consistent with the Existing First Lien Credit Agreement other than the exception for a general liens basket which shall not exceed the greater of $35.0 million and 40% of Consolidated EBITDA as of the most recent test period;

c) fundamental changes;

d) asset sales (including sales of capital stock of restricted subsidiaries) consistent with the Existing First Lien Credit Agreement and sale leasebacks (with no exceptions with respect to sale leasebacks);

e) investments (which shall be permitted on the terms set forth in the section entitled "General Restricted Payment Incurrence Test" hereof, and pursuant to exceptions consistent with the Existing First Lien Credit Agreement, and acquisitions (which shall be permitted on the terms set forth in the section entitled "Permitted Acquisitions" hereof);

f) dividends or distributions on, or redemptions of, the Borrower's equity interests, with exceptions (i) consistent with the Existing First Lien Credit Agreement other than (A) customary exceptions for distributions necessary to pay fees, franchise and similar taxes required to maintain corporate existence and other overhead expenses of direct and indirect parents thereof attributable to the ownership of the Borrower and its subsidiaries and consolidated, combined or similar income

11

taxes attributable to the Borrower and its subsidiaries which shall be permitted up to an amount to be agreed, (B) the payment of any dividends or distributions to repurchase the equity interests of current and former employees and officers etc. up to an amount to be agreed and (ii) on the terms set forth in the section entitled "General Restricted Payment Incurrence Test" hereof; provided that the Term Facility will contain a prohibition on any Loan Party making a Restricted Payment of any portion of the Equity Interests of any Subsidiary that (1) is (a) directly or indirectly wholly owned by such Loan Party, and (b) a Guarantor immediately prior to such Restricted Payment, and (2) remains a direct or indirect Subsidiary of Holdings, Borrower, any other Loan Party or any of their respective Subsidiaries after giving effect to such Restricted Payment, to any Affiliate of Holdings (other than another wholly-owned Subsidiary) unless (x) such Restricted Payment of such Equity Interests is being made in connection with a disposition of such Equity Interests to a third party for fair market value that occurs substantially contemporaneously (and in any event within three (3) Business Days) of such Restricted Payment, or (y) such Subsidiary whose Equity Interests are subject to such Restricted Payment remains a Guarantor;

g)   prepayments, purchases or redemptions of subordinated indebtedness existing on the Closing Date (the "***Specified Indebtedness***"), with exceptions that are consistent with the Existing First Lien Credit Agreement and on the terms set forth in the section entitled "General Restricted Payment Incurrence Test" hereof, or amendments of any documentation governing such indebtedness in a manner material and adverse to the Lenders;

h)   negative pledge clauses and clauses restricting distributions from restricted subsidiaries;

i)   transactions with affiliates; provided that, any

12

Lenders on the Closing Date that also hold equity of the Borrower or Holdings, as applicable, shall not be deemed to be affiliates for purposes to the Term Facility; and

j) passive holding company covenant with respect to Holdings, with exceptions that are consistent with the Existing First Lien Credit Agreement.

The negative covenants will be subject, in the case of each of the foregoing covenants to exceptions, qualifications and "baskets" (including certain fixed dollar baskets and corresponding growth components based on Consolidated EBITDA of the Borrower and its restricted subsidiaries) to be set forth in the Facilities Documentation and shall be consistent with the Existing First Lien Credit Agreement (including an available basket amount (to be set forth in the Facilities Documentation and defined in a manner consistent with the Existing First Lien Credit Agreement, that may be used for investments subject solely to the absence of any event of default, restricted payments subject to the absence of any default or event of default and the Total Leverage Ratio of the Borrower on a pro forma basis not exceeding 6.0 to 1.00 and the prepayment or redemption of Specified Indebtedness subject to the absence of any default or event of default and the Total Leverage Ratio of the Borrower on a pro forma basis not exceeding 6.75 to 1.00.

"**Consolidated EBITDA**" shall be defined in a matter consistent with the Existing First Lien Credit Agreement but shall not include an add-back for "run-rate" cost savings and synergies projected by the Borrower in good faith to result from actions taken prior to or during, or expected to be taken following such period.

"**Total Senior Secured Leverage Ratio**" means the ratio of (a) Consolidated Total Debt, other than unsecured debt less the Borrower's and its restricted subsidiaries' unrestricted cash and cash equivalents, as of the last day of such test period to (b) Consolidated EBITDA for such test period.

"**Total Leverage Ratio**" means the ratio of (a) Consolidated Total Debt less the Borrower's and its

13

|   | restricted subsidiaries' unrestricted cash and cash equivalents, as of the last day of such test period to (b) Consolidated EBITDA for such test period. |
|---|---|
| Asset Sales: | The Borrower or any restricted subsidiary will be permitted to make non-ordinary course asset sales, subject solely to the following terms and conditions: (i) such asset sales are for fair market value as reasonably determined by the Borrower or the applicable restricted subsidiary in good faith; (ii) the consideration for any such sales in excess of an amount to be agreed is at least 75% cash consideration (including designated non-cash consideration up to an amount consistent with the Existing First Lien Credit Agreement); and (iii) the proceeds of such asset sales are subject to the terms set forth in the section entitled "Mandatory Prepayments" hereof. |
| General Restricted Payment Incurrence Test: | The Facilities Documentation shall permit the Borrower and its restricted subsidiaries to make unlimited restricted payments, investments and prepayments of Specified Indebtedness so long as at the time of making such restricted payment, investment or prepayment of Specified Indebtedness: (a) no default or event of default shall have occurred and be continuing; and (b) (i) in the case of investments, the Total Leverage Ratio of the Borrower on a pro forma basis shall be no greater than 5.75 to 1.00; (ii) in the case of restricted payments the Total Leverage Ratio of the Borrower on a pro forma basis shall be no greater than 4.00 to 1.00; and (iii) in the case of prepayments of Specified Indebtedness, the Total Leverage Ratio of the Borrower on a pro forma basis shall be no greater than 4.75 to 1.00. |
| Permitted Acquisitions: | The Borrower or any restricted subsidiary will be permitted to make acquisitions of entities that become restricted subsidiaries or assets that are acquired by the Borrower or a restricted subsidiary (each, a "***Permitted Acquisition***"), subject solely to the terms and conditions that are consistent with the Existing First Lien Credit Agreement. |
| Limited Condition Acquisitions: | Consistent with the Existing First Lien Credit Agreement. |

14

| | |
|---|---|
| Permitted Debt Exchanges: | Consistent with the Existing First Lien Credit Agreement. |
| Financial Maintenance Covenant: | None. |
| Unrestricted Subsidiaries: | Consistent with the Existing First Lien Credit Agreement. |
| Events of Default: | Limited to the following and except as otherwise specified in this Term Facility Term Sheet, consistent with the Existing First Lien Credit Agreement (except as otherwise expressly indicated, to be applicable to the Borrower and its restricted subsidiaries only and, in certain cases, Holdings): nonpayment of principal when due; nonpayment of interest or other amounts after a customary five business day grace period; violation of covenants; incorrectness of representations and warranties in any material respect; cross default and cross acceleration to indebtedness in excess of $50.0 million except in the case of the ABL Facility, in which case the Term Facility will be subject to only cross-acceleration or cross-payment default at final maturity (and not cross default to the ABL Facility); bankruptcy or other insolvency events of Holdings, the Borrower or its material subsidiaries (with a customary grace period for involuntary events); unsatisfied monetary judgments in excess of $50.0 million; ERISA events resulting in a material adverse effect; actual or asserted invalidity of material guarantees or security documents or any material security interest purported to be created thereunder; and change of control (to include a pre- and post-initial public offering provision that will be triggered only if any person or group other than the holders of equity of the Borrower or Holdings, as applicable on the Closing Date shall directly or indirectly have the right to designate a majority of the board of directors of the Borrower). |
| Voting: | Amendments and waivers of the Facilities Documentation will require the approval of Lenders holding more than 50% of the aggregate amount of the Term Loans and, without duplication, commitments under the Term Facility (the "***Required Lenders***"), as the case may be, except that: (i) the consent of each Lender directly and adversely affected thereby shall be required with respect to only the following: (A) increases in the commitment of such Lender; (B) |

reductions or forgiveness of principal, interest, fees, or (if any) prepayment premiums; (C) changes in the "waterfall"; and (D) extensions of scheduled amortization payments, final maturity, interest, fees, or prepayment premiums; (ii) the consent of 100% of the Lenders will be required with respect to only the following: (A) modifications to any of the voting percentages; (B) modifications to any pro rata sharing provisions; and (C) releases of all or substantially all of the value of the Guarantors or releases of all or substantially all of the Collateral; (iii) customary protections for the Administrative Agents will be provided; and (iv) any amendment or waiver that by its terms affects the rights or duties of Lenders holding loans or commitments of a particular class (but not the Lenders holding loans or commitments of any other class) will require only the requisite percentage in interest of the affected class of Lenders that would be required to consent thereto if such class of Lenders were the only class of Lenders.

The Facilities Documentation shall contain customary provisions consistent with the Existing First Lien Credit Agreement for replacing, repaying (on a non-pro rata basis), and/or terminating the commitments of, non-consenting Lenders in connection with amendments and waivers requiring the consent of all relevant Lenders, or of all relevant Lenders directly affected thereby (and for replacing, repaying (on a non-pro rata basis), and/or terminating the commitments of, any lender that constitutes a non-extending lender in connection with an extension of the maturity date as permitted under the section titled "Final Maturity and Amortization" hereof), so long as Lenders holding more than 50% of the aggregate amount of the loans and commitments shall have consented thereto.

Notwithstanding the foregoing, so long as any loans are outstanding under the New Term Facility, Term Loans hereunder shall be deemed to include loans under the New Term Facility and the provisions under "Requisite Lenders" on Exhibit D to the RSA shall be incorporated herein.

<u>Cost and Yield Protection</u>:

The Facilities Documentation will include customary tax gross-up, cost and yield protection provisions

16

consistent with the Existing First Lien Credit Agreement.

Assignments and Participations:

After the Closing Date, the Lenders will be permitted to assign loans and/or commitments under the Term Facility with the consent of the Borrower and the Administrative Agent (in each case not to be unreasonably withheld or delayed; *provided that* (A) no assignment may be made to a natural person, certain disqualified institutions (with each assignee being required to represent that it is not a disqualified institution or an affiliate of a disqualified institution and the disqualified institutions shall be specified on a schedule held with the Administrative Agent (and shall include any competitors and any affiliates of such competitors of the Borrower) and may be communicated to a Lender upon request, but shall not be otherwise posted to the Lenders); (B) no consent of the Borrower shall be required: (i) after the occurrence and during the continuance of a payment or bankruptcy (with respect to the Borrower) event of default or (ii) if such assignment is an assignment to another Lender, an affiliate of a Lender or an approved fund; and (C) no consent of the Administrative Agent, shall be required with respect to assignment of any Term Loans if such assignment is an assignment to another Lender an affiliate of a Lender or an approved fund.

Each assignment (other than to another Lender, an affiliate of a Lender or an approved fund) will be in an amount of an integral multiple of $1.0 million (or lesser amounts, if agreed between the Borrower and the Administrative Agent) or, if less, all of such Lender's remaining loans and commitments of the applicable class. Assignments will be by novation and, in the case of the Term Facility will not be required to be pro rata among the Term Facility. The Administrative Agent, shall receive a processing and recordation fee of $3,500 for each assignment (unless waived by such Administrative Agent).

The Lenders will be permitted to sell participations in loans and commitments (other than, so long as the identity of the disqualified institutions is posted to the Lenders, to disqualified institutions) without restriction in accordance with applicable law and subject to

17

limitations to be agreed in a manner consistent with the Existing First Lien Credit Agreement.  Voting rights of participants shall be limited to matters set forth under "Voting" above with respect to which the unanimous vote of all Lenders (or all directly and adversely affected Lenders, if the participant is directly and adversely affected) would be required.

| | |
|---|---|
| <u>Expenses and Indemnification</u>: | Consistent with the Existing First Lien Credit Agreement |
| <u>Governing Law and Forum</u>: | New York. |
| <u>Counsel to the Administrative Agent, the Lead Arrangers and the Bookrunners</u>: | Milbank Tweed Hadley & McCloy LLP. |

Interest Rates:    Initially, the interest rates under the Term Facility will be as follows:

With respect to Term Loans, at the option of the Borrower, Adjusted LIBOR plus 9.0% or ABR plus 8.0%.

The Borrower may elect interest periods of 3, 6, 9 or 12 months (or, if agreed by all relevant Lenders, less than 3 months) for Adjusted LIBOR borrowings.

Calculation of interest shall be on the basis of the actual days elapsed in a year of 360 days (or 365 or 366 days, as the case may be, in the case of ABR loans where the applicable rate is determined pursuant to clause (i) of the definition of ABR).

Interest shall be payable in arrears (a) for loans accruing interest at a rate based on Adjusted LIBOR, at the end of each interest period and, for interest periods of greater than 3 months, every three months, and on the applicable maturity date and (b) for loans accruing interest based on the ABR, quarterly in arrears and on the applicable maturity date.

"**_ABR_**" is the Alternate Base Rate, which is the highest of (i) the rate of interest established by the applicable Administrative Agent, from time to time, as its "prime rate", (ii) the Federal Funds Rate plus 1/2 of 1.0% and (iii) the one-month Adjusted LIBOR rate (after giving effect to the "floor") plus 1.0% per annum.

"**_Adjusted LIBOR_**" is the London interbank offered rate for dollars, adjusted for statutory reserve requirements; _provided that_, the Term Facility will contain customary LIBOR replacement provisions.

If negative, the Federal Funds Rate and the London interbank offered rate shall be deemed to be 0%.

With respect to the Term Loans there shall be a minimum Adjusted LIBOR (i.e. Adjusted LIBOR prior to adding any applicable interest rate margins thereto) requirement of 1.0% per annum.

\*       \*       \*       \*       \*

19

**<u>Annex 3</u>**

**New Junior Loan Term Sheet**

FULLBEAUTY Brands Holdings Corp.
$50,000,000 Subordinated Facility
Summary of Principal Terms and Conditions

**THIS TERM SHEET (TOGETHER WITH THE EXHIBITS AND SCHEDULES ATTACHED HERETO, EACH AS MAY BE AMENDED, RESTATED, SUPPLEMENTED, OR OTHERWISE MODIFIED FROM TIME TO TIME IN ACCORDANCE WITH THE TERMS HEREOF, THE "*SUBORDINATED FACILITY TERM SHEET*") SETS FORTH THE PRINCIPAL TERMS OF THE SUBORDINATED FACILITY TO BE ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING AND IS ATTACHED AS ANNEX 3 TO, AND SUBJECT IN ALL RESPECTS TO, THE TERMS OF THE RESTRUCTURING TERM SHEET, ATTACHED AS EXHIBIT A TO THE RESTRUCTURING SUPPORT AGREEMENT (THE "RESTRUCTURING TERM SHEET").**

**THIS SUBORDINATED FACILITY TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.   THIS SUMMARY IS PRESENTED FOR DISCUSSION AND SETTLEMENT PURPOSES, AND IS ENTITLED TO PROTECTION FROM ANY USE OR DISCLOSURE TO ANY PERSON PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER RULE OF SIMILAR IMPORT.**

**THE REGULATORY, TAX, ACCOUNTING, AND OTHER LEGAL AND FINANCIAL MATTERS RELATED TO THE RESTRUCTURING HAVE NOT BEEN FULLY EVALUATED, AND ANY SUCH EVALUATION MAY AFFECT THE TERMS AND STRUCTURE OF THE SUBORDINATED FACILITY.   FURTHER, THE TRANSACTIONS DESCRIBED HEREIN WILL BE SUBJECT TO THE NEGOTIATION, EXECUTION, AND DELIVERY OF DEFINITIVE DOCUMENTS IN ACCORDANCE WITH THE TERMS SET FORTH HEREIN (THE "FACILITIES DOCUMENTATION").   THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH FACILITIES DOCUMENTATION.  NO BINDING OBLIGATIONS WILL BE CREATED BY THIS TERM SHEET UNLESS AND UNTIL SIGNATURE PAGES TO THE FACILITIES DOCUMENTATION ARE EXECUTED AND DELIVERED BY ALL APPLICABLE PARTIES.**

| | |
|---|---|
| Borrower: | FULLBEAUTY Brands Holdings Corp. ("**FULLBEAUTY Holdings**") a Delaware corporation or a subsidiary and/or affiliate of FULLBEAUTY Holdings as determined by the Required Consenting First Lien Lenders (as defined in the Restructuring |

|  | Support Agreement ("**RSA**")) and the Company (the "**Borrower**").[1] |
|---|---|
| Holdings: | Blackdog Holdings Inc., a Delaware corporation ("Holdings") |
| Credit Facilities Transactions: | In connection with the Restructuring it is intended that Borrower will obtain: (i) a first lien senior secured term facility in an aggregate principal amount of $250.0 million (the "**Senior Term Facility**", the loans made pursuant thereto, the "**Senior Term Loans**" and each lender party to such Senior Term Facility, a "**Senior Lender**" and collectively, the "**Senior Lenders**"); (ii) a senior facility in an aggregate principal amount of $30.0 million; (iii) a Subordinated Facility (as defined below) in an aggregate principal amount of up to $50.0 million; and (iv) an asset based revolving credit facility in an aggregate principal amount up to $100.0 million. |
| Administrative Agent and Collateral Agent: | An entity determined by Required First Lien Lenders (as defined in the RSA) will act as administrative agent (the "**Administrative Agent**") and collateral agent for a syndicate of banks, financial institutions and other entities (excluding certain disqualified institutions) with respect to the Subordinated Facility (the "**Lenders**"), and will perform the duties customarily associated with such role. |
| Credit Facilities: | A second lien subordinated term loan facility (the "**Subordinated Facility**") in an aggregate principal amount of up to $50.0 million (the loans thereunder, the "**Subordinated Loans**"). |
| Closing Date: | The Restructuring Effective Date (as defined in the RSA). |
| Interest Rates and Fees: | As set forth on Annex I hereto. |

---

[1] To the extent the Borrower is an entity other than FULLBEAUTY Holdings, this Subordinated Facility Term Sheet shall be amended as appropriate to reflect all necessary corresponding changes.

| | |
|---|---|
| <u>Default Rate</u>: | With respect to overdue principal, the applicable interest rate plus 2.00% per annum, and with respect to any other overdue amount (including overdue interest), the interest rate applicable to ABR loans (as defined in Annex I hereto) plus 2.00% per annum, and in each case, shall accrue and be added to the principal of the Subordinated Facility. |
| <u>Amortization</u>: | None. |
| <u>Final Maturity and Amortization</u>: | The Subordinated Facility will mature on the date that is one week prior to the date that is six years after the Closing Date. |
| <u>Guarantees</u>: | Same as the Senior Term Facility. |
| <u>Security</u>: | The Subordinated Facility will be secured, subject to permitted liens and other exceptions to be agreed, by the same Collateral that secures the obligations under the Senior Term Facility and subject to the same limitations governing the pledge, creation and perfection of the Collateral under the Senior Term Facility (the "***Collateral***"). |

The lien priority, relative rights and other creditors' rights issues in respect of the Senior Term Facility and the Subordinated Facility will be set forth in an intercreditor agreement (the "***Intercreditor Agreement***"), which will document the silent second-lien status of the liens on the Collateral securing the Subordinated Facility and shall include in any event: (i) a customary standstill provision with respect to all enforcements, including acceleration; (ii) a prohibition on the Lenders ability to object to validity, priority or enforceability of each Senior Lenders' position; (iii) Senior Lenders will be entitled to all proceeds from the Collateral until it is paid in full, even if the senior lien is invalidated; (iv) a block on the Lenders ability to object to debtor-in-possession (DIP) financing in a bankruptcy proceeding if requested or approved by the Senior Lenders; (v) agreement by the Lenders to abide by the Senior Lenders positions with respect to adequate protection, use of cash collateral, sale of assets and relief from stay; (vi) waiver by the Lenders of their ability to vote on any reorganization plan or

will not vote in favor of any plan opposed to by the Senior Lenders; and (vii) payment blockage provisions with respect to all payments of principal, fees, premium and interest during any event of default to be mutually agreed, which shall permit required cash payments to continue to accrue (but not to be paid) during any such event of default and which shall require turnover to the lenders party to the Senior Term Facility to the extent of amounts received in violation of such payment blockage provisions; *provided further* that such payment subordination terms shall apply regardless of whether any bankruptcy, restructuring or insolvency proceeding has occurred or is continuing.

<u>Mandatory Prepayments</u>:          None.

<u>Voluntary Prepayments</u>:          No voluntary prepayments of the Subordinated Facility shall be permitted until the Senior Term Facility has been paid in full.

<u>Representations and Warranties</u>:          Usual and customary for transactions of this type.

<u>Conditions to Borrowing</u>:          The availability of the initial borrowing under the Subordinated Facility on the Closing Date will be subject to conditions usual and customary for transactions of this type, including without limitation:

(a) the accuracy of representations and warranties in all material respect, (b) the absence of defaults or events of default at the time of, or after giving effect to the making of, such extension of credit and (c) the consummation of the other transactions contemplated to occur pursuant to the RSA on the Closing Date.

<u>Affirmative Covenants</u>:          Limited to the following:  delivery of annual audited and quarterly unaudited financial statements, annual budgets in form customarily prepared by the Borrower, accountants' letters, officers certificates and other information reasonably requested by the Administrative Agent; compliance certificates; notices of defaults and litigation; notice of material ERISA

4

events;[2] inspections (subject to frequency (so long as there is no ongoing event of default) and cost reimbursement limitations); maintenance of existence and corporate franchises, rights, licenses and privileges; payment of material taxes and similar claims; compliance with laws and regulations (including ERISA, environmental, the PATRIOT Act, OFAC and FCPA), subject, in the case of each of the foregoing covenants, to exceptions and qualifications to be provided in the Facilities Documentation.

Negative Covenants:                    None.

Financial Maintenance Covenant:        None.

