Jonathan S. Henes, P.C.
George Klidonas
Rebecca Blake Chaikin
Gene Goldmintz
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Emily E. Geier (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FULLBEAUTY BRANDS HOLDINGS CORP., *et al.*,[1] | ) | Case No. 19-22185 (RDD) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF AN ORDER APPROVING THE DEBTORS' DISCLOSURE STATEMENT FOR, AND CONFIRMING, THE DEBTORS' FIRST AMENDED JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Blackdog Holdings, Inc. (8991); FULLBEAUTY Brands Holdings Corp. (8053); FULLBEAUTY Brands, Inc. (4198); FULLBEAUTY Brands, LLC (9445); FULLBEAUTY Brands Management Services, LLC (8637); FULLBEAUTY Brands Merchant, Inc. (7812); FULLBEAUTY Brands Operations, LLC (5382); FULLBEAUTY Brands Texas, LLC (9606); Jessica London, Inc. (1070); and Swimsuits for All, LLC (3246).  The location of the Debtors' service address is:  50 Main Street, Suite 1000, White Plains, New York 10606.

# TABLE OF CONTENTS

**Page**

Preliminary Statement...................................................................................................13

Relevant Background Information................................................................................16

I.    The Restructuring Transactions and Due Process Safeguards...........................16

II.   The Plan Has the Unanimous Support of the Debtors' Creditors....................18

Argument .....................................................................................................................19

I.    The Disclosure Statement Contains "Adequate Information" As Required
Pursuant to Sections 1125 and 1126 of the Bankruptcy Code..........................20

A.   The Disclosure Statement Contains Adequate Information...............................21

II.   The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code................24

A.   The Plan Complies with the Applicable Provisions of the Bankruptcy Code
(§ 1129(a)(1))...................................................................................................24

B.   The Plan Satisfies the Classification Requirements of Section 1122 of the
Bankruptcy Code. .............................................................................................24

C.   The Plan Satisfies the Mandatory Requirements of Section 1123(a) of the
Bankruptcy Code. .............................................................................................27

      1.    Designation of Classes of Claims and Interests (Section 1123(a)(1)). .................27

      2.    Specification of Unimpaired Classes (§ 1123(a)(2)). ...........................27

      3.    Treatment of Impaired Classes (Section 1123(a)(3))............................28

      4.    Equal Treatment Within Classes (Section 1123(a)(4)).........................28

      5.    Means for Implementation (Section 1123(a)(5)). ................................28

      6.    Issuance of Non-Voting Securities (Section 1123(a)(6))......................29

      7.    Directors and Officers (§ 1123(a)(7)). ................................................30

D.   The Plan Complies With the Discretionary Provisions of Section 1123(b) of the
Bankruptcy Code. .............................................................................................30

      1.    The Debtor Release Is Appropriate and Complies With the Bankruptcy
Code. ...................................................................................................31

2.    The Third-Party Release Is Wholly Consensual And Should Be Approved. ........33

a.    The Debtors' Lenders Played a Critical Role in the Debtors'
Ability to Seek Confirmation of a Consensual Plan. ................................35

b.    The Sponsors. ........................................................................37

c.    The Debtors' and Other Released Parties' Respective Officers,
Directors, Advisers, and Other Representatives and Agents. ...................38

3.    The Exculpation Provision Is Appropriate and Complies With the
Bankruptcy Code. ...............................................................................39

4.    The Injunction Provision Is Appropriate and Complies With the
Bankruptcy Code. ...............................................................................44

E.    The Plan Complies With Section 1123(d) of the Bankruptcy Code. ................................45

F.    The Debtors Complied With the Applicable Provisions of the Bankruptcy Code
(§ 1129(a)(2)). ...................................................................................46

1.    The Debtors Complied With Section 1125 of the Bankruptcy Code. ....................46

2.    The Debtors Complied With Section 1126 of the Bankruptcy Code. ....................46

G.    The Plan Was Proposed in Good Faith and Not by Any Means Forbidden by Law
(§ 1129(a)(3)). ...................................................................................48

H.    The Plan Provides That the Debtors' Payment of Professional Fees and Expenses
Are Subject to Court Approval (§ 1129(a)(4)). .................................................50

I.    The Debtors Disclosed All Necessary Information Regarding Directors, Officers,
and Insiders (§ 1129(a)(5)). ...................................................................51

J.    The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)). ............52

K.    The Plan Is In the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)). ...............52

L.    The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8)
of the Bankruptcy Code. ........................................................................56

M.    The Plan Provides for Payment in Full of All Allowed Priority Claims
(§ 1129(a)(9)). ...................................................................................56

N.    At Least One Class of Impaired, Non-Insider Claims Accepted the Plan
(§ 1129(a)(10)). ..................................................................................57

O.    The Plan Is Feasible (§ 1129(a)(11)). .........................................................58

|   |   | Page |
|---|---|---|
| P. | All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)). | 60 |
| Q. | All Retiree Benefits Will Continue Post-Confirmation (§ 1129(a)(13)). | 60 |
| R. | Sections 1129(a)(14) Through 1129(a)(16) Do Not Apply to the Plan. | 60 |
| S. | The Plan Satisfies the "Cramdown" Requirements of Section 1129(b) of the Bankruptcy Code. | 61 |
|   | 1. The Plan Does Not Unfairly Discriminate with Respect to Impaired Classes That Have Not Voted to Accept the Plan (Section 1129(b)(1)) | 62 |
|   | 2. The Plan Is Fair and Equitable with Respect to the Impaired Deemed Rejecting Classes (Section 1129(b)(2)). | 63 |
| T. | The Debtors Complied With Section 1129(d) of the Bankruptcy Code. | 64 |
| U. | Good Cause Exists to Waive the Stay of the Confirmation Order. | 64 |
| III. | Prolonged Chapter 11 Cases Are Untenable | 66 |
| A. | Limited Liquidity | 66 |
| B. | Vendors and Contract Counterparties | 67 |
| Conclusion | | 69 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 203 N. LaSalle St. Ltd. P'ship.*,
   190 B.R. 567 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, *Bank of Am.*,
   526 U.S. 434 (1999)................................................................................................50

*In re 500 Fifth Ave. Assocs.*,
   148 B.R. 1010 (Bankr. S.D.N.Y. 1993) ................................................................13

*In re Adelphia Commc'ns Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007)........................................................... *passim*

*In re Adelphia Commc'ns Corp.*,
   No. 02-41729 (REG) (Bankr. S.D.N.Y. Jan. 5, 2007) ..........................................30

*Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Ct., New York, N.Y. (In re Chateaugay Corp.)*,
   89 F.3d 942 (2d Cir. 1996).....................................................................................13

*In re Almatis, B.V.*,
   No. 10-12308 (MG) (Bankr. S.D.N.Y. Sept. 20, 2010).........................................29

*In re Ambanc La Mesa Ltd. P'ship*,
   115 F.3d 650 (9th Cir. 1997) .................................................................................50

*In re Amfesco Indus., Inc.*,
   No. 88-2952 (JBW), 1988 WL 141524 (E.D.N.Y. Dec. 21, 1988) ..........................9

*In re Ampex Corp.*,
   No. 08-11094 (AJG) (Bankr. S.D.N.Y. July 31, 2008) .........................................30

*In re Answers Holdings, Inc.*,
   No. 17-10496 (SMB) (Bankr. S.D.N.Y. Apr. 10, 2017).......................25, 29, 30, 32

*In re Avaya Inc.*,
   No. 17-10089 (SMB) (Bankr. S.D.N.Y. Nov. 28, 2017)
   .................................................................................................25, 29, 30, 32

*In re Aztec Co.*,
   107 B.R. 585 (Bankr. M.D. Tenn. 1989) ...............................................................50

*B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc. Corp.)*,
   701 F.2d 1071 (2d Cir. 1983).................................................................................37

*In re Bally Total Fitness of Greater N.Y., Inc.*,
  No. 07-12395 (BRL), 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007) ................ *passim*

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999) .........................................................................................40, 51, 52

*In re BCBG Max Azria Global Holdings, LLC*,
  No. 17-10466 (SCC) (Bankr. S.D.N.Y. July 26, 2017) ........................................25, 29, 30, 32

*In re BearingPoint, Inc.*,
  453 B.R. 486 (Bankr. S.D.N.Y. 2011) ...................................................................30

*In re BearingPoint, Inc.*,
  No. 09-10691 (REG) (Bankr. S.D.N.Y Dec. 17, 2009) ..........................................22

*In re Beyond.com Corp.*,
  289 B.R. 138 (Bankr. N.D. Cal. 2003) .................................................................39

*Bos. Post Rd. Ltd. P'ship v. FDIC (In re Bos. Post Rd. Ltd. P'ship)*,
  21 F.3d 477 (2d Cir. 1994) .................................................................................13

*In re Bowles*,
  48 B.R. 502 (Bankr. E.D. Va. 1985) ....................................................................50

*BSL Op. Corp. v. 125 E Taverns, Inc. (In re BSL Op. Corp.)*,
  57 B.R. 945 (Bankr. S.D.N.Y. 1986) .....................................................................9

*In re Calpine Corp.*,
  No. 05-60200 (BRL), 2007 WL 4565223 (Bankr. S.D.N.Y. Dec. 19, 2007) ...................22, 32

*In re Captran Creditors' Trust*,
  128 B.R. 469 (M.D. Fla. 1991) ...........................................................................28

*In re Cellular Info. Sys., Inc.*,
  171 B.R. 926 (Bankr. S.D.N.Y. 1994) ..................................................................36

*In re Cengage Learning, Inc.*,
  No. 13-44106 (ESS) (Bankr. E.D.N.Y. Mar. 14, 2014) ...................................29, 31

*In re Cenveo, Inc.*,
  No. 18-22178 (Bankr. S.D.N.Y Aug. 21, 2018) .........................................29, 30, 32

*In re Charter Commc'ns*,
  419 B.R. 221 (Bankr. S.D.N.Y. 2009) ..................................................................20

*In re Charter Commc'ns*,
  No. 09-11435 (JMP) (Bankr. S.D.N.Y. Nov. 17, 2009) ..................................29, 32

*In re Chemtura Corp.*,
   No. 09-11233 (REG) (Bankr. S.D.N.Y. Nov. 23, 2010) ........................................................53

*In re Citadel Broad. Corp.*,
   No. 09-17442 (BRL) (Bankr. S.D.N.Y. May 19, 2010) ........................................................32

*In re Copy Crafters Quickprint, Inc.*,
   92 B.R. 973 (Bankr. N.D.N.Y. 1988) ...................................................................................9

*In re Crabtree & Evelyn, Ltd.*,
   No. 09-14267 (BRL), 2010 WL 3638369 (Bankr. S.D.N.Y. Jan. 14. 2010) ..........................22

*In re DBSD N. Am., Inc.*,
   419 B.R. 179 (Bankr. S.D.N.Y. 2009), *aff'd*, *In re DBSD N. Am., Inc.*, No. 09-
   10156 (LAK), 2010 WL 1223109 (S.D.N.Y. May 24, 2010), *aff'd in part,
   rev'd in part*, 634 F.3d 79 (2d Cir. 2011) ..............................................................................30

*In re DBSD N. Am., Inc.*,
   No. 09-13061 (REG) (Bankr. S.D.N.Y. Nov. 23, 2009) ........................................................32

*In re DJK Residential, LLC*,
   No. 08-10375 (JMP), (Bankr. S.D.N.Y. May 7, 2008).....................................................31, 32

*In re Drexel Burnham Lambert Grp., Inc.*,
   138 B.R. 714 (Bankr. S.D.N.Y. 1992)...................................................................................13

*In re Drexel Burnham Lambert Grp., Inc.*,
   138 B.R. 723 (Bankr. S.D.N.Y. 1992).......................................................................... *passim*

*In re Eastman Kodak Co.*,
   No. 12-10202 (ALG) (Bankr. S.D.N.Y. Aug. 23, 2013) ........................................................29

*In re Eddington Thread Mfg. Co.*,
   181 B.R. 826 (Bankr. E.D. Pa. 1995) ...................................................................................46

*In re Elsinore Shore Assocs.*,
   91 B.R. 238 (Bankr. D.N.J. 1988) ........................................................................................38

*In re Enron Corp.*,
   326 B.R. 497 (S.D.N.Y. 2005)..................................................................................28, 29, 30

*In re Extended Stay Inc.*,
   No. 09-13764 (JMP) (Bankr. S.D.N.Y. July 20, 2010) ........................................................53

*In re FairPoint Commc'ns, Inc.*,
   452 B.R. 21 (S.D.N.Y. 2011).................................................................................................26

*In re Freymiller Trucking, Inc.*,
190 B.R. 913 (Bankr. W.D. Okla. 1996) ...............................................................50

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*,
10 F.3d 944 (2d Cir. 1993)......................................................................................13

*In re Gaston & Snow*,
Nos. 93-8517 (JGK), 93-8628 (JGK), 1996 WL 694421 (S.D.N.Y. Dec. 4,
1996) .......................................................................................................................36

*In re Genco Shipping & Trading Ltd.*,
513 B.R. 233 (Bankr. S.D.N.Y. 2014)....................................................................22

*In re Global A&T Electronics Ltd.*,
No. 17-23931 (Bankr. S.D.N.Y. Dec. 21, 2017).........................................29, 30, 32

*In re Granite Broad. Corp.*,
369 B.R. 120 (Bankr. S.D.N.Y. 2007).....................................................................29

*In re Greate Bay Hotel & Casino, Inc.*,
251 B.R. 213 (Bankr. D.N.J. 2000) .........................................................................50

*In re Health Diagnostic Lab., Inc.*,
551 B.R. 218 (Bankr. E.D. Va. 2016)......................................................................29

*Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe
Enters., Ltd. II)*,
994 F.2d 1160 (5th Cir. 1993) ...........................................................................7, 46

*In re Heritage Org., L.L.C.*,
375 B.R. 230 (Bankr. N.D. Tex. 2007).....................................................................13

*In re ION Media Networks, Inc.*,
419 B.R. 585 (Bankr. S.D.N.Y. 2009).....................................................................52

*In re Ion Media Networks, Inc.*,
No. 09-13125 (JMP) (Bankr. S.D.N.Y. Dec. 3, 2009)..............................................32

*In re Ionosphere Clubs, Inc.*,
179 B.R. 24 (Bankr. S.D.N.Y. 1995).........................................................................9

*In re Ionosphere Clubs, Inc.*,
98 B.R. 174 (Bankr. S.D.N.Y. 1989).......................................................................13

*In re Jartran, Inc.*,
44 B.R. 331 (Bankr. N.D. Ill. 1984) .......................................................................31

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987) ..........................50

*Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*),
843 F.2d 636 (2d Cir. 1988).................................................................................12, 36, 46, 50

*Kirk v. Texaco, Inc.*,
82 B.R. 678 (S.D.N.Y. 1988)...................................................................................................9

*In re Lapworth*,
No. 97-34529 (DWS), 1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998) .............................34

*In re Lear Corp.*,
No. 09-14326 (ALG) (Bankr. S.D.N.Y. Nov. 5, 2009) ....................................................22, 32

*In re Legend Parent Inc.*,
No. 14-10701 (RG) (Bankr. S.D.N.Y. 2014)........................................................................25

*In re Lightsquared Inc.*,
513 B.R. 56 (Bankr. S.D.N.Y. 2014) .....................................................................................13

*In re Metro-Goldwyn-Mayer Studios Inc.*,
No. 10-15774 (SMB) (Bankr. S.D.N.Y. Dec. 6, 2010) ....................................................25, 29

*In re Metromedia Fiber Network, Inc.*,
416 F.3d 136 (2d Cir. 2005)............................................................................................21, 22

*In re Momentum Mfg. Corp.*,
25 F.3d 1132 (2d Cir. 1994).....................................................................................................9

*Motorola, Inc. v. Official Comm. of Unsecured Creditors* (*In re Iridium Operating
LLC*),
478 F.3d 452 (2d Cir. 2007).................................................................................................20