Events of Default:                     Limited to the following: nonpayment of principal when due; nonpayment of interest or other amounts after a customary five business day grace period; violation of covenants; incorrectness of representations and warranties in any material respect; cross default and cross acceleration to indebtedness in excess of an amount to be agreed million except in the case of the Senior Term Facility, in which case the Subordinated Facility will be subject to only cross-acceleration; bankruptcy or other insolvency events of Holdings, the Borrower or its material subsidiaries (with a customary grace period for involuntary events); unsatisfied monetary judgments in excess of an amount to be agreed million and change of control (to include a pre- and post-initial public offering provision that will be triggered only if any person or group other than the holders of equity of the Borrower or Holdings, as applicable on the Closing Date shall directly or indirectly have the right to designate a majority of the board of directors of the Borrower).

Voting:                                Amendments and waivers of the Facilities Documentation will require the approval of Lenders holding more than 50% of the aggregate amount of the

---

[2] For the avoidance of doubt, the Subordinated Facility documents shall reflect that the lenders under the Subordinated Facility are entitled to the same reporting information as set forth in the Senior Term Facility.

loans and, without duplication, commitments under the Subordinated Facility (the "**_Required Lenders_**"), as the case may be, except that: (i) the consent of each Lender directly and adversely affected thereby shall be required with respect to only the following:   (A) increases in the commitment of such Lender, (B) reductions or forgiveness of principal, interest, fees, or (if any) prepayment premiums, (C) changes in the "waterfall" and (D) extensions of final maturity, interest, fees, or prepayment premiums; (ii) the consent of 100% of the Lenders will be required with respect to only the following: modifications to any of the voting percentages and releases of all or substantially all of the value of the Guarantors; and (iii) customary protections for the Administrative Agent will be provided.

The Facilities Documentation shall contain customary provisions for replacing, repaying (on a non-pro rata basis), and/or terminating the commitments of, non-consenting Lenders in connection with amendments and waivers requiring the consent of all relevant Lenders, or of all relevant Lenders directly affected thereby (and for replacing, repaying (on a non-pro rata basis), and/or terminating the commitments of, any lender that constitutes a non-extending lender in connection with an extension of the maturity date as permitted under the section titled "Final Maturity" hereof), so long as Lenders holding more than 50% of the aggregate amount of the loans and commitments shall have consented thereto.

Cost and Yield Protection:    The Facilities Documentation will include customary tax gross-up, cost and yield protection provisions.

Assignments and Participations:    After the Closing Date, the Lenders will be permitted to assign loans and/or commitments under the Subordinated Facility with the consent of the Borrower and the Administrative Agent (in each case not to be unreasonably withheld or delayed); _provided that_ (A) no assignment may be made to a natural person, certain disqualified institutions (with each assignee being required to represent that it is not a disqualified institution or an affiliate of a disqualified institution and the disqualified institutions shall be specified on a schedule held with the Administrative Agent (and shall

6

include any competitors and any affiliates of such competitors of the Borrower) and may be communicated to a Lender upon request, but shall not be otherwise posted to the Lenders), (B) no consent of the Borrower shall be required (i) after the occurrence and during the continuance of a payment or bankruptcy (with respect to the Borrower) event of default or (ii) if such assignment is an assignment to another Lender, an affiliate of a Lender or an approved fund and (C) no consent of the Administrative Agent, shall be required with respect to assignment of any Subordinated Loans if such assignment is an assignment to another Lender an affiliate of a Lender or an approved fund.

Each assignment (other than to another Lender, an affiliate of a Lender or an approved fund) will be in an amount of an integral multiple of $1.0 million (or lesser amounts, if agreed between the Borrower and the Administrative Agent) or, if less, all of such Lender's remaining loans and commitments of the applicable class.  Assignments will be by novation and, in the case of the Subordinated Facility will not be required to be pro rata among the Subordinated Facility.  The Administrative Agent, shall receive a processing and recordation fee of $3,500 for each assignment (unless waived by such Administrative Agent).

The Lenders will be permitted to sell participations in loans and commitments (other than, so long as the identity of the disqualified institutions is posted to the Lenders, to disqualified institutions) without restriction in accordance with applicable law and subject to limitations to be agreed in a manner consistent with the Existing First Lien Credit Agreement.  Voting rights of participants shall be limited to matters set forth under "Voting" above with respect to which the unanimous vote of all Lenders (or all directly and adversely affected Lenders, if the participant is directly and adversely affected) would be required.

<u>Expenses and Indemnification</u>:                    Usual and customary for transactions of this type.

| | |
|---|---|
| <u>Governing Law and Forum</u>: | New York. |
| <u>Counsel to the Administrative Agent, the Lead Arrangers and the Bookrunners</u>: | Milbank Tweed Hadley & McCloy LLP. |

ANNEX 1

Interest Rates:    Initially, the interest rates under the Subordinated Facility will be as follows:

With respect to Subordinated Loans, 7.0%; *provided that*, at the Borrower's election up to 6.0% may be paid in kind and added to the outstanding principal amount of the Subordinated Loans.

Interest shall be payable (or capitalized) in arrears, every three months, and on the applicable maturity date; *provided that*, with respect to interest accruing for the period the begins on the fifth anniversary of the issuance date, interest shall not be payable (or capitalized) until Final Maturity and there shall be no contrary election permitted or Lender consent required.

**<u>Annex 4</u>**

**Warrants Term Sheet**

**FULLBEAUTY**

**<u>WARRANTS TERM SHEET</u>**

**DECEMBER 18, 2018**

This term sheet (this "***Warrants Term Sheet***") is a summary of indicative terms of the Series A Warrants, Series B Warrants, and Series C Warrants of Blackdog Holdings, Inc. ("***Holdings***"), a Delaware corporation, to be issued in connection with a financial restructuring (the "***Restructuring***") of the existing debt and other obligations of Holdings and certain of its subsidiaries (together with Holdings, collectively, the "***Company***").

Subject in all respects to the terms of the Restructuring Term Sheet (the "***Restructuring Term Sheet***"), to which this Warrants Term Sheet is attached as <u>Annex 4</u>, and the Restructuring Support Agreement (the "***RSA***"),[1] the Warrants shall be issued in connection with either an Out-of-Court Restructuring or an In-Court Restructuring.

**THIS WARRANTS TERM SHEET IS PRESENTED FOR DISCUSSION AND SETTLEMENT PURPOSES, AND IS ENTITLED TO PROTECTION FROM ANY USE OR DISCLOSURE TO ANY PERSON PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER RULE OF SIMILAR IMPORT.**

**THIS WARRANTS TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, COVENANTS AND OTHER PROVISIONS THAT MAY BE CONTAINED IN THE FULLY NEGOTIATED AND EXECUTED DEFINITIVE DOCUMENTATION IN CONNECTION WITH THE RESTRUCTURING. THIS WARRANTS TERM SHEET AND THE INFORMATION CONTAINED HEREIN SHALL REMAIN STRICTLY CONFIDENTIAL.**

| Term | Description |
|------|-------------|
| **DEFINITIONS** | |
| **First Lien Principal Balance** | $781,568,965.52, which is the current principal amount outstanding under the First Lien Credit Agreement, excluding any accrued interest or other fees. |
| **First Lien Total Debt Recovery** | The sum of (i) $175 million, which is the amount of New First Lien Term Loans other than New First Lien Term Loans extended to refinance the FILO Claims and (ii) the amount of New Junior Loans received by First Lien Lenders who elect to receive New Junior Loans in lieu of New Common Stock. |
| **First Lien Percentage** | The percent of the New Common Stock granted to First Lien Lenders, which is 87.5 percent, subject to dilution by (i) exercise of the Option Rights and |

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the RSA, the Restructuring Term Sheet, or the annexes thereto, as applicable.

| Term | Description |
|---|---|
| **Equity Allocation** | (ii) adjustment (to be agreed upon by the Required Consenting Second Lien Lenders, Sponsors, and the Board of Directors of the Reorganized Company) on account of changes not otherwise addressed herein to the ultimate ownership percentage of the First Lien Lenders in the Reorganized Company as a result of the issuance of common equity prior to the Restructuring Effective Date; *provided* that the adjustments in clause (ii) shall only be used in the calculation of the Strike Price Formula set forth below and shall not be used in the calculation of the amount of New Common Stock to be distributed as First Lien Consideration. |
| **Daily Rate** | Five percent (5%) *divided by* 365. |
| **Sale of Issuer** | Any bona fide consolidation, merger, sale or other transfer of all or substantially all of the equity interests or assets, in each case, of the Issuer, or any successor, and its subsidiaries (taken as a whole) or any similar transaction in which the holders of New Common Stock are entitled to receive (either directly or upon subsequent liquidation) cash, securities or other property with respect to or in exchange for shares of New Common Stock. |
| **WARRANTS** | |
| **Issuer** | Holdings. |
| **Holders** | The Second Lien Lenders with respect to the Series A Warrants, Series B Warrants, and Series C Warrants. On the Restructuring Effective Date, the Second Lien Lenders shall receive 100 percent of the Series A Warrants, 60 percent of the Series B Warrants and 60 percent of the Series C Warrants (the "*Second Lien Warrant Package*"). <br><br> The Service Providers with respect to the Series B Warrants and Series C Warrants. On the Restructuring Effective Date, the Service Providers shall receive 40 percent of the Series B Warrants and 40 percent of the Series C Warrants (the "*Sponsor Warrant Package*"). |
| **Securities to be Issued** | i. Series A warrants (the "*Series A Warrants*") to purchase up to 6 percent (after giving effect to the exercise of the Option Rights (if exercised) and the Series A Warrants) of the New Common Stock issued and outstanding on the Restructuring Effective Date (for the avoidance of doubt, not including any shares issued pursuant to the MIP) at a price that is in accordance with the Strike Price Formula for the Series A Warrants. The ownership percentage represented by the shares of New Common Stock issuable in respect of such Series A Warrants shall be subject to dilution by the Series B Warrants, the Series C Warrants, the MIP and any other issuances of New Common Stock issued after the Restructuring Effective Date (other than as a result of the exercise of the Series A Warrants and the Option Rights). <br><br> ii. Series B warrants (the "*Series B Warrants*") to purchase up to 5 percent (after giving effect to the exercise of the Option Rights (if exercised) and |

| Term | Description |
|------|-------------|
| | the Series A Warrants and Series B Warrants) of the New Common Stock issued and outstanding on the Restructuring Effective Date (for the avoidance of doubt, not including any shares issued pursuant to the MIP) at a price that is in accordance with the Strike Price Formula for the Series B Warrants.  The ownership percentage represented by the shares of New Common Stock issuable in respect of such Series B Warrants shall be subject to dilution by the Series C Warrants, the MIP and any other issuance of New Common Stock issued after the Restructuring Effective Date (other than as a result of the exercise of the Series B Warrants and the Option Rights). |
| | iii. Series C warrants (the "*Series C Warrants*") to purchase up to 5 percent (after giving effect to the exercise of the Option Rights (if exercised) and the Series A Warrants, Series B Warrants and Series C Warrants) of the New Common Stock issued and outstanding on the Restructuring Effective Date (for the avoidance of doubt, not including any shares issued pursuant to the MIP) at a price that is in accordance with the Strike Price Formula for the Series C Warrants.   The ownership percentage represented by the shares of New Common Stock issuable in respect of such Series C Warrants shall be subject to dilution by the MIP and any other issuance of New Common Stock issued after the Restructuring Effective Date (other than as a result of the exercise of the Series C Warrants and the Option Rights). |
| **Strike Price Formula** | The Series A Warrants shall have a strike price equal to: |
| | i.    the First Lien Principal Balance *multiplied by* 85 percent, |
| | ii.   *less* the First Lien Total Debt Recovery, |
| | iii.  *less* any dividends or distributions to the First Lien Lenders in respect of their shares of New Common Stock between the Restructuring Effective Date and the exercise of the Series A Warrants, |
| | iv.   the result of (i) through (iii) *divided by* the First Lien Percentage Equity Allocation, |
| | v.    if exercised prior to the first anniversary of the Restructuring Effective Date, the product of (A) the result of clause (iv) *multiplied by* (B) the sum of (I) one plus (II) the Daily Rate *multiplied by* the number of days between the date of exercise and the Restructuring Effective Date, |
| | vi.   if exercised between the first and second anniversary of the Restructuring Effective Date, the product of (A) the result of clause (iv) *multiplied by* (B) 1.05 multiplied by (C) the sum of (I) one plus (II) the Daily Rate *multiplied by* the number of days between the date of exercise and the first anniversary of the Restructuring Effective Date |
| | vii.  if exercised between the second and third anniversary of the Restructuring Effective Date, the product of (A) the result of clause (iv) *multiplied by* (B) 1.1025 multiplied by (C) the sum of (I) one plus (II) the Daily Rate *multiplied by* the number of days between the date of exercise and the second anniversary of the Restructuring Effective Date, and |

| Term | Description |
|------|-------------|
| | viii. the result of clause (v), (vi) or (vii), as applicable, *divided by* the sum of (A) the number of shares of New Common Stock issued on the Restructuring Effective Date (other than any such shares issued pursuant to the MIP) *plus* (B) the number of shares of New Common Stock issued upon exercise of the Option Rights. |

The Series B Warrants shall have an equity strike price equal to:

i.   the First Lien Principal Balance *multiplied by* 100 percent,

ii.  *less* the First Lien Total Debt Recovery,

iii. *less* any dividends or distributions to the First Lien Lenders in respect of their shares of New Common Stock between the Restructuring Effective Date and the exercise of the Series B Warrants,

iv.  the result of (i) through (iii) *divided by* the First Lien Percentage Equity Allocation,

v.   if exercised prior to the first anniversary of the Restructuring Effective Date, the product of (A) the result of clause (iv) *multiplied by* (B) the sum of (I) one plus (II) the Daily Rate *multiplied by* the number of days between the date of exercise and the Restructuring Effective Date,

vi.  if exercised between the first and second anniversary of the Restructuring Effective Date, the product of (A) the result of clause (iv) *multiplied by* (B) 1.05 multiplied by (C) the sum of (I) one plus (II) the Daily Rate *multiplied by* the number of days between the date of exercise and the first anniversary of the Restructuring Effective Date,

vii. if exercised between the second and third anniversary of the Restructuring Effective Date, the product of (A) the result of clause (iv) *multiplied by* (B) 1.1025 multiplied by (C) the sum of (I) one plus (II) the Daily Rate *multiplied by* the number of days between the date of exercise and the second anniversary of the Restructuring Effective Date, and

viii. the result of clause (v), (vi) or (vii), as applicable, *divided by* the sum of (A) the number of shares of New Common Stock issued on the Restructuring Effective Date (other than any such shares issued pursuant to the MIP) *plus* (B) the number of shares of New Common Stock issued upon exercise of the Option Rights *plus* (C) the number of shares of New Common Stock issued upon exercise of the Series A Warrants.

The Series C Warrants shall have an equity strike price equal to:

i.   the First Lien Principal Balance *multiplied by* 115 percent,

ii.  *less* the First Lien Total Debt Recovery,

iii. *less* any dividends or distributions to the First Lien Lenders in respect of their shares of New Common Stock between the Restructuring Effective Date and the exercise of the Series C Warrants,

iv.  the result of (i) through (iii) *divided by* the First Lien Percentage Equity Allocation,

v.   if exercised prior to the first anniversary of the Restructuring Effective

| Term | Description |
|------|-------------|
| | Date, the product of (A) the result of clause (iv) *multiplied by* (B) the sum of (I) one plus (II) the Daily Rate *multiplied by* the number of days between the date of exercise and the Restructuring Effective Date, |
| | vi. if exercised between the first and second anniversary of the Restructuring Effective Date, the product of (A) the result of clause (iv) *multiplied by* (B) 1.05 multiplied by (C) the sum of (I) one plus (II) the Daily Rate *multiplied by* the number of days between the date of exercise and the first anniversary of the Restructuring Effective Date, |
| | vii. if exercised between the second and third anniversary of the Restructuring Effective Date, the product of (A) the result of clause (iv) *multiplied by* (B) 1.1025 multiplied by (C) the sum of (I) one plus (II) the Daily Rate *multiplied by* the number of days between the date of exercise and the second anniversary of the Restructuring Effective Date, and |
| | viii. the result of clause (v), (vi) or (vii), as applicable, *divided by* the sum of (A) the number of shares of New Common Stock issued on the Restructuring Effective Date (other than any such shares issued pursuant to the MIP) *plus* (B) the number of shares of New Common Stock issued upon exercise of the Option Rights *plus* (C) the number of shares of New Common Stock issued upon exercise of the Series A Warrants and Series B Warrants. |
| | **Exhibit A** attached hereto sets forth illustrative calculations of strike prices for each of the Series A Warrants, the Series B Warrants, and the Series C Warrants based on the applicable Strike Price Formulas set forth above. |
| **Exercisability** | Exercisable in whole or in part at any time on or prior to the Expiration Date, in cash.  The exercise of the Warrants may be conditioned upon the occurrence of an event (such as a securities offering). |
| | The Warrants may be exercised on a "cashless" basis at the times and in the manner described as follows: |
| | i. In connection with, and using the value of the New Common Stock implied by, a Sale of Issuer for cash, publicly traded securities or any combination thereof; or |
| | ii. If the New Common Stock is at any time listed for trading on a national securities exchange or is traded over-the-counter, at any such time using a value of the New Common Stock based on the average trading price for such New Common Stock during the 10 trading day period immediately prior to any applicable date of determination. |
| **Sale Transaction** | If a Sale of Issuer is consummated prior to the Expiration Date in which all of the consideration paid to non-employee stockholders consists of cash or property (including securities) or part cash and part property (including securities) and the Issuer duly and timely effects notice to the holders of Warrants pursuant to the final paragraph of this "Sale Transaction," then any Warrants that are unexercised prior to the consummation of such Sale of Issuer shall be deemed to have expired worthless and will be cancelled for no further consideration. |

| Term | Description |
|------|-------------|
|  | For the avoidance of doubt, holders of Warrants shall not be entitled to the fair market value of the Warrants (using the Black Scholes model or otherwise) in connection with a Sale of Issuer, but shall have the right to exercise the Warrants at any time prior to any Sale of Issuer. |
|  | The Issuer shall provide the holders of Warrants with ten (10) business days' prior written notice of a Sale of Issuer. |
| **Transfers** | The Warrants shall be non-transferable except to holders of New Common Stock immediately following the Restructuring Effective Date (and their affiliates). |
| **Expiration Date** | Three (3) years from the Restructuring Effective Date. |
| **Voting Rights** | The Service Providers and the Second Lien Lenders shall have no voting rights in respect of the Warrants.  Holders of New Common Stock issued upon exercise of any Warrants shall have the same voting rights as other holders of New Common Stock. |
| **Dividends / Distributions** | The Warrants shall not be entitled to receive dividends or distributions.  Holders of New Common Stock issued upon exercise of any Warrants shall have the same rights with respect to dividends and distributions as other holders of New Common Stock. |
| **Warrant Holders' Agreement** | The form of Warrant shall include customary information rights. |
| **Dilution/Adjustments** | The Warrants shall be subject to simple arithmetic anti-dilution protection regarding the equity strike price for the Warrants and number of shares of New Common Stock to be issued upon exercise of the Warrants only for corporate structural events (*e.g.*, recapitalizations, reclassifications, splits, reverse splits, stock dividends, reorganizations, consolidations, mergers, and similar structural transactions), not economic anti-dilution. |
| **Amendments** | The terms and conditions of each series of Warrants may be amended by the Company with the affirmative vote or written consent of holders of 75% of such series of Warrants; *provided that* such amendment does not disproportionately affect any holder or amend the equity strike price of the Warrants. |
| **Governing Law** | Delaware. |

\*        \*        \*        \*        \*

**Exhibit A to Warrants Term Sheet**

Exhibit A
*$ in millions except per share price*

*DRAFT -- FOR DISCUSSION PURPOSES ONLY*

## Warrant Equity Strikes

| | Series A Warrants | | | | Series B Warrants | | | | Series C Warrants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Not Exercised | | Exercised | | Not Exercised | | Exercised | | Not Exercised | | Exercised | |
| Sponsor Purchase Option Election | Full $35mm | None | Full $35mm | None | Full $35mm | None | Full $35mm | None | Full $35mm | None | Full $35mm | None |
| New Junior Debt Elected by First Lien Claims | | | | | | | | | | | | |
| First Lien Principal Balance | $781.6 | $781.6 | $781.6 | $781.6 | $781.6 | $781.6 | $781.6 | $781.6 | $781.6 | $781.6 | $781.6 | $781.6 |
| (x) Target First Lien Recovery | 85.0% | 85.0% | 85.0% | 85.0% | 100.0% | 100.0% | 100.0% | 100.0% | 115.0% | 115.0% | 115.0% | 115.0% |
| **Target First Lien Principal Recovery** | **$664.3** | **$664.3** | **$664.3** | **$664.3** | **$781.6** | **$781.6** | **$781.6** | **$781.6** | **$898.8** | **$898.8** | **$898.8** | **$898.8** |
| (-) First Lien Total Debt Recovery | (210.0) | (175.0) | (210.0) | (175.0) | (210.0) | (175.0) | (210.0) | (175.0) | (210.0) | (175.0) | (210.0) | (175.0) |
| **Target 1L Equity Recovery** | **$454.3** | **$489.3** | **$454.3** | **$489.3** | **$571.6** | **$606.6** | **$571.6** | **$606.6** | **$688.8** | **$723.8** | **$688.8** | **$723.8** |
| (/) First Lien Percentage Equity Allocation | 87.5% | 87.5% | 70.1% | 70.1% | 87.5% | 87.5% | 70.1% | 70.1% | 87.5% | 87.5% | 70.1% | 70.1% |
| **Warrant Equity Strike Price[1]** | **$519.2** | **$559.2** | **$648.2** | **$698.2** | **$653.2** | **$693.2** | **$815.5** | **$865.4** | **$787.2** | **$827.2** | **$982.8** | **$1,032.7** |
| (/) Shares Outstanding (as defined) | 10,000,000 | 10,000,000 | 12,484,395 | 12,484,395 | 10,638,298 | 10,638,298 | 13,281,271 | 13,281,271 | 11,198,208 | 11,198,208 | 13,980,285 | 13,980,285 |
| **Warrant Equity Strike Price / Share** | **$51.92** | **$55.92** | **$51.92** | **$55.92** | **$61.40** | **$65.16** | **$61.40** | **$65.16** | **$70.30** | **$73.87** | **$70.30** | **$73.87** |
| (x) 1.05 | 1.05 | 1.05 | 1.05 | 1.05 | 1.05 | 1.05 | 1.05 | 1.05 | 1.05 | 1.05 | 1.05 | 1.05 |
| **Warrant Equity Strike Price / Share (1st Anniversary of the Restructuring Effective Date)** | **$54.52** | **$58.72** | **$54.52** | **$58.72** | **$64.47** | **$68.42** | **$64.47** | **$68.42** | **$73.81** | **$77.56** | **$73.81** | **$77.56** |
| **Memo: Shares Outstanding (as defined)** | | | | | | | | | | | | |
| New Common Stock Shares[2] | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 |
| Options Rights Shares[2][3] | – | – | 2,484,395 | 2,484,395 | – | – | 2,484,395 | 2,484,395 | – | – | 2,484,395 | 2,484,395 |
| Series A Shares[2] | – | – | – | – | 638,298 | 638,298 | 796,876 | 796,876 | 638,298 | 638,298 | 796,876 | 796,876 |
| Series B Shares[3] | – | – | – | – | – | – | – | – | 559,910 | 559,910 | 699,014 | 699,014 |
| **Shares Outstanding (as defined)** | 10,000,000 | 10,000,000 | 12,484,395 | 12,484,395 | 10,638,298 | 10,638,298 | 13,281,271 | 13,281,271 | 11,198,208 | 11,198,208 | 13,980,285 | 13,980,285 |

Notes
(1) To be adjusted for dividends paid from Restructuring Effective date to exercise of applicable series of warrants
(2) Illustratively assumes 10,000,000 shares of New Common Stock issued on the Restructuring Effective Date.
(3) Calculated per definitions in the Purchase Option Term Sheet.