*Mut. Life Ins. Co. of N.Y. v. Patrician St. Joseph Partners Ltd. P'ship* (*In re
Patrician St. Joseph Partners Ltd. P'ship*),
169 B.R. 669 (Bankr. D. Ariz. 1994).....................................................................................46

*In re NII Holdings, Inc.*,
536 B.R. 61 (Bankr. S.D.N.Y. 2015).....................................................................................20

*NLRB v. Bildisco & Bildisco*,
465 U.S. 513 (1984)...............................................................................................................37

*In re Oldco M. Corp.*,
No. 09-13412 (MG) (Bankr. S.D.N.Y. Feb. 23, 2010)..........................................................53

*In re Oneida Ltd.*,
    351 B.R. 79 (Bankr. S.D.N.Y. 2006) ............................................................ *passim*

*In re PC Liquidation Corp.*,
    383 B.R. 856 (E.D.N.Y. 2008) ...........................................................................9

*In re Penton Bus. Media Holdings, Inc.*,
    No. 10-10689 (AJG) (Bankr. S.D.N.Y. Mar. 5, 2010) ..........................................53

*In re Prudential Energy Co.*,
    58 B.R. 857 (Bankr. S.D.N.Y. 1986) ................................................................47

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000).............................................................................29

*In re Reader's Digest Ass'n, Inc.*,
    No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010)...............................13, 32

*In re Repurchase Corp.*,
    332 B.R. 336 (Bankr. N.D. Ill. 2005) ..............................................................47

*In re Res. Cap., LLC*,
    No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013) ........................................29

*In re Sabine Oil & Gas Corp.*,
    555 B.R. 180 (Bankr. S.D.N.Y. 2016)...................................................13, 26, 27

*In re Sabine Oil & Gas Corp.*,
    No. 15-11835 (SCC) (Bankr. S.D.N.Y. July 27, 2016) .......................................25

*In re Simplot*,
    No. 06-00002 (TLM), 2007 WL 2479664 (Bankr. D. Idaho Aug. 28, 2007).........12

*In re Source Enters., Inc.*,
    No. 06-11707 (AJG), 2007 WL 2903954 (Bankr. S.D.N.Y. Oct. 1, 2007) ............32

*In re Specialty Equip. Cos.*,
    3 F.3d 1043 (7th Cir. 1993) ............................................................................21

*In re Spiegel, Inc.*,
    No. 03-11540 (BRL), 2006 WL 2577825 (Bankr. S.D.N.Y. Aug. 16, 2006),
    *appeal dismissed*, No. 06-09385 (NRB), 2007 WL 656902 (S.D.N.Y. Feb. 28,
    2007), *aff'd*, 269 F. App'x 56 (2d Cir. 2008) ..................................................21

*In re SunEdison, Inc.*,
    No. 16-10992 (SMB), 576 B.R. 453 (Bankr. S.D.N.Y. 2017)..............................22

*Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co.* (*In re U.S. Truck Co.*),
    800 F.2d 581 (6th Cir. 1986) .................................................................................47

*In re Texaco, Inc.*,
    84 B.R. 893 (Bankr. S.D.N.Y. 1988), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1998) ......................................................................................................................36, 47

*In re Toy & Sports Warehouse, Inc.*,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984) ....................................................................37

*In re Trico Marine Servs., Inc.*,
    No. 04-17985 (SMB) (Bankr. S.D.N.Y. Jan. 21, 2005)........................................29

*In re Trinsum Grp., Inc.*,
    No. 08–12547 (MG), 2013 WL 1821592 (Bankr. S.D.N.Y. Apr. 30, 2013)..........26

*In re Uno Rest. Holdings Corp.*,
    No. 10-10209 (MG) (Bankr. S.D.N.Y. July 6, 2010) .............................................29

*In re Winn-Dixie Stores, Inc.*,
    356 B.R. 239 (Bankr. M.D. Fla. 2006) .................................................................28

*In re WorldCom, Inc.*,
    2003 WL 23861928 (Bankr. S.D.N.Y. Oct 31, 2003) .................................. *passim*

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) .................................................................31, 49

**Statutes**

11 U.S.C. § 1122(a) ..................................................................................................12

11 U.S.C. § 1123(a)(1)...............................................................................................15

11 U.S.C. § 1123(a)(2)...............................................................................................15

11 U.S.C. § 1123(a)(3)...............................................................................................16

11 U.S.C. § 1123(a)(4)...............................................................................................16

11 U.S.C. § 1123(a)(5)...............................................................................................16

11 U.S.C. § 1123(a)(6)...............................................................................................17

11 U.S.C. § 1123(a)(7)...............................................................................................18

11 U.S.C. § 1123(b)(1)–(3)........................................................................................18

11 U.S.C. § 1123(b)(6) ................................................................................................18

11 U.S.C. § 1123(d) ...................................................................................................33

11 U.S.C. § 1125(a)(1) ................................................................................................9

11 U.S.C. § 1125(g) .....................................................................................................8

11 U.S.C. § 1126(a) ...................................................................................................34

11 U.S.C. § 1126(b) .....................................................................................................8

11 U.S.C. § 1126(f) ....................................................................................................34

11 U.S.C. § 1126(g) ..............................................................................................34, 35

11 U.S.C. § 1129(a)(1) ..............................................................................................12

11 U.S.C. § 1129(a)(2) ..............................................................................................34

11 U.S.C. § 1129(a)(3) .................................................................................28, 36, 37

11 U.S.C. § 1129(a)(4) ..............................................................................................38

11 U.S.C. § 1129(a)(5)(A)(i) .....................................................................................39

11 U.S.C. § 1129(a)(5)(A)(ii) ....................................................................................39

11 U.S.C. § 1129(a)(5)(B) .........................................................................................39

11 U.S.C. § 1129(a)(6) ..............................................................................................40

11 U.S.C. § 1129(a)(7)(A) .........................................................................................40

11 U.S.C. § 1129(a)(8) ..............................................................................................44

11 U.S.C. § 1129(a)(9)(A) .........................................................................................44

11 U.S.C. § 1129(a)(9)(B) .........................................................................................45

11 U.S.C. § 1129(a)(9)(C) .........................................................................................45

11 U.S.C. § 1129(a)(10) ............................................................................................46

11 U.S.C. § 1129(a)(11) ............................................................................................46

11 U.S.C. § 1129(a)(12) ............................................................................................48

11 U.S.C. § 1129(a)(14) ............................................................................................48

Page

11 U.S.C. § 1129(a)(15)...........................................................................................49

11 U.S.C. § 1129(a)(16)...........................................................................................49

11 U.S.C. § 1129(b)................................................................................................49

11 U.S.C. § 1129(b)(1)...........................................................................................49

11 U.S.C. § 1129(b)(2)(B)(i)...................................................................................51

11 U.S.C. § 1129(b)(2)(B)(ii)..................................................................................51

11 U.S.C. § 1129(b)(2)(C)(ii)..................................................................................51

15 U.S.C. § 77e.......................................................................................................52

28 U.S.C. § 1930.....................................................................................................48

**Rules**

Fed. R. Bankr. P. 3020(e).........................................................................................53

Fed. R. Bankr. P. 6004(h)........................................................................................53

Fed. R. Bankr. P. 6006(d)........................................................................................53

**Other Authorities**

H.R. Rep. No. 95-595 (1977)................................................................................9, 12

S. Rep. No. 95-989 (1978)......................................................................................12

The above-captioned debtors and debtors in possession (collectively, the "Debtors"

or "FullBeauty") submit this memorandum of law in support of approval of the *Disclosure*

*Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of FULLBEAUTY Brands*

*Holdings Corp. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket

No. 14] (as modified, amended, or supplemented from time to time, the "Disclosure Statement")

and confirmation of the *First Amended Joint Prepackaged Chapter 11 Plan of Reorganization of*

*FULLBEAUTY Brands Holdings Corp. and Its Debtor Affiliates Pursuant to Chapter 11 of the*

*Bankruptcy Code* [Docket No. 13] (as modified, amended, or supplemented from time to time,

the "Plan").[2]

## **Preliminary Statement**

1.      The Bankruptcy Court should approve the Disclosure Statement and confirm the

Plan, which will restructure the Debtors' liabilities in a manner designed to maximize stakeholder

value.  Prolonged chapter 11 cases would severely impair the Debtors' business operations, which

would likely threaten the viability of their business as a going concern, and would significantly

constrain liquidity, thus requiring the Debtors to obtain debtor-in-possession financing for these

cases and bear the administrative costs associated therewith.  Moreover, a protracted chapter 11

case may result in vendor contraction, which would reduce the Debtors' access to liquidity in

connection with its consensual cash collateral order.  As a result, to expeditiously confirm and

---

[2]      A detailed description of the facts and circumstances surrounding the Debtors' chapter 11 cases is set forth in
greater detail in the *Declaration of Robert Riesbeck, Chief Financial Officer of FULLBEAUTY Brands Holdings
Corp., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 10] (the "First Day Declaration").
On February 3, 2019, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Directing Joint
Administration of Their Related Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 2].  The Debtors
are operating their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.
No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases, and no committees
have been appointed or designated.  Capitalized terms used but not otherwise defined herein have the meanings
ascribed to such terms in the First Day Declaration, the Plan, or the Disclosure Statement, as applicable.  The
rules of interpretation set forth in Article I.B. of the Plan apply.

consummate the Plan, the Debtors engaged in significant efforts prepetition to forge consensus with their stakeholders. These efforts were successful:

2.     Prior to solicitation, the Restructuring Support Agreement enjoyed the overwhelming support of 100% of the FILO Lenders, approximately 99% of the First Lien Lenders, approximately 95% of the Second Lien Lenders, and the Sponsors. Since completing solicitation, approximately one week prior to filing these Chapter 11 Cases, the Debtors have achieved the monumental task of obtaining 100% of its lenders to vote on the Plan. The Plan represents the culmination of significant efforts by multiple parties in interest to reach a fair and equitable resolution of a myriad of complex business and legal issues. These efforts have resulted in a Plan that provides significant value for the Debtors' stakeholders and a vehicle for the Debtors' successful emergence from chapter 11.

3.     Similar to prior cases before this Court, the Debtors provided prepetition notice of the Plan, Disclosure Statement, and Combined Hearing Notice. But the Debtors here have also gone a few steps further by posting various key documents (*i.e.*, the Plan, Disclosure Statement, Combined Hearing Notice, Plan Supplements, the proposed first day motions, and this confirmation brief and related declarations) on the first and second lien lenders' site, as well as the Prime Clerk public website (which the Debtors launched prepetition). The Debtors also directed Prime Clerk to serve parties with notice of such documents as they were posted to the lender and Prime Clerk sites. Specifically, the Debtor, through their advisors, provided the following notice:

- On January 3, 2019, FullBeauty issued a press release, which announced that it entered into the Restructuring Support Agreement with its funded debtholders.

- On January 4, 2019, FullBeauty served actual notice of the Combined Hearing Notice, Plan, and Disclosure Statement on certain parties in interest.[3]

---

[3]    Specifically, the Debtors provided notice to the: (i) FILO Lenders; (ii) First Lien Lenders; (iii) Second Lien Lenders; (iv) top thirty general unsecured creditors; (v) equity sponsors; (vi) U.S. Attorney's Office for the

- On January 4, 2019, constructive notice of the Combined Hearing Notice was published in *The Wall Street Journal* and *Financial Times International Edition*.

- On January 6, 2019, FullBeauty posted the Combined Hearing Notice, Plan, and Disclosure Statement to (i) the public side of the first and second lien lenders' site, and (ii) the Prime Clerk public website.

- On January 16, 2019 and January 31, 2019, FullBeauty posted the Plan Supplements to: (i) the public side of the first and second lien lenders' site, and (ii) the Prime Clerk public website.[4]

4.      The Debtors also maintained constant contact with its key constituents and the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") to resolve possible objections to the Plan. Specifically, counsel for the Debtors reached out to the U.S. Trustee on January 4, 2019 to notify it about the bankruptcy process and describe the Plan and notice thereof. A few days later, on January 7, counsel hand-delivered a binder containing the Plan, Disclosure Statement, and Combined Hearing Notice and subsequently convened a call with the U.S. Trustee to discuss the manner by which FullBeauty proposed to effectuate the Plan. A few weeks later, on January 23, counsel hand-delivered a binder containing the first Plan Supplement and on January 24, hand-delivered a binder containing a draft of the proposed first day pleadings. On January 29, counsel followed-up with the U.S. trustee and emailed updated first day pleadings.

---

S.D.N.Y.; (vii) secretaries of state for which FullBeauty and its affiliates are organized; (viii) I.R.S.; (ix) S.E.C.; (x) state attorneys general for all states in which FullBeauty conducts business; and (xi) director and officer insurers. FullBeauty asked to have service completed on all employee equity holders on January 7, to allow management to appropriately communicate with employees about the process.

[4]     FullBeauty also served notice of the Plan Supplement on the: (i) FILO Lenders; (ii) First Lien Lenders; (iii) Second Lien Lenders; (iv) top thirty general unsecured creditors; (v) equity sponsors; (vi) U.S. Attorney's Office for the S.D.N.Y.; (vii) secretaries of state for which FullBeauty and its affiliates are organized; (viii) I.R.S.; (ix) S.E.C.; (x) state attorneys general for all states in which FullBeauty conducts business; and (xi) director and officer insurer.

5.    And on February 1, 2019 counsel hand-delivered a binder containing the second

plan supplement.  The Debtors are pleased to report that they have not received any objections,

other than the from U.S. Trustee.

6.    The Debtors and their advisors have followed a very fair process with unflinching

transparency.  Although the Debtors are seeking to have their Plan approved on the first day of

these Chapter 11 Cases, the Debtors submit that there are significant factors that warrant such

relief, including the Debtors' inability to remain in chapter 11 for a long period of time, the fact

that the Debtors have provided notice to the world of its Plan and various plan supplements with

post-reorganization documents, and the fact that every impaired party entitled to vote has voted in

favor of the Plan.  The unanimous support of the Plan by each member of the Voting Classes

represents a mandate for the Debtors to proceed with the restructuring on the timeline necessitated

by the facts of these Chapter 11 Cases.

### Relevant Background Information

**I.    The Restructuring Transactions and Due Process Safeguards.**

7.    Over the past several months, the Debtors engaged in discussions with all of their

major stakeholders, including the first-in, last-out lenders (the "FILO Lenders"), an ad hoc group

of first lien lenders (the "Ad Hoc Group of First Lien Lenders"), an ad hoc group of second lien

lenders (the "Ad Hoc Group of Second Lien Lenders"), and the equity sponsors (the "Sponsors",

and collectively the "RSA Parties").  After months of negotiations, the RSA Parties entered into

that certain restructuring support agreement, dated December 18, 2018, whereby 100% of the

FILO Lenders, approximately 99% of the First Lien Lenders, approximately 95% of the Second

Lien Lenders, and the Sponsors executed the Restructuring Support Agreement.  Thereafter, the

Debtors, the RSA Parties, and the prepetition ABL Lenders, negotiated the forms of the Disclosure

Statement and the Plan, the material terms of which are summarized as follows:[5]

- Holders of Allowed General Administrative Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, Allowed Other Priority Claims, and Allowed Professional Claims will (i) be paid in full in Cash in the ordinary course of business, (ii) be Reinstated, (iii) receive the collateral securing the Claim, or (iv) be otherwise rendered Unimpaired, each as applicable;

- Holders of Allowed ABL Claims shall be paid in full in Cash using the proceeds from the Exit ABL Facility and, in the case of outstanding letters of credit, each such letter of credit shall be (i) cancelled and replaced, (ii) cash collateralized in accordance with section 2.03(f) of the ABL Credit Agreement, or (iii) backstopped or otherwise treated in a manner satisfactory to the applicable L/C Issuer (as defined in the ABL Credit Agreement) in its sole and absolute discretion;

- Holders of Allowed FILO Claims will receive their Pro Rata Share of $75 million of the New First Lien Term Loan plus accrued interest;

- Holders of Allowed First Lien Claims shall receive, in full and final satisfaction of their First Lien Claims, their Pro Rata Share of the following: (i) $175 million in aggregate principal amount of the New First Lien Term Loan; and (ii) subject to Article III.B.6.c of the Plan, at least 87.5% of the New Common Stock, subject to dilution by the Option Rights, Warrants, and Management Incentive Plan; *provided* that a Holder of an Allowed First Lien Claim may have, by selecting the appropriate box on the Class 5 Ballot, elect to receive in lieu of New Common Stock (which forfeited shares shall be distributed to non-electing Holders of Allowed First Lien Claims based on their Pro Rata Share) a principal amount of the New Junior Loan that is equal to 85% of the Exchange Benchmark Value (which is $79 million or the mid-point range of the Plan Equity Value as defined herein) of such Holder's original New Common Stock distribution (i.e., a 15% discount to the Exchange Benchmark Value of its original New Common Stock distribution); *provided*, *further*, that electing Holders of Allowed First Lien Claims shall not receive more than $35 million in aggregate principal amount of the New Junior Loan;[6]

- Holders of Allowed Second Lien Claims shall receive, in exchange for full and final satisfaction, settlement, release, and discharge of their Second Lien Claim, the following: (i) because Class 6 voted to accept the Plan, its Pro Rata Share of

---

[5]   Each description of the Restructuring Support Agreement, the Plan, and the Disclosure Statement herein is qualified in its entirety by the terms of the Restructuring Support Agreement, the Plan, and the Disclosure Statement, as applicable.