## **Annex 5**

**Purchase Option Term Sheet**

## FULLBEAUTY

### PURCHASE OPTION TERM SHEET

### DECEMBER 18, 2018

This term sheet (this "***Purchase Option Term Sheet***") is a summary of indicative terms of the Option Rights to be purchased by the Service Providers in connection with a financial restructuring (the "***Restructuring***") of the existing debt and other obligations of Holdings and certain of its subsidiaries (together with Holdings, collectively, the "***Company***").

Subject in all respects to the terms of the Restructuring Term Sheet (the "***Restructuring Term Sheet***"), to which this Purchase Option Term Sheet is attached as <u>Annex 5</u>, and the Restructuring Support Agreement (the "***RSA***"),[1] the Option Rights shall be issued in connection with either an Out-of-Court Restructuring or an In-Court Restructuring.

**THIS PURCHASE OPTION TERM SHEET IS PRESENTED FOR DISCUSSION AND SETTLEMENT PURPOSES, AND IS ENTITLED TO PROTECTION FROM ANY USE OR DISCLOSURE TO ANY PERSON PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER RULE OF SIMILAR IMPORT.**

**THIS PURCHASE OPTION TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, COVENANTS AND OTHER PROVISIONS THAT MAY BE CONTAINED IN THE FULLY NEGOTIATED AND EXECUTED DEFINITIVE DOCUMENTATION IN CONNECTION WITH THE RESTRUCTURING. THIS PURCHASE OPTION TERM SHEET AND THE INFORMATION CONTAINED HEREIN SHALL REMAIN STRICTLY CONFIDENTIAL.**

| Term | Description |
|---|---|
| **DEFINITIONS** | |
| **First Lien Principal Balance** | $781,568,965.52, which is the current principal amount outstanding under the First Lien Credit Agreement, excluding any accrued interest or other fees. |
| **First Lien Total Debt Recovery** | The sum of (i) $175 million, which is the amount of New First Lien Term Loans other than New First Lien Term Loans extended to refinance the FILO Claims and (ii) the amount of New Junior Loans received by First Lien Lenders who elect to receive New Junior Loans in lieu of New Common Stock. |
| **First Lien Percentage Equity Allocation** | The percent of the New Common Stock granted to First Lien Lenders, which is 87.5 percent, subject to adjustment (to be agreed upon by the Required Consenting Second Lien Lenders, Sponsors, and the Board of Directors of |

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Restructuring Term Sheet or the RSA, as applicable.

| Term | Description |
|------|-------------|
| | the Reorganized Company) on account of changes not otherwise addressed herein to the ultimate ownership percentage of the First Lien Lenders in the Reorganized Company as a result of the issuance of common equity prior to the exercise of the Option Rights; *provided* that such adjustments shall only be used in the calculation of the Strike Price Formula set forth below and shall not be used in the calculation of the amount of New Common Stock to be distributed as First Lien Consideration. |
| **OPTION RIGHTS** | |
| **Counterparties** | The Company, on the one hand, and the Service Providers, on the other hand. |
| **Rights to be Provided** | Option Rights to purchase an amount of shares of New Common Stock that is equal to 19.9 percent ownership (subject to future dilution including by the Warrants and the MIP) of the equity interests issued and outstanding immediately following the exercise of the Option Rights (the "***Sponsor Option Rights Equity Percentage***") at a 70 percent First Lien Claims recovery price (buy-in post-money equity price of $385.3 million, proceeds of $76.7 million, assuming that both the "flip up" is fully elected and the Purchase Option is exercised). The estimated equity strike price will be adjusted to reflect (i) the actual elections made with respect to the "flip up" and (ii) other changes to First Lien Lender ownership as a result of the issuance of New Common Stock by the Company prior to exercise of the Option Rights that impact the equity strike calculations below, such impact to be agreed upon. |
| **Strike Price Formula** | The Option Rights shall have an equity strike price equal to: <br><br> i. the First Lien Principal Balance *multiplied by* 70 percent, <br><br> ii. *less* the First Lien Total Debt Recovery, <br><br> iii. *less* any dividends or distributions to the First Lien Lenders in respect of their shares of New Common Stock between the Restructuring Effective Date and the exercise of the Option Rights, <br><br> iv. the result of (i) through (iii) *divided by* the Initial First Lien Percentage Equity Allocation. |
| **Exercisability** | Exercisable in whole, but not in part, at any time on or prior to the Expiration Date, in cash. To be a valid exercise, subject to the following two paragraphs, each of the Service Providers must exercise all of its Options Rights. <br><br> Apax Partners LP or its designee ("***Apax***") shall have the right to trigger the exercise of the Option Rights by delivering notice of the proposed exercise date to the Company and each other holder of Option Rights, which notice shall be delivered no later than 10 business days in advance of such proposed exercise date. Each other holder of Option Rights will, upon receipt of such notice by Apax, provide notice to Apax within five business days indicating whether it intends to exercise its respective Option Rights. If any such other holder of Option Rights declines to exercise its respective Option Rights, |

| Term | Description |
|---|---|
| | Apax shall exercise such holder's Options Rights (it being understood that if Apax does not exercise such holder's Option Rights, then no holders shall not have the right to exercise any Option Rights). |
| | Notwithstanding the foregoing, if Apax has not triggered the exercise of the Option Rights (or has not sent a notice of its intent to do so) on the date that is 10 business days prior to the Expiration Date, any other holder of Option Rights may trigger the Option Right by delivering notice thereof to the Company and the other Option Right holders (including Apax). Each other holder of Option Rights (including Apax) will, upon receipt of such notice, provide notice to the other holders of Option Rights within five business days indicating whether it intends to exercise its respective Option Rights. If any such other holder of Option Rights declines to exercise its respective Option Rights, the holder that triggered the exercise of the Option Right shall exercise such non-participating holder's Options Rights (it being understood that if the holder that triggered the exercise of the Option Right does not exercise such non-participating holder's Option Rights, then no holders shall have the right to exercise any Option Rights). |
| | The exercise of the Option Rights may not be conditioned upon the occurrence of an event. |
| **Transfers** | The Option Rights shall be nontransferable except to holders of New Common Stock outstanding immediately following the Restructuring Effective Date and their affiliates. |
| **Expiration Date** | August 1, 2019. |
| **Voting Rights** | The Service Providers shall have no voting rights in respect of the Option Rights. Holders of New Common Stock issued upon exercise of any Option Rights shall have the same voting rights as other holders of New Common Stock. |
| **Dilution/Adjustments** | The Option Rights shall be subject to simple arithmetic anti-dilution protection regarding the equity strike price for the Option Rights and number of shares of New Common Stock to be issued upon exercise of the Option Rights only for corporate structural events (*e.g.*, recapitalizations, reclassifications, splits, reverse splits, stock dividends, reorganizations, consolidations, mergers, and similar structural transactions), not economic anti-dilution. |
| **Dividends / Distributions** | The holders of Option Rights shall not be entitled to receive dividends or distributions. Holders of New Common Stock issued upon exercise of any Option Rights shall have the same rights with respect to dividends and distributions following such issuance as other holders of New Common Stock. |
| **Amendment** | The terms of the Option Rights may be amended by the Company with the affirmative vote or written consent of holders of 75% of such Option Rights and a majority of holders of New Common Stock; *provided that* such |

| Term | Description |
|---|---|
|  | amendment does not disproportionately affect any holder of Option Rights. |
| **Governing Law** | Delaware. |

*    *    *    *    *

**Annex 6**

**Release Provisions**

**Defined Terms[1]**

"*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

"*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

"*Exculpated Party*" means each of the following, solely in its capacity as such:  (i)(a) the Debtors; (b) the Reorganized Debtors; (c) with respect to each of the foregoing parties in clauses (i)(a) and (i)(b), each of such Entity's current and former Affiliates; and (d) with respect to each of the foregoing parties in clauses (i)(a) through (i)(c), each of such party's current and former directors, managers, officers, principals, members, managed accounts or funds, fund advisors, employees, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; and (ii)(a) the DIP Agent; (b) the DIP Lenders; (c) the ABL Agent; (d) the ABL Lenders; (e) the Consenting FILO Lenders; (f) the First Lien Agent; (g) the Consenting First Lien Lenders; (h) the Second Lien Agent; (i) the Consenting Second Lien Lenders; (j) the Sponsors; (k) with respect to each of the foregoing parties in clauses (ii)(a) through (ii)(j), each of such Entity's current and former Affiliates; and (l) with respect to each of the foregoing parties in clauses (ii)(a) through (ii)(k), each of such party's current and former directors, managers, officers, principals, members, employees, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, investment advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided* that for purposes of this definition, in no event shall "affiliate" include any entity that is not directly or indirectly, controlled by, or under common control with, the party of which such entity is an affiliate.

"*Released Party*" means each of the following, solely in its capacity as such:  (i)(a) the Debtors; (b) the Reorganized Debtors; (c) with respect to each of the foregoing parties in clauses (i)(a) and (i)(b), each of such Entity's current and former Affiliates; and (d) and with respect to each of the foregoing parties in clauses (i)(a) through (i)(c), each of such party's current and former directors, managers, officers, principals, members, managed accounts or funds, fund advisors, employees, equity holders (regardless of

---

[1]   Capitalized terms used but not defined in this **Annex 7** to the Restructuring Term Sheet shall have the meanings ascribed to them in the Plan, which shall be in form and substance consistent with the RSA and this Term Sheet. References herein to the DIP Agent, DIP Lenders, and DIP Facility shall be included in the Release in the Plan only if the Company determines DIP Financing is necessary to the Chapter 11 Cases and such DIP Financing is approved by the Bankruptcy Court.

whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; and (ii)(a) the DIP Agent; (b) the DIP Lenders; (c) the ABL Agent; (d) the ABL Lenders; (e) the FILO Lenders; (f) the First Lien Agent, (g) the First Lien Lenders; (h) the Second Lien Agent; (i) the Second Lien Lenders; (j) the Sponsors; (k) with respect to each of the foregoing parties in clauses (ii)(a) through (ii)(j), each of such Entity's current and former Affiliates; and (l) with respect to each of the foregoing parties in clauses (ii)(a) through (ii)(k), each of such party's current and former directors, managers, officers, principals, members, employees, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, investment advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided* that for purposes of this definition, in no event shall "Affiliate" include any entity that is not directly or indirectly, controlled by, or under common control with, the party of which such entity is an affiliate; *provided*, *further*, that any holder of a Claim or Interest that opts out of, or objects to, the releases contained in the Plan shall not be a "Released Party."

"*Releasing Party*" means each of the following, solely in its capacity as such: (a) the DIP Agent; (b) the DIP Lenders; (c) the ABL Agent; (d) the ABL Lenders; (e) the FILO Lenders; (f) the First Lien Agent; (g) the First Lien Lenders; (h) the Second Lien Agent; (i) the Second Lien Lenders; (j) the Sponsors; (k) all holders of Claims or Interests who vote to accept the Plan; (l) all holders of Claims or Interests who are eligible to vote, but abstain from voting on the Plan and who do not opt out of the releases provided by the Plan; (m) all holders of Claims or Interests who vote to reject the Plan and who do not opt out of the releases provided by the Plan; and (n) with respect to the foregoing clauses (a) through (m), each such Entity and its current and former Affiliates; and (o) with respect to the foregoing clauses (a) through (n), each such party's current and former directors, managers, officers, principals, members, employees, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, investment advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided* that for purposes of this definition, in no event shall "Affiliate" include any entity that is not directly or indirectly controlled by, or under common control with, the party of which such entity is an affiliate; *provided*, *further*, that any holder of a Claim or Interest that validly opts out of, or objects to, the releases contained in the Plan shall not be a "Releasing Party."

**Releases by the Debtors**

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), any securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of

Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any individual from any claim or Causes of Action related to an act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

**Third-Party Releases by Releasing Parties**

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), any securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any individual from any claim or Causes of Action related to an act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding

that the Third-Party Release is:  (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

**Exculpation**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

*        *        *        *        *

<u>**Annex 7**</u>

**Governance Term Sheet**

# FULLBEAUTY

## GOVERNANCE TERM SHEET

### DECEMBER 18, 2018

This term sheet (this "Equity Term Sheet") sets forth certain terms of the equity (the "Common Stock") to be issued pursuant to the financial restructuring of Blackdog Holdings, Inc. (as reorganized, "Company") as described in the Restructuring Support Agreement and Restructuring Support Term Sheet to which this Equity Term Sheet is attached (the "Restructuring Support Agreement"). Capitalized terms used but not defined in this Equity Term Sheet shall have the meanings set forth in the Restructuring Support Term Sheet.

| | |
|---|---|
| **The Company** | The Company shall be a Delaware corporation or such other entity type as determined by the Required Consenting First Lien Lenders. The Company shall not initially be subject to the reporting requirements under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). |
| **Stockholders Agreement; Common Stock** | Each holder of Common Stock (each, a "Stockholder") shall become party to a stockholders agreement (the "Stockholders Agreement"). From and after the Restructuring Effective Date, it shall be a condition to any issuance or transfer of Common Stock that the recipient thereof become party to the Stockholders Agreement. |
| **Board of Directors** | Board Composition: The Company shall be managed by a Board of Directors (the "Board") consisting of nine directors (collectively, the "Directors"). The directors shall be designated as follows:<br><br>• for as long as Emilie Arel is the Chief Executive Officer of the Company, Emilie Arel;<br><br>• Stockholders that are affiliated with Oaktree Capital Management, L.P. (such Stockholders, "Oaktree") shall have the right to appoint two Directors; *provided*, that if Oaktree ceases to own at least 75% of the shares of Common Stock owned by Oaktree as of the Restructuring Effective Date (as adjusted for stock splits, stock dividends, combinations, or other recapitalizations), Oaktree shall only have the right to appoint one Director; *provided, further*, if Oaktree ceases to own at least 50% of the shares of Common Stock owned by Oaktree as of the Restructuring Effective Date (as adjusted for stock splits, stock dividends, combinations, or other recapitalizations), it will no longer be entitled to appoint a Director.<br><br>• Stockholders that are affiliated with Goldman Sachs & Co., LLC (such Stockholders, "GS") shall have the right to appoint two Directors; *provided*, that if GS ceases to own at least 75% of the |

shares of Common Stock owned by GS as of the Restructuring Effective Date (as adjusted for stock splits, stock dividends, combinations, or other recapitalizations), GS shall only have the right to appoint one Director; *provided*, *further*, if GS ceases to own at least 50% of the shares of Common Stock owned by GS as of the Restructuring Effective Date (as adjusted for stock splits, stock dividends, combinations, or other recapitalizations), it will no longer be entitled to appoint a Director.

- one director shall be appointed by the holders of a majority of the Common Stock held by the Sponsors and the Service Providers (such majority holders, together with any other Stockholders that are advised, managed or directly or indirectly owned or controlled by such majority holders, the "Majority Existing Sponsor Stockholder"); *provided*, that the right of Majority Existing Sponsor Stockholder to appoint such Director shall automatically terminate (and such Director shall be removed from the Board) on the date that is one year after the Restructuring Effective Date if the Option Rights are not exercised in full prior to the Option Expiration Date; *provided*, *further*, that, if the appointment right of the Majority Existing Sponsor Stockholder is not terminated at the one-year anniversary pursuant to the foregoing proviso, the right of the Majority Existing Sponsor Stockholder to appoint such Director shall automatically terminate (and such Director shall be removed from the Board) if at any time thereafter, the Sponsors (together with other Stockholders that are advised, managed or directly or indirectly owned or controlled by the Sponsors) fail to own, in the aggregate, at least 70% of the shares of Common Stock held by the Sponsors and Service Providers immediately following the exercise in full of the Option Rights;

- all other Directors (the "Majority Appointed Directors") shall be elected by the Stockholders owning, in the aggregate, a majority of the issued and outstanding Common Stock (including, for the avoidance of doubt, Common Stock held by Oaktree, GS and the Sponsors); *provided*, that (i) two of the initial Majority Appointed Directors shall be appointed by the Steering Committee of the First Lien Lenders of the Company prior to the Restructuring Effective Date and (ii) one of the initial Majority Appointed Directors shall be appointed by the Consenting Second Lien Lenders owning, in the aggregate, a majority of the issued and outstanding Common Stock held by such Consenting Second Lien Lenders on the Restructuring Effective Date.

For the avoidance of doubt, if Emilie Arel ceases to be the CEO, she shall automatically be deemed to resign from the Board, and her board

seat will be replaced by the remainder of the Board.

In the event that, as of December 31, 2020, the Consenting Second Lien Lenders continue to beneficially own at least 50% of the shares of Common Stock issued to them on the Restructuring Effective Date, the Company shall nominate for election to the Board for the term beginning January 1, 2021 one individual identified by the Consenting Second Lien Lenders beneficially owning, in the aggregate, a majority of the issued and outstanding Common Stock held by such Consenting Second Lien Lenders as of the end of the initial term of the Directors.

Term:  Board members shall be elected for a term of two (2) years; *provided* that the initial term of the Directors shall end on December 31, 2020. In the event that a Stockholder (or group of Stockholders) that has the right to appoint a Designated Director (as defined below) loses its right to appoint a Designated Director, such Designated Director shall automatically be deemed to resign from the Board, and his or her board seat will be replaced by the remainder of the Board, with such replacement Director serving as a Director until the end of his or her predecessor's term.

Vacancies; Removal: The Directors appointed by Oaktree, GS, the Majority Existing Sponsor Stockholder and, during the initial term, the Consenting Second Lien Lenders (the "Designated Directors") may only be removed by, and any vacancy created by the resignation, death or removal of any such Director may only be filled by, the Stockholder (or group of Stockholders) that has the right to appoint such Director. All non-Designated Directors may be removed by the vote of Stockholders holding, in the aggregate, a majority of the issued and outstanding Common Stock. Any vacancies created by the resignation, death or removal of a non-Designated Director shall be filled by the remainder of the Board, with such replacement Director serving as a Director until the end of his or her predecessor's term.