[6]   Holders of Allowed First Lien Claims elected to "flip up" and receive approximately $12 million in aggregate principal amount of the New Junior Loan made available to Class 5 in lieu of their Pro Rata Share of New Common Stock.

(a) $15 million of the New Junior Loan, (b) 10% of the New Common Stock, subject to dilution by the Option Rights, Warrants, and Management Incentive Plan, and (c) the Second Lien Warrant Package as set forth in the Plan and the Warrant Documents.[7]

- Holders of Allowed General Unsecured Claims (other than any Sponsor Claims) shall have such Claims Reinstated;

- Intercompany Claims shall receive be Reinstated, compromised, or cancelled at the election of the Debtors or the Reorganized Debtors, as applicable, and in accordance with the Restructuring Support Agreement;

- Holders of Interests in Holdings shall have such Interests cancelled and extinguished and be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to Holders of Interests in Topco or Holdings on account of any such Interests; and

- Holders of Intercompany Interests shall have such Intercompany Interest Reinstated, compromised, or cancelled at the election of the Debtors or the Reorganized Debtors, as applicable, and in accordance with the Restructuring Support Agreement.

- For the avoidance of doubt, all Sponsor Claims shall be waived, cancelled and/or discharged in accordance with the Plan.

8.      Thereafter, the Debtors commenced a prepetition solicitation of the FILO Lenders, the First Lien Lenders, and the Second Lien Lenders.

## II.      The Plan Has the Unanimous Support of the Debtors' Creditors.

9.      Based upon the *Declaration of Craig Johnson of Prime Clerk LLC Regarding Solicitation of Votes and Tabulation of Ballots Cast on the Joint Prepackaged Chapter 11 Plan of Reorganization* [Docket No. 18] (the "Voting Report"), 100% of Holders of Claims entitled to vote on the Plan voted and unanimously voted to accept the Plan:

---

[7]   In accordance with Article II.B.5.c of the Plan, if Class 6 voted to reject the Plan, no Holder of an Allowed Second Lien Claim would be entitled to receive any distribution under the Plan, and the 10% of the New Common Stock would have been reallocated to the Holders of Allowed First Lien Claims in Class 5 and distributed in accordance with Article III.B.5.c of the Plan.

| Class | Class Description | Number Accepting % | Number Rejecting % | Amount Accepting % | Amount Rejecting % | Class Voting Result |
|-------|-------------------|--------------------|--------------------|--------------------|--------------------|---------------------|
| Class 4 | FILO Claims | 100% | 0% | 100% | 0% | Accept |
| Class 5 | First Lien Claims | 100% | 0% | 100% | 0% | Accept |
| Class 6 | Second Lien Claims | 100% | 0% | 100% | 0% | Accept |

10.    Because of the 100% of votes accepting the Plan, the widespread and concerted support of the Plan by impaired creditors and other parties in interest, and the paucity of objections filed in these Chapter 11 Cases, the Plan is in the best interests of the Debtors' estates, creditors, and other stakeholders and should be approved.

### Argument

11.    This brief is divided into two parts. *First*, the Debtors request approval of the Disclosure Statement and a finding that the Debtors satisfied all notice requirements required under the Bankruptcy Code. *Second*, the Debtors present their "case in chief" that the Plan satisfies section 1129 of the Bankruptcy Code by a preponderance of the evidence, and, accordingly, request that the Bankruptcy Court confirm the Plan.[8]   Additionally, in support of the Plan, the Debtors have filed contemporaneously herewith the following declarations:

- *Declaration of Robert J. Riesbeck in Support of Confirmation of the First Amended Joint Prepackaged Chapter 11 Plan of Reorganization of FULLBEAUTY Brands*

---

[8]    *See In re Bally Total Fitness of Greater N.Y., Inc.*, No. 07-12395 (BRL), 2007 WL 2779438, at *3 (Bankr. S.D.N.Y. Sept. 17, 2007) ("The Debtors, as proponents of the plan, have the burden of proving the satisfaction of the elements of Sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence."); *see also Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd. II* (*In re Briscoe Enters., Ltd. II*), 994 F.2d 1160, 1165 (5th Cir. 1993) ("The combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown." (internal footnote omitted).

> *Holdings Corp. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "<u>Riesbeck Declaration</u>");

- *Declaration of Emilie Arel in Support of Confirmation of the First Amended Joint Prepackaged Chapter 11 Plan of Reorganization of FULLBEAUTY Brands Holdings Corp. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "<u>Arel Declaration</u>");

- *Declaration of Joshua Abramson in Support of Confirmation of the First Amended Joint Prepackaged Chapter 11 Plan of Reorganization of FULLBEAUTY Brands Holdings Corp. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "<u>Abramson Declaration</u>");

- *Declaration of Jesse DelConte in Support of Confirmation of the First Amended Joint Prepackaged Chapter 11 Plan of Reorganization of FULLBEAUTY Brands Holdings Corp. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "<u>DelConte Declaration</u>"); and

- *Declaration of Craig E. Johnson of Prime Clerk LLC Regarding The Solicitation of Votes and Tabulation Of Ballots Cast on the Joint Prepackaged Chapter 11 Plan Of Reorganization of Fullbeauty Brands Holdings Corp. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "<u>Johnson Declaration</u>").

## I.  The Disclosure Statement Contains "Adequate Information" As Required Pursuant to Sections 1125 and 1126 of the Bankruptcy Code.

12.     To approve a prepetition solicitation of votes on the Plan, the Bankruptcy Court must determine whether the solicitation complied with sections 1125 and 1126(b) of the Bankruptcy Code and Bankruptcy Rules 3017(d), 3017(e), 3018(b), and 3018(c).

13.     Section 1125(g) of the Bankruptcy Code provides that:

> [A]n acceptance or rejection of the plan may be solicited from a holder of a claim or interest if such solicitation complies with applicable nonbankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable nonbankruptcy law.[9]

14.     Section 1126(b) of the Bankruptcy Code provides that:

> [A] holder of a claim or interest that has accepted or rejected the plan before the commencement of the case under this title is deemed to have accepted or rejected such plan, as the case may be, if—

---

[9]    11 U.S.C. § 1125(g).

(1) the solicitation of such acceptance or rejection was in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or (2) if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title.[10]

15.    A prepetition solicitation must, therefore, either comply with applicable federal or state securities laws and regulations (including the registration and disclosure requirements thereof) or, if such laws and regulations do not apply, the solicited holders must receive "adequate information" as defined in section 1125(a) of the Bankruptcy Code.  As discussed below, the Debtors satisfied sections 1125(g) and 1126(b) of the Bankruptcy Code.

### A.    The Disclosure Statement Contains Adequate Information.

16.    The primary purpose of a disclosure statement is to provide "adequate information" to allow parties entitled to vote on a proposed plan to make an informed decision about whether to vote to accept or reject the plan.[11]  "Adequate information" is a flexible standard, based on the facts and circumstances of each case.[12]  Courts within the Second Circuit and elsewhere acknowledge that determining what constitutes adequate information for the purpose of satisfying

---

[10]  11 U.S.C. § 1126(b).

[11]  *See In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994); *see also In re Amfesco Indus., Inc.*, No. 88-2952 (JBW), 1988 WL 141524, at *5 (E.D.N.Y. Dec. 21, 1988) ("Under section 1125 of the Bankruptcy Code, a reasonable and typical creditor or equity security holder must be provided 'adequate information' to make an informed judgment regarding a proposed plan." (citation omitted)); *BSL Op. Corp. v. 125 E Taverns, Inc. (In re BSL Op. Corp.)*, 57 B.R. 945, 950 (Bankr. S.D.N.Y. 1986) ("Section 1125 might be described as a non-rigid 'how-to-inform' section . . . . A disclosure statement . . . is evaluated only in terms of whether it provides sufficient information to permit enlightened voting by holders of claims or interests.").

[12]  11 U.S.C. § 1125(a)(1) ("'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records."); *see also In re Ionosphere Clubs, Inc.*, 179 B.R. 24, 29 (Bankr. S.D.N.Y. 1995) (holding that adequacy of a disclosure statement "is to be determined on a case-specific basis under a flexible standard that can promote the chapter 11 policy of fair settlement through a negotiation process between informed interested parties" (internal citation omitted)); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 979 (Bankr. N.D.N.Y. 1988) (holding that the adequacy of a disclosure statement is to be "determined on a case-specific basis under a flexible standard that can promote the policy of chapter 11 towards fair settlement through a negation process between informed interested parties").

section 1125 of the Bankruptcy Code resides within the broad discretion of the court.[13]

Specifically, the Disclosure Statement contains a number of categories of information that courts

consider "adequate information," including, without limitation:

| Category | Description | Location in Disclosure Statement |
|---|---|---|
| Debtors' Corporate History, Structure, and Business Overview | An overview of the Debtors' corporate history, business operations, organizational structure, and capital structure. | Article IV |
| Prepetition Restructuring Efforts | An overview of the Debtors' restructuring process that led to the Restructuring Support Agreement and the Plan, including the Debtors working constructively with their secured creditors to negotiate forbearance agreements to provide the parties with sufficient runway to develop and document the Restructuring Transactions contemplated therein. | Article V |
| Liquidation Analysis | An analysis of the liquidation value of the Debtors. | Article II, Exhibit C |
| Valuation Analysis | An analysis of the value of the Debtors and their assets and business. | Article II, Exhibit D |
| Financial Projections | An overview of the Debtors' financial projections for the fiscal years 2018 through 2022. | Article II, Exhibit E |

---

13  *See, Kirk v. Texaco, Inc.*, 82 B.R. 678, 682 (S.D.N.Y. 1988) ("The legislative history could hardly be more clear in granting broad discretion to bankruptcy judges under § 1125(a): 'Precisely what constitutes adequate information in any particular instance will develop on a case-by-case basis. Courts will take a practical approach as to what is necessary under the circumstances of each case.'" (quoting H.R. Rep. No. 95-595, 95th Cong., 1st Sess., 408–09 (1977))); *see also In re PC Liquidation Corp.*, 383 B.R. 856, 865 (E.D.N.Y. 2008) (explaining that "what constitutes adequate information in any particular situation is determined on a case-by-case basis . . . with the determination being largely within the discretion of the bankruptcy court"). This grant of discretion was intended to permit courts to tailor the disclosures made in connection with a plan of reorganization to facilitate the efficient reorganization of debtors in a broad range of businesses and circumstances. *See* H.R. Rep. No. 95-595, at 409 (1977) ("In reorganization cases, there is frequently great uncertainty. Therefore, the need for flexibility is greatest.").

| Category | Description | Location in Disclosure Statement |
|---|---|---|
| Summary of the Plan | An overview of the Plan and the provisions contained therein. | Articles II, VI |
| Solicitation and Voting Procedures | A description of the procedures for soliciting votes to accept or reject the Plan and voting on the Plan. | Article III |
| Risk Factors | Certain risks associated with the Debtors' businesses, as well as certain risks associated with forward-looking statements and an overall disclaimer as to the information provided by and set forth in the Disclosure Statement. | Article VII |
| Confirmation of the Plan | Confirmation procedures and statutory requirements for confirmation and consummation of the Plan, including a Liquidation Analysis and Financial Projections. | Article VIII, Exhibit C, Exhibit E |
| Important Securities Laws Disclosures | A description of the applicability of section 1145 of the Bankruptcy Code and the issuance of New Common Stock and Warrants under the Plan. | Article IX |
| Certain United States Federal Income Tax Consequences of the Plan | A description of certain U.S. federal income tax law consequences of the Plan. | Article X |
| Recommendation | A recommendation by the Debtors that Holders of Claims in the Voting Classes should vote to accept the Plan. | Article XI |

17.     In addition, prior to the solicitation, the Disclosure Statement and the Plan were subject to review and comment by the signatories to the Restructuring Support Agreement. No party has asked for additional information nor has any party disputed that the Disclosure Statement contained information sufficient for impaired claimants to be able to cast an informed vote on the Plan. Accordingly, the Debtors submit that the Disclosure Statement contains adequate

information within the meaning of section 1125(a) of the Bankruptcy Code in satisfaction of section 1126(b)(2) and should therefore be approved.

## II.     The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code.

### A.     The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).

18.     Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."[14]  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a plan of reorganization, respectively.[15]  As explained below, the Plan complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code as well as other applicable provisions.

### B.     The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

19.     The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.[16]

---

[14]  11 U.S.C. § 1129(a)(1).

[15]  S. Rep. No. 95-989, at 126 (1978); H.R. Rep. No. 95-595, at 412 (1977); *see also Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636, 648-49 (2d Cir. 1988) (suggesting that Congress intended the phrase "'applicable provisions' in [section 1129(a)(1)] to mean provisions of Chapter 11 . . . such as section 1122 . . . ."); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("The legislative history of § 1129(a)(1) explains that this provision embodies the requirements of §§ 1122 and 1123, respectively, governing classification of claims and the contents of the Plan." (citations omitted)); *In re Simplot*, No. 06-00002 (TLM), 2007 WL 2479664, at *14 (Bankr. D. Idaho Aug. 28, 2007) (noting that the objective of section 1129(a)(1) is to ensure compliance with the sections of the Bankruptcy Code governing classification and the contents of a plan reorganization).

[16]  11 U.S.C. § 1122(a).

20.    The substantial similarity requirement does not mean that claims or interests within a particular class must be identical or that all similarly situated claims receive the same treatment under a plan.[17]   Indeed, as one court in this district has stated, "a majority of both cases and commentators have rejected the concept that all creditors of equal rank must receive equal treatment."[18]   Courts generally will approve placement of similar claims in different classes, provided that a "rational" or "reasonable" basis exists for doing so.[19]   Recognizing this flexibility, courts have long held that "the only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan."[20]   Courts have identified several grounds justifying the separate classification of claims, including where members of a particular class possess different legal rights[21] and where the debtors have valid business reasons for separate classification.[22]

---

[17]    *See In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 310 (Bankr. S.D.N.Y. 2016); *Drexel*, 138 B.R. at 757 (Bankr. S.D.N.Y. 1992) ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims.  It does not require that similar classes be grouped together, but merely that any groups be homogenous or share some attributes." (citations omitted)).

[18]    *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989).