Board Action: Subject to customary exceptions for affiliate transactions, Board action shall require the affirmative vote of a majority of the Directors present at a duly called meeting at which a quorum is present, or the written consent of all of the Directors; *provided* that any of the following actions shall require the affirmative vote or prior written consent of at least one Designated Director elected by Oaktree and at least one Designated Director elected by GS for so long as Oaktree and GS, as applicable, has the right to elect at least one Designated Director:

- any change in the scope of the business or the purpose of the Company;

- any merger, consolidation, recapitalization, reorganization or other business combination transaction of the Company or any

3

|  | of its subsidiaries; |
|---|---|
|  | • any sale, lease or other disposition of all or substantially all assets of the Company or any of its material subsidiaries; |
|  | • any dissolution, winding-up or liquidation of the Company or any of its subsidiaries; |
|  | • any material change in the accounting methods or policies of the Company and its subsidiaries; and |
|  | • any material changes to the tax elections of the Company. |
| **Pre-emptive Rights** | If the Company or any of its subsidiaries proposes to issue (i) Common Stock or other equity interests or securities convertible into or exercisable or exchangeable therefor or (ii) any new indebtedness that is junior in priority or liens to the Senior Term Loans and senior or pari passu in priority or liens to the Subordinated Loans pursuant to a transaction described below under "Affiliate Transactions" ("<u>New Debt</u>"), the Company shall (or shall cause such subsidiary to) first offer to each Stockholder that is an "accredited investor" the right (A) with respect to issuances of Common Stock or other equity interests or securities convertible into or exercisable or exchangeable therefor, to purchase, for cash, at a price equal to the price at which the Company (or such subsidiary) proposes to issue such Common Stock or other equity interests or securities, such Stockholder's pro rata portion based on its respective ownership of the Common Stock outstanding immediately prior to such issuance (or, as applicable, its indirect ownership in such subsidiary) of such Common Stock or other equity interests or securities, subject to customary exceptions for Common Stock dividends, issuances in connection with the conversion or exercise of outstanding convertible securities, issuances under employee incentive plans, and issuances in connection with acquisition transactions and (B) with respect to issuances of New Debt, to participate pro rata in the financing of such New Debt based on such Stockholder's ownership of the Common Stock outstanding immediately prior to such issuance (or, as applicable, its indirect ownership in such subsidiary) of such New Debt. In addition, the Company may be permitted to issue Common Stock or other equity interests or securities convertible into or exercisable or exchangeable therefor to third parties without first offering preemptive rights to the Stockholders to the extent such rights are offered promptly following such issuance.  In addition, should any Stockholder choose not to purchase or participate in its pro rata share, the Stockholders that have exercised their preemptive rights shall have the right to purchase the remaining pro rata shares or participate in the remaining portion of such New Debt, as applicable. |

| | |
|---|---|
| **Transfers of Common Stock** | The ability of any Stockholder to directly or indirectly sell, assign, transfer, pledge or otherwise dispose of all or any of its Common Stock (any of the foregoing, a "<u>Transfer</u>") shall be subject to the following restrictions:<br><br>• The transferee shall have executed a joinder to the Stockholders Agreement.<br><br>• All Transfers shall be made in compliance with all applicable federal and state securities laws.<br><br>• All Transfers shall be subject to the Right of First Offer and Tag-Along provisions described below (subject to the applicable percentage thresholds and to customary exceptions for Transfers to affiliates and other "permitted transferees").<br><br>• No Transfer of Common Stock will be permitted if, as a result of such Transfer, any class of equity securities of the Company would be held of record by a number of holders that exceeds the applicable threshold for registration under the Exchange Act or if the Board otherwise determines that such Transfer could result in the Company's being required to file reports under the Exchange Act, if it is not otherwise subject to such requirements.<br><br>• All Transfers of Common Stock may be subject to customary restrictions consistent with the preservation of the net operating loss and other tax attributes of the Company and its subsidiaries.<br><br>• No Transfers of Common Stock will be permitted to any Person that the Board determines in good faith is a competitor of the Company or an affiliate of a competitor, other than as approved by the Board (each, a "<u>Prohibited Transferee</u>"). |
| **Right of First Offer** | In the event that any Stockholder proposes to Transfer Common Stock representing 0.5% or more of the then issued and outstanding Common Stock (the "<u>Offered Securities</u>") to any unaffiliated third party in one transaction or series of related transactions, then such Stockholder (a "<u>ROFO Seller</u>") shall deliver to each of the other Stockholders (or group of affiliated Stockholders) holding equal to or greater than 5% of the issued and outstanding Common Stock (each, a "<u>ROFO Offeree</u>") written notice thereof, specifying the number of Offered Securities, the price per Offered Security, and any other material terms of such Transfer (an "<u>Offer Notice</u>").<br><br>• Each ROFO Offeree may elect to purchase, by written notice given to the ROFO Seller at any time during the 10 business days following its receipt of the Offer Notice (the "<u>Offer Period</u>"), its *pro rata* share (based on its respective ownership of |

the Common Stock held by all ROFO Offerees as of the date of the Offer Notice) of the Offered Securities at the price and on the terms specified in the Offer Notice.

- Any Offered Securities that ROFO Offerees do not elect to purchase will be re-offered *pro rata* to each ROFO Offeree who elected to purchase Offered Securities.

- Any remaining Offered Securities may be Transferred by the ROFO Seller, at any time during the 75 days following expiration of the Offer Period to any third party on terms no more favorable to such third party than the terms specified in the Offer Notice. If a buyer is found during the 75-day ROFO window, the Transfer to such Buyer will be subject to the tag-along provision below if the number of shares of Common Stock exceeds the threshold for a Tag-Along Sale (as defined below).

| | |
|---|---|
| **Tag-along Rights** | In the event that any one or more Stockholders proposes to Transfer to any unaffiliated Person or "group" of unaffiliated Persons (the "Tag-Along Buyer") Common Stock that constitutes more than 35% of the total Common Stock then outstanding (a "Tag-Along Sale"), such Stockholder (the "Selling Stockholder") shall provide notice of the Tag-Along Sale to each of the other Stockholders (the "Tag-Along Offerees") no later than ten (10) business days prior to the proposed closing of such Tag-Along Sale (the "Tag Along Notice"). Each Tag-Along Offeree shall have "tag-along" rights to participate, on a *pro rata* basis (based on its respective ownership of the Common Stock held by all Tag-Along Offerees as of the date of the Tag-Along Notice), in the Tag-Along Sale, on the same terms, and subject to the same conditions as the Selling Stockholder (*provided*, that no Tag-Along Offeree shall be required to agree to any restrictive covenants other than confidentiality), with a corresponding reduction (except to the extent the Tag-Along Buyer agrees to purchase additional Common Stock) in the number of shares of Common Stock being sold by the Tag-Along Seller to reflect the number of shares of Common Stock that Tag-Along Offerees elect to sell in the Tag-Along Sale. It shall be a condition precedent to the effectiveness of any Tag-Along Sale that the Tag-Along Buyer concurrently purchase, pursuant to the terms hereof, all of the shares of Common Stock with respect to which Tag-Along Offerees elect to exercise tag-along rights in connection with such Tag-Along Sale. |
| **Drag-along Rights** | In the event that (a) any one or more Stockholders collectively holding a majority of the outstanding Common Stock proposes to Transfer all or their Common Stock, as the case may be, to any unaffiliated Person or "group" of unaffiliated Persons (the "Drag-Along Buyer"), and (b) such Transfer has been approved by the Board, then such |

| | Stockholders (the "<u>Drag-Along Seller</u>") shall have the right to cause all of the other Stockholders to Transfer all of their Common Stock to the Drag-Along Buyer, on the same terms, and subject to the same conditions as the Drag-Along Seller. In connection with any such Transfer, each Stockholder shall, if applicable, (i) vote in favor of the transaction pursuant to which the Transfer is effected, (ii) not exercise any appraisal or similar rights with respect to such transaction and (iii) provide customary representations and warranties to the Drag-Along Buyer regarding its legal status and authority, and its ownership of the Common Stock being transferred, and customary (several but not joint) indemnities regarding the same, (iv) participate *pro rata* in any customary (several but not joint) indemnification of the Drag-Along Buyer with respect to matters other than the representations and warranties described in clause (iii), it being understood that such participation shall be limited to funding, on a *pro rata* basis, any escrow arrangements related thereto and being responsible for such Stockholder's *pro rata* share of any withdrawals therefrom, and (v) take all other actions reasonably requested in order to consummate such transaction.  In no event shall any such Stockholder be required to agree to any restrictive covenants other than confidentiality or to indemnify or contribute any amount in excess of the net cash amount received by such Stockholder in any such Transfer. |
|---|---|
| **Affiliate Transactions** | Subject to customary exceptions, the Company shall not enter into or effect any transaction having a fair market value in excess of $1,000,000 with any affiliate (as such term is defined in Rule 405 of the Securities Act of 1933, as amended (the "<u>Securities Act</u>")), except on an arms'-length basis and with the approval of a majority of the disinterested directors of the Company. |
| **Information Rights** | The Stockholders Agreement will provide for customary information and access rights for all stockholders, including annual and quarterly financial statements, including balance sheet, income statements, cash flow statements, and equity capitalization tables for and as of the end of the financial period covered by such statements. |
| **Confidentiality** | The Stockholders Agreement shall include customary confidentiality restrictions for a privately held company (including with respect to all information and documents described under "Information Rights" above), with a carve-out allowing Stockholders to share confidential information with any potential transferee that enters into a customary confidentiality agreement in form and substance reasonably acceptable to the Company; *provided however*, that such carve out shall not apply to any Prohibited Transferee, except as approved by the Board. |
| **Amendments** | Any amendment to the Stockholders Agreement shall require approval of Stockholders holding a majority of the Common Stock then outstanding, *provided*, that any amendment that adversely affects the |

| | |
|---|---|
| | Director or observer appointment rights of any Stockholder or could reasonably be expected to materially adversely affect any Stockholder's interest in the Company in a manner that is disproportionate to the effect on one or more other Stockholder's interest in the Company shall require the consent of such Stockholder. |
| **Registration Rights** | Each Stockholder that holds (together with its affiliates) 5% or more of the issued and outstanding Common Stock shall have reasonable and customary piggy back registration rights with respect to all or a portion of such Stockholders Registrable Securities, exercisable at any time the Company files a registration statement under the Securities Act (other than an initial public offering of Common Stock that results in the listing of the Common Stock on a national securities exchange and that solely involves the issuance of shares by the Company), subject to customary restrictions and limitations. In the case of any underwritten public offering by the Company, priority shall be given to securities offered by the Company, and any cut-backs will be allocated proportionally among the Stockholders participating in such offering based on the number of Registrable Securities proposed to be sold by each such Stockholders.<br><br>"Registrable Securities" means, at any time, any shares of Common Stock, and any securities issued or issuable in respect of such shares of Common Stock, by way of conversion, exchange, stock dividend, split or combination, recapitalization, merger, consolidation, other reorganization or otherwise. Equity securities shall cease to be Registrable Securities upon sale to the public, or once the securities are able to be sold (without restrictions on manner of sale or volume limitations) pursuant to Rule 144 under the Securities Act. |
| **Expiration of Rights:** | All of the terms set forth above, other than under "Registration Rights" shall terminate following the listing of the Common Stock on a national securities exchange. |

\*     \*     \*     \*

**Exhibit B**

**Form of Transfer Agreement**

## **<u>Transfer Agreement to Restructuring Support Agreement</u>**

Reference is made to the Restructuring Support Agreement (as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "***Agreement***") dated as of December 18, 2018, by and among Blackdog Holdings, Inc., FULLBEAUTY Brands Holdings Corp., and each of their affiliates that executes the Agreement (collectively, the "***Company***"), certain beneficial holders (or investment managers, advisors or subadvisors for any of the beneficial holders) of Lender Claims (together with their successors and permitted assigns under the Agreement, each, a "***Consenting Lender***" and, collectively, the "***Consenting Lenders***"), and the other parties thereto.[1]

The undersigned (the "***Transferee***") is [a Consenting Lender / a Sponsor] under the Agreement and has acquired the further Lender Claims set forth below, which are in addition to any Lender Claims set forth on its signature page to the Agreement or on any Joinder Agreement or Transfer Agreement executed before the day hereof.

This agreement shall be governed by the governing law set forth in the Agreement.

Date: _____, 201_

**[TRANSFEREE]**

By: _____

Name:

Title:

|  |  |
|---|---|
| Principal Amount of ABL Claims: | $ _____ |
| Principal Amount of FILO Claims: | $ _____ |
| Additional Amount of First Lien Claims: | $ _____ |
| Additional Amount of Second Lien Claims: | $ _____ |

---

[1] Defined terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

## Exhibit C

**Form of Joinder Agreement**

## Joinder Agreement to Restructuring Support Agreement

The undersigned hereby acknowledges that it has reviewed and understands the Restructuring Support Agreement (as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Agreement**") dated as of December 18, 2018, by and among Blackdog Holdings, Inc., FULLBEAUTY Brands Holdings Corp., and each of their affiliates that executes the Agreement (collectively, the "**Company**"), certain beneficial holders (or investment managers, advisors or subadvisors for any of the beneficial holders) of Lender Claims (together with their successors and permitted assigns under the Agreement, each, a "**Consenting Lender**" and, collectively, the "**Consenting Lenders**"), and the other parties thereto, and agrees to be bound as a Consenting Lender by the terms and conditions thereof binding on the Consenting Lender with respect to all Lender Claims held by the undersigned.[1]

The undersigned hereby makes the representations and warranties of the Consenting Lender set forth in Section 9(a) and Section 9(b) of the Agreement to each other Party, effective as of the date hereof.

This joinder agreement shall be governed by the governing law set forth in the Agreement.

Date: _____, 201_

**[TRANSFEREE]**

By: _____

Name:

Title:

| | |
|---|---|
| Principal Amount of ABL Claims: | $ _____ |
| Principal Amount of FILO Claims: | $ _____ |
| Principal Amount of First Lien Claims: | $ _____ |
| Principal Amount of Second Lien Claims: | $ _____ |

---

[1]   Defined terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

## Exhibit D

**Exit Term Facility Commitment Letter**

<u>**PERSONAL AND CONFIDENTIAL**</u>

**December 18, 2018**

**FullBeauty Brands Holdings Corp.**
**1 New York Plaza**
**New York, New York 10004**

Attention: Board of Directors of FullBeauty Brands Holdings Corp.

New Term Commitment Letter

Ladies and Gentlemen:

The entities listed on Schedule 1 hereto (collectively, "**Goldman**") and the entities listed on Schedule 2 hereto (collectively "**Oaktree**" and, together with Goldman, the "**Initial Commitment Parties**") and such other lenders party to the Prepetition First Lien Credit Agreement (as defined below) who execute a joinder to this Commitment Letter before the Joinder Deadline (as defined below) (each a "**Commitment Party**" and, collectively with the Initial Commitment Parties, the "**Commitment Parties**") are pleased to confirm the arrangements under which each of the Commitment Parties commits to provide the financing for the New Term Facility (as defined below) on the terms and subject to the conditions set forth in this letter and the attached Annexes A and B hereto (collectively, the "**Commitment Letter**").

You have informed us that FullBeauty Brands Holdings Corp. and certain of the Company's existing affiliates (collectively, the "**Company**") intend to file voluntary petitions for reorganization under chapter 11 of title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") to commence chapter 11 cases (the "**Cases**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on or before January 22, 2019 (the "**Petition Date**") on the terms and conditions set forth in the Restructuring Support Agreement (as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, and including any exhibits, schedules, or annexes attached thereto, the "**RSA**") to which this Commitment Letter is attached. The Company intends to emerge from the Cases pursuant to a chapter 11 plan of reorganization consistent with the terms and conditions set forth in the RSA (such plan of reorganization, together with all exhibits, schedules, annexes, supplements and other attachments thereto, in each case, as amended, supplemented or otherwise modified on or prior to the date hereof or as amended, supplemented or otherwise modified from time to time hereafter, the "**Acceptable Plan**"). The order confirming the Acceptable Plan shall authorize the Company to obtain a $30 million senior secured term loan facility (the "**New Term Facility**" and the loans made pursuant thereto, the "**New Term Loans**").

In addition, pursuant to the Acceptable Plan, the Company shall also obtain:  (i) a senior secured term loan facility (the "**First Lien Term Facility**") in an aggregate principal amount of $250.0 million (the loans thereunder, the "**First Lien Term Loans**"); (ii) a second lien subordinated term loan facility (the "**Subordinated Facility**") in an aggregate principal amount of up to $50.0 million (the loans thereunder, the "**Subordinated Loans**"); and (iii) an asset based revolving credit facility in an aggregate principal amount of up to $100.0 million (the "**ABL Facility**" and, together with the Subordinated Facility, First Lien Term Facility and New Term Facility, the "**Credit Facilities**").

**1.    Commitments:  Titles and Roles.**

Goldman and Oaktree are pleased to provide the Borrower (as defined below) up to 50% and 50%, respectively, of the New Term Facility, in each case on the terms and subject to the conditions contained

in this Commitment Letter; *provided, that*, each of Goldman and Oaktree's commitments arising under such documentation shall be several and not joint, and neither Goldman nor Oaktree shall be responsible for the obligations of any other party hereto; *provided further, that*, such commitment by the Initial Commitment Parties shall be reduced on a pro rata basis based on the commitments provided by any additional Commitment Parties that execute a joinder to this agreement on or prior to the date that is five (5) business days after the date when the RSA is made available to the lenders party to the Prepetition First Lien Credit Agreement on the virtual data room maintained by the Company for the First Lien Lenders pursuant to the First Lien Credit Agreement (the "**Data Site**" and such date, the "**Joinder Deadline**").  For purposes of this Commitment Letter, the Commitment Parties means each Commitment Party and any of its respective affiliates that perform obligations under this Commitment Letter.

**2.      Conditions Precedent.**

Each Commitment Party's commitment and agreement is subject to:  (i) the satisfactory negotiation, execution and delivery of appropriate definitive loan documents relating to the First Lien Term Facility including, without limitation, credit agreements, guarantees, security agreements, intercreditor agreements, pledge agreements, real property security agreements, opinions of counsel and other related definitive documents (collectively, the "**Loan Documents**") and (ii) confirmation of the Acceptable Plan. Each Commitment Party's commitment is also conditioned upon and made subject to such Commitment Party not becoming aware after the date hereof of any new or inconsistent information or other matter not previously disclosed to such Commitment Party relating to the Company, its subsidiaries, the Cases, or the transactions contemplated by this Commitment Letter which such Commitment Party, in its reasonable judgment, deems material and adverse relative to the information or other matters disclosed to such Commitment Party prior to the date hereof.

**3.      Information.**

The Company represents and covenants that:  (i) all materials and other information (other than financial projections) provided directly or, to the Company's knowledge, indirectly by the Company to the Commitment Parties in connection with the transactions contemplated hereunder is and will be, when taken as a whole, complete and correct in all material respects and does not, and will not, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not materially misleading; and (ii) the financial projections, that have been or will be made available to the Commitment Parties by or on behalf of the Company have been and will be prepared in good faith based upon assumptions that are believed by the preparer thereof to be reasonable at the time such financial projections are furnished to the Commitment Parties, it being understood and agreed that financial projections are not a guarantee of financial performance and actual results may differ from financial projections and such differences may be material.  The Company agrees that if at any time prior to the occurrence of the Closing Date (as defined in Annex B), any of the representations in the preceding sentence would be materially incorrect if the Information and financial projections were being furnished, and such representations were being made, at such time, then the Company will promptly supplement, or cause to be supplemented, the information and financial projections so that such representations will be materially correct under those circumstances.

**4.      Indemnification and Related Matters.**

In connection with arrangements such as this, it is each Commitment Party's policy to receive indemnification.  The Company agrees to the provisions with respect to such indemnity and other matters set forth in Annex A, which is incorporated by reference into this Commitment Letter.

5.    **Assignments.**

This Commitment Letter may not be assigned by you without the prior written consent of each Commitment Party (and any purported assignment without such consent will be null and void), is intended to be solely for the benefit of the Commitment Parties and the other parties hereto and, except as set forth in Annex A hereto, is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto.  Each Commitment Party may assign its commitments and agreements hereunder, in whole or in part, to any of its affiliates and, as provided above, to any Lender (as defined below) prior to the Closing Date.  This Commitment Letter may not be amended or any term or provision hereof or thereof waived or otherwise modified except by an instrument in writing signed by each of the parties hereto or thereto, as applicable, and any term or provision hereof or thereof may be amended or waived only by a written agreement executed and delivered by all parties hereto and thereto.

6.    **Confidentiality.**

Please note that this Commitment Letter and any written communications provided by, or oral discussions with, the Commitment Parties in connection with this arrangement are exclusively for the information of the Company and its subsidiaries and may not be disclosed to any third party or circulated or referred to publicly without the prior written consent of the Commitment Parties except, after providing written notice to the Commitment Parties, pursuant to a subpoena or order issued by a court of competent jurisdiction or by a judicial, administrative or legislative body or committee; *provided, that* (i) the Commitment Parties hereby consent to the disclosure of (A) this Commitment Letter and such communications and discussions with the Company's officers, directors, agents and other advisors who are directly involved in the consideration of the New Term Facility and who have been informed by the Company of the confidential nature of such advice and the Commitment Letter and who have agreed to treat such information confidentially; (B) this Commitment Letter: (1) to the office of the U.S. Trustee, to any ad hoc or statutorily appointed committee of unsecured creditors, to any party to the RSA, and to the respective representatives of and professional advisors to each of the enumerated parties in this subsection (1) on a confidential and "need to know" basis; and (2) to the extent required in motions, in form and substance reasonably satisfactory to the Commitment Parties in their discretion, to be filed with the Bankruptcy Court solely in connection with obtaining an order of the Bankruptcy Court approving the Company's execution, delivery and performance of this Commitment Letter, or the definitive Loan Documents; and (C) this Commitment Letter as required by applicable law or compulsory legal process (in which case you agree to inform the Commitment Parties promptly thereof); and (D) the information contained in Annex B to Moody's Investor Services, Inc. and Standard & Poor's Ratings Group, a division of the McGraw Hill Corporation, provided that such information is supplied only on a confidential basis after consultation with the Commitment Parties and (ii) this Commitment Letter and any Annex attached hereto may be attached as an exhibit to the RSA.

7.    **Absence of Fiduciary Relationship; Affiliates; Etc.**

As you know, each Commitment Party, together with its respective affiliates (each, a **"Commitment Party Group Member"** and collectively, the **"Commitment Party Group"**), is a full service financial services firm engaged, either directly or through affiliates in various activities, including securities trading, investment banking and financial advisory, investment management, principal investment, hedging, financing and brokerage activities and financial planning and benefits counseling for both companies and individuals.  In the ordinary course of these activities, the Commitment Party Group may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and/or financial instruments (including bank loans) for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities and/or instruments.  Such investment and other activities may involve securities and instruments of the

Company, as well as of other entities and persons and their affiliates which may: (i) be involved in transactions arising from or relating to the engagement contemplated by this Commitment Letter, (ii) be customers or competitors of the Company, or (iii) have other relationships with the Company. In addition, the Commitment Party Group may provide investment banking, underwriting and financial advisory services to such other entities and persons. The Commitment Party Group may also co-invest with, make direct investments in, and invest or co-invest client monies in or with funds or other investment vehicles managed by other parties, and such funds or other investment vehicles may trade or make investments in securities of the Company or such other entities. The transactions contemplated by this Commitment Letter may have a direct or indirect impact on the investments, securities or instruments referred to in this paragraph. Although the Commitment Party Group in the course of such other activities and relationships may acquire information about the transaction contemplated by this Commitment Letter or other entities and persons which may be the subject of the transactions contemplated by this Commitment Letter, the Commitment Party Group shall have no obligation to disclose such information, or the fact that the Commitment Party Group is in possession of such information, to the Company or to use such information on the Company's behalf.