[19]    *See, e.g., In re Lightsquared Inc.*, 513 B.R. 56, 82-83 (Bankr. S.D.N.Y. 2014) ("Courts that have considered the issue [of classification], including the Court of Appeals for the Second Circuit as well as numerous courts in this District, have concluded that the separate classification of otherwise substantially similar claims and interests is appropriate so long as the plan proponent can articulate a 'reasonable' (or 'rational') justification for separate classification." (collecting cases)); *In re Reader's Digest Ass'n, Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010) Hr'g Tr. 122:25-123:4 (approving a plan of reorganization where the debtor provided a reasonable basis for differing classification of general unsecured claims); *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 957 (2d Cir. 1993) (finding separate classification appropriate because classification scheme and "discriminatory terms of the Plan attacked by [plan opponents] ha[d] a rational basis"); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) ("[T]he proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case"); *In re Ionosphere Clubs*, 98 B.R. at 177–78 (same).

[20]    *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007); *see also Bos. Post Rd. Ltd. P'ship v. FDIC (In re Bos. Post Rd. Ltd. P'ship)*, 21 F.3d 477, 481 (2d Cir. 1994) (holding that similar claims may be separately classified unless the sole purpose of separate classification is to engineer an assenting impaired class).

[21]    *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 714, 715 (Bankr. S.D.N.Y. 1992).

[22]    *See Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Ct., New York, N.Y. (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996) (approving separate classification of similarly-situated claims where supported by credible proof to justify separate classification of unsecured claims); *Bally Total Fitness*, 2007 WL 2779438, at *3.

21.    The Plan's classification of Claims and Interests, as set forth in Article III, satisfies

the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and

Interests into ten (10) separate Classes, with the Claims and Interests in each Class either differing

legally and factually from those in other Classes or being grouped separately based on other

relevant criteria.   Specifically, the Plan provides for the separate classification of Claims and

Interests into the following Classes:

       a.      <u>Class 1</u>:  Other Secured Claims;

       b.      <u>Class 2</u>:  Other Priority Claims;

       c.      <u>Class 3</u>:  ABL Claims;

       d.      <u>Class 4</u>:  FILO Claims;

       e.      <u>Class 5</u>:  First Lien Claims;

       f.      <u>Class 6</u>:  Second Lien Claims;

       g.      <u>Class 7</u>:  General Unsecured Claims;

       h.      <u>Class 8</u>:  Intercompany Claims;

       i.      <u>Class 9</u>:  Equity Interests; and

       j.      <u>Class 10</u>:  Intercompany Interests.

22.    Claims and Interests assigned to each particular Class described above are

substantially similar to the other Claims and Interests in such Class.  In addition, valid business,

legal, and factual reasons justify the separate classification of the particular Claims or Interests

into the Classes created under the Plan, and no unfair discrimination exists between or among

Holders of Claims and Interests.  Namely, the Plan separately classifies the Claims and Interests

because each Holder of such Claims or Interests may hold or have held rights in the Debtors'

estates legally dissimilar to the rights that Holder of Claims or Interests in other classes may hold

or have held or because substantial administrative convenience resulted from such classification.

For example, Claims (rights to payment) are classified separately from Interests (representing ownership in the business). Secured Claims are classified separately from General Unsecured Claims because the Debtors' obligations with respect to the former are secured by collateral. Secured Claims are further grouped into Classes based on, for instance, the relative priority and differing legal rights of such Claims. Accordingly, the Debtors respectfully submit that the Plan satisfies section 1122(a) of the Bankruptcy Code.

### C.    The Plan Satisfies the Mandatory Requirements of Section 1123(a) of the Bankruptcy Code.

23.    Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must satisfy. As detailed below, the Debtors respectfully submit that the Plan satisfies each of these requirements.

### 1.    Designation of Classes of Claims and Interests (Section 1123(a)(1)).

24.    Section 1123(a)(1) of the Bankruptcy Code requires that a plan designate, with specified exceptions, classes of claims and interests subject to section 1122 of the Bankruptcy Code.[23]    Article III of the Plan properly designates Classes of Claims and Interests and thus satisfies this requirement. Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(a)(1) of the Bankruptcy Code.

### 2.    Specification of Unimpaired Classes (§ 1123(a)(2)).

25.    Section 1123(a)(2) of the Bankruptcy Code requires that a plan "specify any class of claims or interests that is not impaired under the plan."[24]    Article III.A of the Plan identifies Classes 1, 2, 3, and 7 as Unimpaired and preserves optionality for the Debtors to render Classes 8

---

23    11 U.S.C. § 1123(a)(1).

24    11 U.S.C. § 1123(a)(2).

and 10 Unimpaired.  Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(a)(2) of the Bankruptcy Code.

### 3.    Treatment of Impaired Classes (Section 1123(a)(3)).

26.    Section 1123(a)(3) of the Bankruptcy Code requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan."[25]  Article III.A of the Plan identifies Classes 4, 5, 6, and 9 as Impaired and preserves optionality for the Debtors to render Classes 8 and 10 Impaired.  Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(a)(3) of the Bankruptcy Code.

### 4.    Equal Treatment Within Classes (Section 1123(a)(4)).

27.    Section 1123(a)(4) of the Bankruptcy Code requires that a plan "provide the same treatment for each claim or interest of a particular Class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[26]  Article III of the Plan provides that Holders of Allowed Claims or Interests in a particular Class will receive the same treatment as other Holders in such Class, except to the extent that the Debtors and any such Holder agree to less favorable treatment.  Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(a)(4) of the Bankruptcy Code.

### 5.    Means for Implementation (Section 1123(a)(5)).

28.    Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate means" for its implementation.[27]  Article IV of the Plan, among other provisions, provide for the

---

[25]  11 U.S.C. § 1123(a)(3).

[26]  11 U.S.C. § 1123(a)(4).

[27]  11 U.S.C. § 1123(a)(5).

means by which the Plan will be implemented. Among other things, Article IV of the Plan provides for the following:

     a.     the restructuring of the prepetition Secured Lender Claims;

     b.     the continued corporate existence of the Debtors as Reorganized Debtors as set forth in the Plan Supplement;

     c.     the treatment of Intercompany Interests and Intercompany Claims;

     d.     the Debtors' entry into the Exit ABL Documents, New First Lien Term Loan Documents, and New Junior Loan Documents;

     e.     the use of the Reorganized Debtors' cash balances for distributions under the Plan;

     f.     the issuance and distribution of the New Common Stock and Warrants;

     g.     the circumstances pursuant to which Debtors will provide the Option Rights and enter into Management Incentive Plan and the Stockholders Agreement;

     h.     the entry into the Advisory Services Agreement; and

     i.     the creation of the New Board and the continuation of substantially all of the Debtors' existing management.

Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.

### 6.     Issuance of Non-Voting Securities (Section 1123(a)(6)).

29.     Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities.[28] The Stockholders Agreement and the Reorganized Debtors' organizational documents prohibit the issuance of non-

---

[28] 11 U.S.C. § 1123(a)(6).

voting securities.[29]    Accordingly, the Debtors respectfully submit that Plan satisfies section 1123(a)(6) of the Bankruptcy Code.

### 7.    Directors and Officers (§ 1123(a)(7)).

30.    Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selecting of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy."[30] The selection of the initial directors of the Reorganized Debtors was, is, and will be consistent with the interests of Holders of Claims and Interests and public policy.    Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.

### D.    The Plan Complies With the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.

31.    Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.    Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may (a) impair or leave unimpaired any class of claims or interests, (b) provide for the assumption or rejection of executory contracts and unexpired leases, (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates, and (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11.[31]

32.    The Plan is consistent with section 1123(b) of the Bankruptcy Code.    Under Article III of the Plan, Classes 1, 2, 3, and 7 are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims within such classes.    On the other

---

29    *See* Plan Art. IV.J.

30    11 U.S.C. § 1123(a)(7).

31    11 U.S.C. § 1123(b)(1)–(3), (6).

hand, Classes 4, 5, 6, and 9 are Impaired because the Plan modifies the rights of the Holders of

Claims or Interests, as applicable, within such Classes as contemplated by section 1123(b)(1) of

the Bankruptcy Code.[32]  Classes 8 and 10 are either Impaired or Unimpaired, based on whether

the Debtors determine to Reinstate, compromise, or cancel such Claims or Interests without

distribution.  In addition and under section 1123(b)(2) of the Bankruptcy Code, Article V.A of the

Plan provides for the deemed assumption of all Executory Contracts and Unexpired Leases without

the need for any further notice to, or action, order, or approval of the Bankruptcy Court, as of the

Effective Date under section 365 of the Bankruptcy Code.  Finally, for the reasons set forth below,

the Plan's release, exculpation, and injunction provisions are consistent with section 1123(b) of

the Bankruptcy Code.[33]  Accordingly, the Debtors respectfully submit that the Plan satisfies

section 1123(b) of the Bankruptcy Code.

### 1.    The Debtor Release Is Appropriate and Complies With the Bankruptcy Code.

33.    Article IX.B of the Plan provides for releases by the Debtors (the "Debtor Release")

of claims and causes of action against the Released Parties.  For the reasons discussed herein, the

Debtor Release is the product of arm's-length negotiations, is critical to obtaining support for the

Plan and Restructuring Support Agreement from various constituencies, and is in the best interests

of the Estates.  Indeed, the Debtor Release was negotiated in connection with the other terms of

the Plan and Restructuring Support Agreement and is an indispensable component to achieving

final resolution of potential disputes that would otherwise negatively affect these Chapter 11 Cases

and the available recoveries under the Plan.

---

[32]  *Id.*

[33]  *See* Riesbeck Decl., ¶¶ 10-20.

34.     It is well-settled that a debtor is authorized to settle or release its claims in a chapter 11 plan.[34]  Such releases are granted by courts in the Second Circuit where they are in the "best interests of the estate."[35]  In determining whether such a release is within the best interests of the estate, the court need not conduct a "'mini-trial' of the facts or the merits underlying [each] dispute" and "the settlement need not be the best that the debtor could have obtained."[36]  Under this standard, the "court should instead 'canvass the [settled] issues [to] see whether the settlement falls below the lowest point in the range of reasonableness.'"[37]  Courts in the Second Circuit consider the following factors to determine whether a settlement is within the range of reasonableness:  (a) the balance between the claim's possibility of success and the settlement's benefits; (b) the likelihood of complex and protracted litigation, including attendant expense, inconvenience, and delay; (c) the interests of creditors; (d) whether other interested parties support the settlement; (e) the nature and breadth of releases; (f) the competency and experience of counsel supporting, and the experience and knowledge of the judge reviewing, the settlement; and (g) the extent to which the settlement is the product of arm's-length bargaining.[38]

35.     Here, the Debtor Release is a vital component of the Plan and constitutes a sound exercise of the Debtors' business judgment.  During the course of the Restructuring Support Agreement and Plan negotiations, it became apparent that the Debtor Release would be a necessary

---

[34] *See, e.g., In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 263 n. 289, 269 (Bankr. S.D.N.Y. 2007) (holding the debtor may release its own claims); *In re Oneida Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (noting that a debtor's release of its own claims is permissible).

[35] *See In re Charter Commc'ns*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009) ("When reviewing releases in a debtor's plan, courts consider whether such releases are in the best interest of the estate." (citation omitted)).

[36] *In re NII Holdings, Inc.*, 536 B.R. 61, 99 (Bankr. S.D.N.Y. 2015) (*quoting Adelphia*, 368 B.R. at 225).

[37] *Id.* at 100 (*quoting Adelphia*, 368 B.R. at 225 (citation omitted)).

[38] *Id.* (citing *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007)).

condition of the Restructuring Support Agreement and consummation of the Restructuring Transactions embodied in the Plan. Without the Debtor Release, the Debtors' and their stakeholders would not have been able to secure the substantial benefits provided by the Plan, including the significant reduction of debt. In consideration for the Debtor Release, the Debtors and their estates will receive reciprocal releases from potential claims and causes of action of the Releasing Parties in addition to the significant benefits provided to the Debtors through this consensual prepackaged bankruptcy. Moreover, the Debtors appointed an independent director to analyze and ensure that the terms of the Restructuring Transactions, including the Debtor Releases, were in the Debtors' best interest. The Debtors have reviewed and scrutinized potential claims that might exist and determined in their business judgment that they do not currently have any viable claims or causes of action of any kind against any of the Released Parties that are appropriate to preserve in light of the benefits provided by the Plan. For these reasons, the Debtors' agreement to provide the Debtor Release constitutes a sound exercise of the Debtors' business judgment. Accordingly, there is ample justification for providing the Debtor Release, and it should be approved.

### 2.    The Third-Party Release Is Wholly Consensual And Should Be Approved.

36.    Article IX.C of the Plan includes a consensual third-party release among the Debtors and the Releasing Parties (the "Third-Party Release").

37.    Courts in the Second Circuit have explained that a *consensual* third-party release may be approved with the consent of the affected party.[39] Consistent with this instruction, courts

---

[39]    *E.g.*, *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) ("Nondebtor releases may also be tolerated if the affected creditors consent." (citing *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir. 1993)); *Adelphia*, 368 B.R. at 268 ("The Seventh Circuit held in *Specialty Equipment* that consensual releases are permissible, and the *Metromedia* court did not quarrel with that view." (citation and footnote omitted)); *In re Spiegel, Inc.*, No. 03-11540 (BRL), 2006 WL 2577825, at *7 (Bankr. S.D.N.Y. Aug. 16, 2006) (holding that

in this jurisdiction have held that "[r]eleases can be granted by consent and that consent can be established by a vote in favor of the plan, at least where the consequences are plainly and unambiguously expressed to the voting creditor."[40]   In short, courts generally agree that an affirmative vote to accept a plan that contains a third-party release constitutes an express consent to such release.[41]   Here, Article IX.C of the Plan provides for the "Release by the Releasing Parties," which is a consensual release among the parties to the Restructuring Support Agreement. The Disclosure Statement, Ballots, and other solicitation materials distributed to Holders of Claims entitled to vote on the Plan included an exact duplication of this provision, among others, and the Ballots clearly informed Holders of Claims entitled to vote of the steps they should take if they disagreed with the release.  The affected parties were on notice of the Third-Party Release.  By voting to accept the Plan, these parties have unambiguously consented to the releases.

38.    Furthermore, the Debtors carved out specific parties in interest from the Third-Party Releases to ensure that such releases were indisputably consensual.  All Holders of Claims that both voted to reject the Plan and opted out of the releases as well as Holders of Claims and Interests

---

nondebtor releases are tolerated if the creditors consent (citing *Metromedia*, 416 F.3d at 142)), *appeal dismissed*, No. 06-09385 (NRB), 2007 WL 656902 (S.D.N.Y. Feb. 28, 2007), *aff'd*, 269 F. App'x 56 (2d Cir. 2008); *Oneida*, 351 B.R. at 94 (approving consensual release provisions (citing *Metromedia*, 416 F.3d at 142)).

[40]   *E.g.*, *In re BearingPoint, Inc.*, No. 09-10691 (REG) (Bankr. S.D.N.Y Dec. 17, 2009) Hr'g Tr. 62:16-19; *see also In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 271 (Bankr. S.D.N.Y. 2014) (granting third-party release with respect to affected parties that consented to the releases by voting in favor of the plan); *Adelphia*, 368 B.R. at 268 (upholding non-debtor releases for creditors who voted to accept the plan because creditors consented to the releases through their vote to support the plan); *In re Crabtree & Evelyn, Ltd.*, No. 09-14267 (BRL), 2010 WL 3638369, at *8 (Bankr. S.D.N.Y. Jan. 14. 2010) (finding that where creditors have accepted the plan and the non-debtor releases were appropriately disclosed by the debtors in both the disclosure statement and the ballot, the creditors have expressly consented to the non-debtor releases and, therefore, the non-debtor releases satisfy the standards set forth in *Metromedia* for granting non-debtor releases and are fair to the releasing parties); *Lear Corp.*, 2009 WL 6677955, at *7  (finding that non-debtor releases for creditors who voted to accept the plan were permissible); *In re Calpine Corp.*, No. 05-60200 (BRL), 2007 WL 4565223, at *10 (Bankr. S.D.N.Y. Dec. 19, 2007) (same).

[41]   *E.g.*, *In re SunEdison, Inc.*, No. 16-10992 (SMB), 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) (collecting cases).

that are deemed to reject or accept the Plan, including Holders of General Unsecured Claims (including any contract counterparties), are not subject to the Third-Party Releases.