Consistent with each Commitment Party Group Member's policies to hold in confidence the affairs of its customers, the Commitment Party Group will not furnish confidential information obtained from you by virtue of the transactions contemplated by this Commitment Letter to any of its other customers. Furthermore, you acknowledge that the Commitment Party Group has no obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained or that may be obtained by them from any other person.

Each Commitment Party Group Member may have economic interests that conflict with those of the Company, its equity holders and/or its affiliates. You agree that each Commitment Party Group Member will act under this Commitment Letter as an independent contractor and that nothing in this Commitment Letter or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the Commitment Party Group and the Company, its equity holders or its affiliates. You acknowledge and agree that the transactions contemplated by this Commitment Letter (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between each Commitment Party, on the one hand, and the Company, on the other, and in connection therewith and with the process leading thereto: (i) no Commitment Party Group Member has assumed an advisory or fiduciary responsibility in favor of the Company, its equity holders or its affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether such Commitment Party Group Member has advised, is currently advising or will advise the Company, its equity holders or its affiliates on other matters) or any other obligation to the Company except the obligations expressly set forth in this Commitment Letter; and (ii) each Commitment Party Group Member is acting solely as a principal and not as the agent or fiduciary of the Company, its management, equity holders, affiliates, creditors or any other person. The Company acknowledges and agrees that the Company has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. The Company agrees that it will not claim that any Commitment Party Group Member has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to the Company, in connection with such transactions or the process leading thereto. In addition, each Commitment Party may employ the services of its affiliates in providing services and/or performing its obligations hereunder and may exchange with such affiliates information concerning the Company and other companies that may be the subject of this arrangement, and such affiliates will be entitled to the benefits afforded to such Commitment Party hereunder.

In addition, please note that no Commitment Party Group Member provides accounting, tax or legal advice.  Notwithstanding anything herein to the contrary, the Company (and each employee, representative or other agent of the Company) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the New Term Facility and all materials of any kind (including opinions or other tax analyses) that are provided to the Company relating to such tax treatment and tax structure.  However, any information relating to the tax treatment or tax structure will remain subject to the confidentiality provisions hereof (and the foregoing sentence will not apply) to the extent reasonably necessary to enable the parties hereto, their respective affiliates, and their respective affiliates' directors and employees to comply with applicable securities laws.  For this purpose, "tax treatment" means U.S. federal or state income tax treatment, and "tax structure" is limited to any facts relevant to the U.S. federal income tax treatment of the transactions contemplated by this Commitment Letter but does not include information relating to the identity of the parties hereto or any of their respective affiliates.

**8.      Miscellaneous.**

Whether or not the New Term Facility is funded, the Company also agrees to reimburse each Commitment Party periodically for its reasonable and documented out-of-pocket expenses directly related to the New Term Facility and the fees and disbursements of our attorneys and advisors, plus any sales, use or similar taxes (including additions to such taxes, if any arising in connection with any matter referred to in this Commitment Letter) in connection therewith.

Each Commitment Party's commitments and agreements hereunder will terminate upon the first to occur of (such date, the "**Commitment Termination Date**"):  (i) a material breach by the Company under this Commitment Letter; (ii) the RSA ceases to be in full force and effect with respect to the Commitment Parties; (iii) the date that is 45 days from the Petition Date; *provided, that* the Commitment Termination Date may be extended by up to 30 days if agreed to by the Commitment Parties holding a majority of the aggregate principal amount of the loans outstanding under the Prepetition First Lien Credit Agreement held by the Commitment Parties (with notice of such agreement to extend posted on the Data Site) and (iv) the Company closes the Restructuring (as defined in the RSA) as contemplated by the RSA without requiring the funding of the New Term Facility as determined by the Required Consenting First Lien Lenders (as defined in the RSA) and the Company.  In the event of any termination pursuant to this paragraph, this Commitment Letter, and each Commitment Party's agreement to perform the services described herein, shall automatically terminate without further action or notice and without further obligation to the Company unless such Commitment Party shall, in its discretion, agree to an extension in writing.

The provisions set forth under Sections 3, 4 (including Annex A) and 6 hereof and this Section 8 will remain in full force and effect regardless of whether definitive Loan Documents are executed and delivered.  The provisions set forth under Sections 4 (including Annex A) and 6 hereof and this Section 8 will remain in full force and effect notwithstanding the expiration or termination of this Commitment Letter or each Commitment Party's commitments and agreements hereunder.

**The Company for itself and its affiliates agrees that any suit or proceeding arising in respect to this Commitment Letter or each Commitment Party's commitments or agreements hereunder will be tried in the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any federal court of the United States of America sitting in the Borough of Manhattan or, if that court does not have subject matter jurisdiction, in any state court located in the City and County of New York, and the Company agrees to submit to the exclusive jurisdiction of, and to venue in, such court.  Any right to trial by jury with respect to any action or proceeding arising in connection with or as a result of either any Commitment Party's commitments or agreements or any matter referred to in this letter is hereby waived by the parties**

**hereto.  The Company for itself and its affiliates agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Service of any process, summons, notice or document by registered mail or overnight courier addressed to any of the parties hereto at the addresses above shall be effective service of process against such party for any suit, action or proceeding brought in any such court. This Commitment Letter will be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws.**

Each Commitment Party hereby notifies the Company that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**") that such Commitment Party may be required to obtain, verify and record information that identifies the Company and each of the Guarantors (as defined in Annex B), which information includes the name and address of the Company and each of the Guarantors and other information that will allow each Commitment Party to identify the Company and each of the Guarantors in accordance with the Patriot Act.  This notice is given in accordance with the requirements of the Patriot Act and is effective for each Commitment Party and each Lender.

This Commitment Letter may be executed in any number of counterparts, each of which when executed will be an original, and all of which, when taken together, will constitute one agreement.  Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission or electronic transmission (in pdf format) will be effective as delivery of a manually executed counterpart hereof.  This Commitment Letter is the only agreement that has been entered into among the parties hereto with respect to the New Term Facility and sets forth the entire understanding of the parties with respect thereto and supersedes any prior written or oral agreements among the parties hereto with respect to the New Term Facility.

[*Remainder of page intentionally left blank*]

Please confirm that the foregoing is in accordance with your understanding by signing and returning to the Commitment Parties the enclosed copy of this Commitment Letter, if not previously executed and delivered on or before the close of business on December 18, 2018, whereupon this Commitment Letter will become a binding agreement between the parties hereto.  If the Commitment Letter has not been signed and returned as described in the preceding sentence by such date, this offer will terminate on such date.  We look forward to working with you on this transaction.

[*Signature Pages to Follow*]

**ACCEPTED AND AGREED AS OF** \_\_\_12 / 19\_\_\_, **2018:**

**FULLBEAUTY BRANDS HOLDINGS CORP.**

By: _____
Name: Emilie Arel
Title: CEO, FullBeauty Brands

[*Lender Signature Pages to Commitment Letter Omitted*]

**Schedule 1**



**Schedule 2**



## Annex A

*In the event that any Commitment Party becomes involved in any capacity in any action, proceeding or investigation brought by or against any person, including equity holders, partners, members or other shareholders of the Company in connection with or as a result of its commitments to provide the New Term Facility under this Commitment Letter (the "**Letter**"), the Company agrees to periodically reimburse such Commitment Party for its reasonable legal and other expenses (including the cost of any investigation and preparation) incurred in connection therewith. The Company also agrees to indemnify and hold each Commitment Party harmless against any and all losses, claims, damages or liabilities to any such person in connection with or as a result of its commitments to provide the New Term Facility under the Letter  (whether or not such investigation, litigation, claim or proceeding is brought by you, your equity holders or creditors or an indemnified person and whether or not any such indemnified person is otherwise a party thereto), except to the extent that such loss, claim, damage or liability has been found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Commitment Party in performing the services that are the subject of the Letter or from a breach by such Commitment Party of its obligations under the Letter. If for any reason the foregoing indemnification is unavailable to any Commitment Party or insufficient to hold it harmless, then the Company will contribute to the amount paid or payable by such Commitment Party as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative economic interests of: (i) the Company and its affiliates, shareholders, partners, members or other equity holders on the one hand and (ii) such Commitment Party on the other hand in the matters contemplated by the Letter as well as the relative fault of (i) the Company and its affiliates, shareholders, partners, members or other equity holders and (ii) such Commitment Party with respect to such loss, claim, damage or liability and any other relevant equitable considerations.  The reimbursement, indemnity and contribution obligations of the Company under this paragraph will be in addition to any liability which the Company may otherwise have, will extend upon the same terms and conditions to any affiliate of each Commitment Party and the partners, members, directors, agents, employees and controlling persons (if any), as the case may be, of each Commitment Party and any such affiliate, and will be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company, each Commitment Party, any such affiliate and any such person.  The Company also agrees that neither any indemnified party nor any of such affiliates, partners, directors, agents, employees or controlling persons will have any liability to the Company or any person asserting claims on behalf of or in right of the Company or any other person in connection with or as a result of either this arrangement or any matter referred to in the Letter, except in the case of the Company to the extent that any losses, claims, damages, liabilities or expenses incurred by the Company or its affiliates, shareholders, partners or other equity holders have been found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such indemnified party in performing the services that are the subject of the Letter or from a breach by such Commitment Party of its obligations under the Letter; provided, however, that in no event will such indemnified party or such other parties have any liability for any indirect, consequential, special or punitive damages in connection with or as a result of such indemnified party's or such other parties' activities related to the Letter.  **The provisions of this Annex A will survive any termination or completion of the arrangement provided by the Letter and the occurrence of the effective date of any plan of reorganization and any discharge of the Company's obligations.***

### Annex B

### FULLBEAUTY BRANDS HOLDINGS CORP.

#### SUMMARY OF THE NEW TERM FACILITY

*This Summary outlines certain terms of the New Term Facility referred to in the Commitment Letter, of which this Annex B is a part.  Certain capitalized terms used herein are defined in the Commitment Letter.*

| | |
|---|---|
| **Borrower:** | Same as the First Lien Term Facility. |
| **Holdings:** | Same as the First Lien Term Facility. |
| **Guarantors:** | Same as the First Lien Term Facility. |
| **Purpose/Use of Proceeds:** | The proceeds of that portion of the New Term Facility funded on the Closing Date will be used in compliance with the terms of the RSA: (i) to pay transaction costs, fees and expenses which are incurred in connection with the Credit Facilities, including payment of professionals' fees and expenses and (ii) for working capital and other general corporate purposes. |
| **Administrative Agent:** | Same as the First Lien Term Facility. |
| **Lenders:** | The Initial Commitment Parties (each, a **"Lender"** and, collectively, the **"Lenders"**); provided that, each lender party to that certain First Lien Term Loan Credit Agreement, dated as of October 14, 2015, among FULLBEAUTY Holdings, as borrower, JPMorgan Chase Bank N.A., as administrative agent, and the lenders party thereto (as amended, the "**Prepetition First Lien Credit Agreement**") on the date hereof that is also party to the RSA shall be offered the opportunity to provide a pro rata share of the New Term Loans on the terms and conditions set forth in the RSA and each such lender that wishes to provide a pro rata commitment for the New Term Loans shall execute a joinder agreement to the Commitment Letter on or prior to the Joinder Deadline. |
| **Amount of Facility:** | $30.0 million of senior secured New Term Loans. |
| **Facilities Documentation:** | The terms and provisions of the New Term Loans will be included in the documentation for the First Lien Term Loans. |

A-4

| | |
|---|---|
| **Maturity Date and Amortization:** | Commencing on the first full fiscal quarter ended after the Closing Date, the New Term Facility will amortize in equal quarterly installments in aggregate annual amounts equal to 1.0% of the original principal amount of the New Term Facility, with the balance payable on the maturity date thereof.  The New Term Facility will mature on the date that is three years after the Closing Date; provided that the Facilities Documentation shall provide the right for individual Lenders to agree to extend the maturity date of the outstanding New Term Loans upon the request of the Borrower and without the consent of any other Lender (and as further described on Annex 2 to the RSA with respect to the First Lien Term Loans). |
| **Closing Date:** | The date on which the Acceptable Plan becomes effective. |
| **Interest Rate:** | All amounts outstanding under the New Term Facility will bear interest, at the Borrower's option, as follows: |

(i)      at ABR plus 9.0% *per annum*; or

(ii)     at the Adjusted LIBOR plus 10.0% *per annum*

| | |
|---|---|
| | As used herein, the terms "**ABR**" and "**Adjusted LIBOR**" will be defined in a manner consistent with the Facilities Documentation. |
| **Funding Protection**: | Same as the First Lien Term Facility. |
| **New Term Loan Fees:** | The Borrower shall make payments (the **"New Term Loan Fees"**) to each Lender in an amount equal to 5.0% of the amount of such Lender's commitments on the date hereof to provide the New Term Facility, as compensation for the funding of such Lender's loans under the New Term Facility and payable to such Lender upon repayment in full of the New Term Facility.  The New Term Loan Fees shall be non-refundable once paid. |
| **Voluntary Prepayments:** | Voluntary prepayments of borrowings under the New Term Facility will be permitted at any time in minimum principal amounts consistent with the Facilities Documentation, without premium or penalty (except as provided below), subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of Adjusted LIBOR borrowings other than on the last day of the relevant interest period; provided that all voluntary prepayments will be applied first to repay the New Term Loans and, upon the payment in full of all New Term Loans, to repay the First Lien Term Loans. |
| **Prepayment Premium:** | In the event all or any portion of the New Term Facility is voluntarily repaid (or mandatorily prepaid from the proceeds of any indebtedness), such repayments shall be:  (i) non-callable if such repayment occurs prior to the first anniversary of the Closing Date (unless such repayment is made subject to a customary make-whole) and (ii) made at 101% of the amount repaid if such repayment occurs on or after the first anniversary of the Closing Date. |

**Mandatory Prepayments:** The mandatory prepayments shall be the same as the First Lien Term Facility; provided that all mandatory prepayments will be applied first to repay the New Term Loans and upon the payment in full of all New Term Loans to the First Lien Term Loans.

**Security:** The New Term Facility will be secured, subject to permitted liens and other exceptions to be agreed, by the same collateral that secures the obligations under the First Lien Term Facility and subject to the same limitations governing the pledge, creation and perfection of the collateral under the First Lien Term Facility (the "***Collateral***").

The lien priority, relative rights and other creditors' rights issues in respect of the New Term Facility and the First Lien Term Facility will be set forth in an intercreditor agreement (the "***Intercreditor Agreement***"), which will document the senior status of the liens on the Collateral securing the New Term Facility and shall include in any event: a priming first lien vis-à-vis the First Lien Term Facility and a second lien on the assets securing the ABL Facility.

**Representations and Warranties:** Same as the First Lien Term Facility.

**Covenants:** Same as the First Lien Term Facility:

   **- financial covenants:** None.

   **- affirmative covenants:** Same as the First Lien Term Facility.

**Negative Covenants:** Same as the First Lien Term Facility.

**Events of Default:** Same as the First Lien Term Facility.

**Conditions Precedent to Funding:** The several obligations of the Lenders to make, or cause one of their respective affiliates to make, initial loans under the New Term Facility on the Closing Date will be subject to the satisfaction of conditions that are customary and appropriate for financings of this type, including, without limitation: (i) the accuracy of representations and warranties in all material respects, (ii) the absence of defaults or events of default at the time of, or after giving effect to the making of, such extension of credit and (iii) the consummation of the other transactions contemplated to occur pursuant to the RSA on the Closing Date and confirmation of the Acceptable Plan.

**Assignments and Participations:** Same as the First Lien Term Facility.

| | |
|---|---|
| **Requisite Lenders:** | Same as the First Lien Term Facility; *provided, that*, any amendment that would disproportionately affect: (i) the obligation of the Borrower to make payment of the loans under the New Term Facility or (ii) the senior status of the New Term Loans will not be effective without the approval of holders of more than 50% of New Term Loans. |
| **Taxes:** | Same as the First Lien Term Facility. |
| **Indemnity:** | Same as the First Lien Term Facility. |
| **Governing Law and Jurisdiction:** | Same as the First Lien Term Facility. |
| **Counsel to the Lenders:** | Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP. |

*The foregoing is intended to summarize certain basic terms of the New Term Facility.  It is not intended to be a definitive list of all of the requirements of the Lenders in connection with the New Term Facility*

<u>**Exhibit E**</u>

**Forbearance Agreement**

# FORBEARANCE AGREEMENT

This FORBEARANCE AGREEMENT, dated as of November 7, 2018 (this "Agreement"), among BLACKDOG HOLDINGS, INC., a Delaware corporation ("Holdings") (having assumed the obligations of BLACKDOG ACQUISITION CO., INC., a Delaware corporation, by way of contract), FULLBEAUTY BRANDS HOLDINGS CORP., a Delaware corporation (the "Borrower"), the Guarantors party hereto and the Lenders party hereto (collectively, the "Consenting Lenders"), to that certain First Lien Term Loan Credit Agreement dated as of October 14, 2015, among the Borrower, Holdings, JPMORGAN CHASE BANK, N.A., as administrative agent and collateral agent (the "Agent"), and the Lenders from time to time party thereto (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "Credit Agreement").

## W I T N E S S E T H

WHEREAS, the Borrower and Holdings have requested that the Agent, the Lenders and the other Secured Parties temporarily forbear from accelerating the Obligations or otherwise exercising any rights or remedies under the Loan Documents on account of the actual or purported occurrence and continuation of an Event of Default under (i) Section 8.01(e) of the Credit Agreement as the result of the Borrower's actual or prospective failure to make scheduled interest payment of the Second Lien Obligations on or after November 7, 2018, (ii) Section 8.01(c) and 8.01(e) of the Credit Agreement as the result of the Borrower's actual or prospective failure to participate pursuant to Section 6.01 of the Credit Agreement in a conference call for Lenders to discuss the financial position and results of operations of the Borrower and its Subsidiaries for the most recently ended period for which financial statements have been delivered, (iii) Section 8.01(i) of the Credit Agreement as a result of certain Uniform Commercial Code financing statements ceasing to create a valid and perfected Lien on Collateral in connection with certain organizational changes that took place in December 2017, and (iv) Section 8.01(b) of the Credit Agreement as a result of the Borrower's failure to provide notice pursuant to Section 6.03(a) of the Credit Agreement of the Borrower's failure to comply with Section 3.03(a) of the Security Agreement to provide the Agent prompt written notice of certain organizational changes that took place in December 2017 (such Events of Default, collectively, the "Designated Defaults"); and

WHEREAS, the Borrower has requested that the Lenders grant a period of temporary forbearance and the Lenders party hereto, which constitute the Required Lenders under the Credit Agreement, agree to accommodate such request of the Borrower on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, the parties hereto agree as follows:

SECTION 1. <u>Incorporation of Recitals; Acknowledgements</u>. Each of the Loan Parties acknowledges that the recitals set forth above are true and correct in all respects. The Borrower and the other Loan Parties acknowledge and agree that absent this Agreement, upon the occurrence and during the continuance of an Event of Default, the Agent is entitled to, and at the request of Required Lenders shall, accelerate the Loans, seek immediate repayment in full of the Loans and the other Obligations, and exercise any or all of its rights and remedies under the Loan Documents or applicable law.

SECTION 2. <u>Amounts Owing</u>. Each of the Loan Parties acknowledges and agrees that, as of the date hereof, the Borrower is indebted to the Secured Parties in an aggregate amount equal to (a) the aggregate principal amount of Term Loans outstanding under the Credit Agreement in an amount equal to $781,568,965.52, plus accrued and unpaid interest thereon, plus (b) any other Obligations (including without limitation, indemnities, fees, costs and expenses) payable by the Loan Parties under the Loan Documents.

SECTION 3.  <u>Defined Terms and Other Definitional Provisions</u>.  Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

SECTION 4.  <u>Forbearance</u>.

(a)    The "<u>Forbearance Period</u>" shall commence on the Forbearance Effective Date (as defined below) and shall terminate immediately and automatically upon the earliest to occur of (i) the occurrence of a Forbearance Termination Event (as defined below) and (ii) 60 days from the Forbearance Effective Date, at 11:59 p.m. New York time; provided that such date may be extended with the consent of the Borrower and Consenting Lenders constituting the Required Lenders under the Credit Agreement.

(b)    Subject to the satisfaction of the conditions precedent set forth in Section 9 hereof, and in reliance upon the representations of the Loan Parties set forth in Section 8 below, during the Forbearance Period, each of the Lenders party hereto agree not to enforce, or instruct the Agent to enforce, any of their respective rights and remedies under the Loan Documents solely in respect of the Designated Defaults against the Loan Parties or their assets (the "<u>Forbearance</u>").

(c)    The occurrence of any of the following events or circumstances shall constitute a termination event with respect to the Forbearance (each, a "<u>Forbearance Termination Event</u>"):

(i)    the occurrence of any Default or Event of Default under the Credit Agreement that is not a Designated Default;

(ii)    failure by the Borrower or any other Loan Party to comply with or perform under any provision of this Agreement, including, without limitation, a breach by the Borrower or any Loan Party of any of the covenants set forth in Section 5 of this Agreement;

(iii)    the payment of any principal or interest to the holders of the Second Lien Obligations;

(iv)    the exercise by any holders of the ABL Obligations, the Second Lien Obligations or any other Indebtedness having an aggregate principal amount greater than the Threshold Amount (other than the Obligations) of any remedy during the Forbearance Period; or

(v)    any representation, warranty, statement, covenant or other agreement of any Loan Party contained herein (including, but not limited to, the information contained in any financial statements or projections of any Loan Party provided to the Agent and/or the Lenders in connection herewith) shall have been false or misleading in any material respect.