39.    The Third-Party Release is an important component of the Restructuring Support Agreement and Plan.  As with the Debtor Release, each Release Party has made a substantial contribution to the Debtors restructuring justifying their release.  Evidently, the value provided by such Released Parties was not lost on the Debtors creditors and other parties in interest, who uniformly voted in favor of the Plan.  Many of these valuable contributions are outlined in the sections directly below.

    **a.**  **The Debtors' Lenders Played a Critical Role in the Debtors' Ability to Seek Confirmation of a Consensual Plan.**

40.    The RSA Parties have provided substantial and necessary contributions in exchange for their respective releases under the Third-Party Release, including, among other things, the following:  (i) the First Lien Lenders agreed to support the Plan and make substantial value available to junior stakeholders even though in a chapter 7 liquidation, there would be no recoveries available to any such stakeholders; (ii) the Second Lien Lenders agreed to support the Plan and accept reduced recoveries as compared to the face amount of their Claims; (ii) the RSA Parties agreed to let General Unsecured Claims remain unimpaired even though such Claims are out-of-the-money, which conserved the Debtors' resources by allowing for a prepackaged restructuring; (iii) the RSA Parties agreed to forbear from exercising remedies under the applicable credit agreements against the Debtors following the Debtors' failure to make the October 31, 2018 coupon payment and extended the forbearance with respect to each of the First Lien Credit Facility December amortization and January 31, 2019 coupon payments; and (iv) the RSA Parties' releases were negotiated as part of the Restructuring Support Agreement, which provided concrete

evidence to the market of the support of the RSA Parties and in turn provided stability to the Debtors' business while they navigated the restructuring process.

41.      The participation of the RSA Parties in the Debtors' restructuring efforts has undoubtedly been critical to the Debtors' ability to propose and confirm a feasible Plan that will put the Debtors' on a sustainable path forward.  The RSA Parties agreed to, not only impair their Claims as part of a consensual restructuring, but also permit the Debtors to satisfy General Unsecured Claims, in cash, in full through a Plan that was able to be pursued on a highly-expedited timeline.  Successfully balancing the requirements of the Bankruptcy Code (regarding the absolute priority rule and satisfaction of secured claims) and the need to preserve the value of the Debtors' relationships with their stakeholders (including the payment of General Unsecured Claims) would not have been possible without the support of the Debtors' secured lenders.

42.      Similarly, the Debtors, the ABL Lenders and the ABL Agent negotiated a prepetition forbearance agreement and cash collateral order to fund the Debtors Chapter 11 Cases.  Giving the Debtors the breathing room through the forbearance agreements to negotiate with its key stakeholders was crucial in obtaining consensus among all stakeholders.  Moreover, the ability to access cash collateral on a consensual basis, and foregoing the need for debtor in possession financing, was important to the Debtors' plan to effectuate these Chapter 11 Cases on an expedited basis.  Achieving these goals would have been extraordinarily difficult without the ABL Lenders and the ABL Agent.  Therefore, the ABL Lenders and the ABL Agent have made substantial contributions to the Debtors' restructuring.

43.      In short, the parties identified above share the common goal of effectuating a successful reorganization, which creates an identity of interest that has existed among the Debtors and these Released Parties since the outset of the Debtors' prepetition restructuring efforts.  Like

the Debtors, these parties seek to confirm the Plan and implement the transactions contemplated thereunder.

44.     These foregoing contributions enabled the Debtors to conduct the Chapter 11 Cases as prepackaged cases to reduce the negative effect and disruption of the bankruptcy filing on the Debtors' operations, minimize the administrative expenses incurred by the Debtors, and ensure that the General Unsecured Claims remain Unimpaired.  Simply put, without the substantial contributions and concessions by the Released Parties, the Debtors' value-maximizing restructuring contemplated by the Plan would not be possible.  Courts in this district have approved third-party releases under similar circumstances.[42]

### b.     The Sponsors.

45.     The Sponsors have played an essential role in the Debtors' restructuring process. Specifically, the Sponsors engaged with the Debtors and their various stakeholders to ensure that a fully consensual Restructuring Support Agreement and Plan could be reached among the RSA Parties, including forgoing a worthless stock deduction for their Equity Interests in Holdings, which has allowed the Debtors to minimize their tax liabilities.  In addition to the Sponsors' cooperation, they have provided their insight and expertise about the Debtors' industry, which are critical to the Debtors' restructuring and, thus, will strategically position the Debtors and their go-forward business for continued success upon emergence from chapter 11.

---

[42]  *E.g., In re Avaya Inc.*, No. 17-10089 (SMB) (Bankr. S.D.N.Y. Nov. 28, 2017); *In re BCBG Max Azria Global Holdings, LLC*, No. 17-10466 (SCC) (Bankr. S.D.N.Y. July 26, 2017); *In re Answers Holdings, Inc.*, No. 17-10496 (SMB) (Bankr. S.D.N.Y. Apr. 10, 2017);  *In re Sabine Oil & Gas Corp.*, No. 15-11835 (SCC) (Bankr. S.D.N.Y. July 27, 2016); *In re Legend Parent Inc.*, No. 14-10701 (RG) (Bankr. S.D.N.Y. 2014); *In re Metro-Goldwyn-Mayer Studios Inc.*, No. 10-15774 (SMB) (Bankr. S.D.N.Y. Dec. 6, 2010).

c.  **The Debtors' and Other Released Parties' Respective Officers,
Directors, Advisers, and Other Representatives and Agents.**

46.  Finally, the remaining Released Parties include certain Released Parties' current
and former equity holders, subsidiaries, officers, directors, managers, principals, members,
employees, agents, advisory board members, financial advisors, partners, attorneys, accountants,
investment bankers, consultants, representatives, and other professionals, each in their capacity as
such. The foregoing Released Parties have likewise made unique and substantial commitments of
time and effort to bring the Restructuring before the Bankruptcy Court for confirmation.
For instance, the Debtors' management has provided their extensive industry knowledge to the
Debtors during the Restructuring Support Agreement and Plan negotiations, which required
collaborating constructively with their secured lenders. Management will continue to facilitate the
restructuring process during and after these Chapter 11 Cases, as many will remain in their present
roles for the Reorganized Debtors and, as such, have made and will continue to make indispensable
contributions to the successful reorganization of the Debtors. Moreover, continuity of
management in light of the Restructuring was important to the RSA Parties.

47.  In addition, as an integral aspect of the Plan, all of the Reorganized Debtors'
indemnification obligations to directors and officers remain unimpaired as set forth in the Plan.
Therefore, a suit against the officers and directors effectively would constitute a suit against the
Reorganized Debtors and hence, would defeat the purposes of the Plan discharge and injunction
provisions. A court has subject matter jurisdiction to consider and grant third-party releases when
the debtor has a contingent indemnification obligation.[43] In *Sabine*, for example, the Bankruptcy

---

[43]  *See Sabine*, 555 B.R. at 290 (Bankr. S.D.N.Y. 2016) ("[A] contingent indemnification obligation can be sufficient
to satisfy the 'conceivable effect' test because such obligation 'directly affects the *res* of the bankruptcy estate.'")
(quoting *In re FairPoint Commc'ns, Inc.*, 452 B.R. 21, 29 (S.D.N.Y. 2011)); *see also In re Trinsum Grp., Inc.*,
No. 08–12547 (MG), 2013 WL 1821592, at *5 (Bankr. S.D.N.Y. Apr. 30, 2013) ("With respect to the Distributing

Court found it had subject matter jurisdiction to approve releases of certain third parties where, under a credit facility, those parties were granted broad indemnification rights against the debtor's estate.[44]  The Bankruptcy Court found that since the released parties would hold indemnification claims against the estate if held liable on certain claims, it would directly impact the estate.[45]  Here, the claims to be released could have an effect on the *res* of the bankruptcy estate.  Accordingly, the Debtors respectfully submit that the Bankruptcy Court should approve the Third-Party Release.[46]

### 3.    The Exculpation Provision Is Appropriate and Complies With the Bankruptcy Code.

48.    Article IX.D of the Plan sets forth an exculpation provision (the "Exculpation") exculpating Exculpated Parties from enumerated claims.[47]  Courts in the Second Circuit evaluate exculpation provisions based upon a number of factors, including whether the provision is integral

---

Agent, any suit against the Distributing Agent also affects the *res* of the estate because the Distributing Agent has indemnification rights against the estate.").

[44]  *Sabine*, 555 B.R. at 290.

[45]  *Id.*

[46]  *See* Riesbeck Decl., ¶¶ 13-16.

[47]  Pursuant to the Plan, "Exculpated Parties" means, "each of the following, solely in its capacity as such:  (i)(a) the Debtors; (b) the Reorganized Debtors; (c) with respect to each of the foregoing parties in clauses (i)(a) and (i)(b), each of such Entity's current and former Affiliates; and (d) with respect to each of the foregoing parties in clauses (i)(a) through (i)(c), each of such party's current and former directors, managers, officers, principals, members, managed accounts or funds, fund advisors, employees, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; and (ii)(a) the DIP Agent (if any); (b) the DIP Lenders (if any); (c) the ABL Agent; (d) the ABL Lenders; (e) the Consenting FILO Lenders; (f) the First Lien Agent; (g) the Consenting First Lien Lenders; (h) the Second Lien Agent; (i) the Consenting Second Lien Lenders; (j) the Sponsors; (k) with respect to each of the foregoing parties in clauses (ii)(a) through (ii)(j), each of such Entity's current and former Affiliates; and (l) with respect to each of the foregoing parties in clauses (ii)(a) through (ii)(k), each of such party's current and former directors, managers, officers, principals, members, employees, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, investment advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided* that, for purposes of this definition, in no event shall "Affiliate" include any entity that is not directly or indirectly controlled by, or under common control with, the party of which such entity is an Affiliate."  *See* Plan, Art. I.A.

to the plan and whether protection from liability was necessary for plan negotiations.[48]    The

Exculpation is an integral part of the Plan and satisfies the governing standards in the Second

Circuit.  The provision provides necessary and customary protections to those parties in interest

(whether Estate fiduciaries or otherwise) whose efforts were and continue to be vital to formulating

and implementing the Plan, which has garnered unanimous support from the Debtors' creditors.

49.    Additionally, courts have specified certain parties that generally are appropriate

candidates for exculpation, including where the exculpation is consensual and properly noticed or

parties to "unique transactions" who "contribute substantial consideration to the reorganization."[49]

Courts evaluate the appropriateness of exculpation provisions based upon a number of factors,

including whether the plan was proposed in good faith, whether liability is limited, and whether

the exculpation provision was necessary for plan negotiations.[50]

50.    A bankruptcy court cannot confirm a chapter 11 plan unless it finds that the plan

has been proposed in good faith.[51]    Once the court makes this good-faith finding, it is appropriate

to provide a standard of care for the parties involved in the negotiation and formulation of that

---

[48]    *See Bally Total Fitness*, 2007 WL 2779438, at *8 (finding exculpation, release, and injunction provisions
appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan);
*In re Enron Corp.*, 326 B.R. 497, 501, 503 (S.D.N.Y. 2005) (approving an exculpation provision where it was
necessary to effectuate the plan and excluded gross negligence and willful misconduct; also noting that excising
similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to
all those who participated in good faith to bring it into fruition"); *In re WorldCom, Inc.*, 2003 WL 23861928 at
*28 (Bankr. S.D.N.Y. Oct 31, 2003) (approving an exculpation provision where it "was an essential element of
the Plan formulation process and negotiations"); *see also Drexel Burnham*, 960 F.2d at 293; *In re Winn-Dixie
Stores, Inc.*, 356 B.R. 239, 260-61 (Bankr. M.D. Fla. 2006) (approving an exculpation provision where the
beneficiaries made significant contributions and expected an exculpation provision would be included in the plan).

[49]    *See Adelphia*, 368 B.R. at 268.

[50]    *See, e.g., In re Captran Creditors' Trust*, 128 B.R. 469, 476 (M.D. Fla. 1991) (the factors used to evaluate the
language of an exculpation provision "include, but are not limited to: how the exculpatory clause limits liability,
intent of the parties, and the manner in which the exculpatory clause was made a part of the agreement").

[51]    11 U.S.C. § 1129(a)(3).

chapter 11 plan.[52]  Exculpation provisions, therefore, prevent future collateral attacks against a court's good-faith finding.  Ultimately, the Exculpation provides protection to those parties that worked hand-in-hand with the Debtors and were instrumental in assuring the success of the Debtors' restructuring.

51.    In the Second Circuit, exculpation provisions that extend to prepetition conduct and cover non-estate fiduciaries are approved regularly.[53]  In approving these provisions, courts

---

[52]  *See In re Health Diagnostic Lab., Inc.*, 551 B.R. 218, 232 (Bankr. E.D. Va. 2016) ("Exculpation provisions in chapter 11 plans are not uncommon and 'generally are permissible, so long as they are properly limited and not overly broad.'" (citation omitted)); *In re PWS Holding Corp.*, 228 F.3d 224, 246-47 (3d Cir. 2000) (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties.").

[53]  *See, e.g., In re Cenveo, Inc.*, No. 18-22178 (Bankr. S.D.N.Y Aug. 21, 2018) [Docket No. 685] (overruling U.S. Trustee objection to exculpation of both estate fiduciaries and non-fiduciaries from liability for "any cause of action for any claim related to any act or omission in connection with, relating to, or arising out of, the chapter 11 cases . . . or the filing of the Restructuring Support Agreement and related prepetition transactions"); *In re Global A&T Electronics Ltd.*, No. 17-23931 (Bankr. S.D.N.Y. Dec. 21, 2017) [Docket No. 51]; *In re Avaya, Inc.*, No. 17-10089 (SMB) (Bankr. S.D.N.Y. Nov. 28, 2017) [Docket No. 1579]; *In re BCBG Max Azria Global Holdings, LLC*, No. 17-10466 (SCC) (Bankr. S.D.N.Y. July 26, 2017) [Docket No. 591]; *In re Answers Holdings, Inc.*, No. 17-10496 (SMB) (Bankr. S.D.N.Y. Apr. 10, 2017) [Docket No. 120]; *Oneida*, 351 B.R. at 94,  n.22 (considering an exculpation provision covering a number of prepetition actors with respect to certain prepetition actions, as well as postpetition activity); *In re Eastman Kodak Co.*, No. 12-10202 (ALG) (Bankr. S.D.N.Y. Aug. 23, 2013), [Docket No. 4966] (overruling U.S. Trustee objection to exculpation of both estate fiduciaries and non-fiduciaries from liability for "any prepetition or postpetition act taken or omitted to be taken in connection with, or arising from or relating in any way to, the chapter 11 cases"); *In re Metro-Goldwyn-Mayer Studios Inc.*, No. 10-15774 (SMB) (Bankr. S.D.N.Y. Dec. 6, 2010), [Docket No. 173] (approving exculpation provision); *In re Charter Commc'ns*, No. 09-11435 (JMP) (Bankr. S.D.N.Y. Nov. 17, 2009) [Docket No. 921] (approving exculpation of estate fiduciaries and non-fiduciaries for "any pre-petition or postpetition act taken or omitted to be taken in connection with, or related to . . . the restructuring of the Company"); *In re Cengage Learning, Inc.*, No. 13-44106 (ESS) (Bankr. E.D.N.Y. Mar. 14, 2014), [Docket No. 1225] (approving exculpation provision for estate fiduciaries and non-fiduciaries for "any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, implementing, or consummating the Plan"); *In re Res. Cap., LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013), [Docket No. 6066] (approving exculpation of certain prepetition lenders); *In re Almatis, B.V.*, No. 10-12308 (MG) (Bankr. S.D.N.Y. Sept. 20, 2010), [Docket No. 444] (approving exculpation of debtors' prepetition lenders and holders of senior secured notes for both pre- and post-petition conduct); *In re Uno Rest. Holdings Corp.*, No. 10-10209 (MG) (Bankr. S.D.N.Y. July 6, 2010), [Docket No. 559] (approving exculpation of certain prepetition lenders from liability related to acts taken, among other things, "in connection with, or arising out of, the chapter 11 cases, the formulation, dissemination, confirmation, consummation, or administration of the Plan, property to be distributed under the Plan…the Plan, [or] the Disclosure Statement"); *Bally Total Fitness*, 2007 WL 2779438, at *8 (exculpation of prepetition noteholders and new investors); *In re Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving exculpation of controlling shareholder as well as estate fiduciaries); *Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*, 326 B.R. 497, 500 (S.D.N.Y. 2005) (upholding exculpation provision that precluded liability for, *inter alia*, "any act taken or omitted to be taken in connection with and subsequent to the commencement of the chapter 11 cases"); *In re Trico Marine Servs., Inc.*, No. 04-17985 (SMB) (Bankr. S.D.N.Y. Jan. 21, 2005), [Docket No. 52] (approving exculpation provisions).

consider a number of factors, including whether the beneficiaries of the exculpation have participated in good faith in negotiating the plan and bringing it to fruition, and whether the provision is integral to the plan.[54] Where a court finds that a plan has been proposed in good faith and meets the other requirements of confirmation, approval of an exculpation provision is appropriate.[55]

52.    Here, the Debtors propose to exculpate the Exculpated Parties whose contributions and concessions have made the Plan possible. Such exculpation provisions are routinely approved in plans of reorganization in cases similar to these Chapter 11 Cases, which could not have progressed as quickly and as productively absent the significant contributions of the Exculpated Parties.[56] Their efforts were instrumental to the restructuring process and the Plan's unanimous support from the vast majority of the Debtors' stakeholders.