(d)    The Forbearance is limited in nature and nothing contained herein is intended, or shall be deemed or construed (i) to constitute a waiver of any of the Designated Defaults or any other existing, continuing or future Defaults or Events of Default (including non-compliance with any term or provision of the Loan Documents or applicable law) or (ii) to establish a custom or course of dealing between the Loan Parties, on the one hand, and any Lender, on the other hand.  The Loan Parties acknowledge and agree that the agreement of the Lenders hereunder to forbear from exercising their default-related remedies with respect to the Designated Defaults shall not constitute a waiver of any of the Designated Defaults and that, except as expressly set forth in this Agreement, the Lenders expressly reserve all rights and remedies that the Lenders now or may in the future have under any or all of the Loan Documents and applicable law in connection with all Defaults or Events of Default (including, without limitation, the Designated Defaults).

2

(e)     Upon the earlier of the termination or expiration of the Forbearance Period:  (i) the Forbearance and all agreements set forth in Section 4(b) of this Agreement shall terminate automatically and be of no further force or effect, and (ii) subject to the terms of the Loan Documents and applicable law, the Agent and each Lender shall be free to proceed to enforce any or all of its rights and remedies set forth in the Credit Agreement, the other Loan Documents and applicable law.  In furtherance of the foregoing, and notwithstanding the occurrence of the Forbearance Effective Date, each Loan Party acknowledges and confirms that, subject to the Forbearance, all rights and remedies of the Agent and the Lenders under the Loan Documents and applicable law with respect to the Borrower or any other Loan Party shall continue to be available to the Agent and the Lenders. For the avoidance of doubt, each Loan Party acknowledges and confirms that the agreement of the Lenders temporarily to forbear shall not apply to nor preclude any remedy available to the Agent or the Lenders in connection with any proceeding (whether it be an involuntary proceeding or a proceeding commenced voluntarily by the Loan Parties) under any bankruptcy or insolvency law, including, without limitation, to any relief in respect of adequate protection or relief from any stay imposed under such law.

(f)     The parties hereto agree that the running of all statutes of limitation and the doctrine of laches applicable to all claims or causes of action that the Agent or any Lender may be entitled to take or bring in order to enforce its rights and remedies against the Borrower or any other Loan Party are, to the fullest extent permitted by law, tolled and suspended during the Forbearance Period.

(g)     The Lenders party hereto (constituting Required Lenders) hereby consent to the execution, delivery and performance of this Agreement by the Agent and direct the Agent to (i) execute and acknowledge this Agreement and (ii) temporarily act or forbear from acting in accordance with, and pursuant to the terms of, this Agreement.

(h)     The Loan Parties understand and accept the temporary nature of the Forbearance provided hereby and that the Lenders party hereto have given no assurances that they will extend such Forbearance or provide waivers or amendments to the Credit Agreement or any other Loan Document.

(i)     Nothing in this Forbearance Agreement constitutes a legal obligation to participate in any restructuring or amendment of the Credit Agreement or to execute any related documents and no such legal obligation shall arise except pursuant to mutually agreeable executed definitive documentation.

SECTION 5.  Covenants.

(a)     During the Forbearance Period, so long as no Default or Event of Default (other than the Designated Defaults) has occurred and is continuing, interest shall accrue on all outstanding Obligations at the Applicable Rate. At any time during the Forbearance Period and/or following the termination or expiration of the Forbearance Period that a Default or Event of Default (other than the Designated Defaults during the Forbearance Period) has occurred and is continuing, interest shall accrue on all outstanding Obligations at the Default Rate.

(b)     During the Forbearance Period, and following the termination or expiration of the Forbearance Period so long as any Default or Event of Default has occurred and is continuing, the Borrower shall not, and shall not permit its Subsidiaries to, directly or indirectly:

3

(i)    create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, pursuant to Section 7.01(m)(i)[1],(y)[2], (cc)[3] and (hh)[4], and any Lien permitted by reference to Indebtedness permitted under Section 7.03 of the Credit Agreement shall only be permitted to the extent such Indebtedness is permitted under Section 7.03 of the Credit Agreement after giving effect to clause (iii) below (such Liens, the "<u>Specified Liens</u>");

(ii)    make or hold any Investment pursuant to Sections 7.02(b)(iii)[5], 7.02(d)(iv) (other than Investments in Non-Loan Parties in the ordinary course of business and consistent with past practices or with the prior written consent of the Consenting Lenders, which shall not be unreasonably withheld, delayed or conditioned)[6], (j)[7], (n)[8], (t)[9], (u)[10], (v)[11], (z)[12] and (bb)[13] (such Investments, the "<u>Specified Investments</u>");

(iii)    incur any Indebtedness pursuant to Sections 7.03(b) (other than with respect to Indebtedness under the Second Lien Facility and the ABL Facility as in effect on the date hereof)[14], (e) (to the extent such Investment is not permitted by clause (ii) above)[15], (f)[16], (j)[17], (k) (to the extent such Investment or Disposition is not permitted by clause (ii) above or clause (iv) below, as applicable)[18], (l) (to the extent such Investment is not permitted by clause (ii) above)[19],

---

[1]  Lien on cash advances in connection with certain Investments.
[2]  Lien on property of a non-loan party securing such non-loan party's obligations.
[3]  General lien basket.
[4]  Liens in connection with Permitted Receivables Financing.
[5]  Loan and advances to officers, directors, employees.
[6]  Investments in Non-Loan Parties.
[7]  Permitted Acquisition.
[8]  Investment with Available Amount.
[9]  General Investment basket.
[10]  Investments: in JVs and Unrestricted Subs.
[11]  Permitted Receivables Financing.
[12]  Ratio investment basket.
[13]  Permitted Tax Restructuring
[14]  Incremental Indebtedness under Second Lien Facility and ABL Facility
[15]  Indebtedness in respect of the investments between Borrower and Restricted Subsidiary.
[16]  Attributable Indebtedness.
[17]  Indebtedness to officers, directors, employees to finance the purchase or redemption of Equity Interest of Holdings.
[18]  Indemnification obligations or purchase price adjustment obligations incurred in connection with permitted acquisitions, other permitted investments or dispositions.
[19]  Deferred comp incurred in connection with permitted acquisitions, other permitted investments or dispositions.

(r)[20], (s)[21], (t)[22], (u)[23], (v)[24], (x)[25], (y)[26] and (z)[27], or pursuant to Section 7.03(a) in connection with Sections 2.14 and 2.15[28] (such Indebtedness, the "Specified Indebtedness");

(iv)    make any Disposition pursuant to Sections 7.05(l)[29], (m)[30], (o)[31], (r)[32]; and (s)[33] (such Dispositions, the "Specified Dispositions");

(v)    declare or make, directly or indirectly, any Restricted Payment pursuant to Sections 7.06(a)[34], (b)[35], (f)[36], (g)(iv)[37] (to the extent such Investment is not permitted by clause (ii) above), (h) (to the extent such Restricted Payment was otherwise prohibited by this Agreement at the date of declaration)[38], (j)[39], (k)[40], (l)[41], (m)[42] and (o)[43] (such Restricted Payments, the "Specified Restricted Payments");

(vi)    enter into any transaction of any kind with any Affiliate of a Borrower[44], whether or not in the ordinary course of business, pursuant to Sections 7.07(a) (with respect to transactions between a Loan Party and a Non-Loan Party other than in the ordinary course of business consistent with past practice)[45], (e) (provided that such fees may accrue pursuant to the proviso to such Section 7.07(e))[46], (f) (to the extent prohibited by clause (v) above)[47], (g) (to the

---

[20]    Ratio Debt.
[21]    Indebtedness of Non-Loan Parties.
[22]    Permitted Alternative Incremental Facilities Debt.
[23]    General Debt basket.
[24]    Assumed indebtedness basket.
[25]    Permitted Receivables Financing.
[26]    Permitted Debt Exchange Notes.
[27]    Contribution Indebtedness.
[28]    Indebtedness incurred pursuant to incremental facilities and extended offer provisions under the First Lien Credit Agreement
[29]    Permitted Sale Leaseback.
[30]    General Disposition basket.
[31]    Dispositions of non-core assets acquired in a Permitted Acquisition.
[32]    Disposition of Specified Assets and Permitted Tax Restructurings.
[33]    Permitted Receivables Financing.
[34]    Restricted payments to Borrower and other Restricted Subsidiaries (and each other owner of equity of such Restricted Subsidiary).
[35]    Redemptions of equity with other equity.
[36]    Restricted payments for retirement, repurchase or acquisition of stock of any direct or indirect parent held by employees, directors etc.
[37]    Restricted payments constituting Permitted Investments.
[38]    Restricted payments constituting distribution of dividends.
[39]    General Restricted Payment basket.
[40]    Restricted payments with Available Amount basket.
[41]    Post IPO Basket.
[42]    Distribution of Unrestricted Subsidiary.
[43]    Ratio restricted payment basket.
[44]    Threshold: $5M.
[45]    Affiliate transactions among the Borrower and Restricted Subsidiaries.
[46]    Payment of Sponsor management fees.
[47]    Affiliate transactions in connection with retirement, repurchase or acquisition of equity interest by Borrower or any Restricted Subsidiary permitted under Section 7.06.

extent prohibited by clauses (i) through (v) above)[48], (l) (to the extent prohibited by clause (v) above)[49], (m)[50], (o)[51] and (p)[52] (such transactions, the "<u>Specified Affiliate Transactions</u>");

(vii)    prepay, redeem, purchase, defease or otherwise satisfy or make any payments on account of (1) the Second Lien Credit Agreement Secured Obligations (including, without limitation, any loans under the Second Lien Credit Agreement) or (2) any Subordinated Debt, pursuant to Section 7.08 or otherwise (any such prepayments, redemptions, purchases, defeasances satisfactions or other payments on account of, the "<u>Specified Prepayments</u>") or engage in any discussions regarding any Specified Prepayments with any holder (or any of its representatives) of any such Indebtedness (other than in connection with discussions regarding a comprehensive restructuring consistent with the Company's proposal provided to the Consenting Lenders on November 6, 2018) without the prior written consent of the Consenting Lenders; and

(viii)    designate any Restricted Subsidiary as an Unrestricted Subsidiary pursuant to the definition of "Unrestricted Subsidiary" and/or Section 6.13 (such designations, the ("<u>Specified Designations</u>").

All Section references in this clause (b) are to Sections of the Credit Agreement.

(c)    During the Forbearance Period, and following the earlier of the termination or expiration of the Forbearance Period so long as an Event of Default has occurred and is continuing, at no time shall Sponsor Affiliated Lenders hold, or otherwise take assignment of, Term Loans and/or Second Lien Obligations, individually and in the aggregate, in excess of the amounts held by Sponsor Affiliate Lenders on the Forbearance Effective Date.

SECTION 6.  <u>Information and Financial Data</u>.

(a)    During the Forbearance Period, the Borrower shall promptly furnish to the Consenting Lenders each of the following:

(i)    Weekly cash flow reporting, in form and substance satisfactory to the Consenting Lenders, including collections, disbursements, net cash flow and professional fee detail relative to budget, to be delivered on a weekly basis no more than one week following the end of each week;

(ii)    Weekly liquidity reporting, in form and substance satisfactory to the Consenting Lenders, including total liquidity, cash on hand, ABL Facility availability, ABL Facility draw, outstanding letters of credit, gross collateral in connection with the ABL Facility, and ABL Facility borrowing base, to be delivered on a weekly basis no more than one week following the end of each week;

---

[48]    Affiliate transactions otherwise permitted by Article VII.
[49]    Affiliate transactions in connection with restricted payments.
[50]    Customary sponsor financial advisory, financing and underwriting fees.
[51]    Permitted Receivables Financing.
[52]    Permitted Tax Restructuring.

(iii)    Monthly income statements and variance to budget, in form and substance satisfactory to the Consenting Lenders, to be delivered no later than 15 days following the end of each month;

(iv)    Monthly reporting on the Company's top 10 vendors (including current trade terms and open orders), in form and substance satisfactory to the Consenting Lenders, to be delivered no later than 15 days following the end of each month; and

(v)    Such other financial information that is reasonably requested by the Consenting Lenders or their advisors.

SECTION 7.  Confirmation of Loan Documents and Liens.  The Borrower and the other Loan Parties hereby confirms and ratifies all of its obligations under the Loan Documents to which it is a party, including, in the case of any Guarantor, its obligations as a guarantor under the Guaranty.  By its execution on the respective signature lines provided below, each of the Loan Parties hereby confirms and ratifies all of its obligations and the Liens granted by it under the Collateral Documents to which it is a party and confirms that all references in such Collateral Documents to the "Credit Agreement" (or words of similar import) refer to the Credit Agreement as amended hereby without impairing any such obligations or Liens in any respect.

SECTION 8.  Representations and Warranties.

(a)    The Borrower and the other Loan Parties hereby represent and warrant to the Lenders that as of the date hereof:

(i)    the execution, delivery and performance of this Agreement and such Loan Party's obligations hereunder have been duly authorized by all necessary corporate or limited liability company action;

(ii)    this Agreement has been duly executed and delivered by each Loan Party and constitutes, when executed and delivered by such Loan Party, a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity, regardless of whether considered in a proceeding in equity or at law;

(iii)    no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement, except for (i) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect and (ii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure to obtain or make which could not reasonably be expected to have a Material Adverse Effect or (b) the exercise by any Lender of its rights under this Agreement;

(iv)    each of the representations and warranties made by any Loan Party set forth in Article V of the Credit Agreement or in any other Loan Document is true and correct in all material respects (unless otherwise qualified by materiality or the occurrence of a Material Adverse Effect, in which case such representation and warranty is true and correct in all respects) as of the date hereof with the same effect as though made on and as of the date hereof, except to the extent such representations and warranties expressly relate to earlier dates;

7

(v)    no Default or Event of Default has occurred and is continuing other than the Designated Defaults (to the extent it has occurred or is continuing on the date hereof);

(vi)    Except as set forth on <u>Schedule 1</u>, no Specified Liens have been created, incurred or assumed since the start of the fourth quarter for fiscal year ended 2017 (the "<u>Look-Back Date</u>") in an aggregate amount greater than $1,000,000 (the "<u>Threshold Amount</u>");

(vii)    Except as set forth on <u>Schedule 1</u>, no Specified Investments have been made since the Look-Back Date in an aggregate amount greater than the Threshold Amount;

(viii)    Except as set forth on <u>Schedule 1</u>, no Specified Indebtedness has been incurred since the Look-Back Date in an aggregate amount greater than the Threshold Amount;

(ix)    Except as set forth on <u>Schedule 1</u>, no Specified Dispositions have been made since the Look-Back Date in an aggregate amount greater than the Threshold Amount;

(x)    Except as set forth on <u>Schedule 1</u>, no Specified Restricted Payments have been made since the Look-Back Date in an aggregate amount greater than the Threshold Amount;

(xi)    Except as set forth on <u>Schedule 1</u>, no Specified Affiliate Transactions have been entered into since the Look-Back Date in an aggregate amount greater than the Threshold Amount;

(xii)    Except as set forth on <u>Schedule 1</u>, no Specified Prepayments have been made since the Look-Back Date in an aggregate amount greater than the Threshold Amount; and

(xiii)    Except as set forth on <u>Schedule 1</u>, no Specified Designations have been made since the Look-Back Date in an aggregate amount greater than the Threshold Amount.

(b)    Each of the parties hereto hereby represents and warrants that each of the following statements is true, accurate and complete as to such party as of the date hereof:

(i)    such party has carefully read and fully understands all of the terms and conditions of this Agreement;

(ii)    such party has consulted with, or had a full and fair opportunity to consult with, an attorney regarding the terms and conditions of this Agreement;

(iii)    such party has had a full and fair opportunity to participate in the drafting of this Agreement;

(iv)    such party is freely, voluntarily and knowingly entering into this Agreement; and

(v)    in entering into this Agreement, such party has not relied upon any representation, warranty, covenant or agreement not expressly set forth herein or in the other Loan Documents.

SECTION 9.    <u>Conditions to Effectiveness of this Agreement</u>.    The effectiveness of this Agreement is subject to the satisfaction or waiver by the Consenting Lenders of each of the following conditions (the date on which such conditions are satisfied or waived, the "<u>Forbearance Effective Date</u>"):

8

(a)    The Lenders party hereto shall have received a counterpart of this Agreement, executed and delivered by the Borrower, the other Loan Parties and Lenders constituting Required Lenders.

(b)    All representations and warranties of the Borrower and the Loan Parties set forth herein, shall be true and correct in all material respects (or, with respect to those representations and warranties expressly limited by their terms by materiality or material adverse effect qualifications, in all respects) as of the Forbearance Effective Date as if made on such date (except to extent that such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such date).

(c)    Except for the Designated Defaults, both immediately before and after giving effect to this Agreement, no Default or Event of Default would then exist or would result therefrom.

(d)    All of the reasonable and documented out-of-pocket costs and expenses (including the reasonable fees, expenses and disbursements of Milbank, Tweed, Hadley & McCloy LLP and Ducera Partners LLC, in each case, payable under their respective engagement letters) incurred by the Agent or the Lenders in connection with the negotiation, preparation, execution and delivery of this Agreement invoiced at least 2 Business Days prior to the date hereof shall have been paid.

SECTION 10.  <u>Notice of Default</u>.

The Borrower shall provide prompt notice to the Consenting Lenders, as soon as possible but in any event within one (1) Business Day after a Responsible Officer or other officer or employee of the Borrower obtains actual knowledge thereof, of the occurrence of any Forbearance Termination Event, which notice shall state that such event occurred and set forth, in reasonable detail, the facts and circumstances that gave rise to such event.  Such notice shall be delivered by electronic mail to:

Cahill Gordon & Reindel LLP
80 Pine Street
New York, NY 10005
Attn: Corey Wright
Email: cwright@cahill.com

<u>With copies to:</u>

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, New York 10005
Attn.: Dennis F. Dunne
Gerard Uzzi
Nelly Almeida
Email: DDunne@milbank.com
guzzi@milbank.com
nalmeida@milbank.com

All notices given in accordance with the provisions of this Section shall be deemed to have been given on the date of receipt.

SECTION 11.  <u>Effects on Loan Documents</u>.

9

(a)      All Loan Documents (to the extent modified hereby, as so modified) shall continue to be in full force and effect and are hereby in all respects ratified and confirmed.

(b)      The execution, delivery and effectiveness of this Agreement shall not operate as a waiver of any right, power or remedy of any Lender or the Agent under any of the Loan Documents or applicable law, nor constitute a waiver of any provision of the Loan Documents, in each case, other than as specifically provided for hereby with respect to the Forbearance.

(c)      The Borrower and the other parties hereto acknowledge and agree that this Agreement shall constitute a Loan Document.

SECTION 12.  Amendments; Execution in Counterparts.

(a)      This Agreement shall not constitute a modification of any provision of the Credit Agreement or the other Loan Documents and shall not be construed as a waiver or consent to any further or future action on the part of the Borrower or any other Loan Party that would require a waiver or consent of the Lenders or the Agent.  The provisions of the Credit Agreement and the other Loan Documents are and shall remain in full force and effect.

(b)      The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, unless amended, modified or supplemented, or waived or consented to, in accordance with Section 10.01 of the Credit Agreement.  This Agreement may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile or other electronic submission shall be effective as delivery of a manually executed counterpart hereof.

SECTION 13.  Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of each party hereto and their respective successors and assigns.

SECTION 14.  No Third-Party Beneficiaries.  No Person other than the Borrower, the other Loan Parties, and the Lenders shall have any rights hereunder or be entitled to rely on this Agreement and all third-party beneficiary rights are hereby expressly disclaimed.  Without limiting the generality of the foregoing, the Sponsor is not a third-party beneficiary of this Agreement and has no rights hereunder.

SECTION 15.  Severability.  The invalidity, illegality or unenforceability of any provision in or obligation under this Agreement in any jurisdiction shall not affect or impair the validity, legality or enforceability of the remaining provisions or obligations under this Agreement or of such provision or obligation in any other jurisdiction.

SECTION 16.  Time of Essence.  Time is of the essence in the performance of each of the obligations of the Borrower and the other Loan Parties hereunder and with respect to all conditions to be satisfied by such parties.

SECTION 17.  Good Faith Cooperation; Further Assurances.  Each of the Loan Parties hereby agrees to execute and deliver from time to time such other documents and take such other actions as may be reasonably necessary in order to effectuate the terms hereof.  The parties shall cooperate with each other and with their respective counsel in good faith in connection with any steps required to be taken as part of their respective obligations under this Agreement.

SECTION 18.  Prior Negotiations; Entire Agreement.  This Agreement, the Credit Agreement and the other Loan Documents constitute the entire agreement of the Parties with respect to the subject matter hereof, and supersedes all other prior negotiations, understandings or agreements with respect to the subject matter hereof, whether oral or written.

SECTION 19.  Interpretation. This Agreement is the product of negotiations of the parties and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any party by reason of that party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

SECTION 20.  GOVERNING LAW; WAIVER OF JURY TRIAL.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.  EACH PARTY HERETO HEREBY AGREES AS SET FORTH FURTHER IN SECTION 10.15 OF THE CREDIT AGREEMENT AS IF SUCH SECTION WERE SET FORTH IN FULL HEREIN.

SECTION 21.  Notice of Designated Defaults. This Agreement and the matters set forth herein shall constitute written notice of the Designated Defaults for purposes of satisfaction of any disclosure requirement in the Credit Agreement, any Compliance Certificate or any other Loan Document requiring that the Loan Parties give notice of, certify as to the absence of, or otherwise disclose in writing the occurrence and/or continuance of any Default or Event of Default and the failure of any Loan Party prior to, on or after the date hereof to deliver any such notice, certification or other disclosure of the Designated Defaults shall not constitute a Default or Event of Default under the Credit Agreement.

SECTION 22.  Confidentiality. This Agreement, the matters set forth herein and any information delivered pursuant hereto are subject to the terms of Section 10.08 of the Credit Agreement.

*[Remainder of page intentionally left blank; signatures follow.]*

11

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered by their respective duly authorized officers as of the date first above written.