---

[54] *E.g.*, *In re BearingPoint, Inc.*, 453 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("Exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get recoveries they desire; seek vengeance against other parties, or simply wish to second guess the decision makers."); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (same), *aff'd*, *In re DBSD N. Am., Inc.*, No. 09-10156 (LAK), 2010 WL 1223109 (S.D.N.Y. May 24, 2010), *aff'd in part, rev'd in part*, 634 F.3d 79 (2d Cir. 2011); *Bally Total Fitness*, 2007 WL 2779438, at *8 (finding exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *WorldCom*, 2003 WL 23861928, at *28 (approving an exculpation provision where it "was an essential element of the [p]lan formulation process and negotiations"); *Enron Corp.*, 326 B.R. at 503 (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

[55] *See WorldCom*, 2003 WL 23861928, at *28.

[56] *See, e.g.*, *In re Cenveo, Inc.*, No. 18-22178 (Bankr. S.D.N.Y Aug. 21, 2018) [Docket No. 685]; *In re Global A&T Electronics Ltd.*, No. 17-23931 (Bankr. S.D.N.Y. Dec. 21, 2017) [Docket No. 51]; *In re Avaya, Inc.*, No. 17-10089 (SMB) (Bankr. S.D.N.Y. Nov. 28, 2017) [Docket No. 1579]; *In re BCBG Max Azria Global Holdings, LLC*, No. 17-10466 (SCC) (Bankr. S.D.N.Y. July 26, 2017) [Docket No. 591]; *In re Answers Holdings, Inc.*, No. 17-10496 (SMB) (Bankr. S.D.N.Y. Apr. 10, 2017) [Docket No. 120]; *Enron*, 326 B.R. at 500 (upholding exculpation provision that precluded liability for, *inter alia*, "any act taken or omitted to be taken in connection with and subsequent to the commencement of the Chapter 11 Cases"); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG) (Bankr. S.D.N.Y. Jan. 5, 2007) [Docket No. 12952] (approving exculpation for, *inter alia*, "all prepetition activities leading up to the promulgation and confirmation of this Plan," as well as for "any act or omission in connection with, or arising out of the Debtors' restructuring, including, without limitation, the negotiation and execution of this Plan, the Reorganization Cases . . . and . . . all documents ancillary thereto"); *In re Ampex Corp.*, No. 08-11094 (AJG) (Bankr. S.D.N.Y. July 31, 2008) [Docket No. 386] (same).

53.    The Exculpated Parties should be exculpated as provided in the Plan.  The failure

to include exculpation provisions in the chapter 11 plans would chill the critical participation of

the management and the advisors to debtors in possession as well as essential creditor groups and

equity holders in the process of trying to formulate and negotiate consensual chapter 11 plans.  In

light of the bankruptcy policy in favor of consensual chapter 11 plans and the negotiations that

create them, it stands to reason that exculpation provisions are essential to the process and should

be approved.[57]  Further, in light of the carve-out for gross negligence, willful misconduct, and

actual fraud, the standard of care established by the Exculpation is entirely consistent with and

appropriate under applicable law and as a matter of public policy.[58]

54.    The Debtors respectfully submit that the Bankruptcy Court has an ample record

before it to conclude that the Exculpated Parties are entitled to the Exculpation proposed in the

Plan and that the protections afforded therein are reasonable and appropriate.  In short, the

Exculpation represents an integral piece of the overall settlement embodied in the Plan and is the

product of good-faith, arm's-length negotiations, and significant sacrifice by the non-Debtor

Exculpated Parties. The Exculpated Parties played a critical role in formulating the Plan and the

Exculpation provision played a role in bringing these parties to the table.[59]  Failure to include the

Exculpation could have deterred the Exculpated Parties from collaborating with the Debtors to

---

[57]    *See In re Jartran, Inc.*, 44 B.R. 331, 363 (Bankr. N.D. Ill. 1984) ("the spirit of Chapter 11 [is] to promote consensual plans"); *see also In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999) (stating that the Bankruptcy Code has an overall policy of fostering consensual plans of reorganization).

[58]    *See, e.g.*, *Oneida*, 351 B.R. at 94 n.22 (approving exculpation provision except in cases of gross negligence, willful misconduct, fraud, or criminal conduct over an objection that was raised but "not pursue[d] at the confirmation hearing" and noting that the language "generally follows the text that has become standard in this district, is sufficiently narrow to be unexceptional"); *see In re Cengage Learning, Inc.*, No. 13-44106 (ESS) (Bankr. E.D.N.Y. Mar. 14, 2014) [Docket No. 1225] (approving exculpation provision the extended to estate fiduciaries and non-fiduciaries that excluded gross negligence and willful misconduct); *In re DJK Residential, LLC*, No. 08-10375 (JMP), (Bankr. S.D.N.Y. May 7, 2008) [Docket No. 497] (approving an exculpation provision that excluded gross negligence and willful misconduct).

[59]    *See* Riesbeck Decl., ¶¶ 17-18.

develop a fully consensual restructuring. The Exculpation is narrowly tailored to exclude certain acts, relates only to acts or omissions in connection with or arising out of the Debtors' restructuring and ultimately inures to the benefit of only those parties traditionally considered estate fiduciaries or those that have made similar contributions to the Debtors' restructuring. Moreover, the scope of the Exculpation itself and the composition of the Exculpated Parties are entirely consistent with established practice in this and other jurisdictions.[60] Therefore, the Debtors respectfully request that the Bankruptcy Court approve the Exculpation set forth in Article IX.D of the Plan.

> **4.    The Injunction Provision Is Appropriate and Complies With the Bankruptcy Code.**

55.    The injunction provision set forth in Article IX.E of the Plan (the "Injunction Provision") implements the Plan's discharge, release, and exculpation provisions. In part, the Injunction Provision permanently enjoins all Entities from commencing or continuing any action against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of, or in connection with, or with respect to any such Claims, Interests, Causes of Action, or liabilities discharged, released, settled, compromised, or exculpated under the Plan. The

---

[60]  *See, e.g.*, *In re Cenveo, Inc.*, No. 18-22178 (Bankr. S.D.N.Y Aug. 21, 2018) [Docket No. 685]; *In re Global A&T Electronics Ltd.*, No. 17-23931 (Bankr. S.D.N.Y. Jan. 25, 2018) [Docket No. 89]; *In re Avaya, Inc.*, No. 17-10089 (SMB) (Bankr. S.D.N.Y. Nov. 28, 2017) [Docket No. 1579]; *In re BCBG Max Azria Global Holdings, LLC*, No. 17-10466 (SCC) (Bankr. S.D.N.Y. July 26, 2017) [Docket No. 591]; *In re Answers Holdings, Inc.*, No. 17-10496 (SMB) (Bankr. S.D.N.Y. Apr. 10, 2017) [Docket No. 120]; *In re Citadel Broad. Corp.*, No. 09-17442 (BRL) (Bankr. S.D.N.Y. May 19, 2010) [Docket No. 369]; *In re Reader's Digest Ass'n*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 19, 2010) [Docket No. 574]; *In re Ion Media Networks, Inc.*, No. 09-13125 (JMP) (Bankr. S.D.N.Y. Dec. 3, 2009) [Docket No. 453]; *In re DBSD N. Am., Inc.*, No. 09-13061 (REG) (Bankr. S.D.N.Y. Nov. 23, 2009) [Docket No. 547]; *In re Charter Commc'ns, Inc.*, No. 09-11435 (JMP) (Bankr. S.D.N.Y. Nov 17, 2009) [Docket No. 921]; *In re Lear Corp.*, No. 09-14326 (ALG) (Bankr. S.D.N.Y. Nov. 5, 2009) [Docket No. 1070]; *In re DJK Residential LLC*, No. 08-10375 (JMP) (Bankr. S.D.N.Y. May 7, 2008) [Docket No. 497]; *In re Calpine Corp.*, No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 19, 2007); *In re Source Enters., Inc.*, No. 06-11707 (AJG), 2007 WL 2903954, at *13 (Bankr. S.D.N.Y. Oct. 1, 2007) (approved exculpation provision because provision was in the best interests on the debtors' estates and the creditors); *Bally Total Fitness*, 2007 WL 2779438, at *8 (finding that the exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *Oneida Ltd.*, 351 B.R. at 94 n.22 (in overruling objection to exculpation clause court noted that exculpation language that "generally follows the text that has become standard in this district, is sufficiently narrow to be unexceptionable").

Injunction Provision is thus a key provision of the Plan because it is necessary to preserve and enforce the discharge provisions in the Plan, the Debtor Release, the Third-Party Release, and the Exculpation that are central to the Plan and is narrowly tailored to achieve that purpose.[61]  Further, as described above, no party has objected to the Injunction Provision.  As such, to the extent the Bankruptcy Court finds that the Plan's exculpation and release provisions are appropriate, the Bankruptcy Court should approve the Injunction Provision.[62]

>E.    **The Plan Complies With Section 1123(d) of the Bankruptcy Code.**

56.    Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."[63]  Article V.A of the Plan provides for the assumption of all Executory Contracts and Unexpired Leases, except as otherwise noted in the Plan.  The Plan also provides that all Executory Contracts and Unexpired Leases shall be deemed assumed without the need for any further notice to or action, order, or approval of the Bankruptcy Court as of the Effective Date under section 365 of the Bankruptcy Code.  The Debtors do not expect any cure amounts because the Debtors are paying all obligations in the ordinary course of business.  Accordingly, the Plan satisfies the requirements of section 1123(d) of the Bankruptcy Code.

---

[61]    *See Drexel*, 960 F.2d at 293 (holding that a court may approve injunction provision where such provision "plays an important part in the debtor's reorganization plan").

[62]    *See* Riesbeck Decl., ¶¶ 19–20.

[63]    11 U.S.C. § 1123(d).

**F.    The Debtors Complied With the Applicable Provisions of the Bankruptcy
Code (§ 1129(a)(2))**.

57.    The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which

requires that the proponent of a plan of reorganization comply with the applicable provisions of

the Bankruptcy Code regarding solicitation of acceptances of the Plan.[64]   The legislative history

to section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass

the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy

Code.[65]   As discussed below, the Debtors have complied with sections 1125 and 1126 of the

Bankruptcy Code regarding disclosure and solicitation of the Plan.

**1.    The Debtors Complied With Section 1125 of the Bankruptcy Code**.

58.    As discussed in Part I of this memorandum, the Debtors complied with the notice

and solicitation requirements of section 1125 of the Bankruptcy Code.

**2.    The Debtors Complied With Section 1126 of the Bankruptcy Code**.

59.    Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of

a plan of reorganization.   Specifically, under section 1126 of the Bankruptcy Code, only holders

of allowed claims and allowed interests in impaired classes of claims or interests that will receive

or retain property under a plan on account of such claims or interests may vote to accept or reject

such plan.[66]   Section 1126 of the Bankruptcy Code provides, in pertinent part, that:

(a)    The holder of a claim or interest allowed under section 502
of [the Bankruptcy Code] may accept or reject a plan. . . .

---

[64]   11 U.S.C. § 1129(a)(2).

[65]   *In re Lapworth*, No. 97-34529 (DWS), 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *Worldcom, Inc.*, 2003 WL 23861928 at *49 (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code").

[66]   *See* 11 U.S.C. § 1126(a), (f), (g).

(f)     Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

(g)     Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.[67]

60.     As set forth in Part I of this memorandum, in accordance with section 1125 of the Bankruptcy Code, the Debtors solicited acceptances or rejections of the Plan from the Holders of Allowed Claims in Classes 4, 5, and 6—the only Classes entitled to vote on the Plan.  The Debtors did not solicit votes from Holders of Claims or Interests in Classes 1, 2, 3, or 7 because Holders of such Claims and Interests are Unimpaired and deemed to accept the Plan under section 1126(f) of the Bankruptcy Code.  The Debtors also did not solicit votes from Holders of Claims or Interests, as applicable, in Classes 8, 9, or 10.  Holders of Interests in Class 9 are deemed to reject the Plan and, thus, not entitled to vote on the Plan.  Holders of Claims in Class 8 and Interests in Class 10 are either deemed to reject or presumed to accept the Plan based on whether the Debtors determine to Reinstate, compromise, or cancel such Claims or Interests without distribution.  Thus, pursuant to section 1126(a) of the Bankruptcy Code, only Holders of Claims in Classes 4, 5, and 6 were entitled to vote to accept or reject the Plan.

61.     Section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance of a plan by classes of claims:

(c)     A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under

---

[67] *Id.*

subsection (e) of this section, that hold at least two-thirds in
amount and more than one-half in number of the allowed
claims of such class held by creditors, other than any entity
designated under subsection (e) of this section, that have
accepted or rejected such plan.

62.     As described above, the voting parties in each Class entitled to vote on the Plan

voted to accept the Plan in sufficient number and in sufficient amount to constitute an accepting

class under the Bankruptcy Code.[68]  Specifically, 100% of the amount of Claims in Classes 4, 5,

and 6 and all of the Holders of Claims in such Classes voted to accept the Plan.  Based upon the

foregoing, the Debtors respectfully submit that they satisfy the requirements of section 1129(a)(2)

of the Bankruptcy Code.

**G.     The Plan Was Proposed in Good Faith and Not by Any Means Forbidden by
Law (§ 1129(a)(3)).**

63.     Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be

"proposed in good faith and not by any means forbidden by law."[69]  The Second Circuit has

construed this good faith standard as requiring a showing that "the plan was proposed with

'honesty and good intentions' and 'with a basis for expecting that a reorganization can be

effected.'"[70]  Additionally, courts generally hold that "good faith" should be evaluated in light of

the totality of the circumstances surrounding confirmation.[71]   In the context of plans of

reorganization, "a plan is proposed in good faith if there is a reasonable likelihood that the plan

---

[68]   *See* Voting Report, Ex. A.

[69]   11 U.S.C. § 1129(a)(3); *see also In re Gaston & Snow*, Nos. 93-8517 (JGK), 93-8628 (JGK), 1996 WL 694421,
at *9 (S.D.N.Y. Dec. 4, 1996).

[70]   *E.g., Johns-Manville*, 843 F.2d at 649 (citations omitted); *see also In re Texaco, Inc.*, 84 B.R. 893, 901-07 (Bankr.
S.D.N.Y. 1988), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1998) ("[I]n the context of a Chapter 11
reorganization . . . a plan is considered proposed in good faith if there is a likelihood that the plan will achieve a
result consistent with the standards prescribed under the Code." (citations and quotations omitted)).