FullBeauty Brands Holdings, Corp., as the Borrower
Blackdog Holdings, Inc., as Holdings
FullBeauty Brands, Inc., as a Guarantor
FullBeauty Brands, LLC, as a Guarantor
Jessica London, Inc., as a Guarantor
FullBeauty Brands Merchant, Inc., as a Guarantor
FullBeauty Brands Management Services, LLC, as a Guarantor
FullBeauty Brands Operations, LLC, as a Guarantor
Swimsuits for All, LLC, as a Guarantor
FullBeauty Brands Texas, LLC, as a Guarantor

By:_____
     Name: Emilie Arel
     Title: President and Chief Executive Officer

[Signature Page to Forbearance Agreement]

<u>Schedule 1</u>

1.    Specified Liens

    a.    None

2.    Specified Investments

    a.    None

3.    Specified Indebtedness

    a.    None

4.    Specified Dispositions

    a.    None

5.    Specified Restricted Payments

    a.    None

6.    Specified Affiliate Transactions

    a.    None

7.    Specified Prepayments

    a.    None

8.    Specified Designations

    a.    None

**<u>EXHIBIT C</u>**

**Liquidation Analysis**

## Liquidation Analysis

### Overview:

This Liquidation Analysis[1] has been prepared assuming that the Debtors hypothetically convert these chapter 11 cases to undertake a liquidation under chapter 7 of the Bankruptcy Code as of December 31, 2018 (the "Conversion Date").  Except as otherwise noted herein, the values reflected in this Liquidation Analysis are based upon the Debtors' unaudited books and records as of November 24, 2018, and those values are assumed to be representative of the Debtors' assets and liabilities as of the Conversion Date.  This Liquidation Analysis also assumes that the Bankruptcy Court would appoint a chapter 7 trustee (the "Trustee") on the Conversion Date to oversee the liquidation of the Debtors' Estates, during which time substantially all of the Debtors' assets would be sold, abandoned, surrendered, or otherwise liquidated, as applicable, and the Cash proceeds, net of liquidation-related costs, would then be distributed in accordance with applicable law.

This Liquidation Analysis has not been examined or reviewed by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants. Although the Debtors consider the estimates and assumptions set forth herein to be reasonable under the circumstances, such estimates and assumptions are inherently subject to significant uncertainties and contingencies beyond the Debtors' control.  Accordingly, there can be no assurance that the results set forth by this Liquidation Analysis would be realized if the Debtors were actually liquidated pursuant to chapter 7 of the Bankruptcy Code, and actual results in such a proceeding could vary materially from those presented herein, and distributions available to Holders of Claims and Interests could differ materially from the projected recoveries set forth by this Liquidation Analysis.

**THIS LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF THE CONVERSION DATE.  THIS LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE.  THIS LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THE VALUES AND RECOVERIES REPRESENTED IN THIS LIQUIDATION ANALYSIS AND THE**

---

[1]    Capitalized terms used but not defined herein have the meanings given to such terms in the *Joint Prepackaged Chapter 11 Plan of Reorganization of FULLBEAUTY Brands Holdings Corp. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") or the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of FULLBEAUTY Brands Holdings Corp. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"), as applicable.

**VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION.**

**NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THESE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.**

The Debtors have determined, as summarized in this Liquidation Analysis, that Confirmation of the Plan will provide Holders of Claims and Interests with a recovery that is not less than what they would otherwise receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

**Basis of Presentation:**

The actual amount and/or priority of Claims Allowed against the Debtors' Estates may differ from the Claim amounts used in this Liquidation Analysis. As noted above, this Liquidation Analysis is based on the Debtors' books and records as of November 24, 2018, except where otherwise indicated, and the actual value of assets available for distribution in the event of an actual liquidation may differ materially from the assets assumed to be available pursuant to this Liquidation Analysis.

**Global Notes & Assumptions:**

This Liquidation Analysis should be read in conjunction with, and is qualified in its entirety by, the following notes and assumptions:

1. *Additional Claims.* The cessation of business in a chapter 7 liquidation is likely to cause additional Claims to be asserted against the Debtors' Estates that otherwise would not exist absent such a liquidation. Examples of these kinds of Claims include employee-related Claims, claims related to the Debtors' single active multi-employer pension plan, tax liabilities, Claims related to the rejection of Unexpired Leases and Executory Contracts, litigation claims, and other Claims. These additional Claims could be significant and, in certain circumstances, may be entitled to priority under the Bankruptcy Code. No adjustment has been made for these potential Claims in this Liquidation Analysis.

2. *Intercompany Relationships; Non-Debtor Affiliates.* In order to estimate the Debtors' recovery with respect to certain intercompany balances and investments in a chapter 7 liquidation, this Liquidation Analysis assumes substantially all of the Debtors' non-Debtor subsidiaries will undertake parallel liquidations, whereby the

2

proceeds of such liquidations are, in turn, distributed in accordance with priority of Claims and ownership.[2]

3.   *Length of liquidation process.*   The Liquidation Analysis assumes a process of 6 months from the Conversion Date to conduct the orderly disposition of substantially all the Debtors' assets, to collect receivables, to arrange for distributions, and to wind-down the Debtors' Estates.

**Specific Notes to the Liquidation Analysis:**

**A.  Gross Proceeds**

1.   *Cash*

- The liquidation proceeds of Cash and Cash equivalents for all Debtor entities holding cash are estimated to be 100% of the December 31, 2018 projected balance of $5.0 million.

2.   *Credit Card Receivables, Net*

- A 90% to 100% recovery has been estimated for the projected credit card receivables balance of $23.9 million as of December 31, 2018.  These accounts consist of normal course credit card receivables and private label credit card deferred billing receivables, net of applicable fees and estimated chargebacks.

3.   *Other Receivables*

- Other receivables include various items such as paper and purchase card rebates, other receivables and income tax refunds.  This balance has been adjusted to reflect the anticipated receipt of a $10.9 million federal income tax refund in January 2019.  Recoveries of 40% to 60% were assigned to other receivables to account for the corresponding uncertainty of collection.

4.   *Inventory*

- The Debtors forecast a projected inventory balance, comprised of finished goods inventory, whether held by the Debtors or owned but in-transit, of $143.2 million as of December 31, 2018.  This amount is net of certain reserves and ineligibles such as shrink and unpaid duties.  A 63.2% recovery has been estimated for the projected inventory balance.  This level of recovery has been informed by the net orderly liquidation value for January 2019 contained within an appraisal the Debtors received, while acknowledging the limited timeframe the Debtors may have to complete the

---

[2]   This analysis is shown on a consolidated basis; an analysis by legal entity does not produce materially different results.

liquidation process.  The estimated recoveries are net of related liquidation expenses including items such as payroll and advertising.

5. *Prepaid Expenses & Other Current Assets*

- Prepaid expenses and other current assets consist of several accounts, including but not limited to prepaid catalog, software, and insurance accounts, as well as certain deposits.  These accounts were evaluated by type and, in most cases, minimal recoveries were assumed.  In aggregate, the Debtors assume a blended recovery of 5% to 9% for prepaid expenses and other current assets.

6. *Property, Plant, and Equipment, Net ("PP&E")*

- PP&E includes buildings and land, leasehold improvements, furniture and fixtures, hardware, and technical equipment.

- Proceeds of $4.8 million to $7.1 million are estimated for the Debtors' owned building and land in Indianapolis, based on applying an assumed recovery of 50% to 75% to a recent appraisal value of $9.5 million, to account for the accelerated timeline and uncertainty of a liquidation sales process.

- This Liquidation Analysis assumes no recovery for leasehold improvements, and 0% to 10% for all other PP&E.

- In aggregate, the Debtors assume a 13% to 24% recovery for PP&E.

7. *Goodwill, Net*

- The Liquidation Analysis ascribes no value to goodwill.

8. *Other Intangible Assets, Net*

- Intangible assets consist of, but are not limited to, software and certain intellectual property, such as trademarks, domain names, and customer lists.

- The Liquidation Analysis assumes a recovery of $43.2 to $77.8 million for intangible assets, based on a market-based intellectual property report valuation, the recent market performance of comparable companies and the accelerated timeline and uncertainty of a liquidation sales process.

- In aggregate, the Debtors assume a 13% to 23% recovery for other intangible assets.

4

9.    *ABL Priority Collateral*

- Proceeds from Cash, Accounts, Credit Card Receivables, Inventory and Inventory related receivables (each as defined in the ABL Credit Agreement) and all other rights to payments arising from services rendered or from the sale, lease, use or other disposition of Inventory are subject to priority claims from the ABL Facility and FILO Claims.

- Proceeds from all other assets are used to satisfy the First Lien Claims.

10.    *Avoidance Actions*

- Proceeds from Avoidance Actions may be available for distribution to Holders of Administrative Claims, Other Priority Claims, and General Unsecured Claims in accordance with the priorities established by the Bankruptcy Code. The Debtors, however, believe that recoveries from such actions, if any, would be speculative in nature and have not included any such proceeds in the Liquidation Analysis.

## B.  Liquidation Costs

1.    *Wind Down Costs*

- Wind down costs consist primarily of the ordinary course general and administrative costs that will be required to operate the Debtors' businesses for a 6-month period after the Conversion Date.

- The Liquidation Analysis estimates wind down costs, in the aggregate, of approximately 33% of the Debtors' projected 2018 non-GAAP corporate segment general and administrative expenses. This amount represents approximately 2% of gross liquidation proceeds.

- Wind down costs are split Pro Rata between ABL Collateral and other Collateral (as defined in the ABL Credit Agreement) based on projected hypothetical recovery amounts.

2.    *Chapter 7 Trustee Fees*

- Pursuant to sections 326 and 330 of the Bankruptcy Code, the Bankruptcy Court may allow reasonable compensation for the Trustee's services, not to exceed 25% on the first $5,000 or less, 10% on any amount in excess of $5,000 but not in excess of $50,000, 5% on any amount in excess of $50,000 but not in excess of $1.0 million, and reasonable compensation not to exceed 3% of such moneys in excess of $1.0 million, upon all moneys disbursed or turned over in the case by the Trustee to

5

parties in interest.  For purposes of this Liquidation Analysis, these fees are simplified to 2% to 3% of liquidation proceeds realized, excluding Cash.

3. *Other Professional Fees*

- Pursuant to section 726 of the Bankruptcy Code, the allowed administrative expenses incurred by the Trustee, including expenses affiliated with selling the Debtors' assets and winding down operations, will be entitled to payment in full prior to any distribution to Administrative Claims and Other Priority Claims.  This Liquidation Analysis estimates professional fees to be approximately 3% of the total liquidation proceeds realized, which is based on expected fees and expenses of legal, financial, and other professionals as well as the complexity of the Debtors' liquidation and wind-down.

## C. Distribution of Proceeds

1. *Superpriority Carve-Out*

- It is expected that the Cash Collateral Order will provide that certain unpaid holdback and accrued professional fees and expenses shall be entitled to priority above all other Claims and fees.  The Liquidation Analysis estimates this amount at $1.0 million.

2. *ABL Claims*

- The Liquidation Analysis assumes that the ABL Claims will total $77.8 million as of the Conversion Date, which represents the projected pro forma balance of $52.3 million owed under the ABL Credit Agreement, plus all letters of credit, which total $17.5 million and are assumed to have been cash collateralized at 105% upon conversion, as well as the assumed outstanding purchase card cash management obligations balance of $8.0 million.  Accrued interest is assumed to be paid prior to conversion.

- The Liquidation Analysis further assumes that ABL Claims will first be satisfied in full via proceeds from collateral secured under the ABL Credit Agreement in both the low and high recovery scenarios.

3. *FILO Claims*

- The Liquidation Analysis assumes that the aggregate principal amount indebted, plus any accrued interest, under the FILO Loans is $76.3 million.

- The Liquidation Analysis concludes that FILO Claims will receive a total recovery of 38% to 43% in a chapter 7 liquidation from the remaining proceeds of the collateral secured under the ABL Credit Agreement.

- The Liquidation Analysis assumes that the FILO Claims will receive no additional recovery from other collateral proceeds.

4. *First Lien Claims*

- The Liquidation Analysis assumes that the aggregate principal amount indebted, plus any accrued interest, less unamortized original issue discount as of the Petition Date, under the First Lien Claims is $784.2 million.

- The Liquidation Analysis concludes that First Lien Claims will receive a 7% to 12% recovery in a chapter 7 liquidation.

5. *Second Lien Claims*

- The Liquidation Analysis assumes that the aggregate principal amount indebted, plus any accrued interest, less unamortized original issue discount as of the Petition Date, under the Second Lien Claims is $354.8 million.

- The Liquidation Analysis concludes that Second Lien Claims will receive no recovery in a chapter 7 liquidation.

6. *Administrative Claims*

- Administrative Claims arising in a hypothetical chapter 7 liquidation may include, among other things: (a) Claims arising pursuant to section 503(b)(9) of the Bankruptcy Code; (b) postpetition trade payables; (c) accrued postpetition employee obligations; (d) accrued taxes; (e) accrued utility payments; (f) post-petition intercompany payables; and (g) other liabilities incurred by the Estates in the ordinary course of business.

- This Liquidation Analysis assumes there will be approximately $31.4 million of Administrative Claims outstanding as of the Conversion Date. The total amount of Administrative Claims allowed in these Chapter 11 Cases could differ materially from the assumptions set forth by this Liquidation Analysis, thereby reducing recoveries available to Holders of Claims and Interests in a chapter 7 liquidation.

- The Liquidation Analysis concludes that Administrative Claims will receive no recovery in a chapter 7 liquidation.

7.    *General Unsecured Claims*

- General Unsecured Claims arising in a hypothetical chapter 7 liquidation may include, among other things: (a) prepetition trade Claims; (b) prepetition rejection damages Claims; and (c) numerous other types of prepetition liabilities.

- General Unsecured Claims do not include any DIP Facility Claims, Administrative Claims, Accrued Professional Compensation Claims, Priority Tax Claims, Other Priority Claims, ABL Claims, FILO Claims, First Lien Claims, Second Lien Claims, Intercompany Claims against one one or more of the Debtors that is not entitled to priority under the Bankruptcy Code or Final Order of the Bankruptcy Court, or Sponsor Claims.

- This Liquidation Analysis assumes there will be approximately $105.7 million of General Unsecured Claims outstanding as of the Conversion Date.

- The Liquidation Analysis concludes that General Unsecured Claims will receive no recovery in a chapter 7 liquidation.

## FullBeauty Brands
Liquidation Analysis - Summary

*($ in millions)*

| | Notes | Book Value / Claim Low | Book Value / Claim High | Hypothetical Recovery % Low | Hypothetical Recovery % High | Hypothetical Recovery $ Low | Hypothetical Recovery $ High |
|---|---|---|---|---|---|---|---|
| *Gross Proceeds:* | | | | | | | |
| Cash | A1 | $5.0 | $5.0 | 100% | 100% | $5.0 | $5.0 |
| Credit Card Receivables, Net | A2 | 23.9 | 23.9 | 90% | 100% | 21.5 | 23.9 |
| Other Receivables | A3 | 14.8 | 14.8 | 40% | 60% | 5.9 | 8.9 |
| Inventory, Net | A4 | 143.2 | 143.2 | 63% | 63% | 90.5 | 90.5 |
| Prepaid Expenses & Other Current Assets | A5 | 31.9 | 31.9 | 5% | 9% | 1.7 | 2.9 |
| Property, Plant and Equipment, Net | A6 | 35.3 | 35.3 | 13% | 24% | 4.8 | 8.5 |
| Goodwill, Net | A7 | 767.9 | 767.9 | 0% | 0% | - | - |
| Other Intangible Assets, Net | A8 | 341.9 | 341.9 | 13% | 23% | 43.2 | 77.8 |
| **Total Debtor Assets** | | **$1,363.9** | **$1,363.9** | **13%** | **16%** | **$172.6** | **$217.5** |
| | | | | | | | |
| **Total ABL Collateral** | | **$172.1** | **$172.1** | **68%** | **69%** | **$117.0** | **$119.4** |
| **Total Other Collateral** | | **$1,191.8** | **$1,191.8** | **5%** | **8%** | **$55.6** | **$98.1** |
| | | | | | | | |
| *Less Liquidation Costs:* | | | | | | | |
| Wind Down Costs | B1 | | | | | (4.0) | (4.0) |
| Chapter 7 Trustee Fees | B2 | | | | | (5.0) | (4.2) |
| Other Professional Fees | B3 | | | | | (5.2) | (6.5) |
| **Total Liquidation Costs** | | | | | | **($14.2)** | **($14.8)** |
| ABL Collateral Liquidation Costs | | | | | | (9.6) | (8.1) |
| Other Collateral Liquidation Costs | | | | | | (4.6) | (6.7) |
| **ABL Priority Collateral Liquidation Proceeds** | | | | | | **$107.4** | **$111.3** |
| **Other Collateral Liquidation Proceeds** | | | | | | **$51.0** | **$91.4** |
| **Total Liquidation Proceeds** | | | | | | **$158.4** | **$202.7** |
| *Distribution of Proceeds:* | | | | | | | |
| **ABL Priority Collateral Liquidation Proceeds** | | | | | | **$107.4** | **$111.3** |
| **Less: Superpriority Carve-Out** | C1 | 1.0 | 1.0 | 100% | 100% | (1.0) | (1.0) |
| Remaining ABL Collateral Amount Available for Distribution | | | | | | $106.4 | $110.3 |
| **Less: ABL Claims (including LCs and P-Card)** | C2 | 77.8 | 77.8 | 100% | 100% | (77.8) | (77.8) |
| Remaining ABL Collateral Amount Available for Distribution | | | | | | $28.7 | $32.6 |
| **Less: FILO Claims on ABL Collateral** | C3 | 76.3 | 76.3 | 38% | 43% | (28.7) | (32.6) |
| Remaining ABL Collateral Amount Available for Distribution | | | | | | - | - |
| **Other Collateral Liquidation Proceeds** | | | | | | **$51.0** | **$91.4** |
| **Less: First Lien Claims** | C4 | 784.2 | 784.2 | 7% | 12% | (51.0) | (91.4) |
| Remaining Amount Available for Distribution | | | | | | - | - |
| **Less: Second Lien Claims** | C5 | 354.8 | 354.8 | 0% | 0% | - | - |
| Remaining Amount Available for Distribution | | | | | | - | - |
| **Less: Remaining FILO Claims** | C3 | 47.7 | 43.8 | 0% | 0% | - | - |
| Remaining Amount Available for Distribution | | | | | | - | - |
| **Less: Administrative Claims** | C6 | 31.4 | 31.4 | 0% | 0% | - | - |
| Remaining Amount Available for Distribution | | | | | | - | - |
| **Less: General Unsecured Claims** | C7 | 105.7 | 105.7 | 0% | 0% | - | - |
| Remaining Amount Available for Distribution | | | | | | - | - |

**<u>EXHIBIT D</u>**

**Valuation Analysis**

## **Valuation Analysis**

THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR AFFILIATES.

Solely for the purposes of the Plan and the Disclosure Statement, PJT Partners LP ("PJT"), as restructuring advisors to the Debtors, has estimated a range of total enterprise value ("Enterprise Value") and implied equity value ("Equity Value") for the Reorganized Debtors pro forma for the transactions contemplated by the Plan (the "Valuation Analysis"). The Valuation Analysis is based on financial and other information provided by the Debtors' management, as well as the Financial Projections attached to the Disclosure Statement as Exhibit E, and information provided by other sources. The Valuation Analysis is as of December 31, 2018, with an assumed Effective Date in February 2019. The Valuation Analysis utilizes market data as of December 26, 2018. The valuation estimates set forth herein represent valuation analyses of the Reorganized Debtors generally based on the application of customary valuation techniques to the extent deemed appropriate by PJT.

In preparing its valuation, PJT performed a variety of financial analyses and considered a variety of factors, including a (a) discounted cash flow analysis; (b) comparable companies analysis; and (c) precedent transactions analysis. In performing the Valuation Analysis, PJT primarily relied on the comparable companies analysis. While PJT also considered the discounted cash flow analysis, PJT is of the view that it is of limited relevance for estimating the Enterprise Value of the Debtors given the facts and circumstances particular to the Debtors. Similarly, PJT deemed the precedent transactions analysis to be of limited relevance because of the limited number of recent public transactions for companies that are comparable in certain respects to the Reorganized Debtors. The preparation of a valuation analysis is a complex analytical process involving subjective determinations about which methodologies of financial analysis are most appropriate and relevant and the application of those methodologies to particular facts and circumstances in a manner that is not readily susceptible to summary description.

Based on the aforementioned analyses, and other information described herein and solely for purposes of the Plan, the estimated range of Enterprise Value of the Reorganized Debtors, collectively, as of December 31, 2018, is approximately $400 million to approximately $450 million (with the mid-point of such range being $425 million).

In addition, based on the estimated range of Enterprise Value of the Reorganized Debtors and other information described herein and solely for purposes of the Plan, PJT estimated a potential range of total Equity Value of the Reorganized Debtors, which consists of the Enterprise Value, less funded indebtedness plus balance sheet cash on the assumed Effective Date. PJT has assumed that the Reorganized Debtors will have a pro forma cash balance of approximately

$5.0 million as of the Effective Date and funded indebtedness of between $351 million and $386 million, including $15 million to $50 million of New Junior Loan depending upon the results of the determination by Holders of Allowed First Lien Claims to elect to receive, in lieu of its share of the New Common Stock (which forfeited shares shall be distributed to non-electing Holders Pro Rata), a principal amount of the New Junior Loan that is equal to 85% of the Exchange Benchmark Value (which is $79 million or the mid-point range of the Plan Equity Value as defined herein) of its original New Common Stock distribution (*i.e.*, a 15% discount to its Pro Rata share of the Exchange Benchmark Value of its original New Common Stock distribution) (the "First Lien Claim Flip-Up Election"), as further described in the Plan.