[71]   *E.g., In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994) (collecting cases).

will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code."[72] The bankruptcy judge is in the best position to assess the good faith of the parties' proposals.[73]

64.    The fundamental purpose of chapter 11 is to enable a distressed business to reorganize its affairs to prevent job losses and the adverse economic effects associated with disposing of assets at liquidation value.[74]  Here, the Plan will enable the Debtors to reduce their funded debt by approximately $900 million, improve liquidity across the entire enterprise, preserve the value of each Debtor as a going concern (which will inure to benefit of stakeholders enterprise-wide), and position the Debtors for long-term success.  Moreover, the Plan is the product of extensive arm's-length negotiations among the Debtors, all of the Holders of FILO Claims, the Ad Hoc Group of First Lien Lenders, the Ad Hoc Group of Second Lien Lenders, and the Sponsors and is supported by all such stakeholders.  The Plan's unanimous support by the voting parties, who have a vested interest in the Reorganized Debtors' success as their future owners, is strong evidence that the Plan is likely to succeed.  Further, all non-voting, non-insider creditors are Unimpaired under the Plan.  The Debtors determined in good faith that reinstating and satisfying General Unsecured Claims in the ordinary course would minimize disruptions to the business, as such Claims include those belonging to vendors and other trade suppliers that are necessary for the Debtors' ability to operate on a go-forward basis.  Finally, as set forth herein, the Plan complies with the Bankruptcy Code and applicable nonbankruptcy law.  Accordingly, the Debtors respectfully submit that the Plan satisfies section 1129(a)(3) of the Bankruptcy Code.[75]

---

[72]  *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) (citations omitted).

[73]  *Adelphia*, 368 B.R. at 247.

[74]  *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984); *B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc. Corp.)*, 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) (stating that "the two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start" (citations omitted)).

[75]  *See* Riesbeck Decl., ¶ 21.

**H.      The Plan Provides That the Debtors' Payment of Professional Fees and
Expenses Are Subject to Court Approval (§ 1129(a)(4)).**

65.      Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses
paid by the plan proponent, by the debtor, or by a person receiving distributions of property under
the plan be subject to approval by the bankruptcy court as reasonable.[76]  Courts have construed
this section to require that all payments of claims to professionals, similar to the Accrued
Professional Compensation Claims here, paid out of estate assets be subject to review and approval
by the court as to their reasonableness.[77]

66.      Here, all payments made or to be made by the Debtors for services rendered and
expenses incurred during the Chapter 11 Cases, *i.e.*, all Accrued Professional Compensation
Claims, are subject to approval by the Bankruptcy Court as reasonable.  In particular, the Plan
provides for the payment of only Allowed General Administrative Claims on the Effective Date.[78]
In addition, Article II.A of the Plan provides that all final requests for payment of Accrued
Professional Compensation Claims shall be filed no later than sixty (60) days after the Effective
Date.  After notice and a hearing, in accordance with the procedures established by the Bankruptcy
Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional
Compensation Claims shall be determined by the Bankruptcy Court.[79]  Accordingly, the Plan fully
complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

---

[76]   11 U.S.C. § 1129(a)(4).

[77]   *See, e.g.*, *In re Worldcom, Inc.*, 2003 WL 23861928, at *54; *Drexel*, 138 B.R. at 760.

[78]   *See* Plan, Art. II.A; *see generally In re Elsinore Shore Assocs.*, 91 B.R. 238, 268 (Bankr. D.N.J. 1988) (holding
that requirements of section 1129(a)(4) were satisfied where the plan provided for payment of only "allowed"
administrative expenses).

[79]   *See id.*

I.      **The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (§ 1129(a)(5)).**

67.     Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors.[80]  Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent to disclose the identity of an "insider" (as defined by section 101(31) of the Bankruptcy Code) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider.[81]  Additionally, the Bankruptcy Code provides that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[82]   Article IV.J of the Plan provides information about the New Board and the mechanism for how the members will be chosen.  Additionally, the members of management will be substantially the same post-emergence, which is consistent with stakeholders' interests, because the current management team is competent and has relevant, deep-rooted, and solid business and industry experience.  The New Board together with substantially all of existing management will provide both continuity and fresh insights into running the reorganized business.[83]Accordingly, the Debtors respectfully submit that the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

---

[80]   11 U.S.C. § 1129(a)(5)(A)(i).

[81]   11 U.S.C. § 1129(a)(5)(B).

[82]   11 U.S.C. § 1129(a)(5)(A)(ii).

[83]   This requirement to ensure that the Reorganized Debtors are in "good hands" is applied by courts to mean that the proposed directors and officers should have experience in the debtor's business and industry, experience in financial and management matters, and their appointment should not "perpetuate incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor."  *See In re Beyond.com Corp.*, 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003).

**J.      The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6))**.

68.      Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the Plan.[84]  No such regulatory commission exists here. Accordingly, the Debtors respectfully submit that the Plan satisfies section 1129(a)(6) of the Bankruptcy Code.

**K.      The Plan Is In the Best Interests of All the Debtors' Creditors (§ 1129(a)(7))**.

69.      Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," provides, in relevant part:

> With respect to each impaired class of claims or interests—
>
> (A)      each holder of a claim or interest of such class—
>
> > (i)      has accepted the plan; or
> >
> > (ii)      will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . . [85]

70.      The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[86]  As section 1129(a)(7)

---

[84]  11 U.S.C. § 1129(a)(6).

[85]  11 U.S.C. § 1129(a)(7)(A).  *See also Adelphia*, 368 B.R. at 252  ("In determining whether the best interests standard is met, the court must measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7.").

[86]  *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept

of the Bankruptcy Code makes clear, the best interests test applies only to holders of non-accepting impaired claims or interests.  Classes 4, 5, and 6 have voted unanimously in favor of the Plan, and thus, section 1129(a)(7) is inapplicable with respect to those Classes of Claims.[87]

71.     As set forth in the Disclosure Statement[88] and the DelConte Declaration, the Debtors, with the assistance of their advisors, prepared a liquidation analysis that estimates recoveries for members of each Class under the Plan (the "Liquidation Analysis").[89]   The projected recoveries under the Plan are equal to or in excess of the recoveries estimated in a hypothetical chapter 7 liquidation.[90] Specifically, the projected recoveries under the Plan and the results of the Debtors' liquidation analysis for all Holders of FILO Claims, First Lien Claims, Second Lien Claims, Intercompany Claims, Equity Interests, and Intercompany Interests are as follows:

| Class | Claim or Interest | Voting Rights | Treatment | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| 1 | Other Secured Claims | Presumed to Accept | (i) Payment in full in Cash in the ordinary course of business, (ii) the collateral securing such Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (iii) Reinstatement, or (iv) such other treatment rendering such Claim Unimpaired | 100% | 100% |
| 2 | Other Priority Claims | Presumed to Accept | (i) Payment in full in Cash in the ordinary course of business, (ii) Reinstatement, or (iii) such other treatment rendering such Claim Unimpaired | 100% | 100% |
| 3 | ABL Claims | Presumed to Accept | Payment in full in Cash or, in the case of each outstanding letter of credit, (i) cancelled and replaced, (ii) cash collateralized in | 100% | 100% |

the plan."); *Adelphia*, 368 B.R. at 251 (stating that section 1129(a)(7) of the Bankruptcy Code is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

[87]   *See* Voting Report, Ex. A.

[88]   Disclosure Statement, Ex. C.

[89]   *See* DelConte Decl., ¶¶ 6-12.

[90]   *Id.* ¶ 12; Disclosure Statement, Art. VII.8.3.

| Class | Claim or Interest | Voting Rights | Treatment | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| | | | accordance with section 2.03(f) of the ABL Credit Agreement, or (ii) backstopped or otherwise treated in a manner satisfactory to the applicable L/C Issuer (as defined in the ABL Credit Agreement) in its sole and absolute discretion | | |
| 4 | FILO Claims | Entitled to Vote | At the Debtors' election, either the Pro Rata Share of (i) $75 million of the New First Lien Term Loan and payment of any accrued but unpaid interest, fees, and expenses in Cash or (ii) $75 million plus any accrued but unpaid interest, fees, and expenses of the New First Lien Term Loan | 100% | 38% - 43% |
| 5 | First Lien Claims | Entitled to Vote | Pro Rata Share of (i) $175 million of the New First Lien Term Loan and (ii) subject to Article III.B.6.c of the Plan, 87.5% of the New Common Stock, subject to dilution by the Option Rights, Warrants, and Management Incentive Plan; *provided* that a Holder of an Allowed First Lien Claim may check the applicable box on the Class 5 Ballot to receive in lieu of New Common Stock (which forfeited shares shall be distributed Pro Rata to non-electing Holders ) a principal amount of the New Junior Loan that is equal to 85% of the Exchange Benchmark Value of such Holder's original New Common Stock distribution (*i.e.*, a 15% discount to the Exchange Benchmark Value of its original New Common Stock distribution); *provided*, *further*, that electing Holders of Allowed First Lien Claims shall not receive more than $35 million in aggregate principal amount of the New Junior Loan. | Holders Electing Junior Loan 28.9% - 34.4% or Holders Not Electing Junior Loan 27.6% -41.3%[91] | 7% - 12% |
| 6 | Second Lien Claims | Entitled to Vote | (i) **If Class 6 votes to accept the Plan**, the Pro Rata Share of (A) $15 million of the New Junior Loan; (B) 10% of the New | 4.8% - 7.3%[92] | 0% |

[91] These projected recovery ranges for both electing and non-electing Holders assume the valuation range from the Valuation Analysis and a range of participation in the New Junior Loan in lieu of the New Common Stock by that Holders of Allowed First Lien Claims. The recovery ranges are shown prior to any impact of the Management Incentive Plan and prior to the exercise of the Warrants or Option Rights. The value of the New Common Stock for recovery purposes is reduced by the value of the Warrants and Option Rights.

[92] This projected recovery range assumes the valuation range from the Valuation Analysis and a range of participation in the New Junior Loan in lieu of the New Common Stock by that Holders of Allowed First Lien Claims. The recovery range is shown prior to any impact of the Management Incentive Plan and prior to the exercise of the Warrants or Option Rights. The recovery to the Second Lien Claims includes the value of the Second Lien Warrant Package. The value of the New Common Stock for recovery purposes is reduced by the value of the Warrants and Option Rights.

| Class | Claim or Interest | Voting Rights | Treatment | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| | | | Common Stock, subject to dilution by the Option Rights, Warrants, and the Management Incentive Plan; and (C) the Second Lien Warrant Package described in the Warrant Documents or (ii) **If Class 6 votes to reject the Plan**, no distribution shall be received under the Plan, and the 10% of the New Common Stock shall be reallocated to Allowed First Lien Claims in Class 5 and distributed in accordance with Article III.B.5.c of the Plan | | |
| 7 | General Unsecured Claims | Not Entitled to Vote (Presumed to Accept) | Reinstatement (and satisfaction in the ordinary course) | 100% | 0% |
| 8 | Intercompany Claims | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) | Reinstatement or Cancelation | 0% / 100% | N/A |
| 9 | Equity Interests | Not Entitled to Vote (Deemed to Reject) | Cancelation | 0% | 0% |

72.    Under a hypothetical chapter 7 liquidation, the estimated proceeds available for allocation (net of required costs and expenses) would total between approximately $158.4 million and $202.7 million, subject to the estimations and assumptions set forth in the Liquidation Analysis.[93] Thus, in a liquidation scenario, Holders of Claims or Interests would generally fare no better than under the Plan and Holders of Second Lien Claims and General Unsecured Claims would not receive *any* recovery.[94]  As evidenced by the Liquidation Analysis, Holders of non-accepting Impaired Claims will receive far more under the Plan than in a chapter 7 liquidation.

73.    Additionally, all Holders of Claims entitled to vote on the Plan have received the Liquidation Analysis and have been provided ample time to consider the contents thereof.

---

[93]    *See* Disclosure Statement, Ex. C.

[94]    *Id.*

Accordingly, the Debtors respectfully submit that the Plan complies with section 1129(a)(7) of the Bankruptcy Code.[95]

**L.     The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.**

74.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.[96]  Of the impaired classes of Claims and Interests under the Plan, Classes 4, 5, and 6 voted to accept the Plan.  Therefore, the Plan satisfied section 1129(a)(8) of the Bankruptcy Code.

**M.     The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).**

75.     Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments unless such holders agree to different treatment for such claim.  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.[97]  Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally domestic support obligations, wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a

---

[95]  *See* DelConte Decl., ¶ 12.

[96]  11 U.S.C. § 1129(a)(8).

[97]  11 U.S.C. § 1129(a)(9)(A).

value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).[98]  Finally, section 1129(a)(9)(C) provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.[99]

76.    The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  First, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each Holder of an Allowed General Administrative Claim will receive payments in the ordinary course of business, or at such other time as defined in Article II.A of the Plan.  Second, Article II of the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the types of Claims specified by 1129(a)(9)(B) are Impaired under the Plan.  Finally, Article II.D of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it specifically provides that each Holder of Allowed Priority Tax Claims or Allowed Other Priority Claims shall be paid on the Effective Date, or paid in the ordinary course as amounts come due.  Thus, the Debtors respectfully submit that the Plan satisfies each of the requirements set forth in section 1129(a)(9) of the Bankruptcy Code.

**N.    At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).**

77.    Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider," as an alternative to the requirement under

---

[98]   11 U.S.C. § 1129(a)(9)(B).

[99]   11 U.S.C. § 1129(a)(9)(C).

section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept

the plan or be unimpaired under the plan.[100]

78.     As set forth above, Holders of Claims in Classes 4, 5, and 6—which are Impaired

Classes under the Plan—unanimously voted to accept the Plan independent of any insiders'

votes.[101]    Thus, the Debtors respectfully submit that the Plan satisfies the requirements of

section 1129(a)(10) of the Bankruptcy Code.

### O.    The Plan Is Feasible (§ 1129(a)(11)).

79.     Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find

that a plan is feasible as a condition precedent to confirmation.    Specifically, the court must

determine that:

> Confirmation of the plan is not likely to be followed by the
> liquidation, or the need for further financial reorganization, of the
> debtor or any successor to the debtor under the plan, unless such
> liquidation or reorganization is proposed in the plan.[102]

To demonstrate that a plan is feasible, it is not necessary that success be guaranteed; rather, a

debtor must demonstrate a reasonable assurance that consummation of the plan will not likely be

followed by a further need for financial reorganization.[103]    As demonstrated below, the Plan is

feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.

---

[100] 11 U.S.C. § 1129(a)(10).

[101] *See* Voting Report, Ex. A.

[102] 11 U.S.C. § 1129(a)(11).

[103] *See Johns-Manville*, 843 F.2d at 649 ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *see also Briscoe*, 994 F.2d at 1166 ("Only a reasonable assurance of commercial viability is required." (citation omitted)); *In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 833 (Bankr. E.D. Pa. 1995) (finding plan is feasible "so long as there is a reasonable prospect for success and a reasonable assurance that the proponents can comply with the terms of the plan"); *Mut. Life Ins. Co. of N.Y. v. Patrician St. Joseph Partners Ltd. P'ship* (*In re Patrician St. Joseph Partners Ltd. P'ship*), 169 B.R. 669, 674 (Bankr. D. Ariz. 1994) ("A plan meets this feasibility standard if the plan offers a reasonable prospect of success and is workable." (citation omitted)).

80.    In determining standards of feasibility, courts in this jurisdiction and others have identified the following probative factors:

   a.    the adequacy of the capital structure;

   b.    the earning power of the business;

   c.    the economic conditions;

   d.    the ability of management;

   e.    the probability of the continuation of the same management; and

   f.    any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[104]

81.    First, as set forth in Article VIII, section 8.4 of the Disclosure Statement, the Debtors thoroughly analyzed their ability post-confirmation to meet their obligations under the Plan and continue as a going concern without the need for further financial restructuring.  The Debtors have concluded based on their analysis that they will be able to make all payments required under the Plan while conducting ongoing business operations.  This is not surprising and is indisputable given that the Debtors' Plan provides for a massive reduction in debt and interest expense *and* for the Debtors' obtaining approximately $368 million–$403 million in financing through entry into the Exit ABL Facility, the Exit New Money Facility, the New First Lien Term Loan, and the New Junior Loan.