Based upon the estimated range of Enterprise Value of the Reorganized Debtors of between $400 million and $450 million described above, and assuming net debt of $381 million with the maximum First Lien Claim Flip-Up Election, PJT estimated that the potential range of Equity Value for the Reorganized Debtors, as of an assumed Effective Date in February 2019, is between approximately $19 million and approximately $69 million (with the mid-point of such range being $44 million).  Assuming no First Lien Flip-Up Election, which would result in net debt of $346 million, PJT estimated that the potential range of Equity Value for the Reorganized Debtors, as of an assumed Effective Date in February 2019, is between approximately $54 million and approximately $104 million (with the mid-point of such range being $79 million).

For purposes of the Valuation Analysis, PJT assumed that no material changes that would affect estimated value occur between the date of filing of the Disclosure Statement and the assumed Effective Date.  PJT's Valuation Analysis does not constitute an opinion as to the fairness from a financial point of view of the consideration to be received or paid under the Plan, of the terms and provisions of the Plan, or with respect to any other matters.

THE VALUATION ANALYSIS REFLECTS WORK PERFORMED BY PJT ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESSES AND ASSETS OF THE DEBTORS AVAILABLE TO PJT AS OF DECEMBER 26, 2018.  IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY HAVE AFFECTED OR AFFECT PJT'S CONCLUSIONS, PJT DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS VALUATION ANALYSIS AND DOES NOT INTEND TO DO SO.

PJT DID NOT INDEPENDENTLY VERIFY THE FINANCIAL PROJECTIONS OR OTHER INFORMATION THAT PJT USED IN THE VALUATION ANALYSIS, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS OR THEIR ASSETS WERE SOUGHT OR OBTAINED IN CONNECTION THEREWITH.  THE VALUATION ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE PLAN AND THE ANALYSIS OF POTENTIAL RELATIVE RECOVERIES TO CREDITORS THEREUNDER. THE VALUATION ANALYSIS REFLECTS THE APPLICATION OF VARIOUS VALUATION TECHNIQUES, DOES NOT PURPORT TO BE AN OPINION AND DOES NOT PURPORT TO REFLECT OR CONSTITUTE AN APPRAISAL, LIQUIDATION VALUE, OR ESTIMATE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED OR ASSETS TO BE SOLD PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH IN THE VALUATION ANALYSIS.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS.  AS A RESULT, THE VALUATION ANALYSIS IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, PJT, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY.  IN ADDITION, THE POTENTIAL VALUATION OF NEWLY ISSUED FUNDED DEBT AND SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT.  ACTUAL MARKET PRICES OF SUCH FUNDED DEBT AND SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL FUNDED DEBT AND SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, THE POTENTIALLY DILUTIVE IMPACT OF CERTAIN EVENTS, INCLUDING THE ISSUANCE OF EQUITY SECURITIES PURSUANT TO THE MANAGEMENT INCENTIVE PLAN, AND OTHER FACTORS THAT GENERALLY INFLUENCE THE PRICES OF FUNDED DEBT.

Management of the Debtors advised PJT that the Financial Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' best estimates and judgments as to the future operating and financial performance of the Reorganized Debtors.  If the business performs at levels below or above those set forth in the Financial Projections such performance may have a materially negative or positive impact, respectively, on the valuation of the company and the Enterprise Value thereof.

In preparing the Valuation Analysis, PJT:  (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain financial and operating data of the Debtors, including the Financial Projections; (c) discussed the Debtors' operations and future prospects with the Debtors' senior management team and third-party advisors; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that PJT deemed generally relevant in analyzing the value of the Reorganized Debtors; (e) reviewed certain publicly available data for, and considered the market values implied therefrom, recent transactions in the retail industry involving companies comparable in certain respects to the Reorganized Debtors; (f) considered certain economic and industry information that PJT deemed generally relevant to the Reorganized Debtors; (g) considered market feedback received to-date; and (h) conducted such other studies, analyses, inquiries, and investigations as PJT deemed appropriate.  PJT assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management and other parties as well as publicly available information.

The Valuation Analysis does not constitute a recommendation to any Holder of Allowed Claims, or any other person as to how such person should vote or otherwise act with respect to the Plan.  PJT has not been requested to, and does not express any view as to, the potential trading value of the Reorganized Debtors' funded debt and securities on issuance or at any other time.

PJT did not estimate the value of any potential tax attributes (such as carryforwards under section 163(j) of the Internal Revenue Code) that may survive the restructuring or any step-up in tax basis that may occur in connection with a Taxable Transaction (as defined in <u>Article X</u> of the Disclosure Statement) or otherwise evaluate the tax implications of the Plan on the Reorganized Debtors' projections.  Any changes to the assumptions on the availability of tax attributes, the amount of the Reorganized Debtors' tax basis, or the impact of cancellation of indebtedness income on the Reorganized Debtors' projections could materially impact the conclusions reached in the Valuation Analysis.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE VALUATION ANALYSIS PERFORMED BY PJT. THE PREPARATION OF A VALUATION ANALYSIS INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ANALYSIS IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION.  THE VALUATION ANALYSIS PERFORMED BY PJT IS NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE DESCRIBED HEREIN.

PJT IS ACTING AS RESTRUCTURING ADVISORS TO THE DEBTORS, AND HAS NOT AND, WILL NOT BE RESPONSIBLE FOR, AND HAS NOT AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL, OR OTHER SPECIALIST ADVICE TO THE DEBTORS OR ANY OTHER PARTY IN CONNECTION WITH THE DEBTORS' CHAPTER 11 CASES, THE PLAN OR OTHERWISE.

## EXHIBIT E

**Financial Projections**

## Financial Projections

In connection with the Disclosure Statement,[1] the Debtors' management team ("Management") prepared financial projections (the "Financial Projections") for FULLBEAUTY Brands Holdings Corp. and its debtor affiliates (collectively, the "Company" or the "Debtors") for fiscal years 2018 through 2022 (the "Projection Period"). The Financial Projections were prepared by Management with the assistance of the Debtors' advisors and are based upon a number of assumptions made by Management with respect to the future performance of the Debtors' operations. **Although Management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, there can be no assurance that such assumptions will be realized. As described in detail in the Disclosure Statement, a variety of risk factors could affect the Debtors' financial results and must be considered. Accordingly, the Financial Projections should be reviewed in conjunction with a review of the risk factors set forth in the Disclosure Statement and the assumptions described herein, including all relevant qualifications and footnotes.**

The Debtors believe that the Plan meets the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the planning and development of the Plan and for the purposes of determining whether the Plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

**These Financial Projections were not prepared with a view toward compliance with published guidelines of the United States Securities and Exchange Commission or guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. An independent auditor has not examined, compiled or performed any procedures with respect to the prospective financial information contained in this Exhibit and, accordingly, it does not express an opinion or any other form of assurance on such information or its achievability. The Debtors' independent auditor assumes no responsibility for, and denies any association with, the prospective financial information.**

### Principal Assumptions for the Financial Projections

The Financial Projections are based upon, and assume the successful implementation of, the Debtors' business plan (the Long Range Plan or "LRP"). Both the LRP and the Financial Projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors or their advisors. In addition, the assumptions do not take into account the uncertainty and disruption of business that may accompany a restructuring pursuant to the Bankruptcy Code.

---

[1] Capitalized terms used but not defined herein have the meanings given to such terms in the *Joint Prepackaged Chapter 11 Plan of Reorganization of FULLBEAUTY Brands Holdings Corp. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") or the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of FULLBEAUTY Brands Holdings Corp. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"), as applicable.

Therefore, although the Financial Projections are necessarily presented with numerical specificity, the actual results achieved during the Projection Period will likely vary from the projected results. These variations may be material. Accordingly, no definitive representation can be or is being made with respect to the accuracy of the Financial Projections or the ability of the Debtors to achieve the projected results of operations. *See* "Risk Factors."

The Debtors anticipate that the New Board will review post-emergence financial projections and the New Board and Reorganized Debtors reserve the right to make public any post-emergence projections. To the extent that the New Board revisits the post-emergence financial projections, the Debtors anticipate that main drivers of the financial projections that may change are the following: (i) year over year sales growth rates; (ii) commercial investment spend (print and digital); (iii) anticipated IT investment; (iv) warehouse improvements, and (v) other areas for potential investment. Any decisions on adopting or revising post-emergence projections are subject to the New Board's consent. *See* "Risk Factors."

In deciding whether to vote to accept or reject the Plan, Holders of Claims entitled to vote to accept or reject the Plan must make their own determinations as to the reasonableness of such assumptions and the reliability of the Financial Projections. *See* "Risk Factors."

Moreover, the Financial Projections were prepared solely in connection with the restructuring pursuant to the Plan.

Under Accounting Standards Codification "ASC" 852, "Reorganizations", the Debtors note that the Financial Projections reflect the operational emergence from chapter 11 but not the impact of fresh start accounting that will likely be required upon the occurrence of the Effective Date. Fresh start accounting requires all assets, liabilities, and equity instruments to be valued at "fair value." The Financial Projections account for the reorganization and related transactions pursuant to the Plan. While the Debtors expect that they will be required to implement fresh start accounting upon emergence, they have not yet completed the work required to quantify the effect upon the Financial Projections, which effect could be material.

### Safe Harbor under The Private Securities Litigation Reform Act of 1995

The Financial Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act and the Securities Exchange Act. Forward-looking statements in the Financial Projections include the intent, belief, or current expectations of the Debtors and Management with respect to the timing of, completion of, and scope of the current restructuring, Plan, LRP, bank financing, and debt and equity market conditions and the Debtors' future liquidity, as well as the assumptions upon which such statements are based.

While the Debtors believe that the expectations are based upon reasonable assumptions within the bounds of their knowledge of their business and operations, parties in interest are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements.

### Select Risk Factors Related to the Financial Projections

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond Management's control. Many factors could cause actual results, performance or achievements to differ materially from any future results, performance or achievements

expressed or implied by these forward-looking statements. A description of the risk factors associated with the Plan, the Disclosure Statement, and the Financial Projections is included in Article VII of the Disclosure Statement.

**Financial Projection General Assumptions**

**Basis of Presentation (Non-GAAP)**

- Non-GAAP P&L excludes certain expenses including income tax expense, interest expense, depreciation and amortization, transaction expenses, acquisition expenses, sponsor/management fees, stock-based compensation, transition service revenue and the estimated impact of a 53rd fiscal week (if applicable).
- Fiscal 2018 projections include FY 2018 actual results through August.
- Balance sheet projections include adjustments for fresh start accounting and other emergence sources and uses for illustrative purposes only; projections are non-GAAP and not created in accordance with American Institute of Certified Public Accountants Statement of Position 90-7.

**Non-GAAP P&L**

- Total Revenue
    - Net sales of merchandise through catalogs, websites, and customer care center, including related shipping fees paid by our customers, and commissions on certain third-party and ancillary products and services.
    - Net sales are net of sales tax, discounts, cancellations, estimated returns, and loyalty rewards from gross sales.
    - Sales are recognized upon shipment of product to customers.
    - A reserve for merchandise returns is estimated based upon prior customer return experience.
- Cost of Merchandise Sold
    - Primarily includes the cost of raw materials, sourcing costs, inbound and outbound freight, customer service adjustments, free gifts, and changes in obsolescence.
- Commercial Investments
    - Includes digital and print media marketing and advertising costs.
    - Commercial investment costs are largely driven by the costs associated with the creation, production and distribution of print media, such as the cost of paper, printing, creative work, circulation and postage, as well as web marketing expenses, which include paid search, email campaigns, and third party services.
- Other Operating Expenses
    - Includes direct and indirect payroll expenses, corporate overhead, and other expenses as well as depreciation and amortization.
    - Does not include management incentive compensation.

**Non-GAAP Cash Flows**

- Change in Working capital

- Driven by ordinary course changes in accounts receivable, accounts payable, inventory, other current assets, and other current liabilities after a normalization of vendor terms in 2019 post-transaction.

- Interest Expenses
  - Interest expenses for post-emergence period is based upon pro forma $252 million New First Lien Term Loan with interest rate of LIBOR plus 900 basis points, $30 million of New First Lien Term Facility with interest rate of LIBOR plus 1000 basis points, $50 million of New Junior Loan (the amount of New Junior Debt will be at least $15 million and up to $50 million subject to elections made by the Holders of Allowed First Lien Claims) with an interest rate of 700 basis points with 100 basis points payable in cash and remainder in PIK or "paid in kind" interest, Exit FILO ABL with an interest rate of LIBOR plus 225 basis points and an Exit ABL Facility with interest rate of LIBOR plus 125–175 basis points depending upon the level of excess availability.

- Cash Taxes
  - Cash taxes based upon analyses conducted by the Company's advisors in conjunction with the Plan assuming no tax basis step-up in assets. If a Taxable Transaction is consummated in a way that results in a tax basis step-up in the Company's assets, based on numerous simplifying assumptions, the Company currently estimates that cash taxes could be reduced by approximately $5.0 million per year from the projections.

- Capital Expenditures
  - Primarily reflects facility upgrades and procurement of production equipment, corporate IT, real estate, and other investments.

- Net Changes in Debts
  - Includes net draws on the Exit ABL Facility, 1% per annum (on a quarterly basis) amortization payments on the New First Lien Term Facility, and 1% per annum (on a quarterly basis) amortization payments on the New First Lien Term Loan.

- Other Activities
  - Includes costs associated with the capital structure changes for the emergence.

**Non-GAAP Balance Sheet**

- Cash and Cash Equivalents
  - Includes cash, highly liquid investments with an original maturity of three months or less, and receivables from financial institutions related to credit card purchases due to the high credit quality and short time period for settlement of the outstanding amounts.

- Accounts Receivable, Net
  - Includes amounts due from customers for merchandise sales on private label credit cards where the presentation to the credit card processor is delayed ninety (90) days from shipment date. The third-party provider assumes the risk on all approved private label credit card transactions. The Company estimates losses on receivables based upon known troubled accounts and historical experience of losses incurred.

- Taxes Receivable
  - Assumes pre-transaction tax receivable balance as of December 31, 2018. Projections assume balance consists of net federal income tax refund anticipated to be received in January 2019 and expects to receive no further tax refunds during the projection period.

4

- Inventory
  - Inventory consists primarily of purchased finished goods merchandise and is valued at the lower of cost or market value.  Cost is determined using a standard cost method and includes the cost of merchandise and import-related costs, including freight, duty and agent commissions.  Inventory is relieved on a first-in, first-out basis.
- Prepaid Catalog Costs and Paper Inventory
  - Consists of catalog production and mailing costs that have not yet been fully amortized and prepaid paper inventory used in catalog production.  Prepaid catalog costs are amortized following the trend of the expected revenue stream, which is measured from the date the catalogs are mailed, over a period of three to four months.
- Other Current Assets
  - Consists of prepaid expenses including supplies, software, insurance, and other, as well as miscellaneous deposits, rebates, and receivables.
- Property, Plant & Equipment, Net
  - Property and equipment are stated at cost less accumulated depreciation and amortization.  Depreciation and amortization of property and equipment is computed on a straight-line basis over the estimated useful lives of the related assets, which range from ten (10) to thirty (30) years for buildings and improvements, the lesser of ten (10) years or the life of the lease for leasehold improvements, and three (3) to ten (10) years for other property and equipment.  Repairs and maintenance are charged to expense as incurred.  Renewals and betterments which extend service lives are capitalized.
- Other Intangible Assets, Net
  - Intangible assets include capitalized software development costs, trade names, domain names, customer lists and other intangibles.  Other Intangible Assets are held constant over the projection period for illustrative purposes.
- Goodwill
  - Includes illustrative fresh start accounting adjustment at emergence (pro forma December 31, 2018).  Goodwill is held constant over the projection period for illustrative purposes.
- Deferred Tax Liabilities
  - Includes tax liabilities arising from depreciation / amortization basis differences, changes in prepaid expenses and other liabilities

| 1. Non-GAAP P&L ($ in millions) | Projection FY18 | Projection FY19 | Projection FY20 | Projection FY21 | Projection FY22 |
|---|---|---|---|---|---|
| **Total Revenue** | **$827.4** | **$828.6** | **$849.9** | **$881.3** | **$922.7** |
| YoY Growth (%) | (8.4%) | 0.1% | 2.6% | 3.7% | 4.7% |
| Cost of Goods Sold | (402.6) | (410.4) | (424.4) | (441.3) | (463.6) |
| **Gross Profit** | **$424.8** | **$418.1** | **$425.5** | **$440.0** | **$459.1** |
| Gross Margin (%) | 51.3% | 50.5% | 50.1% | 49.9% | 49.8% |
| Commercial Investments | (192.7) | (165.3) | (166.9) | (168.1) | (174.5) |
| Other Operating Expenses | (178.5) | (180.1) | (184.5) | (189.9) | (195.7) |
| **Operating Income** | **$53.7** | **$72.7** | **$74.2** | **$82.0** | **$88.8** |
| Operating Margin (%) | 6.5% | 8.8% | 8.7% | 9.3% | 9.6% |
| Adjustments | 12.1 | 0.6 | 4.2 | 4.2 | 4.2 |
| D&A | 18.9 | 13.5 | 13.5 | 13.5 | 13.5 |
| **Adjusted EBITDA** | **$84.7** | **$86.7** | **$91.8** | **$99.7** | **$106.5** |
| Adjusted EBITDA Margin (%) | 10.2% | 10.5% | 10.8% | 11.3% | 11.5% |

| 2. Non-GAAP Cash Flow Metrics ($ in millions) | | Projection FY19 | Projection FY20 | Projection FY21 | Projection FY22 |
|---|---|---|---|---|---|
| Adjusted EBITDA | | $86.7 | $91.8 | $99.7 | $106.5 |
| Cash Interest Expenses[1] | | (26.9) | (35.1) | (34.6) | (31.4) |
| Cash Taxes | | (10.3) | (10.6) | (11.8) | (13.7) |
| Change in Working Capital | | 38.6 | 2.2 | 2.3 | 1.9 |
| Change in LT Assets and Liabilities | | (3.2) | (3.2) | (3.2) | (3.2) |
| **Operating Cash Flow** | | **$84.9** | **$45.3** | **$52.4** | **$60.1** |
| Capital Expenditures | | (12.5) | (12.5) | (12.5) | (12.5) |
| Net Change in Debts[2] | | (48.1) | (2.8) | (2.8) | (31.6) |
| Other Activities | | (0.6) | (4.2) | (4.2) | (4.2) |
| **Total Cash Flow** | | **$23.7** | **$25.8** | **$32.9** | **$11.8** |

| 3. Non-GAAP Balance Sheet ($ in millions) | Pre-Transaction 4Q18 | Adj. | Pro Forma 4Q18 | Projection FY19 | Projection FY20 | Projection FY21 | Projection FY22 |
|---|---|---|---|---|---|---|---|
| Cash and Cash Equivalents | $5.0 | $0.0 | $5.0 | $28.7 | $54.5 | $87.4 | $99.1 |
| Accounts receivable, Net | 10.5 | - | 10.5 | 10.8 | 11.1 | 11.6 | 12.1 |
| Taxes Receivable | 18.6 | - | 18.6 | 8.6 | 8.6 | 8.6 | 8.6 |
| Inventories | 168.8 | - | 168.8 | 149.1 | 148.6 | 148.5 | 148.9 |
| Prepaid Catalog Costs and Paper Inventory | 12.4 | - | 12.4 | 11.9 | 11.6 | 10.9 | 10.4 |
| Current Deferred Taxes | - | - | - | - | - | - | - |
| Other Current Assets | 11.5 | - | 11.5 | 11.6 | 11.8 | 12.0 | 12.3 |
| **Total Current Assets** | **$226.8** | **($0.0)** | **$226.8** | **$220.7** | **$246.1** | **$278.9** | **$291.4** |
| Property, Plant and Equipment, Net | $36.2 | $0.0 | $36.2 | $35.3 | $34.3 | $33.3 | $32.4 |
| Other Intangible Assets, Net | 341.1 | - | 341.1 | 341.1 | 341.1 | 341.1 | 341.1 |
| Goodwill | 767.9 | (740.8) | 27.1 | 27.1 | 27.1 | 27.1 | 27.1 |
| Other Assets, Net | 13.3 | - | 13.3 | 13.3 | 13.3 | 13.3 | 13.3 |
| **Total Assets** | **$1,385.3** | **($740.8)** | **$644.5** | **$637.4** | **$661.9** | **$693.6** | **$705.2** |
| Accounts Payable | $67.0 | - | $67.0 | $67.8 | $68.5 | $69.2 | $70.2 |
| Accrued Expenses and other liabilities | 61.5 | (0.9) | 60.6 | 74.4 | 75.6 | 77.0 | 78.0 |
| Other Current Liabilities | - | - | - | - | - | - | - |
| **Total Current Liabilities** | **$128.4** | **($0.9)** | **$127.5** | **$142.3** | **$144.1** | **$146.2** | **$148.2** |
| Total Debt | 1,210.7 | (824.7) | 386.0 | 337.9 | 335.1 | 332.3 | 300.7 |
| Tax Liabilities | (2.6) | - | (2.6) | (2.6) | (2.6) | (2.6) | (2.6) |
| Other LT Liabilities | 33.2 | - | 33.2 | 30.0 | 26.8 | 23.6 | 20.4 |
| Deferred Income Taxes | 56.2 | - | 56.2 | 56.2 | 56.2 | 56.2 | 56.2 |
| **Total Liabilities** | **$1,426.0** | **($825.6)** | **$600.4** | **$563.8** | **$559.7** | **$555.8** | **$523.0** |
| **Total Shareholders' Equity** | **(40.8)** | **84.7** | **44.0** | **73.5** | **102.1** | **137.8** | **182.1** |
| **Total Liability and Equity** | **$1,385.3** | **($740.8)** | **$644.5** | **$637.4** | **$661.9** | **$693.6** | **$705.2** |

1. Cash interest payments include three quarterly payments in FY2019 (commencing in April 2019) and assumes four quarterly interest payments in subsequent years.
2. Debt amortization schedule is subject to revision pending finalization of credit agreements.

**<u>EXHIBIT F</u>**

**Corporate Organizational Chart**

KIRKLAND & ELLIS LLP



**FULLBEAUTY Brands Corporate and Capital Structure**