82.    Second, as set forth in the Disclosure Statement, the Debtors prepared projections of the Debtors' financial performance through fiscal year 2022.  These financial projections

---

[104] *See, e.g.*, *WorldCom*, 2003 WL 23861928, at *58; *Texaco*, 84 B.R. at 910; *In re Prudential Energy Co.*, 58 B.R. 857, 862-63 (Bankr. S.D.N.Y. 1986); *see also Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co.* (*In re U.S. Truck Co.*), 800 F.2d 581, 589 (6th Cir. 1986); *In re Repurchase Corp.*, 332 B.R. 336, 342 (Bankr. N.D. Ill. 2005).

demonstrate the Debtors' ability to meet their obligations under the Plan and to have a viable business going forward. Thus, the Debtors respectfully submit that the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.[105]

**P.    All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12))**.

83.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 of the United States Code, as determined by the court at the hearing on confirmation of the plan."[106] The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article II.E of the Plan provides that all such fees and charges, to the extent not previously paid, will be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

**Q.    All Retiree Benefits Will Continue Post-Confirmation (§ 1129(a)(13))**.

84.    Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits to continue post-confirmation in accordance with section 1114 of the Bankruptcy Code. Article V.E of the Plan provides that from and after the Effective Date, all retiree benefits, as defined in section 1114 of the Bankruptcy Code, will continue in the ordinary course in accordance with applicable law. Accordingly, the Debtors respectfully submit that the Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

**R.    Sections 1129(a)(14) Through 1129(a)(16) Do Not Apply to the Plan**.

85.    Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.[107] Because the Debtors are not subject to any domestic support obligations,

---

[105] *See* Riesbeck Decl., ¶¶ 23-25.

[106] 11 U.S.C. § 1129(a)(12); *see also* 28 U.S.C. § 1930.

[107] *See* 11 U.S.C. § 1129(a)(14).

the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply.  Likewise,

section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an

"individual" as defined in the Bankruptcy Code.[108]  Because none of the Debtors is an "individual,"

the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply.  Finally, each of the

Debtors are a commercial corporation and, therefore, section 1129(a)(16) of the Bankruptcy Code,

which provides that property transfers by a corporation or trust that is not a moneyed, business, or

commercial corporation or trust be made in accordance with any applicable provisions of

nonbankruptcy law, is not applicable to the Chapter 11 Cases.[109]   Accordingly, the Debtors

respectfully submit that the Plan satisfies the requirements of section 1129(a)(14)–(16) of the

Bankruptcy Code.

> **S.     The Plan Satisfies the "Cramdown" Requirements of Section 1129(b) of the
> Bankruptcy Code.**

86.    Section 1129(b)(1) of the Bankruptcy Code provides that if all applicable

requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8), a

plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy

Code are satisfied.[110]  To confirm a plan that has not been accepted by all impaired classes (thereby

failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that

the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-

accepting impaired classes.[111]   No party has objected on the basis that the Plan either

---

[108] 11 U.S.C. § 1129(a)(15).

[109] 11 U.S.C. § 1129(a)(16).

[110] *See* 11 U.S.C. § 1129(b).

[111] *See* 11 U.S.C. § 1129(b)(1); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999) (explaining that "[w]here a class of creditors or shareholders has not accepted a plan of reorganization, the court shall nonetheless confirm the plan if it 'does not discriminate unfairly and is fair and equitable.'").

"discriminates unfairly" or is not in fact "fair and equitable" and all of the Impaired Classes of

Claims entitled to vote on the Plan have voted in favor of the Plan.

> **1.    The Plan Does Not Unfairly Discriminate with Respect to Impaired Classes That Have Not Voted to Accept the Plan (Section 1129(b)(1)).**

87.    The Plan does not discriminate unfairly with respect to the impaired classes that

have been deemed to reject the Plan.  Although the Bankruptcy Code does not provide a standard

for determining when "unfair discrimination" exists, courts typically examine the facts and

circumstances of the particular case to make the determination.[112]  Generally, courts have held that

a plan unfairly discriminates in violation of section 1129(b) only if similarly situated claims

receive materially different treatment without a reasonable basis for the disparate treatment.[113]  A

plan does not unfairly discriminate where it provides different treatment to two or more classes

that are comprised of dissimilar claims or interests.[114]  Likewise, there is no unfair discrimination

if, taking into account the particular facts and circumstances of the case, there is a reasonable basis

for the disparate treatment.[115]

88.    Here, the Plan's treatment of the Impaired Classes that have been deemed to reject

the Plan is proper because all similarly situated Claims and Interests will receive substantially

---

[112] *See In re 203 N. LaSalle St. Ltd. P'ship.*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, *Bank of Am.*, 526 U.S. 434 (1999) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established."); *see also In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does so [unfairly] discriminate is to be determined on a case-by-case basis."); *see also In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[113] *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 228 (Bankr. D.N.J. 2000) (noting that one of the "the hallmarks of the various tests" is "whether there is a reasonable basis for the discrimination . . . .").

[114] *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 655 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987); *aff'd sub nom.*, *Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[115] *Aztec Co.*, 107 B.R. at 590.

similar treatment, there is a reasonable basis for those Claims and Interests being classified separately from other Claims and Interests that remain Unimpaired, and the Plan's classification scheme rests on a legally acceptable rationale.  No unfair discrimination exists (i) between General Unsecured Creditors in Class 7, which are Unimpaired, and Intercompany Claims in Class 8, which can be Impaired, and (ii) between Equity Interests in Holdings in Class 9, which are Impaired, and Intercompany Interests in Class 10, which can be Unimpaired.  The Debtors separately classified Intercompany Claims from other unsecured claims and Intercompany Interests from other interests based on ownership in the Plan to preserve the option to either Reinstate, compromise, or cancel these Claims and Interests.  Such treatment allows the Debtors greater flexibility to determine whether it is more efficient to maintain their organizational structure and certain entity relationships when they are implementing the Restructuring Transactions rather than prior thereto. Significantly, the optionality does not affect the stakeholders' recovery under the Plan and is intended for only administrative convenience in the restructuring process.    Accordingly, the Plan does not discriminate unfairly with respect to the Impaired Classes that have been deemed to reject the Plan and satisfies the requirements of 1129(b).

### 2.    The Plan Is Fair and Equitable with Respect to the Impaired Deemed Rejecting Classes (Section 1129(b)(2)).

89.    For a plan to be "fair and equitable" with respect to an impaired class of unsecured claims or interests that rejects a plan (or is deemed to reject a plan), the plan must follow the "absolute priority" rule and satisfy the requirements of section 1129(b)(2).[116]   Generally, this

---

[116] 11 U.S.C. § 1129(b)(2)(B)(ii); 11 U.S.C. § 1129(b)(2)(C)(ii); *see also 203 N. LaSalle*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii). That latter condition is the core of what is known as the 'absolute priority rule.'").

requires that an impaired rejecting class of claims or interests either be paid in full or that a class

junior to the impaired rejecting class not receive any distribution under a plan on account of its

junior claim or interest.[117]

90.     The only Class of Claims junior to the Impaired deemed rejecting Class 9 (Equity

Interests in Holdings) that may receive any recovery under the Plan is Class 10 (Intercompany

Interests).  But to the extent this Class receives any recovery at all, it is simply to maintain the

Debtors' prepetition organizational structure for the administrative benefit of the Reorganized

Debtors and has no economic substance, as explained above.  Courts have recognized that such

technical preservations for the purpose of corporate formalities do not violate the absolute priority

rule.[118]  Accordingly, the Plan is "fair and equitable" with respect to all Impaired Classes of Claims

and Interests and satisfies section 1129(b) of the Bankruptcy Code.

**T.     The Debtors Complied With Section 1129(d) of the Bankruptcy Code**.

91.     The purpose of the Plan is not to avoid taxes or the application of section 5 of the

Securities Act of 1933.[119]  Article II.D of the Plan contemplates the full payment of all priority tax

claims.   Moreover,  no  governmental  unit  or  any  other  party  has  requested  that  the

Bankruptcy Court decline to confirm the Plan on such grounds.  Accordingly, the Plan satisfies

the requirements of section 1129(d) of the Bankruptcy Code.

**U.     Good Cause Exists to Waive the Stay of the Confirmation Order**.

92.     Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until

the  expiration  of  14  days  after  the  entry  of  the  order,  unless  the  Bankruptcy  Court  orders

---

[117] *See 203 N. LaSalle*, 526 U.S. at 459.

[118] *See In re ION Media Networks, Inc.*, 419 B.R. 585, 661 (Bankr. S.D.N.Y. 2009) ("This technical preservation of equity is a means to preserve the corporate structure that does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan.").

[119] 15 U.S.C. § 77e.

otherwise."[120]  Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.[121]  Each rule also permits modification of the imposed stay upon court order.[122]

93.    The Debtors submit that good cause exists for waiving and eliminating any stay of the proposed confirmation order pursuant to Bankruptcy Rules 3020, 6004, and 6006, so that the proposed confirmation order will be effective immediately upon its entry.[123]  The restructuring contemplated by the Plan was vigorously negotiated among sophisticated parties, and has been accepted by the Voting Classes.  Further, each day the Debtors remain in chapter 11 they incur significant administrative and professional costs—expenses that are unnecessary in light of the unanimous support for the Plan among the Voting Classes.  Importantly, not a single creditor in a Voting Class voted to reject the Plan.  Accordingly, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the proposed confirmation order may be effective immediately upon its entry.

---

[120] Fed. R. Bankr. P. 3020(e).

[121] Fed. R. Bankr. P. 6004(h), 6006(d).

[122] *Id.*

[123] *See, e.g.*, *In re Chemtura Corp.*, No. 09-11233 (REG) (Bankr. S.D.N.Y. Nov. 23, 2010) (shortening the Bankruptcy Rule 3020(e) period due to the significant expense to the debtors' estates in delaying the effectiveness of the plan); *In re Extended Stay Inc.*, No. 09-13764 (JMP) (Bankr. S.D.N.Y. July 20, 2010) (waiving stay under Bankruptcy Rule 3020(e)); *In re Penton Bus. Media Holdings, Inc.*, No. 10-10689 (AJG) (Bankr. S.D.N.Y. Mar. 5, 2010) (waiving the stay in Bankruptcy Rule 3020(e) in light of support for the plan by voting classes); *In re Oldco M. Corp.*, No. 09-13412 (MG) (Bankr. S.D.N.Y. Feb. 23, 2010) (waiving the stay imposed by Bankruptcy Rule 3020(e) to permit a distribution trustee to commence its duties as quickly as practicable).

III.     **Prolonged Chapter 11 Cases Are Untenable**

A.     **Limited Liquidity**

94.     Preserving value for the benefit of the Debtors' estates depends in large part on the Debtors proceeding swiftly to confirmation of the Plan and minimizing the effects of the Debtors' chapter 11 cases on the value of the Debtors' brand—a critical component of the value of the Debtors' businesses.  Due to the fact that retail customer sentiment shifts rapidly and stakeholders (including key suppliers and landlords) often turn swiftly against apparel and retail debtors, such debtors often do not fare well in bankruptcy—in many instances electing to liquidate as opposed to reorganize.  The Debtors intend to swiftly consummate the Restructuring Transactions and maximize the value of that achievement for enterprise-wide stakeholders.

95.     Every minute the Debtors remain in bankruptcy longer than is necessary would pose significant issues for the Debtors' liquidity and their value as a going concern.  All chapter 11 cases inherently raise costly administrative expenses that the Debtors cannot afford here.  As detailed in the Riesbeck Declaration, the Debtors may lack sufficient liquidity to operate their business unless the Plan is consummated as soon as possible.  Failure to obtain confirmation on this timeline would have a severe effect on the Debtors' operational cash flow, require the Debtors to negotiate costly debtor-in-possession financing, and may jeopardize the agreement contemplated by the Restructuring Support Agreement and reflected in the Plan.  The incurrence of a debtor in possession facility would require an adjustment of the contemplated exit financing, valuation analysis, and recoveries under the Plan necessitating resolicitation of an amended Plan and Disclosure Statement.  Additionally, every day the Debtors remain in chapter 11 cases would substantially increase the Debtors professional fees.

96.     Moreover, a longer chapter 11 process does not provide any meaningful benefit to the Debtors' Estates.  If confirmed on the Petition Date, the Plan will accomplish precisely what

66

chapter 11 is intended to accomplish—an expeditious reorganization that maximizes estate value for the benefit all stakeholders. Each of the key stakeholders were heavily involved in formulating the Plan, all parties in interest received multiple forms of notice of these Chapter 11 Cases and their proposed treatment under the Plan in accordance with the notice periods required by the Bankruptcy Code, the Local Bankruptcy Rules for the Southern District of New York, and the *Amended Procedural Guidelines for Prepackaged Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of New York*, as amended, effective June 27, 2013 (as adopted by General Order M-387). However, as evidenced by the Disclosure Statement, the Riesbeck Declaration, and the reasons discussed herein, a longer chapter 11 process presents only risk, and no benefit, to the Debtors' Estates.

### B. Vendors and Contract Counterparties

97. Although the Debtors operate all of their businesses within the United States, approximately 64% of the Debtors' vendors and inventory and merchandise sources are located abroad. These creditors may, and likely do, lack minimum contacts with the United States. Although section 362(a) of the Bankruptcy Code provides that the filing of a chapter 11 petition "operates as a stay applicable to all entities," regardless of where the debtor's assets are located, the power to enforce this Bankruptcy Court's jurisdiction against an entity without a presence in the United States could present certain practical challenges. As a practical matter, prepetition, certain trade vendors required deposits totaling in the millions as a condition of continued shipment of merchandise. Delay of confirmation may exacerbate these parties' concerns about the financial health of the Debtors, causing such parties to demand additional deposit amounts. Similarly, cash-on-demand requests would require increased liquidity at purchase that would otherwise be used to secure additional fresh inventory included in the Debtors' borrowing base for purposes of calculating availability. Foreign trade partners may also take adverse actions against the Debtors

that would devastate their go-forward business and ability to operate successfully in the United States, triggering liquidity constraints.    Confirmation of the Debtors' Plan is necessary to maintaining such vendors' confidence in the Debtors' restructuring.    For the reasons stated herein, the Debtors request confirmation of the Plan on the Petition Date.

[*Remainder of page intentionally left blank.*]

## **Conclusion**

98.    For all of the reasons set forth herein and in the Abramson Declaration, DelConte

Declaration, Riesbeck Declaration, and the Arel Declaration, the Debtors respectfully request that

the Bankruptcy Court approve the Disclosure Statement and confirm the Plan as fully satisfying

all of the applicable requirements of the Bankruptcy Code by entering the Proposed Confirmation

Order, overruling the objections, and granting such other and further relief as is just and proper.

Dated:  February 3, 2019                    */s/ Jonathan S. Henes, P.C.*
New York, New York                    Jonathan S. Henes, P.C.
                                                   George Klidonas
                                                   Rebecca Blake Chaikin
                                                   Gene Goldmintz
                                                   **KIRKLAND & ELLIS LLP**
                                                   **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                                   601 Lexington Avenue
                                                   New York, New York 10022
                                                   Telephone:    (212) 446-4800
                                                   Facsimile:    (212) 446-4900

                                                   -and-

                                                   Emily E. Geier (*pro hac vice* admission pending)
                                                   **KIRKLAND & ELLIS LLP**
                                                   **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                                   300 North LaSalle
                                                   Chicago, Illinois 60654
                                                   Telephone:    (312) 862-2000
                                                   Facsimile:    (312) 862-2200

                                                   *Proposed Counsel for the Debtors and Debtors in Possession*